Kevin E. O'Malley (006420)
Hannah H. Porter (029842)
Gallagher & Kennedy
2575 E. Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone: 602.530.8000
Facsimile: 602.530.8500
Email: kevin.omalley@gknet.com
Email: hannah.porter@gknet.com

Steven M. Gombos (pending *pro hac vice*)
Virginia State Bar No. 30788
Gombos Leyton, PC
11350 Random Hills Road #400
Fairfax, Virginia 22030
Telephone: 703.934.2660
Facsimile: 703.934.9840
Email: sgombos@glpclaw.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Grand Canyon University, | No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Phil Rosenfelt, in his Official Capacity as Acting Secretary of the United States Department of Education, and the United States Department of Education, | |
| Defendants. | |

**COMPLAINT AND PRAYER FOR RELIEF**

Grand Canyon University ("GCU") files this Complaint against Phil Rosenfelt, in his official capacity as acting Secretary of the United States Department of Education and the United States Department of Education ("Department") (collectively "Defendants") as follows:

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

**OVERVIEW OF ALLEGATIONS**

1.      Grand Canyon University (GCU) is a private Christian university in Phoenix, Arizona. From its inception in 1949 until 2004, GCU operated as an Arizona nonprofit institution, which best reflects GCU's approach. But when the University faced financial challenges in the early 2000s, GCU's trustees approved the sale of the University to a for-profit company, Grand Canyon Education (GCE), which could leverage capital markets and raise money to keep the University operating. (*See* ¶¶ 22-25).

2.       With increased access to capital and under new leadership starting in 2008, GCU rebounded.  On sound financial footing, and after establishing a strong educational model, GCU's independent Board of Trustees began considering a return to the University's historical nonprofit status. They concluded that reverting to nonprofit status would better align GCU with its Christian mission and allow the University and its students, faculty and staff to participate in academic, co-curricular, and governance opportunities with peer institutions, and provide grant writing and research opportunities for faculty and students. (*See* ¶¶ 26-38).

3.      GCU's independent Board of Trustees formed a new entity ("new GCU"), which purchased the University from GCE.  After years of planning and negotiations aided by sophisticated lawyers, accountants, and valuation and financial experts, new GCU sought nonprofit recognition from the IRS, the State of Arizona, and GCU's accreditor.  (*See* ¶¶ 39-45).

4.      After completing rigorous application processes, the IRS and GCU's accreditor both approved GCU's nonprofit status based on the proposed structure of the sale of the university and the terms of a services agreement between GCE and new GCU. Under that agreement, GCU would pay GCE a share of its revenue in exchange for educational support services.  New GCU and GCE negotiated the services agreement and considered agreements used by other nonprofit institutions, which are expressly permitted

by the Department.  (*See* ¶¶ 46-81).

5.     Nonetheless, the Department refuses to recognize GCU as a nonprofit, citing the services agreement as its primary reason.  Under the Department's regulatory framework, an institution is a nonprofit if it is a recognized by the IRS as a 501(c)(3).  Because, unlike the IRS, the Department has no generally applicable regulations or standards explaining how an institution can obtain recognition as a nonprofit, it has traditionally accepted the IRS determination.  (*See* ¶¶ 82-148, 149-97).

6.     Now, rather than engaging in notice and comment rulemaking that would notify institutions of additional requirements, the Department makes subjective determinations in the absence of generally applicable standards or discernable principles.  Stated differently, the Department decides at whim whether to recognize an institution as a nonprofit for Title IV purposes.  That method has resulted in disparate outcomes for materially similar transactions.  (*See* ¶¶ 198-222).

7.     As applied to GCU, the Department's "nonprofit determination" exceeds its express regulatory authority.  By law, the Department cannot interfere in an institution's internal operational decisions.  Its own regulations expressly allow institutions to contract for the services GCE provides under the service agreement.  The Department has allowed other nonprofit institutions to enter materially similar service agreements with for-profit companies without question. It offers no explanation for why GCU is treated differently from those institutions.  As such, the Department's refusal to acknowledge GCU's nonprofit status for Title IV purposes denied GCU fundamental fairness and is arbitrary and capricious.  (*See* ¶¶ 223-320).

**INTRODUCTION**

8.     This action is filed to remedy the Department's arbitrary and capricious decision to deny nonprofit status to GCU.  By the time of the Department's denial, the Internal Revenue Service ("IRS") had already approved GCU as a tax-exempt nonprofit

pursuant to 26 U.S.C. § 501(c)(3). Under the Department's regulations, the IRS's approval is determinative for purposes of GCU's participation in federal student aid programs authorized under Title IV of the Higher Education Act of 1965, as amended ("Title IV"). The Department has long deferred to the IRS in deciding whether or not to approve an institution as a nonprofit institution. Nonetheless, without notice to GCU or other regulated institutions, and without any acknowledgement or justification for doing so, the Department summarily reversed its policy of deference to the IRS and denied GCU's nonprofit status for Title IV purposes.

9.      The Department's primary stated basis for denying GCU's nonprofit status was GCU's relationship with a company that provides services in exchange for a percentage of GCU's revenue. But the Department has approved other nonprofit institutions that use materially similar arrangements. Moreover, the Department's regulations expressly allow these relationships, which are common among institutions of higher education. In fact, some nonprofits pay as much as 80 percent of their revenue under such arrangements. GCU pays far less under its service agreement. Nonetheless, the Department recognizes the nonprofit status of the other institutions but denied it to GCU. In doing so, the Department provided no justification for its sudden change in position or its disparate treatment of GCU.

10.      Instead, in a November 6, 2019 decision letter and a January 12, 2021 letter reaffirming that decision as to a proposal to modify the service agreement (collectively, "Decisions") the Department notified GCU that, although the Department approved the change in ownership from GCE (a for-profit entity) to GCU (a nonprofit entity), it would continue to treat the university as a for-profit institution for purposes of Title IV programs.

11.      The Department currently treats GCU as a for-profit institution. This treatment subjects GCU to requirements only applicable to for-profit institutions while

1   denying it the benefits of being recognized as a nonprofit institution.[1]  No less important,

2   the Department has barred GCU from publicly referring to itself properly as a nonprofit

3   institution.  The Department's regulations do not provide GCU an appeal of the denial of

4   its nonprofit status.  Thus, the Decisions are final agency actions subject to review under

5   the Administrative Procedure Act.  5 U.S.C. § 706.

6          12.     The Department's Decisions are arbitrary and capricious for several reasons:

7          a.   The Decisions exceed the Department's legal authority.  Under the

8   Department's regulations and consistent with its long-standing practice, GCU's

9   approval as a 501(c)(3) nonprofit conclusively establishes its nonprofit status for Title

10  IV purposes.  The Decisions are inconsistent with the position the Department has

11  historically taken with respect to similar for-profit to nonprofit conversions.

12         b.   Even assuming the Department may second guess GCU's nonprofit status,

13  its authority under the definition the Department cites is limited to whether an

14  institution is owned and operated by one or more nonprofit organizations, and whether

15  the net earnings benefit any individual.  But the Department's Decisions exceeded that

16  limited review by applying the IRS's operational test, which the Department's

17  regulations commit to the sole discretion of the IRS.

18         c.   Finally, the Decisions are arbitrary and capricious because they considered

19  irrelevant evidence and failed to consider relevant evidence.  For example, (a) the

20  Department's analytical approach improperly focused on the impact of the Transaction

21  from the perspective of GCE, a separate and independent entity; (b) the Department's

---

[1] For example, the Department's definition of GCU as a proprietary institution was
applied for the purposes of Coronavirus Response and Relief Supplemental
Appropriations Act, 2021 (CRRSAA), Public Law 116-260, signed into law by President
Donald J. Trump on Dec. 27, 2020.  The CRRSAA created Higher Education Emergency
Relief Fund II (HEERF II) which allocated 89% of relief funds to private nonprofit
institutions, while only allocating 3% to proprietary institutions.  Further, private
nonprofits were granted more flexibility in the use of the funds because those schools
were given both a student aid portion and an institutional portion in the funding.

analysis relied on foundational factual and mathematical errors; (c) the Department failed to consider the benefits of the Transaction to GCU's students, faculty, staff, and community; (d) the Department ignored relevant evidence demonstrating the fair-market value of the revenue share paid to GCE under a Master Services Agreement and the below fair-market value purchase price GCU paid to GCE for the assets transferred in the Transaction; (e) the Department failed to identify compelling evidence to contradict the substantial documentation provided by GCU showing the fairness and legitimacy of the Transaction; and (f) the Department exceeded its authority by basing its denial, in part, on the fact that GCU's president also serves as GCE's CEO, which has been knowingly authorized and approved (with appropriate safeguards to avoid disqualifying conflicts of interest)  by GCU's independent Board of Trustees and accreditor and has no relevancy to the question of whether the net earnings of GCU benefit any private shareholder or individual.

13.     The Department's approach epitomizes arbitrary and capricious action.  The Department has no articulated standards for how it evaluates nonprofit status.  Eschewing consistency, established reliance interests, and the need to provide notice to the regulated field regarding its dramatic policy shift, the Department instead adopted an ad-hoc approach to its consideration of an institution's change to nonprofit status.

14.     Prior to the Transaction, GCU was one of the largest institutions of higher education in the country.  GCU retained multiple accounting firms, financial advisors, tax professionals, corporate and nonprofit counsel, regulatory counsel, real estate counsel, appraisal firms, and others to ensure that the Transaction was fair to GCU and its educational mission and that it complied with Department requirements.  The Transaction was modeled on similar transactions and various online platform management agreements that had already been approved by the Department.  However, despite relying on many experienced professional advisors and prior Department approvals, GCU could not

1    anticipate the Department's disparate treatment of GCU and its arbitrary abandonment of

2    its standard of deference to the IRS.   If GCU and its teams of advisors and experts could

3    not anticipate the standards the Department would use, no one can.

4        15.    GCU seeks a declaration from this Court that: a) GCU is a nonprofit

5    institution for purposes of Title IV programs; b) GCU is entitled to be regulated as a

6    nonprofit institution; and 3) GCU is entitled to refer to itself publicly as a nonprofit

7    institution for all purposes including, without limitation, Title IV purposes.

8                                    **PARTIES**

9        16.    GCU is a tax-exempt, nonprofit corporation under section 501(c)(3) of the

10   Internal Revenue Code ("IRC"), duly incorporated as a nonprofit corporation in the State

11   of Arizona, with its principal place of business at 3300 West Camelback Road - Phoenix,

12   AZ 85017.

13       17.    Mr. Phil Rosenfelt is the acting Secretary of the Department. He is being

14   sued in his official capacity in which he has overall responsibility for the operation and

15   management of the Department. Mr. Rosenfelt, as Secretary, is responsible for the

16   Department's acts and omissions alleged in the complaint even if he was not personally

17   involved. His official address is 400 Maryland Avenue, S.W., Washington, D.C. 20202.

18       18.    The Department is an executive agency of the United States Government.  It

19   was created by the Department of Education Organization Act of 1979, 20 U.S.C. § 3401

20   et seq., Pub. L. No. 96-88, 93 Stat. 668. The Department is headquartered at 400

21   Maryland Avenue, S.W., Washington, D.C. 20202.

22                           **JURISDICTION AND VENUE**

23       19.    This action arises under the Higher Education Act of 1965, 20 U.S.C. §

24   1001, et seq. ("HEA"). This Court has subject-matter jurisdiction over this action under 28

25   U.S.C. § 1331 because it is a case arising under federal law.

26

20.     The Court is authorized to issue the nonmonetary relief sought herein pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 553, 706 ("APA").

21.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(l) because this is an action against the United States, an officer of the United States, and an agency of the United States. A substantial part of the events or omissions giving rise to this action occurred in this judicial district. Plaintiff resides in this judicial district. No real property is involved in the action.

## FACTUAL ALLEGATIONS

### A.     Background

22.     GCU is a private, nonprofit Christian university located in Phoenix, Arizona.  It currently educates over 22,000 students on its ground campus and approximately 85,000 students through online education programs.

23.     Initially founded in 1949 as a nonprofit corporation, GCU operated as a nonprofit for its first 55 years.

24.     In the face of financial difficulties in the early 2000s, however, GCU's trustees authorized the sale of the university to a for-profit entity named Significant Education, LLC.  Significant Education, LLC later changed its name to Grand Canyon Education, Inc ("GCE").

25.     After becoming a publicly traded institution in 2008, GCU gained access to capital that was invested into educational infrastructure that allowed the university to grow and return to solid financial footing.

26.     Under GCE's ownership, GCU thrived, and **all** profits GCU generated— approximately $1.2 billion—were invested back into the school for the development of new classrooms, laboratories, residence halls, student amenities, athletic facilities, and advanced technologies (including a state-of-the-art online learning platform).

27.     While GCU was organized as a for-profit corporation under GCE's ownership, it operated like a nonprofit organization, with all profits reinvested back into supporting its educational mission. As a publicly traded company, GCE never declared or paid dividends, meaning no student tuition dollars ever went to shareholders.

28.     That investment directly benefited GCU's students and allowed GCU to provide high-quality education at affordable tuition rates without any increases in tuition on its ground campus and only nominal increases for its online campus for well over a decade.

29.     Indeed, despite GCE's substantial investment in the school, GCU has not increased its tuition costs on its ground campus in 13 years—a rarity for any university.

30.     Maintaining low tuition costs has allowed GCU to eliminate economic barriers for students, which has resulted in the creation of a diverse student body on GCU's Phoenix campus (around 47% percent of which are students of color).  It has also contributed to GCU's appeal to college-ready undergraduate students (GCU's incoming student body has an average cumulative high school GPA of over 3.5).

31.     GCU's ability to offer a quality, private Christian education at prices that are affordable to many students has made it a resounding success, while making a positive impact in the broader Phoenix community.  For example, GCU has partnered with stakeholders in its surrounding community to help revitalize one of the most impoverished communities in the City of Phoenix.  As part of this commitment, GCU entered into a $2.2 million 11-year partnership with the City of Phoenix Police Department.  In that time, the community benefited from a significant decline in property and violent crimes.

32.     GCU has also partnered with Habitat for Humanity to raise $3.3 million and contribute more than 25,000 volunteer hours to renovate 317 homes in its community.

33.     The University established centers called Learning Lounges® in the community that offer free in-person and online tutoring and mentoring to more than 4,700

1   English and Spanish speaking K-12 students in the Phoenix area.  GCU has awarded 386

2   full-tuition scholarships to low-income students through the program.

3          34.     GCU provides significant job opportunities in Phoenix.  In addition to the

4   thousands of jobs created on its campus, the University has launched several new business

5   enterprises providing management opportunities for recent graduates and employment

6   opportunities for hundreds of current students and local residents. Revenues from those

7   enterprises are reinvested to help GCU's efforts to limit tuition increases.

8          35.     Recently, GCU opened a regional point-of-dispensing site for the Pfizer

9   coronavirus vaccine.  GCU recognized it could reduce the burden of local and state health

10  systems, so it worked with county public health to determine the populations with the

11  greatest need and mobilized its infrastructure to help those communities.  With the help

12  over 100 volunteers a day and other local volunteer medical staff, GCU has been able to

13  administer 800 to 1,000 vaccinations per day.

14          **B.     GCU Converts Back to Nonprofit Status**

15          36.     Having returned to stable financial footing, GCU began exploring a return to

16  its historical nonprofit status in 2011.

17          37.     Nonprofit status best reflects what GCU has always been and continues to

18  be:  a Christian university with a mission to prepare learners to become global citizens,

19  critical thinkers, effective communicators, and responsible leaders by providing an

20  academically challenging, values-based curriculum from the context of its Christian

21  heritage.

22          38.     Nonprofit status for Title IV purposes provides important and substantial

23  benefits to GCU.  Returning to nonprofit status puts GCU on equal footing with other

24  major universities by facilitating philanthropic giving, ensuring its students and faculty

25  have the same access to research opportunities and grants as other universities.  The

26  Department's Decision and order that GCU no longer hold itself out as a nonprofit

institution substantially hinders GCU's ability to obtain these benefits. And the Department's gag order preventing GCU from communicating its nonprofit status creates confusion among the public as to nature of the University and its activities.

### The Transaction

39.     GCU publicly announced its intent to convert to nonprofit status in 2014.  In furtherance, GCU and GCE agreed that GCU would purchase the real property comprising the GCU campus as well as tangible and intangible academic-related assets (including the GCU name) from GCE (the "Transaction").[2]  Additionally, GCE would provide services to GCU in exchange for fees paid pursuant to a Master Services Agreement ("MSA").

40.     GCU is governed by an independent and autonomous Board of Trustees. The Chairman of the Board, an attorney and GCU alumnus, on behalf of the Board of Trustees, led the negotiation of the terms of the acquisition of the University from GCE with the assistance of outside legal and financial advisors.

41.     The sophisticated financial and legal advisors included:

a.     Well Fargo Securities, LLC, an independent financial advisor that assessed GCU's credit agreement with GCE and confirmed the negotiated interest rate was at fair market value;

b.     Deloitte, LLP, an independent tax advisor that completed a Transfer Pricing Study confirming the services GCE provides under the MSA support the negotiated revenue share;

---

[2] The Transaction was structured between GCE (the selling entity) and an Arizona tax-exempt organization known as Gazelle University ("Gazelle") (the purchasing entity) which was granted tax-exempt status by the IRS prior to the Transaction.  After the Transaction, Gazelle changed its name to Grand Canyon University.  For ease of reference, the Complaint will refer to Grand Canyon University or GCU instead of Gazelle.

1           c.     Gallagher & Kennedy and Cooley, LLP, two independent law firms

2    that assisted with the negotiations and analysis of the legal and regulatory terms of

3    the transaction;

4           d.     Johnson Valuation, Inc., an independent valuation expert that valued

5    the tangible personal property assets transferred in the Transaction; and

6           e.     RP Valuation Group, LLC and Hurd and Associates, Inc., two

7    independent valuation experts that valued the real property transferred in the

8    Transaction.

9        42.     The valuation experts GCU engaged collectively valued the acquired assets

10   at $1.2 billion—approximately $323 million more than the purchase price paid.

11       43.     In negotiating the MSA in particular, GCU reviewed numerous service

12   agreements between approved nonprofit institutions and for-profit organizations.

13       44.     This was done to make sure the terms of the agreements between GCU and

14   GCE aligned with industry standards and to ensure there would be no issues with

15   obtaining the Department's approval of the transaction, which was necessary to continue

16   the university's participation in federal student aid programs.

17       45.     Prior to the closing, the transaction was also reviewed and approved by

18   GCU's regional accreditor, the Higher Learning Commission (HLC), and GCU's State

19   accreditor, the Arizona State Board for Private Postsecondary Education (AZPPSE)—both

20   of which approved the transaction and recognized GCU as a nonprofit organization.

21          **GCU Follows IRS, HLC and Department Requirements in Obtaining**
            **Nonprofit Status**
22

23       46.     On October 8, 2015, GCU submitted its application to the IRS for 501(c)(3)

24   nonprofit status (Form 1023) with a request for expedited review.

25       47.     GCU's comprehensive IRS Form 1023 provided detailed information about

26   the proposed transaction including key aspects later reviewed by the Department.

48.     The Form 1023 included:

    a.      draft agreements, including the MSA, asset purchase agreement, and credit agreement;

    b.      details about the roles of key executives, including that GCE's CEO, Brian Mueller, would also serve as GCU's president;

    c.      corporate documents for GCU and GCE, including GCU's conflict of interest policies; and

    d.      details about GCU's history and structure.

49.     On November 20, 2015, GCU received its IRS determination letter (dated November 9, 2015) approving its 501(c)(3) nonprofit status.

50.     After the Transaction closed on July 1, 2018, the IRS issued an affirmation letter, dated August 31, 2018, confirming GCU's tax-exempt status.

51.     Between GCU's 2015 IRS application and the Transaction date, there were minor changes to the financial terms of the Transaction.  Later pricing studies and third-party valuations had not yet been completed because the transaction had not been completed at the time of the application.  GCU initiated these studies for the purpose of informing pricing for the acquisition of GCU and finalizing the terms of the MSA.

52.     After working through the IRS review process, GCU approached its accrediting agency, the Higher Learning Commission ("HLC"), to obtain its approval of the Transaction.

53.     HLC initially denied GCU's request for approval on the basis that it lacked guidelines at that time regarding the permissibility of service agreements between accredited universities and outside service providers.

54.     But in 2017, HLC changed these guidelines and invited GCU to reapply for approval of the Transaction.

55.     GCU submitted its updated application to HLC in August 2017.  The application included the proposed MSA, asset purchase agreement, and credit agreement. It also described Mr. Mueller's dual roles with GCE and GCU.  The application further included GCU's conflict of interest policy and explained measures put in place to ensure GCU's independent control over the University.

56.     The application process involved a multi-day campus visit from HLC staff, which included numerous interviews with key GCU personnel and allowed HLC to thoroughly investigate any concerns it may have had about the specifics of the Transaction and potential effects on GCU's educational programs.

57.     This process is critical because HLC ensures quality of education and services will not suffer as a result of the Transaction.  The Department recognizes this expertise.

58.     While the application with HLC was pending, GCU began the Department's pre-acquisition review process.

59.     An institution that anticipates a change in ownership or control may apply to the Department for pre-acquisition review. This allows the Department to review the details of the proposed change of ownership or control and identify any issues before the transaction closes.  As part of the pre-acquisition review, the Department determines whether it will impose any additional requirements to establish Title IV eligibility under the new ownership.

60.     The pre-acquisition review process is important because the Department requires institutions to submit the formal application for approval of a change in ownership or control after the event has occurred. The process alerts the parties to the transaction to problems or conditions that might cause the parties to abandon the transaction entirely.

61.     On January 18, 2018, GCU voluntarily filed its request for pre-acquisition

review of the Transaction and for guidance as to any regulatory limitations that the Department might impose on GCU following the closing of the Transaction.

62. The pre-acquisition review request included substantially the same information provided to the IRS and HLC, including the proposed MSA, asset purchase agreement, credit agreement, and proposed corporate structure.

63. The pre-acquisition review request also:

a. Disclosed that Mr. Mueller would serve as GCE's CEO and GCU's President;

b. Included GCU's conflict of interest policy; and

c. Discussed GCU's reliance on the terms of other service agreements between nonprofit institutions and for-profit service providers in negotiating the terms of the MSA.

64. From the date of this filing until the Transaction closed on July 1, 2018, GCU made substantial efforts to keep the Department well-informed regarding the details of the Transaction, including promptly responding to any additional requests for information from the Department and offering to make GCU representatives available for meetings and consultations.

65. But without explaining why, the Department never substantively engaged with GCU about the Transaction. Although GCU provided consistent updates, the Department never informed GCU that it had any potential problems with the Transaction.

66. In early March 2018, GCU obtained HLC's approval of the Transaction, and, in April 2018, GCU received approval from its state regulator, the Arizona Board for the Private Postsecondary Education. Both approvals were promptly communicated to the Department.

67. HLC typically requires transactions to close within 30 days of its grant of approval, but HLC agreed to extend the time for closing until the end of June 2018 in

hopes that it would receive the Department's response to its pre-acquisition review application.

68.     On information and belief, the Department informally told GCU's prior counsel that it would respond to its application by May 2018.  But the only official communication that GCU received in May was a supplemental document request, to which GCU promptly responded.

69.     With no further contact from the Department, and no indication as to when its review would be completed, GCU and GCE, and their respective boards, decided to close the Transaction without receiving the Department's response to the pre-acquisition review application.  In doing so, GCU relied on the Department's treatment of other nonprofit conversions and apparent acceptance of materially similar service agreements between other nonprofit schools and for-profit organizations.

70.     In making this decision, GCU considered the significant costs already incurred, the additional costs that would be incurred if the Transaction were further delayed, and the monumental efforts already undertaken. These efforts included, among other things, the transition from GCE to GCU of nearly 7,500 employees, as well as real estate, improvements, and other assets valued at over $1.0 billion; the establishment of insurance, employee benefits programs, and policies to govern and support GCU and its employees; and the establishment of separate email and communication systems for the 2,500 employees remaining with GCE. The parties also considered the risk of placing in jeopardy previously received approvals from the HLC and other agencies if the delay persisted. For example, the initial application to HLC required multiple meetings, a lengthy written submission, and a multi-day site visit before HLC's Commission would formally act on the application.  If GCU had to start the HLC approval process over again because HLC's approval was allowed to lapse, it is likely that the transaction would have been delayed for several more months after GCU received a response from the

Department of Education. GCU and GCE therefore closed the Transaction on July 1, 2018.  Upon closing, GCU sent the Department the principal transaction documents.

71.    Under the Department's regulations, a change in ownership and control automatically terminates an institution's eligibility to participate in federal student financial aid programs under the HEA.  34 C.F.R. § 600.31

72.    To reestablish its eligibility to participate in HEA programs, the Department's regulations required GCU to submit applications to the Secretary to approve its participation in Title IV federal financial aid programs under its new ownership.  The Department's regulations permit the Secretary to continue an institution's participation in Title IV programs on a provisional basis while the institution awaits reinstatement of eligibility under its new ownership.  34 C.F.R. § 600.20(g).

73.    On July 10, 2018, GCU timely filed a materially complete Change in Ownership application with supporting documentation.

74.    The Department issued GCU a temporary provisional program participation agreement ("TPPA") on August 20, 2018.  Pursuant to the TPPA, GCU's Title IV participation continued on a month-to-month basis from September 2018 to November 2019.

75.    GCU then timely filed additional supporting documentation with the Department on August 31, 2018, including all final agreements between the parties, an audited same-day balance sheet, and multiple independent valuation reports of the school assets.

76.    The Change in Ownership application and supporting documentation showed that, at the time of the Change of Ownership application, GCU was a nonprofit institution as defined by the HEA as an institution "owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual."  20 U.S.C. § 1003.

1    77.    Likewise, GCU met the Department's regulatory definition of a nonprofit

2    institution contained in 34 C.F.R. § 600.2:

3        a.    GCU is owned and operated by a nonprofit corporation, with no

4        shareholder or individual benefiting from the net earnings of the corporation;

5        b.    GCU is legally authorized to operate as a nonprofit organization in

6        the state in which it is physically located; and

7        c.    The IRS had determined that GCU is a tax-exempt organization to

8        which tax contributions are deductible under 501(c)(3) of the IRC.

9    78.    Nonetheless, on September 10, 2018, GCU received a request from the

10    Department to provide support for why it should be treated as a nonprofit institution for

11    Title IV program purposes.  GCU explained in detail on October 1, 2018 that GCU meets

12    every component of the Department's definition of a nonprofit institution.

13    79.    GCU also explained that the governance structure and the contractual terms

14    of the Transaction support that GCU is operated by a nonprofit and that "no portion of the

15    net earnings of [GCU] inures to the benefit of any private shareholder or individual." In so

16    stating, GCU explained that:

17        a.    GCU's Board of Trustees and GCE's Board of Directors are fully

18        independent and that GCU's Board possesses and exercises the necessary legal

19        power to establish and review the basic policies that govern the institution;

20        b.    Both Boards made independent decisions to retain Mr. Mueller in his

21        positions as GCU's President GCE's CEO and that each Board has independent

22        authority to retain or terminate his services in the future;

23        c.    The terms of the MSA and GCU's bylaws limited Mr. Mueller's

24        direct oversight of GCU's relationship with GCE;

25        d.    The purchase price GCU paid for the assets of the transaction was

26        several hundred million dollars less than their value;

18

e.  The secured promissory note issued by GCU in consideration for the assets in the Transaction has a fixed interest rate reflecting fair market terms;

f.  GCU retains full control over all policy and academic decisions under the terms of the MSA; and

g.  The terms of the MSA, including the revenue share and the level and scope of services provided by GCE, were on fair-market value terms and based on publicly available service agreements between other institutions and third parties.

80.  The October 1, 2018 Response further clarified that the problematic factors the Department raised in other conversions were absent here, such as the absence of the former owner continuing to own and lease the facilities to the institution; the absence of payments based on the net earnings of the institution; and a lack of negative covenants or other consent rights in favor of the former owner that effectively vest in the former owner the power to control the financial destiny of the institution.

81.  Since the Transaction, GCE's only relationship to GCU is as a creditor and an arms-length service provider.  Moreover, GCE operates as a services provider to approximately 24 other university partners.  GCU remains an independent, private university, accorded nonprofit status by the State of Arizona and tax-exempt status under Section 501(c)(3) of the Internal Revenue Code by the IRS.

### The Department's November 6, 2019 Decision Letter is Arbitrary and Without Justification.

82.  Because the Department did not respond to the pre-acquisition review request, and because the Department has no substantive regulations or guidance on nonprofit conversions, GCU had no choice but to structure the Transaction based on the Department's prior treatment of other nonprofit conversions.

83.  For more than two years, GCU made substantial and numerous efforts to engage the Department regarding the Transaction.

84.     After the transaction closed, in a December 4, 2018 email, Department staff confirmed to GCU counsel that it has no published guidance articulating standards institutions can follow when structuring nonprofit conversions.  The Department also knew that institutions and their attorneys had no knowledge of any Department nonprofit review process.  *Id.*  (Screenshot of December 4, 2018 email from Donna Mangold to Jonathan Glass):

we are getting pushed by many schools to meet upcoming closing deadlines.  These deals need to be reviewed, we are not just pushing them through.  In the near future we will be providing guidance to re-set expectations on review of these deals.  Every attorney and school out there says nothing to look at, simple deal.  But we have to review and

85.     Despite GCU's many offers to make its representatives available for meetings to discuss the substantive issues raised by the Transaction, the Department never discussed these issues with GCU.

86.     Instead, on November 6, 2019, more than 22 months after GCU submitted its pre-acquisition application and more than 16 months after the Transaction closed, the Department issued the November 6, 2019 Decision, refusing to acknowledge GCU as a nonprofit entity for the purposes of its participation in Title IV programs.

87.     The Department concluded that the sole issue as to GCU's qualification as a nonprofit was "whether GCU is operated by a nonprofit and whether its net earnings benefit any private shareholder or individual."  *Id.* at 10.

88.     Without any substantive regulations or guidance regarding nonprofit status, the Department relied entirely on its interpretation of IRS statutes, regulations, and tax case law to deny GCU's nonprofit status.  *Id.* at 15.

89.     The Department's conclusion is particularly problematic and incorrect given that the IRS, the federal agency tasked with interpreting the Internal Revenue Code, reviewed substantially the same facts in November 2015 and determined that GCU is a tax-exempt educational organization pursuant to Section 501(c)(3) and, again, the IRS

1   reaffirmed its determination of GCU's tax-exempt status subsequent to the closing of the

2   Transaction on August 31, 2018.

3       90.     In other words, the IRS had already made the decision that pursuant to the

4   Transaction, GCU would be primarily operated for a tax-exempt purpose and not

5   substantially for the benefit of any other person or entity, such as GCE or its shareholders.

6       91.     In the November 6, 2019 Decision, the Department identified three factors

7   to deny GCU nonprofit status.

8       92.     First, the Department determined that GCU failed the IRS's "operational

9   test" because, under the terms of the MSA with GCE, GCU operated for the benefit of

10  GCE, which would not satisfy the "primary activities" prong of the operational test.

11          a.      But the Department did not explain how it has authority to consider

12          the primary activities prong of the operational test, which the Department's

13          regulations leave solely to the discretion of the IRS.

14          b.      Nor did the Department explain why the MSA was impermissible in

15          this case, when such arrangements have previously been accepted under

16          Department regulations, and where the Department has approved the nonprofit

17          status of other institutions with materially similar service agreements with for-

18          profit companies.

19          c.      Further, the Department based its finding on a statement contained in

20          an executive summary of a report from Barclays, PLC, an entity GCE—not

21          GCU—retained to serve solely as its financial advisor.  But the Barclays report has

22          no relevance to whether GCU is a nonprofit for Title IV purposes.  GCU never saw

23          the report or interacted with Barclays prior to the Transaction, and the report made

24          no findings on the fairness of the Transaction to GCU or how the Transaction

25          benefited GCU's educational mission.

26

d.    And the Department did not engage in any analysis to determine whether the Transaction or MSA actually benefited GCU and its educational mission.

93.    Second, the Department speculated that because Mr. Mueller serves as GCU's President and as GCE's CEO, he may not have "undivided loyalty" to GCU.

a.    However, the Department did not explain how this arrangement is relevant to GCU's nonprofit status.

b.    The Department also failed to explain why the substantial conflict of interest policies and prohibitions on Mr. Mueller making decisions related to GCU's relationship with GCE did not ameliorate any concerns.

c.    Further, the Department approved GCU's Title IV participation as a for-profit institution, notwithstanding Mr. Mueller's dual roles.

d.    The Department did not offer any basis for why this arrangement is permissible for GCU as a for-profit institution but impermissible as a nonprofit.

e.    The Department's regulations do not provide for any such distinction.

94.    Lastly, the Department determined that, based on the number of functions performed by GCE under the MSA, GCU was not actually operating the University.  In doing so, the Department treated GCU differently than other nonprofit institutions, who delegate the same functions to for-profit organizations without any interference from the Department.

95.    In fact, Department regulations expressly allow institutions to enter a written contract with a third-party service provider for the administration of **any** aspect of the institution's participation in any Title IV program.  34 C.F.R § 668.25.

96.    In addition to the Department's unsupportable decision to deny GCU's nonprofit status, the Department also ordered GCU to "cease any advertising or notices that refer to its 'nonprofit status'" despite simultaneously acknowledging that it "does not

1  take a position with respect to [GCU's] nonprofit 501(c)(3) status" and "does not take a

2  position regarding statements that GCU may make about its IRS status as a 501(c)(3) tax

3  exempt organization."

4      97.    The Department's November 6, 2019 Decision is marred by both factual and

5  legal errors.  Without authority or basis in law, and contrary to its prior treatment of other

6  institutions, the Department improperly second-guessed the IRS's determination that GCU

7  is entitled to tax-exempt status, a determination the Department acknowledges is the same

8  for purposes of determining whether GCU is a nonprofit entity for Title IV Programs.

9  The November 6, 2019 Decision further ignores critical information GCU provided to the

10  Department, makes unwarranted assumptions, and minimizes the massive efforts GCU

11  undertook to analyze the Transaction and to ensure that, if consummated, it would benefit

12  GCU, its students, faculty, staff, and community.

13
              **GCU Proposes to Amend the MSA as an Alternative Solution to**
              **Litigating the November 6, 2019 Decision.**
14

15      98.    Nonetheless, GCU chose not to request a reconsideration of the November

16  6, 2019 Decision.

17      99.    Instead, GCU met with Department officials on December 16, 2019 in an

18  attempt to explain some of the specifics of the Transaction and also to demonstrate the

19  resounding success of GCU and its educational mission since the Transaction, including

20  GCU's low cost to students, reinvestment in the university and educational infrastructure,

21  and positive student outcomes.

22      100.   The Department surprisingly informed GCU that it considered these factors

23  irrelevant to its decision.  Rather, the Department told GCU that it should focus on the

24  issues raised in the November 6, 2019 Decision.

25

26

1    101.    In accordance with that directive, GCU held a special meeting of the Board

2    of Trustees on December 23, 2019 where it approved a proposal to amend the terms of the

3    MSA to be even more favorable to GCU.

4    102.    After further negotiations with GCE, the GCU Board of Trustees accepted

5    the Amended MSA at a January 7, 2020 meeting.

6    103.    GCU and GCE agreed that the new MSA ("Amended MSA") was

7    contingent on both an updated transfer pricing study that confirmed the new terms were at

8    or below fair market value and acknowledgement from the Department that the changes

9    would cause it to grant GCU nonprofit recognition.

10    104.    Importantly, the fee structure under the Amended MSA was capped at 59%

11    of GCU's total revenue instead of the 60% payment required under the original MSA.

12    The Amended MSA also allowed for an alternative fee of 66.8% of tuition and fees only,

13    but that figure was subject to the 59% cap on total revenue.  Thus, the fee under the

14    Amended MSA would always be below the fee earned under the original MSA.

15    105.    To address the Department's concerns that GCU was a "captive" client of

16    GCE, the Amended MSA also significantly reduced the time where GCU could invoke its

17    early termination right and expanded GCU's ability to terminate the agreement during any

18    renewal term.  The Amended MSA also reduced GCU's early termination fee by half and

19    completely eliminated a non-renewal fee.

20    106.    Other changes in the Amended MSA benefited GCU as well.  Every change

21    to the MSA was done with the intention of making the arrangement more favorable to

22    GCU and, as suggested by the Department, addressed every issue raised in its November

23    6, 2019 Decision.

24    107.    On January 8, 2020, GCU provided the Department the Amended MSA,

25    which, as GCU explained, was contingent on both the updated Deloitte Transfer Pricing

26    Study confirming the new terms were at or below fair market value and the Department's

1    approval of GCU's nonprofit status. GCU asked for the Department's acknowledgment

2    that the new terms resolved any outstanding concerns.

3         108.   By letter dated January 17, 2020, the Department directed GCU to provide

4    the updated transfer pricing study from Deloitte and also required GCU to retain an

5    additional independent expert to render an opinion on the updated transfer pricing study

6    and to ensure the Amended MSA was fair to GCU.

7         109.   So GCU retained Deloitte to perform an updated transfer pricing study

8    based on the terms of the Amended MSA and also retained BKD, LLP ("BKD") to review

9    the updated transfer pricing study to ensure the fairness of the Amended MSA.   As yet

10   another layer of assurance to placate the Department's unprecedented scrutiny of the

11   Transaction, GCU also retained BKD to provide additional independent valuations of the

12   invested capital of GCU as of July 1, 2018 (the date of the Transaction) and January 7,

13   2020.

14        110.   GCU provided the Deloitte updated transfer pricing study, dated April 29,

15   2020, to the Department on May 6, 2020.

16        111.   On May 12, 2020, GCU provided BKD's independent opinion of the

17   Deloitte transfer pricing study and Amended MSA, dated May 5, 2020, and BKD's two

18   independent valuation reports, both dated May 12, 2020.

19        112.   The updated transfer pricing study from Deloitte confirmed the terms of the

20   Amended MSA were fair to GCU.

21        113.   BKD's review of the Deloitte transfer pricing study confirmed Deloitte's

22   methods and conclusions were appropriate and also opined on the fairness of the

23   Amended MSA.

24        114.   BKD also concluded that the valuation of GCU's invested capital at the time

25   of the Transaction was between $1.2 billion and $1.4 billion—well below the $876.6

26   million purchase price paid by GCU.

115.   BKD further opined that the Transaction's value as of January 7, 2020 was between $1.1 billion and $1.3 billion.

116.   Every expert who has commented on the transaction has found that GCU paid substantially below fair-market rate for the assets in the Transaction.

117.   Every expert who has opined on the fairness of the MSA has found that GCU pays below fair-market rates for the services GCE provides pursuant to the MSA.

118.   Nonetheless, GCU waited months without a decision from the Department. General Counsel for GCU sought an update on July 1, 2020, which never received a response.

119.   On August 14, outside counsel for GCU sent a letter detailing why the Department lacked a legal basis for its refusal to recognize GCU's nonprofit status.  The letter explained:

   a.   how reading 34 C.F.R. 600.2 as a substantive regulation—as opposed to a definition—created unworkable conflicts in the broader regulatory framework;

   b.   that the Department's newly claimed authority to decide whether a 501(c)(3) institution will be recognized as a nonprofit conflicts with prior public statements about its limited role in scrutinizing nonprofit conversions;

   c.   how the November 6, 2019 Decision departs from the Department's longstanding practice of treating an institution's 501(c)(3) status as conclusive for Title IV purposes; and

   d.   how the November 6, 2019 Decision treated GCU differently from other institutions recognized by the Department as nonprofit that have materially similar service agreements with for-profit companies, including the Purdue-Kaplan transaction, discussed below.

120.   The Department responded on August 28, 2020 but did not substantively address any of the points raised in the August 14, 2020 letter.  Rather, the Department

26

1    reasserted that the Department makes its own determination of nonprofit status for a

2    school's participation in Title IV.

3            121.    Without citing any regulatory authority or guidance, the Department stated,

4    "the Department's determination of nonprofit status considers the structure and planned

5    operations of the institution when its owner(s) apply for that change of status, and seeks to

6    ensure that a nonprofit institution's revenues – a good portion of which are generated from

7    Title IV funds – are primarily devoted to the mission of the school and not to other parties,

8    including (as here) the shareholders of the prior owner."

9            122.    The Department did not explain any standards or factors considered in its

10   analysis of the "structure or planned operations of the institution."

11           123.    The Department's concern that Title IV funds "are primarily devoted to the

12   mission of the school" conflicts with its contention in the same letter that "GCU's

13   accomplishments on campus and in the community [under the MSA with GCE] . . . do not

14   change the factors identified in the November 6, 2019 letter."

15           124.    In that letter, the Department informed GCU that its goal for rendering a

16   decision was November 15, 2020.

17           125.    Just days before the Department's proposed deadline, the Department

18   reached out to GCU in a Friday, November 12, 2020 email asking for information about

19   different versions of the Deloitte Transfer Pricing studies—all of which confirmed the

20   fairness of the Amended MSA to GCU.

21           126.    Over the next few weeks, GCU and the Department exchanged

22   correspondence, but the Department continued to be evasive as to when GCU could

23   expect a decision.

24           **The Department again refuses to recognize GCU's nonprofit status.**

25           127.    Secretary Devos resigned from the Department on January 7, 2021.

26

128.    On January 12, 2021, the Department issued a letter ("January 12, 2021 Decision"), again declining to recognize GCU as a nonprofit for Title IV purposes.

129.    The January 12, 2021 Decision incorporated the November 6, 2019 Decision, and confirmed its primary basis for declining to recognize GCU as a nonprofit: "under the [Amended MSA], GCU will still not meet the requirement that both the primary activities of the organization and its stream of revenue benefit the nonprofit itself."

130.    Without citing any positive evidence to support a contention that the terms of the Amended MSA provides an impermissible benefit to GCE, the Department instead noted that the Deloitte Transfer Pricing Study and BKD Review have "not convinced the Department otherwise."

131.    Initially, despite having asked GCU to provide an updated transfer pricing study, the Department questioned the relevance of that study in its January 12, 2021 Decision because GCU is independent from GCE.

132.    Because a transfer pricing study tests relationships between related entities, it sets a higher standard than what is generally applicable to transactions between unrelated parties. That Deloitte and BKD concluded GCU met this higher standard is conclusive that the Amended MSA is fair to GCU, even if the entities are considered independent parties.

133.    Nonetheless, the Department's analysis is fundamentally flawed because at the time the MSA was negotiated, the parties *were* related, which is why GCU obtained a transfer pricing study in the first place.

134.    Second, the Department faulted Deloitte for not adequately explaining the method it selected to value the MSA, citing the IRS's "best method rule."  But under the IRS's best method rule, Deloitte may use the method it deems most reliable without establishing the inapplicability of other methods.  26 C.F.R. § 1.482-1(c).

135.    The best method rule, in other words, does not require an affirmative showing of the inapplicability of alternative methods.  Instead, it allows the IRS to apply an alternate method only if it shows that method is more reliable.

136.    The best method rule gives the IRS this discretion because it has substantial expertise.  It does not apply to the Department, which lacks that expertise.

137.    And even if it did give the Department discretion, the Department never concluded that an alternate method would be more reliable than Deloitte's selected method.

138.    The Deloitte Transfer Pricing study and BKD analysis were appropriate to analyze the arm's length nature of the MSA.

139.    Third, the Department also exceeded its authority under 20 U.S.C. § 1232a, which expressly prohibits the Department from controlling an institution's administrative or personnel decisions.

140.    The Department exceeded this authority by questioning:

a.    whether GCU could obtain the services provided by GCE at a better price;

b.    whether GCU would be better served by performing the services in-house;

c.    whether other alternatives, such as unbundled services from multiple providers would be more appropriate.

141.    Ultimately the two Decisions boiled down to the Department's opinion that, notwithstanding the Deloitte and BKD studies confirming the fairness of the MSA and Amended MSA to GCU, GCU pays too much money to GCE under the MSA.

142.    But the Department's authority to question an institution's expenditures are limited to the Financial Responsibility provisions in 34 C.F.R. § 171, *et seq.*, which only require that an institution have the ability to provide the services described in its official

publications and statements; administer properly its Title IV programs; and meet all of its financial obligations.

143.    The Department made no findings that the MSA or Amended MSA prevent GCU from meeting the Department's Financial Responsibility requirements.

144.    Lastly, despite issuing two written Decisions addressing nonprofit recognition, the Department has not articulated any generally applicable standards that GCU or any other institution could look to in planning a conversion to nonprofit status.

145.    Nonetheless, the Department faulted BKD because *BKD* did not articulate a standard for what constitutes an appropriate service relationship between services providers and higher education institutions.

146.    BKD reviewed 24 agreements between services providers and higher education institutions.  Ten of those involved renumeration based on the institution's total revenues.  BKD determined that the tax year 2019 range of revenue split in the Deloitte Transfer Pricing Study of 59.32% to 59.72% falls within the interquartile range of those ten agreements. Accordingly, BKD determined the revenue share under the Amended MSA was fair and equitable.

147.    But the Department remained unconvinced because BKD did not apply a standard that the Department has never articulated:

> "BKD's analysis is striking for what it does ***not*** address. For example, what is the relationship between the institution and the service provider – were they formerly one and the same? Why is it reasonable to charge GCU a fee equal to 59.9% - 68.8% of revenues (as described in ARMSA Exhibit D §3) when the range of the ten agreements BKD cites included a low of 12%?  Why is it reasonable to charge GCU that fee when the median of the ten agreements reviewed is 50%? Does the increase over the low of 12% or the median of 50% indicate the purpose of the ARMSA is to benefit GCE stockholders?"

148.    There is no requirement or standard in IRS regulations, Department regulations, or any other applicable law that would limit the revenue share between a

nonprofit institution and a third-party service provider to the "low" or "median" of other agreements.  It must be at fair market value. The Department's two Decisions denying GCU nonprofit status rest on the contention that GCU pays GCE too much money for too many services.  But the Decision does not explain the source or methods for how the Department determines when a nonprofit institution pays too much money or outsources too many services to third party service providers, instead adopting a "we know it when we see it" approach.

**C.**     **The Department lacks authority under its regulations to determine nonprofit status.**

**The Department's regulations about nonprofit conversions**

149.    The Department exceeded its lawful authority when it denied GCU's nonprofit status for purposes of the Title IV programs.

150.    Contrary to the Department's position in the Decisions, the Department's nonprofit definition (34 C.F.R. § 600.2) does not give it an independent basis to determine nonprofit status.

151.    Section 600.2 simply defines what "nonprofit institution" means when it is used in 34 C.F.R. Part 600. It is not itself a substantive regulation.

152.    Instead, 600.2 provides a guide to understand those substantive regulations in Part 600 that use the term "nonprofit institution"—like 34 C.F.R. §§ 600.20(b)(2)(iii) and 600.31(d)(7) (the Department's "change-in-control provisions").

153.    Far from clarifying the change-in-control provisions, the Department's interpretation of 34 C.F.R. § 600.2, as a basis for it to make an independent determination of an institution's nonprofit status, contradicts them.

154.    34 C.F.R. § 600.31(d)(7) explains that an institution's change from proprietary to nonprofit status is a change in control that causes the institution to lose its eligibility to participate in Title IV programs.

31

155.    Under the Department's change-in-control provisions, the institution must then reestablish its eligibility by showing the Secretary that it remains eligible **after** the event that triggered its change in control—in this case, **after** it changed from proprietary to nonprofit status.

156.    Indeed, 34 C.F.R. § 600.20(b)(2)(iii) explains that an institution must reapply to the Secretary to establish its eligibility "**after** the institution changes its status as a proprietary, nonprofit, or public institution." (emphasis added).

157.    By way of example: GCU lost its eligibility to participate on July 1, 2018, the day the Transaction closed. By operation of law the Transaction caused GCU to change from proprietary to nonprofit status. And under the change-in-control provisions, GCU had to reapply to participate in the Title IV, HEA programs **after** it changed from proprietary to nonprofit status.

158.    The Department's interpretation of its nonprofit definition turns the change-in-control provisions upside down. Under the change-in-control provisions, an institution's change from proprietary to nonprofit status is the reason why it must reapply to participate in the Title IV programs. Yet the Department interprets the nonprofit definition as its source of authority to make an independent determination of an institution's nonprofit status when it reapplies after the change in control. Simply put, the Department reads its nonprofit institution definition in a manner that contradicts the substantive regulations the definition is meant to clarify.

**The Department's past statements about nonprofit status**

159.    In addition to contradicting the change-in-control provisions, the Department's claimed authority to determine nonprofit status also contradicts its prior statements on nonprofit conversion.

160.    When the Department amended its change-in-control provisions to include the change from proprietary to nonprofit status, the Secretary explained that the

1   amendment was made so that the Department could ensure institutions had not changed

2   status simply to avoid proprietary rules.

3        161.   Indeed, the Secretary explained that the change to nonprofit status was

4   added as a change in control in recognition of the fact that an institution could change to

5   nonprofit status with "little formality," without Department approval, without

6   reconstituting itself as a new corporation, and while "keep[ing] the very same faculty,

7   management, programs and facilities." 59 Fed. Reg. 22324, 22333-34 (Apr. 29, 1994).

8        162.   Simply put, the Secretary added nonprofit conversion to the change-in-

9   control provisions because the Department otherwise had no role in the conversion

10  process.

11       163.   Far from authorizing the Department to make an independent determination

12  of nonprofit status, however, the change-in-control provisions only provide the

13  Department with a limited, after-the-fact role.

14       164.   Indeed, the Department later explained to Congress, in 1995, that because

15  "institutions can easily switch from profit status to nonprofit status," the Department

16  would "subject schools that do change from profit to nonprofit status . . . to the same

17  requirements of **their previous** designation for a certain period of time." *Abuses in*

18  *Federal Student Grant Programs Proprietary School Abuses, Hearing before the S. Perm.*

19  *Subcomm. on Investigations of the Comm. on Governmental Affairs,* 104th Cong. 104-

20  477, at 222 (1995) (written answers of David A. Longanecker, Assist. Sec. for

21  Postsecondary Education) (emphasis added).

22       165.   Implicit in the Department's statement to Congress and inherent in its

23  change-in-control provisions is the recognition that an institution changes from

24  proprietary to nonprofit status, even for Title IV purposes, without the Department's

25  approval.

26

166.    The Department's oversight is after-the-fact and limited to subjecting institutions that have converted to their prior requirements for a defined time.

167.    The Department reiterated this point more recently. In 2010, the Department added a new paragraph to 34 C.F.R. § 600.2 defining foreign nonprofit institutions.

168.    The new paragraph, the Department explained, was meant to be "as comparable as possible to those applicable to domestic institutions." 75 Fed. Reg. 42192, 42192 (July 20, 2010).

169.    "[T]o make the proposed regulations as comparable as possible to those applicable to domestic institutions, the Department proposed, and the Committee agreed, that a determination that an institution is nonprofit by an entity in the institution's foreign country would qualify an institution as nonprofit only if the determination is made by a recognized tax authority of the country, and the Secretary has recognized that tax authority as one that can make a determination using criteria that are similar to those used by the IRS." *Id.*

170.    In other words, if the Secretary has determined that a foreign tax authority uses criteria similar to the IRS, then the Secretary "**automatically accept[s]**" that tax authority's judgement "for purposes of making determinations of an institution's nonprofit status for Title IV, HEA purposes." *Id.* (emphasis added).

171.    The Department chose to "automatically accept" the judgment of foreign tax authority's using criteria similar to the IRS because the Department automatically accepts the IRS's nonprofit determination of domestic institutions for Title IV purposes.

172.    More recently still, the Department conceded what paragraphs 149-71, above, make clear: An institution is a nonprofit institution for purposes of Title IV programs if it is determined by the IRS to be an approved 501(c)(3).

173.    On April 2, 2020, the Department published proposed rules which included changes to its nonprofit definition in 34 C.F.R. 600.2. 85 Fed. Reg. 18638, 18649 (Apr. 2, 2020).

174.    According to the proposed rule the Department intends to delete paragraph 3 from its definition of nonprofit institution. *Id.*

175.    That paragraph explicitly defines a nonprofit institution as an institution that "[i]s determined by the U.S. Internal Revenue Service to be an organization to which contributions are tax-deductible in accordance with section 501(c)(3) of the Internal Revenue Code (26 U.S.C. 501(c)(3))."

176.    In support of the proposed rule, the Department states the following: "Paragraph 3 of this definition repeats the language in paragraph 1, **stipulating** that an institution is a 'nonprofit institution' if it is determined by the U.S. Internal Revenue Service to be an organization to which contributions are tax-deductible in accordance with section 501(c)(3) of the Internal Revenue Code (26 U.S.C. 501(c)(3))." 85 Fed. Reg. 18638, 18649 (emphasis added).

177.    In other words, the Department acknowledged that paragraph 1 of its nonprofit institution definition, the same definition on which its Decision rests, stipulates that an institution is a nonprofit institution if it is an approved 501(c)(3).

178.    Simply put, the Department's prior statements all confirm that an institution's change from proprietary to nonprofit status, even for purposes of the Title IV programs, occurs outside the Department's review.

### The Department's past practice with nonprofit conversion

179.    Consistent with the change-in-control provisions and the Department's past statements, the Department has historically accepted 501(c)(3) status as establishing an institution's nonprofit status for purposes of the Title IV programs.

180.    As described in its Congressional testimony referenced in paragraph 164,

1  above, the Department's role in nonprofit conversion has been limited to requiring

2  recently converted schools to continue compliance with some requirements of their prior,

3  proprietary status for a defined duration after their nonprofit conversion.

4      181.   Specifically, in its publicly available guidance, the Department has

5  instructed institutions that they must comply with the 90/10 rule—a requirement exclusive

6  to proprietary institutions—during the first fiscal year following conversion to nonprofit

7  status.

8      182.   That trailing proprietary requirement is often referred to as a provisional

9  condition.

10     183.   Upon information and belief, the Department's internal change-in-control

11  guidance instructs employees to check if institutions reapplying to participate in Title IV

12  programs after a change in control have changed from proprietary to nonprofit status.

13     184.   Upon information and belief, if the reapplying institution did change from

14  proprietary to nonprofit status, the Department's internal guidance instructs employees to

15  note the institution's change in status when they approve the application and explains that

16  the provisional condition will apply to the institution. Screenshot from *Internal Federal*

17  *Student Aid Change-in-Ownership Guidance*, Version: November 14, 2012 (received

18  through FOIA):

19

20  

3.3.7.3 Section C – Institutional Control and Structure

**Question 18 – Identify the type of institutional structure – Public, Private nonprofit, or Proprietary.**

Verify with the SPD's financial analyst that the response to this question is consistent with the audited financial statements. Determine if the institution changed institutional structure. If it changed from profit (proprietary) to nonprofit or vice versa, the corresponding provisional condition will apply. Also the type of audit the institution must submit will change. When the application has been approved, the EA must alert eZ-audit of the change in institution type.

For Internal SESG Use Only
Version: November 2, 2012                                                      3-51
Updated July 17, 2014

185.   Upon information and belief, the Department tracks institutions subject to the provisional condition using a unique numerical code in its Postsecondary Education Participants System (frequently referred to as a PEPS code), which allows the Department to query historical information related to nonprofit conversions.  Screenshot from *Internal Federal Student Aid Change-in-Ownership Guidance*, Version: November 14, 2012 (received through FOIA):

| Provisional Conditions Used for Change in Ownership | |
|---|---|
| PEPS Provisional Reason Code | Provisional Condition Title |
| (b)(7)(E) | Requirement of Funding Arrangement Other Than Advance Funding, and Requirement of Surety For Not Less Than 10% of Title IV, HEA Funds |
| | FFEL/Direct Loan Cohort Default Rate Condition |
| | Unresolved Audit or Audit Liabilities Condition |
| | Program Review Condition |
| | Change in Ownership |
| | Restrictions, Conditions or Limitations Imposed by Accrediting Agency |
| | Fundamentals of Title IV Administration Training Requirement |
| | Federal Perkins Loan Default Rate Condition |
| | Unpaid Accounts Receivable Condition |
| | Late Submission of Compliance Audits |
| | Restrictions Resulting from Conversion to Nonprofit Status |
| | IPEDS Surveys |
| | Unpaid Accounts Receivable of Institution Owner |
| | Deficiencies in Administrative Capability |
| | Restrictions, Conditions or Limitations Imposed by State Approving Agency |

For Internal SESG Use Only
Version: November 2, 2012
Updated July 17, 2014

3-120

37

1

**The Department's departure from its longstanding practice**

2      186.    Upon information and belief, the Department followed its longstanding and

3  publicly acknowledged policy of automatically accepting 501(c)(3) status as establishing

4  nonprofit status for purposes of Title IV programs until at least August of 2016.

5      187.    On August 11, 2016, the Department denied nonprofit status for purposes of

6  the Title IV programs to the IRS approved 501(c)(3) institution Center for Excellence in

7  Higher Education.

8      188.    Without acknowledging, let alone explaining, its departure from its

9  longstanding and well-known practice, the Department said in its August 2016 decision

10  letter that neither state authorization nor IRS determination confer nonprofit status for

11  Title IV purposes.

12      189.    Instead, the Department stated that it must make an independent

13  determination using its own test for nonprofit status:  the definition provided at 34 C.F.R.

14  § 600.2.

15      190.    In doing so, the Department offered no explanation (let alone a reasonable

16  one) for its decision to depart from its prior practice.

17      191.    Nor did the Department acknowledge that it had previously informed Center

18  for Excellence in Higher Education that the institution's acquisition of four for-profit

19  colleges would result in the colleges changing to nonprofit status.

20      192.    In fact, consistent with its regulations and past practice, the Department had

21  expressly informed Center for Excellence in Higher Education four years earlier, in 2012,

22  during its pre-acquisition review, that the acquisition of the four existing for-profit

23  colleges would mark "a change in structure for the institutions from proprietary to not-for-

24  profit."

25

26

193.    At the same time, the Department informed Center for Excellence in Higher Education that it would have to comply with the 90/10 rule—the provisional condition—for the first fiscal year after the conversion.

194.    The Department, for the first time, purported to explain its departure from its longstanding practice four months **after** it had denied nonprofit status to the colleges owned by Center for Excellence in Higher Education.

195.    In a follow-up letter to Center for Excellence in Higher Education, the Department said that it had determined a more detailed examination of nonprofit status was needed in light of the recent introduction of new proprietary gainful employment regulations, which, the Department said, created greater incentives for for-profits to convert to nonprofit status.

196.    Upon information and belief, the Department's purported explanation for its change in policy was an after-the-fact explanation developed solely for litigation purposes. The reasons for this allegation include the following:

a.      The Department only acknowledged its departure from its prior practice after Center for Excellence in Higher Education challenged the Department's August 11, 2016 decision in federal court.

b.      The Department's purported policy change rested on the belief that for-profit colleges might seek to convert to nonprofit status to avoid the gainful employment rule. That justification fails because:

i.      Those rules went into effect two-and-one-half years after Center for Excellence in Higher Education acquired the four formerly for-profit colleges; and

ii.      The Department's August 2016 decision letter is devoid of any analysis tending to suggest the change-in-control was motivated by a desire to evade the gainful employment rules.

1         c.      The Department never explained why its prior practice (which was designed as a check against institutions converting to evade for-profit regulations and which imposed for-profit requirements on converted nonprofit institutions for a brief duration) was not adequate to address the possibility that institutions might convert to evade gainful employment rules.

         d.      Beginning not long before the Department denied nonprofit status to the colleges owned by Center for Excellence in Higher Education, the Department started receiving heavy political pressure from critics of for-profit education (including former Department officials as well as several members of Congress) to deny for-profit to nonprofit conversions.

         e.      At the same time the Department issued the August 2016 decision letter, it also released a press release, warning for-profit institutions that were thinking about converting to nonprofit status: "Don't waste your time."

         f.      The August 2016 decision letter was addressed only to the Center for Excellence in Higher Education.

         g.      Despite indicating a change in policy in the August 2016 decision letter, the Department has never issued any guidance to regulated entities announcing how it will apply this new policy or even that that it had changed its policy in the first place.

         h.      If the Department has indeed changed its policy to provide for an independent review of an institution's nonprofit status, it has not provided any guidance describing how an institution meets the Department's nonprofit requirements.

197.    Importantly, the Department repealed the gainful employment rules—which purportedly precipitated its change in position—prior to the Decision in the instant case.

Thus, the Department's stated basis for asserting authority to determine nonprofit status is no longer applicable.

**The Department's inconsistent treatment of similarly situated institutions**

198.    Because the Department's change in policy is the product of political pressure and not the Department's purported after-the-fact explanation, the Department's new approach has led to inconsistent treatment of similarly situated institutions.

199.    That inconsistent approach has been intensified by the Department's lack of substantive regulations or guidance addressing nonprofit conversions.

200.    By way of example, GCU closely modeled the Transaction on an earlier transaction the Department approved between Purdue University (public nonprofit) and Kaplan University (private for-profit). Yet the Department denied GCU's nonprofit status.

201.    In doing so, the Department based its Decision denying GCU's nonprofit status on aspects of the Transaction that are nearly identical to the approved Purdue-Kaplan transaction.

202.    Nowhere in its decision does the Department explain why the MSA in this case is improper when many other nonprofit institutions have materially similar revenue-sharing arrangements with for-profit companies.

203.    The 2017 Purdue-Kaplan transaction is illustrative. Purdue created a 501(c)(3) nonprofit, Purdue University Global ("Purdue Global"), to purchase the credential-issuing side of Kaplan's higher education business.

204.    Pursuant to a service agreement with Purdue Global, Kaplan continued to run several aspects of Purdue Global's nonacademic functions, including marketing and advertising, admissions support, financial aid administration, technology and human resources support, accounting, and facilities management.

205.    In exchange, Purdue Global must reimburse Kaplan for the costs of the support services and pay Kaplan an additional 12.5 percent of Purdue Global's consolidated revenues.

206.    The Department's Decision denying GCU nonprofit status offers no justification or standard explaining why Purdue Global-Kaplan's cost-plus-12.5-percent payment structure is acceptable under Department regulations, but GCU's straight sixty percent revenue split is not.

207.    The Department also faults the MSA for having an initial 15-year term with automatic 5-year renewals.

208.    But the approved Purdue Global-Kaplan service agreement provides for a 30-year initial term with automatic 5-year renewals.

209.    The Department's Decision offers no justification for why the Purdue Global-Kaplan 30-year term is acceptable, but GCU's 15-year term is not.

210.    The Decision also faults the MSA's early termination provisions. Those provisions allow GCU to terminate the MSA after year seven subject to paying GCE an early termination fee equal to 50 percent of the aggregate services fees paid or payable to GCE for the trailing twelve-month period.

211.    But again, the Purdue Global-Kaplan service agreement has even more onerous termination fees.  While Purdue Global can terminate its service agreement after six years (instead of seven), if it elects to do so, it must pay Kaplan 125 percent of the total revenue earned during the trailing twelve-month period.

212.    The Department offers no justification or standard supporting its conclusion that GCU's payment of 50 percent of the previous year's revenue is impermissible while Purdue Global's payment of 125 percent of the previous year's revenue is acceptable.

213.    Further, the Department failed to address why the terms of the Amended MSA, which are even more favorable to GCU, did not affect its analysis.

214.    Upon information and belief, the Department recognizes many nonprofit institutions despite those institutions engaging in comparable service arrangements with for-profit companies.

215.    By way of example, a for-profit organization named Bisk Education, Inc. ("Bisk") provides services to the University of Florida Distance and Continuing Education ("UFDCE") pursuant to a service agreement. That agreement requires UFDCE to pay eighty percent of its revenue to the for-profit service provider.

216.    Upon information and belief, University of Southern California, University of California – Berkley, Augusta State University, Arizona State University, Boise State University, University of Cincinnati, Eastern Michigan University, Lamar State College – Port Arthur, Lamar University, Louisiana State University, Stephen F. Austin University, Texas A & M University – Commerce, University of West Florida, University of North Carolina – Wilmington, University of South Carolina, University of Texas – Arlington, University of Texas – Pan-American,  University of Texas – Tyler, Michigan State University, Alcorn State University, Southern Mississippi University, Auburn University, Northern Arizona University, Washington State University, Syracuse University, University of North Carolina, Rice University, University of Arkansas, Kent State, Indiana Wesleyan University, Community College Preparatory Academy, Texas Southmost College, University of Hawaii, Norwich University, George Mason University, University of Delaware, Winthrop University, and others all have service agreements with for-profit companies.

217.    In structuring the Transaction, GCU and GCE purposefully modeled the MSA on service agreements other nonprofit institutions have with for-profit companies.

218.    GCU also expended substantial resources planning and consummating the Transaction. In doing so, GCU relied on the Department's existing regulations and past

1    practices, which allow nonprofit institutions to participate in revenue sharing

2    arrangements with for-profit service providers.

3        219.    The Department's failure to justify its disparate treatment of GCU, and its

4    failure to explain its change in position with respect to its requirements for recognition of

5    nonprofit status, renders its Decision arbitrary and capricious.

6                    **The Department's end-run around negotiated rulemaking**

7        220.    In addition to resulting in inconsistent treatment, the Department's policy

8    changes effectively end-run Congressionally mandated negotiated rulemaking.

9        221.    Under the Higher Education Act, the Secretary may promulgate new rules

10   only through the negotiated rulemaking process, which is meant to guarantee sufficient

11   public engagement, avoid confusion in the field as to what the law is, and prevent

12   inconsistent application of regulations once they go into effect.

13       222.    The Department's change in policy away from automatically accepting IRS

14   nonprofit approval to engaging in its own ad hoc process upends the change-in-control

15   provisions (*see* ¶¶ 149-58, above), contradicts the Department's prior statements on

16   nonprofit conversion (*see* ¶¶ 159-78, above), and imposes new and unannounced

17   substantive regulations that the Department has effectively promulgated outside the

18   negotiated rulemaking process (see ¶¶ 220-21, above).

19       **D.    Even assuming the Department has authority to determine nonprofit
            status for Title IV purposes, the Decision is arbitrary and capricious.**

20

21       **Under its own reading, the Department exceeded its authority.**

22       223.    Even under the Department's view that the nonprofit definition authorizes it

23   to make an independent determination, the Department exceeded its authority.

24       224.    The Decisions expressly confine the Department's inquiry to whether an

25   institution is owned and operated by one or more nonprofit corporations or associations,

26   no part of the net earnings of which benefits any private shareholder or individual.

44

225.    The net earnings inquiry addresses only whether there is private inurement.

226.    This is a different question than whether a nonprofit operates for an exempt purpose.

227.    The Department misapplied federal tax law by conflating whether GCU operates exclusively for an exempt purpose (which the Department does not have the authority to consider, even under its own interpretation of 600.2) with whether GCU's net earnings impermissibly benefit a shareholder or individual.

228.    Under federal tax law, for an organization to qualify as tax-exempt under section 501(c)(3), there are four factors the IRS must consider:

a.      Whether it is organized and will operate exclusively for religious, charitable, scientific, educational, or other specified exempt purposes, 26 C.F.R. § 501(c)(3)-(1)(c)(1) ("**primary activities**");

b.      Whether any part of its net earnings will inure to the benefit of a private shareholder or individual, 26 C.F.R. § 501(c)(3)-(1)(c)(2) ("**distribution of earnings**");

c.       Whether any part of its activities constitutes intervention or participation in any political campaign on behalf of any candidate for public office; and

d.      Whether a substantial part of its activities consists of political or lobbying activities.

229.    To the extent the Department has any discretion to determine whether an institution is nonprofit for Title IV purposes, its authority is expressly limited to the second prong of the IRS's 501(c)(3) analysis:  whether any part of the institution's net earnings will inure to the benefit of a private shareholder or individual (the "distribution of earnings" prong).

230.    But the Department based its denial of GCU's nonprofit status on the "primary activities" prong.  Specifically, the Department determined that GCU operates for the purpose of benefiting GCE.

231.    The Department's regulations defer to the IRS any consideration of whether an institution's primary activities serve a permissible nonprofit purpose.

232.    When it looked beyond the inurement of net earnings, the Department exceeded the scope of its authority by relying on factors its regulations did not allow it to consider.

**The Department misapplied the primary purpose test**

233.    But even assuming the Department has authority to engage in the primary purpose test, it erroneously applied that test to the Transaction.

234.    The Department looked only to the benefits to GCE under the MSA without giving any consideration to GCU's overall mission and activities.

235.    In determining whether an organization operates exclusively for a permissible purpose, "it is necessary and proper for the [Department] to survey **all** of the activities of the organization, in order to determine whether what the organization in fact does is to carry out a [permissible] mission or to engage in commercial business."  *United States v. Dykema*, 666 F.2d 1096, 1100 (7th Cir. 1981) (emphasis added).

236.    The Department did not survey GCU's activities in denying it nonprofit status.  Rather, it only reviewed GCE's activities and revenue share under the MSA.

237.    Importantly, the Department never considered whether the MSA actually benefited GCU and its educational mission.

238.    The Department offered no analysis of the value of the services GCE provides to GCU in exchange for the revenue share but still determined that GCU pays too much for those services.

46

239.   Nor did the Department consider GCU's nearly 70-year history of providing education services (the majority of those years as a nonprofit). It also made no mention of the success of its students and graduates in achieving career success.

240.   In fact, following the November 6, 2019 Decision, GCU met with Department officials and attempted to show the resounding success of GCU and its educational mission since the Transaction, including GCU's low cost to students, reinvestment in the university, and positive student outcomes.  The Department acknowledged these factors were not relevant to its Decision.

241.   The Department later confirmed that GCU's success in its educational mission did not factor into its decision in both its August 20, 2020 letter and January 12, 2021 Decision.

242.   The Department cannot reasonably find that GCU operates for an impermissible purpose under the MSA without also considering the benefits GCU and its students receive from the arrangement.

243.   Since the Transaction, GCU has flourished.

244.   GCU's revenue net of expenses and revenue net of expenses after interest for the year ending June 30, 2019—its first fiscal year of operations as a stand-alone tax-exempt educational institution—were $78.8 million and $26.1 million, respectively.  In addition, for the year ended June 30, 2019, GCU generated over $123 million in operating cash flows and, as of June 30, 2019, held over $325 million in cash reserves.  As of October 31, 2020, GCU held approximately $380 million in cash reserves and generated over $115 million in cash from operations for the year ended June 30, 2020.

245.   GCU has reinvested substantial revenues in the University for the benefit of its students.  Between July 1, 2018 and October 31, 2019, GCU invested $195.4 million in capital improvements and voluntarily prepaid $100 million on its debt.  GCU also plans to self-fund an estimated $500 million campus expansion, adding 400,000 square feet of

1   classroom, research, and laboratory facilities, one to two new residence halls per year, and

2   additional real estate acquisitions to support campus expansion.

3       246.    Importantly, GCU has been able to fund these improvements with minimal

4   costs to its students. GCU has not raised tuition for its traditional ground students for 13

5   years. It has also limited tuition increases for online students to less than nine percent over

6   that period—far below the 69% increase public four-year colleges have averaged over the

7   same time. *See* Department's National Center for Education Statistics, Digest of

8   Education Statistics, Table 330.10, Average undergraduate tuition and fees and room and

9   board rates charged for full-time students in degree-granting postsecondary institutions,

10  by level and control of institution: Selected years, 1963-64 through 2018-19.[3]

11      247.    The only positive evidence cited by the Department in purporting to find

12  that GCU operates to benefit GCE is the executive summary of the Barclay's report,

13  which GCE—not GCU—commissioned to analyze only its side of the Transaction and

14  which indicated that the Transaction and MSA would also benefit GCE.  But the fact that

15  the MSA makes sense for GCE is not evidence that the MSA impermissibly benefits

16  GCE.

17      248.    There is no nonprofit requirement, whether through the IRS or the

18  Department, that requires parties contracting with nonprofits to make lopsided deals or

19  enter into agreements forcing them to operate at a loss.

20      249.    Moreover, the Department's decision to assess GCU's nonprofit status

21  based on the Barclays report is illogical.

22

23

---

24  [3] Table 330.10 of the Digest of Education Statistics shows that in academic year 2007-08,
    the average tuition and required fees at public 4-year institutions was $4,288, in current
25  dollars.  In academic year 2018-19, that figure rose to $7,250.  Table 330.10 can be found
    at:  https://nces.ed.gov/programs/digest/d19/tables/dt19_330.10.asp?current=yes (current
26  as of Feb. 1, 2021)

250.    GCU never saw the Barclays report before consummating the Transaction. GCU did not engage Barclays as its financial advisor on the Transaction, did not review the Barclays report, and had no interaction with Barclays on any matter.  Instead, Barclays acted as financial advisor to GCE in the Transaction.

251.    Because Barclays advised GCE on the Transaction, the report does not assess how GCU benefits under the MSA, which is an essential consideration under the IRS's primary purpose test.

252.    It is unclear why the Department relies on the Barclays report as part of its analysis when it played no role in GCU's approval of the Transaction.

253.    Instead, as discussed in paragraphs 40-44, above, GCU relied on advice from its own experts who assessed the benefits of the Transaction and MSA to GCU.

254.    Those experts all agreed that the Transaction and MSA were favorable to GCU and its educational mission.

255.    GCU made substantial efforts to ensure that every aspect of the transaction benefited its educational mission.  No expert—nor the Department—has offered any compelling reason that is not true.

256.    And, as discussed above, GCU's continued strong financial position confirms those benefits.

257.    By simply looking at whether the Transaction and the MSA were favorable to GCE, the Department ignored the relevant inquiry of whether GCU operates for the purpose of fulfilling the University's mission as a private Christion institution of higher education.

258.    The Department also failed to justify its denial of GCU's nonprofit status based on the primary purpose test because the MSA's terms are materially the same as other agreements between similarly situated schools and other for-profit service providers.

259.    As discussed in paragraphs 198-219, above, the Department has approved the nonprofit status of numerous institutions who share revenue with for-profit service providers in a manner similar to GCE and GCU.

260.    The Department has not offered any cogent explanation of its position that GCU's MSA is improper where other nonprofit schools are permitted to share up to 80% of their revenue with for-profit service providers.

261.    Because the Department allows other, similarly-situated nonprofit institutions to share even greater percentages of their revenue with for-profit services providers, its failure to justify treating GCU differently is arbitrary and capricious.

**GCU's net earnings do not improperly benefit GCE**

262.    The Department purports to have authority to determine whether GCU's net earnings benefit any private shareholder or individual.  But the Decisions cite no compelling evidence that GCU's net earnings impermissibly inure to GCE.

263.    A nonprofit may incur ordinary and necessary expenditures in the course of its operation without losing its tax-exempt status.

264.    Payment for services creates private benefit or inurement only when the payments exceed fair market value.

265.    Deloitte independently determined that the revenue share GCU pays GCE under the MSA is at or below fair market value.

266.    BKD confirmed Deloitte's analysis.

267.    The entirety of the record establishes that GCU does not provide an impermissible benefit to GCE under the MSA.

268.    Further, the Department ignored the fact that GCU paid approximately $361.6 million less than fair market value for the GCU campus in Phoenix.  The Department's failure to consider this substantial benefit in evaluating whether the Transaction impermissibly favors GCE is reversable error on its own.

269.    The only evidence cited by the Department in purporting to find an impermissible benefit to GCE is the executive summary of the Barclay's report, which indicated that the transaction and MSA would be favorable to GCE.  But the fact that the MSA is favorable to GCE does not mean that it confers an impermissible inurement to GCE.

270.    In the Decisions, the Department also erroneously claimed that the Barclays report showed an increase of GCU's operating costs solely as a result of the service fees paid to GCE.  However, the "increased" operating cost referred to in the Barclays report is a hypothetical consolidated expense figure that combines GCE's and GCU's operating expenses post-Transaction.  This figure includes GCU's projected annual revenue share payment to GCE, which cannot fairly be designated as an operating cost of GCU.

271.    In other words, GCU's true operating expenses did not increase as a result of the Transaction.  The fact that GCU receives 100% of the revenue in the first instance and then remits 60% to GCE does not create any actual additional expenses.

272.    Notwithstanding the Department's erroneous interpretation of the Barclays report, the operating expenses GCE incurs to provide services to GCU is irrelevant to the question of whether GCU pays fair market value for those services.

273.    The record evidence establishes that GCU's compensation to GCE under the MSA is at or below fair market value.  Thus, there is no impermissible private inurement to GCE.

**Brian Mueller's dual role is irrelevant to GCU's nonprofit status**

274.    The Department also denied GCU's nonprofit status, in part, because GCU's President is also an executive at GCE.

275.    Outside of specific regulations involving convictions or confessions of fraud involving Title IV funds, the Department is expressly prohibited from exercising any

1  direction, supervision, or control over the administration or personnel of any educational

2  institution.  20 USC § 1232a.

3    276.    Even if the Department had discretion to place restrictions on an

4  institution's choice of President, it is not a factor the Department has authority to consider

5  when evaluating whether GCU satisfies the definition of a nonprofit institution.

6    277.    To the extent the Department has authority to contradict the IRS's nonprofit

7  determination, its discretion is limited only to whether GCU is "owned and operated by

8  one or more nonprofit corporations or associations, no part of the net earnings of which

9  benefits any private shareholder or individual."

10    278.    The Department never explains how Mr. Mueller's dual positions with GCU

11  and GCE is relevant to that question.  Accordingly, the Department acted arbitrarily and

12  capriciously in denying GCU nonprofit status.

13    279.    Additionally, denial of GCU's nonprofit status due to Mr. Mueller's dual

14  roles conflicts with the Department's decision to approve GCU's application for a change

15  in ownership.

16    280.    The Department approved that application knowing about Mr. Mueller's

17  dual roles with GCU and GCE.

18    281.    The Department does not explain why Mr. Mueller's dual roles are

19  permissible for GCU as a for-profit institution but impermissible for GCU as a nonprofit

20  institution.

21    282.    There is no rational basis for this distinction in the Department's

22  regulations. And the Department offered no explanation justifying the disparate treatment

23  of for-profit and nonprofit institutions.

24    283.    Further, the Department improperly ignored the many safeguards GCU put

25  in place to keep Mr. Mueller from making decisions involving GCU's relationship with

26  GCE.

284.    Indeed, GCU's IRS Form 1023 disclosed Mr. Mueller's dual roles and GCU adopted comprehensive conflict of interest policies at the IRS's request.

285.    The MSA includes a conflict-of-interest policy that excludes Mr. Mueller, or any other interested person, from any direct role in overseeing GCU's relationship with GCE.

286.    GCU's Bylaws also specifically delegate oversight of the MSA to a "Master Services Agreement Committee" which precludes any participation from Mr. Mueller or any other interested person.

287.    Further, all GCU employees, officers, and directors, must abide by GCU's conflict of interest policy.

288.    That policy precludes Mr. Mueller from involvement in decisions relating to GCU's relationship with GCE without permission from GCU's Board of Trustees.

289.    GCU's and GCE's relationship is structured so that Mr. Mueller is not a decision maker with respect to any issue relating to GCE, ensuring Mr. Mueller's undivided loyalty is to the University for all matters in which he participates.

290.    The Department offers no explanation why these measures are inadequate in addressing its concerns about Mr. Mueller's loyalty to GCU.

291.    Nor does it explain why the approvals from HLC and the IRS were incorrect.

292.    After a several-day campus visit including interviews of relevant parties, GCU's accreditor, HLC, concluded that Mr. Mueller's dual role did not prevent GCU from meeting HLC standards.

293.    HLC requires that its member institutions have a "conflict of interest policy that ensures that the governing board and the senior administrative personnel act in the best interest of the institution."

1    294.   HLC also requires each member institution to have "ethics policies for

2    faculty and staff regarding conflict of interest, nepotism, recruitment and admissions,

3    financial aid, privacy of personal information, and contracting."

4    295.   The IRS was also fully informed of Mr. Mueller's roles at GCU and GCE

5    when it approved GCU's nonprofit status.

6    296.   Neither HLC nor the IRS determined that Mr. Mueller's dual roles

7    prevented him from serving the best interests of GCU.

8    297.   Unlike the IRS and HLC, the Department has no regulation or guidance on

9    this issue, and it does not explain why the IRS or HLC are wrong.

10    298.   The Department's failure to explain why the HLC and IRS determinations

11    were incorrect renders its Decision arbitrary and capricious.

12    299.   The decision to employ Mr. Mueller was made independently by both

13    GCU's Board of Trustees and GCE's Board of Directors. Each is fully independent of the

14    other, with no overlapping members.  Each board determined, with full knowledge of Mr.

15    Mueller's potential role at the other organization, that Mr. Mueller was the best person to

16    lead their respective organization.

17    300.   There is ample record evidence of GCU's substantial efforts to remove any

18    threat attributable to Mr. Mueller's dual roles with GCU and GCE.

19    301.   But the Department dismisses these efforts without any evidence that the

20    various mitigating policies were not followed and without any meaningful explanation

21    why those protections are insufficient.

22    302.   In denying nonprofit status to GCU on these grounds, the Department acted

23    based on pure speculation.

24             **The MSA does not allow GCE to operate GCU**

25    303.   In the Decisions, the Department erroneously concluded that GCU is not the

26    entity actually operating GCU.  In support of this assertion, the Department states it is

"skeptical that any nonprofit could outsource the number and type of institutional functions that [GCU] has and still be deemed to operate the Institution."

304.    The Department's regulations do not prohibit a nonprofit institution from delegating any of the services performed by GCE under the MSA.

305.    In fact, the Department's regulations expressly allow an institution to contract with a third-party servicer "for the administration of **any aspect** of the institution's participation in any Title IV, HEA program." 34 C.F.R. § 668.25(a) (emphasis added).

306.    The Department offers no explanation for why an institution's rights under § 668.25 are limited by its purported nonprofit approval process.

307.    And the Department has routinely permitted nonprofit institutions to delegate those same services without losing their nonprofit status.

308.    Moreover, the Department is expressly prohibited from dictating how an institution—whether nonprofit or for-profit—chooses to delegate services to outside entities.  20 USC § 1232a ("No provision of any applicable program shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution").

309.    The Department has approved agreements between other nonprofit institutions and for-profit service providers where the for-profit service provider performs substantially the same services that GCE provides for GCU.

310.    For example, in the service agreement between Purdue Global and Kaplan, Kaplan is responsible for Purdue Global's editorial services, marketing and advertising, student advising, admission support services, international student recruitment, test preparation, technology support, business office support, financial aid and student

finances, human resources, facilities and property management, finance and accounting, and other general administrative functions.

311.    UFDCE also delegates many of its services to a for-profit company, Bisk, pursuant to a service agreement.  Bisk is responsible for UFDCE's marketing, recruiting, registration, student support and retention, instructor support, course development support, instructional services, books and materials fulfillment, billing and collections, regulatory assessment, and student documentation services.

312.    GCE provides substantially the same services to GCU as Bisk provides to UFDCE and Kaplan provides to Purdue Global.

313.    GCE is responsible for GCU's marketing and advertising, enrollment services, student advising, student records management, accounting, financial aid, human resources, technology support, business office support, faculty training and recruitment (subject to GCU oversight and approval), and compliance monitoring.

314.    In all three service agreements, the institution shares revenue with a for-profit company responsible for marketing, recruiting, technology support, financial aid, curriculum development, and other administrative functions.

315.    There is no meaningful difference between the services provided under the three service agreements.  And the Department recently approved Purdue Global's nonprofit status despite its agreement with Kaplan, while determining that GCU ceded too much control of its operations to be granted nonprofit status.

316.    The Department has not articulated any distinction between the services Kaplan and Bisk perform and the services GCE performs.

317.    The Department's decision to deny nonprofit status to GCU on the ground that GCE oversees too many institutional functions of GCU is arbitrary and capricious because it has allowed other nonprofit institutions to delegate the same services to for-profit companies.

318.    Further, HLC requires that its member institutions "document[] outsourcing of all services in written agreements, including agreements with parent or affiliated organizations" and also to "take[] responsibility for the ethical and responsible behavior of its contractual partner in relation to actions taken on its behalf."  HLC reviewed and approved the MSA, finding that it complied with HLC Criteria.

319.    The Department did not explain why HLC was wrong in concluding that GCU maintained control over the contractual relationship with GCE.

320.    The Department's failure to consider this evidence and to explain why its decision is counter to other regulating entities renders its decision arbitrary and capricious.

**E. The Department's Licensing Regime is an Unconstitutional Prior Restraint**

321.    GCU was previously approved to operate as a nonprofit business by the State of Arizona and the IRS, which constitutes clear evidence that GCU's decision to operate in the nonprofit business form is legitimate.

322.    By requiring GCU to seek additional approval from the Department of Education in order to identify itself as a nonprofit organization after the IRS had already determined that GCU is entitled to tax-exempt status, the Department stripped GCU of its right to choose its business form.

323.    The requirement that educational institutions seek additional nonprofit status approval from the Department effectively creates a licensing regime, in violation of the well-settled legal principle that the government does not have unfettered freedom to implement a particular content-based restriction through a system of prior administrative restraints.

324.    The Department's licensing regime amounts to a content-based "prior restraint" on GCU's right to hold itself out as a nonprofit.

325.    Although prior restraints are not per se unconstitutional, any system of prior restraint bears a heavy presumption against its constitutional validity.

326.    Department officials are vested with discretion over protected speech and expressive conduct in violation of GCU's well-established First Amendment rights because the Department's licensing regime allows the Department to exercise unfettered discretion over an institution's ability to identify as a nonprofit institution.

327.    Although the First Amendment prohibits the Department from improperly infringing upon GCU's ability to accurately represent itself as a nonprofit institution of higher education, the Department requires GCU to apply to the Department and obtain a permission from the Department in order to hold itself out as a nonprofit educational institution.

328.    Ultimately, the Department's licensing regime and its Decisions infringe on GCU's First Amendment right to hold itself out as a nonprofit university.

# COUNT I

## (Declaratory Judgment Action)

329.    Plaintiff incorporates the preceding paragraphs as if they were fully set forth herein.

330.    GCU is a nonprofit institution as defined in the Department's regulations.

331.    As a matter of law, GCU became a nonprofit institution of higher education on the date of the Transaction.

332.    The Department acted arbitrarily and capriciously in concluding that GCU is a proprietary institution of higher education, which is a decision contrary to the HEA and the Department's regulations.

333.    An actual and justiciable controversy exists between the parties regarding the Department's regulations defining a nonprofit institution. The Department erred in concluding that GCU is a proprietary institution of higher education.

334.    There is no adequate remedy available to GCU by which these controversies may be resolved other than the relief requested.

335.    Plaintiff is therefore entitled pursuant to Rule 57 of the Federal Rules of Civil Procedure to a declaratory judgment order from this Court. Specifically, GCU seeks a declaration that GCU is a nonprofit institution for purposes of Title IV programs entitled to be regulated as a nonprofit institution of higher education as of the date of the Transaction

## COUNT II

### (Administrative Procedure Act)

336.    Plaintiff incorporates the preceding paragraphs as if they were fully set forth herein.

337.    The APA prohibits agency action that is contrary to law or arbitrary and capricious.  Because the Department's Decisions are contrary to law and arbitrary and capricious, the Decisions must be vacated and set aside pursuant to 5 U.S.C. § 706.

338.    The Department's Decisions are plainly contrary to law because GCU is owned and operated by a nonprofit institution, of which no part of the net earnings benefits any private shareholder or individual under the plain language of the HEA and 34 C.F.R. § 600.2.

339.    The Department's Decisions are also arbitrary and capricious.  An agency acts in an arbitrary and capricious manner when it departs from an existing position without providing a reasoned explanation for its departure; when it disregards regulated parties' reliance interest on a prior practice; when it considers factors that congress or the agency's regulations did not intend it to consider; when it fails to consider an important aspect of the issue before it; when it offers an explanation for its decision that runs counter to the evidence before the agency; when it treats like parties differently without providing an adequate explanation to justify the disparate treatment; and when its explanation is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

a.      The Department abandoned its prior practice of conferring nonprofit status based on state authorization and IRS designation in the Decisions without providing a reasoned explanation for this departure.

b.      The Department failed to consider GCU's reasonable reliance on the Department's prior practice before retroactively applying its new practice.

c.      The Department impermissibly considered Mr. Mueller's dual roles with GCE and GCU without explaining the relevancy of that factor to the definition of "nonprofit institution" under the HEA and 34 C.F.R. § 600.2.

d.      The Department impermissibly applied the IRS's "primary purpose" test;

e.      The Department failed to consider GCU's conflict of interest policy and other measures taken to limit Mr. Mueller's involvement in decisions regarding GCU's relationship with GCE.

f.      The Department failed to consider how the Transaction and the terms of the MSA benefited GCU and its educational mission.

g.      The Department's Decisions are counter to the independent expert reports without sufficiently explaining why the expert reports were unreliable or providing contrary expert opinions.

h.      The Department treated GCU differently than similarly situated institutions without providing a reasoned explanation for doing so.

340.    Moreover, by departing from its prior practice of acknowledging nonprofit status for Title IV based on an institution's designation by the IRS as a 501(c)(3) tax-exempt nonprofit; denying GCU's nonprofit status after being provided, in advance of the Transaction, information regarding the details of, and timetable for, the Transaction; and treating GCU differently from other, similarly-situation nonprofit institutions, the Department violated notions of notice, due process, and equal protection.  In so doing the Department acted contrary to law under 5 U.S.C. § 706.

341.    Plaintiff is, therefore, entitled to an order and judgment from this Court declaring that the Department's Decisions violated the law and are arbitrary and capricious within the meaning of 5 U.S.C. § 706, and ordering the Department to recognize GCU as a nonprofit educational institution for all purposes.

## COUNT III

### (Administrative Procedure Act)

342.    Plaintiff incorporates the preceding paragraphs as if they were fully set forth herein.

343.    The Department is obligated to promulgate rules through negotiated rulemaking under HEA section 492.

344.    Further, the APA requires agencies to adhere to certain procedural requirements when promulgating legislative rules through notice and comment rulemaking.  The agency must (1) give 'notice of the proposed rulemaking in the Federal Register"; (2) "afford interested persons an opportunity to participate through submission of written data": and (3) explain the rule ultimately adopted."  5 U.S.C. § 553(b)-(c).  A rule is legislative if it changes existing law, policy or practice.

345.    The Department's Decisions imposed legislative rules because they required GCU to comply with new obligations in order to establish nonprofit status for purposes of Title IV, changed the Department's long-standing practice for acknowledging nonprofit status for purposes of Title IV, and carried the full force and effect of law.

346.    Because the Department's Decisions imposed new obligations on GCU and changed the Department's prior practice, they comprise legislative rulemaking, and the Department adopted this legislative rule in violation of the Administrative Procedure Act's notice-and-comment requirements.

**COUNT IV**

**(Facial Violation of the First Amendment of the United States Constitution)**

347.   Plaintiff incorporates the preceding paragraphs as if they were fully set forth herein.

348.   Under the Department's licensing regime, the Department's permission is required before an institution may engage in protected expressive conduct of calling itself a nonprofit and operating as one under Title IV and the HEA. The process of approval— including the lack of any time constraints for issuance—impose unjustifiable burdens upon protected expression and expressive conduct, which are not reasonable in light of the purposes served by the forum. The Department's licensing regime, and the related regulations governing an institution's nonprofit status, are unconstitutional on their face.

349.   The licensing regime imposed by the Department has a close nexus to expression, or conduct commonly associated with expression, and poses a real and substantial threat of the risk of censorship.

350.   The Department's licensing regime constitutes an illicit prior restraint upon protected speech.

351.   As a direct and proximate result of the Department's actions, GCU has suffered damages and will continue to suffer damages in an amount to be proven at trial.

352.   In addition, GCU is informed and believes and therefore alleges that, unless and until restrained by this Court, the Department will continue to apply its un-constitutional licensing regime described herein and refuse to permit GCU's ability to engage in protected expressive conduct and identify as a nonprofit institution.

353.   Unless the Department is enjoined and restrained from engaging in such conduct, GCU will be irreparably injured and deprived of the constitutional rights guaranteed under the federal Constitution, and will suffer substantial loss, the nature and extent of which will be extremely difficult or impossible to ascertain.

1      354.   GCU has no adequate remedy at law to prevent or redress the irreparable

2  injury alleged herein.

3      355.   GCU is, therefore, entitled to an order and judgment from this Court

4  declaring that the Department's licensing regime is not in accordance with law and is an

5  unconstitutional prior restraint.

6                          **PRAYER FOR RELIEF**

7      WHEREFORE, Plaintiff demands judgment as follows:

8      1.     Under the First Cause of Action, an order and judgment declaring that GCU

9  is a nonprofit institution for purpose of Title IV programs and therefore entitled to be

10  regulated as a nonprofit institution of higher education commencing with the date of the

11  Transaction;

12      2.     Under the Second Cause of Action, an order and judgment declaring that the

13  Department's Decisions are not in accordance with law and are arbitrary and capricious

14  within the meaning of 5 U.S.C. § 706, vacating the Department's Decisions, and ordering

15  the Department to hold that GCU is a nonprofit educational institution for all purposes;

16      3.     Under the Third Cause of Action, an order and judgment vacating the

17  Department's Decisions, in which the Department purports to establish legislative rules

18  without complying with the APA's notice-and-comment rulemaking procedures.

19      4.     Under the Fourth Cause of Action, an order and judgment declaring that the

20  Department's Decisions deny GCU's constitutionally-protected right to call itself a

21  nonprofit institution, in violation of the First Amendment;

22      5.     An order vacating the for-profit PPA the Department required GCU to sign

23  in order to participate in Title IV programs and requiring the Department to issue GCU a

24  new PPA recognizing GCU's as a nonprofit institution of higher education;

25      6.     Attorneys' fees and costs;

26

7.      Such other relief that the Court deems just and equitable under the circumstances.

Dated this February 2, 2021.

Respectfully submitted,

/s/ Hannah H. Porter
Kevin E. O'Malley
Hannah H. Porter
GALLAGHER & KENNEDY
2575 E. Camelback Road, Suite 1100
Phoenix, Arizona 85016

/s/ Steven M. Gombos
GOMBOS LEYTON, P.C.
11350 Random Hills Road, Suite 400
*Lead Attorney for Plaintiff*

I certify that on this 2nd day of February, 2021, I electronically transmitted the foregoing Complaint to the Clerk of Court.

*/s/ Andrea L. Parker*