J. Henk Taylor, A.Z. Bar #016321
RYAN RAPP UNDERWOOD & PACHECO, P.L.C.
3200 N. Central Avenue, Suite 2250, Phoenix, Arizona 85012
Telephone: (602) 280-1000
Facsimile: (602) 265-1495
htaylor@rrulaw.com

Aaron S. Ament, D.C. Bar #1602164 (*pro hac vice* forthcoming)
Daniel A. Zibel, D.C. Bar #491377 (*pro hac vice* forthcoming)
Maya H. Weinstein*, N.C. Bar #56621 (*pro hac vice* forthcoming)
NATIONAL STUDENT LEGAL DEFENSE NETWORK
1015 15th Street NW, Suite 600, Washington, D.C. 20005
(202) 734-7495
aaron@defendstudents.org
dan@defendstudents.org
maya@defendstudents.org

Brian Galle, N.Y. Bar #419154 (*pro hac vice* forthcoming)
Georgetown University Law Center
600 New Jersey Avenue NW, Washington, D.C. 20001
(202) 662-4039
brian.galle@georgetown.edu

Attorneys for Proposed Intervenor-Defendant Student Defense
*Admitted to practice law only in North Carolina; Supervised by organizational
principals while D.C. Bar application is pending.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Grand Canyon University,<br><br>　　　　Plaintiff,<br><br>v.<br><br>Miguel Cardona, in his Official Capacity as Secretary of the United States Department of Education, and the United States Department of Education.<br><br>　　　　Defendants,<br><br>　　　　and<br><br>National Student Legal Defense Network,<br><br>　　　　Applicant to Intervene. | No.: 2:21-cv-00177<br><br>**MOTION OF NATIONAL STUDENT LEGAL DEFENSE NETWORK TO INTERVENE AS DEFENDANT**<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE**<br><br><br>April 22, 2021 |

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................. iii

**MOTION TO INTERVENE** ................................................................. 1

**MEMORANDUM OF POINTS AND AUTHORITIES** ................................. 1

    **INTRODUCTION** ........................................................................ 1

    **BACKGROUND** ......................................................................... 5

        **I.**   **For-Profit and Nonprofit Institutions under the Higher Education Act** ......................................................... 5

        **II.**   **The GCU-GCE Transaction** ............................................ 6

        **III.**  **The Department's November 2019 Decision** ...................... 7

        **IV.**  **Proposed Intervenors** ................................................... 9

    **LEGAL STANDARD** .................................................................. 10

    **ARGUMENT** .............................................................................. 11

        **I.**   **Student Defense Satisfies the Three Threshold Requirements for Permissive Intervention** ......................... 11

            **A.**  **Student Defense has an Independent Ground for Jurisdiction** .................................................. 11

            **B.**  **The Motion to Intervene is Timely** .............................. 12

            **C.**  **Students Defense's Defenses Share Common Questions of Law and Fact with the Main Action** ...... 12

        **II.**  **The Court Should Use Its Discretion to Permit Student Defense to Intervene** ............................................... 13

    **CONCLUSION** ........................................................................... 17

# TABLE OF AUTHORITIES

**CASES**

*Am. Civil Liberties Union of N. Cal. v. Burwell*, No. 16-CV-03539-LB,
    2017 WL 492833 (N.D. Cal. Feb. 7, 2017)........................................ 16

*Arizonans for Fair Elections v. Hobbs*, 335 F.R.D. 261 (D. Ariz. 2020) .............. 12

*Beckman Indus. V. Inst'l Ins. Co.*, 966 F.2d 470 (9th Cir. 1992) ........................ 10

*Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*, 712 F.3d 1349 (9th
    Cir. 2013)........................................................................................ 10

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893 (9th
    Cir. 2011)............................................................................. 12, 13, 14

*Ctr. for Biological Diversity v. Zinke*,
    No. CV-18-00047, 2018 WL 3497081 (D. Ariz. July 20, 2018) ......... 10, 12, 13

*Digit. Media Sols. V. South University*, 1:19-CV-00145 (N.D. Ohio
    Jan. 18, 2019). ................................................................................ 9

*Dunagan et al. v. Ill. Inst. of Art, et. al*, No. 19-CV-00809 (N.D. Ill.
    Mar. 30, 2021). ............................................................................... 9

*Freedom from Religion Found. v. Geithner*, 644 F.3d 836 (9th Cir. 2011) .......... 11

*Nw. Forest Res. Council v. Glickman*, 82 F.3d 825 (9th Cir. 1996) ..................... 12

*Perry v. Proposition 8 Official Proponents*, 587 F.3d 947 (9th Cir. 2009) .......... 13

*Peruta v. Cnty. of San Diego*, 824 F.3d 919 (9th Cir. 2016) ................................ 12

*Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326 (9th Cir. 1977) ............. 16

*Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810 (9th Cir. 2001)..........14, 16

**STATUTES**

HEA § 101, 20 U.S.C. § 1001.............................................................. 1, 2, 5

HEA § 102, 20 U.S.C. § 1002............................................................. 2, 5, 6

20 U.S.C. § 1094 ................................................................................... 6

HEA § 498, 20 U.S.C. § 1099............................................................... 1

20 U.S.C. § 3403(b) ............................................................................ 4

26 U.S.C. § 501(c)(3) ................................................................. 5

Pub. L. 116-260, 134 Stat. 1182 ........................................... 3, 15

Pub. L. 117-2, 135 Stat. 4 ...................................................... 3, 16

**RULES**

Fed. R. Civ. P. 24 ............................................................. *passim*

**TREATISES**

7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Practice & Proc.* § 1917 (3d ed. 2010) ........................................... 12

**REGULATIONS**

34 C.F.R. § 600.2 ............................................................... 2, 5, 8

34 C.F.R. § 600.31 ................................................................ 1, 2

34 C.F.R. §§ 600.4–600.5 ..................................................... 2, 5

34 C.F.R. § 668.28 ................................................................... 8

**OTHER AUTHORITIES**

Grand Canyon Education, Inc., Annual Report (Form 10-K) (Feb. 20, 2019), *available at:* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001434588/000155837020001013/lope-20191231x10ka0a80b.htm ........................................... 14, 15

*Grand Canyon Education Inc (LOPE) CEO Brain Mueller on Q4 2018 Results – Earnings Call Transcript*, Seeking Alpha (Feb. 20, 2019, 10:55 PM), *available at:* https://seekingalpha.com/article/4242733-grand-canyon-education-inc-lope-ceo-brian-mueller-on-q4-2018-results-earnings-call-transcript ........................................... 15

Henry Hansmann, *The Role of Nonprofit Enterprise*, 89 Yale L.J. 835 (1980) ................................................................................. 5, 6

*Higher Education Emergency Relief Fund (HEERF) II Public and Private Nonprofit Institution (a)(1) Programs (CFDA 84.425E and 84.425F) Frequently Asked Questions*, U.S. Dep't of Educ. (Mar. 19, 2021), *available at:* https://www2.ed.gov/about/offices/list/ope/updateda1faqsheerfii.pdf .............. 4

Nonprofit Conversions and Student Success: Recommendations for
    Accreditors," Student Defense, *available at:*
    https://www.defendstudents.org/news/body/quality-assurance/Student-
    Defense-Quality-Assurance-Initiative-Nonprofit-Conversions.pdf ................... 9

Paul Fain, *Education Department Explains Grand Canyon Decision*, Inside
    Higher Ed (Nov. 13, 2019), *available at:*
    https://www.insidehighered.com/quicktakes/2019/11/13/education-
    department-explains-grand-canyon-decision ...................................... 2

Restatement of Charitable Nonprofits § 1.01 cmt. (Am. Law Inst.
    forthcoming 2021) ........................................................... 5

National Student Legal Defense Network, Comment Letter on the
    Oversight of For-Profit Institutions Converting to, or Attempting to
    Convert to, Non-Profit Entities (May 9, 2018), *available at:*
    https://www.defendstudents.org/comment-
    letter-20180509.pdf ......................................................... 10

Vivien Lee & Adam Looney, Brookings Institution, Understanding the
    90/10 Rule: How reliant are public, private, and for-profit institutions
    on federal aid? (Jan. 2019), available at: https://www.brookings.edu/
    wp-content/uploads/2019/01/ES_20190116_Looney-90-10.pdf ...................... 6

## MOTION TO INTERVENE

Defendant-Intervenor, the National Student Legal Defense Network ("Student Defense") respectfully moves pursuant to Federal Rule of Civil Procedure 24(b) for an order permitting it to intervene as a defendant in this action ("Main Action"), in which Plaintiff Grand Canyon University ("GCU") challenges the decision of Defendants United States Department of Education and Secretary of Education Miguel Cardona, in his official capacity, (collectively, the "Department" or "Defendants") to deny its application for change in ownership from for-profit to nonprofit status. This motion is supported by the accompanying Memorandum of Points and Authorities and proposed Answer in Intervention (attached hereto as Exhibit A). Undersigned counsel reached out to counsel for the parties to obtain consent to intervention. GCU does not consent, and the Department stated that it does not take a position at this time.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Under the Higher Education Act of 1965, 20 U.S.C. § 1001 *et seq.* ("HEA"), the Department must determine whether institutions of higher education can participate in the Federal Student Aid programs authorized by Title IV of that Act, and thus serve as conduits for students to receive federal student loans and grants. In this regard, the HEA requires the Department to assess certain facts relating to an institution when determining whether the institution can participate. Two of those factors are relevant here.

*First*, when "qualifying" an institution to participate in the Title IV programs, the Department must consider the institution's ownership. HEA § 498, 20 U.S.C. § 1099c. Because the Department is required to consider ownership, and factors relating to both ownership and corporate control, a participating college must obtain approval from the Department when undergoing a "change in ownership that results in a change in control."

*See generally* 34 C.F.R. § 600.31. *Second*, at all times, the Department must determine whether an institution qualifies as a "public," "proprietary," (*i.e.*, for-profit) or "other nonprofit" institution as those terms are defined in the Department's regulations. *See* HEA §§ 101–102, 20 U.S.C. § 1001–1002; *see also* 34 C.F.R. §§ 600.4–600.5. Therefore, when an institution undergoes a "change in ownership resulting in a change in control," the Department must reconsider the institution's status as a public, proprietary, or nonprofit institution. 34 C.F.R. § 600.31.

This case involves an institution that sought to undergo a change in ownership that it believed would change its status with the Department from that of a proprietary institution to that of a nonprofit institution. *See generally* Compl. ¶¶ 1–3. In 2018, GCU submitted an application to the Department under which the institution would no longer be owned by the for-profit Grand Canyon Education, Inc. ("GCE"). *Id.* ¶ 61. Instead, GCU proposed an arrangement to the Department where it would purchase real property, tangible assets, and intangible assets from GCE, and then obtain services from GCE in exchange for fees paid pursuant to a Master Services Agreement ("MSA"). *Id.* ¶¶ 39, 62.

On November 6, 2019, the Department wrote to Brian Mueller, President and CEO of GCE and GCU, and informed him that it approved the change in ownership from GCE to GCU (referred to in the letter as "Gazelle") and would allow GCU to continue participating in the Title IV programs. *Id.* Nevertheless, after applying its three-part test to determine whether GCU qualified as a nonprofit, *see* 34 C.F.R. § 600.2 (definition of "[n]onprofit institution"), the Department determined, *inter alia*, that "the primary purpose" of the transaction was "to drive shareholder value for GCE," and GCU therefore did not meet the definition of a nonprofit institution. Letter from Michael Frola, Dir.,

Multi-Reg'l & Foreign Schs. Participation Div., U.S. Dep't of Educ., to Brian Mueller, President, Grand Canyon Univ. (Nov. 6, 2019) ("Frola Ltr.").[1]

GCU attempted to convince the Department that its November 2019 decision was erroneous. *See* Compl. ¶¶ 98–101. Unable to do so, GCU and GCE entered into a new Master Services Agreement (the "Amended MSA"), which altered aspects of the original arrangement. *Id.* ¶¶ 102–05. But on January 12, 2021, the Department issued a second decision "again declining to recognize GCU as a nonprofit for Title IV purposes." *Id.* ¶ 128. The January 2021 decision affirmed that, even under the Amended MSA, "GCU will still not meet the requirement that both the primary activities of the organization and its stream of revenue benefit the nonprofit itself." *Id.* ¶ 129.

GCU filed this lawsuit on February 2, 2021. On the one hand, this is a dispute between a regulated entity and its regulator about corporate restructuring, tax laws, and the applicable regulations. But it is more than that because of the intended beneficiaries of the entire regulatory structure: students. Thousands of third party intended beneficiaries—namely *the current and future students* who enroll at GCU—are impacted by the transaction and whether the institution is beholden to GCE or is, more broadly, operating in the public interest as a *bona fide* nonprofit institution. But remarkably, neither the 2019 decision nor the 2021 reconsideration decision discuss or describe the impacts on students that flow from the proposed conversion.

For students, there are immediate consequences should the Department reverse course. Under the Coronavirus Response and Relief Supplemental Appropriations Act,

---

[1] This letter was linked in an Insider Higher Ed article. See Paul Fain, *Education Department Explains Grand Canyon Decision*, Inside Higher Ed (Nov. 13, 2019), *available at:* https://www.insidehighered.com/quicktakes/2019/11/13/education-department-explains-grand-canyon-decision. A direct URL to the letter is: https://www.documentcloud.org/documents/6548148-Grand-Canyon-University-Decision-on-CIO-11-06-19.html

2021 ("CRRSAA") (Pub. L. 116-260, 134 Stat. 1182) and the American Rescue Plan ("ARP") (Pub. L. 117-2, 135 Stat. 4), Congress provided substantial COVID-19 relief funds to institutions of higher education through the Higher Education Emergency Relief Funds ("HEERF"). But in so doing, Congress carved out a distinction for proprietary schools, which must use 100 percent of HEERF awards to provide emergency financial aid grants directly to students. Were GCU to be considered a nonprofit institution, it would be allowed to retain portions of those funds for institutional purposes, including, for example, covering lost revenue and reimbursement for expenses already incurred. *See Higher Education Emergency Relief Fund (HEERF) II Public and Private Nonprofit Institution (a)(1) Programs (CFDA 84.425E and 84.425F) Frequently Asked Questions*, U.S. Dep't of Educ. (Mar. 19, 2021), *available at:* https://www2.ed.gov/about/offices/list/ope/updateda1faqsheerfii.pdf. The current designation of GCU as a proprietary institution ensures that these federal funds solely benefit students, rather than GCU shareholders.

Under the Amended MSA terms, the for-profit, publicly traded GCE will take roughly 59% of the revenues that GCU derives from student tuition, housing, and fees (which may or may not include federal COVID-19 relief funding), Compl. ¶ 104, but there is no party to this matter currently advocating for how that revenue will be used to serve students.[2] Despite this, GCU asserts that the Department of Education—which provided more than $950 million in federal student loans and grants to Grand Canyon in 2019-20—is wrong to continue to treat the institution as anything other than a nonprofit institution. Students have a unique interest ensuring that GCU and GCE do not paper

---

[2] Notably, Congress has placed certain limitations on the Department's authorities. For example, the Department is not authorized to "exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution[.]" 20 U.S.C. § 3403(b).

over their profit arrangements simply by rebranding GCU as a "nonprofit." For this and other reasons, explained more fully below, Student Defense seeks to intervene in this proceeding to ensure that the student voice is heard.

## BACKGROUND

### I.     For-Profit and Nonprofit Institutions under the Higher Education Act

The HEA creates an important distinction between "public," "nonprofit," and "proprietary" institutions for purposes of participation in the Title IV student aid programs. But Congress did not define these terms. *See* HEA § 101–102, 20 U.S.C. § 1001–1002. The Department, however, has adopted definitions by regulation, which establish that a nonprofit institution is one that (1) is legally authorized to operate as a nonprofit in the states in which it is physically located; (2) is determined by the IRS to be an organization under 26 U.S.C. § 501(c)(3); and (3) "[i]s owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private shareholder or individual[.]" 34 C.F.R. § 600.2 (definition of "[n]onprofit institution"); *see also* Frola Ltr. at 9–10; 34 C.F.R. § 600.5 (defining "proprietary institution" as an "institution of higher education" that is, *inter alia*, "not a public or private non-profit" institution).

In nonprofit law, the requirement that no part of the net earnings benefit any private shareholder or individual is referred to as the "nondistribution constraint"[3] and generally is considered essential to the enhanced trust that stakeholders and regulators afford nonprofit organizations over organizations not so constrained.[4] The nondistribution

---

[3] *See* Restatement of Charitable Nonprofits § 1.01 cmt. (Am. Law Inst. forthcoming 2021).

[4] *See, e.g.*, Henry Hansmann, *The Role of Nonprofit Enterprise*, 89 Yale L.J. 835, 847 (1980) (explaining that "because of the legal constraints under which it must operate" a nonprofit warrants greater trust from donors and other consumers).

constraint is essential for diverse stakeholders to make an informed choice to trust a nonprofit organization to prioritize its *mission* over the financial interests of those who control the organization.[5] Without the nondistribution constraint, those stakeholders have less assurance that the organization will pursue its mission rather than pursuing private financial interests.[6]

Congress recognized these divergent incentives when it set requirements specific to for-profit institutions. One of these statutory provisions, commonly referred to as the "90/10 Rule," requires for-profit schools to derive at least 10% of their revenues from sources other than federal student aid programs. 20 U.S.C. § 1094(a)(24). The 90/10 Rule was intended to protect students at for-profit colleges by ensuring that "if an institution is providing a valuable education, someone other than the federal government should be willing to pay for students to attend."[7] When a school converts from a for-profit to a nonprofit, it must report compliance with 90/10 for the first year following its conversion. Another requirement, for example, is that virtually all programs offered by for-profit institutions must "prepare students for gainful employment in a recognized occupation," a requirement inapplicable to public or nonprofit degree programs. 20 U.S.C. §§ 1002(b)(1)(A)(i), (c)(1)(A).

## II.    The GCU-GCE Transaction

The transaction proposed by GCE and GCU would allow the two companies to hide behind a façade of nonprofit designation in order to avoid adhering to statutory

---

[5] *Id.* at 844–45.

[6] *Id.* at 873 (describing the nondistribution constraint as "the essential characteristic that permits nonprofit organizations to serve effectively as a response to contract failure").

[7] Vivien Lee & Adam Looney, Brookings Institution, *Understanding the 90/10 Rule: How reliant are public, private, and for-profit institutions on federal aid?* (Jan. 2019), *available at:* https://www.brookings.edu/wp-content/uploads/2019/01/ES_20190116_Looney-90-10.pdf.

protections enacted by Congress to protect for-profit college students. Under the proposed structure, the entities would continue functioning in a manner substantially similar to its current operations as a for-profit college, because GCE will provide services to GCU at a cost that far exceeds their value, using funds derived from student tuition, housing, and other fees. Frola Ltr., at 2–4.

According to the Department, the original MSA required GCU to pay GCE a fee equal to 60% of GCU's Adjusted Gross Revenue (which includes tuition and revenue generated from student housing, student meal plans, student activities, athletic and recreation revenue, and student use of online communication and learning services). *Id.* at 3. However, under the arrangement, GCE would only be responsible for 28% of GCU's operating costs. *Id.* at 3, 6. Under the MSA, if GCU were not to renew the agreement at end of the 15-year initial term or after each automatic 5-year renewal term, a massive non-renewal fee would be imposed on GCU. *Id.* at 3–4. GCU could only terminate the agreement if it first paid off the balance of the $800 million loan from GCE that it took out to "purchase" the existing campus. *Id.* at 2–4.

In January 2020, GCU and GCE amended the MSA, capping the fee structure at 59% of GCU's total revenue, only marginally less than the original 60%. Compl. ¶ 102, 104. The Amended MSA also allowed GCU to invoke its right to terminate sooner and reduced the termination fee. *Id.* ¶ 105. The transaction was also problematic in that it was structured such that many members of the GCU Executive Leadership Team would remain employed by GCE. Significantly, Brian Mueller, CEO of GCE, would continue to serve as President of GCU. Letter from Martina Fernandez-Rosario, Dir., Sch. Eligibility & Oversight Serv. Grp., U.S. Dep't of Educ., to Brian Mueller, President, Grand Canyon Univ. (Jan. 12, 2021), at 17–19.

### III.    The Department's November 2019 Decision

The genesis of this litigation stems from the Department's application of the third prong of the definition of "nonprofit institution" in the regulations to deny nonprofit status to GCU: the requirement that no part of the net earnings benefit any private shareholder or individual. *See supra* pp. 5–6. The Department did not dispute that GCU is authorized to operate as a nonprofit in the states in which it is physically located (prong 1), nor did it take a position regarding the IRS's determination (prong 2). Rather, after applying the third prong of the definition the Department concluded that GCU was not a nonprofit. Accordingly, when the Department approved the change in ownership application, it approved GCU as a proprietary (for-profit) institution for the purposes of its continued participation in Title IV, HEA Programs. Frola Ltr., at 16-17.

In November 2019, the Department informed GCU that it would be subject to regulatory requirements of for-profit institutions such as compliance with "90/10 eligibility requirements described in 34 C.F.R. § 668.28 and any applicable gainful employment program requirements set out in 34 C.F.R. § Subpart Q." *Id.* at 17. The Department noted that GCU met two of three criteria that define a nonprofit under 34 C.F.R. § 600.2: (1) the IRS determined GCU to be a 501(c)(3) nonprofit and (2) GCU is legally authorized to operate as a nonprofit in the state that it was physically located. However, the Department determined that GCU did not meet the requirement that no part of the net earnings benefit any private shareholder or individual.

In reaching the determination that GCU failed to show that no part of the net earnings benefitted GCE and its shareholders, the Department found that the MSA requires GCU to pay significant portions of its revenue to GCE. Frola Ltr., at 14; *see also* Fernandez-Rosario Letter, at 3–4, The Department also raised concerns related to the nondistribution constraint, highlighting that GCU appears to be GCE's captive client.

Frola Ltr., at 14. The Department noted the non-renewal fees and the buy-out requirement to terminate the agreement. In addition to the financial constraints, the nonprofit GCU Board of Trustees would be governed by people who currently sit on the for-profit GCU board. *Id.* at 16. This structure makes it highly improbable, from a practical standpoint, that GCU could end its contractual relationship in the event that GCE fails to deliver student services or meet the demands of GCU. In spite of the Department's thorough technical analyses of the transaction, students—the intended beneficiaries of Title IV programs—are absent from its discussions.

## IV.   Proposed Intervenors

Student Defense is a nonprofit, non-partisan organization, recognized as tax exempt under section 501(c)(3) of the Internal Revenue Code that works to advance students' rights to educational opportunity and to ensure that higher education provides a launching point for economic mobility. Declaration of Aaron Ament at ¶ 3–4 (attached hereto as Exhibit B). Student Defense has represented numerous students who have been harmed by the ramifications of attempted nonprofit conversions and changes in ownership of their institutions.[8] Student Defense frequently represents students who are targeted by for-profit, often online institutions of higher education, including veterans, students of color, and those with financial hardships. Ament Decl. ¶ 4.

Student Defense has particular expertise in policies that are intended to protect students after a nonprofit conversion. In 2019, Student Defense published a report, "Nonprofit Conversions and Student Success," including recommendations for higher education accrediting agencies to protect students during conversions.[9] In 2018, Student

---

[8] See *Dunagan et al. v. Ill. Inst. of Art, et al.*, No. 19-cv-00809 (N.D. Ill. Mar. 30, 2021); *Digit. Media Sols. v. South University*, 1:19-CV-00145 (N.D. Ohio Jan. 18, 2019).

[9] "Nonprofit Conversions and Student Success: Recommendations for

Defense submitted a detailed comment to the National Advisory Committee on Institutional Quality and Integrity ("NACIQI"), a Federal Advisory Committee established by the HEA, in response to an invitation from NACIQI to provide analysis regarding increased oversight of institutions converting, or attempting to convert to, nonprofit status.[10]

## LEGAL STANDARD

Under Fed. R. Civ. P. 24(b)(1)(B), the Court may permit intervention by any party who "has a claim or defense that shares with the main action a common question of law or fact." Courts in the Ninth Circuit require parties to satisfy three threshold elements in order to permissively intervene: (1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the Main Action. *See, e.g.*, *Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*, 712 F.3d 1349, 1353 (9th Cir. 2013) (citing *Beckman Indus. v. Int'l Ins. Co.*, 966 F.2d 470, 473 (9th Cir. 1992)). In addition, a motion to intervene must "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). Student Defense is contemporaneously filling a proposed Answer (attached hereto as Exhibit A).

Once these requirements are satisfied, the Court may grant permissive intervention. *Id.* "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties'

---

Accreditors," Student Defense, *available at:* https://www.defendstudents.org/news/body/quality-assurance/Student-Defense-Quality-Assurance-Initiative-Nonprofit-Conversions.pdf.

[10] National Student Legal Defense Network, Comment Letter on the Oversight of For-Profit Institutions Converting to, or Attempting to Convert to, Non-Profit Entities (May 9, 2018), *available at:* https://www.defendstudents.org/comment-letters/document/comment-letter-20180509.pdf.

rights." Fed. R. Civ. P. 24(b)(3); *accord Blum*, 712 F.3d at 1354. *See also, e.g.*, *Ctr. for Biological Diversity v. Zinke*, No. CV-18-00047-TUC-JGZ, 2018 WL 3497081, at *4 (D. Ariz. July 20, 2018) (granting permissive intervention where there was "no suggestion" of prejudice).

## ARGUMENT

Student Defense seeks to intervene at the start of this litigation because if GCU prevails in challenging the Department's decision, students are at substantial risk of harm. Student Defense does not raise any claims or questions of law not presented in the Main Action. Furthermore, Student Defense will align its position with the Department's reasoning under the HEA and APA for denying GCU's participation in Federal Student Aid programs as a nonprofit institution. For these reasons, intervention presents no jurisdictional concerns and poses no risk of delaying the Main Action or prejudicing the original parties to the case.

Importantly, Student Defense brings unique perspective and subject matter expertise to this case. Not only is Student Defense a voice for students, whose lives are most impacted by this action, but it is also staffed by individuals who are experts at the intersection of consumer protection and higher education, including individuals with high level government experience working on related issues. Accordingly, the Court should exercise its discretion to permit Student Defense to intervene as a defendant in this case.

**I.     Student Defense Satisfies the Three Threshold Requirements for Permissive Intervention**

**A.     Student Defense has an Independent Ground for Jurisdiction**

As a proposed defendant-intervenor in a federal question case, Student Defense need not show an independent ground for jurisdiction. *Freedom from Religion Found. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011) ("[I]n federal-question cases, the identity of

the parties is irrelevant and the district court's jurisdiction is grounded in the federal question(s) raised by the plaintiff."). For this reason, the independent jurisdictional grounds requirement "does not apply to proposed intervenors in federal-question cases when the proposed intervenor is not raising new claims" or is a defendant. *Id.* (citing 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Practice & Proc.* § 1917 (3d ed. 2010) ("In federal-question cases there should be no problem of jurisdiction with regard to an intervening defendant . . . .")); *see also Zinke*, 2018 WL 3497081, at \*4.

### B.    The Motion to Intervene is Timely

This Motion is undeniably timely. The Ninth Circuit has identified three factors relevant to determining whether a motion is timely: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of any delay." *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 940 (9th Cir. 2016) (en banc) (citation omitted). Moving "at an early stage of the proceedings," when "intervention would not cause disruption or delay in the proceedings," "are traditional features of a timely motion." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (citing *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996)); *see also Arizonans for Fair Elections v. Hobbs*, 335 F.R.D. 261, 265–66 (D. Ariz. 2020) (internal quotations omitted) (finding a motion timely when filed "at the outset of litigation" and before defendants filed an answer).

Student Defense is filing this motion at the beginning of the litigation, before Defendants file a responsive pleading. Granting this motion will cause neither delay nor prejudice to either party. *See, e.g., Glickman*, 82 F.3d at 837 (holding that a motion to intervene was timely where it was filed "before the [Defendant] had filed an answer, and before any proceedings had taken place").

### C.   Student Defense's Defenses Share Common Questions of Law and Fact with the Main Action

Finally, to qualify for permissive intervention, a potential intervenor need only show a "claim or defense that shares with the main action a common question of law or fact." *Hobbs*, 335 F.R.D. at 267 (quoting Fed. R. Civ. P. 24(b)(1)(B)). Student Defense intends to defend the Department's denial of GCU's conversion by raising common legal defenses to those on which the Department will likely rely, *i.e.*, that GCU is not a nonprofit under the regulatory definitions and that to qualify as such, GCU would need to make significant operational and management changes. Furthermore, the fundamental questions of law and fact will not change if Student Defense is permitted to intervene. This is sufficient to establish that Student Defense has defenses that share common questions of law or fact with the Main Action.

### II.   The Court Should Use Its Discretion and Permit Student Defense to Intervene

Because Student Defense satisfies the threshold factors, the Court has discretion to grant permissive intervention unless intervention would unduly delay or prejudice the adjudication of the original parties' rights. Fed. R. Civ. P. 24(b)(3). The Court should exercise that discretion here.

*First*, as set forth above, this motion was filed shortly after GCU filed the Main Action, and the Department has not filed its Answer. This Court has not conducted or scheduled proceedings. Accordingly, granting Student Defense's motion would not delay the litigation. Moreover, Student Defense does not propose to assert a counterclaim or expand the questions of law or fact presented by the Complaint. There is, therefore, no prejudicial delay. *See, e.g.*, *Citizens for Balanced Use*, 647 F.3d at 897 (finding no prejudice where intervention was granted "less than three months after the complaint was filed and less than two weeks after the [defendant] filed its answer to the complaint");

*Zinke*, 2018 WL 3497081, at *4 (finding no prejudice where intervenor's motion was timely filed and did not propose to bring new questions of law or fact into the dispute).

*Second*, intervention is particularly appropriate where the intervenors' interests may not be adequately represented by other parties. *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 955 (9th Cir. 2009) (quoting *Spangler v. Pasadena City Bd. of Educ.,* 552 F.2d 1326, 1329 (9th Cir.1977)); *Citizens for Balanced Use,* 647 F.3d at 898–900 (reversing denial of intervention where, despite sharing an ultimate objective, the original defendant might not adequately represent the applicant's interests). This factor is satisfied where, as here, the Department and Student Defense share an ultimate objective but have different interests. *Sw. Ctr. For Biological Diversity v. Berg*, 268 F.3d 810, 823 (9th Cir. 2001) ("Just as the City could not successfully negotiate the Plans without some private sector participation from Applicants, so too the City in this case cannot be expected successfully to safeguard Applicants' legally protectable interests.").

There is no question that the interests of students and the Department are not the same. Whereas both the 2019 decision and 2021 reconsideration decision are premised on issues of technical noncompliance with a complicated regulatory regime, Student Defense is focused primarily on the real-world impacts on students that may result if GCU modifies the transaction to appease issues of technical noncompliance. For instance, whereas Department has analyzed numerous "valuation" reports, a "transfer pricing planning report," a "transfer pricing study," and an "economic profit split" analysis, the primary focus of Student Defense is the impact that the transaction would have on students. *See, e.g.* Fernandez-Rosario Ltr. at 4–9. If GCU is permitted to convert to a nonprofit while effectively remaining a for-profit institution, the majority of revenues from tuition and fees that students pay the school (*i.e.*, 59% under the Amended MSA)

14

1   will go to benefit GCE and its shareholders, rather than to directly benefit the educational

2   institution and its students.

3        GCU—but presumably not the Department—is similarly focused on these real-

4   world consequences, albeit from the opposite perspective. For instance, GCE reported to

5   investors that "ED's determination to treat GCU as a proprietary institution for Title IV,

6   HEA purposes could adversely impact GCU's enrollment." Grand Canyon Education,

7   Inc., Annual Report (Form 10-K) (Feb. 20, 2019) at 24, *available at:*

8   https://www.sec.gov/ix?doc=/Archives/edgar/data/0001434588/000155837020001013/lo

9   pe-20191231x10ka0a80b.htm. GCE also stated that any limitations on GCU's ability to

10  "identify itself as a nonprofit university in its advertising or other materials" could "have

11  a material adverse effect on its enrollment and, consequently, on [GCU's] and [GCE's]

12  financial condition, results of operations and cash flows." *Id.*[11]

13       For students, the consequences of the proposed conversion are even more tangible.

14  As part of recent COVID-19 relief packages, Congress placed restrictions on how for-

15  profit colleges spend pandemic-related grant funds.  These restrictions have significant

16  implications for students. As a for-profit, GCU received over $18 million under the

17  CRRSAA formula (governing the second COVID-19 relief package), all of which must

18  be provided to students to cover cost of attendance or pandemic-related emergency costs

19  such as healthcare, childcare, food and housing. If, however, GCU was permitted to

20

---

[11] Notably, after it began advertising as a nonprofit school, GCU hit a record high
of new student enrollment. *See Grand Canyon Education Inc (LOPE) CEO Brain
Mueller on Q4 2018 Results – Earnings Call Transcript*, Seeking Alpha (Feb. 20, 2019,
10:55 PM), *available at:*  https://seekingalpha.com/article/4242733-grand-canyon-
education-inc-lope-ceo-brian-mueller-on-q4-2018-results-earnings-call-transcript. GCE
attributed this increase—and the concurrent revenue growth—specifically to GCU's
nonprofit status, with CEO Mueller boasting that being a nonprofit "has provided a
tailwind from a new student growth perspective" and that the numbers are "evidence that
being out there now a million times a day saying, we're non-profit, has had an impact."
*Id.*

participate as a non-profit, GCU will only be required to provide $11.175 million in direct student aid to students.

In contrast, CRRSAA provides far more flexibility to nonprofit and public institutions. While nonprofit and public institutions are required to give at least the same amount in direct financial aid grants to students as they were required to provide under a formula adopted under the prior "CARES Act," governing an initial round of COVID-19 funding, institutions may use remaining grant funds for institutional needs, such as lost revenue. This distinction is critical, because whereas nonprofit institutions' primary stakeholders are their students, for-profit institutions have a fiduciary obligation to shareholders with financially motivated interests. If GCU were able to spend the stimulus funds under the provisions afforded to nonprofit institutions, there is a significant risk of large portions of these taxpayer funds flowing to GCE.

The implications for GCU students will continue under a new round of funding (HEERF III) that was included in Section 2003 of the ARP, signed into law on March 11, 2021. While allocations have not yet been determined, the spending requirements are similar to those established under the CRRSAA: for-profit institutions must spend all funding on student aid grants while nonprofit and public institutions are only required to spend only half on student aid, with remaining funds going to the institution itself. Yet again, if considered a nonprofit under this formula, students would be at risk of GCU spending emergency grants to prioritize GCE shareholders, not students.

*Third*, intervention is appropriate where the proposed intervenor "would likely offer important elements to the proceedings that the existing parties would likely neglect." *Berg*, 268 F.3d at 823; *see also Spangler,* 552 F.2d at 1329 (asserting that a court should consider "whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit, and . . . the legal questions

presented"); *Am. Civil Liberties Union of N. Cal. v. Burwell*, No. 16-CV-03539-LB, 2017 WL 492833, at *3 (N.D. Cal. Feb. 7, 2017) (granting United States Conference of Catholic Bishop's motion to intervene in Establishment Clause challenge where intervention would "contribute to the development of the factual and legal landscape"). As described above, the Department has focused exclusively in its letters on technical legal compliance, without significant consideration to the implications that this case will have on students. Without Student Defense's intervention, the impact on students may not be addressed.

If GCU is granted nonprofit status without adequate student protections, the risks for students are high. Student Defense is uniquely positioned to advocate on behalf of students and provide the court with a necessary perspective on how the legal issues presented impact students.

## CONCLUSION

Defendant-Intervenor Student Defense respectfully requests that the Court grant its motion for permissive intervention. Student Defense meets all of the requirements of permissive intervention under Federal Rule of Civil Procedure 24(b)(1)(B) and its participation will materially assist the resolution of issues in this case.

Respectfully submitted,

/s/ J. Henk Taylor
J. Henk Taylor, A.Z. Bar #016321
RYAN RAPP UNDERWOOD &
PACHECO, P.L.C.
3200 N. Central Avenue, Suite 2250
Phoenix, Arizona 85012
Telephone: (602) 280-1000
Facsimile: (602) 265-1495
htaylor@rrulaw.com

Aaron S. Ament, D.C. Bar #1602164
(*pro hac vice* forthcoming)

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniel A. Zibel, D.C. Bar #491377
　　(*pro hac vice* forthcoming)
Maya H. Weinstein*, N.C. Bar #56621
　　(*pro hac vice* forthcoming)
NATIONAL STUDENT LEGAL
DEFENSE NETWORK
1015 15th Street NW, Suite 600
Washington, D.C. 20005
(202) 734-7495
aaron@defendstudents.org
dan@defendstudents.org
maya@defendstudents.org

Brian Galle, N.Y. Bar #419154
　　(*pro hac vice* forthcoming)
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, D.C. 20001
(202) 662-4039
brian.galle@georgetown.edu

*Attorneys for Proposed Intervenor-Defendant Student Defense*

* Admitted to practice law only in North Carolina; Supervised by organizational principals while D.C. Bar application is pending.

April 22, 2021