Kevin E. O'Malley (006420)
Hannah H. Porter (029842)
Gallagher & Kennedy
2575 E. Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone: 602.530.8000
Facsimile: 602.530.8500
Email: kevin.omalley@gknet.com
Email: hannah.porter@gknet.com

Steven M. Gombos (*pro hac vice*)
Virginia State Bar No. 30788
David A. Obuchowicz (*pro hac vice*)
Virginia State Bar No. 82483
Gombos Leyton, PC
11350 Random Hills Road, Suite 400
Fairfax, Virginia 22030
Telephone: 703.934.2660
Facsimile: 703.934.9840
Email: sgombos@glpclaw.com
Email: dobuchowicz@glpclaw.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Grand Canyon University,<br><br>                    Plaintiff,<br><br>v.<br><br>Miguel Cardona, *et al*,<br><br>                    Defendants. | No. 2:21-cv-00177-SRB<br><br>**Plaintiff's Motion to Complete the Administrative Record and Take Limited Discovery**<br><br>**(Oral argument requested)** |

*Gallagher & Kennedy, P.A.*
*2575 East Camelback Road*
*Phoenix, Arizona 85016-9225*
*(602) 530-8000*

1   Grand Canyon University asks the Court to order the Department of Education to
2   complete the administrative record. In assembling the record, the Department
3   categorically excluded internal materials. With the exception of perhaps 10 documents,
4   the agency record is comprised exclusively of GCU's documents. The Department's
5   constrained view of the agency record improperly shields from judicial scrutiny critical
6   internal documents pertaining to the merits of its decision. For example, emails GCU
7   received through FOIA reveal the Department concealed from GCU that it had decided
8   to deny GCU's nonprofit status 16 months before it issued its decision and at least 8 days
9   before GCU purchased the university.

10   GCU also requests limited discovery. The Department acted in bad faith by misleading
11   GCU about the status of its review. Months before closing the transaction to acquire the
12   university, GCU accepted the Department's offer to review the transaction—a process the
13   Department's calls preacquisition review. Before the transaction even closed, the
14   Department had decided to deny the university's nonprofit status, yet it withheld that
15   decision from GCU and falsely told GCU that its preacquisition review remained ongoing,
16   despite knowing GCU was purchasing the university for nearly $1 billion solely to return
17   it to its former nonprofit status.

18   This Court's effective review depends on the agency record containing all relevant
19   materials, not only materials supporting the agency's decision but also evidence
20   unfavorable to its decision. Otherwise, this Court "cannot engage in the 'thorough,
21   probing, in-depth review' that the APA requires." *In re United States*, 138 S.Ct. 371 (2017).
22   Because the "whole record" includes evidence of agency bias and those internal materials
23   the Department categorically excluded, GCU asks the Court to enter an order (1)
24   compelling the Department to complete the record by adding or logging all internal
25   materials pertaining to the merits of its decision, including the documents in Exhibit B;
26

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

1  and (2) permitting GCU limited discovery after the Department completes the record to
2  further show agency bias and bad faith and to ensure the record is complete.

3  **Background**

4  **1. Grand Canyon University's nonprofit status.** For most of its 70-year history,
5  GCU operated as a nonprofit university. That is consistent with its aspirations and
6  Christian mission. Financial troubles in the early 2000s led the university's Board of
7  Trustees to sell the school to the for-profit Grand Canyon Education, Inc., whose access
8  to public funds stabilized the university. In 2014, the Board of Trustees decided to return
9  the university to its historical nonprofit status, confident in GCU's educational model and
10 financial strength. AR-J-0001-0008.[1]

11   The Board began the process of converting the university to nonprofit status in 2015.
12 It formed a new Arizona nonprofit entity, Gazelle University, to purchase the university's
13 educational assets, name and trademarks, and Phoenix campus. After the transaction, GCE
14 would serve as an educational service provider, providing marketing, accounting, and
15 other services to GCU under a Master Services Agreement (MSA) in exchange for a fixed
16 share of revenue. *Id.* Such agreements are common in the higher education industry.

17   With the broad terms worked out, Gazelle University applied for 501(c)(3) tax-exempt
18 nonprofit status, which the IRS approved in November 2015. AR-F-0607. GCU also
19 approached the Department and had many positive discussions about the planned
20 transaction and the university's return to nonprofit status. Exs. B-2, B-3, B-4.

21

22 [1] All citations to documents in the Administrative Record follow the same form: AR-
   Vol.-Page. So, AR-J-0001 (above) references Administrative Record—Volume J—Page
23 0001. At this time, the government has served the Administrative Record on Plaintiff
   but not yet submitted it to the Court. Because the record largely consists of GCU's
24 documents, many of which contain confidential business or financial information, the
   parties intend to file in the public record a joint appendix within two weeks of GCU's
25 reply brief in support of this motion, with the record materials referenced in the parties'
   briefing and other documents necessary for the Court's review. At the same time, the
26 government will file with the Court the full Administrative Record under seal.

After a two-year delay, GCU moved forward with its nonprofit conversion in 2017. In the two-year interim, the Department, under pressure from think tanks and congressional offices opposed to for-profit education, had adopted a hostile approach to nonprofit conversions.

**2. The Department's approach to nonprofit status.** Before August 2016, the Department recognized IRS-approved 501(c)(3) entities as nonprofits for Title IV purposes. The Department understood "nonprofit" to refer to an institution's tax status—nothing more.

The Department acknowledged this when it promulgated new rules about foreign institutions in 2010. In an effort to treat foreign institutions "as comparable as possible to . . . domestic institutions," the Department decided that a foreign institution recognized by its tax authority as a nonprofit would "automatically" qualify as a nonprofit for Title IV purposes, so long as the foreign tax authority used "criteria that are similar to those used by the U.S. IRS." 75 Fed. Reg. 42192 (July 20, 2010). This rule remains in place. *See* 34 CFR 600.2 (defining foreign nonprofit institution).

Simply put, the Department acknowledged that state law and IRS approval conferred nonprofit status. It required recently converted institutions to comply with "the same requirements of their previous [for-profit] designation" for a brief period. *Id.; see* AR-J-0333 (converting schools must comply with 90.10 rule for one year after converting). It did this to prevent institutions from converting to nonprofit status simply to evade Title IV for-profit rules. AR-J-0318. But, until recently, it never claimed any authority to second guess an institution's tax status.

That changed in August 2016. Departing from its past practice, the Department for the first time rejected the nonprofit status of an IRS approved 501(c)(3) entity. *See* Ex. B-5. At the time, the Department gave no explanation for its policy change. Only much later—indeed, after the denied school filed a lawsuit—did the Department explain that its

3

1   independent assessment of nonprofit status was necessary because recently enacted Title
2   IV for-profit rules increased the risk that for-profit schools might convert to evade
3   requirements. AR-J-0333. So, without notice or the opportunity to comment, the
4   Department asserted new authority to independently determine nonprofit status through
5   its own application of IRS rules. *Id.* But that after-the-fact explanation simply covered up
6   the fact that the Department had departed from its longstanding policy in order to stop
7   nonprofit conversions. Indeed, in a press release accompanying the August 2016 decision,
8   the Secretary warned schools seeking to convert to nonprofit status: "Don't waste your
9   time." AR-J-0328.

10   **3. Preacquisition Review.** GCU filed an application with the Department on January
11   18, 2018, requesting its preacquisition review of the planned change in ownership. AR-J-
12   0001. The preacquisition review process is meant to identify any potential concerns the
13   Department may have before an entity completes a change in ownership or control.
14   Because the Department lacks substantive nonprofit regulations and published guidance,
15   it is the only means an institution has to receive guidance from the Department.

16   The Department encourages institutions to file for preacquisition review at least 45
17   days before planned transactions. *See* U.S. Dept. of Ed., FSA Handbook, vol. 2, ch. 5, 2-
18   121 (2017-18), available at https://tinyurl.com/8e2ze4k5. Some larger deals may require
19   more time. By way of example, it took the Department three months to review the Kaplan-
20   Purdue transaction, a deal comparable in scope to GCU's.

21   Out an abundance of caution, GCU requested the Department's preacquisition review
22   six months before the July 1, 2018 transaction date—enough time to make any necessary
23   changes before the transaction. Over the next 6 months—and repeatedly in the final weeks
24   before July 1—counsel for both GCU and GCE reached out to the Department for
25   guidance and any indication whether the Department foresaw necessary changes. AR-J-
26   0112. None came. The Department consistently refused to provide any guidance, claiming

4

its review remained ongoing. With no indication from the Department when it would complete its review and facing the possibility of having to reapply for HLC's approval if it delayed further, GCU closed the transaction without the Department's guidance on July 1, 2018.

But, in truth, the Department had already completed its review, and it withheld that fact as GCU moved forward with the transaction. Internal emails show that eight days before the transaction closed, on June 22, 2018, Robin Minor, the Department's Chief Compliance Officer, confirmed the review had been completed and the Department had decided to deny the university nonprofit status after its change in ownership. Ex. B-1. That information would have been material to GCU's decision to close the transaction. But by concealing its decision, the Department knew GCU would close the deal on terms the Department had already rejected, effectively denying GCU the full benefit of its nonprofit status. Even though GCU is a nonprofit entity, the Department has barred GCU from referring to itself as such. AR-A-0017.

Despite making its decision in June 2018, the Department issued its decision to GCU on November 6, 2019, some 16 months after the transaction. It approved the change in ownership from the publicly traded for-profit GCE to the 501(c)(3) tax-exempt nonprofit Gazelle University (now known as GCU). But it refused to recognize GCU as a nonprofit for Title IV purposes. The primary basis for its refusal was the compensation paid to GCE under the MSA. AR-A-0001-0018.

In the months after the Department issued its decision, GCU proposed changes to the MSA, hoping to address the Department's concerns. AR-J-0088. GCU also submitted new reports, at the Department's request (AR-J-0092), confirming the MSA's fairness to GCU. But the Department again denied GCU nonprofit status in a second decision issued on January 12, 2021. AR-A-0019.

1   GCU only discovered that the Department made its pre-transaction conclusion months
2   later in response to a FOIA. Had GCU not submitted FOIA requests, the Department's
3   internal decision, as well as other critical information, would have been concealed entirely
4   from this Court's review.

5   **4. This lawsuit.** GCU filed this APA challenge on February 2, 2021. The complaint
6   alleges, among other things, that the Department denied GCU nonprofit status based on
7   impermissible whim and in conflict with its own regulations (Compl. ¶¶ 149-58, 336-41);
8   that the Department treated GCU differently than similarly situated schools (Compl.
9   ¶¶ 198-219, 336-41); and that the Department departed from its prior nonprofit policy
10   without reasoned basis (Compl. ¶¶ 159-197, 336-41). GCU put the Department on notice
11   of each basis months before filing and while the matter remained in the agency's hands.
12   AR-J-0316-323.

13   **5. The administrative record.** The parties initially conferred about the administrative
14   record when preparing the case management report filed on May 27, 2021. *See* ECF Dkt.
15   No. 28. As detailed therein, the parties disagreed about the need for a privilege log, with
16   the government asserting that it would neither designate in the record nor log privileged
17   documents. *Id.* at 4-5. Further, the government said it would need 60 days, until July 27,
18   2021, to fully assemble the administrative record. *Id.* at 5.

19   The Department served the record on GCU after exhausting the full 60 days. But, with
20   the exception of perhaps 10 documents—the two decision letters, three documents
21   referenced therein, and less than a handful more—the record is made up exclusively of
22   GCU's documents. The Department categorically excluded **all** internal communications,
23   including the email showing the Department's pre-transaction decision. The record
24   excludes any indication that the Department considered whether, in denying GCU's
25   nonprofit status, it had acted in a disparate manner. And it is silent about the Department's
26   departure from its longstanding policy of deferring to the IRS on nonprofit status.

1       The parties met about the record in an effort to limit the issues brought to the Court.

2   The Department agreed to add six discrete documents it agreed had been inadvertently

3   excluded. *See* Ex. A-5. It otherwise stood on the assembled record. *Id.* The Department

4   asserted that internal communications are not record materials. And, in contradiction to

5   the June 22, 2018 email from Robin Minor, the Department asserted that it did not make

6   its decision until November 6, 2019, refusing to comment further on the email. The

7   Department denied having changed its approach to evaluating nonprofit conversions. And

8   it offered no response to GCU identifying specific schools that had received different

9   treatment from the Department despite having similar service arrangements.

10  **Argument**

11  **1.  The administrative record is incomplete because it omits documents before the**
12      **Department when it denied GCU's nonprofit status.**

13      The administrative record designated by the government is presumed complete until

14  shown otherwise. But showing the administrative record is incomplete "is no tall order"

15  when, as here, the government concedes it excluded all internal materials. *Ctr. for*

16  *Biological Diversity v. Bernhardt*, 2020 U.S. Dist. LEXIS 40646, *10 (D. Mont. 2020). As

17  the Ninth Circuit has explained, the administrative record "includes everything that was

18  before the agency pertaining to the merits of the decision." *Portland Audubon Soc. v.*

19  *Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993). And "[i]t is obvious that

20  in many cases internal comments, draft reports, inter- or intra-agency emails, revisions,

21  memoranda, or meeting notes will inform an agency's final decision." *Inst. for Fisheries Res.*

22  *v. Burwell*, 2017 U.S. Dist. LEXIS 5642 (N.D. Cal. Jan. 10, 2017).

23      When the administrative record is incomplete, as here, it is necessary to compel the

24  government to complete it. "Effective review depends upon the administrative record

25  containing all relevant materials presented to the agency, including not only materials

26  supportive of the government's decision but also materials contrary to the government's

7

decision. Otherwise, the reviewing court cannot engage in the thorough, probing, in-depth review that the APA requires." *In re United States*, 138 S.Ct. 371 (2017).

## 1.1  The assembled record is incomplete because it excludes internal materials.

The government asserts a categorical bar to the inclusion of internal materials in the agency record. *See* Ex. A-2. The record assembled by the government thus excludes all inter- and intra-agency emails, memos, and guidance pertaining to the Department's decision to deny GCU nonprofit status.

But "contrary to the [government's] position, internal materials are part of the universe of materials considered by the agency, and must be included in the administrative record unless omitted on the basis of privilege." *Ctr. for Envtl. Health v. Perdue*, 2019 U.S. Dist. LEXIS 145073, *6 (N.D. Cal. May 6, 2019). The whole record "includes everything that was before the agency pertaining to the merits of its decision," *Portland Audubon Soc.*, 984 F.2d at 1548, which many district courts within the Ninth Circuit have held includes internal materials. *See, e.g., Lower San Pedro Watershed Alliance v. Barta*, 2020 U.S. Dist. LEXIS 246983, *7 (D. Arizona Nov. 30, 2020) ("Defendant's assertion of a categorical bar to the inclusion of deliberative materials fails to satisfy this Court.").[2]

The Government asserts that all internal materials are "deliberative" in nature and are not properly within the administrative record, citing *Oceana, Inc. v. Ross*, 920 F.3d 855 (D.C. Cir. 2019), and the district court cases following it. But the reliance on *Oceana* is at odds with the support the Ninth Circuit has indicated for the "many district courts within this circuit" that have required "assertedly deliberative documents be logged and examined." *In re United States*, 875 F.3d 1200, 1210 (9th Cir. 2017); *see WildEarth Guardians v. Bernhardt*, 507 F. Supp. 3d 1219, 1225 (C.D. Cal Dec. 16, 2020) (noting the Ninth Circuit

---

[2] *See also Desert Survivors v. U.S. Dep't of Interior*, 231 F. Supp. 368, 380 (N.D. Cal. 2017); *Guam Constrs. Assn. v. Sessions*, 2018 U.S. Dist. LEXIS 12343, *45 (D. Guam Jan. 24, 2018); *Kalispel Tribe of Indians & Spokane County v. U.S. Dep't of Interior*, 2018 U.S. Dist. LEXIS 229141, *5 (E.D. Wash. March 8, 2018).

1   "indicated support for this approach"); *see also In Re Clean Water Act Rulemaking*, 2020 U.S.
2   Dist. LEXIS 211820 (N.D. Cal. 2020) (explaining that neither the Ninth Circuit nor the
3   Supreme Court "has disturbed this trend").

4       The government's position also runs counter to one of the primary purposes
5   underlying the APA's "whole record" requirement, which is to "ensure that neither party
6   is withholding evidence unfavorable to its position," *Regents of Univ. of California v. U.S.*
7   *Dep't of Homeland Security*, 2017 U.S. Dist. LEXIS 171805, *7 (N.D. Cal. Oct. 17, 2017).
8   "Allowing agencies discretion to determine which internal communications to include or
9   withhold, without explanation or even bare assertion of privilege, would invite all manner
10  of mischief." *San Francisco Bay Conservation Dev. Comm'n. v. U.S. Army Corps of Eng'rs*, 2018
11  U.S. Dist. LEXIS 136659, *23 (N.D. Cal. Aug. 13, 2018).

12      Here, there are strong reasons to suspect that the government's categorical bar on
13  including internal materials is keeping "unfavorable" evidence from the Court's view. By
14  way of example, counsel for GCU received through FOIA emails showing that the
15  Department solicited CPA firms to review its analysis of the MSA. *See* Ex. B-6, B-7. The
16  FOIA emails do not confirm, nor did the government address in the meet-and-confer
17  process, whether the Department ultimately retained any outside contractor to review its
18  findings. But the Department's need to solicit contractors for their expertise in transfer
19  pricing studies itself is highly relevant because it shows the agency's lack of expertise—
20  even more so if the retained experts questioned the Department's analysis. Indeed, the
21  Department's failure to address such contradictory evidence would render its decision
22  arbitrary and capricious.

23      Similarly, internal emails evince agency bad faith. At least 8 days before GCU
24  acquired the university solely to convert it to nonprofit status, the agency secretly
25  "completed the analysis of the GCU" change in ownership. Ex. B-1. And despite many

26

requests after that date for guidance,[3] the Department withheld its decision and told GCU it could offer no "directional guidance" because its review was ongoing. Ex. E-1.[4] Not only was that a falsehood but the Department later underscored the falsehood by construing GCU's decision to go through with the transaction without preacquisition review against it. *See, e.g.*, AR-J-0349 ("As you know, the parties to the GCU transaction closed the transaction without the benefit of a pre-acquisition review by the Department.").

Apart from the issue of bad faith, the internal email references an attached "document which provides the results of the analysis." Ex. B-1. The agency record is not complete so long as the Department's internal analysis is excluded. To be sure, the Department may assert its November 6, 2019 letter expresses the genuine basis for its decision, but the Court has no way to assess the veracity of the claim without the initial decision. Put simply, the Department cannot shield its internal analysis from judicial review by issuing a curated decision for public release that may not reflect the real reasons for its action. *See Bernhardt*, 2020 U.S. Dist. LEXIS 40646 at *9 (stating that in some circumstances "deliberative documents may go to the heart of the question" such as when "a regional office receives instructions . . . to justify a decision that has already been made on policy grounds"). Absent the internal decision, this Court cannot assess whether the Department rejected GCU's nonprofit status based on "articulated standards and reflective findings, in furtherance of even-handed application of law, rather than impermissible whim, improper influence, or misplaced zeal." *See Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851-852 (D.C. Cir. 1970).

---

[3] *See, e.g.*, AR-J-0131 ("[E]ven hearing orally the direction the Department is headed would be . . . helpful.").

[4] Exhibit E-1 is one the six documents the government agreed had been inadvertently excluded from the Administrative Record. *See* Ex. A-5.

Other internal emails received through FOIA reference the creation of a change-in-ownership working group within the Department. Ex. D-1.[5] This specialized group, according to the Department's public statements, was established to develop expertise and ensure consistency in the agency's review of changes in ownership, including nonprofit conversions. *See* Ex. D-2 at 8-9. Given the group's stated purpose, it strains credulity to believe the Department rejected GCU's nonprofit status without relying on, either directly or indirectly, communications, memoranda, or other materials prepared by the change-in-ownership working group. *See, e.g.*, Ex. B-11, B-12. Yet the record includes nothing sent to or from that specialized group.

Finally, there are strong reasons to conclude internal emails support GCU's allegations about improper outside influence leading to inconsistent treatment of similarly situated schools. Once again, Department records received through FOIA disclose pressure from "left-leaning" think tanks and members of congress targeting GCU's nonprofit conversion. Exs. B-8, B-13, B-14. Those communications, which the Department considered in the context of GCU's nonprofit conversion, properly belong in the agency record.

To be complete, an agency record must include or otherwise account for all documents pertaining to the merits of its decision. The government cannot unilaterally determine what constitutes the administrative record. But unilaterally deciding that all internal communications are deliberative documents and withholding those materials without even a bare claim of privilege is what the Department has done here. GCU thus asks the Court to order the Department to complete the agency record by adding or logging all internal materials pertaining to the merits of its decision, including the internal materials in Ex. B.

---

[5] The documents in Exhibit D—unlike those in Exhibit B—do not expressly discuss GCU's change in ownership. GCU does not ask the Court to add Ex. D-1 or D-2 to the Administrative Record. Instead, GCU references both documents simply to establish the existence of the change-in-ownership working group.

1   *See, e.g., Lower San Pedro Watershed Alliance*, 2020 U.S. Dist. LEXIS 246983, *7 (D. Ariz.

2   Nov. 30, 2020) (rejecting the agency's "categorical bar" and requiring it to add deliberative

3   materials to the administrative record).

**1.2   The assembled record improperly excludes materials related to the merits of the agency's action.**

In addition to excluding internal materials, the record also excludes information GCU submitted to the Department during preacquisition review. Specifically, GCU provided a spreadsheet with information about service agreements similar to the MSA used by other colleges. Although the spreadsheet is in the record (*see* AR-C-1775), the other service agreements and related documents, accessible through embedded links in the spreadsheet, are not. Because GCU prepared the spreadsheet years ago, some of the links are no longer active. To prevent any additional loss of information, GCU asks the Court to order the Department to include the service agreements accessible through the embedded links in the record. The available agreements are included as Exhibits C-1 through C-45.

The service agreements and related documents properly belong in the record. GCU provided the information, before closing, in response to the Department's document requests. *See WildEarth Guardians v. United States Forest Serv.*, 713 F. Supp. 2d 1243, 1254 (D. Colo. 2010) (all that is necessary to overcome the presumption of regularity is show when the documents were submitted, to whom, and under what context). And this Court cannot meaningfully review whether the Department treated GCU differently than similarly situated institutions without access to those other agreements. Accordingly, GCU asks the Court to order the Department to include the service agreements and related documents in the record.

**2.   The Court should permit limited discovery.**

This Court has broad discretion to allow GCU limited discovery to develop its bad faith claim and to determine whether the administrative record is complete. *Ctr. for*

1    *Biological Diversity*, 450 F.3d 930, 943 (outlining when extra-record evidence is

2    appropriate in APA cases). Indeed, limited discovery is often appropriate notwithstanding

3    the narrow scope of APA review. *See Animal Def. Council*, 840 F.2d 1432,1437 (9th Cir.

4    1988) ("Courts may inquire outside the agency record when plaintiffs make a showing of

5    agency bad faith."). This is because, absent a complete record explaining the Department's

6    action, the Court cannot engage in the "thorough, in-depth, and probing review" the APA

7    requires. *Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (discovery into agency "mental

8    processes" permissible upon showing of bad faith).

9    **2.1  The Department's bad faith warrants limited discovery about agency bias.**

10   Effective judicial review is not possible when the record is missing relevant information

11   such as evidence of bias or bad faith. Courts therefore permit discovery in APA cases when

12   plaintiffs seek to demonstrate bad faith or improper behavior by the agency. *See Animal*

13   *Def. Council*, 840 F.2d at 1436. To overcome the presumption against discovery, plaintiffs

14   must make a "threshold showing . . . of conduct that is hard to explain absent bad faith."

15   *Palantir USG Inc. v United States*, 129 Fed. Cl. 218, 237 (2016).

16   That threshold showing is satisfied here. The Department's actions—i.e., its many

17   misrepresentations to GCU about the status of its review and its improper withholding of

18   its preacquisition decision—cannot be explained absent bad faith. And those bad faith acts

19   induced both GCU, a nonprofit entity, and GCE, a publicly traded company, to go forward

20   on a nearly $1 billion transaction, unaware that the Department had secretly rejected

21   GCU's nonprofit status.

22   As discussed above, the preacquisition review process is the only opportunity an

23   institution considering nonprofit conversion has to receive guidance from the Department.

24   That voluntary process requires good-faith participation by both the institution and the

25   Department. That is not what occurred here. While GCU was forthcoming with the

26   agency, the Department dissembled. *See* Ex. E-1. Aware the transaction closed on July 1,

13

1  and despite GCU's repeated requests for guidance, the Department misled GCU about its

2  review.

3      On June 22—eight days before GCU's deal closed—the Department's Chief

4  Compliance Officer, Robin Minor, wrote: "The team, along with OGC have completed the

5  analysis of the GCU CIO that includes the conversion from for profit to nonprofit. They

6  have concluded that for title IV purposes GCU would still be considered a for profit

7  institution after the CIO." *See* Ex. B-1. Indeed, the recipient's response to Robin Minor's

8  email—"I thought this was old and done"—indicates that the Department's decision had

9  been made much earlier. *Id.*

10     The Department's concealment demonstrates bias. The agency had sufficient time to

11  complete its review. No additional sign off was needed—Robin Minor, who wrote the June

12  22 email, had final sign-off authority on the Department's decision. Ex. B-11, B-12. The

13  Department knew the deal closed on July 1 and it had ample opportunity to inform GCU

14  by that date. GCU's and GCE's respective counsel requested status updates from the

15  Department on June 27 and June 28—at least 5 days after the agency made its conclusion.

16  Counsel explained that the boards for both entities had to make an "important decision"

17  about the plan to close on July 1 and urgently needed any "directional guidance" the

18  Department could provide. Ex. E-1. But despite its completed review, the Department

19  misled counsel in the days leading up to the July 1 deadline when it communicated that it

20  could not provide guidance, because its review was still ongoing. *Id.*

21     That conduct is inexplicable absent bad faith. The Department knew GCU pursued the

22  transaction solely to convert the university to nonprofit status. Its pre-transaction

23  decision to deny the university nonprofit status after the change in ownership was highly

24  material to GCU's decision to close the transaction. *See* Declaration of Brian Roberts

25  (attached as an exhibit); *see also* Declaration of Will Gonzalez (same). By withholding its

26  decision and informing GCU that the review was ongoing, with no determinate end date,

14

1   the Department induced GCU to close knowing its decision had defeated the transaction's

2   purpose. And by concealing its decision, the Department induced GCU to purchase the

3   university, ensuring the university would be bound by state and federal nonprofit laws

4   restricting its operations, even though it had already decided to reject GCU's nonprofit

5   status and to restrict GCU from advertising the university as a nonprofit. *See Niz-Chavez*

6   *v. Garland*, 141 S.Ct. 1474, 1486 (2021) ("If men must turn square corners when they deal

7   with the government, it cannot be too much to expect the government to turn square

8   corners when it deals with them.").

9       Limited discovery is appropriate here based on GCU's showing that discovery is likely

10  to turn up additional evidence of agency bad faith. Although GCU has met its showing on

11  the existing record, GCU asks that the Court permit limited discovery after the

12  Department has completed the agency record by adding or otherwise logging all internal

13  materials.

14  **2.2  Concerns about the record's completeness further justify limited discovery**.

15      GCU requests that the Court permit limited discovery related to the Department's (1)

16  disparate treatment of GCU; (2) internal practices; and (3) agency communications about

17  nonprofit conversion. The Complaint and this motion identify detailed facts supporting

18  each topic as a basis for challenging the Department's decision to reject GCU's nonprofit

19  status. *See* Compl. ¶¶ 186-197, 339a, 340 (departure from past practice); Compl. ¶¶ 198-

20  219, 339h, 340 (inconsistent treatment); Compl. ¶¶ 196d, 198 (political pressure to deny

21  nonprofit conversions). Moreover, GCU put the Department on notice of those challenges

22  months before the agency issued its second decision on January 12, 2021. *See* AR-J-0319-

23  0321. Yet the Department's January 2021 decision makes no mention of those relevant

24  factors, and the administrative record is silent about the Department's consideration (if

25  any) of GCU's disparate treatment.

26

15

In situations like this, where an agency fails to consider evidence relevant to the final decision, its rationale and justification may be undermined. By its nature, evidence which the agency fails to consider is generally not in the record. So it is appropriate in those circumstances, in order to allow for meaningful, in-depth, probing review, to permit limited discovery to determine if the agency considered relevant factors. *Pac. Coast Fed'n of Fishermen's Ass'ns*, 2005 U.S. Dist. LEXIS 50662 at *5-6.

There is good evidence the Department treated GCU differently than similarly situated institutions. Revenue sharing arrangements like the MSA have been ubiquitous in higher education for some time. *See* Ex. C-1–C-45 (collecting service arrangements); AR-C-1775 (spreadsheet describing agreements). Numerous nonprofit colleges contract with for-profit service providers on similar terms and for services like those GCU receives from GCE in exchange for a defined share of revenue—some as much as 80% of revenue. *Id.* Agencies are required to treat like cases the same, but aside from an oblique reference to other service provider arrangements in the January 12, 2021 decision (AR-A-0034-35), there is no indication in the record that the Department considered the widespread use of similar service arrangements at all. This despite GCU having directly raised the point with the Department before it issued the January 2021 decision. *See* AR-J-0322.

There are also good reasons to doubt that GCU's disparate treatment followed from an even-handed application of articulable standards. In fact, counsel expressly asked the Department if there were any "thresholds" on revenue sharing it needed to know about. AR-J-0128. The Department refused to respond. So GCU relied on similar service agreements between nonprofit institutions and for-profit service providers available in the public domain. But unlike those nonprofit institutions, whose nonprofit status the Department has not second guessed, GCU had been targeted by certain think tanks and members of congress, who have demanded that the Department deny GCU nonprofit recognition. *See* Ex. B-8, B-13, B-14. Simply put, the Department's disparate treatment

16

derives not from the purported need to ensure Title IV funds do not benefit private individuals (AR-A-0015), but instead from a desire to publicly label GCU as a "for-profit" university. Indeed, GCE receives the same revenue share (which includes Title IV funds) irrespective of the Department's decision to recognize GCU as a nonprofit.

"[G]iven the near-universal understanding that an agency has some obligation to apply its positions and policies consistently across proceedings," limited discovery is appropriate here to identify and supplement the record with "evidence of any internal policy, guidance, or determination even indirectly related to the determinations [made by the Department]." *Guam Contrs. Assn.*, 2018 U.S. Dist. LEXIS 12343, *45. GCU thus asks the Court to permit limited discovery, including depositions and interrogatories, related to the Department's disparate treatment of GCU, its internal policies related to its decisions, and communications with third parties related to GCU's nonprofit status. As above, GCU requests that the Court permit discovery after the Department has completed the record by adding or otherwise logging all internal materials pertaining to the merits of its decision.

## Conclusion

For these reasons, GCU requests that the Court grant its motion to complete the agency record and permit GCU to take limited discovery of the Department to develop its bad faith claim and determine whether the record is complete.

Dated this October 18, 2021.


Respectfully submitted,


_____
Kevin E. O'Malley
Hannah H. Porter
GALLAGHER & KENNEDY
2575 E. Camelback Road, Suite 1100

Phoenix, Arizona 85016

_/s/David A. Obuchowicz_____
Steven M. Gombos
David A. Obuchowicz
GOMBOS LEYTON, P.C.
11350 Random Hills Road, Suite 400
*Lead Attorney for Plaintiff*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Certificate of Service**

I certify that on October 18, 2021, I electronically filed this motion through the Court's CM/ECF system.

*/s/ David A. Obuchowicz*