# Exhibit B-2



**From:** Brian Roberts
**Sent:** Monday, May 18, 2015 12:23 PM
**To:** Jeff Appel (jeff.appel@ed.gov)
**Subject:** Service Agreements

Jeff – thanks again for your time today.  Attached are the service agreement examples we discussed.  Also, below is a link to the Pearson and 2U websites where they outline the various partner institutions that they work with to provide services.

Pearson - http://www.pearsonembanet.com/

2U - http://2u.com/about/partners/

Again, we'll take direction from you on the next steps.  We're happy to come to DC at your convenience to discuss further if that would be helpful.  Thanks, -Brian

**Brian M. Roberts**
**General Counsel**

**Grand Canyon University**
3300 W. Camelback Road
Phoenix, AZ  85017
T
M
F



This message is private and confidential. If you have received it in error, please notify the sender and remove it from your system.

Exhibit 10.2

### MASTER SERVICES AGREEMENT

AGREEMENT dated April 12, 2010, between University of Southern California, a California nonprofit educational institution ("USC"), on behalf of the professional school set forth in each Addendum annexed hereto (with addresses as set forth therein) (each an "Addendum"), and 2tor, Inc., a Delaware corporation, having an office at Chelsea Piers, Pier 59 West 23rd & Hudson River, Suite 200, New York, NY 10011 ("2tor"). USC and 2tor are referred to collectively in this Agreement as the "parties" and individually as a "party."

### W I T N E S S E T H :

WHEREAS, USC is one of the world's leading private research universities and includes the professional schools set forth in each Addendum hereto (each a "School");

WHEREAS, USC has determined a demand for an online distance learning program (the "Program") for the masters or doctorate degree program(s) set forth in each Addendum hereto (each a "Degree");

WHEREAS, USC and 2tor have agreed to make a multi-million dollar investment into the development and administration of the Program and to perform the work and furnish services as described in this Agreement with respect to each School;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein set forth, the sufficiency of which is acknowledged, the parties agree hereby as follows:

1) <u>2tor's Services</u>. For each Degree for each School, 2tor shall provide a specific set of technological, marketing, promotional, development and/or support services. The following list represents a basic set of services; additions or deletions will be set forth in the Addendum.

    A) <u>Recruitment</u>. 2tor shall create and carry out marketing and promotional strategies (collectively, "Promotion Strategies") targeted toward building awareness of the Program and generating a flow of quality applications from prospective students from the United States and from such additional countries as either 2tor or USC periodically proposes in reasonable detail, subject to the other's approval and Section 10 below (collectively, the "Territory").

        i) 2tor shall develop a written plan and appropriate marketing materials for the Program and shall execute this plan. 2tor shall fund and develop appropriate materials and shall be responsible for recruiting students into the Program. The written plan and all materials related to the Program shall be subject to USC's written approval prior to any use thereof, not to be unreasonably withheld.

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

      ii)    Every year and when major changes are proposed, 2tor will submit the Plan, along with materials related to the Program, to the USC Admissions Office or other appropriate office designated by USC for review and approval. To facilitate this review, 2tor shall provide the USC Admissions Office or other appropriate office designated by USC with a summary of all Promotion Strategies implemented in the past year.

B)    <u>Admissions Processing</u> . Subject to USC's oversight, 2tor shall collect completed online applications for the Program, which shall be obtained through the Platform (defined below) using a form that shall be developed by 2tor and approved by USC, and forward those applications satisfying USC's Admission Standards (as provided for in Section 2.B below) to the School's admissions office.

C)    <u>Customer Service and Counseling</u> . In an effort to maintain a high level of customer service, 2tor shall provide phone support and guidance (i.e., technical and assist in career, but not academic) counseling (in a manner consistent with reasonable guidelines provided by USC) to prospective students as well to students upon matriculation and throughout the Program.

D)    <u>Host Relationships</u> . As part of the Program, students may be required to be mentored in a real world setting (each, an "Internship"). 2tor shall use commercially reasonable efforts to identify, contact, and negotiate potential arrangements with appropriate organizations (collectively, "Hosts") and appropriately credentialed supervisors (collectively, "field instructors/supervisors") for the Program, and to reserve placements for Program students with such Hosts (each, a "Residency" and collectively, "Residencies"), and, unless commercially impracticable or mutually agreed to be unnecessary, such placements shall be made no less than the minimum period specified in an Addendum. In addition, 2tor shall identify, compensate (if required and to the extent negotiated by 2tor) and support Hosts and Internships for these Residencies as per paragraph 1D of the Addendum.

E)    <u>Curriculum Design</u> . In USC's design of the Curriculum (as hereinafter defined), 2tor shall provide technical assistance and recommendations with respect to content and techniques that best use the available technologies and methods embodied in the Platform (as hereinafter defined) in order to meet the needs of Program students and schools. 2tor may also provide other related support as necessary and as agreed by the parties.

F)    <u>Curriculum Production and Deployment</u> .

      i)    From the Curriculum designed and created by USC faculty, 2tor shall produce lectures, simulations, videos, presentations and other typical online course content developed by USC that will make up the asynchronous products of the Program (the "Produced Segments"), including logistical coordination, and shall ready the Curriculum for online deployment through the Platform. Without limiting the generality of the foregoing, 2tor shall be responsible for

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

(i) all on-site production costs with respect to each Produced Segment, including the cost of all production personnel and equipment (but not including salaries or other compensation of USC instructional personnel), (ii) all legal clearances for music and graphics used in and students and others who appear in the Produced Segments, provided that USC shall cooperate with 2tor in securing such clearances from USC instructional personnel, and (iii) digitizing and otherwise converting all content for each Produced Segment to a medium suitable for delivery to students via the Platform. Promptly after completion of each Produced Segment, 2tor shall deliver a copy of such Produced Segment to USC. All such Produced Segments shall conform to USC's design as set forth in Section 2.E and be subject to USC's written approval prior to any distribution or other release thereof.

    ii)   Periodically, 2tor will update the Produced Segments to correspond to USC's changes in the Curriculum as per Paragraph 2E. 2tor shall be responsible for the reasonable production costs of such updates as per above.

G)   <u>Program Delivery and Support</u>.  2tor shall provide consulting assistance for USC's development of the instructional content of the Program, and for its efforts to hire, train and support its faculty and field instructors/supervisors who deliver such instruction.

    i)   2tor shall create a curriculum for USC faculty members, field instructors/supervisors, and other instructional and technical personnel, and be responsible for providing them with ongoing technical training and online support as per paragraph 1G of the Addendum.

    ii)   2tor shall propose service levels to govern its support for Program students and faculty, subject to written approval by USC, which may be revised periodically in writing upon mutual agreement by USC and 2tor.  Service level agreements (or "SLAs") shall include, but not be limited to, timeliness of response and user satisfaction.  USC shall notify 2tor if 2tor is in default of its SLAs, specifying any failure or default in reasonable detail and suggesting how USC would like such failure to be remedied, and 2tor shall, at its expense promptly after receipt of USC's notice, improve its service to comply with such agreements.  2tor shall provide such services as USC may reasonably require to maintain records and communications regarding academic performance.

H)   <u>Technology</u>.  2tor has built, and shall maintain, periodically revise, and host a technology platform for the Program, to serve as an online communication portal for students, faculty, course coordinators, course assistants, Internships and Program staff and to enable online applications, course delivery, Program communications, development and maintenance of student portfolios, placement services and such other functions as are mutually agreed to by the parties (the "Platform").  The Platform is (a) designed to enable the effective delivery of the Curriculum and (b) shall be made available to USC at no additional fee for use in making the Curriculum and Produced Segments available to each School's in-classroom Degree students, except that 2tor shall not be required to incur any

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

additional cost for such availability. The parties agree to negotiate in good faith should USC wish to use the Platform for other programs.

i) <u>Specifications and Service Levels.</u>  The specifications and performance standards for the Platform and the related service level agreements are as set forth in the Exhibits attached to each Addendum. Such service level agreements shall address, without limitation, continuous availability of the Platform (subject to reasonable amounts of downtime for maintenance and similar matters), correction of any errors, bugs and defects in the Platform and 2tor's responsiveness to students and other users experiencing problems with the Platform. 2tor's proposed specifications and standards and service level agreements shall be subject to the written approval of USC. Periodically, 2tor shall propose changes to the specifications and performance standards for the Platform, all of which shall be subject to the written approval of USC.

ii) <u>Upgrades .</u>  2tor will make its best commercial efforts to integrate tested new technologies and insights into the platform. Therefore, it will periodically upgrade the platform to add functionality or streamline the user interface. Prior to such upgrades, it shall perform reasonable acceptance tests to determine whether the changes compromise platform security, scalability, and usability. In the event that USC reasonably determines that the upgrade, despite these tests, threatens the stability or usability of the platform, 2tor will roll back those changes and conduct further testing.

iii) <u>Ongoing Quality .</u>  After Program Launch, USC shall notify 2tor if the Platform has failed to satisfy the specifications and standards contemplated hereby or if 2tor is in default of its service level agreements, specifying any failure or default in reasonable detail and suggesting how USC would like such failure to be remedied, and 2tor shall, at its expense promptly after receipt of USC's notice, modify or improve the Platform or take other corrective action in order to bring the Platform into compliance with such specifications and standards or improve its service to comply with such service level agreements. Failure of the Platform to meet such specifications and standards or of 2tor to comply with such service level agreements within a reasonable period, but not more than thirty (30) days, after 2tor's receipt of USC's notice shall entitle USC to terminate the Addendum to this Agreement for that School pursuant to Section 5(C) below.

iv) <u>Escrow .</u>  2tor shall keep and maintain a current copy of the source code, object code, compiling instructions, and all relevant development and user documentation for the Platform, with a mutually acceptable escrow agent. 2tor shall update the escrowed materials annually for the term of the Agreement. The agreement with the escrow agent (with such agreement to be mutually agreed upon by the parties) shall authorize the escrow agent to release the escrowed materials to USC in the event that 2tor, or its successor organization, becomes unable to continue to do business in the ordinary course, through bankruptcy or otherwise, following a reasonable opportunity to restructure or cure any such breach. In the event of their release, USC shall have the right to use, modify, and maintain escrowed materials for the sole purpose of continuing the benefits afforded to USC under or pursuant to this

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

Agreement, except that such rights shall be fully subject to, and only as permitted by, all applicable licensing and other agreements relating to the escrowed materials. USC shall be obligated to maintain the confidentiality of the released materials, and if the release event has been remedied, 2tor or its successor organization shall have the right to put the materials back into escrow. At its own expense, USC reserves the right to audit in the presence of a 2tor agent that the deposits and updates have been made pursuant to this Agreement.

I)   Academic and Professional Certification .

Upon request by USC, 2tor shall assist USC in securing approval of the Program by (i) the Western Association of Schools and Colleges ("WASC") and any other professional accreditation agencies if required; and (ii) as may be necessary to enable graduates to satisfy the academic and related requirements for certification in California (unless specifically excluded in an Addendum) and in states other than California, or in confirming applicable reciprocity rules outside California. All costs incurred under 1.I.i shall be borne by USC, and all costs incurred under 1.I.ii shall be borne by 2tor, subject in each case to the prior written approval of the paying party of any such expense incurred by the non-paying party. 2tor shall make no representation to Program students or applicants that the Program will satisfy the certification requirements in a particular state prior to confirmation of such approval or reciprocity in such state.

J)   Program and Student Evaluation . 2tor shall gather ongoing data of Program students to further overall Program evaluation, including, but not limited to, student satisfaction with the Program, evaluation of instructors, and such other matters in such form and at such frequency as USC may reasonably require.

K)   Placement . 2tor shall use good-faith efforts, in collaboration with USC's career counseling and placement efforts provided pursuant to Section 2.K, to place Program graduates.

L)   Alumni . USC shall be solely responsible for the management of alumni relationships, provided that USC may request 2tor to provide reasonable assistance in maintaining contact with recent alumni and tracking their career progress at any time through the effective date of the termination of this Agreement for any reason.

M)   Compliance .

i)   Personal Information . 2tor acknowledges that USC is subject to internal policies, laws, and regulations that govern and restrict the collection, storage, processing, dissemination, and use of non-public personal information that relates to applicants to the Program, Internship participants and USC's students and personnel that could be used, either directly or indirectly, to identify such person (collectively, "Personal Information"). 2tor shall, and

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

shall cause its employees, agents, servants, principals, and any subcontractors to, at all times comply with all applicable laws, rules, regulations and USC policies, including privacy and information security laws and regulations and USC policies regarding Personal Information relating to the performance of 2tor's obligations under this Agreement. Without limiting the generality of the foregoing, 2tor agrees (a) not to collect, store, process, disseminate, or use any such Personal Information obtained from USC except to the extent expressly permitted or required in the performance of its obligations under this Agreement, (b) to store all such Personal Information only in encrypted or otherwise secure form on 2tor's computer system and (c) not to sell, distribute, release or disclose lists or compilations of any items of Personal Information without the prior written consent of USC or of the subject(s) of the Personal Information to be released or disclosed. Any disclosure of Personal Information by 2tor in the performance of its obligations hereunder shall be made only on a "need-to-know" basis and subject to an applicable confidentiality agreement or other obligation substantially similar to the confidentiality, privacy and information security requirements imposed on 2tor under this Agreement and applicable law.

ii) <u>Student Privacy Rights</u>. Without limitation of its obligations under paragraph 1.M.i above, (a) 2tor shall take all commercially reasonable measures to protect the Personal Information of Program students consistent with Family Education Rights and Privacy Act ("FERPA") and the applicable laws of the State of California, (b) 2tor shall furnish USC a copy of 2tor's information security procedures for the storage and handling of education records and other Personal Information prior the commencement of 2tor's handling and processing of such matter, (c) 2tor shall furnish USC a copy of any update or other modification of such security procedures and (d) such security procedures and all updates and modifications thereof shall be subject to USC's written approval.

iii) <u>Agency Regarding Student Information</u>. In order to satisfy regulatory requirements applicable to USC, 2tor is hereby appointed as an agent of the USC Office of the Registrar for the use of student education records and other Personal Information solely for the purpose of providing the student and graduate services required hereunder throughout the Program and thereafter, including without limitation counseling of prospective students and continuing contact with graduates of the Program.

iv) <u>Incentive Compensation Rule</u>. 2tor shall compensate its employees engaged in the recruitment of Program students, or in the supervision of such employees, only in accordance with its commercially reasonable interpretation of the provisions of 34 CFR § 668(b)(22), commonly referred to as the Incentive Compensation Rule.

v) <u>HEOA Section 495 Compliance</u>. 2tor shall remain in compliance with HEOA Section 495. Without limiting the foregoing, 2tor shall have and maintain security mechanisms in place to ensure that each student registering for a course is the same student who participates in the course or receives course credit. Such security mechanisms shall include one or more of the following

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

methods: (a) a secure login and pass code; (b) proctored examinations; and (c) new or other technologies and practices that are effective in verifying student identification.

N) Monitoring and Audits Generally

i)   2tor shall (a) measure, monitor, and track the performance of its services and obligations, conduct internal audits and self-testing, and compare such performance to the service level agreements and other specifications and standards provided for in this Agreement, (b) detect and promptly cure deficiencies, and (c) report such performance, deficiencies and cures to USC on a quarterly or other basis as agreed between the parties in a form mutually agreed by the Parties from time to time.  Such assessment of the performance of 2tor's services and obligations shall include providing USC an opportunity to assess or comment to 2tor on 2tor's performance of its services and obligations, irrespective of any other measurements.  If legally required, 2tor shall also provide to USC, initially and on an annual basis thereafter, a copy of a Statement on Auditing Standards (SAS) 70, Type II, report obtained by 2tor from an auditing firm reasonably acceptable to USC with respect to 2tor's operations related to its services and obligations under this Agreement.

ii)   At least annually as requested by USC, and at such other times as USC may reasonably request, 2tor shall provide reasonable, mutually acceptable, written certifications as to 2tor's compliance with applicable laws, the service level agreements and other specifications and standards provided for in this Agreement, and such other matters as may be reasonably requested by USC.  For the avoidance of doubt, such written certifications shall include any sub-certifications reasonably required by USC to enable USC to provide its own written certifications to any students, graduates or regulators as required by applicable law or contract. USC shall consult with 2tor prior to agreeing to provide certifications with regard to the Program that will require a 2tor sub-certification.

iii)   Upon USC's request and subject to 2tor's then-current confidentiality, security and data protection procedures, 2tor will permit USC's authorized representatives and auditors to visit with the appropriate personnel at 2tor, and will provide USC with access to or copies of (a) applicable 2tor records, including testing results (whether conducted by 2tor or a third-party), (b) 2tor's compliance policies and procedures applicable to 2tor's operations related to its services and obligations, and (c) any other records required to be delivered by 2tor pursuant to this Agreement, in each case in order to conduct due diligence on, audit, inspect or otherwise examine 2tor's operations, computer systems and access controls directly relating to its performance hereunder (collectively, "Reviews").  At USC's reasonable request, and expense, Reviews also may include "ethical hacks," penetration testing or other testing of the 2tor System and 2tor's information security, data protection, disaster recovery, business continuity and confidentiality policies, procedures and safeguards.  USC agrees that Reviews will be completed at

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

2tor's facilities upon reasonable advance notice during regular business hours. The parties will cooperate in good faith to minimize the disruption associated with Reviews, including the timing of such Reviews.

iv)  If 2tor receives a request or demand from a student or graduate of the Program, or from a regulator in regard to USC or a student or graduate of the Program, requesting a Review, 2tor shall notify USC promptly, and 2tor shall work with USC or any such student, graduate, or regulator in conducting and responding to any such request for a Review, provided that 2tor shall not be required to provide a Review to a third party, except as required by law.

v)  Subject to 2tor's then-current confidentiality, security, and data protection procedures, (a) 2tor will discuss with USC personnel, or provide summaries to USC of, any material violations of 2tor's code of ethics or other compliance-related policies and procedures by 2tor personnel related to 2tor's performance hereunder, and (b) 2tor will promptly notify USC of (and, if requested by USC, provide USC summaries of) material changes to 2tor's code of ethics and other compliance-related policies and procedures applicable to 2tor's performance hereunder.

vi)  If 2tor fails to meet a service level agreement or other specification or standard in the performance of any service or obligation under this Agreement, or if a deficiency is identified as a result of any self-testing, SAS 70 audit, "ethical hack," penetration testing or other monitoring or other Review contemplated in this Section 1.N, as soon as practicable following knowledge of such failure or deficiency, 2tor shall, at its expense (a) perform an analysis to identify the cause of any such failure or deficiency, (b) provide USC with a report identifying the cause of such failure or deficiency and describing the intended procedure/steps for correcting or resolving such failure or deficiency and the timeline for completing such procedure/steps, (c) if requested by USC, meet with USC (in person or by teleconference) to discuss such failure or deficiency and such intended procedure/steps and timeline, (d) promptly cure such failure or deficiency and (e) after such failure or deficiency is cured, promptly notify USC that such failure or deficiency has been cured.

2)  <u>USC's Services</u>.  For each Degree for each School, USC shall be exclusively responsible for ensuring the academic quality and academic integrity of the Program. The following list represents a basic set of services; additions or deletions will be set forth in the Addendum.

A)  <u>Recruitment</u>.  The Program shall be branded as set forth in each Addendum (the "Brand"). USC shall promote the Program on the School's website (including, but not limited to, the homepage thereof), the School's career center and at all student recruitment events and professional school fairs attended by School representatives in a manner comparable to the promotion of the School's in-classroom Degree programs, and, to the extent USC promotes the School's in-classroom Degree programs, it will promote the Program in a comparable manner. Further, USC shall consult with 2tor in the development of additional Promotion Strategies, and USC

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

shall have the right to review and approve all marketing and other materials related to the Program prior to their use.

B) <u>Admissions Processing and Financial Aid</u>.

   i) After USC's receipt of a complete application from 2tor (as set forth in Section 1.B. above), USC shall, in its sole discretion, determine which qualified students shall be admitted to the Program; USC shall use commercially reasonable efforts to accept or reject each applicant within ten business days after receipt of such applicant's completed application.

   ii) USC shall, in its sole discretion, establish Admissions Standards for the Program, which shall require that students admitted to the Program have similar academic qualifications to those in the School's in-classroom Degree program, as applicable; USC and 2tor shall cooperate to make the admissions process and the application of Admissions Standards streamlined, transparent and clear to enable 2tor to target its promotional efforts to students likely to be accepted.

   iii) USC shall be solely responsible for the administration of all financial aid programs. USC shall provide student financial assistance services similar to those offered students enrolled in the School's in-classroom Degree program, and shall use commercially reasonable efforts to provide such services at a service level similar to that of competitive online programs. 2tor shall not be involved in any manner in the award or disbursement of financial assistance provided pursuant to Title IV of the Higher Education Act of 1965, as amended.

C) <u>Student Service and Counseling</u>. Once admitted to the Program, students shall, to the extent practicable given the inherent differences between in-classroom and online students, have similar rights and privileges and receive services similar to those received by the School's in-classroom Degree students. USC shall ensure the availability and participation of School faculty and staff, and provide academic counseling in Program requirements, add/drop policies, probations, leave of absence and similar matters. Program students shall not be charged for services that apply only to in-classroom Degree students.

D) <u>Host Relationships</u>. USC shall use commercially reasonable efforts, including, but not limited to, sharing any connections, contacts or networking suggestions it might have with 2tor, in order to assist 2tor in the cultivation of relationships with Hosts, subject to the written approval of USC. USC shall set customary standards for Internship participants (including students and field instructors/supervisors) and oversee the Internship and the work of the clinical supervisors. USC may require 2tor to remove any Internship participant from participation in the Program who does not, in USC's sole discretion, meet the reasonable standards of the Program.

E) <u>Curriculum Design</u>. USC shall be solely responsible for the design of the Program curriculum (the "Curriculum"), making its commercially reasonable efforts to have the framework of the Curriculum set by the date set forth in each Addendum, so that the Pilot (as hereinafter defined) can be launched by the date set forth in each

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

Addendum. School faculty or other personnel provided by USC shall provide reasonable assistance to 2tor's web team in the adaptation of the Curriculum for the Program to web-based presentation via the Platform. USC and School faculty shall be solely responsible for the ongoing review and revision of the Curriculum as USC determines, at its sole discretion, to be necessary and appropriate to maintain the academic quality and academic integrity of the Program. USC shall ensure the availability and participation of faculty and other personnel to achieve the Curriculum design as set forth in this Section 2.E.

F)  Curriculum Production and Deployment . USC shall use commercially reasonable efforts to prepare drafts of the syllabi (and submit them to the appropriate curricular committees in time to obtain timely approval), subject to approval by such appropriate curricular committees, (i) on or before the date set forth in each Addendum, for the Pilot Launch courses specified in Section 5.A, (ii) on or before the date set forth in each Addendum, for the Program Launch courses specified in Section 5.A, and (iii) on or before the date set forth in each Addendum, for such additional courses as the parties may mutually agree for the Additional Courses Launch as referenced in Section 5.A. USC shall also use commercially reasonable efforts to develop such syllabi into appropriate materials in time for production to meet such schedule. USC shall secure the commitment of those School faculty members and other instructional personnel selected by USC for the Produced Segments and for any modifications to the Curriculum required by the online delivery mechanism. Unless otherwise agreed in writing by the parties, USC shall be solely responsible for the expense of such faculty, other instructional personnel and other USC and School staff. Each Produced Segment shall be subject to USC's review and written approval prior to any distribution or other release thereof. Each course approved by USC shall be released for distribution on the Platform as such course is approved, subject to the provisions of Section 1.H and 1.I hereof.

G)  Program and Course Development & Support . Each course shall be taught exclusively by School faculty and other instructional personnel selected by USC. USC shall be responsible for the creation of the Curriculum and for the hiring, curricular training, and oversight of the work of the School faculty and other instructional personnel. USC shall use commercially reasonable efforts to maintain faculty availability, experience, quality, and student to faculty ratio similar to those of competitive programs. USC shall provide 2tor with access to information pertaining to both classroom-based and online students' admissions, performance, and post-graduation outcomes as well as information pertaining to relevant faculty, staff, and Internship participant information, to the extent permitted by and subject to the requirements of the FERPA and such other laws and regulations as may pertain.

H)  Technology . USC shall, upon 2tor's reasonable request, advise and consult with 2tor as to the design of the Platform and its sufficiency for use for the Program. USC shall make available to 2tor, upon 2tor's reasonable request, the appropriate

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

USC personnel to participate with 2tor in the testing and, as necessary, re-testing of the Platform as contemplated by Section 1.H above.

I)   Professional Certification. If appropriate, USC shall take such measures as are reasonable and necessary to secure such California approval of the Program as may be necessary to enable graduates to satisfy the academic and related requirements for professional certification. USC shall assist 2tor in seeking acceptance of Program credentials by other states either as an alternative certification program or under existing reciprocity rules with California, and USC shall make a good faith effort to make commercially reasonable supplements to or modification in the Curriculum or Program to satisfy state alternative certification requirements; provided that USC shall have no obligation to supplement or modify the Curriculum or the Program or make other adjustments in order to satisfy any such other state's perceived deficiencies in the Program in any way that USC believes would impair the academic integrity of the Program or USC's reputation.

J)   Evaluation. USC shall oversee the Program evaluation, utilizing USC data and the data gathered by 2tor pursuant to Section 1.J above and other available data. USC shall at its sole discretion determine satisfaction of degree requirements, award all grades, and confer all degrees.

K)   Placement & Credentialing. If determined by USC to be necessary for the Program, USC and 2tor shall take such reasonable measures to provide Program students with such advice and guidance as they may reasonably require to secure alternative resources for the satisfaction of individual state-specific requirements not included in the Program curriculum. USC shall, to the extent practicable given the inherent differences between in-classroom and online students, make its career counseling resources available to students in the Program on a basis similar to that provided to students enrolled in the School's in-classroom Degree program, including in-person meetings to the extent Program students visit a USC campus where that School's in-classroom Degree course is taught.

L)   Alumni. USC shall be solely responsible for the management of alumni relationships, provided that USC may request 2tor to provide reasonable assistance in maintaining contact with alumni and tracking their career progress.

3)   Accounting.

A)   Fiscal Year. "Fiscal Year" shall mean a period starting July 1 and ending on June 30 of the following calendar year. The first Fiscal Year of the Program shall end on the date set forth in each Addendum.

B)   Program Proceeds. USC shall collect all of the tuition and fees charged to Program students (such tuition and fees, other than the Excluded Fees (as hereinafter defined), collectively, the "Program Proceeds"). Tuition per credit for Program students shall be the same as the tuition per credit imposed upon School in-

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

classroom Degree students. Any charges for Program students that are not included in "Program Proceeds" shall not exceed similar charges imposed on School in-classroom Degree students. The following fees and charges shall not be included in determining "Program Proceeds": the Graduate Admissions Fee, the Norman Topping Fee, the Graduate Program Fee, the Graduate Student Service Fee and Off Campus Health Insurance (collectively, the "Excluded Fees").

C)  Finances. All Program Proceeds net of refunds actually granted by USC ("Net Program Proceeds") shall be shared between USC and 2tor as set forth in the Addendum.

D)  Reports and Payment.

   i)   For each time period where a course or group of courses start (a "Session") during the term of this Agreement, USC shall provide to 2tor the following reports on or before the 30th day after the commencement of each Session, (a) a listing for such Session, through the final add/drop date for such Session of: (i) the students offered admission by USC to the Program, (ii) the students who enrolled in or dropped from each course in the Program, including a course listing for the enrolled students, (iii) the Program Proceeds charged by type of charge for each student, (iv) the Program Proceeds collected by type of charge for each student, and (v) a calculation of the payments between the parties pursuant to paragraph 3.D.ii hereof for such Session; and (b) a reconciliation of the foregoing described report against actual results obtained during the most recently completed Session.

   ii)  Concurrently with the delivery of each report required by paragraph 3.D.i, USC shall also pay or adjust, as applicable, 2tor's portion of Net Program Proceeds for the subject Session by wire transfer of funds to such bank account as 2tor may direct by notice to USC no later than ten (10) business days prior to the scheduled date for such wire transfer. The payment for the most recently commenced Session shall equal the sum of (a) 2tor's portion (determined pursuant to paragraph 3.C.i) of the greater of (i) the amount of Net Program Proceeds collected by USC from all Program students enrolled in the Program for such Session as of the last add/drop date for such Session and (ii) 95% of the amount of Net Program Proceeds charged by USC to all Program students enrolled in the Program for such Session as of the last add/drop date for such Session plus (b) any adjustment in prior payments under this paragraph 3.D.ii required to reflect the Net Program Proceeds actually collected by USC for Sessions prior to the most recently commenced Session, inclusive of uncollectible revenues, refunds given and/or additional enrollment during such prior Sessions.

   iii) Any payment by 2tor to USC to make up any post-Session adjustment shall be paid within thirty (30) days after 2tor's receipt of the applicable report.

   iv)  A final payment of amounts due from either party to the other pursuant to this Section 3.D shall be made within thirty (30) days after the termination or expiration of this Agreement.

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

12

E)  Maintenance of Books and Records; Rights on Audit. USC shall maintain such books and records as are necessary to substantiate Program Proceeds received in connection with the Program and this Agreement. During the term of this Agreement and for a period of 180 days after the expiration or termination of this Agreement for any reason (or, if applicable, after any [***] described in the Addendum, Section 5.D), 2tor shall have the right to examine such books and records that are specifically related to the Program and this Agreement. Such examinations shall be held upon reasonable advance notice to USC at USC's offices during normal business hours and shall take place no more frequently than once each Fiscal Year. Once a particular Fiscal Year has been so examined, such Fiscal Year shall not be subject to any subsequent re-examination pursuant to this Section 3.E or otherwise, unless 2tor can show reasonable grounds for believing that an uncorrected error that would materially affect the Net Program Proceeds payable to 2tor for such Fiscal Year occurred in such previously examined Fiscal Year, either because a new error is subsequently found in a different Fiscal Year or 2tor can demonstrate that new information evidencing such error has come to its attention. Any such examination shall be made at 2tor's sole cost and expense. If such examination discloses that any amounts have not been paid or have been made in incorrect amounts, and such amounts are not in dispute, the parties shall promptly take appropriate steps to correct such errors in payment, including interest accruing at 12% per annum from the date such payment should have been made to the date on which such payment is made, and any reasonable costs of the audit.

4)  Intellectual Property.

A)  USC Property. USC shall own and retain all right, title, and interest, including, but not limited to, all copyrights, trademark rights and other intellectual property rights, in all of the content of the Program, including without limitation the content of the Curriculum ("USC's Intellectual Property"). 2tor acknowledges and agrees that all right, title and interest in and to all results and proceeds of 2tor's services hereunder in producing the Produced Segments, whether stored on tape, computer disks or otherwise, and all derivative works that are conceived, created, or developed as a result of or in connection with such 2tor services (collectively, the "Work Product") shall be the sole property of USC, whether such 2tor services are completed or not. 2tor acknowledges and agrees that (i) all Work Product shall constitute a "work made for hire" for USC, as that phrase is defined in Section 101 and 201 of the Copyright Act of 1976 (Title 17, United States Code), including without limitation a work specially commissioned by USC, and (ii) notwithstanding the foregoing subparagraph (i), if and to the extent 2tor retains any interest in the Work Product (in whole or in part), 2tor hereby grants, assigns and transfers to USC all right, title and interest in and to the Work Product, and all intellectual property rights therein, including without limitation all patent, copyright, trade secret and other proprietary rights, and the right to make any modifications, adjustments or

additions thereto (2tor hereby expressly waiving any *droit moral* or similar rights to object to any such changes), the right to make and distribute derivative works thereof and the right to all claims for past infringement thereof.  Upon USC's request, 2tor shall

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

13

execute and deliver to USC all documents and instruments, including without limitation copyright assignments, and shall otherwise assist USC, at USC's expense, to perfect in USC the sole and exclusive right, title and other interests in the Work Product. In the event USC is unable, because 2tor is no longer in business, to obtain the signature of 2tor to any document or instrument necessary or desirable to apply for protection of, or to enforce any action with respect to, any intellectual property right in or to the Work Product, 2tor hereby irrevocably designates and appoints USC and its duly authorized officers and agents as 2tor's agent and attorney-in-fact, whose power is expressly coupled with an interest, to act for and on behalf of 2tor, to execute such documents and instruments and to take all lawfully permitted actions to protect USC's interests in any intellectual property right with the same legal force and effect as if executed by 2tor. USC shall not use such Work Product except (i) in connection with the Program hereunder, (ii) for the exclusive use by students in the School's on-site masters Degree and/or doctorate Degree programs, (iii) to users licensed to use 2tor's Intellectual Property under Section 4.D below, (iv) upon expiration of this Agreement at the end of the term provided for in Section 5.B or any Renewal Term provided for in Section 5.D, (v) in the event that 2tor becomes insolvent or admits its inability, or becomes unable, to pay its debts generally as they become due; files a petition for relief or for reorganization or for the adoption of an arrangement under the federal bankruptcy laws or any other similar law or statute for the relief or aid of debtors of the United States of America or any State thereof, as now or hereafter in effect (the "Bankruptcy Laws"), or makes an admission seeking the relief therein provided; or has an order for relief entered against it under the Bankruptcy Laws or is otherwise adjudicated a bankrupt or insolvent, (vi) in the event that any Addendum to this Agreement is terminated by 2tor for a School pursuant to Section 5.C below or terminated by USC pursuant for a School to subparagraph 5.C.i(a) below and/or (vii) under terms the parties shall negotiate from time to time in good faith for other uses that are not competitive with the Program.

B)   2tor Property .  2tor shall own and retain all right, title and interest, including, but not limited to, all copyrights, trademark rights and other intellectual property rights, in the Platform and all other technology, computer programs and software source code, developed for the Platform, including, but not limited to, 2tor-developed or 2tor-acquired user interface designs necessary to facilitate access to USC's Intellectual Property via the Platform (provided that, for further clarity, 2tor's rights in such matter shall not give it any right whatsoever in or to any portion of USC's Intellectual Property, none of which may be used by 2tor except in accordance with the express terms of this Agreement), logic and data modules, algorithms, feature sets and source code, and documentation relating thereto ("2tor's Intellectual Property"). Anything in this Agreement to the contrary notwithstanding, this Section 4.B shall not apply to software licensed from persons or entities other than the parties and included in 2tor's Intellectual Property by mutual agreement of the parties.

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

C)  License of USC Intellectual Property . USC grants to 2tor the right to use, during the term of this Agreement, the names "USC," "University of Southern California," and other names set forth in each Addendum and other trade names, trademarks, service marks, designs and logos specified by USC for use in connection with the Program, including, but not limited to, 2tor's marketing and promotion of the Program, subject to USC's prior written approval of the form and manner of each such use. Subject to the remaining provisions of this Agreement, USC grants to 2tor the right and license during the term of this Agreement to use USC's Intellectual Property within the Territory *only* to the extent necessary for USC's Intellectual Property to be incorporated into or used with the Program pursuant to the terms of this Agreement. 2tor shall acquire no rights in any of USC's Intellectual Property or in any of USC's trade names, trademarks, service marks, designs or logos from 2tor's use hereunder.

D)  License of 2tor Intellectual Property . 2tor grants to USC the right and license during the term of this Agreement, and during the [***] described in the Addendum, Section 5.D, to use all of 2tor's Intellectual Property used in the Program, including, without limitation, a license of all rights under copyright and the rights to reproduce and copy 2tor's Intellectual Property in all editions, versions and formats for print and in any other form or medium, whether now known or hereafter known, throughout the world, including, without limitation, electronic, magnetic, digital, laser, or optical-based media, for use *only* in the School's on-site Degree programs and, under terms to be negotiated, for use in other online programs that are not competitive with the Program. To the extent necessary to facilitate access to the Program, 2tor shall also grant to Program students a royalty-free license to use the 2tor Intellectual Property that is used in the Program for the duration of their participation in the Program, but only as part of the Program studies.

E)  Other Uses of Marks . Other than the licenses granted in Sections 4.C and 4.D, no party may use the other's name, trademark, sign, logo or similar designation without such other's prior written approval, which may be granted in such other's sole discretion. The rights under Section 4.C above may not be (i) transferred, except to an entity acquiring all or substantially all of the business of 2tor, or (ii) sublicensed.

F)  Infringements by Others . Each party shall promptly report in writing to the other during the term any known or suspected infringement of any of USC's Intellectual Property or 2tor's Intellectual Property of which such party becomes aware, and shall provide the other with all available evidence supporting such known or suspected infringement or unauthorized use.

G)  Infringements by Parties . In the event that a party becomes aware of any claim that the practice by either party in the development, production, promotion, marketing or distribution of the Program infringes the intellectual property rights of any third party, such party shall promptly notify the other party. In any such instance, the

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

parties shall cooperate and shall mutually agree upon an appropriate course of action. Each party shall provide to the other party copies of any notices it receives from any person or entity other than a party regarding any alleged infringement or misappropriation of third party intellectual property relating to the development, production, promotion or marketing of the Program. Such notices shall be provided promptly, but in no event after more than fifteen (15) days following receipt thereof.

5) <u>Term and Termination</u> .

A) <u>Pilot and Program Launch</u> . The parties contemplate a three-phase rollout of the Program as follows: (i) an initial pilot (the "Pilot") projected to start in the date set forth in each Addendum (the "Pilot Launch"), consisting of the number of courses set forth in each Addendum with working titles set forth in each Addendum and including no more than the number of students set forth in each Addendum for the initial Session, in order to give both parties the opportunity to further develop the Program; (ii) a launch of the Program projected to start in the date set forth in each Addendum (the "Program Launch"), consisting of the number of courses set forth in each Addendum with working titles set forth in each Addendum; and (iii) a launch of such additional courses in the Program as the parties may mutually agree (the "Additional Courses Launch"), projected to start as set forth in each Addendum. Subject to Section 1.H and 1.I, the parties shall agree in good faith when the Program is ready for Pilot Launch and for Program Launch.

B) <u>Initial Term</u> . This Agreement and its initial term shall be deemed to have commenced on the date set forth in each Addendum (the "Effective Date") and continue for the number of years as set forth in each Addendum ending on the date set forth in each Addendum, subject to earlier termination or non-renewal as set forth in Sections 5.C and 5.D below.

C) <u>Termination For Cause</u> .

   i) If either party (the "Non-Performing Party") materially breaches any of its material obligations hereunder with respect to a School, the other party may deliver, in writing, a notice to such Non-Performing Party describing in detail such non-performance and adequately listing reasonable suggestions as to the steps that may be taken to cure such non-performance. If the Non-Performing Party has not cured such breach within (a) thirty (30) days following the Non-Performing Party's receipt of such notice or (b) such shorter period as may be reasonably required to attempt to avoid a material adverse effect on USC's reputation or the academic integrity of the Program, then in either such case the other party may terminate the Addendum to this Agreement for that School effective upon delivery of notice to the Non-Performing Party.

   ii) If the Non-Performing Party commits a breach of its obligations hereunder with respect to a School other than as described in paragraph 5.C.i above, the other party may deliver, in writing, a notice to such Non-Performing Party describing

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

in detail such non-performance and adequately listing reasonable suggestions as to the steps that may be taken to cure such non-performance. If after thirty (30) days following the date of such notice, the Non-Performing Party has not undertaken and diligently pursued a cure of such breach, with the goal of curing such breach within sixty (60) days after the Non-Performing Party's receipt of the original notice from the other party, the other party may terminate the Addendum to this Agreement for that School effective upon delivery of notice to the Non-Performing Party.

    iii)  A Non-Performing Party that receives a notice of breach and that has reasonable grounds for the position that the alleged breach is not, in fact, a breach hereof, may apply to an arbitrator or to court for a temporary restraining order or preliminary injunctive relief to in effect toll the period hereunder to cure such breach or other similar relief, until an arbitrator has determined whether such alleged breach is, in fact, a breach hereof.

D)  <u>Automatic Renewal Terms</u>. With respect to each School and subject to earlier termination as set forth in Section 5.C, this agreement and each Addendum hereto may renew as set forth in the Addendum (the "Renewal Terms").

E)  <u>Effect of Termination</u>. Any provision herein notwithstanding, after any termination or expiration of this Agreement (including any Addendum hereto) with respect to each School:

    i)  Subject to paragraph 5.E.ii, each party shall cease all use of the other party's Intellectual Property, and 2tor shall surrender to USC all Work Product and any reproductions thereof, except for one copy that may be maintained solely for archival purposes and not distributed.

    ii)  2tor and USC shall allow each student using the Platform, to complete all individual courses in the Program that such student has actually commenced prior to the termination of this Agreement (except to the extent that such student is expelled by USC or does not finish such course within six months following such termination or expiration). Notwithstanding any other provision of this agreement, 2tor and USC shall be entitled to receive their respective shares of any Net Program Proceeds paid by such students for such courses.

    iii)  Upon any termination or expiration, USC shall enable each then-enrolled Program student to complete his or her degree in an online format, subject to USC's right in its sole discretion to determine student evaluation, the awarding of degrees and expulsion of students for cause, and provided that such student does so diligently and within three years of termination or expiration of this Agreement.

    iv)  Sections 4.A, 6.D, 6.E, 8, 9, and 11 through 17 of this Agreement, and any other provisions of this Agreement that are expressly stated to survive for a period after termination, shall survive termination or expiration of this Agreement; and Sections 3 and 4.C shall survive in respect of the [***] described in the Addendum, Section 5.D.

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

17

**v)**   Termination of this Agreement shall not prejudice the terminating party's rights to any sums due or accrued under this Agreement prior to termination or expiration and shall not prejudice any cause of action or claim of the terminating party accrued or to accrue on account of any breach or default by the non-terminating party.

**F)**   Non-Solicitation . For one year following termination or expiration of this Agreement, and unless otherwise agreed in writing by the parties, each of the parties shall not, and shall not allow their affiliates, or any of their affiliates' employees or agents, to employ or otherwise obtain services from, or solicit or otherwise attempt to employ or otherwise obtain services from, or assist any person or business entity in employing or otherwise obtaining services from, or attempting to employ or otherwise obtain services from, any person who is then, or at any time during the preceding twelve months shall have been, in the employ of or retained by the other party.

6)   Representations and Warranties; Indemnifications .

**A)**   Laws and Regulations . Each party shall comply with all applicable federal, state and local laws and regulations applicable to it.

**B)**   Representations of 2tor . 2tor represents and warrants that (i) it is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware; (ii) this Agreement has been duly executed and delivered by 2tor and constitutes the legal, valid and binding obligation of 2tor, enforceable in accordance with its terms; (iii) the delivery and performance of this Agreement does not and will not conflict with, result in the breach of, constitute a default, with or without notice and/or lapse of time, under, result in being declared void or voidable any provision of, or result in any right to terminate or cancel any contract, lease or agreement to which 2tor or any of its affiliates is bound, constitute a violation of any statute, judgment, order, decree or regulation or rule of any court, governmental authority or arbitrator applicable or relating to 2tor or any 2tor affiliate, or result in the acceleration of any debt or other obligation of 2tor; (iv) 2tor, in its actions in connection with this Agreement, shall comply with all applicable federal, state and local laws, regulations and rules applicable to it: (v) 2tor owns, or will own, the rights and interests in, or to, the 2tor Intellectual Property necessary to enter into this Agreement and to be developed pursuant to this Agreement, and to grant the licenses and assignments of such property described in this Agreement; (vi) 2tor Intellectual Property do not, and will not, infringe any statutory or common law copyright, privacy, trade secret or other intellectual property right of any third party; and (vii) 2tor has not previously assigned, pledged, licensed or otherwise encumbered any rights or interest in, or to, any component of 2tor Intellectual Property in any way that would interfere with or prevent the grant of the licenses and assignments of such property described in this Agreement.

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

18

C) <u>Representations of USC</u> . USC represents and warrants that (i) it is a California nonprofit public benefit corporation;  (ii) this Agreement has been duly executed and delivered by USC and constitutes the legal, valid and binding obligation of USC enforceable in accordance with its terms; (iii) the delivery and performance of this Agreement does not and will not conflict with, result in the breach of, constitute a default, with or without notice and/or lapse of time, under, result in being declared void or voidable any provision of, or result in any right to terminate or cancel any material contract, lease or agreement to which USC or any of its properties is bound, constitute a violation of any material statute, judgment, order, decree or regulation or rule of any court, governmental authority or arbitrator applicable or relating to USC, or result in the acceleration of any debt or other obligation of USC; (iv) USC, in its actions in connection with this Agreement, shall comply with all applicable federal, state and local laws, regulations and rules applicable to it; (v) USC owns, or will own, the rights and interests in, or to, the USC Intellectual Property necessary to enter into this Agreement and to grant the licenses of such property described in this Agreement; (vi) to USC's knowledge, USC Intellectual Property and the trademarks licensed under Section 4 above do not, and will not, infringe any statutory or common law copyright, privacy, trade secret, trademark or other intellectual property right of any third party; and (vii) USC has not previously assigned, pledged, licensed or otherwise encumbered any rights or interest in, or to, any component of USC Intellectual Property or the trademarks licensed under Section 4 above in any way which would interfere with or prevent the grant of the licenses of such property described in this Agreement.

D) <u>Indemnity</u> . Each party ("Indemnifying Party") shall indemnify and defend the other party ("Indemnified Party") against any costs, expenses (including reasonable attorneys' fees whether arising out of a third-party claim or in enforcing this indemnification), claims, judgments, settlements and damages (including all damages awarded to any person or entity other than the parties payable by Indemnified Party, but in all cases only Indemnified Party's direct damages) arising out of, or related to: (i) the inaccuracy or breach of any of the representations, warranties or covenants of Indemnifying Party in this Agreement, and (ii) any breach by Indemnifying Party of any applicable laws, regulations and rules (and such breach is unknown to the Indemnified Party); provided in each case that the indemnification arises out of the administration of the Program and that the Indemnified Party gives prompt notice to Indemnifying Party of any possible claim for indemnification under this Agreement promptly after the Indemnified Party becomes aware of such possible claim, and permits Indemnifying Party to control the defense and settlement, if any, of any action brought by any person or entity other than a party relating to any such claim with counsel of its choosing at Indemnifying Party's expense; and provided further that any delay by Indemnified Party in notifying Indemnifying Party shall not relieve Indemnifying Party from any liability or obligation under this Agreement unless (and then solely to the extent) Indemnifying Party is damaged thereby.  If Indemnifying Party shall fail to promptly and diligently defend any such action after notice, Indemnified Party may re-assume the defense and settlement of such action.  Indemnified Party shall

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

cooperate in the defense of any claim for which Indemnifying Party is indemnifying hereunder, at the expense of Indemnifying Party, except the Indemnified Party shall bear the expense of the time of its own employees.

E)    Indemnification Procedure . Following notice of a claim or a threatened or actual suit that might result in an indemnification liability under Section 6.D above, Indemnifying Party may, at its own expense, without obligation to do so, procure for Indemnified Party the right to continue to use the relevant intellectual property or to replace or modify such intellectual property with products of substantially similar functionality to avoid the infringement or alleged infringement claimed, but such procurement shall not release such Indemnifying Party of its indemnification obligation under this Agreement.

7)    Insurance . Each party shall be solely responsible for obtaining workers compensation insurance for its employees and agents and such other insurance as may be required by applicable laws.  In addition, each party agrees to carry (or, in USC's case, to self-insure for) general liability insurance in an amount not less than $1,000,000 per occurrence. Each insurance policy required above shall name the other party as additional insured on broad form endorsements with respect to all bodily injury, personal injury, advertising injury, and property damage liability arising out of the party's operations, services or products. Each such insurance policy shall be endorsed to provide that such coverage shall be primary over any coverage available to the other party under its own insurance program in the event of any suit, claim damages or loss.  With respect to each School, each party shall provide to the other party a copy or copies of a Certificate or Certificates of Insurance, or in USC's case evidence of a self-insurance program, demonstrating that the insurance coverage set forth above is in full force and effect no later than sixty (60) business days after the date of the parties' execution of each Addendum.  The certificate(s) shall also evidence the insurers' agreement to endeavor to provide the other party at least 30 days' advance notice of any cancellation or material change in any policy of insurance for coverage required under this Agreement. Further, each party shall maintain any insurance coverage referenced herein for a period of five (5) years after termination of this Agreement.

8)    Confidentiality .

A)    Announcements . Neither 2tor or any of its subsidiaries, officers, directors, employees, other affiliates or agents on the one hand, nor USC or any of its subsidiaries, officers, directors, employees, other affiliates or agents on the other hand shall, without the prior consent of the other, make any public statement or announcement or any release to trade publications or through the press or otherwise, or make any statement to any customer or other third party with respect to this Agreement (including, without limitation, the intent and the terms of this Agreement), except as may be necessary to comply with the requirements of any applicable law, governmental order or regulation or legal proceeding. 2tor may also disclose this Agreement to potential financing parties who agree in a customary form of confidentiality agreement to keep its terms confidential.

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

20

B)    Confidential Information . The parties (each a "Receiving Party") acknowledge that each has been informed that it is the policy of the other party (each a "Disclosing Party") to maintain as secret and confidential all information relating to the business, products, services, costs, marketing, information pertaining to both on-site and online students' admissions, performance, and post-graduation outcomes (as set forth in Section 2 above) as well as all information (including, but not limited to, academic as well as personal contact and financial information) pertaining to all faculty, staff, on-site students, on-line students, Hosts, and Internship participants, and future plans of a Disclosing Party, except such information as becomes publicly known other than through the action of the Receiving Party (all such information is referred to in this Agreement as "Confidential Information"), and further acknowledges that such Confidential Information is of great value to a Disclosing Party.  The terms of this Agreement shall be included in the definition of Confidential Information.  The parties recognize that in negotiating and carrying out the terms of this Agreement, each Receiving Party has and will acquire Confidential Information as aforesaid. Each Receiving Party confirms that it is reasonably necessary to protect each Disclosing Party's Confidential Information and associated goodwill, and accordingly:

Each Receiving Party shall not directly or indirectly (except where authorized by the Disclosing Party in writing for the benefit of the Disclosing Party), for or on behalf of the Receiving Party or any Person for any reason, divulge any of the Disclosing Party's Confidential Information to any Person other than the Disclosing Party (hereinafter referred to collectively as a "Third Party"), except as required by law, in which case, when possible, only after providing prior notice to the Disclosing Party, or use or cause to authorize any Third Parties to use, any such Confidential Information, or any other information regarded as confidential and valuable by the Disclosing Party that the Receiving Party knows or should know is regarded as confidential and valuable by the Disclosing Party (whether or not any of the foregoing information is actually novel or unique or is actually known to others and whether or not the Confidential Information is labeled as confidential). Each Receiving Party shall, upon the expiration or termination of this Agreement for any reason, forthwith deliver up to the Disclosing Party, or destroy or delete, any and all documents and materials, or copies thereof, in electronic format or otherwise, in Receiving Party's possession or under its control that relate to any Confidential Information or that are otherwise the property of the Disclosing Party, provided that the Receiving Party may maintain one copy of records containing Confidential Information for archival purposes only.

C)    Return of Confidential Information . Upon the request of the Disclosing Party at any time after the termination of this Agreement, the Receiving Party will return (and purge its systems and files of) all Confidential Information and Personal Information supplied to, or otherwise obtained by, the Receiving Party in connection with this Agreement or provide, in form and substance acceptable to the

Disclosing Party, a certificate of destruction with respect to all such Confidential

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

21

Information and Personal Information, except the Receiving party may retain one copy solely for archival purposes, which shall remain subject to the confidentiality provisions hereof.

D)   Remedies . Any breach or threatened breach by either party of any provision of this Section 8 will, because of the unique nature of the Confidential Information entrusted to it as aforesaid, cause irreparable harm to the other party and shall entitle such other party, in addition to any other legal remedies available to it, to apply to any court of competent jurisdiction to enjoin such breach or threatened breach. The parties understand and intend that each restriction agreed to in this Section 8 shall be construed as separable and divisible from every other restriction, and the unenforceability, in whole or in part, of any such restriction, shall not affect the enforceability of the remaining restrictions and that one or more or all of such restrictions may be enforced in whole or in part as the circumstances warrant. Each party further acknowledges that the other party is relying upon such covenants as an inducement to enter into this Agreement. Each party shall cause its employees, agents and independent contractors to enter into appropriate confidentiality agreements to enforce the provisions of this Section 8. For the purposes of this Section 8, the term "person" shall mean any person, corporation, limited liability company, partnership or other entity, along with the heirs, successors, and assigns of the same. The provisions of this Section 8 shall apply to a party and any affiliate of such party at any time during the term hereof, including at any time that such affiliate is no longer an affiliate of such party, and each party shall cause each of such affiliates to enter into an agreement agreeing to comply with the terms of this Section 8.

9)   Limitation of Liability . To the maximum extent permitted by law, neither party shall be liable to the other or to any other person for any indirect, incidental, consequential, exemplary, or special damages, of any character, including, but not limited to, damages for loss of goodwill, lost profits, lost business and/or any indirect economic damages whatsoever regardless of whether such damages arise from claims based upon contract, negligence, tort (including strict liability or other legal theory), a breach of warranty or term of the Agreement, and regardless of whether a party was advised or had reason to know of the possibility of incurring such damages in advance. In no event will a party's aggregate liability for all claims, damages, or losses under this Agreement, apart from claims, damages, or losses asserted by a third party and subject to such party's indemnification obligations hereunder, exceed the Net Program Proceeds received by such party under Section 3.C of this Agreement during the twelve (12) month period preceding the occurrence of the initial event that gives rise to a claim.

10)  Exclusivity . [***] ("Competitive Programs") [***];

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

(b) 2tor may offer other online Degree programs, online degree programs in other fields, and other certificate programs, under other names, [***]; and (c) if either USC or 2tor proposes a reasonable expansion of the Territory and the other fails or refuses to proceed hereunder to enable marketing of the Program within such expansion area within one (1) year after such proposal, then, so long as such other party is not in default of any of its material obligations hereunder, such proposing party shall have the right to develop or offer Competitive Programs, but only within such expansion area pursuant to this clause (c). For further clarity, USC's traditional in-class competitive programs that are predominantly delivered in classrooms in person by live professors on any of USC's campuses are not Competitive Programs even if they utilize the Platform.

11) Force Majeure . The nonperformance of either party to this Agreement, except nonperformance of payment obligations, will be excused to the extent that performance is rendered impossible by any act of God or circumstances beyond the control of a party and without its fault or negligence, including without limitation, fire, war, riots, flood, earthquake, failure of third party hardware or software, governmental acts or orders or restrictions, or power or communications failure (each a "Force Majeure Event"), provided that the non-performing party gives prompt notice of such Force Majeure Event to the other party and makes all commercially reasonable efforts to remove such causes of nonperformance promptly and perform whenever such Force Majeure Event has ceased. In the event that the Force Majeure Event continues and prevents substantial use of the Program for more than forty-five (45) days, either party may terminate this Agreement with respect to that School upon written notice to the other party, and upon such termination, neither party shall have any further obligation or liability to the other except as set forth in Section 5.E hereof.

12) Entire Agreement . This Agreement (including all Addendums and Exhibits hereto) contains the entire understanding of the parties with respect to the subject matter hereof and supersedes any prior agreement between the parties, except that the parties acknowledge the existence of a certain October 20, 2008 Services Agreement between USC, on behalf of the USC Rossier School of Education, and 2tor, and agree that nothing herein is intended to or shall be considered, deemed or held to modify, supersede, cancel or otherwise affect the validity, enforceability or terms thereof, either in whole or in part or parts. No change, amendment, termination or attempted waiver

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

of any of the provisions hereof shall be binding unless in writing and signed by the party against whom the same is sought to be enforced.

13) <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the respective successors and assigns of the parties, provided that neither party may assign, subcontract or sublicense this Agreement in whole or in part or any of its rights or obligations hereunder without the prior written consent of the other, provided, however, that 2tor may subcontract out aspects of the work for the Program other than overall Program management, provided further that 2tor shall be responsible for any subcontractor work engaged by 2tor for the Program as if 2tor were performing it.  2tor shall consult with USC before effecting a change of control in the company.

14) <u>Governing Law</u>. This Agreement and any claim or dispute arising out of, relating to or in connection with this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be governed by and construed in accordance with the laws of the State of California without giving effect to its conflicts of law principles.

15) <u>Review and Notices</u>.

   A) <u>Approvals Generally</u>. If either party hereto wishes to object to any proposal or other matter submitted by the other party for consent or approval, the objecting party shall promptly after submission of such proposal provide to the submitting party a description of its objection(s) in reasonable detail together with suggestions as to how it would like to see such objection(s) cured.  Unless otherwise specified herein, approval for or consent to any proposal hereunder shall not be unreasonably delayed, conditioned or withheld and shall be deemed to have been given following 10 days after the written submission of such proposal, unless the reviewing party has provided a notice of objection(s) as described in this Section.

   B) <u>Content and Brand Approvals</u>. In the case of any consent or approval required from USC with respect to the content or appearance (to users) of the Program, any substantive modification of any USC Intellectual Property, or the content or appearance of any use of the Brand in the context of any marketing message in which it will appear, such approval or consent may be withheld in the sole and absolute discretion of USC.  Once the content or appearance of any use of the Brand in context is approved by USC in its sole and absolute discretion, no further approval shall be required hereunder for re-purposing such content or appearance in any different media that would be consistent with any marketing plan that USC otherwise approves.

   C) <u>Notices</u>. Any notices or other communications under this Agreement, except as may otherwise be provided in this Agreement, will be deemed given and delivered (a) when delivered personally or (b) on the date received by or rejected by addressee, if mailed postage prepaid by certified mail, return receipt requested or if sent shipping prepaid by nationally recognized courier service requesting signature on delivery or (c) on the date received, if sent by confirmed facsimile (provided,

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

however, in each case, if such confirmation is not by 3 p.m. on a business day, then on the next business day), in each case addressed to the address on the first page hereof, or, in the case of fax, to 2tor at: 59 Chelsea Piers, Suite 200, New York, NY 10011, and to USC at the address (and to the attention) as set forth in each Addendum hereto, or to such other address as either party shall designate by notice to the other, effective ten (10) days after such notice. In the case of notice to 2tor, a copy shall also be sent to Obermayer Rebmann Maxwell & Hippel LLP, attention: Todd J. Glassman, Esquire, One Penn Center, Suite 1900, 1617 John F. Kennedy Boulevard, Philadelphia, PA 19103-1895, fax no.: (215) 665-3165. In the case of USC, a copy shall also be sent to General Counsel, University of Southern California, University Park, ADM-352, Los Angeles, California 90089-5013, fax no: (213) 740-3249.

16)  Severability . The invalidity or unenforceability of any particular provision of this Agreement in any jurisdiction shall not affect the other provisions hereof or such provision in other jurisdictions, and this Agreement shall be construed in such jurisdiction in all respects as if such invalid or unenforceable provisions were omitted.

17)  Independent Contractors . Each party shall be an independent contractor of the other party hereto. This Agreement shall not create a partnership and shall not authorize either party hereto to bind the other party in any manner.

18)  Resolution of Disputes . Any dispute relating to this Agreement; the making, performance, nonperformance or termination of this Agreement; or any transaction in connection with this Agreement shall be resolved in the following manner. The parties shall first meet in good faith and attempt to resolve the dispute on their own. If the dispute cannot be resolved by the parties, the dispute shall be submitted to mediation or arbitration and, if to arbitration, such arbitration shall be conducted in Los Angeles, California in accordance with the rules of the American Arbitration Association ("AAA"). The award of such arbitration shall be final, binding and non-appealable, except to the extent provided for in the rules of the AAA. The arbitrator(s) may not amend or alter any term of this Agreement, shall apply the law as set forth herein, and shall have the discretion to impose the cost of the arbitration upon the losing party or divide it between the parties upon any terms which (s)he/they deem appropriate; provided, however, that each party shall bear its own legal fees and costs. A judgment upon an award rendered by the arbitrator(s) may be entered in any court of competent jurisdiction, or application may be made to such court for confirmation of such award or a judicial acceptance of such award, and for an order of enforcement or other legal remedy.

19)  Individual Agreements between USC and 2tor . The parties intend and agree that this Agreement, when combined with each Addendum attached (or to be attached) hereto, shall each constitute a separate and distinct agreement between USC and 2tor with respect to each School set forth in each Addendum. As such, all rights, remedies, duties, responsibilities and obligations of each party with respect to the development and administration of the Program and otherwise hereunder for each School set forth in

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

each Addendum shall be separate and apart from the rights, remedies, duties, responsibilities and obligations of the parties with respect to the development and administration of the Program and otherwise hereunder for every other School set forth in every other Addendum.  For the avoidance of doubt, either party's performance or non-performance of any obligation or otherwise hereunder with respect to any School set forth in any Addendum shall have no effect, bearing or consequence on either party's performance or non-performance of any obligation or otherwise with respect to any other School set forth in any other Addendum, and this Agreement and all other Addendums shall otherwise remain in full force and effect.  All terms of this Agreement, when combined with each individual Addendum, shall be read individually and specifically with respect to each School listed in each individual Addendum.

IN WITNESS WHEREOF, USC and 2tor have each caused this Agreement to be executed by its duly authorized officer as of the date first above written.

By:  /s/ C. L. Max Nikias                                    By:  /s/ John Katzman
     C. L. Max Nikias                                            John Katzman
     Executive Vice President and Provost                        Chief Executive Officer

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

26

ADDENDUM TO THE
MASTER SERVICES AGREEMENT
FOR SCHOOL OF SOCIAL WORK

The parties agree that the following shall constitute the definitions and other information agreed upon by the parties via this Addendum, as referenced in the applicable sections of the Master Services Agreement set forth below:

Recitals

A)  1ˢᵗ Recital:   The following shall constitute the "School" as set forth in the first recital of the Agreement: School of Social Work, with an address of Montgomery Ross Fisher Building, Los Angeles, CA 90089-0411.

B)  2ⁿᵈ Recital:   The following shall constitute the "Degree" to be offered by the School listed above as set forth in the second recital of the Agreement: Master of Social Work.

I)  2tor's Services.

D.  Host Relationships . In the event that 2tor is unable to arrange a residency for a student, it will consult with USC before ending that effort.  In such event, USC and 2tor will jointly work to arrange an appropriate Residency for the student. 2tor shall place students into Residencies within [***] of the start of classes.

G.  Program and Course Delivery and Support .  2tor will provide support to USC faculty members, field instructors/supervisors, other instructional and technical personnel, and students for the use of 2tor technology and related required applications.

H.  [***]. USC may, in its sole and absolute discretion, provide 2tor with appropriate content developed through its military and other contracts to distribute [***] to certain professionals or others as designated by USC.  USC retains all right, title and interest, including but not limited to intellectual property rights, to these materials.  In such event, 2tor will create and administer, [***], a distribution mechanism for this content, provided that the parties shall allocate the costs in a manner to be reasonably agreed in advance by written agreement signed by the authorized signatories of the parties.  [***], such tuition and/or fees shall constitute Program Proceeds and shall be shared by the parties in the same manner as otherwise provided herein.

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

I.   Academic and Professional Certification. 2tor is not required to assist USC in securing approval of the Program as may be necessary to enable graduates to satisfy the academic and related requirements for certification in California.

2) USC's Services.

A)   Recruiting. The Program will be branded as the MSW@USC, as the "Virtual Academic Center," and as otherwise proposed by 2tor as part of its marketing efforts with respect to the Program and as accepted by USC.

B)   Admissions Processing and Financial Aid. USC shall provide 2tor employees with sufficient access to meeting space on campus to facilitate such employees' interactions with participating faculty.

E)   Curriculum Design. Date by which USC will set the Curriculum framework: June 15, 2010; Date on which USC will launch the Pilot: September 27, 2010

F)   Curriculum Production and Deployment.

    i. Syllabi draft date for Pilot Launch courses: June 15, 2010.
    ii. Syllabi draft date for Program Launch courses: July 30, 2010.
    iii. Syllabi draft date for Additional Courses Launch courses: September 30, 2010.

    USC shall submit syllabi drafts to 2tor for all subsequent courses not included in the Pilot Launch, Program Launch or Additional Courses Launch no less than three (3) months in advance of the mutually agreed upon launch date for each subsequent course.

G.   Program and Course Delivery and Support. USC will provide support to its faculty and field instructors/supervisors in teaching online, in the curriculum, and in other necessary non-technical content.

3) Accounting:

A)   End date for the first Fiscal Year of the Program: June 30, 2011.

C)   Finances. All Program Proceeds net of refunds actually granted by USC ("Net Program Proceeds") shall be shared between USC and 2tor as follows:

    i)   2tor will be entitled to [***]% of the Net Program Proceeds, in the aggregated through each payment/adjustment date under Section 3.C of the Agreement, for its technology, production, marketing, technical support and other services.

    ii)   USC will be entitled to retain all remaining Net Program Proceeds after 2tor receives its share under paragraph 3.C.i of the Appendix above for USC's

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

admissions, marketing, Curriculum development, Program instruction, student evaluation, Program evaluation and other support of the Program.

4)    C) <u>Additional names</u> . Additional names that USC grants to 2tor the right to use: none.

5)    <u>Term and Termination.</u>

A) <u>Pilot and Program Launch</u>

     i)     The Pilot Launch will be in September 2010; it shall contain one course. The parties shall reasonably agree on the working titles of the courses in the Pilot Launch. The number of students for the initial Session shall not exceed 60.
     ii)    The Program Launch shall be October 4, 2010; it shall consist of five courses.  The parties shall reasonably agree upon the working titles of the courses in the Program Launch.
     iii)   The Additional Courses Launch will be January 10, 2011.
     iv)   If either party reasonably believes that the October 4, 2010 launch date cannot be met, the launch will be delayed until January 10, 2011.

B) <u>Initial Term</u> . This Agreement and its initial term shall be deemed to have commenced on July 1, 2010 (the "Effective Date") and continue for ten (10) years ending on June 30, 2020, subject to earlier termination or non-renewal as set forth in Sections 5.C and 5.D of the Agreement.

D) <u>Automatic Renewal Terms</u> . Subject to earlier termination as set forth in Section 5.C of the Agreement, this Agreement and each Addendum hereto shall automatically renew for successive 3-year terms (the "Renewal Terms"), unless either party shall give notice of non-renewal at least 1 year prior to the end of the then current term. [***] shall be made on a schedule and otherwise in accordance with the terms of the Agreement.

10) <u>Exclusivity</u> .

(a)(ii):  Date by which Program Proceeds received during prior Fiscal Year must equal or exceed designated amount: July 1, 2015; amount that Program Proceeds received during prior Fiscal Year must equal or exceed: $[***].

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

29

[Language in addition to Section 10 of the Agreement] Assuming 2tor is able to recruit a sufficient number of qualified applicants, USC agrees that it shall permit up to 2,000 new student starts per Fiscal Year; at any time, it may raise this number to reflect increased capabilities ("Maximum Class Size"). However, if USC materially changes it admissions criteria, or if the number of new students starts in any Fiscal Year is equal to or exceeds eighty percent (80%) of the Maximum Class Size, then, for the remainder of the contract term (and any renewals or extensions hereof), 2tor may offer Competitive Program(s).

15) C) <u>Address</u>. Address for notice to USC to be delivered to (address and attention):

University of Southern California
Office of the General Counsel
Administration 352
Los Angeles, California 90089-5013

Attention: Stephen A. Yamaguchi, University Council

THE UNIVERSITY OF SOUTHERN
CALIFORNIA                                                         2TOR INC.

By:  /s/ C. L. Max Nikias                                      By:  /s/ John Katzman
C. L. Max Nikias                                                        John Katzman
Executive Vice President and Provost                      Chief Executive Officer

Date:  4/15/10                                                       Date:  4/12/10

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

30

## ADDENDUM
## TO
## MASTER SERVICES AGREEMENT
## REGARDING TURNITIN SERVICES

This Addendum ("Addendum") to that certain Master Services Agreement dated April 12, 2010 (the "Original Agreement") is entered into effective as of July 22, 2011 ("Effective Date") by and between the University of Southern California ("USC") and 2tor, Inc. ("2tor"). Capitalized terms not defined herein shall have the respective meanings ascribed to such terms in the Original Agreement.

### Background

USC and 2tor desire that 2tor integrate the iParadigms, LLC's ("iParadigms") Turnitin Ensure Originality service ("TurnItIn Services") into the 2tor Platform and Programs provided to USC under the Original Agreement, in order to help evaluate the originality of student work.

In consideration of the foregoing and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows.

### Agreement

1.     <u>Integration</u>. All licenses and rights to use the Turnitin Services are subject to and conditioned upon USC's receipt of written authorization from iParadigms and USC's continued authority to grant such licenses and rights from iParadigms. 2tor shall not commence use of the TurnItIn Services until 2tor receives USC's written confirmation of receipt of such authorization from iParadigms. Subject to the forgoing conditions, USC hereby grants 2tor the non-transferable, limited, non-exclusive right and license to use the TurnItIn Services for the integration purposes contemplated below and solely in connection with USC end users with respect to the Programs for purposes of submitting student work for evaluation. 2tor shall not rent, lease or provide access to, or benefits from, the TurnItIn Services to any other third party. 2tor shall integrate the Platform and Programs with the TurnItIn Services, which integration shall include:

a) accepting student essay submissions via the Platform/Programs;
b) transferring those submissions to the TurnItIn Services such that they may be evaluated by the TurnItIn Services;
c) retrieving selected evaluation data made available by the TurnItIn Services, including an originality score/report; and
d) displaying such originality score/report to end-users within the Platform and Programs.

To the extent available, USC shall facilitate the provision of support from iParadigms in connection with such integration. USC shall promptly

notify 2tor of any changes in its authorization or continued authority to grant the aforementioned licenses and rights from iParadigms, and 2tor shall not be responsible for ensuring that USC maintains such authorization, continued authority, licenses or rights from iParadigms, and shall not be liable in any way for USC's failure to do so.  Any failure by 2tor to integrate the Platform and/or Programs with the TurnItIn Services as set forth in this Section 1 shall not constitute a breach or default of its obligations contained in the Original Agreement, provided that 2tor has used commercially reasonable, good faith efforts to achieve such integration.

      2.      **Additional Provisions**. 2tor will not be responsible for the accuracy of the TurnItIn Services originality scores/reports, or the reliability (uptime) of the TurnItIn Services. 2tor's student

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

1

services support team will respond to USC end-user queries regarding the origin and general nature of the originality scores/reports provided by TurnItIn Services; however, 2tor will not be in a position to explain in detail the reasons for TurnItIn Services originality scores/reports, nor give specific advice as to how originality scores/reports may be improved. USC will be responsible for managing the relationship for TurnItIn with iParadigms, including addressing problems with originality scores/reports accuracy, TurnItIn Services reliability (uptime), and any legal questions regarding the right of iParadigms to possess copies of student essays. Upon USC's reasonable request, 2tor shall provide such reports and data that are available to 2tor in connection with use of the TurnItIn Services.

3.  **Terms** . 2tor shall access and use the TurnItIn Services in compliance with and subject to, Sections 1(M)(i) and (ii) of the Original Agreement and the TurnItIn Services Usage Policy and Privacy Policy/Pledge available at www.turnitin.com (collectively, the "Terms").

4.  **Indemnification** . 2tor shall defend and indemnify USC, iParadigms and their parents, subsidiaries, and their officers, directors, employees and agents and their successors and assigns (collectively, for purposes of this Section, "USC Indemnitees") against, and hold USC Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against, USC Indemnitees occurring as a result of, or in connection with any breach of the Terms by 2tor. USC shall defend and indemnify 2tor and its parents, subsidiaries, and their officers, directors, employees and agents and their successors and assigns (collectively, for purposes of this Section, "2tor Indemnitees") against, and hold 2tor Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against, 2tor Indemnitees occurring as a result of, or in connection with a claim brought by any USC end user alleging that such USC end user's TurnItIn originality scores/reports are inaccurate, or any claim brought by iParadigms or any other party regarding USC's failure to maintain the authorization, continued authority, licenses or rights in or to use the TurnItIn Services as required hereunder. If seeking indemnification, indemnified party will give prompt written notice to indemnifying party.  The failure by indemnified party to give notice as provided above, shall not relieve indemnifying party of its obligations under this section, except to the extent that the failure results in the failure of actual notice and indemnifying party is damaged as a result of the failure to give notice.  In addition, indemnified party will allow indemnifying party to direct the defense and settlement of any such claim, with counsel of indemnifying party's choosing, and will provide indemnifying party, at indemnifying party's expense, with information and assistance that is reasonably necessary for the defense and settlement of the claim.  Indemnified party shall not be liable for any settlement of an action effected without its written consent (which consent shall not be unreasonably withheld or delayed).  Indemnifying party will not consent to the entry of any judgment or enter into any settlement that does not include as unconditional term(s) thereof, (a) the giving by the claimant or plaintiff to indemnified party a release from all liability with respect to the claim; and (b) confidentiality of the terms of such settlement agreement.

5.  **Ownership** . The application program interfaces and design interfaces (i) necessary to facilitate access from the Platform and Programs to the TurnItIn Services and (ii) developed by 2tor shall constitute 2tor's Intellectual Property under the Original Agreement. As between 2tor and iParadigms, subject to the underlying ownership rights of students in and to the submitted work, iParadigms owns all rights in and to the TurnItIn Services and all material created by the TurnItIn Services, including the format of the originality reports, and all intellectual property rights related thereto.

6.  **Confidential Information** . The information, including the originality scores/reports, received by 2tor in connection with use of the TurnItIn Services as contemplated under this Addendum shall constitute Confidential Information of USC under the Original Agreement.

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

7.     **General** . Except as set forth in this Addendum, all terms and conditions set forth in the Original Agreement shall remain in full force and effect and shall be applicable to this Addendum. If there is any conflict between the terms of this Addendum and the Original Agreement, then the terms of this Addendum shall prevail.

IN WITNESS WHEREOF, the parties have caused this Addendum to be executed and do each hereby represent that their respective signatory whose signature appears below has been and is on the Effective Date duly authorized by all necessary and appropriate corporate action to execute this Addendum.

**UNIVERSITY OF SOUTHERN CALIFORNIA**                     **2TOR, INC.**

| | | | | |
|---|---|---|---|---|
| Signature: | /s/ Robert Cooper | | Signature: | /s/ Christopher Paucek |
| Name: | Robert Cooper | | Name: | Christopher J. Paucek |
| Title: | Vice Provost, Planning and Budget | | Title: | President |
| Date: | 07/22/2011 | | Date: | 8/2/11 |

CONFIDENTIAL TREATMENT HAS BEEN REQUESTED FOR PORTIONS OF THIS EXHIBIT. THE COPY FILED HEREWITH OMITS THE INFORMATION SUBJECT TO A CONFIDENTIALITY REQUEST. OMISSIONS ARE DESIGNATED [* * *]. A COMPLETE VERSION OF THIS EXHIBIT HAS BEEN FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE COMMISSION.

3

DocuSign Envelope ID: FADE1431-26FE-4A26-8B14-F2C3CB062CBE

## FIRST AMENDED AND RESTATED MASTER SERVICES AND LICENSE AGREEMENT

The Arizona Board of Regents ("**ABOR**") for and on behalf of Arizona State University ("**ASU**") and eCollege.com, a Delaware corporation and a Pearson company ("**Pearson**"), hereby enter into this First Amended and Restated Master Services and License Agreement (as it may be amended from time to time, this "**Agreement**"), effective as of January 1, 2015 (the "**Effective Date**"). This Agreement supersedes and replaces in its entirety the Master Services and License Agreement entered into by the parties effective August 16, 2010, and all addenda thereto (collectively, the "**Original Agreement**"). This Agreement and the Original Agreement were entered into as a culmination of the negotiation process following Pearson's response to ASU's Request for Proposal #281002 -- Online Course Delivery Services.

Subject to the terms and conditions set forth herein and in the attached Exhibits and addenda, if any, the parties agree as follows:

## I. PURPOSE AND SCOPE

ASU and Pearson will develop, provide, and promote online degree programs under the ASU Online® brand (or such other branding as may later be developed or adopted (the "**Managed Programs**"). All ASU students enrolled in the Managed Programs are referred to as "**Students.**" Except as set forth in this Section or otherwise agreed in writing between ASU and Pearson, all of ASU's online degree programs will be Managed Programs. The following programs are not considered Managed Programs for purposes of this Agreement:

> a. Online programs under the ASU Online® brand that were in existence prior to the date of the Original Agreement;

> b. Courses or programs offered by ASU that are only marketed to non-online degree seeking ASU students;

> c. Other graduate programs managed or to be managed (i) though an existing contract with a third party, (ii) by ASU through its academic units outside of ASU Online.

From time to time ASU may seek to enroll in the Managed Programs groups of students that were (a) recruited by persons or entities other than Pearson and (b) are part of a formal relationship that has been documented between ASU and a third party to enroll such students in an ASU program(s) ("**ASU Recruited Groups**"). The services Pearson provides with respect to ASU Recruited Groups may be different than those provided to Students recruited by Pearson, and therefore, at the request of ASU, the economics for the integration of and the services Pearson provides with respect to ASU Recruited Groups will be evaluated and agreed on a case-by-case basis. To the extent that ASU and Pearson agree on an approach to a particular ASU Recruited Group that is different than the terms in this Agreement, the terms for integration of each ASU Recruited Group may be integrated into this Agreement by the execution of an addendum, in the form of Addendum to Master Services and License Agreement attached as <u>Exhibit A</u>, each of which will be added to <u>Exhibit A</u> following execution, at which point this Agreement will be deemed amended to incorporate the terms set forth therein.

## II. TERM

The initial term of this Agreement will commence on the Effective Date and end on August 16, 2018, unless terminated sooner as set forth in this Agreement or as mutually agreed by the parties (the

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

"**Initial Term**"). The Initial Term will automatically renew for an additional two year term commencing on August 17, 2018, and ending on August 16, 2020, unless either party provides written notice to the other party of its intent not to renew the Agreement at least 120 days prior to the expiration of the Initial Term. Thereafter, the parties may agree in writing to further renew the Term and such renewal is not a contractual right of Pearson. The "**Term**" includes the Initial Term and all renewals. The period from the Effective Date through August 16, 2015, and each subsequent 12 month period (or part thereof) commencing on each August 17, thereafter during the Term shall each be a "**Contract Year.**"

## III. ASU ROLES AND RESPONSIBILITIES

ASU will be responsible for, and will provide and perform at its sole cost and expense during the Term the following roles and responsibilities, as they relate to the Managed Programs:

a.      **Academic Oversight**. ASU will provide institutional and academic guidance, evaluation and oversight for the Managed Programs.

b.      **Administrative Services**. ASU will perform all administrative services that are related to the official student services component of the Managed Programs (for example, administrative services relating to financial aid, admission, and enrollment).

c.      **Program Development and Support.** ASU will be responsible for developing, maintaining and operating the Managed Programs and will use commercially reasonable efforts to provide an appropriate number and selection of programs and courses, as needed to accommodate all prospective Students generated through Pearson's efforts under this Agreement. ASU will retain control and decision-making authority over, and will own the copyright in and to, all academic content and programmatic components of the Managed Programs.

d.      **Program Consistency and Continuity.** ASU will provide support to the Managed Programs in alignment with support provided to other similarly situated ASU programs

e.      **Faculty Selection**. ASU will be responsible for review and verification of credentials, appointment and coordination of course instructor(s), faculty/facilitators and their staff and their activities.   ASU will also be responsible for ensuring that an appropriate number of faculty are available to meet the needs of the Managed Programs and use commercially reasonable efforts to ensure that an appropriate number of faculty are available to meet the needs of projected  Student enrollment growth.

f.      **Course Instruction**. ASU will be responsible for all course instruction and related Student and academic support activities and functions.

g.      **Content and Curriculum**. ASU will provide, own, and exercise control over, the content and quality of the curriculum and related course materials. ASU will work in good faith to evaluate, and where appropriate adopt, recommendations from Pearson regarding the need for course audits and supplements to the curriculum and related course materials.

h.      **Admissions.**   ASU will be responsible for all decisions regarding the admission and registration criteria of Students.  ASU will provide admissions resources that are dedicated solely to the Managed Programs. ASU commits to complete, and communicate the results of all official transcript evaluations for the Managed Programs within two business days after receipt of the prospective student's completed file.

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

i.        **Financial Aid.**  ASU will be responsible for all tasks and functions related to the financial aid process.  ASU will provide financial aid resources that are dedicated solely to the Managed Programs. ASU commits to complete a review of, and communicate the results of all financial aid applications for the Managed Programs within five business days after receipt of a completed application.

j.        **Tuition and Ancillary Fees.**  ASU will collect all revenues and ancillary fees and will be responsible for making payments to Pearson as set forth herein.

k.        **Academic Credit and Degree.**  ASU will be responsible for granting course credits and degrees to Students successfully completing a Managed Program and who otherwise satisfy the necessary criteria established by ASU for such degrees.

l.        **Records.**  ASU will be responsible for processing and maintaining all academic, administrative and financial aid records for Students who are enrolled in or seeking enrollment in a Managed Program.

m.        **Access to ASU Enrollment and Marketing Systems, Documents and Training.**  Subject to Pearson's compliance with the information security requirements set forth in Section IV(f), ASU will provide Pearson with immediate and ongoing access to all ASU enrollment and marketing systems (including pertinent documentation and training as may be needed to facilitate this use by Pearson), and will work in good faith with Pearson to facilitate any reasonable requests that Pearson may make to extend or enhance such access.  Pearson will consider all information on such systems to be ASU Data, as defined in Section V 5.

n.        **Marketing Coordination.**  ASU will provide reasonable coordination and support of marketing efforts between ASU's traditional academic programs and the Managed Programs.

o.        **Brand Usage.**  ASU hereby grants Pearson the right and license to reproduce, display and use the name, trade names, trademarks, service marks, logos, symbols and trade dress owned or licensable by ASU which is applicable to ASU Online® and/or the Managed Programs, to promote and market ASU Online and the Managed Programs, to facilitate Student recruitment activities and to support and service the Managed Programs; provided, however, that Pearson will submit to ASU all marketing plans (including samples of representative marketing materials) for   prior review and approval.  Pearson will obtain ASU's approval prior to public dissemination of the subject materials. ASU commits to use commercially reasonable efforts to complete, and communicate the results of its review of each marketing plan within two business days after receipt of the applicable marketing plan.

p.        **Dedicated Project Manager.**  ASU will provide a dedicated project manager to facilitate the performance of ASU's obligations under this Agreement, as well as to provide coordination with Pearson on all activities related to the Managed Programs.

q.        **LearningStudio.**  ASU will control and manage access to the LearningStudio and to all ASU Information stored within, or accessible through, the LearningStudio.  ASU will instruct its authorized users as to the importance of maintaining the confidentiality of passwords and/or user identifications. ASU acknowledges that ASU's data security may be compromised if ASU's authorized users do not follow all applicable security policies and procedures and take other appropriate steps to maintain the security of the LearningStudio, including, without limitation, maintaining the confidentiality of user identifications and passwords, frequent changing of passwords and maintaining appropriate internal controls to monitor access to and use of the LearningStudio.

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

r.       **Cooperation and Assistance.** ASU will cooperate with Pearson and provide assistance as reasonably requested by Pearson to support Pearson in performance of its duties under this Agreement.

## IV. PEARSON ROLES AND RESPONSIBILITIES

Pearson will be responsible for, and will provide and perform at its sole cost and expense during the Term, the following roles and responsibilities, as they relate to the Managed Programs (the "**Pearson Services**"):

a.       **LearningStudio Access and Enhancements.** Pearson will provide ASU and its authorized users with access to and use of applicable and appropriate portions of Pearson's LearningStudio virtual learning environment, or any successor virtual learning environment online platform that ASU has agreed to accept (the "**LearningStudio**"), which Pearson will be host and maintain on Pearson servers and accessed via the Internet through an online campus, for educational, instructional and related administrative purposes. The specific content, features and functionality reflected in the LearningStudio is subject to change and discontinuation by Pearson in its sole discretion. As part of its ongoing development efforts, Pearson may, from time to time, make upgrades or enhancements to the LearningStudio. In most instances, such upgrades and enhancements are made available free of charge to Pearson customers. However, if Pearson requires payment of additional fees in order to use certain upgrades and enhancements, such use will be at ASU's sole discretion. ASU acknowledges that Pearson has made no commitments as to the exact functionality or timing of upgrades and enhancements to the LearningStudio. Notwithstanding the foregoing, Pearson acknowledges that ASU is presently migrating courses from LearningStudio to another virtual learning environment.

b.       **ASU's Intellectual Property Ownership.** Subject to Section IV(c), all Contract IP is and will be owned by ASU, and where applicable, all copyrightable Contract IP will be considered "Work Made for Hire" under the U.S. Copyright Act, 17 U.S.C. § 101, et seq. "**Contract IP**" means: (1) all processes, work flows, scripts, writings, manuals, data bases, inventions, programs, marketing assets, and deliverables created or developed, by Pearson (and to the extent expressly provided herein, by its subcontractors) specifically for ASU; (2) all procedures that are memorialized in writing created or developed, by Pearson (and to the extent expressly provided herein, by its subcontractors) specifically for ASU; (3) any other Intellectual Property identified in writing by the parties at the time of creation, or thereafter as Contract IP; and (4) all derivative works arising out of or created from the foregoing. Contract IP expressly includes all procedures developed and utilized by Pearson (and to the extent expressly provided herein, by its subcontractors) in the management and servicing of online programs for ASU. Contract IP does not include any Pearson IP described in Section IV(c). Pearson hereby irrevocably assigns and will cause its employees, agents, and to the extent expressly provided herein, its contractors and subcontractors to so assign, without further consideration, to ASU all right, title and interest to all Contract IP. All rights with regard to the Contract IP are reserved by ASU and Pearson will not resell, publish, transfer, distribute, sublicense, provide access to, copy, adapt, translate, reproduce, modify, enhance, or use the Contract IP or the content contained therein without the express written permission of ASU. All right, title and interest in and to the Contract IP and the content, materials and data contained therein, and any derivative works thereof whether authorized or not (including any modifications made specifically for ASU by Pearson and to the extent provided herein, by its subcontractors), is expressly reserved by ASU. Pearson will require any subcontractors engaged to perform services under this Agreement after the Effective Date, as well as any subcontractors engaged prior to the Effective date whose engagements are renewed or extended after the Effective Date, to transfer any Intellectual Property developed under an applicable subcontract to ASU unless otherwise agreed in writing by ASU. "**Intellectual Property**" means any and all inventions, designs, original works of authorship, formulas, processes, compositions,

4

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

programs, databases, data, technologies, discoveries, ideas, writings, improvements, procedures, techniques, know-how, and all patent, trademark, service mark, trade secret, copyright and other intellectual property rights (and goodwill) relating to the foregoing. During and after the Term, Pearson will, and will cause its employees, agents, and to the extent expressly provided herein, its contractors and subcontractors, on request of ASU, to do such acts, and sign, and deliver all such instruments requested by ASU to vest in ASU the entire right, title and interest to the Contract IP, and to enable ASU to properly prepare, file, and prosecute applications for, and to obtain patents and/or copyrights on, the Contract IP, and, at ASU's cost and expense, to cooperate with ASU in the protection and/or defense of the Contract IP and any litigation arising in connection therewith. ASU hereby grants to Pearson for the Term of this Agreement a non-transferable, royalty-free, exclusive, worldwide right and license to use, modify, revise, augment, create derivative works of, develop, produce, reproduce, manufacture, distribute, host, perform, display, promote, advertise, market, and otherwise exploit the Contract IP solely for the benefit of ASU as set forth herein, and for the Strategic Initiatives described in Article X of this Agreement. The parties shall work together in good faith to transfer possession of the Contract IP to ASU at the conclusion of the Term.

c.      **Pearson's Intellectual Property Ownership**. Pearson will retain ownership to the following (collectively, the **"Pearson IP"**): (a) the LearningStudio; (b) EQUELLA; (c) the Pearson Content Products; (d) all Intellectual Property of Pearson created prior to the date of this Agreement; and (e) all Intellectual Property created by Pearson other than for use by ASU; which, includes any of Pearson's pre-existing Intellectual Property that may be incorporated into the Contract IP and all processes, work flows, writings, manuals, inventions, programs, and know-how developed by Pearson and its affiliates in the course of providing online program management services to other institutions of higher learning. Pearson hereby grants to ASU a perpetual, irrevocable, royalty-free, worldwide right and license to freely use, make, have made, reproduce, disseminate, display, perform, and create derivative works based on such Pearson Intellectual Property as Pearson may incorporated into the Contract IP in the course of performing Pearson's obligations under this Agreement.

d.      **Joint Intellectual Property.** From time to time, the parties may decide to jointly create Intellectual Property with the intention that such Intellectual Property will be owned other than as set forth in this Agreement (**"Joint IP"**). Prior to creating any Joint IP, the parties will enter into a SOW that sets forth the terms and conditions of the creation, ownership, and rights to, the specific Joint IP.

e.      **Integration to ASU Systems.** Pearson will integrate the LearningStudio for user and course provisioning with the PeopleSoft system and student dashboards and course access through ASU's MyASU portal. Additional customization and extension of the user experience, as the parties may agree upon, will be provided by Pearson through existing or enhanced application programming interfaces within the LearningStudio.

f.      **Information Security**. All Pearson systems that contain ASU Confidential Information, including ASU Data, as these terms are defined in Articles XII and V, respectively, must be designed, managed and operated in accordance with information security best practices and in compliance with all applicable federal and state laws, regulations and policies. In addition, systems must be managed in such a way that they are in compliance or are consistent with industry best practices, including ISO 27001. To diminish information security threats, Pearson will (or will require the third party host appointee to):

   i.  Security Reviews: Complete SSAE 16 or substantially equivalent reviews for Learning Studio in accordance with industry best practices, which reviews are subject to review by ASU.
   ii. System Scanning and Penetration Tests: Perform periodic scans, including penetration tests, for unauthorized applications, services, code and system vulnerabilities on the delegated

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

services network and systems at regular intervals in accordance with industry best practices. Weaknesses must be corrected within a commercially reasonable period of time according to the risk level.

iii. Secure Development:   Use secure development and coding standards including secure change management procedures in accordance with ASU's policies and standards as amended from time to time. Internal standards and procedures are to be provided to ASU for review and approval a minimum of one time annually.

iv. Patch Management:  Carry out updates and patch management in a timely manner and to the satisfaction of ASU. Updates and patch management must be deployed using an auditable process that can be reviewed by ASU upon request.

v. Access Control:  Control access to ASU's resources, including sensitive data, limiting access to legitimate business need based on an individual's job-related assignment.  Access should be approved and tracked by the system owner to ensure proper usage and accountability and shall be subject to review by ASU upon request.

vi. Incident Reporting:  Report information security incidents to ASU within 24 hours (including, but not limited to those that involve information disclosure incidents, network intrusions, successful virus attacks, unauthorized access or modifications).

vii. Off Shore:  Data collected and processed under this Agreement will be hosted and stored within the borders of the United States.

viii. Notifications:   Notify ASU immediately if Pearson receives any kind of subpoena for or involving ASU data, or if any third-party requests ASU data, or if Pearson has a change in the location or transmission of ASU data unless prohibited by law.

g.      **Learning Outcomes.**  Pearson will provide functionality within the LearningStudio that will allow faculty to: (i) track and grade learning outcomes within courses; (ii) track Student activity; and (iii) track Student grades through the Learning Studio gradebook.

h.      **Technical Support.**  Pearson will provide telephone and online support (via chat and email) to ASU's faculty, Students and staff who need technical assistance associated with their use of the LearningStudio.   Pearson will provide this support on a 24 hours a day, 7 days a week basis. Technical support does not include support related to the use of ASU's or other third parties' technology, technical issues associated with outside ISPs, networks or third-party software or issues related to user inexperience with systems and settings other than the LearningStudio.  Pearson will promptly refer requests for technical support outside the scope of its responsibilities to the ASU help desk or such other responsible persons identified by ASU from time to time.

i.       **Operational Support.**  Pearson will provide ASU with a single point of contact for the day-to-day operations and support of the Managed Programs.

j.       **Training.**  Pearson will provide commercially reasonable appropriate (to be determined by Pearson in consultation with ASU) training on the LearningStudio to ASU faculty and staff on an as needed basis.

k.      **Faculty Support.**  Through Pearson's iSupport team, Pearson will provide ASU faculty and staff who have previously participated in applicable Pearson training with phone and/or email support that allows contact with course development, instructional multimedia, and instructional design resources for informational consulting relating to the design, development and teaching methodologies of courses for the LearningStudio platform.

l.       **General Management.**  Pearson will provide an experienced program management, technical and operations team to support ASU in the management, facilitation and coordination of the Managed Programs.  This team will develop timelines for each phase of the mutually agreed upon business

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

plan and provide an acceptable reporting structure to ensure transparency and effective decision-making between ASU and Pearson. The parties will work in good faith to add new program offerings. Pearson will retain discretion in determining the appropriate levels of effort, investment and resources (staffing and otherwise) applied by Pearson to carry out its obligations under this Section IV; provided, however, that the foregoing will not be construed to apply to the standard to which Pearson must perform, but rather the means by which Pearson satisfies its obligations.

m.      **Marketing and Student Recruitment**. Subject to ASU's exercise of the Call Center Services Termination Option, Pearson has primary responsibility for promoting and marketing the Managed Programs, subject to approval by ASU as set forth in this Agreement. At least 30 days before the start of each calendar quarter during the Term, Pearson will present to ASU, for review and approval by ASU, a proposed marketing plan for the upcoming calendar quarter. Each proposed marketing plan will describe in detail satisfactory to ASU, the messaging, frequency, methodology, delivery channels and mix of promotions and marketing. Each proposed marketing plan may also identify opportunities for leveraging Pearson's investment in creative development in ways that would be of benefit to ASU. The intent of both parties is to coordinate the efforts of Pearson in promoting ASU Online with the efforts of ASU across a broad array of ASU channels and business units. ASU will, in writing to Pearson, either approve or provide requested changes to each proposed marketing plan within five business days after ASU receives each proposed marketing plan. ASU and Pearson will work in good faith to negotiate mutually agreed-to marketing plans for each calendar quarter. If the parties cannot agree on a marketing plan for a particular quarter, then the parties will continue to use the last approved marketing plan until a new marketing plan is approved. Pearson will promote and market the Managed Programs (and will, subject to approval by ASU of the marketing plan(s), retain decision-making authority on the messaging, frequency, methodology, delivery channels and mix for such promotion and marketing); collect, respond to, qualify and manage all inquiries related to the Managed Programs; provide follow-up contact; provide enrollment counseling and facilitate prospect decision-making; provide guidance and support for application submission; collect applications and provide them to ASU for admission consideration. The parties will work together, with the collaboration of ASU's Chief Marketing Officer, to develop, produce, and air a pilot television marketing campaign for the promotion and marketing of the Managed Programs on mutually agreed terms. The parties intend to begin this pilot campaign prior to December 31, 2016. The parties recognize that time is of the essence with respect to the Pearson Services, therefore Pearson will perform the Pearson Services in a prompt and timely manner.

n.      **Content Enhancement.** Pearson will provide ASU with instructional design consultation services for the Managed Programs, with scope, sequence and outcomes that can be customized by ASU faculty. If such services are desired by ASU, Pearson and ASU will work in good faith to develop a mutually acceptable project scope (in accordance with Pearson's standard development efforts and methodology for similar projects with other customers) and enter into an appropriate Statement of Work for such services. Unless otherwise agreed to by the parties in the applicable Statement of Work, all content developed pursuant to this paragraph will belong to ASU.

o.      **Commercial Content.** Pearson may provide Pearson's commercial content products ("**Pearson Content Products**") for select Managed Programs, where such Pearson Content Products may strengthen the existing offering or speed the launch of new programs that are in development. The specific Pearson Content Products made available to ASU hereunder will be subject to the mutual agreement of ASU and Pearson, and subject to the license terms set forth below.

p.      **Student Support and Retention.** Unless and until ASU exercises the Call Center Services Termination Option, Pearson will use deliberate communication, outreach programs and technological integration with ASU information systems to identify to ASU at-risk Students enrolled in Managed Programs. This is done by identifying behavior that correlates to academic performance and

7

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

attendance. Pearson will use automated, real-time calling strategies customized for each individual student, to increase the likelihood of retention and continuing academic engagement.

q.     **Beta Programs.**

1.     **Beta Programs.** From time to time and in Pearson's sole discretion, ASU will be invited by Pearson to participate in designated periodic and ongoing "beta" functionality release programs (each, a "**Beta Program**"). If ASU decides to participate in a particular Beta Program (as evidenced by written agreement by an authorized ASU signatory ("**Beta Agreement**")), the terms and conditions of this Subsection (q) will govern that participation and use except as otherwise provided in the Beta Agreement. Additional information specific to a particular Beta Program (including the scope, timing and support plan for the Beta Program) may be communicated to ASU and updated as the Beta Program evolves and matures; provided, however, that the terms set forth in this Agreement may not be superseded by such information. ASU may reject any new programs for any reason, including if there is an associated increase in costs; if ASU rejects a program, Pearson will revert back to pre-program functionality. Participation in a Beta Program will result in Pearson implementing the applicable beta functionality on the LearningStudio for ASU's access and use, as further detailed herein. In return, ASU agrees to comply with and accept the terms and conditions of this Agreement and fulfill its obligations as set forth herein. Pearson may terminate a Beta Program, or ASU's participation in a Beta Program, at any time upon communication to ASU of its decision to do so. ASU may terminate ASU's participation in a Beta Program, at any time upon communication to Pearson of ASU's decision to do so. Upon termination of a Beta Program, Pearson will revert to pre-Beta Program functionality.

2.     **License.** All beta functionality will be deemed to be part of the LearningStudio and ASU's use of the beta functionality will therefore be subject to all of the terms and conditions associated with the use of the LearningStudio, except as otherwise specified in this Subsection (q). To the extent, and at such time, that beta functionality is made generally available to Pearson clients who are not participating in the applicable Beta Program (which will be subject to Pearson's sole discretion), ASU's use of the beta functionality will be governed solely by this Agreement. All other rights are reserved to Pearson.

3.     **Beta Program Participation.** ASU may use beta functionality as described herein and provide reasonable feedback to Pearson, including but not limited to feedback on usability, features and general impressions and issues with the beta functionality and associated Pearson products and services. ASU may provide Pearson such feedback on a bi-weekly basis or such other interval as may be requested. If ASU experiences problems with the beta functionality or associated Pearson products and services, ASU will promptly report such problems to Pearson. Pearson provides no assurance that specific issues within beta functionality will be corrected or addressed, except as otherwise set forth herein, nor is Pearson obligated to incorporate or build suggested feature or functionality enhancements.

4.     **Disclaimer of Warranties.** PEARSON DOES NOT WARRANT THAT THE OPERATION OF THE BETA FUNCTIONALITY WILL BE UNINTERRUPTED OR ERROR-FREE. ANY IMPACTS ON THE PERFORMANCE OR AVAILABILITY OF THE LEARNINGSTUDIO WHICH ARE ATTRIBUTABLE TO OR RELATED TO BETA FUNCTIONALITY THAT OCCUR DURING PARTICIPATION IN THE SUBJECT BETA PROGRAM SHALL NOT BE ASSESSED FOR PURPOSES OF MEASURING PEARSON'S PERFORMANCE UNDER SECTION VII OF THIS AGREEMENT. IF THE BETA FUNCTIONALITY DISRUPTS OR DEGRADES ASU's OR ANY OF ITS STUDENTS' OR EMPLOYEES' ABILITY TO USE THE LEARNINGSTUDIO, PEARSON WILL IMMEDIATELY

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

DEPLOY ALL THAT IS NECESSARY TO PROMPTLY CORRECT THE FUNCTIONALITY ISSUES AND UPON REQUEST BY ASU WILL PROMPTLY TERMINATE THE SUBJECT BETA PROGRAM AND RESTORE THE FUNCTIONALITY OF LEARNINGSTUDIO TO PRE-BETA PROGRAM LEVELS.

r.      **Call Center Services Termination Option.** Effective July 1, 2015, ASU will have the option (the "**Call Center Services Termination Option**") to terminate Pearson's Student Recruitment and Student Support and Retention services as described in Sections IV(m) and (p), respectively (the "**Call Center Services**"), on the following terms and conditions:

      i.      ASU may terminate the Call Center Services upon 120 days' prior written notice to Pearson ("**Notice to Terminate**").

      ii.     Pearson will cease the Call Center Services 30 days after receipt of the Notice to Terminate.

      iii.    Pearson will work with ASU in good faith to successfully transition the Call Center Services to ASU during the 90 day period following the cessation of the Call Center Services; provided, however, such efforts to transition the Call Center Services to ASU shall not encompass or include the transfer of Pearson IP, as herein defined, to ASU.

      iv.     All fees due Pearson from ASU under Article VI will be reduced by 21% effective upon the expiration of the 120 day notice period as more particularly set forth in Article VI of this Agreement.

s.      **Brand Usage.** Pearson will comply with guidance provided in writing by ASU regarding ASU's trademark licensing program with the use of any names, service marks, trademarks, trade names, logos, or other identifying names, domain names, or identifying marks of ASU ("**ASU Marks**"), on goods and in relation to services provided herein. Prior to any use of an ASU Mark by Pearson or its affiliates or successors or assigns, Pearson will submit the proposed use of the ASU Mark (together with a sample or specimen of an intended use) to ASU's Trademark Licensing Coordinator for approval. Pearson is not permitted to use any ASU Mark without written approval by ASU's Trademark Licensing Coordinator. Pearson's use of any ASU Mark must comply with ASU's requirements, including using the "®" indication of a registered trademark. For the avoidance of doubt, this requirement is separate and distinct from the marketing material approval requirements set forth in Section 3(o). Except as expressly permitted under this Agreement or as otherwise agreed in writing, Pearson will not use any ASU Marks in any Pearson advertising.

t.      **Statements of Work.** Additional services may be contracted for pursuant to a statement of work, on terms agreed to by the parties, which will be governed by the terms and conditions of this Agreement (each, a "**Statement of Work**"), provided, however, that the terms set forth in any Statement of Work will not be binding on ASU unless signed by an ASU authorized signatory. If and to the extent of any conflict between the terms herein and those set forth in any Statement of Work, the terms of this Agreement will control the matters governed by such Statement of Work.

## V. LICENSES

1.      **Pearson Content Products License:** During the Term or for so long as Pearson is authorized to offer the Pearson Content Products to ASU, whichever period is shorter, Pearson hereby authorizes ASU to access and use the Pearson Content Products and provide access to the Pearson Content Products to ASU's faculty, Students and staff, solely for educational and instructional use on the LearningStudio. Authorized users may access the Pearson Content Products

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

only in accordance with the terms and conditions set forth in the Agreement and in any end-user license agreement (each a "**EULA**") or terms of use that may be contained in or with the Pearson Content Products. ASU will not allow other individuals or third parties to access the Pearson Content Products. ASU's use of and access to the Pearson Content Products may be subject to pending conversion or setup of the Pearson Content Products. Except as set forth in the foregoing, all rights with regard to the Pearson Content Products are reserved by Pearson and under no circumstances will ASU (or its users or Students) resell, publish, transfer, distribute, sublicense, provide access to, copy, adapt, translate, reproduce, modify, enhance, or use the Pearson Content Products or the content contained therein without the express written permission of Pearson. ASU will not remove or alter any trademark or other proprietary notice in or on any Pearson Product. All right, title and interest in and to the Pearson Content Products and the content, materials and data contained therein, and any derivative works thereof whether authorized or not (including any modifications made specifically for ASU by Pearson or any other third party (including ASU and its agents or representatives)), is expressly reserved by Pearson. Pearson will not be obligated to maintain, revise, enhance or update the standardized Pearson Content Products, unless specifically agreed to in a separate writing from this Agreement. Pearson may suspend ASU's use of or access to the Pearson Content Products in connection with any material violation of this Agreement by ASU or any applicable EULA. ASU will indemnify and hold harmless Pearson from any liability or damages incurred by Pearson that is caused by ASU's negligent alteration or unauthorized use of the Pearson Content Products. ASU will only use the Pearson Content Products in conjunction with the LearningStudio and in accordance with the terms and conditions of this Agreement. The Pearson Content Products may be retired or supplanted by new editions at any time, and Pearson is under no obligation to make new editions or replacement products available to ASU, other than while ASU students are enrolled in the specific Pearson Content Product. Notwithstanding ASU's rights to use the Pearson Content Products, Pearson may require ASU to promptly cease (within three business days) using any Pearson Content Products, if (i) Pearson notifies ASU that Pearson no longer has the necessary rights to the Pearson Content Products, (ii) Pearson believes cessation is necessary to limit or avoid liability or (iii) Pearson is otherwise required by law or court order to cease and desist. In such events, Pearson will use commercially reasonable efforts to replace, at no cost to ASU, any affected Pearson Content Products with other materials to be used by ASU pursuant to the terms of this Agreement.

2.     **Product and Service Exclusions.** Except as specifically otherwise provided for in this Agreement, no other Pearson products and services are included in this Agreement. Additional fees, in excess of the fees set forth herein, may apply to the use of Third Party Services or additional Pearson products and services. Pearson will notify ASU before providing, or charging ASU for, any Pearson products or services that are not included in this Agreement.

3.     **ASU Ownership.** ASU and its authorized users may provide Pearson, either directly or indirectly (through placement of such information, materials, product and data on the LearningStudio by ASU's authorized users) with information, materials and data (the "**ASU Information**"). As between Pearson and ASU, all such ASU Information is the exclusive and proprietary property of ASU, and will be considered and treated as ASU Data, as defined herein. Pearson will not sell, lease, assign, disclose, or sublicense any ASU Information except as provided herein.

4.     **ASU Grant of License.** ASU grants to Pearson a limited, non-transferable, non-exclusive, non-sublicensable license during the Term to internally copy, transmit, use and prepare derivative works of the ASU Information solely to the extent necessary for Pearson to perform its obligations under this Agreement. This license may not be sublicensed by Pearson (other than to subcontractors of Pearson) nor will it be construed to permit Pearson to use ASU Information for any other purpose.

5.     **Data Ownership.** ASU will own, or retain all of its rights in, all data and information that ASU provides to Pearson, as well as all data managed by Pearson on behalf of ASU, including all output,

10

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

reports, analyses, and other materials relating to or generated by the Pearson Services, even if generated by Pearson as well as all data collected, extracted, or received through ASU's or Pearson's use of the Pearson Services (collectively, the "**ASU Data**"). The ASU Data will be considered ASU's Confidential Information. Pearson will not use, access, disclose, or license or provide to third parties, any ASU Data, or any materials derived therefrom, except, in each case, as authorized in writing by ASU. Without limiting the generality of the foregoing, Pearson may not use any ASU Data, whether or not aggregated or de-identified, for product development, marketing, profiling, benchmarking, or product demonstrations, without, in each case, ASU's prior written consent; provided, however, that Pearson may use ASU Data for Pearson's internal purposes only to gauge the efficacy of the Pearson Content Products in achieving desired Student outcomes.

6.      **LearningStudio.**   Pearson hereby grants ASU a non-transferable, non-exclusive, non-sublicensable license to access and use the applicable portions of the LearningStudio, and all work product created by Pearson pursuant to any Statement of Work, during the Term for the sole purpose of ASU and its authorized users receiving the Pearson Services for educational, instructional and related administrative purposes.   ASU's right to use included content items and other materials is limited to use solely within the LearningStudio. All such access and use will be subject to the terms and conditions of this Agreement. All rights not specifically granted herein regarding the LearningStudio are reserved by Pearson. ASU's faculty, Students and staff are hereby deemed to be authorized users of the LearningStudio. ASU will be responsible for the actions and inactions of its employees with regard to their access and use of the LearningStudio and the Pearson Services.

7.      **License to use EQUELLA as a Digital Content Repository.**   Pearson hereby grants ASU and its authorized users a non-exclusive, non-transferable, non-sublicensable license to access and use Pearson's EQUELLA product (as a Pearson-hosted solution) as a digital content repository for the Managed Programs during the term of the Agreement, beginning from the date the implementation activities are determined by Pearson, in its reasonable discretion, to be complete. Pearson will provide to ASU up to 50 days of training and implementation services as may be set forth in a separate Statement of Work, at no charge, as more fully described in a separate Statement of Work between ASU and Pearson. The exact date and timing of implementation activities will depend upon the scheduling and availability of applicable Pearson personnel and other resources. All training, implementation and/or maintenance hours over those allocated above and any related costs must be pre-approved by ASU, will be invoiced separately by Pearson, and must comply with the requirements of ASU's FIN 421-01 and the applicable Statement of Work.  Any pre-approved travel and expenses incurred by Pearson in association with training and implementation activities must comply with the requirements of ASU's FIN 421-01 and the applicable Statement of Work to be reimbursed by ASU upon invoicing from Pearson. The EQUELLA product will be considered to be part of the LearningStudio and therefore subject to the same terms and conditions and limitations on access and use as set forth in this Agreement for the LearningStudio. There will be no charge for the license and 50 days of training and implementation services referenced herein.

8.      **Restrictions on Use of LearningStudio.**   Pearson will provide ASU with the ability to generate passwords and/or user identifications, which will be used by ASU to provide access to the LearningStudio for its authorized users. ASU will control and manage access to the LearningStudio and to all ASU Information stored within, or accessible through, the LearningStudio. ASU will instruct its authorized users as to the importance of maintaining the confidentiality of passwords and/or user identifications. ASU acknowledges that ASU's data security may be compromised if ASU's authorized users do not follow all applicable security policies and procedures and take other appropriate steps to maintain the security of the LearningStudio, including, without limitation, maintaining the confidentiality of user identifications and passwords, frequent changing of passwords and maintaining appropriate internal controls to monitor access to and use of the LearningStudio.

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

Under no circumstances may ASU, without prior written permission from Pearson: (a) use the Pearson Services to provide products or services to another school, college, university, or other third party; (b) directly or indirectly provide access to the Pearson Services, in whole or in part, to another school, college, university or other third party, (c) sublicense its rights with respect to this Agreement without the written permission of Pearson, or (d) attempt, or grant permission to others, to modify, adapt, decompile, decrypt, disassemble, extract or reverse engineer any part of the LearningStudio. ASU will not knowingly use the LearningStudio to (a) engage in spamming or other impermissible advertising, marketing or other activities, including, without limitation, any activities that violate anti-spamming laws or regulations; (b) transmit, display or store infringing, obscene, threatening, indecent, libelous, slanderous, defamatory or otherwise unlawful or tortious material, including material that is harmful to children or violates third party privacy rights; (c) introduce malicious programs (such as viruses, worms or Trojan horses) into the LearningStudio; (d) interfere with or disrupt the integrity or performance of the LearningStudio, the Pearson Services or the data contained or used therein; (e) attempt to gain unauthorized access to the LearningStudio or its related systems or networks; or (f) harass or interfere with another user's use of the LearningStudio or the Pearson Services. ASU will, at all times, comply with all applicable local, state, federal, and foreign laws in using the LearningStudio or the Pearson Services. Pearson reserves the right to suspend access to and use of the LearningStudio and the Pearson Services with respect to any individual user who Pearson reasonably believes has undertaken, or participated in, any of the foregoing activities.

Except for the license granted herein, ASU will not have direct access to the software or infrastructure used to provide the LearningStudio to ASU, at any time during or after the term of this Agreement. ASU will have no right to modify the LearningStudio.

9.     **Additional Products or Services.** Pearson is not obligated to provide access to or use of any other Pearson products or services, unless set forth in the Agreement. ASU is not authorized to access or use any other Pearson products or services, except as set forth in the Agreement.

10.     **Affirmation of Rights.** All rights and licenses granted pursuant to any section of this Agreement are, and will otherwise be, for purposes of Section 365 (n) of the United States Bankruptcy Code and/or any similar or comparable section of the United States Bankruptcy Code (as such sections may be modified, amended, replaced or renumbered from time to time) (the "**Code**"), executory licenses of rights to "intellectual property," as defined under Section 101 (35A) of the Code. The parties will retain and may fully exercise all of their respective rights and elections under the Code. Accordingly, the licensee of such rights shall retain and may fully exercise all of its rights and elections under the Code. Upon the commencement of bankruptcy proceedings by or against either party under the Code, the other party will be entitled to retain all of its license rights and use rights granted under this Agreement.

## VI. FEES AND PERFORMANCE INDICATORS

In consideration of Pearson providing the Pearson Services to ASU, and subject to the most favored nation provisions set forth in Section X.9, ASU will pay Pearson for services rendered as set forth below.

1.     **Payment for Services.** The payment owed by ASU to Pearson for the Pearson Services performed under this Agreement will be based on a declared revenue per Student credit hour basis ("**DR/SCH**"), as follows:

a.     Declared Revenue per Student Credit Hour. The minimum DR/SCH for the Term is $480, unless otherwise agreed in writing.

.

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

If tuition reductions are imposed by ABOR, (i) ASU and Pearson will evaluate the impact of such tuition reductions on the DR/SCH, (ii) ASU and Pearson will work in good faith to negotiate appropriate changes to the fee provisions of this Section to reflect the adjusted circumstances each party may then face, and (iii) if the parties are unsuccessful in achieving a mutually agreed-to compromise under the foregoing, either party may terminate this Agreement upon 180 days written notice to the other party.

b.      Census Date.  An official census of enrolled Students will be taken by ASU for each course (the "**Census Data**"), 21 ASU calendar days after the start of the applicable course (the "**Census Date**").  A Student will be counted for purposes of this Agreement if (a) the Student is enrolled in a Managed Program course and (b) the Student is registered for at least one credit hour. ASU will deliver the Census Data to Pearson for review and reconciliation. Any discrepancies will be reported to ASU within five business days or such data will be deemed agreed to by the parties. Notwithstanding the foregoing, ASU and Pearson will work diligently and in good faith to continue to refine the reconciliation process, with the goal of reducing this five business day feedback commitment to a two business day process.

c.      Volume Factor.  Pearson will calculate "**Volume Factor**" for each academic session, based on the highest total number of unique Students enrolled in the Managed Programs in that session, in accordance with the following chart. The Volume Factor will be calculated at the Census Date of each Fall and Spring session. The Summer session Volume Factor will be equal to the Spring B Volume Factor. Each unique Student is only counted once for purposes of this calculation, even if that Student takes more than one course during the session.  Excess Students, Starbucks Students, Active Duty Military Students, and EdVantage America Students are excluded from the Student headcount for purposes of this calculation.

| Enrolled Students (Headcount) | Volume Factor |
|---|---|
| 0 – 999 | 100% |
| 1,000 - 4,999 (at minimum of 10 programs) | 95% |
| 5,000 - 8,999 (at a minimum of 25 programs) | 84% |
| 9,000 - 14,999 (at a minimum of 40 programs) | 82% |
| 15,000 - 19,999 (at a minimum of 50 programs) | 80% |
| 20,000 - 24,999 | 78% |
| 25,000 – 29,999 | 76% |
| 30,000 – 34,999 | 74% |

d.      Student Fees for Managed Programs Courses.  Following the official Census Date for each course, ASU will pay to Pearson a fee for each enrolled  Student credit hour for the Managed Programs for that course (the "**SCH Fees**"), upon invoicing by Pearson.  Except as otherwise expressly provided in Sections VI(1)(f)-(i) of this Agreement, SCH Fees will be calculated for all Managed Programs courses at the time of the official census date for each such course, in accordance with the following formula:

*SCH Fees = ((DR/SCH x 0.5645) x (Volume Factor)) x (Students enrolled in the course) x (credit hours per Student for the course)*

If ASU exercises the Call Center Services Termination Option, the SCH Fees will be calculated in accordance with the following formula upon the expiration of the 120 day notice period described in Section IV(r):

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

**SCH Fees = ((DR/SCH x 0.5645) x (Volume Factor) x (0.79) x (Students enrolled in the course) x (credit hours per Student for the course)**

ASU's obligation to pay Pearson the amount set forth above will remain in effect notwithstanding (i) the failure of a Student to complete the applicable course, or (ii) ASU's failure or inability to collect the tuition or any related fees from that student. ASU further agrees that it will allocate 17% of all DR/SCH fees to fund financial aid. ASU will evaluate Managed Programs Students based on the same qualifying criteria with other ASU students in terms of eligibility and consideration for financial aid (acknowledging that some awards may be programmatic and therefore by their terms exclude Students enrolled in Managed Programs). ASU will provide Pearson on an annual basis with relevant data from which to measure the relative distribution of financial aid to Managed Programs Students compared to other ASU students.

e.      SCH Fees Adjustments. ASU will pay Pearson an additional $17 per Managed Program Student SCH for the SCH associated with each class hosted on the LearningStudio.

f.      Student Fees for Excess Students. **"Excess Students"** are defined as those ASU Online Students directly attributable to recruiting efforts undertaken by ASU in partnership with third parties as set forth in Section I of this Agreement. Other than for Starbucks Students, Active Military Students, and EdVantage Students, the fees for which are set forth in this Section, the SCH fees for Excess Students will be $50 per SCH. Pearson will provide Excess Students with enrollment and retention coaching services at no extra cost to ASU.

g.      SCH Fees for Starbucks Students.

SCH Fees owed by ASU to Pearson for Managed Program courses taken by Starbucks Students will be $50 per SCH, provided such Students can be properly attributed and documented as Starbucks Students. It will be ASU's responsibility to identify and differentiate the Starbucks Students through the use of role types or extended user properties within its student information system; which information will be made available to Pearson.

Starbucks Students will not be used in calculating (a) ASU's overall Volume Factor,(b) total enrolled Students under Section VI(2)(c), or (c) the total number of new Students under Section VI(1)(f).

Pearson will not provide promotional or marketing services for Starbucks Students, but will provide enrollment and retention coaching services.

h.      SCH Fees for Active Duty Military Students. SCH Fees owed to Pearson for Managed Program courses taken by Active Duty Military Students will be $50 per SCH, provided all such Students can be properly attributed and documented as Active Duty Military Students. **"Active Duty Military Students"** are those ASU Online Students serving in any branch of the United States Armed Forces at the time of their enrollment in ASU Online. Pearson will not provide promotional or marketing services for Active Duty Military Students, but will provide enrollment and retention coaching services. In the event the number of Active Duty Military Students exceeds 1,500, the parties will negotiate in good faith to amend this Agreement to address the impact of such enrollment growth to the satisfaction of each party.

i.      SCH Fees for EdVantage America Students. No SCH Fees will be owed to Pearson for Managed Program courses taken by EdVantage America Students, provided such Students can be properly attributed and documented as EdVantage America Students, and Pearson will not perform any enrollment, retention, promotional or marketing services in support of EdVantage America

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

Students. "**EdVantage America Students**" are those ASU Online Students recruited by EdVantage America.

j.        Adjustment for Uncollected Accounts.  All invoices generated pursuant to this Section VI(1) will reflect a 3% reduction on the aggregate amount due (the "**Doubtful Account Percentage**"), which 3% reduction is intended as an allowance for uncollected accounts (the "**Doubtful Account Reserve**"). Within 90 days following the end of each Contract Year, the parties will review and compare the actual uncollected accounts against the Doubtful Account Reserve. The parties will then adjust the Doubtful Account Percentage for the following Contract Year to equal the percentage of accounts that were uncollectable in the prior Contract Year (rounded to the nearest tenth of a percent), up to a maximum Doubtful Account Percentage of 5%.

k.        Due Date and Payment.  ASU will pay all invoices issued by Pearson for the Pearson Services and other services rendered within 30 days after the date ASU receives the applicable invoice. Payment will be remitted per the instructions on the invoice or as instructed by Pearson from time to time. No endorsement or statement on any check or in any letter accompanying any check or other payment will be deemed an accord and satisfaction. Pearson may accept any payment without prejudice to Pearson's right to recover any remaining balance or to pursue any other remedy provided in this Agreement, or by applicable law. ASU may make any payment without prejudice to ASU's right to contest such payment or to pursue any other remedy under applicable law. If any invoice is not contested or paid in full within 30 days after receipt by ASU, ASU will pay simple interest at the rate of 10% per annum beginning 31 days after the date of the invoice. If ASU fails to pay an uncontested invoice within 60 days after receipt of the invoice, Pearson may, after providing seven days prior written notice to ASU, with opportunity to cure, suspend the provision of products and services, including turning off ASU's access to the LearningStudio. Pearson reserves the right at any time to condition provision of the Pearson Services on reasonable assurance of payment.

l.        Smarthinking Services.      Pearson will provide ASU up to 1,000 aggregate hours of Smarthinking tutoring services in each Contract Year (with hours prorated for the partial Contract Year). The parties shall execute an appropriate Statement of Work setting forth the manner in which these hours shall be used. As students use Smarthinking tutoring, time will be deducted in accordance with the measurements listed below. Any remaining balance of unused hours will expire at the end of the first Contract Year. ASU may purchase additional tutoring hours as needed under this Agreement at the rate of $25/hour.

**Included are the following:**
- One day of training·
- Unlimited ongoing webinar training for faculty and staff
- Unlimited access to a Smarthinking Implementation
- Specialist Account setup costs/services and student registration into the Smarthinking system
- Access to administrative reports to monitor usage
- Marketing materials to help make students aware of Smarthinking
**How is time measured? ·**
- Live on-demand sessions: "Metered" to the minute of time spent working with a tutor
- Submitted questions: 20 minutes per
- Submitted essays or career writing:  35 minutes or 60 minutes for 10+ page essays
- Paragraphs and submitted essays of 200 words or fewer: 20 minutes
- Pre-scheduled sessions: 30 minute increments

(In all of the above, add 7 minutes for archiving and post processing)

Each Contract Year the number of hours provided by Pearson without additional charge will be adjusted based on demand and efficiency, and agreed to in writing by the parties.

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

m.      Additional Services.   Additional services provided by Pearson to ASU will be provided at Pearson's then-current standard rates and prices, subject to the most favored nation provisions set forth in Section X.9. All prices are quoted in U.S. dollars and all payments will be made in U.S. dollars. The fees hereunder do not include any applicable sales, use, excise, VAT or other taxes or duties levied or based on this Agreement or the Pearson Services provided hereunder, which will be invoiced to ASU separately exclusive of income taxes or taxes based on Pearson's income.

2.      **Use of Pearson Content Products by Non-Managed Programs Students**. ASU will pay Pearson a fee per enrollment (assessed at the time of the applicable Census Date) for all use of Pearson Content Products for non-Managed Programs students, in accordance with the table included below. To the extent the fees per enrollment are increased* by Pearson during the Term, continued use of such Pearson Products by ASU will be subject to the increased fees.

| Pearson Content Product | Fee per enrollment |
|---|---|
| MyAstronomyLab | $74.70 |
| Mastering Environmental Science with eText for Environmental Science | $50.00 |
| MyMathLabPlus | $93.50 |

Pearson course materials for students enrolled in Pearson Content Product courses will be paid for using student course fees. As new Pearson Content Products are added, the parties will set forth the fees for materials and payment terms in a separate Statement of Work.

3.      **Performance Indicators**. Subject to ASU's exercise of the Call Center Services Termination Option as set forth in Section IV(r), Pearson will track key performance indicators for the Managed Programs, to measure the success of the Managed Programs against certain defined targets, as set forth in this Section. All key performance indicators will be ASU Data.

a.      Lead-to-Start Conversion Rate:   The lead-to-start conversion rate will be calculated as the total number of requests for information from prospective students received by ASU and posted to Pearson's enrollment service providers ("**RFIs**") during each of the following time periods: (a) from 120 days prior to a Spring A start through 30 days prior to a Spring B start, and (b) from 120 days prior to  a Summer A start through 30 days prior to a Fall B start; divided by the total number of new Students who enroll in the Managed Programs during the immediately following Spring and Summer/Fall sessions, respectively. The new Students number used for the Spring calculation will be all new Students who enrolled for one or both of the Spring A or Spring B academic sessions. The number of new students used for the Fall calculation will be all new Students who enrolled for one or more of the Summer A, Summer B, Fall A and Fall B academic sessions. For example, if 1,000 RFIs are posted during the time period from 120 days prior to a Spring A start through 30 days prior to a Spring B start, and 50 new  Students enroll in one or both of the Spring A and Spring B academic sessions, the lead-to-start conversion rate for the Spring calculation period will be 5%. If the lead-to-start conversion rate is measured as less than 5% at two consecutive calculation dates, Pearson and ASU will review the data and make appropriate operational adjustments within the following two academic sessions. If ASU exercises the Call Center Services Termination Option, the lead-to-start conversion rate key performance indicator will apply to ASU's Student recruitment activities.

b.      Session-to-Session Persistence:   The session-to-session persistence will be calculated as the percentage of unique  Students enrolled in one (1) session that continue into the following session.

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

New Students and Students returning after a hiatus from the Managed Programs are not considered in this calculation. If the session-to-session persistence rate for the Managed Programs is less than 85% (the "**Minimum Persistence Rate**") during any Contract Year (excluding summer), Pearson and ASU will review the data and make appropriate operational adjustments within the following two sessions. If the Minimum Persistence Rate is not met during four of any six consecutive sessions, Pearson and ASU will negotiate an appropriate remedy in good faith, up to and including termination of the Agreement. If ASU exercises the Call Center Services Termination Option, the session-to-session persistence rate key performance indicator will apply to ASU's performance of Student support and retention activities.

c.      Total Enrolled Students:  The total number of Students enrolled in the Managed Programs will be calculated as the total number of unique Students enrolled in a course at the time of the Fall B Census Date of each year. If the total number of Students enrolled in the Managed Programs is less than the minimums set forth below for any calendar year, Pearson and ASU will work in good faith to take corrective actions, including the addition of courses and programs, the addition of sections and/or the transition of unmanaged courses and programs to be included in the Managed Programs. In addition to the foregoing, ASU will use commercially reasonable efforts to ensure that the Managed Programs will attain the minimum enrolled Students level for each Calendar Year set forth below.

| Calendar Year | Minimum Enrolled Students |
|---------------|---------------------------|
| 2015          | 12,500                    |
| 2016          | 15,500                    |
| 2017          | 18,500                    |
| 2018          | 21,500                    |
| 2019          | 24,500                    |

d.      Referral of Students to other ASU Programs:  Upon discovery that a prospective student is not interested in a Managed Program, but may be interested in other ASU programming, Pearson will promptly refer the prospective student to regular ASU admission channels as instructed by ASU from time to time.

e.      Regulatory Activity:  If the Department of Education or other applicable governing body or entity (whether governmental or otherwise) creates regulations or rules that, in the reasonable opinion of either ASU or Pearson, significantly impact any material aspect of this Agreement, the parties will negotiate in good faith to amend this Agreement to address the impact of such regulations to the satisfaction of each party.

f.      Reimbursement upon Expiration of the Agreement: At least 120 days prior to the expiration of this Agreement (at the end of any renewal term that the parties may agree to in writing, as applicable), ASU will provide written notice to Pearson of ASU's intent to either renew the Agreement or allow it to expire.  Pearson may discontinue all Student marketing, recruitment, support and retention services (as set forth in Sections IV(m) and IV(p)) for the 90 day period prior to Agreement expiration if either (a) ASU provides written notice to Pearson of its intent to allow the Agreement to expire in accordance with the forgoing sentence, or (b) ASU and Pearson have not formally extended the Agreement by mutual written agreement by the 90th day prior to expiration of the Agreement.

g.      Reimbursement upon termination of the Agreement:  If the Agreement is terminated prior to August 16, 2018, then prior to the actual termination date ASU will select one of the following options and provide Pearson with formal written notice of such election:

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

    i.    ASU will reimburse Pearson for all costs actually incurred by Pearson associated with marketing, recruitment, support and retention services (as set forth in Sections IV(m) and IV(p)) during the 90 days prior to termination of the Term. This amount may be paid by ASU to Pearson as either (in ASU's discretion) (i) a one-time lump-sum payment within 90 days after the last day of the Term, or (ii) in equal installments to be paid regularly to Pearson over up to a 6 month period from the last day of the Term.

    ii.    Extend the Term for an additional 120 day period, during which time Pearson may discontinue all Student marketing, recruitment, support and retention services (as set forth in Sections IV(m) and IV(p)) for the final 90 days of the extension period.

h.    Post-Termination Fees upon Auto-Renewal. If the two year auto-renewal under Section II of this Agreement commencing on August 17, 2018, and ending on August 16, 2020, takes effect, the parties will negotiate in good faith to amend this Agreement to provide for an alternative post-termination fee structure on mutually agreeable terms. If the parties do not reach agreement on the amendment of the post-termination fee structure under this paragraph, the then-current fee structure as set forth in subparagraph (g) directly above will remain in place during the two year renewal period.

## VII. SYSTEM AVAILABILITY

Pearson will use commercially reasonable efforts to maintain operation of the LearningStudio on a 24 hours per day, 365 days per year basis.

a.    Repairs, Upgrades, and Routine or Emergency Maintenance. From time to time and as may be necessary to maintain the proper operation of the LearningStudio, Pearson may take the LearningStudio down for repairs, upgrades or routine or emergency maintenance. Pearson will use commercially reasonable efforts to minimize the impact of such activities. Pearson will take commercially reasonable efforts to protect the LearningStudio platform from viruses, worms, Trojan Horses, or other disabling devices or codes.

b.    Critical One Fixes. Reported problems of a critical nature preventing ASU's access to the LearningStudio will be repaired within 24 hours, or if not within 24 hours, as soon as commercially reasonable. Pearson will commence repair work immediately upon receipt of notice, and will diligently continue repair work until the problem is corrected.

c.    Critical Two Fixes. Reported problems of a nature limiting ASU's use of the Pearson Services will be repaired within three business days, or if not within three business days, as soon as commercially reasonable. Pearson will commence repair work as soon as commercially reasonable, and will diligently continue repair work until the problem is corrected.

d.    Non-critical Fixes. Reported fixes of typographical errors and other non-critical issues will be made within 10 business days, or if not within 10 business days, as soon as commercially reasonable.

Notwithstanding the foregoing, the following will constitute an event of default under this Agreement (which breaches will not be eligible for the 30 day cure period set forth in Article VIII): (i) unscheduled System Unavailability of the LearningStudio for more than 170 hours in any one year period, and (ii) unscheduled System Unavailability that exceeds 24 hours in continuous duration. **"System Unavailability"** is defined as the inability to access the LearningStudio for more than 15 consecutive minutes from Pearson's designated monitoring locations around the world, using Pearson's established primary and secondary access routes. Data from Pearson's third party monitoring service will be used to resolve any disputes between Pearson and ASU as to whether Pearson has met or failed to meet the requirements set forth in this paragraph. Scheduled System Unavailability will be

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

any period for which Pearson gives 8 hours or more notice that the LearningStudio will be unavailable. Pearson is not responsible for repair of or problems with (i) ASU-caused or third party caused outages or disruptions, (ii) problems due to the performance of networks or systems controlled by companies or entities other than Pearson, (iii) Third Party Services, or (iv) Force Majeure events.

## VIII.  TERMINATION, EVENTS OF DEFAULT AND REMEDIES

1.      **Termination by Mutual Agreement.**  This Agreement may be terminated at any time by the mutual, written agreement of ASU and Pearson.

2.      **Termination for Breach.**  Except as otherwise set forth herein, this Agreement may be terminated by either party if the other is in material breach of any provision of this Agreement, but only after written notice of default and opportunity to cure has been given to the breaching party. The notice of default must provide for an opportunity to cure of at least 30 days following receipt of notice. If the party receiving the notice has not cured the breach before the cure date stated in the notice then the party giving notice may terminate this Agreement by giving the breaching party written notice of termination, which will be effective upon delivery.

3.      **Effect of Termination or Expiration.**  Upon termination or expiration of the Term, all licenses granted hereunder will immediately terminate, and any and all then due and unpaid fees set forth herein will become immediately due and payable.

4.      **Additional Remedies.**  In addition to the right to terminate this Agreement, and except as otherwise limited under this Agreement (including, without limitation, Article XII, Section 7), if either party materially breaches this Agreement, the nonbreaching party may, after providing the other 30 days written notice of breach and opportunity to cure, following the lapse of any applicable cure period, pursue any and all rights or legal and equitable remedies afforded under applicable law. No failure of either party to exercise their rights hereunder will be construed to prejudice its rights upon the occurrence of any other or subsequent breach. All remedies hereunder, unless otherwise provided in this Agreement, will be cumulative. PEARSON'S MAXIMUM AGGREGATE LIABILITY TO ASU UNDER THIS AGREEMENT DURING EACH CONTRACT YEAR WILL IN NO EVENT EXCEED SEVENTEEN MILLION DOLLARS (USD). NOTWITHSTANDING THE FOREGOING, CLAIMS BASED ON PERSONAL INJURY OR DEATH, PEARSON'S INDEMNIFICATION OBLIGATIONS, OR THAT ARE OTHERWISE COVERED BY THE INSURANCE REQUIRED BY PEARSON TO CARRY HEREIN, SHALL NOT BE SUBJECT TO (OR COUNTED IN REACHING) THIS LIABILITY CAP; PROVIDED, HOWEVER, CLAIMS PAID BY PEARSON'S PROFESSIONAL NEGLIGENCE CARRIER SHALL BE COUNTED IN REACHING THIS LIABILITY CAP. THE LIMITATIONS SET FORTH IN THIS SECTION SHALL APPLY WHETHER SUCH LIABILITY IS ASSERTED ON THE BASIS OF CONTRACT, TORT, OR OTHERWISE, EVEN IF THE PARTY HAS BEEN WARNED OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE, AND EVEN IF ANY OF THE LIMITED REMEDIES IN THIS AGREEMENT FAILS OF THEIR ESSENTIAL PURPOSE.

5.      **Transition Services.**  Notwithstanding anything contained herein to the contrary, if this Agreement is terminated (regardless of the reason for such termination) and at ASU's option, Pearson will continue providing the services contemplated herein and providing ASU access to its data and materials for a period of 60 days following the termination date (the post termination services are referred to as the "**Transition Services**", and the sixty day period is referred to as the "**Transition Period**"). The Transition Services will be provided at least at the same levels of quality and timeliness of performance as such services were provided prior to the termination, and in a professional manner, with high quality and in accordance with industry standards.  ASU may, upon notice to Pearson, modify the specific Transition Services to be provided to a subset of the services provided under this Agreement and may reduce the term for the Transition Period to less than 60 days. The parties may agree in writing to extend the Transition Period.  Upon termination of this Agreement the parties agree

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

to work in good faith to effectuate an orderly transition of the services contemplated herein, with minimum interruption to ASU's business. Additional services beyond those set forth in this Agreement may be supplied by Pearson on a fee basis to ASU, after ASU's request for such services.

## IX.  REPRESENTATIONS & WARRANTIES.

1.      **Mutual Representations and Warranties.**  ASU and Pearson each represents and warrants to the other as follows: (a) the execution, delivery and performance by it of this Agreement have been duly authorized by all necessary corporate action and do not and will not require any consent or approval of its stockholders or owners or violate any provision of any agreement, law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to it or any provision of its charter documents; (b) this Agreement is a legal, valid and binding obligation of it enforceable against it in accordance with its terms and conditions; and (c) it is not under any obligation to any person, or entity, contractual or otherwise, that is conflicting or inconsistent in any respect with the terms of this Agreement or that would impede the diligent and complete fulfillment of its obligations hereunder and that it has all power and authority under all instruments or agreements to which it is a party to enter into this Agreement and to perform its obligation hereunder.

2.      **Pearson Representations and Warranties.**  Pearson represents and warrants that: (a) the Pearson Services will be performed in a professional manner and Pearson will use its best efforts to conform to the performance criteria, standards and other descriptions set forth in this Agreement, in compliance with applicable federal, state and local laws, regulations, rules, and ordinances; (b) all services will be performed by qualified, trained, and properly equipped personnel; (c) Pearson will comply with all applicable Federal, state and local laws, regulations, rules and ordinances (including those promulgated by ABOR); (d) that the Certifications attached as Exhibit B are accurate on and as of the Effective Date, and, those previously delivered to ASU in response to the RFP (forms of which are included in the RFP), were accurate on and as of the date of the Original Agreement with the same force and effect as if they were executed and delivered upon execution of the original Agreement: and (e) all Contract IP will not infringe upon or violate any Intellectual Property of any third parties. PEARSON MAKES NO WARRANTY THAT THE SYSTEM OR ASU'S USE THEREOF WILL BE UNINTERRUPTED OR ERROR-FREE.

3.      **ASU Representations and Warranties.**  ASU represents and warrants to Pearson that it owns the ASU Information or has obtained all rights in the ASU Information to provide the ASU Information to Pearson and convey the licenses granted herein to Pearson so that the use by Pearson to provide the Pearson Services and other services does not violate the intellectual property rights or other rights of a third party. ASU is responsible for meeting the then-current hardware, operating system, browser and other technical requirements necessary to properly use and access the LearningStudio. ASU will comply with all applicable federal, state and local laws, regulations, rules, and ordinances.

4.      **Prohibited Contacts.**  Pearson and ASU will each comply with telemarketing laws, rules and regulations on a local, state, and federal level, as applicable with respect to any contacts made by such party or its contractors, customers or affiliates. The term "**telemarketing laws, rules and regulations**" includes but is not limited to the Telemarketing Sales Rule and the Telephone Consumer Protection Act. ASU may supply leads and related information to Pearson in order for Pearson to perform the Pearson Services.  In such instances, ASU represents, covenants, and warrants  that each lead it supplies will satisfy the following criteria: (1) ASU has received a request from the lead that it expressly desires to receive additional information via telephone at a date certain, or (2) ASU has received an express request in writing to be contacted via telephone using a form which includes the number to be called and the lead's signature, or (3) the lead is not registered on

20

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3C8062CBE

any state or federal "Do Not Call Lists." Further, ASU will not provide any lead to Pearson if the lead has made a prior "Do Not Call" request to ASU. ASU is responsible for the leads it obtains from its contractors, customers or affiliates. ASU and Pearson will work together to identify procedural changes or other measures that would reduce the likelihood of any issues in this area. If Pearson and ASU agree that Pearson will contact leads by any means or medium in addition to telephone (including, without limitation text messages or email), each party will be responsible for ensuring that any leads and other contacts provided by that party can be contacted without such contact resulting in the violation of any applicable federal, state, or local laws, rules, and regulations pertaining to the contact of persons or entities by such means or medium.

## X. STRATEGIC INITIATIVES.

ASU and Pearson intend to broaden their relationship by launching and undertaking, subject to all applicable laws, certain strategic initiatives as set forth in this Article X.

1.   **Online Program Management Business Initiative**. ASU and Pearson will develop an online program management business initiative pursuant to the following guiding principles:

   a.   Consulting Agreement.   Within 180 days after the Effective Date, pursuant to a Consulting Agreement reasonably satisfactory to both parties (the **"Consulting Agreement"**), Pearson will engage ASU as a consultant to Pearson or one of its affiliates for the purpose of guiding Pearson on building, developing, and maintaining an internal infrastructure to support an extensive, enterprise-wide offering of online undergraduate and graduate programs to select public institutions similar to ASU in size, educational mission, and philosophy concerning online higher education. Pearson will pay ASU based on efforts and results, or other basis to be determined by the parties. ASU's consulting services will include: consultation on the management and coordination of instructional design activities; program selection, and making recommendations regarding development and implementation of programs; website development best practices; internal capabilities development; and online education best practices.

   b.   Programs; Non-circumvention. After the execution of the Consulting Agreement, Pearson will offer online program management services, similar in nature and scope to the Pearson Services provided to ASU under this Agreement, to select public institutions similar to ASU in size, educational mission, and philosophy concerning online higher education. Pearson will not circumvent ASU by moving forward on this project, or a substantially similar project or initiative, without a then current Consulting Agreement with ASU, or ASU's written permission to proceed. The term of the Consulting Agreement will be co-extensive with the Term of this Agreement, and may only be terminated by Pearson for cause. Nothing herein shall prevent Pearson from offering its customary online program management services to institutions outside the scope of this strategic initiative.

   c.   Timeline.  The Consulting Agreement will include targets, goals, and a fee structure applicable to this initiative. The parties shall take commercially reasonable efforts to achieve the targets and goals set forth in the Consulting Agreement.

2.   **Support of Teaching and Learning Action Lab Initiative**. ASU and Pearson will develop an initiative to support ASU's Teaching and Learning Action Lab pursuant to the following guiding principles:

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

    a.    Research. Upon receipt of the first funding as described in subparagraph 2b below, the Teaching and Learning Action Lab will begin researching the following topics, with the goal of producing published white papers and reviews of its research results:

        (i)    The translation of research findings into the classroom;
        (ii)   Understanding how universities develop, at scale, teaching ecosystems;
        (iii)  How universities stay on the forefront of personalized and adaptive learning; and
        (iv)  Assessing tools in the marketplace used in hybrid and online teaching.

    b.    Findings. ASU and Pearson shall collaboratively review, evaluate, and assess the Teaching and Learning Action Lab's research and resulting findings for the purpose of achieving better student outcomes.

    c.    Funding. The parties will provide funding for this initiative on a Contract Year basis, with the first contributions due and payable by November 17, 2015, and within three months of the final day of each Contract Year thereafter during the Term. Each party will contribute funding via a percentage of each party's gross proceeds under this Agreement as follows: 2.5% from Pearson, and 1.0% from ASU.

3.    **International Consortium Initiative.** ASU and Pearson will investigate the establishment of a consortium of no more than 6 premier, international colleges and universities (including ASU) to form a new higher education delivery model capable of pursuing opportunities of outcomes, access and development requiring the scale and credibility of a multi-university system to enable the creation of an innovative, international multi-university system that can leverage the capabilities of its constituent member institutions to accomplish the following:

    (i)    Improve the quality and breadth of educational offerings available to constituent institutions' students by joint research, development, and articulation;

    (ii)   Respond to the major challenges of an emerging global middle class serving governments and industry;

    (iii)  Focus on student outcomes and improve student access to higher education;

    (iv)  Work with governments and industry to meet the needs of fast-growing economies where existing educational opportunities do not meet the demands of the employment market.

Pearson will assist the consortium in the negotiation and engagement of contracts between the consortium and governmental entities, employers, and/or providers.

## XI.  MISCELLANEOUS

1.    **Third Party Services.** Pearson may recommend products and services from a third party provider or provide ASU with integration to third party applications for the use of a third party's products or services (collectively, the "**Third Party Services**"). Products and services provided by Pearson under this Agreement will not be considered to be Third Party Services. The privacy policies and other terms and conditions applicable to the use of such Third Party Services may differ from those applicable to the use of the LearningStudio or the Pearson Services, and ASU's access to and use of the Third Party Services will be subject to such policies and terms and conditions. To the extent that ASU's use of such Third Party Services requires the transfer of, or access to, any ASU Information or other ASU data by the third party, ASU hereby expressly consents to such transfer

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

and/or access. Pearson makes no representations or warranties as to the Third Party Services, either express or implied, including any implied warranties of merchantability, quality, accuracy, performance, fitness for a particular purpose, or non-infringement, and Pearson will not be liable to ASU for any claims, expenses, costs or other damages of any kind, arising out of or relating to the Third Party Services or ASU's use thereof.

2.      **Notices.** All notices, requests, demands and other communications under this Agreement will be in writing and will be to the parties as set forth below:

Notice to ASU. Unless hereinafter changed by written notice to Pearson, any notice to ASU, other than invoices and notice with respect to invoices, will be delivered or mailed to:

Arizona State University
ASU Online and Extended Campus
Attn:  Exec Vice Provost & Dean
P.O. Box 870101
Tempe AZ  85287-0101

With copy to:

Arizona State University
Purchasing and Business Services
Attn:   Chief Procurement Officer
PO Box 875212
Tempe AZ  85287-5212

Unless changed by written notice to Pearson, invoices and notices regarding invoices to ASU will be delivered or mailed to:

Arizona State University
ASU Online and Extended Campus
Executive Vice Provost and Dean
PO Box 870101
Tempe AZ  85287-0101

Notice to Pearson. Unless hereinafter changed by written notice to ASU, any notice to Pearson will be delivered or mailed to:

Pearson eCollege
Attn: Legal Department
2154 E. Commons Avenue, Suite 4000
Centennial, CO 80122, USA

Notices will be effective upon receipt and will be deemed to be received as follows: i) if delivered by nationally recognized overnight courier, effective the business day following the date of shipment; or ii) if by U.S. certified mail, actual receipt.

3.      **Non-Exclusive Services.**  Pearson provides products and services to other educational institutions that may be similar to, or the same as, those offered as part of the Pearson Services.

4.      **Independent Contractors and Responsibility.** The relationship between ASU and Pearson is limited solely to the activities, rights and obligations as set forth in this Agreement. Nothing in this

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

Agreement will be construed (i) to create or imply a partnership or other legal entity between ASU and Pearson, (ii) to create any duties or obligations between ASU and Pearson except as expressly set forth herein, or (iii) to grant any direct or implied licenses or any other right other than as expressly set forth herein. Each party will be responsible for its own negligence, actions and omissions. Neither party is authorized to take any actions in the name of, or to bind, the other party.

5.      **Severability.** If any provision hereof is invalid or unenforceable, the other provisions hereof will remain in full force and effect.

6.      **Survival.** All provisions of this Agreement that by their terms anticipate performance after the termination of this Agreement, and all provisions necessary or appropriate to interpret and enforce such provisions, will survive termination of this Agreement and remain in full force and effect.

7.      **Publicity.** ASU and Pearson, upon the execution of this Agreement, may agree upon the text and the exact timing of a public announcement relating to the relationship established by this Agreement; provided however that the parties acknowledge that ASU is a public institution and therefore is subject to public records requests. Advance release of information related to this transaction by ASU in accordance with its policies will not constitute a breach of this Agreement.

8.      **Right of Removal.** If any ASU Information is or becomes, or in Pearson's opinion is (a) likely to become the subject of a claim that the ASU Information infringes any party's patents or copyrights or misappropriates such third party's trade secrets, or (b) indecent, obscene, threatening, libelous, slanderous, defamatory, illegal, or otherwise unlawful or tortious, including material that is harmful to children or violates third party privacy or publicity rights, Pearson will give ASU notice of the potential issue and Pearson may, without liability under this Agreement, remove such ASU Information from the LearningStudio until such time as the issue has been resolved to Pearson's satisfaction.

9.      **Most Favored Nation Pricing.** To the maximum extent provided by applicable law, Pearson will provide pricing to ASU for products and services rendered under this Agreement on a most favored nation basis. In the event Pearson enters into a Substantially Similar Agreement with another college or university with more favorable pricing terms than this Agreement, Pearson will promptly inform ASU of the existence of the Substantially Similar Agreement and a summary of its relevant pricing terms. The Parties will thereafter work together in good faith to amend Article VI of this Agreement so that its fee structure matches that of the Substantially Similar Agreement. Nothing herein will require Pearson to provide ASU with a copy of the Substantially Similar Agreement. A **"Substantially Similar Agreement"** is an online program management agreement between Pearson and another college or university entered into on or after the Effective Date of this Agreement that is substantially similar to this Agreement in all of the following respects: (a) the actual or anticipated number of Managed Programs; (b) the Managed Programs encompass substantially all of the college or university's online programs on an enterprise-wide basis; (c) the product and service bundle provided by Pearson; (d) the actual or anticipated tuition charged for enrollment in a Managed Program; and (e) the actual or anticipated Student enrollment levels in the Managed Programs.

## XII. GENERAL TERMS AND CONDITIONS

The following terms and conditional will apply to this Agreement, and in the event of any conflicts or inconsistencies, the terms in this Section will control to the extent necessary to resolve such conflict or inconsistency.

1.      **Governing Law and Venue.** This Agreement will be governed by the laws of the State of Arizona without regard to any conflicts of laws principles. ASU's obligations hereunder are subject to the regulations/policies of the Arizona Board of Regents. Any proceeding arising out of or relating to

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

this Agreement will be conducted in Maricopa County, Arizona. Each party waives any objection it may now or hereafter have to venue or to convenience of forum.

2.      **Contract Claims and Controversies.** All contract claims and controversies arising under this Agreement will be resolved pursuant to the Arizona Board of Regents procurement procedures, section 3-809, in particular section 3-809C.

3.      **Arbitration in Superior Court.** In the event of litigation, as required by A.R.S. § 12-1518), the parties agree to make use of arbitration in all contracts that are subject to mandatory arbitration pursuant to rules adopted under A.R.S. § 12-133.

4.      **Force Majeure.** Neither party will be held in default for any losses resulting if the fulfillment of any terms or provisions of this Agreement are delayed or prevented by any cause not within the control of the party whose performance is interfered with, and which by the exercise of reasonable diligence, said party is unable to prevent. Such causes may include, but are not restricted to, acts of God or the public enemy, acts of the state or the United States in its sovereign capacity, wars, insurrections, riots, blackouts, explosions, earthquakes, lightning, wind, terrorism, sabotage, fires, floods, epidemics, strikes and unusually severe weather.

5.      **Anti-Kickback.** In compliance with FAR 52.203-7, ASU has in place and follows procedures designed to prevent and detect violations of the Anti-Kickback Act of 1986 in its operations and direct business relationships.

6.      **Confidentiality.** ASU is a public institution and, as such, is subject to A.R.S. §§ 39-121 through 39-127 regarding public records. Accordingly, notwithstanding any other provision of this Contract to the contrary, any provision regarding confidentiality is limited to the extent necessary to comply with the provisions of Arizona law. During the Term, a party ("**Receiving Party**") may have disclosed to it or come in contact with information of the other party ("**Disclosing Party**") of a sensitive or proprietary nature that is marked as confidential ("**Confidential Information**"). Except as necessary to comply with applicable law, neither party will, directly or indirectly, use, disseminate or disclose the Confidential Information of the other to any person or entity (other than to agents and contractors who are bound by similar obligations of confidentiality) for any purpose or at any time, except as expressly authorized by the Disclosing Party or as needed to perform its obligations under this Agreement. The Receiving Party will use the same standard of care to avoid disclosure of any Confidential Information as it uses with respect to its own confidential or proprietary information, provided that in no event will the Receiving Party employ less than reasonable efforts to protect any Confidential Information of the other party.  Confidential Information will not include information that: i) is or becomes publicly known or available to the Receiving Party at or after the time of disclosure through no wrongful act of the Receiving Party; ii) is in the possession of or known to the Receiving Party at the time of disclosure without confidentiality restrictions; iii) is rightfully obtained by the Receiving Party from a third party; or iv) is independently developed by the Receiving Party. Notwithstanding anything to the contrary set forth in this section, any disclosure of confidential or proprietary information by means of a third-party attack, probe, theft, or other breach of network security will not be deemed to be a breach of the Agreement. In addition, a party will not be considered to have breached its obligations under this section for disclosing Confidential Information of the Disclosing Party to the extent required to satisfy any legal requirement of a competent governmental authority, provided that promptly upon receiving any such request and to the extent that it may legally do so, such party advises the Disclosing Party prior to making such disclosure in order that the Disclosing Party may object to such disclosure, take action to ensure confidential treatment of the Confidential Information, or take such other action as it considers appropriate to protect the Confidential Information disclosed pursuant to the requirement or request of a governmental agency or disclosure is required by operation of law.

25

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

7. **Indemnification by ASU.** To the extent permitted by Arizona law, ASU will indemnify, save and hold harmless Pearson and its owners, officers, directors, or employees (collectively, "**Indemnitee**") for, from, and against any and all claims, actions, liabilities, damages, losses, or expenses (including court costs, attorneys' fees, and costs of claim processing, investigation, and litigation) actually incurred by Pearson for bodily injury or personal injury (including death), or loss or damage to property to the extent caused, or alleged to be caused, by (i) the negligent or willful acts or omissions of ASU or any of its officials, officers, or employees, or (ii) failure to comply with any applicable law. ASU will be responsible for primary loss investigation and judgment costs where this indemnification is applicable. ASU is a public institution and, as such, any indemnification, liability limitation, or hold harmless provision will be limited as required by Arizona law, including without limitation Article 9, Sections 5 and 7 of the Arizona Constitution and A.R.S. §§ 35-154 and 41-621. Therefore, notwithstanding any other provision of this Agreement to the contrary, ASU's liability under any claim for indemnification is limited to claims for property damage, personal injury, or death to the extent caused by acts or omissions of ASU.

8. **Indemnification by Pearson**. To the extent permitted by Arizona law, Pearson will indemnify, defend, save and hold harmless the State of Arizona, its departments, agencies, boards, commissions, universities, and its and their officials, agents, and employees (collectively, "**Indemnitee**") for, from, and against any and all claims, actions, liabilities, damages, losses, or expenses (including court costs, attorneys' fees, and costs of claim processing, investigation, and litigation) for bodily injury or personal injury (including death), or loss or damage to tangible or intangible property to the extent caused, or alleged to be caused, by (i) the negligent or willful acts or omissions of Pearson or any of its owners, officers, directors, members, managers, agents, employees, or subcontractors, (ii) a breach of this Agreement, or (iii) failure to comply with any applicable law. Pearson will be responsible for primary loss investigation, defense and judgment costs where this indemnification is applicable. In consideration of the award of this contract, Pearson waives all rights of subrogation against Indemnitee for losses arising from the services performed or items provided by Pearson under this Agreement.

9. **Gratuities.** ASU may, by written notice to Pearson, cancel this Agreement if it is found by ASU that gratuities, in the form of entertainment, gifts or otherwise, were offered or given by Pearson, or any agent or representative of Pearson, to any officer or employee of the State of Arizona with a view toward securing a contract or securing favorable treatment with respect to the awarding or amending, or the making of any determinations with respect to the performing of such contract.  In the event this Agreement is canceled by ASU pursuant to this provision, ASU will be entitled, in addition to any other rights and remedies, to recover or withhold the amount of the cost incurred by Pearson in providing such gratuities.

10. **Modifications.** This Agreement can be modified or rescinded only by a writing signed by duly authorized agents of both parties. If purchase orders or other documents or acknowledgments are issued by either party containing terms and conditions in addition to, modifying or contrary to the provisions of this Agreement, those printed terms and conditions are hereby specifically objected to and will be of no force or effect; it being the parties' intentions that this Agreement will govern all matters relating to the subject matter herein.

11. **Assignment-Delegation.** No right or interest in this Agreement may be assigned, or any obligation delegated, by either party without the prior written permission of the other party. Any attempted assignment or delegation will be wholly void and totally ineffective for all purposes unless made in conformity with this paragraph.

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

12.     **Interpretation, Parol Evidence and Counterparts**.  This writing and the Exhibits attached hereto, which are hereby incorporated by reference, is intended by the parties as a final expression of their Agreement, is intended also as a complete and exclusive statement of the terms of their Agreement and supersedes any and all prior understandings and agreements, whether written or oral, between the parties with respect to such subject matter. No course of prior dealings between the parties and no usage of the trade will be relevant to supplement or explain any term used in this Agreement. Acceptance or acquiescence in a course of performance rendered under this Agreement will not be relevant to determine the meaning of this Agreement even though the accepting or acquiescing party has knowledge of the nature of the performance and opportunity for objection. This Agreement may be executed in several counterparts, each of which will be deemed an original, but such counterparts will together constitute but one and the same agreement.

13.     **No Waiver.**  No waiver of satisfaction of a condition or nonperformance of an obligation under this agreement will be effective unless it is in writing and signed by the party granting the waiver. No waiver by either party of any breach of the provisions of this Agreement by the other party will in any way be construed to be a waiver of any future breach or bar the right to insist on strict performance of the provisions of this Agreement.

14.     **Cancellation of State Contract.**  In accordance with A.R.S. § 38-511, this Agreement may be canceled without penalty or further obligation if any person significantly involved in initiating, negotiating, securing, drafting or creating the Agreement on behalf of ASU is, at any time while this Agreement or any extension of this Agreement is in effect, an employee of any other party to this Agreement in any capacity or a consultant to any other party to this Agreement with respect to the subject matter of this Agreement.

15.     **Labor Disputes.**  Pearson will give prompt notice to ASU of any actual or potential labor dispute which delays or may delay performance under this Agreement.

16.     **Failure of Legislature to Appropriate**.  In accordance with A.R.S. § 35-154, if ASU's performance under this Agreement depends on the appropriation of funds by the Arizona Legislature, and if the Legislature fails to appropriate the funds necessary for performance, then ASU may provide prompt written notice of this to Pearson and cancel this Agreement without further obligation of ASU. Appropriation is a legislative act and is beyond the control of ASU.

17.     **Inspection and Audit.**  To the extent required by A.R.S. § 35-214, Pearson will retain all records relating to this Agreement. Pearson will make those records available at all reasonable times for inspection and audit by ASU or the Auditor General of the State of Arizona during the term of this Agreement and for a period of five years after the completion of this Agreement. The records will be provided at Arizona State University, Tempe, Arizona, or another location designated by ASU upon reasonable notice to Pearson.

18.     **Insolvency.**  ASU shall have the right to terminate this Agreement at any time in the event Pearson files a petition in bankruptcy, or is adjudicated bankrupt; or if a petition in bankruptcy is filed against Pearson and not discharged within 30 days; or if Pearson becomes insolvent or makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law; or if a receiver is appointed for Pearson or its business.

19.     **Offshore Performance of Work Prohibited.**  Due to security and identity protection concerns, direct services under this Agreement will be performed within the borders of the United States.  Any services that are described in the specifications or scope of work that directly serve ASU and may involve access to secure or sensitive data or personal client data for ASU will be performed within the borders of the United States. Unless specifically stated otherwise in the specifications, this

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

definition does not apply to indirect or "overhead" services, redundant back-up services or services that are incidental to the performance of the Agreement (such as software development/support, back-office functions and remote professional services activities). This provision applies to work performed by subcontractors at all tiers.

20. **Non-Discrimination.** The parties will comply with all applicable state and federal laws, rules, regulations, and executive orders governing equal employment opportunity, immigration, and nondiscrimination, including the Americans with Disabilities Act. **If applicable, the parties will abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability.**

21. **Weapons, Explosive Devices and Fireworks.** ASU prohibits the use, possession, display or storage of any weapon, explosive device or fireworks on all land and buildings owned, leased, or under the control of ASU or its affiliated or related entities, in all ASU residential facilities (whether managed by ASU or another entity), in all ASU vehicles, and at all ASU or ASU affiliate sponsored events and activities, except as provided in A.R.S. § 12-781 (Section 12-781 of the Arizona Revised Statutes) or unless written permission is given by the Chief of the ASU Police Department or a designated representative. Notification by Pearson to all persons or entities who are employees, officers, subcontractors, consultants, agents, guests, invitees or licensees of Pearson (**"Pearson Notification Parties"**) of this policy is a condition and requirement of this Agreement. Pearson further agrees to enforce this contractual requirement against all Pearson Notification Parties. ASU's policy may be accessed through the following web page: http://www.asu.edu/aad/manuals/pdp/pdp201-05.html.

22. **Tobacco-Free University**. ASU is tobacco-free. For details visit www.asu.edu/tobaccofree.

23. **Insurance Requirements.** Without limiting any liabilities or any other obligation of Pearson, Pearson will purchase and maintain, in a company or companies lawfully authorized to do business in the State of Arizona, and rated at least A- VII in the current A.M. Best's, the minimum insurance coverage below. **Minimum requirements are subject to change based on changes in statutory requirements, scope of work, and contract awarded.**

Pearson will (and will cause its subcontractors to) procure and maintain until all of their obligations have been discharged, including any warranty periods under this Agreement, are satisfied, insurance against claims for injury to persons or damage to property that may arise from or in connection with the performance of the work hereunder by Pearson, its agents, representatives, employees or subcontractors.

The insurance requirements herein are minimum requirements for this Agreement and in no way limit the indemnity covenants contained in this Agreement. ASU in no way warrants that the minimum limits contained herein are sufficient to protect Pearson from liabilities that might arise out of the performance of the work under this Agreement by Pearson, its agents, representatives, employees or subcontractors, and Pearson is free to purchase additional insurance.

A. MINIMUM SCOPE AND LIMITS OF INSURANCE: Pearson will provide coverage with limits of liability not less than those stated below.

28

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

1. **Commercial General Liability – Occurrence Form**
   Policy will include bodily injury, property damage, personal injury and contractual liability coverage. Limits may be provided in any combination of primary and umbrella/excess insurance.
   - General Aggregate $4,000,000
   - Products Completed Operations Aggregate $1,000,000
   - Personal and Advertising Injury $1,000,000
   - Blanket Contractual Liability – Written and Oral
   - Damage to Rented Premises $ 50,000
   - Each Occurrence $1,000,000

   a. Policy will be endorsed to include the following additional insured language: **"The State of Arizona, its departments, agencies, boards, commissions, universities, and its officers, officials, agents, and employees, shall be named as additional insureds with respect to liability arising out of the activites performed by or on behalf of Pearson."**
   b. Policy will contain a waiver of subrogation against the State of Arizona, its departments, agencies, boards, commissions, universities and its officers, officials, agents, and employees for losses arising from work performed by or on behalf of Pearson.

2. **Worker's Compensation and Employers' Liability** – statutory limits, as amended from time to time and in each case no less than the amounts specified below

   Workers' Compensation
   Employers' Liability
   - Each Accident $1,000,000
   - Disease – Each Employee $1,000,000
   - Disease – Policy Limit $1,000,000

   a. Policy will contain a waiver of subrogation against the State of Arizona, its departments, agencies, boards, commissions, universities and its officers, officials, agents, and employees for losses arising from work performed by or on behalf of the Pearson.
   b. This requirement will not apply to: Separately, EACH contractor or subcontractor exempt under A.R.S. 23-901, AND when such contractor or subcontractor executes the appropriate waiver (Sole Proprietor/Independent Pearson) form.

3. **Professional Services & Multimedia Liability**

   Each Claim $4,000,000
   Annual Aggregate $4,000,000

   Coverage to include:
   - Hostile action or a threat of hostile action with the intent to affect, alter, copy, corrupt, destroy, disrupt, damage, or provide unauthorized access/unauthorized use of a computer system including exposing or publicizing confidential electronic data or causing electronic data to be inaccessible;
   - Computer viruses, Trojan horses, worms and other types of malicious or damaging code;
   - Dishonest, fraudulent, malicious, or criminal use of a computer system by an employee to affect, alter, copy corrupt, delete, disrupt, or destroy a computer system or obtain financial benefit for any party or to steal or take electronic data;
   - Denial of service for which the insured is responsible that results in the degradation of or loss of access to internet or network activities or normal us of a computer system;
   - Access to a computer system or computer system resources by an unauthorized person or an authorized person in an unauthorized manner;

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

- Loss or disclosure of confidential information;
- Outsource service provider;
- Systems design, consulting, development and modification;
- Training services relating to professional services;

a. If the professional liability insurance required by this Agreement is written on a claims-made basis, Pearson warrants that any retroactive date under the policy will precede the effective date of this Agreement; and that either continuous coverage will be maintained or an extended discovery period will be exercised for a period of two years beginning at the time work under this Agreement is completed.
b. The policy will cover negligent errors, unintentional omissions or negligent acts for those positions defined in the Scope of Work of this contract.
c. This insurance shall cover Pearson's liability for negligent acts, errors and omissions arising out of Pearson's operations or Services, including loss arising from unauthorized access or use that results in identity theft or fraud.

B.   ADDITIONAL INSURANCE REQUIREMENTS:   The Commercial General Liability policy will be primary insurance with respect to all other available sources.

C.   NOTICE OF CANCELLATION:  In the event an insurance policy/coverage required hereunder is cancelled, Pearson will provide notice at least 30 days prior to such cancellation to the State of Arizona. Such notice and certificate will be sent directly to Arizona State University, Risk Management, PO Box 876512, Tempe, Arizona 85287.

D.   VERIFICATION OF COVERAGE:  Pearson will furnish ASU with certificates of insurance (ACORD form or equivalent approved by the State of Arizona) as required by this Agreement. The certificates for each insurance policy are to be signed by a person authorized by that insurer to bind coverage on its behalf.

All certificates and endorsements are to be received and approved by ASU before work commences. Each insurance policy required by this Agreement must be in effect at or prior to commencement of work under this Agreement and remain in effect for the duration of the project. Failure to maintain the insurance policies as required by this Agreement is a material breach of contract.

All certificates required by this section will be sent directly to Arizona State University, Risk Management, PO Box 876512, Tempe, Arizona 85287. The ASU project/contract number and project description will be noted on the certificate of insurance. ASU reserves the right to require complete, copies of all insurance policies, redacted of proprietary (i.e. premium and rating) information, required by this Agreement at any time.

24.   **Sales and Use Tax.**  Pearson agrees to comply with and to require all of its subcontractors to comply with all the provisions of applicable state sales excise tax law and compensation use tax law and all amendments to same. Pearson further agrees to indemnify, defend, and save harmless ASU, for, from and against any and all claims and demands made against it by virtue of the failure of Pearson or any subcontractor to comply with the provisions of any or all said laws and amendments. ASU is not exempt from state sales excise tax and compensation use tax, except for equipment purchased for research or development under the provisions of A.R.S. §42-5159 (B) (14).  Any equipment ordered as tax exempt will be invoiced separately from taxable systems, even if purchased on the same purchase order from ASU.

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

25.    **Student Educational Records**.  Student educational records are protected by the federal Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("**FERPA**") (20 U.S.C. § 1232g). Pearson will comply with FERPA and will not access or make any disclosures of student educational records to third parties without prior notice to and consent from ASU or as otherwise provided by law. If this Agreement permits Pearson to access or release any student records, then, for purposes of this Agreement only, ASU hereby designates Pearson as a "school official" for ASU under FERPA, as that term is used in FERPA and its implementing regulations.  As such, Pearson will comply with FERPA and will not make any disclosures of ASU students' educational records to third parties without prior notice to, and consent from, ASU or as otherwise permitted by law.  In addition, any access or disclosures of student educational records made by Pearson or its employees and agents must comply with ASU's definition of legitimate educational purpose, which definition can be found at: SSM 107-01: Release of Student Information (http://www.asu.edu/aad/manuals/ssm/ssm107-01.html).  If Pearson violates the terms of this section, Pearson will immediately provide notice of the violation to ASU.

26.    **Debarment and Suspension.** Pearson will fully comply with the requirements stipulated in Subpart C of 45 CFR 620, entitled "Responsibilities of Participants Regarding Transactions." Pearson is responsible for ensuring that any lower tier covered transaction, as described in Subpart B of 45 CFR 620, entitled "Covered Transactions", includes a term or condition requiring compliance with Subpart C. Pearson also is responsible for further requiring the inclusion of a similar term or condition in any subsequent lower tier covered transaction. Pearson acknowledges that failing to disclose the information required under 45 CFR 620.335 may result in the termination of the award, or pursuance of other available remedies, including suspension and debarment. Pearson may access the System for Award Management at https://www.sam.gov/portal/SAM/#1.

27.    **Authorized Presence Requirements.**  As required by A.R.S. § 41-4401, ASU is prohibited from awarding a contract to any contractor or subcontractor that fails to comply with A.R.S. § 23-214(A) (verification of employee eligibility through the e-verify program). Pearson warrants that it and its subcontractors comply fully with all applicable federal immigration laws and regulations that relate to their employees and their compliance with A.R.S. § 23-214(A). A breach of the foregoing warranty will be deemed a material breach of this Agreement that is subject to penalties up to and including termination of this Agreement. ASU retains the legal right to inspect the papers of any contractor or subcontractor employee who works hereunder to ensure that the contractor or subcontractor is complying with the warranty stated above.

28.    **Americans with Disabilities and Rehabilitation Act.** Pearson will comply with all applicable provisions of the Americans with Disabilities Act, the Rehabilitation Act, and all applicable federal regulations promulgated in connection therewith. All electronic and information technology and products and services to be used by ASU faculty/staff, students, program participants, or other ASU constituencies must be compliant with the Americans with Disabilities Act as amended and Section 508 of the Rehabilitation Act of 1973. Compliance means that a disabled person can acquire the same information, engage in the same interactions, and enjoy the same services as a nondisabled person, in an equally effective and integrated manner, with substantially equivalent ease of use.

DocuSign Envelope ID: FADE1431-26FE-4A26-8B14-F2C3CB062CBE

**IN WITNESS WHEREOF**, the persons executing this Agreement for and on behalf of the parties hereto represent that they are fully authorized to do so for and on behalf of their respective principals.

eCollege.com

By: _____

David Daniels, President

Date Signed: _____28 January 2015 | 18:27 PT_____

Arizona Board of Regents for and on behalf of Arizona State University

By: _____

Nichol Luoma, Director of Procurement, Chief Procurement Officer

Date Signed: _____29 January 2015 | 10:55 MT_____

Exhibit A: Addenda Governing Treatment of ASU Recruited Groups
Exhibit B: Updated Pearson Certifications

32

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

**Exhibit A**
**Addenda Governing ASU Recruited Groups**

**Form of\* Addenda No. __ to Master Services and License Agreement**

This Addenda Number **[__]\*** is being entered into effective as of _____, 20__,\* by and between the Arizona Board of Regents for and on behalf of Arizona State University ("**ASU**") and eCollege.com, a Delaware corporation and a Pearson company ("**Pearson**") for the purpose of delineating the terms and conditions that apply to **[insert description of student group]** (the "**Subject Student Group**"), which group of students is considered an ASU Recruited Group under the terms of the First Amended and Restated Master Services and License Agreement dated effective as of January 1, 2015, by and between ASU and Pearson (the "**MSLA**").

The terms set forth herein shall apply solely to the Subject Student Group and with respect to the Subject Student Group shall replace in their entirety the terms and conditions set forth in the MSLA referenced herein. All other terms and conditions set forth in the MSLA shall apply to the Subject Student Group.

**Terms:**

**[To be completed on a case-by-case basis; if possible, clearly reference the Sections/terms of MSLA that are being replaced by the terms set forth herein.]\***

**IN WITNESS WHEREOF**, the persons executing this Addendum to the MSLA for and on behalf of the parties hereto represent that they are fully authorized to do so for and on behalf of their respective principals.

**eCollege.com**

By: _____

David Daniels, President

**Arizona Board of Regents**
**for and on behalf of**
**Arizona State University**

By: _____

Chief Procurement Officer

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

**Exhibit B**
**Updated Pearson Certifications**

**CONFLICT OF INTEREST CERTIFICATION**

1/28/15
(Date)

Purchasing and Business Services
Arizona State University
PO Box 875212
Tempe, AZ 85287-5212

The undersigned certifies that to the best of his/her knowledge: (**check only one**)

( x )   There is no officer or employee of Arizona State University who has, or whose relative
has, a substantial interest in any contract resulting from this request.

(  )   The names of any and all public officers or employees of Arizona State University who
have, or whose relative has, a substantial interest in any contract resulting from this
request, and the nature of the substantial interest, are included below or as an
attachment to this certification.

---

Pearson eCollege
(Firm)

david.daniels@pearson.com
(Email Address)

David Daniels
(Signature required)

David Daniels
(Print name)

President
(Print title)

2154 E. Commons Avenue, Suite 4000
(Address)

Centennial, CO 80122 USA

3174283124

(Phone)
3174283254

(Fax)

(Federal Taxpayer ID Number)

{Purchasing 01-31-2007. Previous editions are obsolete and cannot be used.)

B-1

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

## FEDERAL DEBARRED LIST CERTIFICATION

**Certification Regarding Debarment, Suspension, Proposed Debarment, and Other Responsibility Matters (Dec 2001)**

__1/28/15__
(Date)

Purchasing and Business Services
Arizona State University
PO Box 875212
Tempe, AZ 85287-5212

In accordance with the Federal Acquisition Regulation, 52.209-5:

(a) (1) The Offeror certifies, to the best of its knowledge and belief, that—
(i) The Offeror and/or any of its Principals—

> (A) (check one) **Are (    )** or **are not ( x )** presently debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any Federal agency; (The debarred list (List of Parties Excluded from Federal Procurement and Non-Procurement Programs) can be found at https://www.sam.gov/index.html/#1#1.)

> (B) (check one) **Have (    )** or **have not ( x )**, within a three-year period preceding this offer, been convicted of or had a civil judgment rendered against them for: commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, state, or local) contract or subcontract; violation of Federal or state antitrust statutes relating to the submission of offers; or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen property; and

> (C) (check one) **Are (    )** or **are not ( x )** presently indicted for, or otherwise criminally or civilly charged by a governmental entity with, commission of any of the offenses enumerated in paragraph (a)(1)(i)(B) of this provision.

> (ii) The Offeror (check one) **has (    )** or **has not ( x )**, within a three-year period preceding this offer, had one or more contracts terminated for default by any Federal agency.

> (2) "Principals," for the purposes of this certification, means officers; directors; owners; partners; and, persons having primary management or supervisory responsibilities within a business entity (*e.g.,* general manager; plant manager; head of a subsidiary, division, or business segment, and similar positions).

This Certification Concerns a Matter Within the Jurisdiction of an Agency of the United States and the Making of a False, Fictitious, or Fraudulent Certification May Render the Maker Subject to Prosecution Under Section 1001, Title 18, United States Code.

(b) The Offeror shall provide immediate written notice to the Contracting Officer if, at any time prior to contract award, the Offeror learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

(c) A certification that any of the items in paragraph (a) of this provision exists will not necessarily result in withholding of an award under this solicitation. However, the certification will be considered in connection with a determination of the Offeror's responsibility. Failure of the Offeror to furnish a certification or provide such additional information as requested by the Contracting Officer may render the Offeror nonresponsible.

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

(d) Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render, in good faith, the certification required by paragraph (a) of this provision. The knowledge and information of an Offeror is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

(e) The certification in paragraph (a) of this provision is a material representation of fact upon which reliance was placed when making award. If it is later determined that the Offeror knowingly rendered an erroneous certification, in addition to other remedies available to the Government, the Contracting Officer may terminate the contract resulting from this solicitation for default.

Pearson eCollege

(Firm)

david.daniels@pearson.com

(Email Address)

DocuSigned by:

David Daniels

(Signature required)

David Daniels

(Print name)

President

(Print title)

2154 E. Commons Avenue, Suite 4000

(Address)

Centennial, CO 80122

3174283124

(Phone)

3174283254

(Fax)

(Federal Taxpayer ID Number)

(Federal Debarred List Continued)
(Purchasing 01-31-2007)

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

## ANTI-LOBBYING CERTIFICATION

**Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions (Sept 2007)**

  1/28/15
(Date)

Purchasing and Business Services
Arizona State University
PO Box 875212
Tempe, AZ 85287-5212

In accordance with the Federal Acquisition Regulation, 52.203-11:

(a) The definitions and prohibitions contained in the clause, at FAR 52.203-12, Limitation on Payments to Influence Certain Federal Transactions, included in this solicitation, are hereby incorporated by reference in paragraph (b) of this certification.

(b) The offeror, by signing its offer, hereby certifies to the best of his or her knowledge and belief that on or after December 23, 1989—

    (1) No Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress on his or her behalf in connection with the awarding of this contract;

    (2) If any funds other than Federal appropriated funds (including profit or fee received under a covered Federal transaction) have been paid, or will be paid, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress on his or her behalf in connection with this solicitation, the offeror shall complete and submit, with its offer, OMB standard form LLL, Disclosure of Lobbying Activities, to the Contracting Officer; and

    (3) He or she will include the language of this certification in all subcontract awards at any tier and require that all recipients of subcontract awards in excess of $100,000 shall certify and disclose accordingly.

(c) Submission of this certification and disclosure is a prerequisite for making or entering into this contract imposed by Section 1352, Title 31, United States Code. Any person who makes an expenditure prohibited under this provision or who fails to file or amend the disclosure form to be filed or amended by this provision, shall be subject to a civil penalty of not less than $10,000, and not more than $100,000, for each such failure.

| | |
|---|---|
| Pearson eCollege | 2154 E. Commons Avenue, Suite 4000 |
| (Firm) | (Address) |
| david.daniels@pearson.com | |
| | Centennial, CO 80122 |
| (Email Address) | |
| *David Daniels* | 3174283124 |
| (Signature required) | |
| | (Phone) |
| David Daniels | 3174283254 |
| (Print name) | (Fax) |
| President | ████████ |
| (Print title) | (Federal Taxpayer ID Number) |

(Anti-Lobbying Certificate)
(Purchasing 01-31-2007)

B-4

DocuSign Envelope ID: FADE1431-28FE-4A26-8B14-F2C3CB062CBE

## LEGAL WORKER CERTIFICATION

___1/28/15___
(Date)

Purchasing and Business Services
Arizona State University
PO Box 875212
Tempe, AZ 85287-5212

As required by Arizona Revised Statutes §41-4401, ASU is prohibited from awarding a contract to any contractor who fails, or whose subcontractors/subrecipients fail, to comply with Arizona Revised Statutes § 23-214-A. Contractor warrants that it complies fully with all applicable federal immigration laws and regulations that relate to its employees, that it shall, as applicable or required under Arizona Revised Statutes § 23-214A, verify, through the e-verify program as jointly administered by the U.S. Department of Homeland Security and the Social Security Administration or any of its successor programs, the employment eligibility of each employee hired to work on the contract, and that it shall, as applicable or required under Arizona Revised Statutes § 23-214A, require its subcontractors and sub-subcontractors to provide the same warranties to Contractor.

A breach of the foregoing warranty shall be deemed a material breach of the contract. In addition to the legal rights and remedies available to ASU hereunder and under the common law, in the event of such a breach, ASU shall have the right to terminate the contract. Upon request, ASU shall have the right to inspect the papers of each contractor, subcontractor or any employee of either who performs work hereunder for the purpose of ensuring that the contractor or subcontractor is in compliance with the warranty set forth in this provision.

| | |
|---|---|
| Pearson eCollege | 2154 E. Commons Avenue, Suite 4000 |
| (Firm) | (Address) |
| david.daniels@pearson.com | Centennial, CO 80122 |
| (Email Address) | |
| David Daniels | 3174283124 |
| (Signature required) | (Phone)            3174283254 |
| David Daniels | |
| (Print name) | (Fax) |
| President | |
| (Print title) | (Federal Taxpayer ID Number) |

(Purchasing 06-23-2014