# Exhibit C-2

# MASTER SERVICES AGREEMENT

## e-Learning Program

## WSU Contract #18535

This e-Learning Program Master Services Agreement (hereinafter the "Agreement") is entered into by and between Embanet ULC ("Embanet") and Washington State University, an institution of higher education and agency of the state of Washington on behalf of its College of Business (the "University") as of, and effective, this 24th day of February, 2010 ("Effective Date").

WHEREAS, Embanet is an e-Learning online educational services and solutions company that combines educational content, technology, and marketing services to provide e-Learning programs for higher education and certain corporate training markets;

WHEREAS, the University is an educational institution which has content and instructional expertise in a wide range of business disciplines and subject matter; and,

WHEREAS, the University wishes to retain Embanet to provide its College of Business with the e-Learning programs and services described in, and subject to, this Agreement.

NOW THEREFORE, the Parties agree as follows:

## ARTICLE 1
## INTERPRETATION

For the purposes of this Agreement, the following definitions shall apply:

### 1.1     Definitions.

**1.1.1**    "Academic Director" means the representative from the University charged with overseeing and administering the performance of the University's obligations under this Agreement, including the delivery of Content to Embanet.

**1.1.2**    "Agreement" means this Agreement, as amended from time to time and all Schedules and exhibits attached hereto. Words such as "herein," "hereinafter," "hereto," and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

**1.1.3**    "Census Date" means the student drop/add date of each e-Learning Program Course.

**1.1.4**    "Chief Development Officer" means the employee of Embanet who is assigned as Embanet's project manager for the purposes of this Agreement.

**1.1.5**    "Confidential Information" means information that is identified as "confidential" either verbally or in writing at the time of disclosure, or is of such a nature that a reasonable person would understand such information to be confidential, including without limiting the generality of the foregoing, business, commercial, Intellectual Property, financial, personnel, administrative strategic planning, and student information.

**1.1.6** " "Content" means the descriptive attributes of a collection of university courses, such as course descriptions, course sequences, intended learning outcomes, and course topics, that constitute an area of specialization as well as units of learning, usually defined by expected outcomes, including syllabi, assignments, tests, notes, presentations, and examples created for classroom and learning programs that are used to deliver Courses.

**1.1.7** "Course" means an academic or training delivery framework developed by Embanet with a set of assignments and activities within an e-Learning Program developed pursuant to this agreement that is designed to fulfill a particular set of learning objectives within a specified period of time.

**1.1.8** "Distance-Learning" means and includes any training, learning or educational activity via an "online" or electronic network or similarly connected electronic medium (whether by dedicated, closed-loop, Ethernet cable, satellite, telephone (cell, mobile, or land), BPN, Internet, optical fiber, broadcast, wireless, or any other media or electronic communication system) where multiple users can use simultaneously, including, without limitation, the Internet or intranets, for the broadcast, transmission or distribution, now known or hereafter developed, such training, learning or educational activity "Distance-Learning" does not include non-electronic and other traditional education via textbook/paper course materials or live classroom or similar face-to-face instruction. Further, Distance-Learning does not include courses offered by Washington State University through its Distance and Professional Education Center.

**1.1.9** "Effective Date" shall mean the date on which this Agreement shall be effective as first set forth in this Agreement.

**1.1.10** "e-Learning Program" means a Distance-Learning Degree program pursuant to one or more e-Learning Program Term Sheets, and the associated Courses to be conducted by Embanet and the University pursuant to this Agreement.

**1.1.11** "e-Learning Program Term Sheet" shall mean the existing or future document that specifies each e-Learning Program, and the associated terms, conditions and requirements, which the Parties wish to undertake pursuant to this Agreement, and that includes the number of courses that they wish to undertake as a part of each e-Learning Program the form and content subject matter of which is more specifically set out in Schedule A.

**1.1.12** "Embanet's Intellectual Property" means all Intellectual Property that is combined or associated with, or incorporated into (or that is any part of) the Courses or otherwise a part of an e-Learning Program, whether originally conceived, created, developed, authored, or otherwise owned by Embanet or by its affiliates, subsidiaries, licensors pursuant to Sections 2.2 and 2.4.1, including, but not limited to, e-Learning Program delivery components, such as flash, media course structure, instructional design and multimedia development, and marketing materials, such as marketing databases, slogans, websites and website content..

**1.1.13** "Enhancements" shall mean changes or additions, other than Maintenance Modification, to an e-Learning Program, Courses and related Documentation, including all new releases, that seek to further develop or improve an e-Learning Program.

**1.1.14** "Faculty" means the University employees who shall instruct, teach, and directly administer each Course.

**1.1.15** " Gross Receipts" means the gross tuition amounts that are collected from all student enrollments in the e-Learning Program and Courses, less the following amounts incurred by the University or Embanet or their affiliates with respect to such e-Learning Program and Courses: (a) trade, cash and quantity discounts or rebates actually allowed or taken; (b) credits or allowances given or made for rejection of, and for uncollectible amounts with respect to the e-Learning Program and Courses; (c) credit card fees paid to non-affiliates; (d) any taxes that are levied on the provision or performance of the e-Learning Program (including any tax such as value added of similar tax or government charge); and, (e) amounts payable to students who have been permitted to withdraw from Courses. Tuition amounts received from students enrolled in an e-Learning Program due to the University's efforts or agreements with business partners and paid at the student referral rate shall be excluded from "Gross Receipts", however, Embanet shall be entitled to compensation for its services related to such students in accordance with the applicable e-Learning Program term sheet.

**1.1.16** "Intellectual Property" shall mean and include: (i) all trademark rights, logos, trade dress, service marks, trade names and brand names, all registrations and applications thereof and all goodwill associated with the foregoing; (ii) all copyrights, copyright registrations and copyright applications, and all other rights associated with the foregoing and the underlying works of authorship; , including moral rights and all similar rights to protect or preserve the integrity of a work or to be associated as the author of a work; (iii) all Patent Rights, patents and patent applications, and all international proprietary rights associated therewith; (iv) all industrial designs, integrated circuit topographies, mask works and mask work registrations; and, (v) all improvements, Enhancements, inventions, so-called "look & feel", graphic design elements, graphic user interface, order of operations, order of Content presentment and related configuration, ideas, concepts, know-how, discoveries, improvements, designs, trade secrets, shop and royalty rights.

**1.1.17** "Maintenance Modifications" shall mean any modifications or revisions, other than Enhancements, to an e-Learning Program, Courses, Content or Documentation that correct errors, rectify omissions, support new releases of an e-Learning Program or provide other incidental updates and corrections.

**1.1.18** "Parties" or individually, "Party" shall mean the entities entering into this Agreement, and their successors and permitted assigns.

**1.1.19** "Patent Rights" means the rights and interests in and to issued patents and pending patent applications (which for purposes of this Agreement shall be deemed to include certificates of inventions and application for certificates of invention and priority rights) in any country, including all provisional applications, substitutions, continuations-in-part, divisions, and renewals, all letters patent granted thereon, and all reissues, reexaminations and extensions thereof and all supplementary protection certificates, whether owned or licensed by or to a Party.

**1.1.20** "Subject Matter Expert(s)" means individuals selected by the University who are experts in the subject matter of a Course or e-Learning Program, and who develop Content/provide multimedia ideas on his/her subject of expertise for incorporation into either such Courses or e-Learning Program.

**1.1.21** "Teaching Aids" means all web enhanced, multi-media technology and software used for the delivery and support of curriculum.

**1.1.22** "Term" means the term of this Agreement as set forth in Article 8.1 hereof.

**1.1.23** "Territory" means **United States of America**.

**1.1.24** "University's Intellectual Property" means all Intellectual Property (as defined in subsection 1.1.15) and derivative works therefrom, including the Content provided by University, whether used or otherwise included in any Course developed by Embanet or by its affiliates, but not including Intellectual Property of a third party which is included in the Content subject to a license executed between University and the third party.

### 1.2    Headings.

The division of this Agreement into Articles, Sections and Schedules and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. Except as expressly set out herein, references to an Article, Section or Schedule refer to the applicable Article, Section or Schedule to the main body of this Agreement and not to any Article, Section or any Schedule to this Agreement.

### 1.3    Meaning of Terms.

The Parties agree to the following interpretive terms and conditions:

(i)     words importing the singular number include the plural and vice versa and words importing gender include all genders in this Agreement;

(ii)    reference to any agreement, indenture or other instrument in writing means such agreement, indenture or other instrument in writing as amended, modified, replaced or supplemented from time to time, unless otherwise agreed to herein;

(iii)   reference to any statute or regulation or bylaw shall be deemed to be a reference to such statute or regulation or bylaw as amended, re-enacted or replaced from time to time, unless otherwise agreed to herein;

(iv)    time periods within which a payment is to be made or any other action is to be taken hereunder shall be calculated excluding the day on which the period commences, but including the day on which the period ends; and,

(v)     whenever any payment to be made or action to be taken hereunder is required to be made or taken on a day other than a business day, such payment shall be made or action taken on the next following business day.

### 1.4    Entire Agreement.

This Agreement, together with the Schedules, sets forth the entire agreement and understanding between the Parties and supersedes all prior agreements, conditions, warranties, representations, arrangements and communications, whether oral or written, with respect to the subject matter of this Agreement.

### 1.5    Implied Terms.

No implied representations, warranties, covenants, terms or obligations of any kind by, or on behalf of, either Embanet or the University shall arise from anything in this Agreement and only the express terms and conditions contained in this Agreement shall be binding upon Embanet and the University.

### 1.6 No Waiver.

No waiver of or consent to depart from the requirements of any provision of this Agreement shall be binding against either Party unless it is in writing and is signed by the Party giving it. Such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it has been given and shall not be deemed or constitute a waiver of any other provisions (whether or not similar) nor shall such waiver constitute a continuing waiver unless otherwise expressly provided. Notwithstanding Section 1.7, no failure on the part of either Party to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver of such right. No single or partial exercise of any such right shall preclude any other or further exercise of such right or the exercise of any other right.

### 1.7 Time of the Essence.

The University's and Embanet's time obligations herein <u>shall</u> be of the essence in the performance of any obligation or duty to the extent any time requirements are specifically set out in this Agreement.

### 1.8 Currency.

All dollar amounts in this Agreement are expressed in the case of the United States of America.

### 1.9 Illegal Provisions.

If any covenant or provision contained in this Agreement is determined to be illegal, void or unenforceable in whole or in part, it shall not be deemed to affect or impair the validity of any other covenant or provision and such illegal, void or unenforceable covenant or provision shall be modified, amended and/or changed in such a manner as to maintain the integrity of the Agreement and the Parties intent as evidenced hereby.

### 1.10 Schedules.

The following schedules are attached to and form part of this Agreement:

Schedule A – e-Learning Program Term Sheet #1 – Executive Masters of Business Administration (the "EMBA Program")

Schedule B – e-Learning Program Term Sheet #2 – Masters of Business Administration (the "MBA Program")

### 1.11 Amendments.

This Agreement may be modified only upon the mutual written consent of Embanet and the University.

    **1.12** Embanet and University acknowledge that there will need to be collaboration between the staff of both parties to adapt, integrate and construct systems and interfaces for the registration, tuition, financial aid, and other student systems as they relate to the E-Learning Programs provided pursuant to this Agreement. This work will begin immediately after the execution of the Agreement by both parties and will be completed to the satisfaction of both parties no later than April 16, 2010, unless otherwise agreed. In the event the parties are unable to successfully integrate the e-Learning

Program to WSU's reasonable satisfaction, WSU may terminate this Agreement without liability and the parties shall have no further obligations hereunder,

## ARTICLE 2
## OBJECTIVES, DUTIES AND RESPONSIBILITIES OF EMBANET

Embanet shall be responsible for and shall provide, at its sole cost and expense unless otherwise expressly stated herein, the following obligations and services:

### 2.1    Development of e-Learning Program.

**2.1.1**    Embanet shall develop, create, operate and deliver the e-Learning Programs in accordance with the terms and conditions of this Agreement.

**2.1.2**    The University and Embanet agree that they shall work together and reasonably assist each other in the collaborative and joint development of the e-Learning Program based upon the University's Course requirements, including Content, curriculum and related materials.

### 2.2    e-Learning Program.

Based upon the collaborative assistance and cooperation of the University set out in Section 2.1 and in Article 3 of this Agreement, Embanet will develop, create and deliver to the University the e-Learning Program. Embanet will, through the direction of the Chief Development Officer, provide the University with commercially reasonable consulting assistance in this regard at no extra cost to University.

### 2.3    Technical Development of Courses.

Embanet will develop and create the on-line component of all Courses including instructional design, multimedia development, course uploading, and course/program hosting to established standards set by the Academic Director, as more particularly described in the mutually agreed to e-Learning Program Term Sheet. All Courses shall be developed and created by Embanet in accordance with the terms and conditions of the relevant and applicable e-Learning Program Term Sheet, including all Content requirements and specifications. Course activities that are related to media products, course structure and appearances (including graphic design, order of operations, so-called "look & feel", and page lay-out), duplication of such materials, repurposing of such information for the e-Learning Program, creating the e-Learning environment, dissemination of such materials to students, and providing surveys and assessments, shall all be subject to the prior approval of the University. Prior to the commencement of advertising and offering any Course to the general public, Embanet shall submit to the University, for approval as to quality and form, all Course materials prepared by the Parties and all promotional, packaging and advertising material associated therewith. The University shall, within ten (10) business days of such submission either reject or accept such Course materials in writing.

### 2.4    Embanet Duty.

Embanet represents, warrants and covenants that the performance of Embanet's obligations under Section 2.3 shall not infringe, breach, contravene, or otherwise misappropriate any Intellectual Property of third parties. Notwithstanding the foregoing, the University shall be solely responsible for securing all third party consents, authorizations, permissions, approvals, and licenses concerning the Content that are required for Embanet to perform such services.

### 2.5    Marketing.

**2.5.1**    Embanet will undertake commercially reasonable marketing efforts, subject to the nature of the e-Learning Program, and the Academic Director's review and prior written approval and in compliance with University brand standards, to develop, promote, market and sell the e-Learning Program throughout the Territory. To the extent expressly provided in each e-Learning Program Term Sheet, Embanet will manage, implement and be responsible for: (i) marketing and tracking the associated e-Learning Program databases; (ii) activities related to entry, coordination, tracking, and control of the associated e-Learning Program marketing databases; (iii)   activities related to determination of the associated e-Learning Program marketplace acceptance, size and probability; (iv)   activities related to the execution of the associated e-Learning Program market research via direct mail, telephone surveys and other methods with specific benchmarks established periodically by the Embanet necessary to develop and execute marketing strategy; (v) dissemination of such print and electronic marketing materials; (vi) such database management of electronic and hardcopy mailing lists for secondary mailings; (vii) activities related to creation of script and management of telephonic contact with potential students for such e-Learning Programs; (viii) activities related to direct response marketing (which may include direct mail, trade publication advertising, Internet, telemarketing, inbound and outbound); and, (ix)   public relations and attending trade shows related to such e-Learning Programs, subject to the approval of the University.   The Parties agree and confirm that Embanet's performance of all such obligations as expressly provided and required in the relevant e-Learning Program Term Sheet shall be deemed to fully satisfy Embanet's commercially reasonable marketing efforts first set out in this Section 2.5.

**2.5.2**    The University agrees that, subject to the University's existing proprietary rights and interests in admitted students, any name, trade name, logo, domain names that are associated with the University's goodwill, brand indicia, trademark, service mark, Embanet shall own all right, title and interest in and to: (i) all student data and information in the marketing database as a result of Embanet's marketing activities, excluding admissions data and information related to the students admitted to the university; (ii) all marketing copy, slogans, art work and related materials associated with the e-Learning Program marketing materials that are created and developed by Embanet, with the exception of any of University's Intellectual Property used by Embanet with University's permission in such marketing materials; and, (iii)   all web sites and web site content created and developed by Embanet for the marketing effort of the e-Learning Program, with the exception of any of University's Intellectual Property used by Embanet with University's permission in such web sites or web site content ("Marketing Materials").

**2.5.3**    Embanet agrees that it shall not use the Marketing Materials for any purpose other than to market and promote the e-Learning Program pursuant to this Section 2.5.

**2.5.4**    In the event that this Agreement is terminated for any reason, Embanet shall provide the University (subject to a royalty free, personal, non-transferable and non-exclusive license from Embanet to the University) with the right to use and reproduce all or any part of the tangible and material form of Marketing Materials that Embanet has created to promote the e-Learning Program, such as brochures, art work, and the hard copy manifestation of the e-Learning Program's website's marketing content, that have been produced and printed (material form) by Embanet as at the date of such termination.

### 2.6    Student Information.

Embanet shall receive and promptly respond to student requests for information, schedules and handouts.  Embanet will provide a reasonable degree of general student support; however, all requests and questions related to any Course's academic issues shall be directly forwarded by Embanet to the University for the University's sole and direct response.

### 2.7    Technical Support and Technology.

Embanet will provide the technical support to e-Learning Program students and Faculty concerning their access to, and use of, the Courses that are part of the e-Learning program. Embanet agrees to utilize, and use commercially reasonable efforts during the entire Term of this Agreement to continue to utilize, reasonably current technology in offering the Course to students.

### 2.8    Business Administration.

Embanet will manage the day-to-day business administration of the e-Learning Program including the following: (i) activities related to initial contact, description of the e-Learning Program, marketing, mailing of brochures, and notification of schedule; (ii) assistance for verification of receipt of information necessary for registration; (iii) activities related to notification of deadlines, e-mail updates, mailing of registration packets; (iv) verifications of receipt of information; and, (v) telephone support in the application process, processing of information, and receipt of necessary student documentation. Embanet will use its best efforts and in a timely manner electronically transfer all relevant information pertaining to applicants and student enrollments in the e-Learning Program.

### 2.9    e-Learning Program Accounting.

Embanet will be responsible for undertaking the financial services, transactions and for maintaining the accounting, with respect to e-Learning Program activities in accordance with Generally Accepted Accounting Practices in the United States of America to the extent such obligations are expressly set out and provided in the e-Learning Program Term Sheet, which may include, without limitation, the recording, tracking and paying all business vendors and suppliers associated with the e-Learning Program other than those business vendors and expenses for which the University is directly responsible.

### 2.10    e-Learning Program and Business Funding.

Each Party shall fund and be responsible for the payment of all costs and all expenses with respect to the performance of their respective duties, responsibilities and activities assigned to each Party in this Agreement and the applicable Program Term Sheet unless otherwise specifically stated herein.

### ARTICLE 3
### OBLIGATIONS AND CONTRIBUTIONS OF THE UNIVERSITY

The University shall be responsible for and shall provide at its sole cost and expense (unless otherwise indicated in this Agreement) the following obligations and services:

### 3.1    e-Learning Program Term Sheet.

**3.1.1**    The University and Embanet shall use their reasonable efforts, on an expedited basis and in good faith, to propose, discuss, settle, agree to, execute and deliver such e-Learning Program Term Sheets as may be required after the Effective Date to more particularly define the e-Learning Program(s) that shall be subject to this Agreement, including all associated Course and Content requirements and specifications.

**3.1.2**    Once each e-Learning Program Term Sheet is agreed upon by each of the Parties, each e-Learning Program Term Sheet shall be signed by the Parties and shall become a part of this Agreement.

### 3.2    Content and Curriculum.

The University will be solely responsible for the development and timely delivery to Embanet of all Content for course development. Academic programming and curriculum matters for all e-Learning Programs shall be the University's exclusive responsibility, and the University will make all decisions concerning each course's curriculum and Content. The University shall exercise control over, and be exclusively responsible for, the Content and quality of the curriculum of the e-Learning Program. The University agrees that it shall undertake an annual review of each Course and that it shall provide all reasonably required improvements, revisions, additions, deletions and curriculum refreshment that may be required (whether due to information currency, discipline development, or any other reason related to Course quality and completeness).

### 3.3    Faculty.

The University will be responsible for the review of credentials, appointment and coordination of Faculty. The University acknowledges the close relationship of the quality of the Faculty and Content with the success of each e-Learning Program, and the University agrees that all Faculty shall have the experience, qualifications and expertise to perform their respective obligations in connection with each Course they are associated with and that the care, quality and performance of each Faculty shall be of a reasonably diligent and professional quality that is consistent with faculty standards associated with the College's AACSB accreditation. For greater certainty, employment or retainer (including all remuneration, benefits, statutory deductions and remittances) with respect to Faculty (and other employees or independent contractors of the University) are the responsibility of the University, and other than Embanet's obligation to compensate the University pursuant to Section 3.4, Embanet shall have no obligations, responsibilities or duties concerning same.

### 3.4    Compensation of Faculty

The University shall be responsible for paying University faculty and other University employees for the work performed by them for the e-Learning Program. The amounts agreed upon in the applicable Term Sheet that will be paid to the University by Embanet for course development, instruction, and course facilitation will be deducted from the percentage payments made by the University to Embanet prior to transmitting the payments to Embanet. Embanet shall be responsible for paying facilitators who are not employed by the University for work performed on the e-Learning program.

### 3.5    Academic Credit and Degree.

The University shall be responsible for assessing and granting all e-Learning Program accreditations, such as Course credits and degrees, to students whom the University determines have successfully completing an e-Learning Program and who otherwise satisfy the necessary academic criteria established by the University for such accreditation. For greater certainty, all Course and e-Learning Program student evaluations, performance assessments, and accreditation entitlements shall be the sole and absolute responsibility and discretion of the University.

### 3.6    Admissions.

The Academic Director is responsible for determining the student capacity of the e-Learning Program, including the number of students to be admitted, and the number of Course sections offered, in order to maintain the academic quality of each Course and the e-Learning Program. The University shall be responsible for all decisions regarding each Course's student admission and registration criteria.

### 3.7    Records.

The University will have the sole duty and responsibly to maintain all academic records in accordance with its existing contractual obligations with students, the University's policies and practices, and in compliance with all applicable laws and regulations. Upon the University's request, Embanet shall promptly provide the University with any academic records concerning this Agreement that are in Embanet's possession or under its control.

### 3.8    Licenses; Third Parties.

Without limiting Article 9 hereof, the University shall obtain and shall take all actions necessary to maintain, at its own expense, any authorizations, approvals, consents, permits and licenses from third parties that are necessary for University to perform its responsibilities under this Agreement, as required for Embanet to carry out its responsibilities to develop, deliver, manufacture, use, host, and commercialize the Content as contemplated by this Agreement, including the procurement of all information technology, Intellectual Property concerning the Content. Subject to the confidentiality obligations set forth herein, the University shall promptly provide to Embanet, upon Embanet's reasonable request, material information regarding the University's agreements with third parties that directly affect the e-Learning Program and/or Embanet's rights to have access to, host, or to otherwise possess or use such things. The University shall promptly disclose to Embanet any Intellectual Property rights of Faculty associated with any Course (including Content) of which it becomes aware and which may adversely affect the ability of either Party to perform its obligations under this Agreement. Without limiting the foregoing, the University shall ensure that they have secured, in writing, all right, title and interest (whether by license or otherwise) from all Faculty for the University and Embanet to use the Content that is associated with each Course for the purposes of this Agreement. The University represents, warrants and covenants that the Content shall not infringe upon the Intellectual Property rights of any third party.

## ARTICLE 4
## LICENSE

### 4.1    License to Embanet.

The University hereby grants to Embanet for the Term of this Agreement a non-transferable (except as otherwise permitted pursuant to this Agreement), non-exclusive license to use, modify, revise, augment, create derivative works of, develop, produce, reproduce, manufacture, distribute, host, perform, display, promote, advertise sell and otherwise exploit anywhere in the Territory the Content (and all other goods, things, information and information technology that the University shall provide Embanet pursuant to each e-Learning Program Term Sheet) solely for the purposes of this Agreement, including the hosting of e-Learning Program, and the creation of either foreign language versions or new versions of the e-Learning Program. This license includes a license under all existing or future Content. ALL OTHER RIGHTS AND INTERESTS CONCERNING THE CONTENT ARE RESERVED BY THE UNIVERSITY.

### 4.2    License to The University.

Embanet hereby grants to the University for the Term of this Agreement a personal, non-transferable and non-exclusive license to use Embanet's Intellectual Property to develop, produce, reproduce, manufacture, distribute, perform, display, promote, advertise, sell, and otherwise exploit the e-Learning Program that is produced pursuant to this Agreement, including any foreign language (direct

translations) versions, but not for the purpose of creating or developing any derivative works or new versions of the e-Learning Program. For greater certainty, unless otherwise expressly agreed to in writing between the Parties, the University shall not (directly or indirectly) create, author, develop or produce any modifications, changes, revisions, adaptations, derivative works, alterations, deletions from, additions to, or customizations of all or any part of any Embanet property (including Embanet's Intellectual Property) or confidential information.

### 4.3    Course Contributions.

Embanet shall solely and exclusively own all right, title and interest in all Embanet Intellectual Property, whether same is created, authored, or developed pursuant to this Agreement or otherwise.

### 4.4    Rights to Content and Program.

Subject to Embanet's rights pursuant to Section 4.3, the University and/or the Faculty, shall retain all right, title, and interest in the Content and any derivative works, modifications, revisions, augmentations, or improvements that the University and/or Faculty makes or creates to the original Content including trademarks, service marks and related goodwill associated with the Content.

### 4.5    Marking Provisions.

Without limiting Sections 4.1 and 12.2, the licenses granted by the University to Embanet hereunder are conditioned on Embanet's full and complete compliance with all trademark, patent, and copyright laws of the United States and other countries in the Territory.

### 4.6    Moral Right.

University shall secure from an author, including Faculty, the right for Embanet to use the author's likeness, name and biographical materials for the purpose of promoting and delivering that Course pursuant to this Agreement.

### ARTICLE 5
### REMUNERATION

### 5.1    Service Fees.

As full consideration for all of the obligations and services performed by Embanet pursuant to this Agreement, the University agrees to pay Embanet the service fees that are set out, and as calculable in, each applicable e-Learning Program Term Sheet (the "Service Fee").

### 5.2    Payment.

Except as otherwise provided in an applicable e-Learning Program Term Sheet, the parties agree that the University shall collect all e-Learning Program student fee payments. The University shall provide payment to Embanet of its agreed-upon portion of the Service Fees hereunder on a periodic basis consistent with the University's tuition receivables process and the University shall also provide Embanet with periodic written reports containing accurate, complete and current information concerning all such collections, deductions and remittances in accordance with this Article 5. All Service Fees payable to Embanet pursuant to this Agreement will be made by direct bank deposit, or check payable to Embanet and sent to Embanet at the address set out in Article 12 or as University may be otherwise directed in

writing by Embanet; provided that all payments hereunder will be subject to the deduction of withholding and other applicable taxes. Embanet shall be responsible for any applicable income, sales, use or other taxes arising out of or in connection with Embanet's receipt of the Service Fees.

## ARTICLE 6
## AUDIT

### 6.1    Right to Audit.

Embanet shall have the right, at Embanet's expense, to have a certified chartered accountant (the "Auditor") perform an audit (the "Audit") of the University's performance of its financial obligations to Embanet under Article 5, exercisable by at least 20 days prior written notice delivered to the University, including providing reasonable access to the University 's relevant financial books, records and materials regarding the e-Learning Program's financial affairs. For greater certainty, any Audit shall only and strictly be conducted for the limited purpose of verifying the Service Fee that is payable by the University to Embanet hereunder, and for no other purpose whatsoever. Such audit shall not interfere with the conduct of the University's business operations. If a difference between the amount of the Service Fee payable to Embanet, as determined by any Audit to be greater than one percent (1%) or more than the actual amount of Fees paid to Embanet for such period ("Significant Discrepancy") then such Significant Discrepancy shall be immediately repaid by the University to Embanet.

### 6.2    Embanet Under- or Over-Compensated.

In the event the Audit determines that Embanet has been either under or over compensated by any amount for such Audit period, then such Service Fees that are either due and payable or reimbursable for such Audit period shall be immediately paid by University or repaid by Embanet as the case may be.

### 6.3    Maintenance of Books and Records.

All books and records relative to the obligations hereunder shall be maintained and kept accessible and available to the Parties for inspection for at least two (2) years after termination of this Agreement.

## ARTICLE 7
## CONFIDENTIAL INFORMATION AND NON-COMPETITION

### 7.1    Confidentiality.

The University and Embanet each recognize that each other Party's Confidential Information constitutes highly valuable and proprietary confidential information. The University and Embanet each agree, to the extent permitted by law, to keep confidential, and to contractually require its employees, consultants, affiliates and licensees and sublicensees to keep confidential, all Confidential Information of each other Party. Neither the University nor Embanet nor any of their respective employees, affiliates and licensees and sublicenses shall use Confidential Information of either other Party for any purpose whatsoever except as expressly permitted by this Agreement.

**7.2** Notwithstanding Section 7.1, neither Party shall have any obligations of confidentiality with respect to Confidential Information in the following circumstances except to the extent that such information:

(i) as of the date of disclosure is demonstrably known to the Party receiving such disclosure, as shown by written documentation, other than by virtue of a prior confidential disclosure to such Party or its affiliates;

(ii) as of the date of disclosure is in, or subsequently enters, the public domain, through no fault or omission of the Party receiving such disclosure; or

(iii) as of the date of disclosure or thereafter is obtained from a third party free from any obligation of confidentiality to the disclosing Party;

(iv) is created or developed by a receiving Party, without use of the Confidential Information of the disclosing Party by persons who did not have access to the disclosing Party's Confidential Information; or

(v) is required by applicable law, regulation or court order to be disclosed, including a request pursuant to the Washington Public Records Act, following prior written notice to Party whose information is being disclosed. Embanet acknowledges that University, as a state agency, is at all times is subject to the Washington Public Records Act, RCW 42.56.010 et seq. as now existing or as amended. If University receives a public records request for this Agreement and/or for documents and/or materials provided to University under this Agreement, generally such information will be a public record and must be disclosed to the public records requester. However, University agrees to notify Embanet if it receives such a public records request and the date University plans to release the records. If Embanet fails to obtain a protective order from the applicable court prior to the time University releases the records to the public records requester, Embanet gives University full authority to release the records on the date specified, and Embanet understands it has thereby given up all rights to challenge the disclosure in any forum.

**7.3    Publicity.**

Neither Party may disclose the terms of this Agreement without the prior written consent of the other Party; provided, however, that any Party hereto may make such a disclosure to the extent required by law, including disclosure pursuant to the Washington Public Records Act. Such disclosure shall be on reasonable notice to each other Party and after taking all reasonable steps as may be appropriate to maintain confidentiality. The Parties, upon the execution of this Agreement, will use their reasonable efforts to agree upon the Content and the exact timing of an initial public announcement relating to the transactions contemplated by this Agreement as soon as possible after the Effective Date (such agreement not to be unreasonably withheld or delayed). Thereafter, the Parties will use their reasonable efforts to agree on the text and the timing of any subsequent public announcements regarding this Agreement or the transactions contemplated herein; provided that once any written statement is mutually approved for disclosure, any Party hereto may make subsequent public disclosure of the contents of such statement without the further approval of the other Party. Any costs incurred for public relations in respect of this Agreement shall be paid by the Party incurring the expense.

### 7.4 Limitation On Disclosures.

Notwithstanding any provision in this Agreement, no Party shall be obligated hereunder to disclose to another Party any information which it is prohibited from disclosing by law or under any agreement with a third Party.

### 7.5 Prohibition On Hiring.

Neither Party shall, during term of this Agreement and for a period of one (1) year thereafter, hire or solicit any person who was employed by the other Party hereto or its affiliates during such period, whether such person is hired as an employee or consultant, unless authorized in writing by the other Party, or unless such person has not been employed by the other Party for at least 12 months prior to his or her hiring or solicitation. Hiring as a result of advertisements of open positions which are directed to the general public will not constitute a violation of this provision.

### 7.6 Restrictive Covenant.

During the term of this Agreement, the University agrees, as a material condition of this Agreement, that it shall not use, commercially exploit, distribute, market, license, or otherwise allow any other person to use or have the benefit of, all or any part of, the e-Learning Program except solely and exclusively for the University's internal operations, including the University's educational and research functions, and not in any manner that competes with any good or service Embanet commercially provides to other persons in the Distance-Learning market, whether as a service provider, host, application service provider (ASP), facility manager, service bureau, outsourcing service provider, or as a shared service.

## ARTICLE 8
## TERM AND TERMINATION

### 8.1 Term and Renewal

**8.1.1** This Agreement shall take effect on the later of the Effective Date or when the last signatory executes this Agreement, and shall continue for a period of ten (10) years (the "Term") unless sooner terminated in accordance with the provisions of this Article.

**8.1.2** This Agreement may be renewed by the mutual written consent of the Parties for an additional period not to exceed ten (10) years (the "Renewal Term").

### 8.2 Termination Prior to End of Term

This Agreement may be terminated prior to the end of the Term in any of the following manners:

### 8.2.1 Termination for Breach

A Party may terminate this Agreement if the other Party defaults in the payment of any financial obligation arising from the performance of this Agreement and fails to cure such default within thirty (30) days of receipt of written notice of the default from the non-defaulting Party.

A Party may terminate this Agreement if the other Party materially breaches any of the terms of this Agreement other than for default in payment and fails to cure the breach within sixty (60) days of receipt of written notice of the default from the non-defaulting Party.

### 8.2.2   Termination for Cessation of Business Operations or Insolvency

Upon not less than sixty (60) days written notice to the other Party, a Party may terminate this Agreement if the other Party has dissolved, ceased active business operations, or filed for insolvency, bankruptcy or reorganization, unless the Party's dissolution, cessation or liquidation results solely from reorganization, acquisition, merger or similar event and the Parties have mutually agreed to Assignment of this Agreement as provided in Section 12.7. If this Agreement is terminated because Embanet has dissolved, ceased active business operations, or filed for insolvency, bankruptcy, or reorganization, other than as provided in Section 12.7, the University may continue existing Programs, including the right use Embanet's Intellectual Property developed for the existing Programs, upon such terms as are commercially reasonable under the circumstances.

### 8.2.3   Termination for Failure to Meet Targets

The University shall have the right to terminate a Program without liability for Embanet's costs, expenses, or expected profits and without penalty at any time after the fourth (4th) year of this Agreement if minimum annual revenue targets ("Target(s)") as set forth in the applicable Term Sheet have not been met.

The Target will be measured within thirty (30) days after the completion of each year of the Program for the twelve month period immediately preceding. In the event that the Targets have not been met after the fourth year of a Program, the University may, within sixty (60) days of the end of the fourth year, or by the end of each year thereafter, exercise its right to terminate the Program ("Termination Right") pursuant to this Section 8.2.3. If the University does not exercise its Termination Right during this time, the Termination Right for the applicable year will expire. If, after termination, of a Program, there are no other active Programs remaining, then this Agreement shall also terminate.

### 8.2.4   Termination by Mutual Consent

The Parties may terminate this Agreement at any time upon written mutual consent.

### 8.2.5   Termination for University's Convenience

The University may terminate this Agreement for Convenience at any time after the fifth year of the Term upon not less than one hundred eighty (180) days prior written notice to Embanet.

If the University terminates this Agreement under this provision, University shall pay Embanet the unamortized direct costs incurred by Embanet in the development of Courses under this Agreement. "Unamortized Direct Costs" shall be defined to mean Embanet's direct capital costs amortized over a straight line basis. In addition, the University shall pay Embanet up to a maximum of $500,000, based on a calculation of the marginal net revenue Embanet reasonably anticipated receiving from existing Programs for the succeeding two (2) years or the period from termination until the end of the Term of this Agreement whichever is less. "Marginal Net Revenue" shall be defined to mean Embanet's share of Gross Receipts for that period less Embanet's share of expenses for that period (expenses to include reimbursed Unamortized Direct Costs for that period) had the Programs been continued to be offered.

If the Parties do not agree on the amount of Embanet's expected Marginal Net Revenue, the matter shall be submitted for resolution pursuant to the dispute resolution process set forth in Section 11.2.

The compensation obligations of the University in this Section 8.2.5 are compensatory and remedial only, shall not constitute any penalty whatsoever, and shall be in full satisfaction of any and all claims Embanet may have against the University for termination. The Parties agree and confirm that such remedy constitutes liquidated damages to compensate Embanet for all harm and losses, and that the provisions of this Section are fair and reasonable in the commercial circumstances of this Agreement and such provisions have been relied upon by Embanet and the University as a material inducement to enter into this Agreement.

### 8.3    Teach-out Due to Failure to Meet Annual Target

In the event the University terminates an e-Learning Program pursuant to Section 8.2.3, the University may elect that Embanet, for a period of two years following such termination (the "Teach-out Period"), perform the following teach-out services: technical support pursuant to section 2.7; and student support pursuant to sections 2.6 and 2.8 and accounting services pursuant to section 2.9 (the "Teach-out Services"). In the event the University elects that Embanet provide the Teach-out Services, the University shall pay Embanet 45% of Gross Receipts, as defined in this Agreement, collected from students as of the Termination Date and for so long as they remain enrolled in the e-Learning Program during the Teach-out Period. In the event that the University does not elect that Embanet provide the Teach-out Services, then the University shall be entitled to continue the existing e-Learning Programs and shall have the right to use Embanet's Intellectual Property developed for the existing e-Learning Programs during the Teach-out Period, and shall pay Embanet 35% of Gross Receipts, as defined in this Agreement, collected from Non-Referred Students, and 20% of Gross Receipts collected from Referred Students, enrolled in the e-Learning Program as of the Termination Date and for so long as they remain enrolled during the Teach-out Period. Referred Students shall be defined as students enrolled in the e-Learning Program as a result of the University's referral of a student to Embanet. Non-Referred Students shall be defined as all other students enrolled in the e-Learning Program.

### 8.4    Other Relief

Each Party acknowledges the unique, commercially sensitive and operationally critical nature of the e-Learning Program, and all other obligations and duties under this Agreement, and that each Party could be immediately and irreparably harmed by any material breach of the obligations owed by either Party to the other and that monetary relief alone for any such breach might not adequately compensate the harmed Party in such event. The Parties further agree that they shall be entitled to seek equitable relief in connection with any such breach of this Agreement, including a restraining order, injunctive relief, or specific performance as may be granted by any Court of competent jurisdiction to prevent or otherwise remedy any such expected or actual breach of this Agreement, and to enforce the terms and provisions hereof. Such remedies shall not be deemed to be the exclusive remedies for any breach of this Agreement, but shall be in addition to all other remedies available at law or equity.

### ARTICLE 9
### REPRESENTATIONS, WARRANTIES AND COVENANTS

#### 9.1    University Representations.

The University represents and covenants to Embanet as follows:

(i)     Organization. The University is an institution of higher education created under the laws of the State of Washington. The University has all requisite power and authority, corporate or otherwise, to conduct its business as now being conducted and to execute, deliver and perform this Agreement in accordance with its terms.

(ii)    No Legal Violation. The performance of this Agreement by the University shall not, to the best of the University's knowledge and belief, violate any provision of any agreement, law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to this Agreement.

(iii)   Binding Agreement. This Agreement is a legal, valid and binding obligation of the University enforceable against it in accordance with its terms and conditions.

(iv)    No Inconsistent Obligation. The performance of this Agreement by the University shall not, to the best of University's knowledge and belief, infringe, breach, contravene or detrimentally affect any other person's contractual, confidentiality or intellectual property rights, and the University does not require any authorization, consent, permission, or approval otherwise from any other person concerning the ability of the University to perform all, or any part of, this Agreement (including permitting Embanet to take possession of, host, use, operate, maintain, or otherwise have access to any Course, Content, information technology, or information). The University is not under any obligation to any person, or entity, contractual or otherwise, that is conflicting or inconsistent in any respect with the terms of this Agreement or that would prevent, delay, interfere with, or otherwise impede the diligent and complete fulfillment of the University's obligations hereunder.

#### 9.2    Embanet Representations.

Embanet represents to University as follows:

(i)     Organization. Embanet is a corporation duly organized, validly existing and is in good standing under the laws of the jurisdiction of its incorporation, is qualified to do business and is in good standing as a foreign corporation in each jurisdiction in which the performance of its Service obligations requires such qualification and has all requisite power and authority, corporate or otherwise, to conduct its business as now being conducted, and to execute, deliver and perform this Agreement.

(ii)    Authorization. The execution, delivery and performance of this Agreement by Embanet shall not violate any provision of any agreement, law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to it or any provision of its charter documents.

(iii)   Binding Agreement. This Agreement is a legal, valid and binding obligation of Embanet enforceable against it in accordance with its terms and conditions.

(iv)    No Inconsistent Obligation. The performance of this Agreement by Embanet shall not, to the best of Embanet's knowledge and belief, infringe, breach, contravene or detrimentally affect any other person's contractual, confidentiality or intellectual property rights, and Embanet does not require any authorization, consent, permission, or approval otherwise from any other person concerning the ability of Embanet to perform all, or any part of, this Agreement. Embanet is not under any obligation to any person, or entity, contractual or otherwise, that is conflicting or inconsistent in any respect with the terms of this Agreement or that would impede the diligent and complete fulfillment of its obligations hereunder.

(v)     Third Party Intellectual Property. As at the Effective Date, Embanet has no actual knowledge that the performance of the Services by Embanet will infringe the Intellectual Property rights of any third party.

### 9.3    WARRANTY DISCLAIMER.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT OR LIMITED BY LAW, EACH PARTY AGREES AND ACCEPTS THAT NO PARTY UNDER THIS AGREEMENT MAKES ANY REPRESENTATION, COVENANT, PROMISE, GUARANTEE OR WARRANTY WITH RESPECT TO ANY TECHNOLOGY, GOODS, SERVICES, RIGHTS OR OTHER ASPECT OF THIS AGREEMENT AND HEREBY ABSOLUTELY DENIES AND DISCLAIMS SAME, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS OF SERVICES FOR ANY PARTICULAR PURPOSE OR OTHERWISE WITH RESPECT TO ANY ASPECT OF THIS AGREEMENT.

## ARTICLE 10
## RISK MANAGEMENT

### 10.1    Infringement Indemnification by The University.

The University shall, to the extent permitted by law, defend, indemnify and hold harmless Embanet, its subsidiaries, parent corporations, affiliates, officers, directors, independent Companies, partners, shareholders, employees, agents, successors and assigns from and against any damages, claims, suits, liabilities, losses and expenses, including attorney's fees, arising from or related to any third party claim that use of the Content in accordance with the terms of this Agreement infringes the Intellectual Property of such third party, including moral rights. If any Content or its use is held to constitute an infringement of any third party's Intellectual Property or any Content is, or is likely to be held to constitute, such an infringement, the University will at its expense and option: (1) procure the right for Embanet to continue using the Content; (2) replace the Content with non-infringing equivalent content conforming to the applicable specification required by this Agreement; or (3) modify the Content to make it non-infringing while conforming to the applicable specifications.

### 10.2    Infringement Indemnification by Embanet.

Embanet shall defend, indemnify and hold harmless the University, its subsidiaries, parent corporations, affiliates, officers, trustees, independent companies, partners, shareholders, employees, agents, successors and assigns from and against any damages, claims, suits, liabilities, losses and expenses, including attorney's fees, arising from or related to any third party claim that Embanet's intellectual property infringes any Intellectual Property of any third party. If any Embanet intellectual property or its use is held to constitute an infringement of any third party's Intellectual Property or any

Embanet intellectual property is, or is likely to be held to constitute, such an infringement, Embanet will at its expense and option: (1) procure the right for the University to continue using Embanet intellectual property; (2) replace Embanet intellectual property with non-infringing equivalent content conforming to the applicable specification required by this Agreement; or (3) modify Embanet intellectual property to make it non-infringing while conforming to the applicable specifications.

### 10.3    Notice of Infringement.

Each Party shall inform the other promptly in writing of any alleged infringement of an Intellectual Property Right relating to an e-Learning Program by a third party and of any available evidence thereof.

### 10.4    Right to Assume Litigation Defense.

Each indemnifying Party shall have the right, but shall not be obligated, to defend and litigate at its own expense any infringement claim to which it may be liable under this Article 10.

### 10.5    Cooperation.

The indemnified Party shall fully cooperate and assist in all respects with the defense of any such intellectual property infringement claim, including to testify when requested and to make available all relevant records, papers, information, samples, specimens, and the like.

### 10.6    Limitation and Exclusion of Liability.

Except as otherwise agreed in Sections 8.2.5, 10.1 and 10.2 hereof, the Parties agree and confirm that: neither the University nor Embanet shall, in any circumstance, be liable, responsible or obligated for any indirect, third party, consequential, special or punitive liability, damages, compensation, award, loss, harm, injury, cost or expense whatsoever regardless of the cause of action for same arose, including contract, tort, negligence, common law, equity, statute or otherwise; and each Party's sole, exclusive and exhaustive liability, responsibility and remedy to the other Party shall be strictly limited, in the aggregate for all occurrences, to no more than **$1,000,000** during the entire term of this Agreement.

### 10.7    Insurance.

During the term of this Agreement, Embanet agrees to obtain and maintain insurance issued by a company authorized to provide insurance in the United States of America, in the following kinds and amounts:

**10.7.1**  Commercially reasonable worker's compensation and employer liability, but in no event less than statutorily-required minimums, including occupational disease, covering all employees on or off the work site, acting within the course and scope of their employment.

**10.7.2**  Insurance for bodily injury and property damage as listed below:

Commercial General Liability with:
$1,000,000 per occurrence
$1,000,000 personal injury
$2,000,000 general aggregate
$2,000,000 products/ completed operations aggregate

**10.7.3** Commercial automobile insurance with coverage of $1,000,000 Combined Single Limited Liability including hired and non-owned.

**10.7.4** The policy limits in 10.7.2 and 10.7.3 shall be reviewed and re-adjusted as necessary after year five (5) of the Term.

**10.7.5** Embanet agrees to add the University as an additional insured, and upon the request of the University, shall confirm in writing to the University the existence of the insurance coverage that is required pursuant to this Section 10.7.

### ARTICLE 11
### DISPUTE RESOLUTION

#### 11.1 Internal Resolution Attempts.

In the event of any dispute arising between the Parties in connection with this Agreement, the Parties shall attempt to amicably resolve the dispute, including through escalation of the matter to a senior representative or senior representatives of each Party.

#### 11.2 Alternative Dispute Resolution.

In the event that a dispute arises under this Agreement that the parties can't resolve per Section 11.1, they shall allow the dispute to be decided by a Dispute Panel in the following manner: each party to this Agreement shall appoint one member to the Dispute Panel, and the members so appointed shall jointly appoint an additional member to the Dispute Panel. The Dispute Panel shall review the facts, contract terms and applicable statutes and rules and make a determination of the dispute. The determination of the Dispute Panel shall be final and binding on the parties hereto. The parties shall equally share the costs, if any, for the services of the Dispute Panel.

### ARTICLE 12
### GENERAL PROVISIONS

#### 12.1 Relationship of the Parties.

The relationship between the Parties is limited solely to the activities, rights and obligations set forth in this Agreement. Nothing in this Agreement shall be construed: (i) to create or imply any joint venture, franchise, agency, employment or partnership relationship; (ii) to give any Party hereto the right to obligate or bind the other; (iii) to create any duties or obligations between the Parties except as expressly set forth herein; or, (iv) to grant any direct or implied licenses or any other right other than as expressly set forth herein. The Parties each agree and confirm that they are independent contractors as, and to the limited extent, set out in this Agreement.

#### 12.2 Compliance with Law.

The Parties agree that this Agreement and all activities in any way relating to it shall be conducted in compliance with the specific state laws and regulations. Embanet agrees to comply with the University's policies with respect to privacy of educational records that are provided to Embanet.

### 12.3   Family Educational Rights and Privacy Act.

Embanet shall comply with the Family Educational Rights and Privacy Act (FERPA), 12 U.S.C. 1232g (and implementing regulations), in carrying out all of its obligations under this Agreement.

### 12.4   Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of Washington, without regard to its law governing conflict of laws.   This Agreement contains the entire agreement between the Parties with respect to the matters set out herein and it supersedes in full all prior discussions, all other documents, and agreements between the Parties concerning the subject matter hereof. This Agreement may be amended, modified or supplemented only by a written document signed by an authorized representative of each Party.

### 12.5   Further Assurances.

The Parties agree to execute such other filings, registrations, agreements, certificates and documents, and the Parties will file record and publish such other certificates and documents, as may be necessary to perform this Agreement, and to comply with the requirements of applicable laws governing the formation and operation of this Agreement.

### 12.6   Notices.

Any notice to be given to the University or Embanet under the terms of this Agreement may be delivered personally, by telecopy, telex or other form of written electronic transmission, or by registered or certified mail, postage prepaid, and shall be addressed as follows:

| | |
|---|---|
| If to Embanet: | 225 Sparks Avenue, Toronto, ON Canada M2H 2S5 |
| | Phone:  416-494-6622 ext. 2259 |
| | Fax:  416-494-1891 |
| | Attention: Steve Fireng |
| If to the University: | Washington State University |
| | P.O. Box 644750, Pullman Washington 99164 |
| | Phone:  888-585-5433 |
| | Fax: 509-335-3851 |
| | Attention:  David Sprott |
| With Copy to: | Washington State University |
| | Office of Business & Finance |
| | P.O. Box 641045 |
| | Pullman, WA  99164-1045 |
| | Attention: Contracts Manager |

A Party may hereafter notify another in writing of any change in address. Any notice shall be deemed duly given (i) when personally delivered, (ii) when telecopied, telexed or transmitted by other form of written electronic transmission (upon confirmation of receipt) or (iii) on the third day after it is mailed by registered or certified mail, postage prepaid, as provided herein.

### 12.7 Successors and Assigns.

Neither Party may assign this Agreement, including an assignment to a successor in interest as a result of a merger, acquisition or public offering, without first obtaining the written consent of the other Party, which may not be unreasonably withheld, except that Embanet may assign this Agreement, including all licenses granted hereunder, to an affiliate or subsidiary without the University's consent. This Agreement will inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

### 12.8 Counterpart Execution.

This Agreement may be executed in any number of counterparts with the same effect as if all Parties hereto have signed the same document. All counterparts shall be construed together and shall constitute one Agreement.

### 12.9 Survival.

Notwithstanding any provision herein to the contrary, the rights and obligations set forth in Sections 2.5.2, 2.5.4; 4.3, 4.4; 7.1, 7.5; 8.3, 8.4, 8.5, 8.6, 8.7; 10.1, 10.2, 10.3, 10.4, 10.6; 12.4 and 12.6, shall survive the expiration or termination of this Agreement.

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the Effective Date.

**Washington State University**                    **Embanet ULC**

Per: _____          Per: _____
Eric Spangenberg, Dean                       Philip Kim
WSU College of Business                      VP & Corporate Controller
Date: _____          Date: _Feb. 24, 2010_

Per: _____
Warwick M. Bayly, Provost &
Executive Vice President
Date: _____

Per: _____
Richard A. Heath, Sr. AVP
Office of Business & Finance
Date: _3/18/10_

**APPROVED AS TO FORM:**
_____
Asst. Atty. Gen.
_8th_ day of _March_, 20_10_

# Schedule A

## Embanet ULC- Washington State University
## e-Learning Program Term Sheet

Upon execution by the parties, this e-Learning Program Term Sheet ("Term Sheet") will be attached and form part of the e-Learning Program Master Services Agreement (the "Agreement") between Embanet ULC ("Embanet") and Washington State University on behalf of its College of Business (the "University"). In the event of any inconsistency between the terms and conditions of the Term Sheet and the Agreement, the terms and conditions of this Term Sheet will prevail.

1.  <u>e-Learning Program ("Program"):</u>   Executive Masters in Business Administration

2.  <u>Number of Courses in the Program:</u> The following 14 Courses make up the Program

| | | |
|---|---|---|
| a) | Acctg 533 | Managerial Accounting |
| b) | MIS 572 | Business Intelligence and Decision Making |
| c) | Fin 526 | Financial Analyses |
| d) | MgtOps 593 | Leadership and Conflict Management |
| e) | Mktg 506 | Value and the Marketing Process |
| f) | MgtOps 590 | Organizational and Marketing Strategy |
| g) | IBUS 580 | International Business Management |
| h) | MgtOp 581 | Managing Lean Businesses |
| i) | MIS 580 | Technology Management |
| j) | MgtOp 588 | Management of Innovation |
| k) | Entrp 501 | Business Plan Competition (6 credits) |
| l) | Elective 1 | 3 credits |
| m) | Study Abroad | 3 credits (or Elective 2) |
| n) | BA 702 | 2 credits required in final term for final exam (business plan competition) |

3.  <u>Per credit hour tuition rate:</u>  $ 1,136.37 or such higher amount from time to time as may <u>be set by the University with input from Embanet. See Note 7 below.</u>

4.  <u>Entry Points per Year:</u>  *8 6  Rev*  *RK*.

5.  <u>Course Length:</u>  5 weeks.

6.  <u>Total number of Program Courses anticipated to be developed:</u>       14

7.  <u>Total number of existing on-line Courses:</u> 0

1

# Schedule A

8.  Number of Individual Courses to be delivered each year:  No more than 20 individual courses will be delivered per year

9.  Total number of Course carousels: 2.3

10.  Number of Courses being shared across concentrations: 0

11.  Current Learning Management System (LMS) utilized if any: None

12.  Learning Management System (LMS) that the e-learning program is to utilize initially for this Term Sheet:  Angel (See Note 9 below.)

13.  Course Development:  The University shall deliver course Content to Embanet and Embanet will complete development of each Course and each Update of the Course on a mutually agreed upon schedule. See Note 6 below.

14.  Course Development Fee:  The purpose of the Course Development Fee, to be paid by Embanet to the University by deduction from Embanet's share of Gross Receipts, is to select Faculty to serve as Subject Matter Experts ("SME") for each Course and is a maximum of $10,000 (inclusive of a 50% bonus opportunity) per Course during the first five years and $12,500 per Course during the second five years.  The bonus portion of this fee will be paid out subject to mutually agreed timelines in accordance with section 6 of the Notes below. WSU may, not more than once every five (5) years, redevelop the Course Content to keep such Courses current, for which Embanet shall pay, in the same manner as set forth above, a Course Redevelopment Fee of the same amount ($10,000 per Course during the first five years, and $12,500 per Course for the second five years).

15.  Instructor of Record Fee:  The purpose of the Instructor of Record Fee, to be paid by Embanet to the University by deduction from Embanet's share of Gross Receipts, is to appoint a Faculty member to serve as the instructor of record for a Course of no more than 300 students and is $12,000, to be increased by five percent (5%) each year thereafter. In the event that more than 300 students are enrolled in the Course, a second instructor of record will be appointed and Embanet will pay University for a second Instructor of Record Fee for the Course in the same manner as set forth above.  In the event that there are less than 10 students enrolled for a Course, Embanet may at its discretion choose not to run a Course.

16.  Facilitator Payment:  Embanet shall pay University $2,000 for each Course facilitator employed by WSU during the first five years, and $2,500 during the second five years, by deduction from Embanet's share of Gross Receipts.  Course facilitators contracted by

2

# Schedule A

Embanet will be paid directly by Embanet at the same rates. One facilitator will be appointed for every 20 students on average registered as of the Census Date.

17. Financial aid to be made available to students (Yes/No)?    Yes

18. Embanet's Duties:

The following services shall be provided by Embanet to the University, as applicable: (Yes/No/Optional):

| Functional Area | Specific Service | Yes/No |
|---|---|---|
| Academic | Instructional Design & Course Development | Yes |
| Academic | Facilitator Recruitment | Yes |
| Academic | Facilitator Management | Yes |
| Academic | Faculty and Facilitator Training | Yes |
| Marketing & Enrollment | Campaign Design | Yes |
| Marketing & Enrollment | Testing, Analysis and Optimization | Yes |
| Marketing & Enrollment | Lead Generation | Yes |
| Marketing & Enrollment | Applicant Evaluation/Admissions | Yes |
| Finance | Tuition Billing & Collections | Optional |
| Technology Services & Support | eLearning Platform Selection and Implementation | Yes |
| Technology Services & Support | Tier 1 Data Center Hosting | No |
| Technology Services & Support | 24/7/365 Help Desk Support | Yes |
| Program Management/ Student Services | Training | Yes |
| Program Management/ Student Services | Facilitator Support | Yes |
| Program Management/ Student Services | e-Learning Program Student Retention Management | Yes |

**Responsible Parties/Contact Information:**

Embanet ULC
Name: **Steve Fireng**
Title:   CEO

Address:
225 Sparks Avenue
Toronto, ON M2H 2S5
Canada

Phone: (416) 494-6622 x 2241

School: Washington State University
Name: Dave Sprott, Ph.D.
Title:    Associate Dean for Graduate,
            International & Professional Programs
Address: College of Business
            P.O. Box 644750
            Pullman, WA 99164-4750

Phone: (509) 335-6896

19. System Implementation Assistant. WSU will employ, and Embanet will pay $50,000 of the salary and benefits associated with, an Assistant to facilitate program implementation for the first year of both the EMBA and MBA e-Learning Programs. Future support of this position after the first year will be negotiable and as agreed upon between Embanet and WSU.

3

# Schedule A

**Service Fee/Business Model (Section 5.1 of the Agreement)**

Revenue Share Model

| Number of Students | | Breakdown | |
| Start | End | Embanet Gross Tuition & Revenue Share | University Gross Tuition |
|---|---|---|---|
| 1 | 200 | 75% | 25% |
| 201 | 300 | 70% | 30% |
| 301 | 400 | 65% | 35% |
| 401+ | | 60% | 40% |

For the purposes of determining the Service Fee under all scenarios, the calculation is based on a current census of the student population taken on the Census Date and for Business to Business Students will be based on tuition revenue net of any mutually agreed discounts provided.

**Minimum Annual Revenue Target ("Target")**
The Minimum Annual Revenue Targets for Gross Receipts to be retained by the University for each Program are:

| Target | Gross Receipts retained by the University* |
|---|---|
| Year 4 of the Program | $800,000 |
| Year 5 of the Program | $1,000,000 |
| Year 6 of the Program | $1,200,000 |
| Year 7 of the Program | $1,400,000 |
| Year 8 of the Program | $1,600,000 |
| Year 9 of the Program | $1,800,000 |

* i.e; after paying Service Fees to Embanet.

The Targets referred to in the above table are minimum targets and will be measured within thirty (30) days after the completion of each year of the Program for the twelve month period immediately preceding. In the event that an annual Target of the Program has not been met, the University may, within sixty (60) days of the end of that respective year, exercise its right at that time to terminate the Program ("Termination Right") pursuant to section 8.2.3 of the Agreement. If the target for any year thereafter has not been met, the University may, within sixty (60) days of the end of that year, exercise its right to terminate the Program pursuant to section 8.2.3 of the Agreement. If the University does not exercise its Termination Right during this time the Termination Right for the applicable year will expire.

**Executive Masters in Business Administration Exclusivity**

The Parties recognize the competitive nature of the Executive Masters of Business Administration ("EMBA") program in the Washington State area and, as consideration for the University entering into this Term Sheet, Embanet shall, during the Term of the Agreement, not provide the EMBA e-Learning Program to the following institutions: (1) University of Washington, and (2) Eastern Washington University. In addition, Embanet agrees to a two (2) year exclusivity for the State of Washington for the Program. The two (2) years commence upon the execution of this Term Sheet and remain for the duration of the Term Sheet.

4

# Schedule A

### Notes to the e-Learning Program Term Sheet

1. For the purposes of determining the Service Fee, as set out in section 5.1 of the Agreement, Embanet applies the Service Fee/Business Model above on a Course by Course basis. The calculation is based on a current census of the student population taken on the Census Date. For example if, during a semester, Course 1 has 150 students and Course 2 has 150 students, the revenue sharing is 75/25 for each Course. There is also no historical carry forward of previous student population sizes and when computing the sharing of revenue for a particular Course the count starts at zero. For example, if Course 1 has 150 enrollments, revenue sharing is 75/25. If the same 150 students move on to Course 2 the following semester, and an additional 350 students also enroll in Course 2; total Course enrollment is 500 with revenue sharing as follows: 200 students at 75/25, 100 students at 70/30, 100 students at 65/35 and 100 students at 60/40.

2. Upon receipt of a completed student application, the University shall process the application and communicate their decision to Embanet within five business days.

3. University agrees that Embanet will notify the students of acceptance in the Program and will then proceed to work with the students to ensure they are registered in the required Courses.

4. Embanet and the University will take a census of students enrolled on the Census Date. For e-Learning student tuition collected by the University, the University shall distribute to Embanet the above stated Service Fees no later than thirty days after the Census Date. For student tuition collected by Embanet, Embanet shall distribute the University its portion of the gross tuition no later than 30 days from the Census Date. Late payments will be subject to interest at the rate of 1.0% per month.

5. Embanet's payment to University for applicable Instructor of Record and Course Development Fees and any applicable Facilitator Payments for facilitators employed directly by the University shall be deducted by University from Embanet's share of Gross Receipts. Within forty-five days after the end of each semester, either Embanet or the University may conduct an audit at their own cost as to registered students in the Program, and adjust the Instructor and University employed Facilitator fees accordingly if the audit shows a different payment is necessary in accordance with this Term Sheet.

6. Embanet will work with the key members in the Faculty to create a design and development schedule for the development of Courses, which will be added at a later date as "Schedule B" and form part of this e-Learning Program Term Sheet. Both the University and Embanet will work to achieve the defined timelines for the development of Courses. Should an SME not

5

# Schedule A

meet the mutually agreed development schedule time deadline, Embanet will have no obligation to pay the University the applicable 50% bonus portion of the Course Development Fee, but Embanet may, at its discretion, make a partial or full exception.  The University shall be responsible for any SME costs associated with updating the Courses after the initial Course development.

7.  The tuition per credit rate is set out in this e-Learning Program Term Sheet; however, based on market research, University may implement a tuition rate revision with input from Embanet.

8.  Embanet shall forward the University the Standard Application Fee in accordance with section 4, above.

9.  Should the University change the Learning Management System ("LMS") platform(s) at any time during the Program Term and when Courses are in session, Embanet and the University agree that the cost of these migrations is not included in this Program Term Sheet and may negotiate a separate migration fee per Course, payable within 30 days of invoice.

10. To better understand and promote the University's core values and curriculum, Embanet may at its discretion, allow its current employees to enroll and complete this Program and both the tuition and Standard Application Fees will be waived, and the Embanet employee(s) will not be counted in the tiering levels of the Service Fee/Business Model.  To be admitted into the Program, Embanet employees must submit a student application and meet the entrance criteria of the University.

11. The University and Embanet will mutually agree to any tuition discounts offered to students employed by corporations enrolled in Embanet's business to business program and immediate family members of such persons.

12. The University may establish any tuition discounts offered by it to students enrolled through the University's business to business agreements.  The University will forward copies of any executed business to business relationship contracts to Embanet within 30 days.

The parties hereby approve this e-Learning Program Term Sheet.

Embanet ULC

Name: Philip Kim

Title: VP & Corporate Controller

Date: March 9, 2010

Washington State University

Name: Richard A. Heath
Sr. Associate Vice President

Title: Washington State University

Date: 3/18/10

6

APPROVED AS TO FORM:

Asst. Atty. Gen.

18 day of March , 2010

# Schedule B

## Embanet ULC- Washington State University
## e-Learning Program Term Sheet

Upon execution by the parties, this e-Learning Program Term Sheet ("Term Sheet") will be attached and form part of the e-Learning Program Master Services Agreement (the "Agreement") between Embanet ULC ("Embanet") and Washington State University on behalf of its College of Business (the "University").  In the event of any inconsistency between the terms and conditions of the Term Sheet and the Agreement, the terms and conditions of this Term Sheet will prevail.

1.  e-Learning Program ("Program"):    Master in Business Administration

2.  Number of Courses in the Program:  The following 13 Courses make up the Program:
    a)  Fin 526            Problems in Financial Management
    b)  Acctg 533          Administrative Control
    c)  MIS 580            Information Systems Management
    d)  MgtOps 593         Managerial Leadership and Productivity
    e)  MgtOps 591         Statistical Analysis for Business Decisions
    f)  Mktg 506           Marketing Management and Administrative Policy
    g)  MgtOps 590         Strategy Formulation and Organizational Design
    h)  HBM 581            Services Management
    i)  Entrp 501          Business Plan Competition
    j)  Elective I         3 credits
    k)  Elective II        3 credits
    l)  Elective III       3 credits
    m)  BA 702             3 credits required in final term for final exam (business plan competition

3.  Per credit hour tuition rate:    $ 750 or such higher amount from time to time as may be set by the University with input from Embanet.  See Note 5 below.

4.  Entry Points per Year: 2 6 *Read P.R.*

5.  Total number of anticipated on-line Courses: 13

6.  Current Learning Management System (LMS) utilized if any: Angel (See Note 7 below.)

7.  Learning Management System (LMS) that the e-learning program is to utilize initially for this Term Sheet:  Angel

8.  Financial aid to be made available to students (Yes/No)?        Yes

1

# Schedule B

9. Embanet's Duties. The following services shall be provided by Embanet to the University, as applicable (Yes/No/optional):

| Functional Area | Specific Service | Yes/No |
|---|---|---|
| Academic | Instructional Design & Course Development | No |
| Academic | Facilitator Recruitment | No |
| Academic | Facilitator Management | No |
| Academic | Faculty and Facilitator Training | No |
| Marketing & Enrollment | Campaign Design | Yes |
| Marketing & Enrollment | Testing, Analysis and Optimization | Yes |
| Marketing & Enrollment | Lead Generation | Yes |
| Marketing & Enrollment | Applicant Evaluation/Admissions | Yes |
| Finance | Tuition Billing & Collections | Optional |
| Technology Services & Support | eLearning Platform Selection and Implementation | No |
| Technology Services & Support | Tier 1 Data Center Hosting | No |
| Technology Services & Support | 24/7/365 Help Desk Support | No |
| Program Management/ Student Services | Training | No |
| Program Management/ Student Services | Facilitator Support | No |
| Program Management/ Student Services | e-Learning Program Student Retention Management | Yes |

**Responsible Parties/Contact Information:**

Embanet ULC
Name: Steve Fireng
Title:  CEO

Address:
225 Sparks Avenue
Toronto, ON M2H 2S5
Canada

Phone: (416) 494-6622 x 2241

School: Washington State University
Name:  Dave Sprott, Ph.D.
Title:   Associate Dean of Graduate,
        International & Professional Programs
Address: College of Business
        P.O. Box 644750
        Pullman, WA 99164-4750

Phone: (509) 335-6896

2

# Schedule B

**Service Fee/Business Model (Section 5.1 of the Agreement)**

Revenue Share Model for New Students

The revenue share table below applies to any new students.

| | |
|---|---|
| 35% | 65% |

Revenue Share Model for Existing Students

The revenue share table below applies to any currently-enrolled University students who are in the existing on-line MBA offered by the University as of the effective date of the new E-Learning MBA Program.

| | |
|---|---|
| 10% | 90% |

For the purposes of determining the Service Fee under all scenarios, the calculation is based on a current census of the student population taken on the Census Date and for Business to Business Students will be based on tuition revenue net of any discounts provided.

**Minimum Annual Revenue Target ("Target")**
The Minimum Annual Revenue Targets for Gross Receipts to be retained by the University for each Program are:

| Target | Gross Receipts retained by the University* |
|---|---|
| Year 4 of the Program | $800,000 |
| Year 5 of the Program | $1,000,000 |
| Year 6 of the Program | $1,200,000 |
| Year 7 of the Program | $1,400,000 |
| Year 8 of the Program | $1,600,000 |
| Year 9 of the Program | $1,800,000 |

* i.e; after paying Service Fees to Embanet.

The Targets referred to in the above table are minimum targets and will be measured within thirty (30) days after the completion of each year of the Program for the twelve month period immediately preceding. In the event that an annual Target of the Program has not been met, the University may, within sixty (60) days of the end of that respective year, exercise its right at that time to terminate the Program ("Termination Right") pursuant to section 8.2.3 of the Agreement. If the target for any year thereafter has not been met, the University may, within sixty (60) days of the end of that year, exercise its right to terminate the Program pursuant to section 8.2.3 of the

3

# Schedule B

Agreement. If the University does not exercise its Termination Right during this time the Termination Right for the applicable year will expire.

**Masters of Business Administration Exclusivity**

The Parties recognize the competitive nature of the Masters of Business Administration ("MBA") program in the Washington State area and, as consideration for the University entering into this Term Sheet, Embanet shall, during the Term of the Agreement, not provide the EMBA e-Learning Program to the following institutions: (1) University of Washington, and (2) Eastern Washington University. In addition, Embanet agrees to a two (2) year exclusivity for the State of Washington for the Program. The two (2) years commence upon the execution of this Term Sheet and remain for the duration of the Term Sheet.

## Notes to the e-Learning Program Term Sheet

1.  For the purposes of determining the Service Fee, as set out in section 5.1 of the Agreement, Embanet applies the Service Fee/Business Model above on a Course by Course basis. The calculation is based on a current census of the student population taken on the Census Date. The revenue sharing is 35/65 for each Course.

2.  Upon receipt of a completed student application, the University shall process the application and communicate their decision to Embanet within five business days.

3.  University agrees that Embanet will notify the students of acceptance in the Program and will then proceed to work with the students to ensure they are registered in the required Courses.

4.  Embanet and the University will take a census of students enrolled on the Census Date. For e-Learning student tuition collected by the University, the University shall distribute to Embanet the above stated Service Fees no later than thirty days after the Census Date. Late payments will be subject to interest at the rate of 1.0% per month.

5.  The tuition per credit rate is set out in this e-Learning Program Term Sheet; however, based on market research University may implement a tuition rate revision with input from Embanet.

6.  Embanet shall forward the University the standard application fee, if any, in accordance with section 4, above.

7.  Should the University change the Learning Management System ("LMS") platform(s) at any time during the Program Term and when Courses are in session, Embanet and the University agree that the cost of these migrations is not included in this Program Term Sheet and may negotiate a separate migration fee per Course, payable within 30 days of invoice.

4

# Schedule B

8. To better understand and promote the University's core values and curriculum, Embanet may at its discretion, allow its current employees to enroll and complete this Program and both the tuition and Standard Application Fees will be waived, and the Embanet employee(s) will not be counted in the tiering levels of the Service Fee/Business Model.  To be admitted into the Program, Embanet employees must submit a student application and meet the entrance criteria of the University.

9. The University and Embanet will mutually agree to any tuition discounts offered to students employed by corporations enrolled in Embanet's business to business program and immediate family members of such persons.

10. The University may establish any tuition discounts offered by it to students enrolled through the University's business to business agreements.  The University will forward copies of any executed business to business relationship contracts to Embanet within 30 days.

The parties hereby approve this e-Learning Program Term Sheet.

Embanet ULC

Name: Philip Kim

Title: VP and Corporate Controller

Date: *March 9, 2010*

Washington State University

Name: Richard A. Heath
      Sr. Associate Vice President

Title: Washington State University

Date: *3/18/10*

APPROVED AS TO FORM:

Assk Atty. Gen.

18 day of March , 20 10

5

WSU Contract No. _18535_

# Pearson Online Learning Services

### AMENDMENT 2 TO E-LEARNING PROGRAM MASTER SERVICES AGREEMENT

**THIS AMENDMENT 2 TO E-LEARNING PROGRAM MASTER SERVICES AGREEMENT** ("Amendment 2") is entered into by and between Embanet ULC ("Pearson") and Washington State University ("University"), effective as of the date of the last signature below ("Effective Date").  Pearson and the University will be singularly referred to herein as a "Party" and collectively as the "Parties."

**WHEREAS,** the Parties entered into the e-Learning Program Master Services Agreement effective February 24, 2010, and designated WSU Contract #18535 ("Agreement");

**WHEREAS,** the Parties entered into the Amendment to e-Learning Program Master Services Agreement effective June 28, 2011 ("Amendment 1");

**WHEREAS,** the Parties desire to amend the Agreement on the terms and conditions set forth in this Amendment 2;

**NOW THEREFORE,** the Parties hereby agree to amend the Agreement as follows:

1.	All references to "Embanet" and hereby changed to "Pearson."

2.	The table and associated text on page 3 of Schedule B – e-Learning Program Term Sheet for the Master in Business Administration Program ("Schedule B"), under the heading "Service Fee/Business Model (Section 5.1 of the Agreement)," are amended to provide as follows:

"Revenue Share Model for All Students

Except as otherwise set forth herein, the revenue share table below applies to all students enrolled in e-Learning Program Courses:

| Pearson Gross Receipts % | University Gross Receipts % |
|---|---|
| 35% | 65%" |

3.	The following is inserted onto page 3 of Schedule B under the heading "Service Fee/Business Model (Section 5.1 of the Agreement)":

"Revenue Share Model for On-Ground (Pullman, Tri-Cities, Vancouver campus) MBA Students in existing WSU programs.

The revenue share table below applies to the first eight (8) foundation and elective/core e-Learning Program Course enrollments taken by a student enrolled in the University's traditional on-ground MBA programs in Pullman, Tri-Cities, and Vancouver (each, an

'On-Ground MBA Student'); provided, however, that the "Revenue Share Model for All Students" shall apply in the event an On-Ground MBA Student transfers into the e-Learning Program (collectively, 'On-Ground MBA Students'):

| Pearson Gross Receipts % | University Gross Receipts % |
|---|---|
| 15% | 85%" |

4.      The campuses that have On-Ground MBA Students will retain the responsibilities of recruiting and referring students for admission to their respective programs. Pullman campus will retain its respective duties as well including but not limited to setting admissions standards, admissions processing and advising. Those campuses will initiate the advisement of students to enroll in up to the first eight (8) foundation and elective/core e-Learning Program Course enrollments subsequently taken by a student.

5. All other terms and conditions of the Agreement shall remain in full force and effect.

The Parties have executed this Amendment 2 on the date of the last signature below, effective as of the Effective Date.

**Embanet ULC**

By: _____
Name:  Todd Hitchcock
Title:  Chief Operating Officer
Date:   05/12/2016

**Washington State University**

By: _____
Name: Amanda Owen
Title: Contracts Manager
Date: _____ 5/2/16 _____

WSU Contract No. ____21922____



GP Strategies Corporation
University Partnership Agreement

This University Partnership Agreement is entered into by and between Washington State University, with its principal offices located at Pullman, WA (hereinafter "Educational Institution") and GP Strategies Corporation, with its principal offices located at 70 Corporate Center, 11000 Broken Land Parkway, Suite 200, Columbia, MD, 20144 (hereinafter "Company"). (hereinafter "Company").

## 1. Purpose

Company is a third-party service provider for educational services for a number of organizations (hereinafter "Client"). Company is acting as agent on behalf of these Clients with respect to providing such educational services. The purpose of this Agreement is to state the terms and conditions of the services to be provided by each party as well as the services that will be provided to the Clients that Company represents. These services are more fully set forth in the Statement of Work incorporated as part of this Agreement.

## 2. Term

This Agreement shall become effective the date both parties sign this Agreement and shall continue for a period of three (3) years. This Agreement may be renewed for an additional three (3) year term upon mutual written agreement between the parties. Each party agrees to send to the other its intent to either renew or not to renew at least sixty (60) days prior to the renewal date during which time, if applicable, the parties will meet and confer with respect to the terms of the renewal. If no intent to renew or not renew if timely given, this Agreement shall terminate at the end of the three (3) year term.

## 3. Student Privacy

The parties acknowledge that they are subject to and will fully comply with the privacy regulations outlined in the Family Education Rights and Privacy Act, 20 U.S.C § 1232g; 34 CFR Part 99, as amended (FERPA) for the handling of student information. No party shall disclose or use any student information except to the extent necessary to carry out their obligations under this Agreement and as permitted by FERPA.

## 4. Confidential and Proprietary Information

To further their discussion of various business matters, the parties anticipate that they will disclose confidential, proprietary or trade secret information to each other. "Proprietary Information" means any information disclosed by one party ("Disclosing Party") to the other party, ("Receiving Party"), including, without limitation business records and files, manuals, software, financial data, budgetary information, income and sales data or projections, customers lists, facilities, suppliers, designs, plans, techniques, processes, formulas, drawings, concepts, developments, experiments, and market analyses.

### 4.1 Nondisclosure of Proprietary Information

The Receiving Party agrees (i) to hold the Disclosing Party's Proprietary Information in confidence and to take all necessary precautions to protect such Proprietary Information including, without limitation, all precautions the Receiving Party employs with respect to its own confidential materials, but in no event less than reasonable precautions (ii) not to disclose, provide or make available any such Proprietary Information or any information derived therefrom to any third person, (iii) not to make any use of such Proprietary Information, except for the evaluation contemplated by this Agreement. The Receiving Party further agrees to limit the use of and access to the Disclosing Party's Proprietary Information to the Receiving Party's employees, directors, officers, consultants and agents who need to know such Proprietary Information for said purposes and shall cause such employees, directors, officers, consultants and agents to comply with the obligations set for herein (all such consultants and agents shall agree in writing to safeguard such Proprietary Information). The obligations of non-use and non-disclosure set forth in this Agreement shall survive for a period of three (3) years from the date of disclosure of the Proprietary Information.

### 4.2 Exceptions to the Restrictions on Use and Disclosure

The Disclosing Party agrees that the restrictions on disclosure and use set forth in this Agreement shall not apply with respect to information that (i) is in the public domain at the time it is disclosed or becomes part of the public domain after disclosure without Receiving Party's breach of any obligation owed to Disclosing Party, (ii) was in the possession of the Receiving Party or known by it prior to receipt from the Disclosing Party, (iii) was rightfully disclosed to the Receiving Party by a third party without restriction, (iv) was independently developed by the Receiving Party without access to such Proprietary Information, (v) was disclosed to a third party by the Disclosing Party without restrictions on disclosure and use similar to those found in this Agreement or (vi) is required to be disclosed pursuant to any statutory or regulatory authority, including, but not limited to, the Washington State Public Records Act, or court order, provided the Receiving Party has given the Disclosing Party prompt notice of such requirement and the opportunity to contest it.

### 4.3 Ownership and Return of Proprietary Information

Each party acknowledges and agrees that the Proprietary Information shall belong to and shall remain the sole and exclusive property of the Disclosing Party, and, that disclosure and use pursuant to this Agreement shall not constitute a transfer, assignment, or conveyance or any right to own, use, or possess such Proprietary Information by the Receiving Party. Upon written request by the Disclosing Party, the Receiving Party shall promptly return to the Disclosing Party all Proprietary Information of the Disclosing Party and all documents or media containing any such Proprietary Information and all copies or extracts thereof and will promptly and permanently delete any Proprietary Information which is electronically or optically recorded or stored.

### 4.4 Disclaimer of Warranties and Limitation of Liability.

No warranties of any kind (including implied warranties or merchantability or fitness for a particular purpose) are given with respect to the proprietary information disclosed or used under this agreement, and neither party shall be liable to the other for damages arising out of our caused by defects or deficiencies in the proprietary information of either party, whether direct, incidental, consequential, or otherwise.

### 4.5 Acknowledgement of Disclosing Party.

The Disclosing Party understands and agrees that the Receiving Party may, currently or in the future, be developing information internally, or receiving information from third parties, which may be similar to the Disclosing Party's Proprietary Information. Nothing in this Agreement shall be construed as a representation or inference that the Receiving Party will not develop products, strategies or plans, for itself or others, which compete with the products, strategies or plans contemplated by the Disclosing Party's Proprietary Information.

### 5.    Educational Institution's Contact

Questions or concerns regarding this agreement shall be directed to the following person:

Alaina McCully
Engineering & Technology Mgt
Eng Tch/res 303
Pullman, WA 99164-2780
509-335-5595
mccully@wsu.edu

### 6.    Organization's Contact

Questions or concerns regarding this agreement shall be directed to the following person:

Heather Koschmann
University Partnership Manager
GP Strategies Corporation
300 E Big Beaver, Suite 300
Troy, MI 48083
248.729.4288
hkoschmann@gpstrategies.com
universityrelations@gpstrategies.com

Invoices should be directed to:
Boeing Learning Together Program (LTP)
PO Box 99639
Troy, MI 48099-9639
Boeingltp@gpstrategies.com

The signatories to this University Partnership Agreement represent and warrant that each has the right and authority to execute this Agreement in their individual or representative capacity, as applicable.

**Washington State University**

Approved By:

_____

Amanda Owen
Contracts Manager, Finance and Administration

$\dfrac{8/11/14}{\text{Date}}$

Recommended By:

_____

Jerman Rose
Interim Vice Provost

$\dfrac{8/12/14}{\text{Date}}$

**GP Strategies Corporation**

_____

Jennifer Dobaczewski
Director, Learning Solutions
GP Strategies Corporation

August 8, 2014
Date

**Statement of Work –Boeing**

In return for designation as a Boeing Company university partner, the Educational Institution shall:

1. Grant all Boeing Company eligible participants preferred pricing equivalent to a 5% discount off the MBA tuition for the WSU online MBA. Greater tuition discounts are negotiable with larger numbers of enrolled students from Boeing.
2. Make available to all Boeing Company eligible participants the opportunity to enroll in courses, certificates and degrees from the Engineering and Technology Management online program. Eligible company participants will also have access to other Voiland College of Engineering and Architecture online courses as available from individual college schools or departments.
3. Invoice Company for tuition and approved academic fees after the institution's drop/add period and no more than 90 days after the class/subject end date indicating the published tuition costs and the discounted amount per student. Invoice must include, at a minimum, invoice number and date, degree program, semester and year, student name, course name, per course/program academic credits or continuing education units (CEUs), detailed line item breakdown of tuition and academic fees, discount and total. A copy of the enrollment voucher provided by the student at the time of registration must accompany the invoice. Invoices must not be submitted prior to the class start date.
4. The voucher is valid one-time only for payment of tuition and eligible fees, up to the annual funding limits, for courses specified on the voucher.
5. Educational Institution shall invoice tuition and eligible fees per employee, per course up to the Boeing Company annual program fund limits. The Boeing Company paid courses, programs, or fees earning refunds will be issued to Company and processed by Company on behalf of the Boeing Company. Payment shall be made to Washington State University as provided in each invoice.
6. Any amount owed for courses or related expenses, above and beyond the annual funding limits, must be billed directly to the student.
7. Subject to FERPA and any applicable law, Educational Institution may provide enrollment reports to Company.
8. Route all program communication through Company contact referenced in Agreement, Section

Company shall:

1. Display of Educational Institution's logo (as indicated at Exhibit A), website address, and program information will be highlighted on Company's tuition program management online system which will be accessible to Boeing Company employees.
2. Distribute Educational Institution's printed materials as acceptable or directed by The Boeing Company.
3. Highlight Educational Institution via system announcements as mutually agreed to between The Boeing Company and Educational Institution.

GP Strategies Corporation
University Partnership Agreement

Exhibit A

Washington State University Marks

Download file from brand.wsu.edu



# What's in your logo package

This is your PRIMARY unit logo. Your first choice for all communication.
There are two configurations of your logo, so you can choose the one that best fits the space.

WSU-Voiland Engr amp Arch-Logo_Unit 2                    WSU-Voiland Engr amp Arch-Logo_Unit 3

 Voiland College of
Engineering & Architecture
WASHINGTON STATE UNIVERSITY

 Voiland College
of Engineering
& Architecture
WASHINGTON STATE UNIVERSITY

• SPOT: For 2-color printing—business cards, letterhead, etc.

 Voiland College of
Engineering & Architecture
WASHINGTON STATE UNIVERSITY

 Voiland College
of Engineering
& Architecture
WASHINGTON STATE UNIVERSITY

• CMYK: For 4-color printing—brochures, etc.

 Voiland College of
Engineering & Architecture
WASHINGTON STATE UNIVERSITY

 Voiland College
of Engineering
& Architecture
WASHINGTON STATE UNIVERSITY

• RGB: For websites and PowerPoint presentations

 Voiland College of
Engineering & Architecture
WASHINGTON STATE UNIVERSITY

 Voiland College
of Engineering
& Architecture
WASHINGTON STATE UNIVERSITY

• BLK: For 1-color printing

 Voiland College of
Engineering & Architecture
WASHINGTON STATE UNIVERSITY

 Voiland College
of Engineering
& Architecture
WASHINGTON STATE UNIVERSITY

• BLK-B65: For 1-color printing with a shade of gray

Voiland College of
Engineering & Architecture
WASHINGTON STATE UNIVERSITY

Voiland College
of Engineering
& Architecture
WASHINGTON STATE UNIVERSITY

• WHITE: To put on a dark background



• **Social media badge** for Facebook, Twitter and other social media sites.

# Secondary-Abbreviated logos

There are two configurations of your abbreviated logo,
so you can choose the one that best fits the space.

**WSU-Voiland Engr amp Arch-Logo_Abbrv-Hrzn 2**          **WSU-Voiland Engr amp Arch-Logo_Abbrv-Hrzn 3**

 Voiland College of Engineering & Architecture           Voiland College of Engineering & Architecture

• SPOT: For 2-color printing—business cards, letterhead, etc.

 Voiland College of Engineering & Architecture           Voiland College of Engineering & Architecture

• CMYK: For 4-color printing—brochures, etc.

 Voiland College of Engineering & Architecture           Voiland College of Engineering & Architecture

• RGB: For websites and PowerPoint presentations

 Voiland College of Engineering & Architecture           Voiland College of Engineering & Architecture

• BLK: For 1-color printing

 Voiland College of Engineering & Architecture           Voiland College of Engineering & Architecture

• BLK-B65: For 1-color printing with a shade of gray

 Voiland College of Engineering & Architecture           Voiland College of Engineering & Architecture

• WHITE: To put on a dark background



• **Social media badge** for Facebook, Twitter and other social media sites.

# What's in your logo package

This is your PRIMARY unit logo. Your first choice for all communication.
There are two configurations of your logo, so you can choose the one that best fits the space.

WSU-Carson-Busin-Logo_Unit 1                                    WSU-Carson-Busin-Logo_Unit 2

 **Carson College of Business**
WASHINGTON STATE UNIVERSITY

 **Carson College of Business**
WASHINGTON STATE UNIVERSITY

• SPOT: For 2-color printing—business cards, letterhead, etc.

 **Carson College of Business**
WASHINGTON STATE UNIVERSITY

 **Carson College of Business**
WASHINGTON STATE UNIVERSITY

• CMYK: For 4-color printing—brochures, etc.

 **Carson College of Business**
WASHINGTON STATE UNIVERSITY

 **Carson College of Business**
WASHINGTON STATE UNIVERSITY

• RGB: For websites and PowerPoint presentations

 **Carson College of Business**
WASHINGTON STATE UNIVERSITY

 **Carson College of Business**
WASHINGTON STATE UNIVERSITY

• BLK: For 1-color printing

 **Carson College of Business**
WASHINGTON STATE UNIVERSITY

 **Carson College of Business**
WASHINGTON STATE UNIVERSITY

• BLK-B65: For 1-color printing with a shade of gray

 **Carson College of Business**
WASHINGTON STATE UNIVERSITY

 **Carson College of Business**
WASHINGTON STATE UNIVERSITY

• WHITE: To put on a dark background



• **Social media badge** for Facebook, Twitter and other social media sites.

# Secondary-Abbreviated logos

There are two configurations of your abbreviated logo,
so you can choose the one that best fits the space.

WSU-Carson-Busin-Logo_Abbrv-Hrzn 1                    WSU-Carson-Busin-Logo_Abbrv-Hrzn 2

 Carson College of Business         Carson College
of Business

• SPOT: For 2-color printing—business cards, letterhead, etc.

 Carson College of Business         Carson College
of Business

• CMYK: For 4-color printing—brochures, etc.

 Carson College of Business         Carson College
of Business

• RGB: For websites and PowerPoint presentations

 Carson College of Business         Carson College
of Business

• BLK: For 1-color printing

 Carson College of Business         Carson College
of Business

• BLK-B65: For 1-color printing with a shade of gray

 Carson College of Business        Carson College
of Business

• WHITE: To put on a dark background



• **Social media badge** for Facebook, Twitter and other social media sites.

 **Human Resources**



# Learning Together Program
## Fields of Study – Approved

| Field of Study | Major (Examples) |
|---|---|
| **Aviation Studies** | Aeronautical Science / Technology |
| | Air Traffic Control |
| | Aircraft Design |
| | Airframe & Powerplant |
| | Aviation Maintenance |
| | Aviation Management |
| | Avionics / Avionics Technology |
| | Flight Training |
| | Ground School |
| **Business** | Accounting |
| | Business Administration |
| | Corporate Sustainability |
| | Economics |
| | Ethics |
| | Finance |
| | Financial Engineering |
| | Innovation |

Subject to Change

| | |
|---|---|
| | Marketing |
| | Office Administration |
| | Office Professional |
| | Organizational Administration |
| | Secretarial Studies |
| **Chemistry (*)** | Biochemistry |
| | Chemistry |
| | Physical Chemistry |
| | Polymer Science |
| **Communication** | Communications |
| | English as a Second Language |
| | Public Communications |
| | Public Relations |
| | Sign Language |
| | Technical Writing |
| | Telecommunications |
| **Computer Science (*)** | Artificial Intelligence |
| | Computer Graphics and Visualization |
| | Computer Science |
| | Software Development |
| **Cyber Security (*)** | CISSP Studies |
| | Cyber Security |
| | Information Security and Assurance |
| | Information Systems Security |
| | Information Security Technology and Management |
| **Engineering (*)** | Engineering – Aerospace / Aeronautical |
| | Engineering - Biological |
| | Engineering - Chemical |

Subject to Change

|  | Engineering - Civil |
|---|---|
|  | Engineering - Computer |
|  | Engineering – Electrical / Electronics |
|  | Engineering - Environmental |
|  | Engineering - Flight |
|  | Engineering - General |
|  | Engineering - Human Factors |
|  | Engineering - Industrial |
|  | Engineering - Manufacturing |
|  | Engineering - Manufacturing Engineering Technology |
|  | Engineering - Materials |
|  | Engineering - Mechanical & Structures |
|  | Engineering – Modeling & Simulation |
|  | Engineering - Software |
|  | Engineering - Systems |
|  | Product Lifecycle Management |
| **Environmental Health and Safety** | Environmental Air Quality / Emissions / Pollution |
|  | Environmental Occupational Health and Safety |
|  | Ergonomics |
|  | Safety / Safety Management |
| **Geospatial Studies (*)** | Geographic / Geography Information Systems |
|  | Geographical Information Science |
|  | Geoinformatics and Geospatial Information Sciences |
|  | Geospatial Intelligence |
|  | Geospatial Studies |
| **Human Resources** | Benefits Administration |

| | |
|---|---|
| | Conflict Resolution |
| | Disability Management |
| | EEO Investigations |
| | Human Resources |
| | Human Resources Management |
| | Industrial / Labor Relations |
| | Instructional Design and Development |
| | Organizational Behavior |
| | Organizational Development |
| | Organizational Leadership |
| | Organizational Management |
| **Information Systems/Technology** | A+ Certification |
| | Adobe |
| | C++ / C# |
| | CAD / CAM |
| | CISCO Studies |
| | Computer Information Systems |
| | Computer Programming |
| | Configuration Management |
| | Data Management |
| | Desktop Applications / Software |
| | Dreamweaver |
| | HTML |
| | Information Assurance |
| | Information systems / Technology |
| | JAVA |
| | Management Information systems |
| | .Net |
| | Oracle |

| | Web Development and Design |
| --- | --- |
| | Windows |
| **Intelligence Studies (**)** | Defense Strategies |
| | Homeland Security |
| | Intelligence Studies |
| | Military Science |
| | Strategic Intelligence |
| | Terrorism / Counter-Terrorism / Anti-Terrorism |
| **Management** | Business Management |
| | Engineering Management |
| | Management |
| | Manufacturing Management |
| | Operations Management |
| | Product Management |
| | Program Management |
| | Project Management |
| | Technical / Technology Management |
| **Manufacturing** | Aircraft Interior |
| | Assembly / Fabrication |
| | Blueprint reading |
| | CNC Programming |
| | Composites Assembly / Fabrication / Technology |
| | Drafting |
| | Electronics / Electrical Technology |
| | Machine Tooling |
| | Machinist |
| | Non-destructive Testing (NDT) |
| | Sheet metal Assembly / Fabrication |
| **Mathematics (*)** | Algebra |
| | Calculus |
| | Math |

|  | Predictive Analysis |
|---|---|
|  | Probability |
|  | Quantitative Analysis |
|  | Statistics |
| **Physics (*)** | Physics |
| **Quality** | ISO / AS9100 Studies |
|  | Lean / Green Studies |
|  | Non-destructive Test (NDT) |
|  | Quality Assurance |
|  | Quality Control |
|  | Quality Inspections |
|  | Quality Systems Management |
|  | Six Sigma Studies |
| **Supply Chain** | Acquisitions / Mergers |
|  | Contracts |
|  | Import / Export control |
|  | Inventory control |
|  | Logistics |
|  | Materials Management |
|  | Supply Chain / Supply Chain Management |

**(*)** – Special Funding – For Certificate, Bachelor, or Master degree program when taken through  a Preferred School Partner.

**(**)** – Special Funding for these specific programs at American Military University

# Boeing Preferred School Partner-WEBEX Information Share Sessions

Thank you for participating in the Boeing Preferred School Partner WEBEX information sessions.
This document serves as a guide for the development of your presentation. Your presentation time will be 20 minutes with an additional 5 minutes for Q&A or as time permits.

**Institution Name;**

**Date of presentation;**
Fall Session September 19th – 30th

**Presenter Information & Backup Individual(s)**

| Name and Title | Phone | E-mail |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**Presentation Information (To be provided in a PowerPoint Presentation)**
- Number of slides should allow for 20 minutes of presentation material
- Feature programs in Business, Manufacturing, Engineering (Certificate, Bachelors and Masters) please review list of approved field of study document.
- Since this will be an enterprise-wide promotion, online programs with no residency and attractive to full time working adults are encouraged (professional certs, grad certs reduce time commitment for employees to gain the education they may need)
- Provide **specific** info/links to programs that are promoted, any discounts (i.e. tuition, family)
- Focus on school/program uniqueness/value to Boeing employees
- Discuss admission and other processes to obtain credit for degrees (PLA, challenge test)
- Available open enrollment opportunities for fall 2016 or Spring 2017
- Contact information for enrollment or program questions

**WEBEX Presentation Flow**
1. Host (LTP Staff) introduces institution
2. Self Introduction of speakers (name, title, role)
3. Speaker presents
4. Closing/additional points
5. Q&A

## Thank you!
Please send your completed PowerPoint slides to rhonda.g.fuller@boeing.com **no later than Wednesday September 7, 2016.**
This will allow time for an LTP review and to address questions for clarification.
Following your information session, the presentations will be posted on the Learning Together Program website for employee access.

Questions call Rhonda Fuller at: 562 797-8380.

WSU Contract #18535

**PROGRAM TERM SHEET ADDENDUM**
**e-LEARNING PROGRAM**
**EMBANET ULC and WASHINGTON STATE UNIVERSITY**

This Addendum supplements Schedules A & B of the Master Services Agreement between Embanet ULC ("Embanet") and Washington State University (the "University") entered into on March 18, 2010.

1. The following shall be added as Note 11 to Schedule B, the MBA e-Learning Program Term Sheet:

   11. **Students Enrolled in State Supported University Graduate Programs**

   Embanet and the University agree that University graduate students enrolled in University state supported programs (hereafter referred to as "State-Supported Program Graduate Students" or "SSP Graduate Students") may enroll and complete MBA e-Learning Program Courses subject to the following terms:

   a) SSP Graduate Students may only enroll in a Program Course with the permission of the College of Business;
   b) All Program fees (including EMBANET service fees and other charges) will be waived provided that the College employs the existing CDPE (Centre for Distance and Professional Education) infrastructure to support the SSP Graduate Students while enrolled in courses and pays for all related expenses directly or reimburses Embanet for expenses incurred for support as outlined in point 9 of Schedule B;
   c) SSP Graduate Students will be excluded from the tiering threshold calculations set out in the e-Learning Program's Service Fee/Business Model; and
   d) SSP Graduate students will be identified to Embanet through a specific code identifier.

   For the purposes of this provision, "state supported programs" mean those University graduate programs that receive state-supported resources for the delivery of the program and are therefore not "self-supporting."

2. Section 6 of the Notes for Schedule A, the Executive MBA e-Learning Program Term Sheet, is hereby amended as follows:

   "Embanet will work with the key members in the Faculty to create a design and development schedule for the development of Courses, which will be added at a later

date as "Schedule C" and form part of this e-Learning Program Term Sheet.  Both the University and Embanet will work to achieve the defined timelines for the development of Courses.  Should an SME not meet the mutually agreed development schedule time deadline, Embanet will have no obligation to pay the University the applicable 50% bonus portion of the Course Development Fee, but Embanet may, at its discretion, make a partial or full exception.  The University shall be responsible for any SME costs associated with updating the Courses after the initial Course development."

This Addendum is agreed to by the University and Embanet as of May _17_, 2010.

Washington State University

Name: Richard A. Heath
Title: Sr. Associate Vice President
Washington State University

Embanet ULC

Philip Kim
VP and Corporate Controller

# Pearson Embanet™

## ADDENDUM TO

## MASTER SERVICES AGREEMENT:

## STATEMENT OF WORK #1

This Statement of Work #1 ("SOW") is entered into as of the date of last signature indicated below ("Effective Date") by and between Embanet ULC ("Pearson Embanet") and Washington State University, on behalf of its College of Business ("University") as an addendum to and pursuant to the e-Learning Program Master Services Agreement between the Parties effective February 24, 2010, identified by WSU Contract #18535, ("Agreement").

1. **Objectives.**

The objective of the engagement governed by this SOW is to conduct a quality assurance review of courses offered by the University in its online Masters of Business Administration program ("Online MBA Program Courses").

2. **Services.**

Pearson Embanet shall perform the services described on Schedule A hereto (collectively, "Services"). The commencement of the Services shall be no later than June 15, 2014.

3. **Deliverables.**

Pearson Embanet shall provide the University with a report on its quality assurance review of the Online MBA Program Courses within thirty five (30) business days of the commencement of the Services ("Deliverables"). The Deliverables shall be a work made for hire.

4. **University Obligations.**

University shall have the following obligations under this SOW:

a. University shall promptly provide Pearson Embanet course auditors with instructor access to the Online MBA Program Courses by June 15, 2014.

b. University shall provide a single point of contact for troubleshooting issues/technical questions that may arise during the performance of the Services.

5. **Fees and Costs.**

University shall pay Pearson Embanet a total fee of $ 20,600 for the Services ("Service Fee"). University shall pay 25% of the Service Fee within ten (10) days of the execution of this SOW. The remaining 75% of the Service Fee shall be due upon completion of the Services.

This Service Fee is based upon the assumption that all Audited Course content is located within the University's Learning Management System, Angel ("LMS"). Additional fees shall apply if Pearson Embanet course auditors must retrieve Audited Course content or information from outside of the University's LMS.

6. **Additional Terms and Conditions.**

a. Unless otherwise provided herein, capitalized terms in this SOW shall have the same meaning as assigned to them in the Agreement.

b. This SOW shall be governed by the terms and conditions of the Agreement.

c. In the event of any conflict between the terms and conditions of this SOW and the Agreement, the terms and conditions of this SOW shall prevail.

d. Notwithstanding anything in this Agreement to the contract, the access Pearson Embanet auditors shall have to University's LMS shall be limited to the master courses as listed in schedule A. In no event shall Pearson Embanet auditors have access to other University systems or databases, nor to student information protected by law, including but not limited to the Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g; 34 CFR Part 99).

Wherefore, the Parties have entered into this SOW as of the Effective Date.

**Embanet ULC**

By:
_____
Philip Kim
Vice President & Controller
Date : _____

**Washington State University**

Recommended By:

By: _____

David A. Whidbee
Interim Dean, College of Business
Date: _5/21/14_

Approved By:

By: _____

Amanda N. Owen
Contracts Manager
Finance and Administration
Date: _5/19/14_

## Schedule A
### Services

Pearson Embanet shall perform the following Services:

1. Audit of Masters of the following twenty (20) courses ("Audited Courses"):

| Course Code | Course Name |
| --- | --- |
| BA 600 | Introduction to Business Statistics |
| BA 502 | Foundations in Operations Management |
| BA 503 | Foundations of Business Law |
| Acctg 550 | Introduction to Financial and Managerial Accounting |
| BA 501 | Foundations in Marketing |
| Econs 555 | Managerial Economics |
| BA 504 | Foundations in Finance |
| Fin 526 | Problems in Financial Management |
| Mktg 506 | Marketing Management and Administrative Policy |
| Acctg 533 | Administrative Control |
| MgtOp 593 | Managerial Leadership and Productivity |
| MIS 580 | Information Systems Management |
| MgtOp 590 | Strategy Formation and Organizational Design |
| BA 579 | Special Projects or Independent Study (Capstone) |
| BA 579 | Special Projects or Independent Study (Capstone) |
| MIS 580 | IS Mgmt |
| Fin 581 | Intl. Finance |
| IBUS 580 | Intl. Mgmt |
| Mktg 507 | Consumer Behavior |
| Mktg 577 | Promotional Mgmt. |

2. As used in this SOW, "audit" shall mean:
   a. An objective review of the presence or absence of items required in the Audited Courses as set forth in the "Guidelines and Best Practices MBA Online Courses, Spring 2014-Fall 2014" document provided to Pearson Embanet by the College.
   b. A qualitative review of adherence to Best Practices as set forth in "Guidelines and Best Practices MBA Online Courses, Spring 2014-Fall 2014" document provided to Pearson Embanet by the College.

3. The audit will be limited to content that can be accessed within the Learning Management System with Instructor level rights.

**AMENDMENT TO MASTER SERVICES AGREEMENT**
**e-Learning Program**
**WSU Contract #18535**

**PURPOSE**
This writing (Amendment) amends the Master Services Agreement, e-Learning Program contract (Agreement). That Agreement was fully executed March 18, 2010, and assigned WSU contract #18535.

**AMENDMENT**
By their signature below the parties hereby amend the AGREEMENT as follows:

1. In Section 1.1.15 striking the following provision:
   - "Tuition amounts received from students enrolled in an e-Learning Program due to the University's efforts or agreements with business partners and paid at the student referral rate shall be excluded from "Gross Receipts", however, Embanet shall be entitled to compensation for its services related to such students in accordance with the applicable e-Learning Program term sheet."

2. In section 8.3 striking the word "Non-Referred" in line twelve of this provision and the following two phrases:
   - ", and 20% of Gross Receipts collected from Referred Students," and,
   - "Referred Students shall be defined as students enrolled in the eLearning Program as a result of the University's referral of a student to Embanet. Non-Referred Students shall be defined as all other students enrolled in the e-Learning Program."

3. By striking the following language and associated Table from page 3 of "Schedule B" Term sheet:

   - "Revenue Share Model for Existing Students

   The revenue share table below applies to any currently-enrolled University students who are in the existing on-line MBA offered by the University as of the effective date of the new E-Learning MBA Program.

| Embanet Gross Tuition % | University Gross Tuition % |
|---|---|
| 10% | 90% |

4. By changing the following language and associated Table from page 3 of "Schedule B" Term sheet:
   • Revenue Share Model for All Students

The revenue share table below applies to all students:

| Embanet Gross Tuition % | University Gross Tuition % |
|---|---|
| 35% | 65% |

5. This Amendment may be executed in counterpart originals, both of which taken together will be deemed one original

The AGREEMENT in all other respects shall remain unchanged unless modified or amended as provided in that AGREEMENT

SIGNATURES OF AUTHORIZED REPRESENTATIVES OF THE PARTIES

Washington State University

By: _____
Name: _Eric Spangenberg_
Title: _Dean, College of Business_
Date: _6/28/11_

Approved By:

_Barry E. Johnston_
Asst. VP, Business & Finance

APPROVED AS TO FORM:
_____
Asst. Atty. Gen.
_22_ day of _June_, 20_11_

Embanet ULC

By: _____
Name: Philip Kim
Title: VP & Corporate Controller
Date: _June 20/11_