# Exhibit C-6

# OPERATIONAL AGREEMENT

This agreement ("Agreement") is entered into between Academic Partnerships, LLC ("AP") and Stephen F. Austin State University ("SFA"), as of May 13th, 2011 (the "Effective Date"). AP and SFA are sometimes referred to herein each as a "Party", and collectively as the "Parties".

SFA is a higher educational institution that offers undergraduate, graduate, and post-graduate courses.

AP provides marketing services, software for course conversion, and a distribution system suitable for Online Education degree programs.

For fair consideration, the Parties agree to the following:

I. **Definitions.** Capitalized terms used in this Agreement shall have the meanings set forth below or elsewhere in the Agreement.

    A. **"AP Material"** means:

        i) The Distribution System,

        ii) The AP Developed Materials, and

        iii) Any documentation or other materials associated with the foregoing.

    B. **"Course"** means those educational courses offered by SFA to Students that the completion of which results in the award of college credits, which are marketed or distributed in whole or part utilizing the AP Material.

    C. **"Curriculum"** means a group of related Program(s), completion of which results in a degree or other objective.

    D. **"Developed Materials"** means any ideas, designs, development tools, know-how, concepts, documentation, or written materials developed by either Party.

    E. **"Distribution System"** means AP's proprietary software platform.

    F. **"Faculty"** means persons appointed by SFA as SFA faculty to teach the Curriculum as part of the Program(s).

    G. **"Intellectual Property"** means any and all now known or hereafter existing rights associated with (i) works of authorship throughout the world, including exclusive exploitation rights, copyrights, moral rights and mask works; (ii) trade secret rights; (iii) trademark and trade rights; (iv) patents, designs, algorithms and other industrial property rights; (v) other intellectual and proprietary rights of every kind and nature throughout the world whether arising by operation of law, by contract or license or otherwise; and (vi) all registrations, renewals, extensions, combinations, divisions, or reissues of any of the foregoing.

    H. **"Online Education"** means the distribution of academic Programs (defined below) through electronic media.

    **I.** **"Program(s)"** means those educational programs offered by SFA to Students that receive college credits as part of programs, the successful completion of which results in the award of a Course credit, certificate or degree, which programs are marketed or distributed in whole or part utilizing the AP Material. Each program under this term is identified by an executed Program Identification Addendum to this agreement.

    **J.** **"Student(s)"** means a student enrolled in the Program(s).

    **K.** **"SFA Material"** means any material, including without limitation Curriculum, lectures, documentation or related material that is created by SFA, including SFA Developed Materials. For the purposes of this definition, SFA includes any SFA staff, including without limitation Faculty, and any contractors of SFA other than AP except as otherwise provided in this agreement.

**II.**     **AP Obligations.** During the Term of this Agreement, AP shall assist SFA in distributing the Program(s) by rendering the following services and bearing the following obligations (collectively, the "AP Obligations"):

    **A.** **Distribution System.** AP may provide its Distribution System for distributing the Program(s) to Students at the request of SFA, such request not to be unreasonably withheld or denied.

    **B.** **Marketing.** AP will market the Program(s) to prospective Students at least consistent with its marketing efforts for other clients of AP for similar Program(s) and consistent with the standards of the industry. Marketing materials (including any related advertising) will be subject to the prior review and approval of SFA, which approval will not be unreasonably withheld or delayed. Marketing efforts could include, but are not limited to, email campaigns, paid search, online display advertising, landing pages, information sessions, direct mail, online videos, affinity website marketing, broadcast media and social media. AP agrees that in the course of marketing to Students for enrollment in the Program(s) it will (1) perform such marketing in full compliance with all applicable laws, rules, and regulations, including only performing marketing identified as in compliance with the prohibition on incentive compensation rules as expressed in the United State Department of Education "Dear Colleague" letter GEN-11-05 and any subsequent amendment, and (2) not provide any commission, bonus or other incentive payments based directly or indirectly upon success in securing enrollments to any person or entity engaged in any Student recruiting or admission activities, or to any person directly supervising such person, except in accordance with the provisions of 34 C.F.R. 668.14(b)(22)(2011) and the United States Department of Education "Dear Colleague" letter GEN-11-05 of March 17, 2011, any subsequent amendment thereto, and any additional guidance provided by any federal department, and/or any other requirement of the United States Department of Education, the Texas Higher Education Coordinating Board or The Higher Learning Commission of the Southern Association of Colleges and Schools (hereafter collectively the "Education Regulatory Authorities") hereafter in effect, and all such activities will be carried out in accordance with the requirements and standards of all applicable state or federal Education Regulatory Authorities.

    **C.**     **Protection of Student Information.** Under this Agreement, AP may (1) create, (2) receive from or on behalf of University, or (3) have access to, records or record systems ("FERPA Records") that are subject to the Family Educational Rights and Privacy Act (FERPA), (20 U.S.C. § 1232g; 34 CFR Part 99). If such SFA records or record systems are subject to FERPA, then (A) SFA designates AP as a SFA official with a legitimate educational interest in such records and record systems and AP is under SFA's direct control with respect to the use and maintenance of such records and records systems, and (B) AP acknowledges that its improper disclosure or redisclosure of personally identifiable information from such records or record systems will result in AP's exclusion from eligibility to contract with SFA for at

least five (5) years.  AP expressly agrees that it and its employees, contractors, agents, or other persons for which it is responsible:

(1) will only create, receive, or access any such records or record systems solely for the purpose of assisting SFA in the distribution of the Program(s) in accordance with the terms of this Agreement,

(2) will not disclose any such records or records systems except as (a) permitted or required by this Agreement, (b) required by law, or (c) otherwise authorized by SFA in writing, and specifically AP will not disclose any personally identifiable information from such records or records systems to any other party without the prior consent of the applicable parent or eligible student in accordance with 34 C.F.R. §99.33.

(3) will take all necessary measures to safeguard such records or record systems according to reasonable administrative, physical and technical standards that are no less rigorous than the standards by which AP protects its own confidential information, and

(4) continually monitor their operations and take any action necessary to assure that such records and records systems are safeguarded and maintained as confidential in accordance with FERPA and the terms of this Agreement.

Furthermore, AP SHALL INDEMNIFY AND OTHERWISE HOLD HARMLESS SFA FOR ANY BREACH OF OR FAILURE TO COMPLY WITH THIS SECTION II. B., II. C. OR WITH FERPA.

**III. SFA Obligations.**  During the Term of this Agreement, SFA may obtain from AP the services described in Section II above and bearing the following obligations (collectively, the "SFA Obligations"):

A. **Regulatory Approvals, Accreditations, and Licenses.**  SFA will determine and obtain all necessary regulatory approvals and licenses for the Program(s) from such Education Regulatory Authorities as are applicable.

B. **Evaluation of Performance and Granting of Credentials**.  SFA will evaluate the performance of Students enrolled in the Program(s) in such manner as it shall deem appropriate, and shall grant the applicable Course credit and credentials to those Students it has deemed, in the exercise of its sole discretion, to have met its standards for the award of such Course credit and credentials.

C. **Faculty.**  SFA will have and exercise overall academic supervision of all Faculty engaged in the Program(s).

D. **Student Information Systems.**  SFA will be responsible for all Student information systems including maintaining, supporting and administering the student information systems necessary to facilitate and process Student enrollment, including but not limited to enabling Student registration for courses, providing transcripts, and enabling the entering of grades and the tracking of grades.

E. **Financial/Business Oversight.**  SFA will oversee the financial management of the Program(s). SFA will have full control over the number of enrollments to any Program offered under this Agreement.

F. **Intellectual Property Notices.**  SFA will not remove, deface, or obscure any of AP's or its suppliers' copyright or trademark notices and/or legends or other proprietary notices on,

incorporated in, or associated with the AP Materials, the Program(s) or the Distribution System. AP trademarks might appear on business cards, letterhead, websites, emails and other correspondence or marketing materials.

**IV.     License Grants By AP.** AP hereby grants SFA a perpetual, non-exclusive license to use the AP Materials for Online Education for delivery through the Distribution System or as otherwise agreed to in writing by AP; as well as a limited, non-exclusive, worldwide license to use such AP trademarks as are designated in writing by AP, in the form designated by AP, solely for the purpose of marketing the Program(s) that utilize the AP Material and contingent upon AP's prior written approval of each use. Appendix A lists the initial AP trademarks that may be used per this Section. All rights not expressly granted to SFA in this Section IV herein are reserved by AP.

**V.      License Grants by SFA.** SFA hereby grants AP a limited, non-exclusive, worldwide license to use, reproduce, perform, display and distribute the SFA Material including trademarks during the Term as necessary or appropriate to distribute the Program(s) to the Students and or for the purpose of marketing the Program(s) that is contingent upon SFA's prior written approval for use, which shall not be unreasonably withheld. Appendix B lists the initial SFA trademarks that may be used per this Section. All rights not expressly granted to AP in this Section V are reserved by SFA.

**VI.     Ownership.** AP shall retain all ownership of and Intellectual Property rights in the AP Material and SFA retains all ownership of and Intellectual Property rights in the SFA Material.

      **A.     Ownership of AP Intellectual Property.** AP retains all ownership of and Intellectual Property rights in the AP Material.

      **B.     Ownership of SFA Material.** SFA retains all ownership of and Intellectual Property rights in the SFA Material and the SFA trademarks identified in Section V above.

      **C.     Ownership of Developed Materials.** Each Party shall promptly disclose to the other any Intellectual Property arising from or attributed to any of the work or activities undertaken as part of this Agreement. Any right, title and interest in and to any Developed Materials (including any Intellectual Property with respect thereto) arising from or attributed to any of the work or activities undertaken as part of this Agreement shall belong to the Party that creates such Developed Material or Intellectual Property, unless mutually agreed otherwise in writing.

      **D.     Assistance.** Each party agrees to work together to identify the owner of the Developed Material arising from or attributed to any work or activities undertaken as a result of this Agreement and to assist the other Party and/or its nominees in every reasonable way to document, secure, maintain and defend, to the extent allowed by law, each Party's ownership in the Developed Materials and the Intellectual Property rights therein.

      **E.     Transferred Developed Materials.** Any Developed Materials (including any drawings, specifications, plans, computations, sketches, data, photographs, tapes, renderings, models, publications, statements, accounts, reports, studies, and other materials) prepared by AP or its employees, subcontractors, or agents under this Agreement that are to be owned by SFA ("Transferred Developed Materials") are, whether or not accepted or rejected by SFA, the sole property of SFA and for its exclusive use and re-use at any time without further compensation and without any restrictions. The Transferred Developed Materials are included in the SFA Materials as defined in this Agreement.

          AP grants and assigns to SFA all rights and claims of whatever nature and whether now or hereafter arising in and to the Transferred Developed Materials and will cooperate fully with

SFA in any steps SFA may take to obtain or enforce patent, copyright, trademark or like protections with respect to the Transferred Developed Materials.

AP will deliver all Transferred Developed Materials to SFA upon expiration or termination of this Agreement. SFA will have the right to use the Transferred Developed Materials for the completion of the work set forth in this Agreement or otherwise. SFA may, at all times, retain the originals of the Transferred Developed Materials. The Transferred Developed Materials will not be used by any person other than SFA on other projects unless expressly authorized by SFA in writing.

The Transferred Developed Materials will not be used or published by AP or any other party unless expressly authorized by SFA in writing. AP will treat all Transferred Developed Materials as confidential.

All title and interest in the Transferred Developed Materials will vest in SFA and will be deemed to be a work made for hire and made in the course of the work rendered under this Agreement. To the extent that title to any Transferred Developed Materials may not, by operation of law, vest in SFA or Transferred Developed Materials may not be considered works made for hire, AP hereby irrevocably assigns, conveys and transfers to SFA and its successors, licensees and assigns, all rights, title and interest worldwide in and to the Transferred Developed Materials and all proprietary rights therein, including all copyrights, trademarks, service marks, patents, trade secrets, moral rights, all contract and licensing rights and all claims and causes of action with respect to any of the foregoing, whether now known or hereafter to become known. In the event AP has any rights in the Transferred Developed Materials which cannot be assigned, AP agrees to waive enforcement worldwide of the rights against SFA, its successors, licensees, assigns, distributors and customers or, if necessary, to exclusively license the rights, worldwide to SFA with the right to sublicense. These rights are assignable by SFA.

AP represents and warrants that all of AP's Personnel contributing to the Transferred Developed Materials under this Agreement will be required to (i) acknowledge in writing the ownership of AP (for the benefit of SFA) of the Transferred Developed Materials and each element thereof produced by the Personnel while performing services pursuant to this Agreement and (ii) make all assignments necessary to effectuate such ownership. "Personnel" means any and all persons associated with AP who provide any work or work product pursuant to this Agreement, including officers, managers, supervisors, full-time employees, part-time employees, and independent contractors.

**VII.    Term.** The Term of this Agreement commences on the Effective Date and ends on the fifth (5th) anniversary of the Effective Date, unless earlier terminated under Section XII (the "Term"). The Term shall automatically renew for successive three (3) year periods, unless notice of non-renewal is provided by either Party in writing at least twelve (12) months before the expiration of the then current Term.

**VIII.    Payment and Taxes.** Unless otherwise provided in a properly executed Program Identification Addendum, in consideration for the mutual obligations and terms of this Agreement, AP shall receive seventy percent (70%) of designated, statutory, and graduate tuition, as applicable, ("Tuition"). Any payments from SFA to AP shall be derived from and limited to the tuition categories listed above. All other student fees or charges shall be retained by SFA. Tuition received by SFA for the Program(s) shall be remitted to AP within thirty (30) days of the last date a student is eligible for a refund or withdrawal reimbursement for the Program(s) term. Each Party shall be responsible for any and all withholding taxes due; however, any applicable sales tax due for services rendered shall be the responsibility of SFA. This payment shall represent full payment for all services offered by AP collectively, and in no event shall AP be entitled to a separate payment for student recruitment services. This provision shall not apply to Tuition

received from those students enrolled in a similar program prior to this Agreement being executed by the parties.

**IX. INDEMNIFICATION.** AP WILL DEFEND AND INDEMNIFY SFA, TO THE EXTENT PERMITTED BY TEXAS LAW, AGAINST ANY CLAIM THAT ANY AP MATERIAL FURNISHED BY AP HEREUNDER, INCLUDING BUT NOT LIMITED TO TRANSFERRED DEVELOPED MATERIALS, INFRINGES A UNITED STATES COPYRIGHT, PROVIDED THAT: (A) SFA NOTIFIES AP IN WRITING WITHIN THIRTY (30) DAYS OF THE CLAIM; (B) AP HAS SOLE CONTROL OF THE DEFENSE AND ALL RELATED SETTLEMENT NEGOTIATIONS, EXCEPT AS MAY BE REQUIRED BY THE TEXAS OFFICE OF THE ATTORNEY GENERAL; AND (C) SFA PROVIDES AP WITH THE ASSISTANCE, INFORMATION, AND AUTHORITY REASONABLY NECESSARY TO PERFORM THE ABOVE; REASONABLE OUT-OF-POCKET EXPENSES INCURRED BY SFA IN PROVIDING SUCH ASSISTANCE WILL BE REIMBURSED BY AP. HOWEVER, AP SHALL HAVE NO LIABILITY FOR ANY CLAIM OF INTELLECTUAL PROPERTY INFRINGEMENT RESULTING FROM: (A) MODIFICATIONS, UPGRADES OR UPDATES TO THE AP MATERIAL MADE BY SFA; (B) ANY SFA MATERIAL; AND (C) ANY COMBINATION OF THE AP MATERIAL AND SFA MATERIAL WITH OTHER MATERIAL BY SFA THAT, BUT FOR THE COMBINATION, THE AP MATERIAL WOULD NOT BE INFRINGING.

    A. **REMEDIES.** IN THE EVENT THAT SOME OR ALL OF THE AP MATERIAL ARE HELD OR ARE BELIEVED BY AP TO INFRINGE THE INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY, AP SHALL HAVE THE OPTION, AT ITS EXPENSE: (A) TO MODIFY THE AP MATERIAL TO BE NON-INFRINGING; OR (B) TO OBTAIN A LICENSE TO CONTINUE USING THE AP MATERIAL. IF IT IS NOT COMMERCIALLY FEASIBLE TO PERFORM EITHER OF THE ABOVE OPTIONS, THEN AT AP'S REQUEST SFA WILL RETURN THE INFRINGING AP MATERIAL AND RELINQUISH ALL RIGHTS THERETO. UPON RETURN OF THE INFRINGING AP MATERIAL TO AP, SFA MAY TERMINATE THIS AGREEMENT WITH TEN (10) DAYS WRITTEN NOTICE. **THIS SECTION IX STATES AP'S ENTIRE LIABILITY AND SFA'S EXCLUSIVE REMEDY FOR CLAIMS OR DAMAGES RELATED TO INTELLECTUAL PROPERTY INFRINGEMENT.**

**X. LIMITATION OF LIABILITY.**

    **TO THE EXTENT AUTHORIZED BY THE LAWS AND CONSTITUTION OF THE STATE OF TEXAS, NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, REGARDLESS OF THE TYPE OF CLAIM, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), WARRANTY, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY, WHETHER OR NOT FORESEEABLE, AND REGARDLESS OF THE CAUSE OF SUCH DAMAGES, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE.**

    **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, THE LIMITATIONS ON AP'S LIABILITY SET FORTH IN THIS AGREEMENT (INCLUDING THIS SECTION X) WILL NOT APPLY TO AP'S INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT.**

**XI. Warranties.** Each Party represents and warrants to the other Party that (i) it has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder; (ii) the execution and delivery of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all requisite action on the part of such Party regardless of the value of this Agreement or the amount of Revenues generated hereunder; (iii) it is the sole and exclusive owner of all AP Material or SFA Material (as applicable)

developed or has the license to use and sub-license any Intellectual Property owned by third parties and incorporated into such AP Material or SFA Material (as applicable), and that, to the best of its knowledge, such AP Material or SFA Material and the use thereof in accordance with the license terms hereunder does not and will not infringe any third-party right and (iv) this Agreement has been duly executed and delivered on behalf of such Party.

### XII. Termination

A. If either Party materially breaches the terms of this Agreement and fails to correct the breach within 30 days after the non-breaching Party provides written notification, the non-breaching Party may terminate this Agreement.

B. If AP uses the SFA Material, or if SFA uses the AP Material, in any manner that exceeds the licenses granted to such Party herein, and fails to immediately cease within 30 days after provided written notification of such unlicensed use, the other Party may immediately terminate this Agreement with written notice.

C. In the event any federal or state law, regulation, or rule negatively affects a Party's purpose in entering into this Agreement, in the sole discretion of that affected Party, or otherwise fundamentally changes the position of a Party, this Agreement may be terminated upon thirty days written notice.

D. Both parties may mutually agree in writing to terminate this Agreement at any time.

E. Upon expiration or termination, SFA must cease all use of AP Material pursuant to Section IV hereof and return any such material in its possession to AP, provided that the license set forth in Section IV shall survive expiration or termination of the Agreement. Additionally, AP must cease all use of SFA Material and return any such material in its possession to SFA, provided that AP shall have the right to continue to use the SFA Material for the sole purpose of permitting Students then enrolled in the Program(s) to complete such Program(s). Notwithstanding the foregoing, AP may retain one copy of the SFA Material for quality assurance purposes. Sections II, III, and VIII shall survive termination of this Agreement with respect to those students enrolled in the Program(s) on the date of termination until such time as those students cease to be enrolled in the Program(s).

### XIII. General

A. **Relationship Between the Parties.** In connection with this Agreement, each Party is an independent contractor. Each Party will be solely responsible for payment of all compensation owed to its employees, as well as employment related taxes. Each Party will maintain appropriate worker's compensation for its employees. AP and SFA, to the extent permitted by the State of Texas, shall also maintain general liability insurance. The Parties are and shall act as independent contractors and not as an agent or employee of the other Party. Neither this Agreement, nor any terms or conditions contained herein, shall be construed as creating a partnership, joint venture, agency or franchise relationship between the Parties.

B. **Governing Law.** This Agreement, and all matters arising out of or relating to this Agreement, shall be governed by the laws of the State of Texas.

C. **Compliance with Stephen F. Austin University - Regents' Rules and Regulations and Policy Manual.** The Parties intend that this Agreement conform to SFA's – Regents' <u>Rules and Regulations</u> as amended ("Rules and Regulations") and <u>Policy Manual</u> as amended ("Policy Manual"). Should any provision of this Agreement be determined to directly conflict with

provisions of the Rules and Regulations and/or Policy Manual, the Parties will work together in good faith to modify such provisions of the Agreement in a mutually agreeable manner and all other non-conflicting provisions of this Agreement shall remain in full force and effect.

D. **Compliance with Federal, State and Local Laws.** The Parties shall comply with all applicable federal, state and local laws in the conduct of the work supported by this Agreement. Neither Party nor any of its employees are or shall be deemed to be employees of the other Party for any purpose including, without limitation, application of the Fair Labor Standards Act minimum wage and overtime payment provisions, the Federal Insurance Contribution Act, the Social Security Act, the Federal Unemployment Tax Act, the provisions of the Internal Revenue Code, any state or local revenue or tax laws, state workers' compensation laws and state unemployment insurance laws. Each Party accepts full responsibility for payment of all taxes including, without limitation, unemployment compensation insurance premiums, all income tax deductions, Social Security deduction, and any and all other taxes or payroll deductions required for all employees engaged by such Party in the performance of the work supported by this Agreement. Each Party represents and warrants that it is qualified to do business in the geographies in which it will perform its obligations under this Agreement, and will obtain all necessary licenses and permits, and satisfy any other legal, regulatory and administrative requirements, necessary to its performance hereunder.

E. **Declaration Regarding Material Assistance/Non-assistance to a Terrorist Organization.** If applicable, the Parties will provide certification attesting that they do not provide material assistance to any organization on the U.S. Department of State exclusion list.

F. **Equal Opportunity Workplace.** In performing this Agreement, the Parties shall not discriminate against any employee, applicant for employment or other person because of race, religion, color, sex, national origin, disability, age or ancestry. The Parties will take affirmative steps to ensure that applicants are employed and that employees are treated during their employment without regard to race, religion, sex, national origin, disability, age, or ancestry.

G. **Notice.** All notices, including notices of address change, required to be sent hereunder shall be in writing and shall be deemed to have been given when mailed by first class mail to:

> If to AP:
> Academic Partnerships, LLC
> Attn: Chief Financial Officer
> 160 Continental Ave.
> Dallas, TX 75207
> FAX: 214-210-3997
>
> With copy to:
> Academic Partnerships, LLC
> Attn: Legal Dept.
> 2200 Ross Ave., Suite 3800
> Dallas, TX 75201
> FAX No. 214-438-4133
>
> If to SFA:
> Stephen F. Austin State University
> Attn: Provost and VPFA
> 1936 North Street, Austin 309
> Nacogdoches, Texas 75962
> FAX: 936-468-4077

    With copy to:
      Stephen F. Austin State University
      Attn: General Counsel
      1936 North Street, Austin 310
      Nacogdoches, Texas 75962
      FAX: 936-468-3875

  The Parties agree that they each may treat documents faxed by the other Party as original documents; nevertheless, either Party may require the other to exchange original signed documents.

**H. Severability.** In the event any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions of this Agreement will remain in full force.

**I. Waiver.** The waiver by either Party of any default or breach of this Agreement shall not constitute a waiver of any other or subsequent default or breach.

**J. Headings.** The headings appearing in this Agreement are inserted for convenience only, and will not be used to define, limit or enlarge the scope of this Agreement or any of the obligations herein.

**K. Counterparts.** This Agreement may be executed in any number of counterparts, each of which will be an original, and such counterparts together will constitute one and the same instrument. Execution may be effected by delivery of facsimiles of signature pages (and the Parties will follow such delivery by prompt delivery of originals of such pages).

**L. Confidential Information.** Each Party agrees that, except for the purpose of performing its obligations in accordance with the terms of this Agreement, it will not use or disclose to any third party any business or technical information of the other Party which, in the exercise of reasonable judgment, should be recognized by such Party as confidential ("Confidential Information"). The obligation of confidentiality shall not apply to information which: (i) is or becomes part of the public domain through no fault of the disclosing Party; (ii) is furnished by the disclosing Party to others without restrictions on use and disclosure; (iii) becomes known or available to the receiving Party without restriction from a source other than the disclosing Party without breach of any agreement with the disclosing Party; (iv) is disclosed with prior written approval of the other Party; (v) is independently developed by the receiving Party without the use of any Confidential Information; (vi) is previously known to the receiving Party on a non-confidential basis; or (vii) is required by court order or government agency to be disclosed, in which case, the disclosing Party shall give the other Party as much notice as is reasonably practical so that the other Party may seek a protective order or other confidential protection as the other Party, in its sole discretion, may elect and the disclosing Party shall reasonably cooperate with the other Party, at the other Party's expense, in the other Party's efforts to obtain such order or protection. The Parties expressly recognize that SFA, as an entity of the state of Texas, is subject to the Texas Public Information Act and may be required to disclose information classified as "Confidential Information". Any such disclosure shall only be made in accordance with that Act, including its notice provisions, and any disclosure made pursuant to that Act shall not be deemed a breach of this Agreement.

**M. Force Majeure.** Neither Party will be liable for delays or failure in its performance hereunder to the extent such delay or failure is caused by any act of God, war, natural disaster, strike, lockout, labor dispute, work stoppage, fire, third-party criminal act, quarantine restriction or act of government, or any other event beyond the reasonable control of that Party (an "Excusable Delay"). This Agreement may be terminated, with written notice, by either Party under this Section if the Excusable Delay continues for more than 90 days.

N. **Entire Agreement.** This Agreement and any Exhibits and properly executed Addenda hereto constitute the complete agreement between the Parties with respect to the subject matter of this Agreement and supersede all previous and contemporaneous agreements, proposals, or representations, written or oral, concerning such subject matter. Neither this Agreement nor an Exhibit or Addendum may be modified or amended except in writing signed by a duly authorized representative of each Party; no other act, document, usage, or custom shall be deemed to amend or modify this Agreement or an Exhibit or Addendum. The following Sections shall survive the expiration and termination of this Agreement: III.F, IV, VI, VIII, IX, X, XI, XII, and XIII.

O. **Dispute Resolution.** To the extent that Chapter 2260 of the *Texas Government Code*, as it may be amended from time to time ("Chapter 2260"), is applicable to this Agreement and is not preempted by other Applicable Law, the dispute resolution process provided for in Chapter 2260 shall be used, as further described herein, by SFA and AP to attempt to resolve any claim by AP for breach of contract by SFA:

   (1) AP's claims for breach of this Agreement that the Parties cannot resolve pursuant to other provisions of this Agreement or in the ordinary course of business shall be submitted to the negotiation process provided in subchapter B of Chapter 2260. To initiate the process, AP shall submit written notice, as required by subchapter B of Chapter 2260, to SFA in accordance with the notice provisions in this Agreement. AP's notice shall specifically state that the provisions of subchapter B of Chapter 2260 are being invoked, the date and nature of the event giving rise to the claim, the specific contract provision that SFA allegedly breached, the amount of damages AP seeks, and the method used to calculate the damages. Compliance by AP with subchapter B of Chapter 2260 is a required prerequisite to AP's filing a contested case proceeding under subchapter C of Chapter 2260. The Vice President for Finance and Administration of SFA, or such other official of SFA as may be designated from time to time by SFA by written notice thereof to AP in accordance with the notice provisions in this Agreement, shall examine AP's claim and any counterclaim and negotiate with AP in an effort to resolve such claims. Such examination and negotiation may include utilizing a neutral third party, chosen by SFA and AP, to review the dispute and present its findings.
   (2) If the Parties are unable to resolve their disputes under subparagraph (A) of this section, the contested case process provided in subchapter C of Chapter 2260 is AP's sole and exclusive process for seeking a remedy for any and all of AP's claims for breach of this Agreement by SFA.
   (3) Compliance with the contested case process provided in subchapter C of Chapter 2260 is a required prerequisite to seeking consent to sue from the Legislature under Chapter 107 of the Texas Civil Practices and Remedies Code. The Parties hereto specifically agree that (i) neither the execution of this Agreement by SFA nor any other conduct, action or inaction of any representative of SFA relating to this Agreement constitutes or is intended to constitute a waiver of SFA's or the state's sovereign immunity to suit and (ii) SFA has not waived its right to seek redress in the courts.
   (4) The submission, processing and resolution of AP' claim is governed by the published rules adopted by the Texas Attorney General pursuant to Chapter 2260, as currently effective, hereafter enacted or subsequently amended.
   (5) Neither the occurrence of an event giving rise to a breach of contract claim nor the tendency of a claim constitute grounds for the suspension of performance by AP; provided, however, that AP may suspend performance in the event of non-payment by SFA. SFA and AP agree that any periods set forth in this Agreement for notice and cure of defaults are not waived, delayed, or suspended by Chapter 2260 or this section.

**P. Certifications**

    **(1)** Eligibility Certification. AP certifies that pursuant to Sections 2155.004 and 2155.006 of the Texas Government Code it is not ineligible to receive the award of or payments under this Agreement and acknowledges that this Agreement may be terminated and payment withheld if these certifications are inaccurate.

    **(2)** Tax Certification. To the extent applicable and in accordance with Chapter 171 of the Texas Tax Code, AP certifies that it is not currently delinquent in the payment of any taxes due under Chapter 171, or that AP is exempt from the payment of such taxes, or that AP is an out-of-state limited liability corporation that is not subject to the Texas Franchise Tax, whichever is applicable, and acknowledges that this Agreement may be terminated and payment withheld if these certifications are inaccurate.

    **(3)** Payment of Debts or Delinquency to the State.  AP agrees that pursuant to Sections 2107.008 and 2252.903 of the Texas Government Code, that any payments owing to AP under this Agreement may be applied directly toward any debt or delinquency that AP owes the State of Texas or any agency of the State of Texas regardless of when it arises, until such debt or delinquency is paid in full.

    **(4)** Texas Family Code Child Support Certification. AP certifies that pursuant to Section 231.006 of the Texas Family Code it is not ineligible to receive the award of or payment under this Agreement and AP acknowledges that this Agreement may be terminated and payment may be withheld if this certification is inaccurate.

    **(5)** Products and Materials Produced in Texas. To the extent applicable to this Agreement, AP covenants and agrees that pursuant to Section 2155.4441 of the Texas Government Code, in performing its duties and obligations under this Agreement, AP shall purchase products and materials produced in Texas when such products and materials are available at a price and delivery time comparable to products and materials produced outside of Texas.

**Q. Successors and Assigns.** This Agreement will be binding upon, and will inure to the benefit of, the permitted successors and assigns of each Party hereto.  Neither Party may assign, delegate, transfer, or otherwise convey this Agreement or any of its rights hereunder, to any other entity without the prior written consent of the other Party, and any attempted assignment or delegation without such consent shall be void.   Provided, however, either Party may assign, delegate, transfer, or convey this Agreement to a successor third party who obtains control over the assigning Party through sale, merger, or other change in control of the assigning Party, so long as that successor third party agrees to assume and perform all of the assigning Party's duties and obligations under this Agreement.

If such an assignment occurs through sale, merger, or any other change in control of AP, the AP assignee shall assume all of the duties and obligations of AP under this Agreement and notice of such change in control shall be given to SFA within 30 days from the date of such assignment. Should AP be unable to secure such regulatory approval, then SFA shall have the right to terminate the Agreement upon completion of the Programs underway at the time of AP's attempted assignment.  If such assignment is made on behalf of AP to a company that is not affiliated with AP, AP shall provide SFA notice of such assignment as set forth above; however, if SFA makes a good faith determination within 30 days of AP's notice of assignment that such assignee is not a viable provider of services set forth herein or is a competitor of SFA for online Programs, SFA may terminate the Agreement by delivering six months written notice thereof.

| ACADEMIC PARTNERSHIPS, LLC | | Stephen F. Austin State University | |
|---|---|---|---|
| Signature: | *[signature]* | Signature: | *[signature]* |
| Name: | Mike Briskey | Name: | BAKER PATTILLO |
| Title: | CFO | Title: | President |
| Date: | 5/13/11 | Date: | 5-13-11 |

APPENDIX A
(AP Trademarks, including those of its affiliates)

1. ACADEMIC PARTNERSHIPS, LLC
2. AP
3. UNIVERSITY PARTNERS
4. STATEU.COM
5. EPIC
6. EPIC LEARNING

APPENDIX B
(SFA Trademarks)

1. Stephen F. Austin State University
2. SFALOGO
3. SFA

## Stephen F. Austin University Program Identification Addendum No. 1

This Program Identification Addendum ("Addendum") is a supplement to the Operational Agreement dated May 13th, 2011 ("Agreement") between Stephen F. Austin State University ("SFA") and Academic Partnerships, LLC ("AP") and is fully incorporated therein.

1. NAME OF PARTICIPATING SCHOOL:
James I. Perkins College of Education

2. EFFECTIVE DATE OF PROGRAM:
May 2011

3. COURSES TO BE OFFERED:
Standard to Bachelor's Degree and Master's Degree in Education, including pre-requisite courses

4. PROGRAMS AND/OR DEGREES:
Bachelor of Science in Child Development and Family Living (Head Start Completer Program)
Master of Education in Early Childhood Education

5. PAYMENT (This section may replace Section VIII of the Agreement.):

   A. SFA will collect all Revenue and remit to AP 70% of Revenues collected for each course within the specified degree programs within thirty (30) days of the last date a student is eligible for a refund or withdrawal reimbursement for the course term.. Revenue will be defined to include: Undergraduate Degree – Statutory and Designated Tuition (currently totaling $7,324.80/degree; $174.40/hour x 60 hours) and Graduate Degree – Statutory Tuition, Designated Tuition and Graduate Tuition (currently totaling $5,150.80 degree; $204.40/hour x 36 hours)

**ACADEMIC PARTNERSHIPS, LLC**

Signature: _/s/ Mikel Griskey_
Name: Mikel Griskey
Title: CFO
Date: 5/13/11

**Stephen F. Austin State University**

Signature: _/s/ Baker Pattillo_
Name: BAKER PATTILLO
Title: _[illegible]_
Date: 5-13-11