# Exhibit C-11

*Execution*

# DISTANCE EDUCATION AGREEMENT

THIS AGREEMENT is entered into as of February 22, 2012 (the "Effective Date") between Bisk Education, Inc., a Florida Corporation ("Company") and the University of Florida Board of Trustees a public body corporate of the state of Florida for the benefit of the University of Florida Distance and Continuing Education ("University").

## I.    INTRODUCTION

The University and the Company have entered into this Agreement for the purpose of creating, marketing, promoting, and delivering an online program to working professionals and other non-traditional learners.

Company is a corporation specializing in learning management technology and course development, worldwide marketing and learner recruitment, and support services for distance education.  Under Article IX, § 7(a) of the Florida Constitution, the state of Florida has established the State University System to achieve excellence through teaching, advancing research, and providing public service.  This Agreement operates to further these important goals, by providing a mechanism by which educational materials can be delivered.  Specifically, Company will apply proven business strategies to support the University of Florida Distance and Continuing Education (UF DCE) Executive Education Unit in the development and delivery of an online program, and make the Distance Education Program (as defined below) widely accessible to working professionals from Florida, the United States and overseas.  These individuals require non-credit executive education programs in order to attain or maintain certifications and to improve business skills.  The Company's online format enables this material to be delivered without travel for face-to-face sessions, and Company's marketing and registration services are effective to reach non-traditional learners worldwide.  This Agreement furthers Florida's teaching and service missions.

## II.   DEFINITIONS

A.    "Confidential Information" means written information which is disclosed by one Party to the other and marked as "confidential" at the time of disclosure or oral or visual information that a Party indicates is proprietary or confidential and, within thirty (30) days of disclosure, delivers written notice containing a description indicating the confidential nature of the information.

B.    "Company Material" means all materials and delivery components for the Distance Education Program, including, marketing materials, web sites, computer code and processes, and Intellectual Property Rights in materials and delivery components of the online course framework that are provided to the Distance Education Program or developed by the Company.

C.     "Distance Course" means an individual non-credit course offering designed to fulfill a particular set of learning objectives and other University requirements necessary to complete the Distance Education Program.

D.     "Distance Education Program" means the defined set of learning objectives and requirements for which the Parties have agreed pursuant to Article III and as described in Exhibit 1 to offer Distance Courses for a distance learning program of study at the University, including, the related marketing material (websites, landing pages, participant leads), University Material, and Company Material.

E.     "Effective Date" means the date in the opening paragraph of this Agreement.

F.     "Instructional Fees" means revenue earned by the University related to the enrollment of each Participant in Distance Courses minus applicable discounts, refunds, credits, rebates, credit card expenses, bank fees, bad debt expenses, and sales taxes.

G.     "Instructor" means the employee of the University who has primary responsibility to provide Distance Course instruction.  The Instructor is identified in Section III.B.2.b below.

H.     "Intellectual Property Rights" means trademark, copyright, patent rights, know-how, and trade secrets.

I.     "Learning Management System" or "LMS" means the proprietary computer source code, associated databases, third party integrated applications and related processes, all of which have been developed or licensed and engineered by Company for interactive presentation and classroom management, including testing, of academic content in an online environment.

J.     "Participants" means registered enrollees in Distance Courses.

K.     "Party" or "Parties" means either the Company or the University, and collectively the Company and the University.

L.     "Program Term Sheet" means the form that specifies the terms for the Distance Education Program as provided on Exhibit 1.

M.     "Revenue Distribution" means the fees received by the Company and University according to Section III.F.1 and Exhibit 1, Paragraph 5.

N.     "Steering Committee" means the committee of the Company and the University representatives established pursuant to Section III.C.

O.     "Term" means the time period defined in Section VII.A of this Agreement.

P.     "University Material" means all content, data, materials, and Intellectual Property Rights in content, data, and materials for the Distance Education Program that are developed under this Agreement by the University.

## III.   PROGRAM STRUCTURE

Exhibit 1 outlines the specific obligations of each Party with respect to the Distance Education Program and establishes mutually agreed success criteria. If the Distance Education Program does not reach those success criteria, the Parties shall meet to discuss appropriate actions for the remainder of the Term.

A.      Responsibilities of Company. The Company shall provide the following services as selected by the University. These services are described in detail in Exhibit 1.

      1.      Marketing. The Company shall perform all marketing activities to generate interest to meet enrollment goals. Marketing includes working with the University to develop a marketing plan and design for the Distance Education Program.

      2.      Recruitment. The Company shall undertake recruitment to attract participants for the Distance Learning Program.

      3.      Registration. Company representatives will communicate with prospective participants and register participants in Distance Courses. The Parties shall determine mutually agreeable procedures for management and control of registration records in accordance with University policies.

      4.      Support and Retention. The Company shall undertake logistical and basic customer service and technical support to retain Participants through completion of the Distance Education Program.

      5.      Instructor Support. The Company shall provide course development support to the Instructor.

      6.      Instructional Services and Related Technology. The Company shall provide instructional design, technology, including its LMS, and multimedia services to build and deliver Distance Courses and provide technical support to Participants and Instructor.

      7.      Books and Materials Fulfillment. Company shall make available to Participants all required books and materials for the Online Courses.

      8.      Billing, Reconciliation, and Collections. Company shall provide full accounting services for the Distance Education Program.

      9.      Regulatory Assessment. The Company shall assess and make a determination of the regulatory requirements for the Distance Education Program, including, actions necessary for compliance with any state, national, and foreign laws,

rules, and regulations, and shall assist University with compliance efforts. University is responsible for fees that are charged by regulatory authorities, if any.

      10.    Documenting Completion. The Company shall issue documentation to Participants that meet the University's approved criteria for successful completion of the Distance Education Program.

    B.    Responsibilities of the University. The University shall provide the following services. These services are described in detail in Exhibit 1.

      1.    Curriculum and Content. University has sole discretionary control over the academic curriculum and course content. The University shall develop content for the Distance Courses.

      2.    Instructor and Staff.

        a.    The University through the Executive Education Unit of UF DCE is solely responsible in its discretion for review, selection, appointment, administration, evaluation, and coordination of program directors, Instructor, and staff at the University for the Distance Education Program.

        b.    The Executive Education Unit of UF DCE will appoint the Instructor(s), who is(are) primarily responsible for Distance Course instruction.

      4.    Approval of Successful Completion. Distance and Continuing Education at the University in consultation with the Instructor is solely responsible in its discretion for approving successful completion of the Distance Education Program by Participants.

    C.    Steering Committee.

      1.    Purpose. The Steering Committee is responsible for overseeing the activities of the Parties with respect to the Distance Education Program.

      2.    Members. The University shall designate a chair of the Steering Committee from its members. Each Steering Committee consists of four (4) members, two (2) representatives designated by each Party. Each Party may substitute individuals by giving written notice to the other Party.

      3.    Meetings.

        a.    The Steering Committee shall meet by teleconference, videoconference, or in person when the Steering Committee deems appropriate, but at least semi-annually. Representatives of each Party in addition to the members of the Steering Committee may attend Steering Committee meetings as non-voting observers at the invitation of either Party. The Steering Committee shall meet in Gainesville, Florida, or where mutually agreed.

        b.     At each Steering Committee meeting, five (3) members of the Steering Committee constitute a quorum. Each Party has one (1) vote on all matters before the Steering Committee. The Chair of the Steering Committee shall keep accurate minutes of all actions recommended or taken.

D.    Licenses.

        1.     University Material. The University hereby grants to the Company for the Term, a world-wide, royalty-free, non-exclusive right to access, copy, display, and use the University Material solely as necessary for Company to perform its obligations under this Agreement. The University shall obtain any licenses or rights in Intellectual Property Rights of third parties that are necessary to enable the Company to perform its obligations under this Agreement. It is understood and agreed that, as between the Parties, the University retains all right, title, and interest in its Intellectual Property Rights in the University Material.

        2.     Company Material. The Company hereby grants to the University for the Term, a world-wide, royalty-free, non-exclusive right and license to access, copy, display, and use the Company Material solely as necessary for University to obtain the benefits of Company's services as set forth in this Agreement. The Company shall obtain any licenses or rights in all Intellectual Property Rights of third parties that are necessary to enable the University to obtain the benefits of Company's services as set forth in this Agreement. It is understood and agreed that, as between the Parties, the Company retains all right, title, and interest in its Intellectual Property Rights in the Company Material.

        3.     Distance Education Program and Distance Courses. University retains sole rights to all University Material it contributes to the development of the Distance Education Program and Distance Courses. Except as specifically provided in this Agreement, neither party may use, license, transfer, or otherwise dispose of the Distance Education Program or Distance Courses or any copyrights or intellectual property rights in them without the express prior written consent of the other. The Parties shall mark software, audio and video recordings, CD-ROMs, texts, tools, materials, and other course media for the Distance Education Program and Distance Courses with mutually agreed copyright markings as permitted under United States copyright law.

E.    University Trademarks.

        The Company may not use the name, trade names and trademarks of the University (the "University Trademarks") without the prior written approval of the University's Vice President for University Relations or his/her designee in each instance. The Company agrees that the University Trademarks are subject to the standards and specifications of the University.

F.    Fees and Distributions

1.    Distribution of Instructional Fees. Within six (6) weeks following the first day of class for each 8-week session for each Distance Course, the Company shall report Participant enrollments to the University. At that time, the Company shall provide a distribution of seventy-five percent (75%) of Instructional Fees to the parties in accordance with the applicable Company and University percentage of revenue distribution in Exhibit 1. Following the end of each 8-week session, Company shall distribute the balance of Instructional Fees earned (in accordance with GAAP based on actual participants registered) for each Participant with respect to the Distance Course.

2.    Reconciliation. With each Distribution, the Company shall provide the University with a written statement in a form reasonably acceptable to the Parties reciting the Instructional Fees, including, names of participants, Instructional Fees earned, and all deductions applied in the calculation of Instructional Fees.

3.    Funding. Each Party is responsible for the payment of all costs and expenses associated with performing the duties assigned to it in this Agreement. Each Party is responsible for any third party products or services that it uses to perform its duties under this Agreement.

4.    Development Financing. Upon request by the University, Company shall make available to University a sum of money, to be mutually agreed as a good faith advance on Distance Education Program revenue distributions to cover costs incident to the creation and initial administration of the Distance Education Program ("Development Financing"). Development Financing would include fees and travel expenses for Instructor, management of Distance Course development prior to launch, and staff and materials expenses related to the Distance Education Program incurred prior to launch. If University uses Development Financing, University shall provide Company with monthly invoices for actual Distance Education Program development costs incurred during the prior month, up to the established limit, and Company shall pay these to University within thirty (30) days of receipt. University's repayment to Company of Development Financing shall commence one (1) year following launch of the Distance Education Program by deducting an amount from revenues until the Development Financing is repaid, without interest, in accordance with a schedule to be included in Exhibit 1. The parties agree to adjust the repayment schedule accordingly if there are insufficient Distance Education Program revenues to support the repayment schedule at that time. If the Distance Education Program does not provide sufficient revenues prior to termination of the Agreement (for any reason other than material breach by University) to support any or all of the repayment of the Development Financing, Company agrees to forgive the repayment obligation outstanding at the time of termination.

G.    Maintenance of Records. The Parties shall maintain all books and records relative to this Agreement for the longer of three (3) years after termination or expiration of this Agreement and the time that is required by Title IV of the Higher Education Act (as amended) or other applicable law.

H.     Free Enrollments.  Company and University may enroll their employees as well as employee spouses and dependents in the Distance Education Program, and the Parties may charge them pursuant to their respective personnel policies (if any).  These enrollments are subject to availability as determined by the Parties and may not be counted when determining minimum class size.  Company shall charge all instructional materials, text books, software and technology access fees at the then existing rates by Company and provided by Company.

I.     Exclusivity.

1.     During the Term, University may not develop, market, or deliver any online courses or programs that are materially similar to the Distance Courses or the Distance Education Program in UF DCE Executive Education Unit. University may offer all courses and programs via classroom attendance at one or more of its campuses or external facilities and offer other courses and programs online other than Distance Courses or the Distance Education Program.

2.     During the Term, Company agrees that it may not develop, market, or deliver any online courses or programs that are materially similar to the Distance Courses or the Distance Education Program that are associated with any institutions of higher education in the states of Florida, Georgia, and Mississippi.

## IV.   CONFIDENTIAL INFORMATION

A.     Confidentiality.  Subject to Florida law, each Party shall maintain the confidentiality of the Confidential Information of the other Party in the same manner that it maintains its own confidential information, but in no event less than a commercially reasonable manner.  The Parties may only disclose the other Party's Confidential Information to its officers, employees, consultants, contractors, or agents who need to know the Confidential Information to carry out their rights and responsibilities under this Agreement.  In the case of consultants, contractors and agents, the Parties may only disclose the other Party's Confidential Information to persons who are bound by obligations no less restrictive than those set forth in this Agreement.  Confidential Information does not include information that (1) is publicly known; (2) is already known or independently developed or discovered without use of the Confidential Information as shown by written records; (3) is disclosed by a third party having no known obligation of confidentiality with respect to the Confidential Information; or (4) is required to be disclosed to comply with applicable laws or regulations or with a court or administrative order, including the Florida Public Records Act.

B.     Return of Confidential Information.  Upon termination or expiration of this Agreement for any reason, each Party shall immediately discontinue all use of the Confidential Information of the other Party, except as required to comply with the Teach-Out provision in Section VII.B.1.  Within sixty (60) days after the termination or expiration of this Agreement for any reason, each Party shall return or destroy (according to instruction by the disclosing Party) all the Confidential Information of the other Party, and an officer of each Party shall certify that

all those materials have been returned or destroyed. Notwithstanding the foregoing, one copy of all Confidential Information may be retained by the Parties' legal counsel to monitor compliance with this Section IV.B.

     C.    Publicity. The Company may not advertise or publish information concerning this Agreement without the prior written consent of the University.

     D.    Survival. The Provisions of this Article IV survive termination of this Agreement.

## V.   PROTECTED HEALTH INFORMATION

Before the University provides access to protected health information to the Company pursuant to this Agreement, the Parties shall enter into a separate business associate agreement to govern the confidentiality and non-use of that information.

## VI.   FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT

Company shall comply with the requirements of all privacy laws applicable to information obtained as a result of participation in this Agreement, including, the Family Educational Rights and Privacy Act (known as "FERPA").

## VII.   TERM AND TERMINATION

     A.    Term. This Agreement takes effect as of the Effective Date and continues for seven (7) years, unless sooner terminated in accordance with the provisions of this Agreement (the "Term").

     B.    Termination. This Agreement and the Distance Education Program may be terminated in any one or more of the following ways: (1) by mutual consent of the Parties; (2) upon sixty (60) days' advance written notice by one Party if the other Party commits a material breach of the this Agreement and the breaching Party has not cured the material breach during the sixty-day period; (3) by one Party upon written notice if (a) the other Party dissolves, ceases active business operations or liquidates, or (b) bankruptcy or insolvency proceedings, including any proceeding under Title 11 of the United States Code, have been brought by or against the other Party and remains un-dismissed for sixty (60) days; or (4) upon ninety (90) days' prior written notice given by either Party if there are fewer than the agreed minimum number of Participants enrolled in the Distance Learning Program during the agreed period of time following first enrollment. The parties shall mutually determine a minimum number of Participants and a corresponding period of time in Exhibit 1.

      1.    Survival; Teach-Out. Any provisions which by their nature are intended to be applicable after any expiration or termination of this Agreement remain in effect. "Teach-Out" provision: subsequent to the final day of the Term or following notice of termination for cause, the parties shall: (a) cease accepting new Participants, but (b) continue to fulfill their respective obligations and receive their respective Revenue Distributions as set forth in this Agreement for all Participants that are enrolled in the Distance Education Program prior to Termination until the earliest of (i) those Participants' successful completion of the Distance Education Program, (ii) those Participants' withdrawal from the Distance Education Program, and (iii) six (6) months after the effective date of expiration or termination.

      2.    Necessary Acts; Further Assurances. Upon termination or expiration of this Agreement for any reason, subject to the Teach-Out provision in Section VII.B.1, the Company shall immediately discontinue all access, display, or use of the University Material, and the University shall immediately discontinue all access, display, or use of the Company Material. Within sixty (60) days after termination or expiration of this Agreement for any reason, each Party shall return or destroy the University Material or Company Material (as directed by the applicable Party), and an officer of each Party shall certify that the University Material or the Company Material has been returned or destroyed, except that each Party may retain one (1) copy for the purpose of complying with its records retention policy.

    C.    Legislative and Regulatory Changes. If the United States Department of Education rules prohibit tuition revenue sharing compensation for services provided by Company or otherwise prohibit or limit this Agreement, the Parties agree to negotiate in good faith a mutually agreed alternative compensation model. The Parties agree to work together to address any requirements imposed by the United States Department of Education on the Distance Education Program, including, those included in Title IV of the Higher Education Act. However, if either Party determines that those requirements make its further participation in this Agreement impossible or impractical, and the Steering Committee cannot develop a mutually agreeable solution within sixty (60) days after one Party notified the other of the offending requirements, it may terminate this Agreement immediately with no further obligation.

    D.    Termination by University.

      1.    Upon thirty (30) days' prior written notice, the University may terminate this agreement upon the occurrence of any of the following circumstances: (a) the Company enters into an agreement to perform educational services for a for-profit educational institution, or work with a for-profit educational institution to provide services that are similar to the Distance Education Program; (b) the Company acquires a financial interest in a company that is engaged in or owns a for-profit college or post graduate educational institution; (c) the Company materially changes the ability of the Company to deliver the same quality of services to the University; or (d) the Company remains a private company, and a for-profit educational entity obtains an ownership interest in the Company; or (e) the Company becomes a public company, and a for-profit educational entity acquires ten percent (10%) or more voting interest in the Company.

2.    The University reserves the right to terminate this Agreement immediately in whole or in part due to the failure of the Company to acquire and maintain all required insurance policies, bonds, licenses, and permits. Termination pursuant to this Section VII.D.2 is effective following thirty (30) days' prior written notice of the termination and the reasons for it by the University to the Company and Company's failure to cure within that thirty (30) days. Upon termination under this provision, except for Company Material, all goods, materials, documents, data and reports prepared by the Company under this Agreement shall become the property of and be delivered to the University on demand. The University may, upon termination of this Agreement, procure, on terms and in the manner that it deems appropriate, materials or services to replace those under this Agreement. The Company shall be liable to the University for any excess costs incurred by the University in re-procuring the materials or services.

3.    The University may, by written notice to the Company, immediately cancel this Agreement if it is discovered by the University that gratuities, in the form of entertainment, gifts or other items of value, were offered or given by the Company or any agent or representative of the Company to any officer or employee of the University with a view toward securing favorable treatment with respect to the awarding or amending, or the making any determinations with respect to the performance of this Agreement. If this Agreement is canceled by the University pursuant to this provision, University may, in addition to any other rights and remedies, recover or withhold the amount of the cost incurred by Company in providing those gratuities.

4.    The University may immediately cancel this Agreement without further obligation on the part of the University if sufficient appropriated funding is unavailable to assure full performance of the terms. The University shall notify Company in writing of the non-appropriation as soon as reasonably possible. No penalty accrues to the University if this cancellation provision is exercised. This cancellation provision does not permit the University to terminate this Agreement in order to acquire similar equipment, material, supplies, or services from another party.

5.    The University may by written notice to the Company immediately terminate this Agreement if the University determines that the Company has been debarred, suspended, or otherwise lawfully prohibited from participating in any public procurement activity, including but limited to, being disapproved as a subcontractor Company of any public procurement unit or other governmental body.

6.    The Company shall continue to perform, in accordance with the requirements of this Agreement, up to the date of termination, as directed in the termination notice.

*Execution*

## VIII.   REPRESENTATIONS, WARRANTIES, AND COVENANTS

A.    Company Warranties and Covenants.

1.    Organization. The Company represents and warrants that it is duly organized, validly existing and in good standing, has all requisite power and authority, corporate or otherwise, to conduct its business as now being conducted and to execute, deliver and perform the services that are required by this Agreement and that it holds the required registrations to perform its obligations under this Agreement.

2.    No Conflict. The Company warrants that no officer, director, or agent of the Company is also an employee of the University and that no University employee owns, directly or indirectly, an interest of five percent (5%) or more in the Company or any of its affiliates.

3.    Right to Use. The Company represents and warrants that it has permission to use (and for the University to use) any Company Material as set forth in this Agreement.

4.    Infringement. The Company represents and warrants that it has no actual knowledge after due inquiry that the Company Material infringes upon, misappropriates, or otherwise violates the Intellectual Property Rights of any third party.

5.    Resources. The Company covenants that it will devote the capabilities, resources, and personnel to Company Services that are substantially identical to those that were represented to the University during the negotiation of this Agreement.

6.    Services Commitment. The Company covenants to use diligent efforts to deliver the services contemplated in this Agreement in compliance with industry standards, using proven, state-of-the-art technologies and skilled resources trained according to the highest professional standards in compliance with applicable regulatory and accreditation standards.

7.    Compliance with Laws. The Company further represents and covenants that it is in compliance with all applicable laws and regulations, including, without limitation the Americans with Disabilities Act and applicable regulations and maintains a "Drug Free Workplace Policy" (including inserting that obligation in any subcontracts executed in relation to the services that are provided pursuant to this Agreement) and agrees to be bound by applicable state and federal rules governing equal opportunity and non-discrimination.

8.    Liens. The Company covenants that it will keep the University free and clear from all liens asserted by any person or entity for any reason arising out of the furnishing of services or materials by or to the Company.

9.      Certification.  The Company warrants that entering into this Agreement did not involve collusion or anti-competitive practices and warrants and covenants that it has not given, offered to give, nor intends to give at any time economic opportunity, future employment, gift, loan, gratuity, special discount, trip, favor, or service to a public servant in connection with any submitted proposal. The Company further certifies that:

a.      no employee of the University and no employee's relative has a substantial interest in this Agreement;

b.      neither Company nor any of its employees have been debarred or suspended by any federal entity; and

c.      the Company has not been placed on the discriminatory list with respect to submitting a bid to the University concerning the subject matter of this Agreement.

10.     False Statements.  Company understands that any false statements with regard to the warrants, covenants, and certifications set forth in this Section VIII.A.10 will void this Agreement; this Agreement is subject to legal remedies provided by law; and Company agrees to promote and offer to the University under this Agreement only those services and materials as stated in this Agreement.

B.      University Warranties.

1.      Organization.  The University represents and warrants that it is duly organized, validly existing and in good standing, and has all requisite power and authority, corporate or otherwise, to conduct its business as now being conducted, and to execute, deliver and perform this Agreement.

2.      Right to Use.  The University represents and warrants that it has permission to use (and for the Company to use) any University Material as set forth in this Agreement.

3.      Infringement.  The University represents and warrants that it has no actual knowledge that the University Material infringes upon, misappropriates, or otherwise violates the Intellectual Property Rights of any third party.

C.      WARRANTY DISCLAIMER.  EXCEPT AS SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATION OR WARRANTY WITH RESPECT TO ANY TECHNOLOGY, GOODS, SERVICES, RIGHTS OR OTHER SUBJECT MATTER OF THIS AGREEMENT, AND BOTH PARTIES HEREBY DISCLAIM ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## IX.    LIABILITY; INDEMNIFICATION

A.    Limitation of Liability. Neither party is liable to the other Party for any special, indirect, incidental, or consequential damages.

B.    Infringing Material; Indemnification

1.    University Material. If any University Material is held by a court of competent jurisdiction to constitute an infringement or other violation of any third party's Intellectual Property Rights, or if in the Company's reasonable opinion any of the University Material is, or is likely to infringe or otherwise violate a third party's Intellectual Property Rights, the University shall at its own expense and option: (a) procure the right for the Company to continue using the University Material; (b) replace the University Material with non-infringing equivalent material conforming to the applicable specifications required by this Agreement; or (c) modify the University Material to make it non-infringing while conforming to the applicable specifications required by this Agreement. If none of the foregoing options is economically feasible, the University shall so notify the Company and the Company shall be entitled to terminate the Distance Education Program or Distance Course that is impacted by the infringement.

2.    Company Material. If any Company Material is held by a court of competent jurisdiction to constitute an infringement or other violation of any third party's Intellectual Property Rights, or if in the University's reasonable opinion any of the Company Material is, or is likely to infringe or otherwise violate a third party's Intellectual Property Rights, the Company shall at its own expense and option: (a) procure the right for the University to continue using the Company Material; (b) replace the Company Material with non-infringing equivalent material conforming to the applicable specifications required by this Agreement; or (c) modify the Company Material to make it non-infringing while conforming to the applicable specifications required by this Agreement. If none of the foregoing options is economically feasible, the Company shall so notify the University and the University shall be entitled to terminate the Distance Education Program or Distance Course that is impacted by the infringement.

3.    Company Indemnification. The Company shall defend, indemnify and hold harmless the University of Florida Board of Trustees, the University of Florida, the State of Florida, and the Florida Board of Governors, their employees, agents, officers and directors with respect to any and all claims, demands, suits, actions, proceedings, loss, cost, and damage of every kind and description, including reasonable attorneys' fees and reasonable litigation expenses, which may be brought or made against or incurred on account of loss of or damage to any property or for injuries or death of any person, caused by, arising out of, or contributed to, in whole or in part, by reasons of any act, omission, professional error, fault, mistake or negligence of Company, its employees, agents, representatives, or subcontractors, their employees, agents or representatives, in connection with or incident to the performance of this Agreement. Notwithstanding the

foregoing, the Company's obligation under this provision will not extend to any liability caused by the sole negligence of the University, or its officers, agents and employees. The University shall, upon becoming aware of a claim which may be subject to this provision, notify the Company as soon as practicable. Failure to provide notice as soon as practicable is not a waiver of the University's rights under this Section IX.B.3, but the amount of reimbursement to which the University is entitled is reduced by the amount, if any, by which the claims would have been reduced had notice been delivered as soon as practicable. If a court of competent jurisdiction determines that the claims arose as a result of the negligence, intentional misconduct or breach of this Agreement by the University of Florida Board of Trustees, the University of Florida, the State of Florida, or the Florida Board of Governors, the foregoing indemnification obligation shall be proportionately reduced based on the extent to which the court determines the claims resulted from that negligence, intentional misconduct, or breach. Nothing in this Agreement (a) denies the Company any remedy or defense available under the laws of the State of Florida; (b) constitutes consent by the State of Florida or its agents and agencies to be sued; or (c) constitutes a waiver of sovereign immunity of the State of Florida beyond the waiver provided in Section 768.28 Florida Statutes and related case law.

## X.    MANDATORY TERMS

A.    The University is under no obligation to be bound by the actions of Company with respect to third parties. The Company is not a division or agent of the University

B.    The Company agrees that in the performance of this Agreement, neither the Company nor any employee of the Company shall engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance in conducting any activity covered by this Agreement. The University reserves the right to request a copy of the Company's Drug Free Workplace Policy. The Company further agrees to insert a provision similar to this statement in all subcontracts for services under this Agreement.

C.    State Universities have established equal opportunity practices which conform to both the spirit and the letter of all laws against discrimination and prohibit discrimination based on race, creed, color, sex, age, national origin, marital status, or religion. The Company commits to the following:

1.    The provisions of Executive Order 11246, "Equal Employment Opportunity," September 24, 1966, and the rules, regulations, and relevant orders of the Secretary of Labor are applicable to this Agreement.

2.    The Company has attached a complete certificate of non-segregated facilities to its proposal response.

3.      If the Company expects to receive $50,000 in orders during the first 12 months of this Agreement and employs more than 50 people, standard form 100 (EEOO-1) must be filed prior to March 1 of each year.

4.      If the Company expects to receive $50,000 in orders during the first 12 months and employs more than 50 people, a written program for affirmative action compliance must be maintained by the Company, subject to review upon request by the University.

5.      The Company is solely responsible for complying with all laws, ordinances, and regulations including but not limited to, those relating to taxes, licenses, and permits, as they may apply to any matter under this Agreement. The Company must demonstrate that it is duly licensed by applicable regulatory bodies during the performance of this Agreement. Prior to the commencement of this Agreement, the Company shall provide evidence of licensing as may be requested by the University. Company shall, at no expense to the University, procure and keep in force during the entire period of this Agreement all applicable permits and licenses.

6.      All books, accounts, reports, files and other records of Company that directly relate to this Agreement are subject to annual inspection and audit by a reputable third party auditing firm retained by the University, upon adequate notice and during normal business hours.

7.      Federal law and the policies of the University prohibit sexual harassment of University employees or students. Sexual harassment includes any unwelcome sexual advance toward a University employee or student, any request for a sexual favor from a University employee or student, or any other verbal or physical conduct of a sexual nature that is so pervasive as to create a hostile or offensive working environment for University employees, or a hostile or a offensive academic environment for University students. Company and Company's subcontractors and suppliers for this project are required to exercise control over their employees so as to prohibit acts of sexual harassment of University employees and students. If the University reasonably determines that any person under the control of the Company has committed an act of sexual harassment, the Company shall cause that person to be removed from the project site and from University premises and take other action as may be reasonably necessary to cause the sexual harassment to cease.

8.      University is an equal opportunity institution and  encourages the use of small businesses, including women and minority-owned small businesses in the provision of goods and services. Small businesses should have a fair and equal opportunity to compete for dollars spent by the University. Competition ensures that prices are competitive and a broad Company base is available. Company shall use good faith efforts to ensure opportunities are available to small businesses, including women and minority-owned businesses. For questions about the University's Small Business Program contact Faylene Welcome, Director of Small Business and Company Diversity, 352-392-0380.

*Execution*

9.     All facilities of University of Florida are smoke free. Tobacco use is not permitted inside University buildings or within fifty (50) feet of doorways and air intakes. The Company covenants that it will respect and fully comply with the University's tobacco free policy.

10.     The University's purchasing directives support the purchase of products that will minimize any negative environmental impacts of our work. In order to facilitate a healthy market in sustainable products, the Company covenants that it will engage in both waste recycling and the initial purchase of products containing recycled content.

11.     The parties recognize that in actual economic practice overcharges resulting from anti-trust violations are in fact borne by the ultimate purchaser; therefore, Company hereby assigns to the University any and all claims for overcharges.

12.     Company shall give prompt notice to the University of any actual or potential labor dispute which delays or may delay performance of this Agreement.

13.     Company is solely responsible for keeping itself fully informed of, requiring its subcontractors and agents to comply with, and faithfully observing all laws, ordinances, and regulations. The Company further agrees to indemnify and hold harmless the University from any and all claims and demands made against it by virtue of the failure of the Company or any subcontractors to comply with the provisions of any and all applicable laws

14.     The Company shall obtain all parking permits and/or decals that may be required while performing project work on University premises. The Company should contact Transportation and Parking Services at 352-392-2241.

15.     The University's obligation is payable only and solely from funds appropriated for the purpose of this Agreement. Unless otherwise stated herein, the payment terms for this Agreement are net thirty (30) days. COMPANY OMBUDSMAN: The University's Company ombudsman whose duties include acting as an advocate for Company may be experiencing problems in obtaining payment(s) from the University may be contacted at 352-392-1241.

16.     The University will normally only consider price changes at the end of one Agreement period and the beginning of another. The University will not approve unsupported price increases that merely increase the gross profitability of the Company at the expense of the University. Price change requests shall be a factor in this Agreement extension review process. The University shall, in its sole opinion, determine whether the requested price increase or an alternate option is in the best interest of the University.

17.     No trade usage, prior course of dealings, or course of performance under other agreements may be used in the interpretation or construction of this Agreement.

18.     It is expressly understood and agreed that any articles which are the subject of or required to carry out this contract shall be purchased from Pride of Florida in the same manner and under the procedures set forth in Section 946.5l5 (2), (4), Florida Statutes; and for purposes of this contract the person, firm or other business entity carrying out the provisions of this contract shall be deemed to be substituted for this agency insofar as dealings with that corporation.  Contact, Terrie Brooks, Bid Administrator, PRIDE of Florida, 2720 Blair Stone RD, Suite G, Tallahassee, FL 32301.

19.     A person or affiliate who has been placed on the convicted list by the Department of Management Services, State of Florida, may not submit a proposal on a contract to provide any goods or services, including construction, repairs, or leases and may not be awarded or perform work as a Company, supplier, subcontractor, or consultant for the University of Florida for a period of thirty-six (36) months from the date of being placed on the convicted list; a "person" or "affiliate" includes any natural person or any entity, including predecessor or successor entities or any entity under the control of any natural person who is active in its management and who has been convicted of a public entity crime (Rule 6C1-3.020 FAC).

20.     This Agreement may be unilaterally canceled for refusal by the Company to allow public access to all documents, papers, letters, or other materials subject to the provisions of Chapter 119 F.S. and made or received by the Company in conjunction with this Agreement.

## XI.     GENERAL PROVISIONS

A.     Notices.  The Parties shall give any notice under this Agreement in writing and delivered by nationally recognized overnight delivery service (e.g., Federal Express) or by registered or certified mail, postage prepaid, and addressed to as follows.

| If to Company: | If to University: |
|---|---|
| 9417 Princess Palm Avenue<br>Tampa, Florida 33619 | 235 Tigert Hall, P.O. Box 113175<br>Gainesville, FL 32611-3175 |
| Attention: Chief Executive Officer *with copy to* President & COO | Attention:  Provost |

Either Party may notify the other in writing of any change in address.  Any notice is duly given one (1) day after deposit with nationally recognized overnight delivery service or five (5) days after it is mailed by registered or certified mail, postage prepaid.

B.     Further Actions.  The Parties agree to execute any documents or perform any acts as may be reasonably necessary in order to give effect to the intentions expressed in this Agreement.

*Execution*

      C.    Interpretation; Severability. The Parties may use the captions this Agreement only for convenience and not for interpreting this Agreement. If any portion of this Agreement is held illegal, invalid or inoperative by a court of competent jurisdiction, then so far as is reasonable and possible (1) the remainder of this Agreement is valid and operative; and (2) to the extent legally possible, the Parties shall give effect to the intent manifested by the portion held invalid or inoperative.

      D.    Counterpart Execution. This Agreement may be executed in any number of counterparts with the same effect as if both Parties have signed the same document. All counterparts constitute one Agreement.

      E.    Assignment. Neither party may assign its rights or responsibilities under this Agreement (including through an acquisition or a change of control) without the prior written consent of the other party, which consent the parties may not unreasonably condition, withhold, or delay and may be withheld by the University only to assure that the prospective successor or acquirer's capabilities, reputation, and ethical standards are consistent with those of other similar University contractors (including Company at the time of this Agreement).

      F.    Relationship. The relationship between the Company and the University is independent contractor. Nothing in this Agreement creates or implies a partnership, agency, employer/employee, or other legal relationship between the Parties. Either Party may utilize the products and/or services of third party contractors other than for-profit educational institutions in connection with the performance of the services under this Agreement without the consent of the other Party.

      G.    Prohibition on Hiring. Neither Party may, during the Term and for one (1) year thereafter, hire or solicit with intent to hire any person who was employed by the other Party during that period, unless authorized in writing by the other Party, or unless the person has not been employed by the other Party for at least 12 months prior to his or her hiring or solicitation. Advertisements of open positions that are directed to the general public do not violate this provision.

      H.    Entire Contract. This Agreement constitutes the complete understanding of the Parties and supersedes any prior contracts, arrangements, communications, whether oral or written, with respect to the subject matter of this Agreement.

      I.    Modifications and Waiver. The Parties may only modify this Agreement by a writing signed by both Parties. The waiver by either Party of any default under this Agreement is not a waiver of any other or subsequent default and is not effective unless it is set forth in a document signed by the Party against which the waiver is asserted.

      J.    Force Majeure. If compliance with any obligation under this Agreement is impractical or impossible due to any Event of Force Majeure, then the time for performance of that obligation is extended for the duration of the Event of Force Majeure. The provisions of this Section XI.J do not excuse either Party's inability to perform its obligations because of inadequate finances. "Event of Force Majeure" means any strike, lockout, labor dispute,

*Execution*

embargo, flood, earthquake, storm, dust storm, lightning, fire, epidemic, act of God, war, national emergency, civil disturbance or disobedience, riot, sabotage, terrorism, restraint by governmental order or any other occurrence beyond the reasonable control of the Party in question.

  K. <u>Governing Law</u>.  This Agreement is governed and construed in accordance with the laws (other than conflict of laws provisions) of the State of Florida and the rules and regulations of the Florida Board of Governors and the University.  The University and Company have all remedies afforded each by Florida law.  The venue in any action or litigation commenced to enforce this Agreement is Gainesville, Florida.

  The Parties have executed this Agreement by their duly authorized representatives as of the Effective Date.

**BISK EDUCATION, INC.**

By: _____

Print Name: Joseph R. Smith

Title: Executive Vice President d CAO

Date: 2/22/12

**UNIVERSITY OF FLORIDA BOARD OF TRUSTEES**

By: _____

  Lisa S. Deal
  Director of Purchasing, Division of
  Finance and Accounting

Date: 2/23/12

Approved:

By: _____

  W. Andrew McCollough
  Associate Provost for IT, E-Learning
  and Distance Education

Date: 2/22/12

## EXHIBIT 1
## PROGRAM TERM SHEET

This Exhibit 1 (the "**Program Term Sheet**") is an exhibit to the Agreement entered into as of _____, 20___ between Bisk Education, Inc. ("**Company**") and the University of Florida, Board of Trustees ("**University**"). All terms of the Agreement remain in full force and effect, and this Program Term Sheet may not alter any of the terms of the Agreement. Capitalized terms not defined in this Program Term Sheet have the meaning provided in the Agreement.

1. **Distance Education Program**: The name of the Distance Education Program is the Executive Certificate in Business Essentials (the "Distance Education Program") and is described as follows:

---

**Program Description**

*Online Executive Education Program: Business Essentials* comprises three eight-week courses. The first two courses address a core curriculum and are followed by a third emphasis course. Each eight-week course contains 12 - 16 hours of streaming video presentations, independent exercises, and mastery assessments that in total will take between 25-30 total hours to complete.

Participants are required to take the first two courses as the core curriculum, after which Participants may take a third emphasis course. The first course is designed to help the Participant build a solid understanding of the business disciplines that make up the core of a business program. During this course, Participants will develop a foundation in marketing, finance, statistics, and accounting. The second course builds on the first course and is designed to provide working knowledge of international business, advanced finance, financial statement analysis, and leadership. The third course allows the Participant to specialize in one of the following specific disciplines – (1) strategic management, providing a foundation in managerial perspectives, human resources management, business law, and managerial economics; (2) human resource management, providing a foundation in human resource perspectives and practices, organizational behavior, staffing and appraisal, and strategic compensation management; (3) marketing, providing a foundation in marketing strategy, marketing promotions, business-to-business marketing, and international marketing; and (4) information technology management, providing a foundation in information technology ethics, policy, and security, business information systems, technology-enhanced decision-making, and systems thinking and the management team.

**Pricing**

The three-course Online Executive Education Program: Business Essentials will cost Participants $4,995, or Participants may purchase courses on an individual basis, at $2,180 per course. Participants are required to complete all three courses in order to achieve an Executive Certificate of Completion in Business Essentials.

---

*Execution*

---

**Revenue and Enrollment Summary**

The following chart summarizes projected enrollments in the *Online Executive Education Program: Business Essentials*. This projection assumes that 90% of the Participants purchase the complete three-course program. The projection for the five year period is 1,345 new students to complete 4,754 total courses.

| Online Executive Development Program: Business Essentials | | | | | | | |
|---|---|---|---|---|---|---|---|
| Years | 1 | 2 | 3 | 4 | 5 | | Total |
| New Participants | 195 | 220 | 260 | 325 | 345 | | 1,345 |
| Total Courses Per Year | 447 | 827 | 970 | 1,199 | 1,311 | | 4,754 |
| Projected Gross Revenue | $ 744,255 | $1,376,955 | $ 1,615,050 | $ 1,996,335 | $ 2,182,815 | | $ 7,915,410 |
| Univ of Florida Projected Revenue 20% | $ 148,851 | $ 275,391 | $ 323,010 | $ 399,267 | $ 436,563 | | $ 1,583,082 |
| Bisk Revenue | $ 595,404 | $1,101,564 | $ 1,292,040 | $ 1,597,068 | $ 1,746,252 | | $ 6,332,328 |

2.  **Enrollment Term**: New participants may enter this Distance Education Program monthly.

3.  **Steering Committee Designees**

    a.  For the University:

        Kenneth Nanni, Director of Distance and Continuing Education
        Ron Kirsch, Executive Director, Leadership Institute

    b.  For the Company:

        George Straschnov, Vice President Strategic Development
        Joseph R. Smith, Executive Vice President Operations, CAO

4.  **Company Services:**

| Service Offerings |
|---|
| Marketing |
| Recruitment |
| Registration |
| Retention |
| Learning Management System |
| Instructional Design |
| Billing, Reconciliation and Collections |
| Customer Service and Technical Support |
| Books and Materials fulfillment |
| Regulatory Assessment |

5.  **Revenue Distribution**:  eighty per cent (80%) for Company; twenty per cent (20%) for University.

6.  **Minimum Number of Students**:  Pursuant to Section VII.B(4) of the Agreement, the Distance Education Program is subject to termination after five (5) years, if sixty percent (60%) of the five year Revenue Enrollment Summary in paragraph 1 of this Exhibit1is not realized.

7.  **Further Description of Services and Responsibilities:**

**Course Media Production.**  Company shall produce the course media that are required for the Distance Education Program and Distance Courses, including, software, audio and video recordings, CD-ROMs, texts, tools, and materials.

Course media design involves incorporating University Material in the development of Distance Courses in accordance with the course outlines that are prepared by the Instructor. Planning for Distance Courses includes establishing (1) the rationale for the course, including the overall educational goals; (2) intended learning outcomes; (3) ideas and skills to be learned in the course; (4) and an instructional plan for each learning segment.  Instructor will develop power point presentations to facilitate their presentation with assistance from Company staff and thereafter make a formal presentation of the material which will be captured in a video format. Video presentations developed for each course must be a minimum of ten (10) hours.

Company shall incorporate a syllabus for each Distance Course into course media.  In addition, Company shall incorporate assessment materials, such as, writing assignments and/or a bank of test questions for administering randomized multiple-choice quizzes and tests into course media.

Company shall design and produce all media and mechanisms that deliver the Distance Courses to the Participants, which include:  acquiring an appropriate domain name and hosting the DNS and associated code on its servers; designing, building and maintaining an appropriate, dedicated Internet website; and adapting and installing a Distance Education Program-specific version of its LMS.

When all course media for the Distance Courses are completed, Company shall provide University with a complete set of all course media on CD ROM along with learning guides and texts for each course.

Company shall obtain releases from Instructor and any person who appears in the course media and maintain copies of the releases on file with Company, to be furnished to University at its request.

**Marketing and Advertising.**  Company shall design and produce all Distance Education Program marketing materials.  University shall provide Company guidelines governing the use

of its trademarks, including name, logo, shield, or seal, as the case may be. Company agrees to adhere to all those guidelines. University shall make available to Company University approved images, textual descriptions of the school and its programs, and other existing marketing materials to assist Company in fulfilling its obligations of this Agreement. Company may not publish promotional, marketing, or other materials, including the Distance Education Program website and adjunct creative pieces which make reference to the Distance Education Program or University without the University's prior review and consent. University shall review requested materials within ten (10) business days of receipt from Company; if Company does not receive feedback on materials presented for review within ten (10) business days, Company may proceed with its marketing efforts involving the requested materials. Thereafter, during the Term, Company may, without further approval from University, use the materials to promote the Distance Education Program.

Company is solely responsible, subject to University review and approval, for marketing and advertising the Distance Education Program to prospective and enrolled participants in a commercially reasonable manner for success of the Distance Education Program, which may include, but is not limited to, market research and choice of format; developing (as described below) and distributing all manner of unique advertising materials including brochures, product catalogues, web creative, use of the Distance Education Program website, trade show displays, informational letters and PDFs; inclusion of the Distance Education Program in existing and future distribution media and channels; distributing copies of course media to appropriate parties; telephone campaigns including unique sales scripts; direct mailing campaigns; TV, radio and all manner of Internet advertising; use of outside marketing representatives; and by such other means that Company deems suitable, pursuant to and in compliance with rules and regulations of the United States Department of Education and in conformity with all regional accrediting agency standards. Bisk may include approved marketing materials for the Distance Education Program in Bisk's University Alliance-branded marketing, which is designed to market all of Bisk's university programs broadly to corporate, governmental, and military audiences.

University will incorporate the Distance Education Program as appropriate in its discretion into its marketing and sales literature.

**Course Sessions; Capacities.** All Distance Courses will be offered in an eight-week format, with up to twelve (12) start times per year. Company shall market the Distance Education Program accordingly and enroll participants for each session.

**Communication With Prospects.** Company shall respond to all indications of interest from prospective participants who are responsive to Distance Education Program marketing and advertising. Company shall customize and employ its proprietary instant response technology and its customer relationship management (CRM) software, so that it shall be responsive in a timely manner. Company shall dedicate enrollment representatives to the Distance Education Program, who are specially trained and managed to represent University. The role of Company's program representatives shall be to provide further information about University and the Distance Education Program, including the requirements of attending an online program, all in accordance with the policies and procedures of University.

**Course Registration and Retention.** Company shall communicate with both new and previously admitted participants in order to ensure participants are registering for the appropriate classes and have the necessary information for the appropriate session. The parties will agree, as part of the Distance Education Program launch, on the methodology participants and the parties will employ to allow participants to timely and efficiently register for classes. Company shall also utilize its online order entry system to collect "acknowledgements of enrollment" from registering participants each session, which requires participants to electronically affirm their registration in a particular class, books and materials ordered, payment method, and terms and conditions including, among other information, University registration policies and procedures. Company acknowledges that registration materials may be education records and that the requirements of the Family Educational Rights and Privacy Act ("FERPA") attach to Company's custodianship and utilization of education records. The role of Company representatives in this process is to assist participants in understanding and completing the administrative process of signing up for courses, ordering books, and securing method of payment, and does not include academic advisement.

**Billing and Collection; Withdrawal.** Company shall bill and collect all tuition and other charges and fees relating to the Distance Education Program. Participants are required to make payments in cash or cash equivalents, including credit cards. Company shall manage the receipt of payments from sources including tuition assistance providers, e.g., the United States military or corporate sponsors/employers, who may have specific payment terms and conditions. Company will deposit all cash received in a jointly named, separate bank account in a national banking institution, currently Wells Fargo, located in Hillsborough County, Florida, and, except for the payment of ordinary tuition refunds for withdrawal from class and supplemental tuition refunds for exceptions to withdrawal from class (approved by both parties), Company is not permitted to make any withdrawals from the account except as specifically permitted under Section III.F of this Agreement.

Ordinary tuition refunds are allowed for withdrawals up until the first day of class for each session. After the first day of class, no refunds are allowed upon withdrawal. Bisk shall include in its monthly reports the disposition of requests for refund exceptions, including the rationale for granting or denying requests.

**Support.** Company shall provide customer service during extended hours during the regular work week and on weekends to Participants who have questions or issues concerning the Distance Education Program via telephone, e-mail, and live chat. Company shall also provide technical support services to participants for the online LMS, 24 hours per day, 365 days per year, via telephone, e-mail, and live chat.