# Exhibit C-16

## MASTER SERVICES AGREEMENT

**THIS AGREEMENT** dated January 18, 2013 ("Effective Date"), by and between The Regents of the University of California, a nonprofit educational institution, on behalf of the School of Information at University of California, Berkeley, with an address of 102 South Hall #4600, Berkeley, CA 94720-4600 ("University"), and 2U, Inc., a Delaware corporation, having an office at 8201 Corporate Drive, Suite 190, Landover, Maryland 20785 ("2U").  University and 2U are referred to collectively in this Agreement as the "parties" and individually as a "party."

## W I T N E S S E T H:

**WHEREAS**, University is a world class educational institution and includes its School of Information ("School");

**WHEREAS**, University has determined a demand for an online distance learning Master of Information and Data Science program for the School;

**WHEREAS**, University and 2U have agreed to invest into the development and administration of the Program and to perform the work and furnish services as described in this Agreement;

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants herein set forth, the sufficiency of which is acknowledged, the parties agree hereby as follows:

**Definitions**.  Capitalized terms not defined within the text of the Agreement shall have the respective meanings ascribed to such terms herein or as set forth below:

"2U's Intellectual Property" means the Platform, including all patents, copyrights, trademark rights and other intellectual property rights in the Platform; all other technology, computer programs and software source code developed for the Platform, including 2U-developed or 2U-acquired user interface designs necessary to facilitate access to University's Intellectual Property via the Platform; logic and data modules, algorithms, feature sets and source code, and documentation relating thereto; all micro sites and other marketing content created, developed and/or hosted by 2U as part of 2U's Promotion Strategies (but specifically excluding any University Intellectual Property which may be used or incorporated therein during the Term); Program Trademarks (as defined below), and any information 2U collects that relates to any individual other than information relating to any University student, information relating to any University personnel (including, faculty, staff, consultants or other individuals associated with University), or any Program Applicant Information.

"Admissions Standards" means admissions standards similar to the admissions standards applicable to the Master of Information Management and Systems (MIMS) program for all student starts through the first Fiscal Year of the Program; and the admission standards to be articulated by the University at the start of the second Fiscal Year and reevaluated and potentially revised at the start of the fifth Fiscal Year to be applicable to all Program students thereafter.

"Change in Control" means (i) any merger, consolidation, acquisition or similar transaction(s) resulting in the stockholders of 2U immediately before such transaction or transactions not retaining a majority of the voting power of the surviving entity, or (ii) a sale of all or substantially all of 2U's assets.

"Competitive Programs" means any online program offering any Master of Information and Data Science degree, Master of Information Management and Systems degree, or other comparable masters degree in information management other than the Degree offered by the parties pursuant to this Agreement.

"Confidential Information" means all the business, products, services, costs, and marketing information pertaining to both on-site and online students' admissions, performance, and post-graduation outcomes as well as all information (including academic as well as personal contact and financial information) pertaining to any faculty, staff, on-site students, on-line students, applicants, and future plans of a Disclosing Party and any other information regarded as confidential and valuable by the Disclosing Party that the Receiving Party knows or should know is regarded as confidential and valuable by the Disclosing Party (whether or not the Confidential Information is labeled as confidential) except such information that: (i) is or becomes publicly known other than through the action of the Receiving Party; (ii) that was possessed before receipt; (iii) is lawfully received from a third party not owing a duty of confidentiality; or (iv) is independently developed.  For the avoidance of doubt, non-public information regarding University students, applicants, faculty and staff, and all GPA, GRE and other admission data provided pursuant to Section 2(b)(i), shall be University Confidential Information.

"Curriculum" means the Program curriculum, including all asynchronous lessons and any other course content provided by University faculty and staff.

"Degree" means the School's Master of Information and Data Science ("MIDS") degree when used in reference to the Program; and the School's Master of Information Management and Systems ("MIMS") degree when used in reference to the School's in-classroom degree program.

"Disclosing Party" means a party that discloses its Confidential Information to Receiving Party as specified in Section 8(B).

"Fiscal Year" means a period starting July 1 and ending on June 30 of the following calendar year.

"Full Time Equivalent Student" or "FTE Student" means the total number of credits started by all Program students during any semester divided by nine (9).

"Indemnified Party" means a party that is indemnified by an Indemnifying Party as specified in Section 6(D).

"Indemnifying Party" means a party that indemnifies an Indemnified Party as specified in Section 6(D).

"Non-Performing Party" means a party that breaches any of its obligations under this Agreement.

"Personal Information" means (i) any educational record of a University student or an applicant to the Program, (ii) Program Applicant Information, or (iii) other non-public personal information that relates to University students or University personnel that could be used, either directly or indirectly, to identify any such person or is otherwise protected under applicable law.

"Platform" means a technology platform for the Program, to serve as an online communication portal for students, faculty, course coordinators, course assistants, and Program staff and to enable online applications, course delivery, Program communications, development and maintenance of student portfolios, career services and such other functions as are mutually agreed to by the parties.  For the avoidance of doubt, the Platform specifically excludes all third party software that the University requires or suggests students to use.

"Program" means the online distance-learning program for University developed, delivered and used pursuant to this Agreement.

"Program Applicant Information" means non-public information collected about Program applicants as part of the Program application process, including as contained within the Program application.

"Promotion Strategies" means all marketing and promotional strategies related to the Program agreed upon by the parties.

"Produced Segments" means the asynchronous products of the Program produced by 2U from the Curriculum, and comprised of lectures, simulations, videos, PowerPoints and other typical online course content.

"Receiving Party" means the party that receives the Confidential Information of a Disclosing Party as specified in Section 8(B).

"Residencies" means face-to-face components of the Program led in a physical environment by University faculty, staff or instructors within each other's physical presence.

"Reviews" means due diligence on, audit, inspection and examination of 2U's operations, computer systems, Platform and access controls directly related to the Program.

"Semester" means each spring, summer and fall semester as defined and otherwise ordinarily referred to by University.

"Territory" means the world.

"University's Intellectual Property" means all copyrights, trademark rights and other intellectual property rights, in all of the non-technical content of the Program, including the Work Product, the Curriculum and the Produced Segments (excluding 2U's Intellectual Property), the names "UC Berkeley," "Berkeley," "I School" in association with "UC Berkeley" or "Berkeley" or other trade name, trademark, design or logo specified by University and incorporated into the Program trademark for use in connection with the Program, any information provided by University to 2U and relating to any University student or University personnel (including, faculty, staff, consultants or other individuals associated with University), and any information relating to any University student, information relating to any University personnel (including, faculty, staff, consultants or other individuals associated with University), or any Program Applicant Information.

"Work Product" consists of all results and proceeds of 2U's services hereunder in producing the Produced Segments, whether stored on tape, computer disks or otherwise, and all derivative works that are conceived, created or developed as a result of or in connection with such 2U services. For the avoidance of doubt, Work Product constitutes University's Intellectual Property and specifically excludes all of 2U's Intellectual Property.

1) <u>2U's Services</u>.   2U shall provide technological, marketing, promotional, development and support services with respect to the Program as follows:

A) <u>Recruitment</u>.   2U shall create and carry out Promotion Strategies targeted toward building awareness of the Program and generating a flow of quality applications from prospective students from the Territory.   To do this, 2U shall develop a written plan and appropriate marketing materials for the Program and shall execute this plan.   2U shall fund and develop appropriate materials and shall be responsible for recruiting students into the Program.   2U's Promotion Strategies may include, but shall not be limited to, engaging personnel or utilizing other resources to recruit prospective students, any and all lead development efforts (including purchasing leads), and any and all other efforts 2U utilizes and resources 2U engages as part of marketing the Program and generating quality applications from prospective students throughout the Territory. 2U shall draft and deliver a written plan regarding the Program to the School no less than annually, and the School shall have the right to review and approve the written plan and the ongoing right to review and approve all marketing materials related to the marketing of the Program.   As described in paragraph 2(A), the parties shall jointly agree to the creation of any marketing materials newly created or reformatted for the purpose of including the Program as part of University's offerings, and 2U shall be responsible for all direct costs incurred with respect thereto.

B) <u>Admissions Processing</u>.   2U shall collect completed online applications for the Program and forward those applications to the School's admissions office, all through the Platform in a manner that shall be agreed upon by the parties and set forth in writing, including as amended from time to time.

C) <u>Customer Service and Counseling</u>.   In an effort to maintain a high level of customer service, 2U shall provide phone support and guidance to prospective students and to students upon matriculation and throughout the Program.   Such counseling shall include technical and career issues, but 2U shall defer academic guidance to University counselors. 2U shall provide all such counseling in a manner consistent with reasonable written guidelines provided by the University.

D) <u>Residences</u>.   As described in paragraph 2(D), University may require or encourage Program students to participate in Residencies.

E) <u>Curriculum Design</u>.   In the School's design of the Curriculum as described in paragraph 2(E), 2U shall provide technical assistance and recommendations with respect to content and techniques that best use the available technologies and methods embodied in the Platform in order to meet the needs of Program students.   2U may also provide other related support as necessary and as agreed by the parties.

F) <u>Curriculum Production and Deployment</u>.  From the Curriculum designed and created by School faculty, 2U shall produce, and shall coordinate the logistics to produce, the Produced Segments and shall prepare the Curriculum for online deployment through the Platform.  Without limiting the generality of the foregoing, 2U shall be responsible for (i) all production costs with respect to each Produced Segment, including the cost of all production personnel and equipment (but not including payment to University for the use of University facilities, or salaries or other compensation of School instructional personnel), (ii) all legal clearances for music and graphics used in the Produced Segments and all legal clearances for students and others who appear in the Produced Segments, provided that the School shall cooperate with 2U in securing such clearances from School instructional personnel, and (iii) digitizing and otherwise converting all content for each Produced Segment to a medium suitable for delivery to students via the Platform.  Promptly after completion of each Produced Segment, 2U shall deliver a copy of such Produced Segment to the School.  All such Produced Segments shall conform to the School's design as set forth in Section 2(E) and be subject to the School's written approval prior to any distribution or other release thereof; 2U will make reasonable efforts to ensure that School online curricular materials are up to the quality standards of its classroom program and are competitive with the best of competing online programs.

G) <u>Program Delivery and Support</u>.  2U shall provide consulting assistance for the School's development of the instructional content of the Program, and for its efforts to hire, train and support its faculty who deliver such instruction, all as more fully described in Schedule 1(G).  Service levels defined in Schedule 1(G) shall govern 2U's support for Program students and faculty, such service levels to be revised periodically in writing upon mutual agreement by the School and 2U.  Service level agreements shall include, but not be limited to, timeliness of response and user satisfaction.  2U shall provide such services as the School may reasonably require to maintain records and communications regarding academic performance.  2U shall provide training and technical support to School faculty and other instructional personnel with respect to the use of the technologies within the Platform.  Throughout the term of this Agreement and any Term Extension(s), 2U shall support the Program with a team headed by 2U's President for Graduate Programs and a designated Senior Vice President/General Manager of the company ("SVP/GM").  The SVP/GM shall be dedicated to the delivery and support of the Program, with his or her principal office located in Berkeley, California.

H) <u>Technology</u>.  2U has built, and shall maintain, periodically revise, and host the Platform.  2U shall use commercially reasonable efforts to integrate tested new technologies and insights into the Program and the Platform.  University may request an upgrade of the Platform if, in the reasonable judgment of University, such upgrade is necessary to maintain the reputation and competitiveness of the Program.  Should the School wish to use the Platform for other programs, the related fees from 2U shall be as set forth in Schedule 1(H).

   i) <u>Specifications and Service Levels</u>.  The Platform will be accessible through the World Wide Web, and the specifications and performance standards for the Platform and the related service level agreements are as set forth in Schedule 1(H)(i) attached hereto.  Such service level agreements shall address availability of the Platform (subject to reasonable amounts of scheduled downtime for maintenance and similar matters), correction of any errors, bugs and defects in the Platform and 2U's responsiveness to students and other users experiencing problems with the Platform.  At least once every twelve months following the Program

Launch, 2U shall propose changes and updates to the specifications and performance standards for the Platform in order to maintain the effective performance of the Platform.

ii) <u>Ongoing Quality</u>.  After Program Launch, the School shall notify 2U if the Platform has failed to satisfy the specifications and standards contemplated hereby or if 2U is in default of its service level agreements, specifying any failure or default in reasonable detail and suggesting how the School would like such failure to be remedied, and 2U shall, at its expense promptly after receipt of the School's notice, modify or improve the Platform or take other corrective action in order to bring the Platform into compliance with such specifications and standards or improve its service to comply with such service level agreements.  Failure of the Platform to meet such specifications and standards or of 2U to comply with such service level agreements within five (5) days after 2U's receipt of the School's notice, shall, pursuant to Section 5(C) below, constitute a material breach by 2U of this Agreement, subject to the right of University to terminate this Agreement according to Section 5.

I) <u>Program and Student Evaluation</u>.  2U shall gather ongoing data of Program students to assist with overall Program evaluation, including student satisfaction with the Program, evaluation of instructors and such other matters in such form and at such frequency as the School may reasonably require.  2U shall share evaluative data frequently (as agreed upon by the parties) to help drive ongoing improvement.  The data that 2U gathers pursuant to this Section 1(I) shall constitute University's Intellectual Property unless it does not relate to any University student, University personnel (including, faculty, staff, consultants or other individuals associated with University), or Program Applicant.

J) <u>Career Services</u>.  2U shall use good-faith efforts to support through the Platform and through other services provided by 2U under this Agreement the career services provided by the School pursuant to Section 2(K) to Program participants and graduates.

K) <u>Compliance</u>.

i) <u>Personal Information</u>.  2U acknowledges that University is subject to laws and regulations, which govern and restrict the collection, storage, processing, dissemination and use of Personal Information.  2U shall, and shall cause its employees, agents, servants, principals and any subcontractors, to comply at all times with all applicable laws, rules and regulations, including privacy and information security laws and regulations relating to the performance of 2U's obligations under this Agreement, and University internal policies.  Without limiting the generality of the foregoing, 2U agrees (a) not to collect, store, process, disseminate or use any such Personal Information obtained from University except to the extent expressly permitted or required in the performance of its obligations under this Agreement and in compliance with law, (b) to store all such Personal Information only in secured form within 2U's information systems and (c) not to sell, distribute, release or disclose lists or compilations of any items of Personal Information unless in compliance with applicable law and with the prior written consent of University (including through the School, as appropriate) or of the subject(s) of the Personal Information to be released or disclosed.  Any disclosure of Personal Information by 2U in the performance of its obligations hereunder shall be made only on a "need-to-know" basis and subject to an applicable confidentiality

agreement or other obligation substantially similar to the confidentiality, privacy and information security requirements imposed on 2U under this Agreement and applicable law.

ii) <u>Student Privacy Rights</u>.  Without limitation of its obligations under paragraph 1(K)(i) above, (a) 2U shall take all reasonable measures to protect the Personal Information of Program students consistent with Family Education Rights and Privacy Act ("FERPA"), (b) 2U shall furnish the School a copy of 2U's information security procedures for the storage and handling of Personal Information prior to the commencement of 2U's handling and processing of such matter, (c) 2U shall furnish the School a copy of any update or other modification of such security procedures and (d) such security procedures and all updates and modifications thereof shall be subject to the advance written approval of School.

iii) <u>Agency Regarding Student Information</u>.  For the term of this Agreement and as needed to satisfy regulatory requirements applicable to University, University may appoint 2U an agent of the University Office of the Registrar for the use of student education records and other Personal Information solely for the purpose of providing the student and graduate services required hereunder throughout the Program and thereafter, including counseling of prospective students, continuing contact with graduates of the Program, and ongoing employment of Program students and graduates.  Under such agency arrangement, 2U shall be under the direct control of University and must follow the same rules and laws as University with respect to all such student education records and Personal Information. University shall comply with the annual FERPA notification requirement to parents and eligible students.

iv) <u>Incentive Compensation Rule</u>.  2U shall compensate its employees engaged in the recruitment of Program students, or in the supervision of such employees, only in accordance with the provisions of 34 CFR § 668.14 (b)(22), commonly referred to as the Incentive Compensation Rule.

v) <u>HEOA Section 495 Compliance</u>.  2U shall remain in compliance with HEOA Section 495. Without limiting the foregoing, 2U shall, at its sole expense, have and maintain security mechanisms in place to ensure that each student registering for a course is the same student who participates in the course or receives course credit.  Such security mechanisms shall, as agreed between the parties, include one or more of the following methods: (a) a secure login and pass code; (b) proctored examinations (with the parties to share equally the marginal costs of any live proctoring); and (c) new or other technologies and practices that are effective in verifying student identification.  Nothing herein shall prohibit 2U from requiring Program students to purchase specific hardware intended to enable the security mechanisms referenced herein.

vi) <u>Disability Access</u>.  2U shall be responsible for assuring compliance with all applicable accessibility requirements of California and federal disability laws, including section 508 of the Rehabilitation Act of 1973, as amended (29 U.S.C. 794d), and its implementing regulations set forth in Title 36, Code of Federal Regulations, Part 1194 with respect to the Platform, Produced Segments and all other services provided by 2U hereunder, provided however that University will be the party reasonably determining, in consultation with 2U, how those legal obligations will be met in a particular case.  University shall be responsible

for assuring compliance with all other applicable accessibility requirements of California and federal disability laws, including relating to the Program, specifically including all costs associated with making real-time faculty presentations accessible.

L) <u>Monitoring and Audits Generally</u>.

i) 2U shall regularly (a) measure, monitor and track the performance of its services, obligations, and Platform; and compare such performance to the service level agreements and other specifications and standards provided for in this Agreement, (b) detect and promptly cure deficiencies and (c) report such deficiencies and cures to the School on a quarterly or other basis as agreed between the parties in a form mutually agreed by the parties from time to time.  Such assessment of the performance of 2U's services and obligations shall include providing the School an opportunity to assess or comment to 2U on 2U's performance of its services and obligations, irrespective of any other measurements.

ii) At least annually as requested by the School, 2U shall provide reasonable, mutually acceptable, written certifications as to 2U's compliance with applicable laws, the service level agreements and other specifications and standards provided for in this Agreement, and such other matters as may be reasonably requested by the School.  For the avoidance of doubt, such written certifications shall include any sub-certifications reasonably required by the School to enable the School to provide its own written certifications to any students, graduates or regulators as required by applicable law or contract.  The School shall consult with 2U prior to agreeing to provide certifications with regard to the Program that will require a 2U sub-certification.

iii) Upon the School's request, 2U will promptly furnish (in a time frame not to exceed fifteen (15) business days) the School's authorized representatives and auditors (consisting of one School representative and one representative of the University's Chief Financial Officer) copies of (a) applicable 2U records, including testing results (whether conducted by 2U or a third-party), (b) 2U's compliance policies and procedures applicable to 2U's operations related to its services and obligations, and (c) any other records required to be delivered by 2U pursuant to this Agreement in each case in order to conduct Reviews or as otherwise relating to 2U's performance under this Agreement for purposes of verifying any sums discussed in Section 3 hereof.  At the School's reasonable request and expense, Reviews also may include "ethical hacks," penetration testing or other testing of the 2U system and 2U's information security, data protection, disaster recovery, business continuity and confidentiality policies, procedures and safeguards.  The School agrees that Reviews will be completed at 2U's facilities when relating to assessment of the Platform such that on-site review is the only reasonable way to perform the assessment upon reasonable advance notice during regular business hours.  The parties will cooperate in good faith to minimize the disruption associated with on-site Reviews, including the timing of such Reviews.  Notwithstanding any of 2U's obligations set forth in this paragraph, 2U's release of any information hereunder shall be deemed Confidential Information for purposes of this Agreement to the extent it does not meet one of the exceptions set forth in the definition of that term.

iv) If 2U receives a request or demand from an applicant, student or graduate of the Program, or a regulator in regard to University or the School or a student or graduate of the Program, requesting a Review, 2U shall notify University or the School (as appropriate) promptly, and 2U shall work with University and/or the School (as appropriate) or any such student, graduate or regulator in conducting and responding to any such request for a Review, provided that 2U shall not be required to provide a Review to a third party (excluding regulators), except as required by law.

v) 2U will discuss with School personnel, or provide summaries to the School of, any material violations of 2U's code of ethics, laws, or other compliance-related policies and procedures (whether internal to 2U or where compliance with University policy is required by this Agreement) by 2U personnel related to 2U's performance hereunder, and 2U will promptly notify the School of (and, if requested by the School, provide the School summaries of) material changes to 2U's code of ethics and other compliance-related policies and procedures applicable to 2U's performance hereunder.  Notwithstanding any of 2U's obligations set forth in this paragraph, any release of information shall occur in a manner that ensures that the confidentiality and integrity of such information is maintained.

vi) Without limiting any other provision contained herein, if 2U becomes aware, for any reason, including as a result of any self-testing, "ethical hack," penetration testing or other monitoring or other Review contemplated in this Section 1(K), of a deficiency in meeting any service level or other specification or standard in the performance of any service or obligation under this Agreement, then 2U shall promptly, at its expense  (a) perform an analysis to identify the cause of any such failure or deficiency, (b) provide the School with a report identifying the cause of such failure or deficiency and describing the intended procedure/steps for correcting or resolving such failure or deficiency and the timeline for completing such procedure/steps, (c) if requested by the School, meet with the School (in person or by teleconference) to discuss such failure or deficiency and such intended procedure/steps and timeline, (d) promptly cure such failure or deficiency and (e) after such failure or deficiency is cured, promptly notify the School that such failure or deficiency has been cured.

M) <u>Data Sharing</u>.  2U shall provide the following information to the School via electronic access, updated daily:  (a) the number of prospective students contacting 2U as of that date during the month; (b) the number of non-completed applications in the process of completion as of that date during the month; (c) the number of completed applications sent, delivered or otherwise transmitted to the School as of that date during the month; and (d) such other information as may be mutually agreed upon by the parties from time to time.

N) <u>2U Employees & Contractors</u>.  2U shall be responsible for any liabilities arising from 2U's employees and use of subcontractors hereunder.  At the School's reasonable request, except if such removal is prohibited by law, 2U agrees to promptly remove from involvement with the Program or from providing services hereunder any 2U employee or contractor, provided that such employee or contractor is one who (i) uses an email address with a domain of "berkeley.edu," (ii) holds himself or herself out as acting on behalf of University or the School in the course of performing services under this Agreement, or (iii) for whom the Program constitutes 50% or more of his or her employment responsibilities.

2)  University's Services.  The School shall be exclusively responsible for ensuring the academic quality and academic integrity of the Program, including the following:

   A)  Recruitment.  The Program shall be branded with a trademark mutually agreed upon by the parties ("Program Trademark").  University and the School shall promote the Program as in the same method and manner as in-classroom programs at the School, including placement on the School's website (if such placement is given to any other School program), within the School's career center, and at all student recruitment events and professional school fairs attended by School representatives in a manner comparable to the promotion of the School's in-classroom Degree program, and, to the extent University and/or the School promotes the School's in-classroom Degree programs, it will promote the Program in a comparable manner, including by characterizing the Program as equal in quality to the in-class program.  Further, the School shall consult with 2U in the development of additional Promotion Strategies, and the School shall have the right to review and approve all marketing and other materials related to the Program prior to their use.

   B)  Admissions Processing and Financial Aid.

      i)  After the School's receipt of a complete application from 2U (as set forth in Section 1(B) above), the School shall, in its sole discretion, determine which qualified students shall be admitted to the Program. The process shall be as objective as possible to help make the process predictable for the parties and for students.  The School shall share with 2U non-personally identifiable GPA, GRE and other admissions data (showing, for example, percent of admits in bands of college GPA and other relevant admissions qualifications) to assist 2U in developing an understanding of the School's admissions process, determining how to apply admissions standards, and making projections.  After receipt of an applicant's completed application, for ninety percent (90%) of applications, the School shall admit or reject each applicant, within ten business days (excluding campus holidays and closures) and will ready admitted students for matriculation in accordance with the School's standard matriculation timelines.  At such time as the School institutes an in-classroom MIDS program, the School shall apply admissions standards to the Program that will yield a class equally qualified to that of the then current in-classroom program.

      ii)  The School shall, in its sole discretion, establish Admissions Standards for the Program that are at least as competitive as those for any of School's residential degree programs. The School and 2U shall cooperate to make the admissions process and the application of admissions standards streamlined, transparent and clear to enable 2U to target its promotional efforts to students likely to be accepted.

      iii)  University shall be solely responsible for the administration of all financial aid programs and will process all requests for aid quickly. University shall provide financial assistance to Program students similar to that offered students in the School's classroom degree program. 2U shall not be involved in any manner in the award or disbursement of financial assistance provided pursuant to Title IV of the Higher Education Act of 1965, as amended.  The parties may agree to provide scholarships and fellowships to Program students in accordance with the terms specified in Section 3 below.

C) <u>Student Service and Counseling</u>.  Once admitted to the Program, students shall, to the extent practicable given the inherent differences between in-classroom and online students, have similar rights and privileges and receive services similar to those received by the School's in-classroom Degree students.  The School shall ensure the availability and participation of School faculty and staff, and provide academic counseling in Program requirements, add/drop policies, probations, leave of absence and similar matters.  Fees for specific activities (<u>e.g.</u>, an on campus gymnasium charge) will not be imposed on Program students who cannot reasonably benefit from the related services that appropriately apply only to in-classroom Degree students. The School shall provide academic counseling to Program students (in-person to students visiting the campus and by telephone or internet to others) to answer questions concerning incoming/outgoing transfer credits, specific prerequisite academic or certification requirements, academic petitions or disputes and leaves of absence. The School shall provide academic support to any student in danger of dropping or being dropped from the Program, and shall provide academic support to Program students equivalent to the academic support provided to in-classroom students.

D) <u>Residencies.</u>  University may require or encourage Program students to participate in Residencies, and will establish locations and other logistics as University deems necessary to conduct and implement any such Residencies.

E) <u>Curriculum Design</u>.  The School shall be solely responsible for the timely design, timely creation and ongoing revision of the Curriculum, making its reasonable efforts to have the framework of the Curriculum set by June, 2013, so that the Program can be launched by September, 2014. University shall require School faculty members' timely participation in the creation and design of the Curriculum and in any modifications thereof.  As required by 2U and the Platform, School faculty or other personnel provided by the School shall provide reasonable assistance (including timely participation) to 2U's web team in the adaptation of the Curriculum for the Program to web-based presentation via the Platform. The School shall be solely responsible for the ongoing review and revision of the Curriculum as the School determines, at its sole discretion, to be necessary and appropriate to maintain the academic quality and academic integrity of the Program, provided that 2U shall use reasonable efforts to promptly include such revisions into the Produced Segments.  Further, while 2U and the School are initially readying the Curriculum for the Program, the School shall provide 2U with meeting space at the School for 2U employees in order to facilitate such employees' interactions with participating faculty.  The School shall ensure the availability and participation of faculty and other personnel to achieve the Curriculum design as set forth in this Section 2(E).  University shall be responsible to obtain any legally required rights, permissions, consents or other clearances required, whether relating to copyright or otherwise, with respect to the use of any content or materials (educational or otherwise) incorporated into the Curriculum (excluding any clearances required for the Produced Segment more generally pursuant to Section 1(F)). University shall take all required actions necessary to ensure that University's faculty members do not make available during the term or any Term Extension(s) all or substantially all of the Curriculum, any Work Product and/or any Competitive Program on the Internet for any purpose, including but not limited to where such Curriculum (or portions thereof), Work Product and/or Competitive Program includes any University Intellectual Property created by 2U and owned by any faculty member.

F) <u>Curriculum Production and Deployment</u>.  The School shall use reasonable efforts to prepare drafts of the syllabi (and to obtain timely any required internal approval(s)) (i) on or before June 1, 2013, for the courses to be included at the time of Program Launch, and (ii) on or before the date(s) to be mutually agreed upon by the parties for courses to be offered subsequent to Program Launch.  The School shall also use reasonable efforts to develop such syllabi into appropriate materials in time for production to meet such schedules.  The School shall secure the commitment of those School faculty members and other instructional personnel selected by the School for the Produced Segments and for any modifications to the Curriculum required by the online delivery mechanism.  Unless otherwise agreed in writing by the parties, the School shall be solely responsible for the expense of such faculty, other instructional personnel and other University and School staff.  Each Produced Segment shall conform to the School's design and be subject to the School's review and written approval prior to any distribution or other release thereof.  Each course approved by the School shall be released for distribution on the Platform as such course is approved, subject to the provisions of Section 1(G) and 1(H) hereof.  University and the School shall be solely and exclusively responsible for ensuring that University's faculty members do not at any time use any Produced Segment, in whole or in part, for any purpose other than (i) as part of the Program or (ii) as permitted pursuant to Schedule 1(H), and that all such use shall be otherwise in accordance with this Agreement.

G) <u>Course Development & Support</u>.  Each course that comprises Produced Segments shall be taught exclusively by School faculty and other instructional personnel selected by the School.  The School and 2U shall be jointly responsible for the creation of a training curriculum and the School shall be responsible for the hiring, training, support, management and oversight of the work of the School faculty and other instructional personnel, provided that 2U will provide consulting support to assist the School in such efforts, in the School's development of the instructional content of the Program, and in the School's efforts to hire, train and support its faculty who will deliver instruction within the Program.  The School shall use reasonable efforts to maintain faculty availability, experience, quality and student to faculty ratio similar to those of competitive degree programs.  At 2U's reasonable request, University and the School shall provide 2U with access to information pertaining to both classroom-based and online students' admissions, non-aggregated academic performance, Program satisfaction and post-graduation outcomes, as well as information pertaining to relevant faculty, staff information, to the extent permitted by and subject to the requirements of FERPA and such other laws and regulations as may pertain The School shall identify the course materials to be used within the Program reasonably in advance of each course start.

H) <u>Technology</u>.  The School shall, upon 2U's reasonable request, advise and consult with 2U as to the design of the Platform and its sufficiency for use for the Program.  At 2U's request, the School shall participate with 2U in the testing and, as necessary, re-testing of the Platform as contemplated by Section 1(H) above.

I) <u>Academic or Other Certifications</u>.  University and the School shall be responsible to secure any accreditations, registrations or approvals with respect to the Program as may be necessary to operate in any domestic or international jurisdiction or to otherwise accomplish the activities set forth in this Agreement.  2U shall provide to University and the School reasonable assistance in securing such accreditations, registrations or approvals as University and the School may reasonably request and as mutually agreed by the parties.  2U shall prepare all necessary

applications and/or other forms associated therewith for review and approval by University and University shall execute and file all such approved applications and/or other forms and, as an expense of the Program, pay all associated filing fees.

J) <u>Evaluation</u>.  The School shall oversee the Program evaluation, utilizing University and School data and the data gathered by 2U pursuant to Section 1(I) above and other available data. University and the School shall at their sole discretion determine satisfaction of degree requirements, award all grades, and confer all degrees.  University and the School shall share evaluative data frequently (as agreed upon by the parties) to help drive ongoing improvement of the Program.

K) <u>Placement</u>. The School will, to the extent practicable given the inherent differences between in-classroom and online students, make its career counseling and placement resources available to Program students on a basis similar to that provided to students enrolled in the School's in-classroom Degree program, including in-person meetings to the extent Program students visit the School's campus.

L) <u>Alumni</u>.  University and the School shall be solely responsible for the management of alumni relationships, provided that the School may request 2U to provide reasonable assistance in maintaining contact with Program alumni and tracking their career progress.

M) <u>Data Sharing</u>.   University and/or the School (as applicable) will provide 2U with real time electronic access to:  (a) information about Program students, which shall include University identification number, name, address, University email address and any activity restrictions (<u>e.g.</u>, financial, health or other holds on newly admitted and registered students); (b) Program professor and administrator information, which shall include basic information regarding each Platform user and his or her role; (c) Program course information, which shall include information regarding student registrations for courses and sections, section numbers, professors and related information; and (d) such other information as may be mutually agreed upon by the parties from time to time.  Information released to 2U in compliance with this provision shall be deemed University Confidential Information and any Personal Information contained therein shall be handled in accordance with Section 1(K) hereof.

3) <u>Accounting</u>.

A) <u>Fiscal Year</u>.  The first Fiscal Year of the Program shall end on June 30, 2015.

B) <u>Program Tuition</u>.  University shall collect all Program tuition.  University shall have the sole authority to set tuition for the Program.  Except as set forth in Section 2(C) above, tuition, non-tuition fees and other charges for Program students shall be no lower than those for comparable classroom students of the School, provided the School may impose additional fees or charges for activities only available to online students.

C) <u>Finances</u>. University shall compensate 2U as follows:

   i)   University shall calculate the number of FTE Students in each Fiscal Year.  For its technology, curriculum production and deployment, student recruiting, technical support and

other services, 2U shall receive the following payments from University based on the number of FTE Students in each Fiscal Year:  for the first 499 FTE Students in each Fiscal Year, 2U shall receive $39,000 ("Base Fee") per FTE Student; for the next 500 FTE Students in each Fiscal Year (*i.e.*, 500 to 999 total FTE Students in a Fiscal Year), 2U shall receive Base Fee x 98.077 per FTE Student. Should there be 1,000 or more FTE Students in a Fiscal Year 2U shall receive Base Fee x 92.308% per each FTE Student (*i.e.*, including the first 999 FTE Students) in that Fiscal Year.  2U shall be paid for any partial FTE Student on a percentage basis.

ii) The initial per Program credit charge shall be $2,222.22.  Should University increase the price per Program credit charged to Program students at any time, the Base Fee set forth in (and including as may be reset in accordance with) Section 3(C)(i) above shall automatically increase by the same percentage; that is, in the amount of the percentage of the increased price per Program credit over the immediately previous price per Program credit.

iii) The Base Fee set forth in Section 3(C)(i) shall be effective as of the Effective Date.  Any increases to the price per Program credit charged to Program students at any time after the Effective Date shall be subject to Section 3(C)(ii) above.

iv) The parties agree that the University on-campus students shall be allowed access to the Platform and Produced Segments in exchange for certain fees as more fully set forth in the Schedule 1(H) attached hereto and incorporated hereinto as a part of this Agreement.

D) <u>Reports and Payment</u>.

i) For each course start during the term of this Agreement, University shall provide to 2U the following reports on or before the 30th day after the commencement of each course start, (a) a listing for such course start of: (i) the students offered admission by University to the Program, (ii) the students who enrolled in or dropped from each course in the Program, including a course listing for the enrolled students, (iii) the total number of credits started by each Program student in any course start, and (iv) a calculation of the payments between the parties pursuant to paragraph 3(D)(ii) below for such course start; and (b) a reconciliation of the foregoing described report against actual results obtained during the most recently completed course start.

ii) Concurrently with the delivery of each report required by paragraph 3(D)(i) above, University shall also pay or adjust, as applicable, the payment due to 2U for the subject course start by electronic transfer of funds to such bank account as 2U may direct by notice to University no later than ten (10) business days prior to the scheduled date for such electronic transfer.  The payment for the most recently commenced course start shall equal (a) the payment due to 2U (as determined pursuant to paragraph 3(C)(i) above) for such course start (b) adjusted by changes to the amount due to 2U for course starts prior to the most recently commenced course start.

iii) Any payment by 2U to University to make up any post-course start adjustment shall be paid within thirty (30) days after 2U's receipt of the applicable report.

iv)  A final payment of amounts due from either party to the other pursuant to this Section 3(D) shall be made within thirty (30) days after the termination or expiration of this Agreement.

v)  Each month from January 2014 through December 2014, 2U shall advance to University $25,000.

vi)  Each month from January 2016 through December 2016, University shall pay to 2U  $25,000 per month as repayment of the advance received under paragraph 3(D)(v).

vii)  No less than three business days after submission to its Board of Directors, and upon prior notice of availability to the University, 2U shall make available to no more than five (5) University employees, as designated by the School, for three (3) business days, via password protected access on the world wide web, copies of its unaudited quarterly financial statements.  The University may review such statements online solely to confirm 2U's ongoing economic viability; provided that the University shall not (and shall not cause or direct other persons or entities to) copy or otherwise capture, in any tangible form (*e.g.*, screen shot, printing, download, hand-copied, etc.), such 2U reports.  2U's obligation under this subparagraph shall continue until the earlier of (x) the University's confirmation to 2U that, in its reasonable judgment, 2U's business is economically viable on an ongoing basis; or (y) 2U stock becoming a publicly traded company through the effectiveness of a registration statement under the Securities Act of 1933, as amended.

E)  <u>Maintenance of Books and Records; Rights on Audit</u>.  University shall maintain such books and records as are necessary to substantiate all calculations and payments made in connection with the Program and this Agreement.  During the term of this Agreement and any Term Extension(s) for a period of 180 days after the expiration or termination of this Agreement for any reason, 2U shall have the right to examine such books and records that are specifically related to the Program and this Agreement.  The parties will cooperate in good faith to minimize the disruption associated with 2U's exercise of its rights pursuant to this Section 3(E).  Such examinations shall be held upon reasonable advance notice to University at University's offices during normal business hours and shall take place no more frequently than once each Fiscal Year.  Once a particular Fiscal Year has been so examined, such Fiscal Year shall not be subject to any subsequent re-examination pursuant to this Section 3(E) or otherwise, unless 2U can show reasonable grounds for believing that an uncorrected error that would materially affect the amounts payable to 2U for such Fiscal Year occurred in such previously examined Fiscal Year, either because a new error is subsequently found in a different Fiscal Year or 2U can demonstrate that new information evidencing such error has come to its attention.  Any such examination shall be made at 2U's sole cost and expense.  If such examination discloses that any amounts have not been paid or have been made in incorrect amounts, and such amounts are not in dispute, the parties shall promptly take appropriate steps to correct such errors in payment, including interest accruing at 12% per annum such interest to be calculated from the date such payment should have been made to the date on which such payment is made, and any reasonable costs of the audit.

4) <u>Intellectual Property</u>.

A) <u>University Property</u>. 2U acknowledges that University's faculty members own or shall own some of the University Intellectual Property created with the aid of 2U's services and/or licensed to 2U by University hereunder. University shall obtain all required licenses, rights and permissions from its faculty members (including all required licenses, rights and permissions for the parties to continue to use (consistent with this Agreement) any intellectual property owned by any faculty member incorporated into the Program following any such University faculty member's termination of employment with University for any reason, as necessary for University and 2U to perform their obligations as set forth in this Agreement. As between University and 2U, University shall own and retain all right, title and interest to University's Intellectual Property, provided that nothing in the foregoing or this Agreement shall affect the ownership of any University Intellectual Property including the copyright of any underlying content by and between University and any or all of its faculty members. 2U acknowledges and agrees that (i) all Work Product shall constitute a "work made for hire" for University, as that phrase is defined in Section 101 and 201 of the Copyright Act of 1976 (Title 17, United States Code), including a work specially commissioned by University, and (ii) notwithstanding the foregoing subparagraph (i), if and to the extent 2U retains any interest in the Work Product (in whole or in part), 2U hereby grants, assigns and transfers to University all right, title and interest in and to the Work Product, and all intellectual property rights therein, including all patent, copyright, trade secret and other proprietary rights, and the right to make any modifications, adjustments or additions thereto (2U hereby expressly waiving any *droit moral* or similar rights to object to any such changes), the right to make and distribute derivative works thereof and the right to all claims for past infringement thereof. Upon University's request, 2U shall execute and deliver to University all documents and instruments, including copyright assignments, and shall otherwise assist University, at University's expense, to perfect in University the sole and exclusive right, title and other interests in the Work Product. In the event University is unable, because 2U is no longer in business, to obtain the signature of 2U to any document or instrument necessary or desirable to apply for protection of, or to enforce any action with respect to, any intellectual property right in or to the Work Product, 2U hereby irrevocably designates and appoints University and its duly authorized officers and agents as 2U's agent and attorney-in-fact, whose power is expressly coupled with an interest, to act for and on behalf of 2U, to execute such documents and instruments and to take all lawfully permitted actions to protect University's interests in any intellectual property right with the same legal force and effect as if executed by 2U. During the term of this Agreement and any Term Extension(s), University may use the Work Product solely with respect to the Program and as otherwise consistent with this Agreement. Notwithstanding the foregoing, University may use the University's Intellectual Property, including the content of all asynchronous lessons and the Work Product, and Produced Segments (including the 2U Intellectual Property contained therein), in any of University's in-class programs during the term (and Term Extension(s)) of this Agreement, provided that 2U makes no representations or warranties with respect to the usability or functionality of the Produced Segments when accessed or used outside of the Platform.

B) <u>2U Property</u>. 2U shall own and retain all right, title and interest to all 2U's Intellectual Property, provided that, for further clarity, 2U's rights therein shall not give it any right whatsoever in or to any portion of University's Intellectual Property, none of which may be used by 2U except in accordance with the express terms of this Agreement. Anything in this Agreement to the contrary

notwithstanding, this Section 4(B) shall not apply to software licensed from persons or entities other than the parties and included in 2U's Intellectual Property by mutual agreement of the parties. University hereby expressly acknowledges that 2U shall be the owner of the Program Trademark and all logos, designs, or other branding feature(s) relating to the Program Trademark, excluding any University Intellectual Property (as already set forth in the definition of University's Intellectual Property). University acknowledges that 2U shall have the right to take any and all actions necessary to apply to the United States Patent and Trademark Office for Program Trademarks, and to otherwise take any and all actions necessary to maintain and protect Program Trademarks. University's acknowledgment of 2U's ownership of Program Trademarks is subject to the express conditions that (i) the parties shall remain at all times obligated to utilize Program Trademarks solely in connection with the Program and consistent with this Agreement; and (ii) 2U shall execute a royalty free licensing agreement with the University with respect to the University's use of any 2U-owned Program Trademark after termination of this Agreement. Should the Program Trademark contain any University Intellectual Property, 2U expressly acknowledges that University shall be the owner of such Program Trademark and shall have the right to take any and all actions necessary to apply to the United States Patent and Trademark Office for such Program Trademark, and to otherwise take any and all actions necessary to maintain and protect Program Trademarks that contain University Intellectual Property.

C) <u>License of University Intellectual Property</u>. University grants to 2U the non-exclusive right to use, during the term of this Agreement and any Term Extension(s), the names "UC Berkeley," in combination with the "I School," any Program Trademark(s) owned by the University, and/or any other trade names, trademarks, service marks, designs and logos specified by University solely for use by 2U in connection with the Program, including 2U's marketing and promotion of the Program, subject to the School's prior approval of the form and manner of each such use. Subject to the limitation of the foregoing sentence with respect to University trademarks, trade names, trademarks, service marks, designs and logos, University and the School grant to 2U the non-exclusive right and royalty free license during the term of this Agreement to use all of University's Intellectual Property within the Territory *only* to the extent necessary for University's Intellectual Property to be incorporated into or used with the Program pursuant to the terms of this Agreement (but specifically including 2U's marketing and other obligations set forth herein). Such right and license shall include without limitation (except that the use must be pursuant to and in furtherance of the terms of this Agreement) a license of all rights under copyright and the rights to reproduce and copy University's Intellectual Property in all editions, versions and formats for print and in any other form or medium, whether now known or hereafter known, throughout the Territory, including electronic, magnetic, digital, laser, or optical-based media (but excluding the right to make any changes in University's Intellectual Property or to create derivative or related products). 2U shall acquire no rights in any of University's Intellectual Property or in any of University's or the School's trade names, trademarks, service marks, designs or logos from 2U's use hereunder. 2U shall require any party to whom or to which it grants (as permitted by and in accordance with the terms and conditions of this Agreement) a sublicense of any University Intellectual Property to be bound by terms no less restrictive than those set forth in this Section 4(C).

D) <u>License of 2U Intellectual Property</u>. 2U grants to University and the School the right and license during the term of this Agreement and any Term Extension(s) to use all of 2U's Intellectual Property, including a license of all rights under copyright and the rights to reproduce and copy

2U's Intellectual Property in all editions, versions and formats for print and in any other form or medium, whether now known or hereafter known, throughout the world, including electronic, magnetic, digital, laser, or optical-based media, for use *only* in conjunction with:

(i) the School's delivery of the Program as anticipated by this Agreement,

(ii) the School's and non-Program students' use of the Produced Segments and/or Work Product pursuant to Schedule 1(G),

(iii) the School's and/or non-Program students' use of the Platform pursuant to Schedule 1(G), and

(iv) as otherwise agreed by the parties in writing in ways that are not competitive with the Program, provided that all such uses comply with the terms of this Agreement.

2U shall also grant to each student enrolled in the Program a royalty-free license to use the 2U Intellectual Property as part of the School's permitted delivery of the Program to such student.

E) <u>Other Uses of Marks</u>.  Other than the licenses granted in Sections 4(C) and 4(D), no party may use the other's name, trademark, sign, logo or similar designation without each other's prior written approval, which may be granted in such other's sole discretion.  The rights under Section 4(C) above may not be (i) transferred, except upon a Change in Control or (ii) sublicensed.

F) <u>Infringements by Others</u>.  Each party shall promptly report in writing to the other during the term any known or suspected infringement of any of University's Intellectual Property or 2U's Intellectual Property of which such party becomes aware, and shall provide the other with all available evidence supporting such known or suspected infringement or unauthorized use.

G) <u>Infringements by Parties</u>.  In the event that a party becomes aware of any claim that the practice by either party in the development, production, promotion, marketing or distribution of the Program infringes the intellectual property rights of any third party, such party shall promptly notify the other party.  In any such instance, the parties shall cooperate and shall mutually agree upon an appropriate course of action.  Each party shall provide to the other party copies of any notices it receives from any person or entity other than a party regarding any alleged infringement or misappropriation of third party intellectual property relating to the development, production, promotion or marketing of the Program.  Such notices shall be provided promptly, but in no event after more than fifteen (15) days following receipt thereof.

5) <u>Term and Termination</u>.

A) <u>Program Launch</u>.  The parties contemplate a rollout of the Program as follows:  initial launch of the Program projected to start in January, 2014 (the "Program Launch"), consisting of 3 – 4 courses and including no more than 50 students for the initial launch, provided that the parties may mutually agree to change the date of the Program Launch, and the parties shall agree in good faith as to when the Program is ready for Program Launch.  The parties shall mutually agree on an additional 9 – 11 (12 – 15 total) additional courses to be incorporated into the Program subsequent to Program Launch.  The parties shall work towards no fewer than four (4) start dates per Fiscal Year for the Program.

B) <u>Term</u>.  This Agreement and its term shall be deemed to have commenced on the Effective Date and continue for fifteen (15) Fiscal Years ending on June 30, 2029, subject to earlier termination or non-renewal as set forth in Sections 5(C), and 5(D) below, and subject to automatic three (3) year extensions as set forth in Section 5(E) below.

C) <u>Termination For Cause</u>.

   i)  University may terminate this Agreement effective upon delivery of written notice in the event of any material breach by 2U of this Agreement that is not cured within 60 days of 2U receiving written notice of such breach, provided that such written notice shall describe in detail such breach.

   ii)  2U may terminate this Agreement effective upon delivery of written notice in the event of any failure by University to make payments, or any other material breach of this Agreement by University that is not cured within 60 days of University receiving written notice of such breach, provided that such written notice shall describe in detail such failure to pay or other breach.  2U may also terminate this Agreement effective one year after delivery of written notice if University unilaterally materially raises its Admissions Standards for the Program.

   iii)  A Non-Performing Party that receives a notice of breach and that has reasonable grounds for the position that the alleged breach is not, in fact, a breach hereof, may apply to a court for a temporary restraining order or preliminary injunctive relief to in effect toll the period hereunder to cure such breach or other similar relief, until the court has determined whether such alleged breach is, in fact, a breach hereof.

   iv)  Either party may terminate this Agreement if:  (a) at any time the other party files or has filed against it a petition for bankruptcy, insolvency, reorganization or for the appointment of a receiver, and such petition is not dismissed, vacated or set aside within sixty (60) days from the commencement thereof; (b) either party becomes insolvent or unable to pay its debts as they mature in the ordinary course of business; or (c) either party takes any action to make an assignment for the benefit of creditors or to liquidate or to dissolve.

   v)  Should 2U (or its successor organization) become unable to continue to do business in the ordinary course through bankruptcy or otherwise, and following a reasonable opportunity to restructure or otherwise cure, 2U (or its successor organization) shall immediately make the Platform (including any Platform materials reasonably required for the School to use the Platform) available to University to enable the School to continue to deliver the Program and receive the benefits afforded to University under or pursuant to this Agreement, except that such rights shall be fully subject to, and only as permitted by, all applicable licensing and other agreements relating to the Platform and Platform materials.  University shall be obligated at all times to maintain the confidentiality of all confidential aspects of the Platform (including any Platform materials).  Should the event(s) causing University to exercise its rights under this Section 5(C)(v) be remedied, the School's right to use the Platform shall cease.

vi) Beginning on July 1, 2018, either party shall have the right to terminate this Agreement upon ninety (90) days prior written notice to the other party if less than a total of one hundred and fifty (150) students enroll in the Program in the prior Fiscal Year, provided that such termination right shall be waived if not exercised within ninety (90) days after the close of such prior Fiscal Year.

D) <u>UC Berkeley Termination following 2U Change in Control</u>.  Should 2U experience a Change of Control, UC Berkeley may terminate this Agreement prior to the end of the Initial Term if either:

   i) such change results in 2U being controlled by a person or entity in whom or with whom UC Berkeley would not be permitted to invest or contract based on UC Berkeley's investment policies then in effect, or because of moral, social justice or similar reasons; or

   ii) the surviving entity following a Change in Control unilaterally makes a material reduction in the financial or other resources devoted by 2U (or its successor) to 2U's services in comparison to the Fiscal Year preceding the Change in Control or unilaterally reduces its obligations in operating plans previously agreed upon between 2U and UC Berkeley and in effect in the reasonable time frame prior to the Change in Control, subject to the notice and right to cure provisions of Section 5(C)(iii), above.

E) <u>Term Extension</u>.  Subject to earlier termination as set forth in Sections 5(C) and 5(D), the term of this Agreement shall automatically extend for successive three (3) year periods (each a "Term Extension") as follows: the first Term Extension (covering Fiscal Years sixteen through and including eighteen) shall become effective upon the conclusion of the thirteenth Fiscal Year of the term of this Agreement; and each subsequent Term Extension shall become effective upon the conclusion of the first year of each subsequent three (3) Fiscal Year interval thereafter (*i.e.*, the second Term Extension, covering Fiscal Years nineteen through and including twenty-one, effective upon the conclusion of the sixteenth Fiscal Year; the third Term Extension, covering Fiscal Years twenty-two through and including twenty-four, at the end of the twentieth Fiscal Year; etc.).  Notwithstanding the foregoing, the first Term Extension shall not become effective upon either party providing written notice to the other party of non-extension before the conclusion of the thirteenth Fiscal Year of the original term; and any subsequent Term Extension shall not become effective upon either party providing written notice to the other party of non-extension up to two (2) years before the expiration of any Term Extension of this Agreement. Upon receipt of University's notice of non-extension to 2U, 2U shall not be obligated to expend any additional amounts as part of 2U's recruitment services described in Section 1(A) above, and any such non-expenditure by 2U shall not constitute or be deemed to be a breach of the Agreement.  Notwithstanding the foregoing, the parties may mutually agree upon an amount that University shall reimburse to 2U for 2U to continue to provide its recruitment services described in Section 1(A) above ("Reimbursable Expenditure"), whereupon 2U shall continue to provide its recruitment services described in Section 1(A) above up to the amount of the Reimbursable Expenditure.  In the event that 2U does not extend the Agreement (except for any reason that would permit early termination of the Agreement by University), 2U shall provide a transition plan to University that shall set forth the method and manner for the School to continue to operate the Program through a person (or person) or entity (or entities) other than 2U, as specified by University (which may include specific responsibilities to be completed by 2U upon any such

non-extension by 2U and at 2U's expense), with the contents of such transition plan to be mutually agreed upon by the parties.

F) <u>Effect of Termination</u>.  Any provision herein notwithstanding, after any termination or expiration of this Agreement:

   i)   Subject to paragraph 5(F)(ii), each party shall cease all use of the other party's intellectual property, and 2U shall surrender to University all Work Product and any reproductions thereof, except for one copy that may be maintained solely for archival purposes and not distributed.

   ii)  2U and the School shall allow each student using the Platform to complete all individual courses in the Program that such student has actually commenced prior to the termination of this Agreement (except to the extent that such student is expelled by University or does not finish such course within six months following such termination or expiration). Notwithstanding any other provision of this Agreement, 2U shall be entitled to receive all amounts due hereunder for such courses.

   iii) Upon any termination or expiration, the School shall enable each then-enrolled Program student to complete his or her degree in an online format, subject to the School's right in its sole discretion to determine student evaluation, the awarding of degrees and expulsion of students for cause, and provided that such student does so diligently and within three years of termination or expiration of this Agreement.

   iv)  Sections 1)(K)(i) and (ii), 1(N),  4(A) and (B), 6(D), 8, 9, and 12 through 20 of this Agreement, and any other provisions of this Agreement that are expressly stated to survive for a period after termination, shall survive termination or expiration of this Agreement.

   v)   Termination of this Agreement shall not prejudice the terminating party's rights to any sums due or accrued under this Agreement prior to termination or expiration and shall not prejudice any cause of action or claim of the terminating party accrued or to accrue on account of any breach or default by the non-terminating party.

G) <u>Transition Plan</u>.  University may, at any time, require 2U to provide, at University's expense (provided that 2U's services shall be billed at industry-standard rates), a plan setting forth the method and manner for University to continue operating the Program with University personnel and assets or through a person (or persons) or entity (or entities) other than 2U ("Transition Plan").  2U shall cooperate with University in implementing any such Transition Plan should University terminate the Agreement as per Section 5(C) or 5(D).

6)  <u>Representations and Warranties; Indemnifications</u>.

   A) <u>Laws and Regulations</u>.  Each party shall comply with all applicable federal, state and local laws and regulations applicable to it.

   B) <u>Representations and Warranties of 2U</u>.  2U represents and warrants that (i) it is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware; (ii) this

Agreement has been duly executed and delivered by 2U and constitutes the legal, valid and binding obligation of 2U, enforceable in accordance with its terms; (iii) the delivery and performance of this Agreement does not and will not conflict with, result in the breach of, constitute a default, with or without notice and/or lapse of time, under, result in being declared void or voidable any provision of, or result in any right to terminate or cancel any contract, lease or agreement to which 2U or any of its affiliates is bound, constitute a violation of any statute, judgment, order, decree or regulation or rule of any court, governmental authority or arbitrator applicable or relating to 2U or any 2U affiliate, or result in the acceleration of any debt or other obligation of 2U; (iv) 2U, in its actions in connection with this Agreement, shall comply with all applicable federal, state and local laws, regulations and rules, and all University policies reasonably ("reasonably" as used in this subsection (iv) to be interpreted solely within the context of a public university setting) applicable to it or any of its activities on behalf of or in the name of University hereunder in effect on the Effective Date, or promulgated by University after the Effective Date, reasonably applicable to it or any of its activities, and provided by the University in writing to 2U; provided that should any policy or policies (or portion(s) thereof) conflict with any term(s) of this Agreement, the term(s) of this Agreement, and not the conflicting policy or policies (or conflicting portion(s) thereof) shall apply to 2U; (v) 2U owns, or will own, the rights and interests in, or to, the 2U Intellectual Property necessary to enter into this Agreement and to be developed pursuant to this Agreement, and to grant the licenses and assignments of such property described in this Agreement; (vi) 2U Intellectual Property do not, and will not, infringe any statutory or common law copyright, patent, privacy, trade secret or other intellectual property right of any third party; (vii) 2U has not previously assigned, pledged, licensed or otherwise encumbered any rights or interest in, or to, any component of 2U Intellectual Property in any way that would interfere with or prevent the grant of the licenses and assignments of such property described in this Agreement, nor will assign, pledge, license or otherwise encumber any rights or interest in, or to, any component of 2U Intellectual Property in any way that would interfere with the assignment or licenses granted hereunder; and (viii) on the Effective Date of this Agreement, 2U has access to sufficient financial resources to fulfill its obligations under this Agreement.

2U further represents and warrants that (i) it is, and to the best of its knowledge will be, in sufficiently sound financial and operational condition for it to satisfy its obligations hereunder, and that during the term of this Agreement, other than any Change in Control, 2U will not undertake any action that will result in, or omit to take any action necessary to avoid, impairment to its resources such as to substantially affect its ability to perform its obligations hereunder; (ii) there are no known financial, legal or any other type of liabilities encumbering 2U, whether existing or likely to materialize during the term of this Agreement to 2U's knowledge, that by themselves individually or in the aggregate are likely to substantially affect 2U's ability to perform its obligations according to the terms of this Agreement; (iii) as a learning management system and admissions and student information system, the Platform as operated and managed by 2U will perform each of its central functions of course delivery, student learning and support, communication, application and admissions support, and information management to the highest current applicable industry standards; (iv) 2U will adopt reasonable measures to ensure the integrity of all activities 2U undertakes in University's name including but not limited to marketing, recruiting, use, generation, preparation and disposition of information concerning University's students, applicants, graduates, faculty and staff;  (v) 2U will keep University reasonably informed about its operation of the Program, and work with University to improve the Program throughout this Agreement; and (vi) 2U will follow University guidelines in using any

University trademark or trade name pursuant to the license granted hereunder, and will not engage in any conduct that is likely to result in or omit to take any action reasonably necessary to avoid damage to the University name or reputation  or the academic integrity of the Program.

C) <u>Representations of University</u>.  University represents and warrants that (i) it is an institution of higher education chartered by the laws of the State of California;  (ii) this Agreement has been duly executed and delivered by University and constitutes the legal, valid and binding obligation of University enforceable in accordance with its terms; (iii) the delivery and performance of this Agreement does not and will not conflict with, result in the breach of, constitute a default, with or without notice and/or lapse of time, under, result in being declared void or voidable any provision of, or result in any right to terminate or cancel any material contract, lease or agreement to which University or any of its properties is bound, constitute a violation of any material statute, judgment, order, decree or regulation or rule of any court, governmental authority or arbitrator applicable or relating to University, or result in the acceleration of any debt or other obligation of University; (iv) University, in its actions in connection with this Agreement, shall comply with all applicable federal, state and local laws, regulations and rules applicable to it (provided that this representation does not impact the division of responsibilities between the parties with respect to complying with applicable law and policy, including the obligations set forth in Section 1(K)); (v) University holds, or will hold, the rights and interests in, or to, the University Intellectual Property necessary to enter into this Agreement and to grant the licenses of such property described in this Agreement; (vi) University Intellectual Property and the trademarks licensed under Section 4 above do not, and will not, infringe any statutory or common law copyright, privacy, trade secret, trademark or other intellectual property right of any third party; and (vii) University has not previously assigned, pledged, licensed or otherwise encumbered any rights or interest in, or to, any component of University Intellectual Property or the trademarks licensed under Section 4 above in any way which would interfere with or prevent the grant of the licenses of such property described in this Agreement.

The parties agree that any breach by a party of any of its representations or warranties made in this Section (Representations and Warranties) shall constitute a material breach of the Agreement by such party subject to Section 5(C).

The parties agree that the representations and warranties (excluding Section 6(B)(ii) and 6(C)(ii) contained herein shall survive the expiration or early termination of this Agreement.

D) <u>Indemnity</u>.

   i) <u>General</u>. (a) Except as provided for in Sections 6(D)(ii) and (iii) below, 2U shall defend, indemnify, and hold harmless University, its officers, employees, and agents, from and against all losses, expenses (including attorneys' fees), damages, and liabilities of any kind arising out of its performance under this Agreement but only in proportion to and to the extent that such losses, expenses, damages and liabilities are caused by the negligent or willful acts or omissions of 2U, its officers, employees, or agents. (b) Except as provided for in Sections 6(D)(ii) and (iii) below, University shall defend, indemnify, and hold harmless 2U, its officers, employees, and agents, from and against all losses, expenses (including attorneys' fees), damages, and liabilities of any kind arising out of its performance under this Agreement but only in proportion to and to the extent that such losses, expenses, damages

and liabilities are caused by the negligent or willful acts or omissions of University, its officers, employees, or agents. (c) Without limiting the foregoing, the Indemnifying Party shall indemnify and defend the Indemnified Party against any costs, expenses (including reasonable attorneys' fees whether arising out of a third-party claim or in enforcing this indemnification), claims, judgments, settlements and damages (including all damages awarded to any person or entity other than the parties payable by Indemnified Party) arising out of, or related to: (i) the inaccuracy or breach of any of the representations, warranties or covenants of the Indemnifying Party or its employees, agents, or subcontractors in this Agreement, and (ii) any breach by the Indemnifying Party, its employees, agents, or subcontractors of any applicable laws, regulations and rules.

ii) <u>Accessibility Claims</u>.  2U shall defend, indemnify and hold the University harmless against any and all claims or investigations arising out of or in any way connected to any actual or alleged violation of any federal or state law (including any U.S. territory) relating to 2U's obligations to provide disability access as set forth in Section 1(K)(vi).  University shall defend, indemnify and hold 2U harmless against any and all claims or investigations arising out of or in any way connected to any actual or alleged violation of any federal or state law (including any U.S. territory) relating to University's obligations to provide disability access as set forth in Section 1(K)(vi).  Each such obligation includes payment of any costs associated with investigations initiated by a governmental enforcement body, settlement or verdict, including payment of attorneys' fees to which any plaintiff is entitled pursuant to federal and state law.  Each party understands, agrees and acknowledges that the Indemnified Party maintains sole control of the defense of any such action, including any settlement negotiations and decisions, and any trial or appeal decisions.

iii) <u>Indemnification Conditions</u>.  The indemnification obligations set forth in this Agreement are subject to the following conditions: (a) the Indemnified Party must give prompt notice to the Indemnifying Party of any possible claim for indemnification under this Agreement promptly after the Indemnified Party becomes aware of such possible claim; (b) the Indemnified Party at its own expense may participate with counsel of its own choosing and appear on an equal footing with the Indemnifying Party in the defense of any such claim; (c) the Indemnifying Party shall not consent to settle or compromise any claim without the prior written approval of the Indemnified Party, not to be unreasonably withheld, conditioned or delayed, provided that the Indemnifying Party shall not be required to obtain prior approval of the Indemnified Party for any settlement that involves only the payment of money by the Indemnifying Party, does not contain any admission of liability by or with respect to the Indemnified Party, and contains a full release of all claims against the Indemnified Party.  Any delay by the Indemnified Party in notifying the Indemnifying Party shall not relieve the Indemnifying Party from any liability or obligation under this Agreement unless (and then solely to the extent) the Indemnifying Party is damaged thereby.  The Indemnified Party shall cooperate in the defense of any claim for which the Indemnifying Party is indemnifying hereunder, at the expense of the Indemnifying Party, except the Indemnified Party shall bear the expense of the time of its own employees.

iv) <u>Indemnification Procedure</u>.  Following notice of a claim or a threatened or actual suit that might result in an indemnification liability under this Section 6(D), the Indemnifying Party may, at its own expense, without obligation to do so, procure for the Indemnified Party the

right to continue to use the relevant intellectual property or to replace or modify such intellectual property with products of substantially similar functionality to avoid the infringement or alleged infringement claimed, but such procurement shall not release such Indemnifying Party of its indemnification obligation under this Agreement.

7) <u>Insurance</u>.  Each party shall be solely responsible for obtaining workers compensation insurance for its employees and agents and such other insurance as may be required by applicable laws.  In addition, each party agrees to carry (or, in University's case, to self-insure for) general liability insurance in an amount not less than $1,000,000 per occurrence.  Any insurance policy required above shall name the other party as additional insured on broad form endorsements with respect to all bodily injury, personal injury, products/completed operations injury, advertising injury, and property damage liability arising out of the party's operations, services or products.  Any such insurance policy shall be endorsed to provide that such coverage shall be primary over any coverage available to the other party under its own insurance program in the event of any suit, claim damages or loss.  Each party shall provide to the other party a copy or copies of a Certificate or Certificates of Insurance, or in University's case evidence of a self-insurance program, demonstrating that the insurance coverage set forth above is in full force and effect no later than sixty (60) business days after the date of the parties' execution of this Agreement.  The certificate(s) shall also evidence the insurers' agreement to endeavor to provide the other party at least 30 days' advance notice of any cancellation or material change in any policy of insurance for coverage required under this Agreement.  Further, each party shall maintain any insurance coverage referenced herein for a period of five (5) years after termination of this Agreement.

8) <u>Confidentiality</u>.

   A) <u>Announcements</u>.  Neither 2U or any of its subsidiaries, officers, directors, employees, other affiliates or agents on the one hand, nor University or any of its subsidiaries, officers, directors, employees, other affiliates or agents on the other hand shall, without the prior consent of the other, make any public statement or announcement or any release to trade publications or through the press or otherwise without the advance consent of the other party, except as may be necessary to comply with the requirements of any applicable law, governmental order or regulation or legal proceeding.  2U may also disclose this Agreement to potential financing parties who agree in a customary form of confidentiality agreement to keep its terms confidential.

   B) <u>Confidential Information</u>.  Each Receiving Party acknowledges that it has been informed that it is the policy of each Disclosing Party to maintain as secret and confidential all Confidential Information, and further acknowledges that such Confidential Information is of great value to the Disclosing Party.  The terms of this Agreement shall be included in the definition of Confidential Information, provided however that 2U understands and acknowledges that the final executed version of this Agreement will be subject to disclosure pursuant to the California Public Records Act. The parties recognize that in negotiating and carrying out the terms of this Agreement, each Receiving Party has and will acquire Confidential Information as aforesaid.  Each Receiving Party confirms that it is reasonably necessary to protect each Disclosing Party's Confidential Information and associated goodwill, and accordingly:

   Each Receiving Party shall not directly or indirectly (except where authorized by the Disclosing Party in writing), for or on behalf of the Receiving Party or any Person for any reason, divulge

any of the Disclosing Party's Confidential Information to any Person other than the Disclosing Party (hereinafter referred to collectively as a "Third Party"), except as required by law, in which case, when possible, only after providing prior notice to the Disclosing Party, or use or cause to authorize any third parties to use, any such Confidential Information.  Each Receiving Party shall, upon the expiration or termination of this Agreement for any reason, forthwith deliver up to the Disclosing Party, or destroy or delete as requested by the Disclosing Party, any and all documents and materials, or copies thereof, in electronic format or otherwise, in the Receiving Party's possession or under its control that relate to any Confidential Information or that are otherwise the property of the Disclosing Party, provided that the Receiving Party may maintain one copy of records containing Confidential Information for archival purposes only.

C) <u>Return of Confidential Information</u>.  Upon the request of the Disclosing Party at any time after the termination of this Agreement, the Receiving Party will return or destroy or delete as requested by the Disclosing party (and purge its systems and files of) all Confidential Information supplied to, or otherwise obtained by, the Receiving Party in connection with this Agreement or provide, in form and substance acceptable to the Disclosing Party, a certificate of destruction with respect to all such Confidential Information, except the Receiving party may retain one copy solely for archival purposes, which shall remain subject to the confidentiality provisions hereof.

D) <u>Remedies</u>.  Any breach or threatened breach by either party of any provision of this Section 8 will, because of the unique nature of the Confidential Information entrusted to it as aforesaid, cause irreparable harm to the other party and shall entitle such other party, in addition to any other legal remedies available to it, to apply to any court of competent jurisdiction to enjoin such breach or threatened breach.  The parties understand and intend that each restriction agreed to in this Section 8 shall be construed as separable and divisible from every other restriction, and the unenforceability, in whole or in part, of any such restriction, shall not affect the enforceability of the remaining restrictions and that one or more or all of such restrictions may be enforced in whole or in part as the circumstances warrant.  Each party further acknowledges that the other party is relying upon such covenants as an inducement to enter into this Agreement.  2U shall cause its employees, agents and independent contractors to enter into appropriate confidentiality agreements to enforce the provisions of this Section 8.  University shall cause its employees, agents and independent contractors to comply with the provisions of this Section 8.  For the purposes of this Section 8, the term "person" shall mean any person, corporation, limited liability company, partnership or other entity, along with the heirs, successors and assigns of the same.  The provisions of this Section 8 shall apply to a party and any affiliate of such party at any time during the term hereof, including at any time that such affiliate is no longer an affiliate of such party.

9) <u>Limitation of Liability</u>.  To the maximum extent permitted by law, in no event shall either party be liable to the other or to any other person for any indirect, incidental, consequential, exemplary or special damages, of any character, including, but not limited to, damages for loss of goodwill, lost profits, lost business and/or any indirect economic damages whatsoever regardless of whether such damages arise from claims based upon contract, negligence, tort (including strict liability or other legal theory), a breach of warranty or term of the Agreement, and regardless of whether a party was advised or had reason to know of the possibility of incurring such damages in advance.  In no event will a party's aggregate liability for all claims, damages or losses under this Agreement, apart from claims, damages or losses asserted by a third party and subject to such party's indemnification

obligations hereunder, exceed the greater between: (a) the amount paid by University to 2U under Section 3(D)(ii), (iii) and (iv) of this Agreement during the twelve (12) month period preceding the occurrence of the initial event that gives rise to a claim and (b) eight million dollars ($8,000,000).

10) <u>Exclusivity</u>.  This Agreement shall be exclusive among the parties, and, during the term or Term Extensions of this Agreement, neither the School nor 2U shall offer, or begin to develop or otherwise enter into any other agreement (either written or oral) to develop or collaborate on or offer, any Competitive Program within any part of the world, except as follows:

A) 2U may offer Competitive Programs as follows:  (i) 2U may offer a program under another name provided that (a) such program is not offered through any of the following schools:  Carnegie Mellon, Harvard, MIT, Northwestern, NYU, Stanford, UCLA, University of Illinois, University of Michigan, University of North Carolina, University of Pennsylvania, and University of Washington, (b) 2U does not utilize the Curriculum, Work Product or other University materials or Confidential Information in offering such program, and (c) 2U's launch of any Competitive Program does not occur prior to the two (2) year anniversary date of the Program Launch.  (ii) Provided that 2U is able to recruit more than 500 qualified applicants to the Program, University agrees that, by no later than the fifth anniversary of the Effective Date, it shall permit up to 500 new student starts (across all programs) or such higher number of starts as the School may permit, failing which 2U may offer a Competitive Program.  (iii) 2U may offer a Competitive Program upon receipt of notice from the University of non-extension of the original term or any Term Extension of this Agreement pursuant to Section 5(F).

B) School may offer Competitive Programs provided that should School intend to develop and/or otherwise offer any Competitive Program(s) using a third party, School shall first identify each such proposed Competitive Program in writing to 2U, and 2U shall have the right of first refusal to develop and administer each such proposed Competitive Program on the same terms and conditions set forth in this Agreement; and further provided that University does not utilize any 2U Intellectual Property or 2U Confidential Information in offering such program.

C) Any party offering Competitive Programs hereunder shall not utilize any Confidential Information obtained from the other party for the benefit of any Competitive Program.  Any party offering Competitive Programs shall create, implement and maintain an "ethical wall" to ensure complete separation of personnel identifying themselves as working for University from personnel identifying themselves as working for any Competitive Program.

11) <u>Force Majeure</u>.  The nonperformance of either party to this Agreement, except nonperformance of payment obligations, will be excused to the extent that performance is rendered impossible by any act of God or circumstances beyond the control of a party and without its fault or negligence, including fire, war, riots, flood, earthquake, failure of third party hardware or software, governmental acts or orders or restrictions, or power or communications failure (each a "Force Majeure Event"), provided that the non-performing party gives prompt notice of such Force Majeure Event to the other party and makes all reasonable efforts to remove such causes of nonperformance promptly and perform whenever such Force Majeure Event has ceased.  In the event that the Force Majeure Event continues and prevents substantial use of the Program for more than forty-five (45) days, either party may terminate this Agreement with respect to that School upon written notice to the other party, and upon such termination, neither party shall have any further obligation or liability to the other except as set

forth in Section 5(G) hereof.

12) <u>Sharing of Information</u>.  University and 2U shall share information (including access to appropriate electronic data), but only to the degree permitted by applicable law and guidelines.  Upon reasonable request, both parties shall share information about online and in-classroom students' admissions, performance, and post-graduate outcomes.  All information shared under this Section 12 shall be deemed University Confidential Information, whether it constitutes Personal Information or not. Such shared information shall include daily updates for admission and financial aid status, grades and academic status.  University and 2U shall collaborate to analyze the correlation of application data with grades and other outcome metrics to help the Program continually refine admissions standards.

13) <u>Entire Agreement</u>.  This Agreement (including all schedules hereto) contains the entire understanding of the parties with respect to the subject matter hereof and supersedes any prior agreement between the parties.  No change, amendment, termination or attempted waiver of any of the provisions hereof shall be binding unless in writing and signed by the party against whom the same is sought to be enforced.

14) <u>Successors and Assigns</u>.  This Agreement, including, without limitation, all service levels, quality maintenance controls and investment obligations, shall be binding upon and shall inure to the benefit of the respective successors and assigns of the parties, provided that neither party may assign, subcontract or sublicense this Agreement in whole or in part or any of its rights or obligations hereunder without the prior written consent of the other, provided, however, that 2U may subcontract out aspects of the work for the Program other than overall Program management, provided further that 2U shall be responsible for any subcontractor work engaged by 2U for the Program as if 2U were performing it.

15) <u>Resolution of Disputes</u>.  Any dispute relating to this Agreement; the making, performance, nonperformance or termination of this Agreement; or any transaction in connection with this Agreement shall be resolved in the following manner.  The parties shall first meet in good faith and attempt to resolve the dispute on their own.  If the dispute cannot be resolved by the parties, the dispute shall be submitted to non-binding arbitration, and such arbitration shall be conducted in the County of Alameda, California, in accordance with the rules of the American Arbitration Association ("AAA").

16) <u>Governing Law</u>.  This Agreement and any claim or dispute arising out of, relating to or in connection with this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be governed by and construed in accordance with the laws of the State of California without giving effect to its conflicts of law principles.

17) <u>Review and Notices</u>.

A) <u>Approvals Generally</u>. If either party hereto wishes to object to any proposal or other matter submitted by the other party for consent or approval, the objecting party shall promptly after submission of such proposal provide to the submitting party a description of its objection(s) in reasonable detail together with suggestions as to how it would like to see such objection(s) cured. Unless otherwise specified herein, approval for or consent to any proposal hereunder shall not be unreasonably delayed, conditioned or withheld and shall be deemed to have been given following

10 days after the written submission of such proposal, unless the reviewing party has provided a notice of objection(s) as described in this Section.

B) <u>Content and Brand Approvals</u>. In the case of any consent or approval required from the School with respect to the content or appearance (to users) of the Program, any substantive modification of any University Intellectual Property, or the content or appearance of any use of any University or School brands in the context of any marketing message in which it will appear, shall require the prior approval of University or the School prior to any use.  The University and/or School trademarks, as noted in Exhibit A, hereto attached and made a part of this Agreement may not be modified in any way without written approval from University's Office of Marketing & Business Outreach.  Once the content or appearance of any use of any such brand in context is approved by the School in its sole and absolute discretion, no further approval shall be required hereunder for re-purposing such content or appearance in any media that would be consistent with the marketing plan and media previously approved by the School.

C) <u>Notices</u>.  Any notices or other communications under this Agreement, except as may otherwise be provided in this Agreement, will be deemed given and delivered (a) when delivered personally or (b) on the date received by or rejected by addressee, if mailed postage prepaid by certified mail, return receipt requested or if sent shipping prepaid by nationally recognized courier service requesting signature on delivery or (c) on the date received, if sent by confirmed facsimile (provided, however, in each case, if such confirmation is not by 3 p.m. on a business day, then on the next business day), in each case addressed to the address on the first page hereof, or, in the case of fax, to

2U at:              Chelsea Piers
                    Pier 60, Suite 6020
                    New York, NY 10011
                    Fax no: (212) 656-1109

and to

University at:      Dean of the School of Information
                    University of California, Berkeley
                    102 South Hall #4600
                    Berkeley, CA 94720-4600
                    Fax:  (510) 642-5814

or to such other address as either party shall designate by notice to the other, effective ten (10) days after such notice.

In the case of notice to 2U, a copy shall also be sent to:

> Obermayer Rebmann Maxwell & Hippel LLP
> Attention: Peter J. Oberkircher, Esquire
> One Penn Center, Suite 1900
> 1617 John F. Kennedy Boulevard
> Philadelphia, PA 19103-1895
> Fax:  215-665-3165

In the case of University, a copy shall also be sent to:

> Business Contracts Administrator
> Business Contracts Office
> 412 O'Brien Hall
> University of California, Berkeley
> Berkeley, CA 94720-5620
> Fax: 510-643-0622

18) <u>Severability</u>.  The invalidity or unenforceability of any particular provision of this Agreement in any jurisdiction shall not affect the other provisions hereof or such provision in other jurisdictions, and this Agreement shall be construed in such jurisdiction in all respects as if such invalid or unenforceable provisions were omitted.

19) <u>Independent Contractors</u>.  Each party shall be an independent contractor of the other party hereto. This Agreement shall not create a partnership and shall not authorize either party hereto to bind the other party in any manner.

20) <u>Specific Performance</u>.  Each party acknowledges that money damages will not be a sufficient remedy for a breach of certain material obligations of the other party under this Agreement, and each party hereto shall be entitled to equitable relief pursuant to Section 20 compelling specific performance of such material obligations as a remedy for any such breach.  Such remedies shall not be deemed to be the exclusive remedies for a breach of a material obligation of this Agreement but shall be in addition to all other remedies available at law or equity to the parties.

21) <u>2U Employee Benefit</u>.  The School agrees that 2U employees and their immediate family members (as appropriate) who are academically qualified to attend the Program shall be eligible for any and all discounts that University may make available to University and/or School employees and their immediate family members attending the Program.

[SIGNATURES FOLLOW]

**IN WITNESS WHEREOF**, University and 2U have each caused this Agreement to be executed by its duly authorized officer as of the date first above written.

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA**, on behalf of its School of Information at the  University of California, Berkeley

**2U, INC.**

By: _____

By: _____

John Wilton

Christopher J. Paucek

Its:  Vice Chancellor, Administration and Finance

Its:  Chief Executive Officer

**IN WITNESS WHEREOF**, University and 2U have each caused this Agreement to be executed by its duly authorized officer as of the date first above written.

| | |
|---|---|
| **THE REGENTS OF THE UNIVERSITY OF CALIFORNIA**, on behalf of its School of Information at the  University of California, Berkeley | **2U, INC.** |

By: _____  
  John Wilton  
Its:  Vice Chancellor, Administration and Finance

By: _____  
  Christopher J. Paucek  
Its:  Chief Executive Officer

**SCHEDULE 1(G)**

2U Support of Program Students & Faculty

1. **Scope of SLA.** This SLA covers a broad range of services and support provided by 2U throughout the Program student lifecycle. *(The Service Level Agreement will be revised periodically and modified through mutual agreement. 2U and the School agree to review annually but may do so more frequently.)*

2. **Student Support.** 2U's Post-Enrollment Services team will provide full lifecycle support for Program students as follows:

    a) <u>New Enrollment Services</u>. This is defined as assisting Program students once they have signed their Intent to Enroll form and continuing through the on boarding and orientation to the start of courses.

        i) Welcome Call--Upon acceptance into the program, students receive a congratulatory call from their Admissions Counselor who transitions the relationship to Student Support. Upon conclusion of this call or a period of 48 hours, an email is sent to the student. This email welcomes them to the program and requests a time to conduct a Welcome Call. These calls are an opportunity to gather and share information with the Program student to include:
            (a) Introduction to the Student Support team and the School Academic Advising team.
            (b) Financial Aid process – Notify Program students of the forms/process and provide referrals to the University Financial Aid Office.
            (c) Introduction to the Program and course schedule.
        ii) Orientation -- Once a Program student signs their Intent to Enroll form, 2U provides them with access to the Platform. Program students are given a username and password and an introduction to the required assignments.
        iii) Live Orientation -- In Orientation, Program students are invited to attend a Live Orientation session run by a 2U Student Support Advisor. During this session, Program students are introduced to Adobe Connect and asked to test their webcam and headset.

    b) <u>Student Support</u>. 2U's Student Support team will offer customer and technical support to all Program students.

        i) Telephone Support – 2U will offer phone support to students:
            (1) Official Program support hours will be defined in partnership with School staff. Special attention will be paid to distribution of students across times and for international coverage. Student support phone hours will be adjusted to cover enrolled student needs.
            (2) 2U and the School will review the geographic composition of each incoming class to determine the most appropriate hours of operation. This review will lead to a modification of this agreement to reflect the updated hours of operation.
            (3) Business Hours are defined as:
                (a) Monday through Friday, 7AM EST to 12AM EST
                (b) Saturday, 10AM to 6PM EST
                (c) Sunday, 10AM to 6PM EST
            Hours are subject to change in accordance with mutually agreed-upon holidays or other changes. All changes will be included as an addendum to this Schedule. In the event of a

phone system outage due to severe weather, acts of nature, or other events not within 2U's control, 2U will make every reasonable effort to provide telephone support through other methods and/or will provide a recorded message with status updates every 6 hours, if necessary and possible, during the above business hours.

ii) Email Support -- 2U will offer email support to Program students according to hours described above. All emails/support cases will be acknowledged and responded to within 24 hours.

iii) Feedback via Platform-- The feedback mechanism is available to Program students and faculty on a 24x7 basis.  Feedback submissions are reviewed and delegated daily.

iv) Responsiveness –
    (1) Phone metrics - 2U will provide routine call metrics as part of its performance reporting (Average Speed to Answer, Abandonment Rates, Call Counts, Talk Times, etc.).  2U and the School will work to define specific targets based upon acceptable industry standards.
    (2) Email is acknowledged immediately upon receipt and responded to within 24 hours by email or phone. These are documented and included in the student record in Salesforce and reporting is provided based upon any open task.
    (3) Platform feedback is reviewed nightly and delegated to the appropriate resources for follow-up within 48 hours.

v) Resolution Expectations
    (1) 2U and the School will work to establish expected resolution times for various types of support issues.
    (2) 2U and the School will define specific communication and escalation paths for issues unresolved with the expected resolution times.

vi) Office Hours -- Student Support representatives will be available in Platform office hours to support Program students and faculty.

vii) Prior to each course start, 2U's Student Support team will provide students with the following:
    (a) Book ordering information
    (b) Expectations, pre-reading and syllabus for each course
    (c) Information on how to register for class

c) <u>Administrative Support</u>
i) Forecasting – 2U will develop and maintain an ongoing retention and enrollment model to provide estimates for class times and sections.

ii) Documentation and tracking of escalations – 2U will maintain tracking for issues escalated to Academic Advisors, faculty leads or other University or School staff.

iii) Class times and sections – 2U's Student Services team will lead the operational implementation and communication with Program students regarding registration processing. 2U will leverage 2U and University/School systems and processes to coordinate the logistics of optimizing and assigning class times, sections and faculty.  The School is responsible for the final approval of section numbers, class times and faculty.

iv) University Registration support – 2U will provide necessary support for both Program student self registration or bulk registration processes directly with the Registrar.

3. **Faculty Support**
   a. Training Materials – The School and 2U will develop and provide faculty-training materials in paper and electronic format covering Program overview processes and procedures, technology and systems, personal computer system check, and ongoing support procedures.
   b. Training
      i. 2U Technical Training – 2U is responsible for initial technical and platform training.
      ii. 2U Platform Support – 2U is responsible for on-going Platform support for University faculty.
      iii. School Technical Support – The School is responsible for all non-Platform technical support for faculty members.
      iv. School Pedagogical/Instructional Training and Support – the School is responsible for initial and on-going instructional training and support.
   c. Training Delivery -- Training will be provided through a combination of onsite and remote training. The School will schedule major training sessions thirty days in advance.  Training is mandatory for all new faculty members involved in the Program.
   d. Scheduling – Training sessions will be planned around quarterly starts as new faculty members are hired.  The School is responsible for forecasting and hiring of faculty in a timely fashion commensurate with projected enrollments.  In addition, School faculty will participate and lead all aspects of programmatic and course specific sections of the training in partnership with 2U. The School will notify 2U 30 days in advance of scheduled course dates and will secure facilities in Berkeley for the training session.
   e. Class-Time Observations – 2U support staff will join in on the first two weeks of class times with all new faculty members teaching in the Program.   This will help reinforce the training provided with real world practical follow-up.  This will allow support personnel to resolve any student side start-up issues and help the instructor become more familiar and comfortable with the platform.

4. **Metrics and Measurement.** The School and 2U will agree on Platform, program, and service metrics to track Program success.
   a. 2U will provide the School with a routine dashboard report to include the following components:
      i. Enrollment
      ii. Retention
      iii. Student Satisfaction
      iv. Faculty Satisfaction
      v. Call Metrics
      vi. Platform Feedback

5. **Changes and Renewal.** The parties will mutually agree on adjustments to this SLA on an annual basis or more frequently as mutually agreed.

The following describes the high-level division of roles and responsibilities between 2U's Student Services team and the School Program Office.  These lists can be altered upon mutual agreement of the parties.

**2U Student Services**
- Welcome email/call
- Access to Platform
- Access to Orientation
- Personal ID card
- University email account
- Customer support
- Technical setup (headset, video recorder, etc.)
- Confirm contact info
- Assigning Program students for Academic support as identified by the Associate Dean (coordination and management of writing tutor support)
- Technical support
- Reviewing, responding to, escalating online feedback

**School Program Office**
- Program student course plan (e.g., part-time schedules, leaves of absence, withdrawals, etc.)
- Medical/Personal Issues requiring Leave of Absence/Deferrals
- Course Add/Drops
- Academic support (working with faculty to identify at-risk Program students)
- Program change requests
- Institutional Verification for Program completers
- Provide intro/overview of Curriculum
- Create and share course schedules
- Faculty procedural questions ("can I give him an incomplete")
- University/School fellowships
- Graduation/Commencement
- Weekly online office hours
- Program scheduling (communication with other departments)

## SCHEDULE 1(H)

(1)      Except as otherwise explicitly set forth in the Agreement, only Program students and their professors may utilize the Platform.  Each Program Student will receive a personal ID card and access password, which password will be required prior to such student's access to the Platform. To the extent possible given the technological considerations with respect thereto, UC Berkeley may use the Produced Segments and Work Product outside of the Platform for on-campus students of the School. Notwithstanding anything contained in the preceding sentence, the Agreement, or otherwise, 2U makes no representations or warranties with respect to the usability or functionality of the Produced Segments or Work Product when accessed or used outside of the Platform.

(2)      (A)      Upon request by UC Berkeley, 2U shall provide in-classroom Degree students the following services:  (i) the Customer Service and Counseling services to matriculated students as set forth in Section 1(C) of the Agreement; (ii) technical support of the Platform, but not training, to such in-classroom students and their professors; and (iii) access to and use of the Platform as provided to the corresponding online Degree students.

         (B)      In exchange for the services 2U renders pursuant to Section 2(A) of this Schedule 1(H), UC Berkeley shall pay to 2U $3,000 per student, on the same schedule and as otherwise set forth in Section 3 of the Agreement.

(3)      (A)      Upon request by UC Berkeley at any time after Program Launch, 2U shall provide asynchronous access to and use of the Platform to in-classroom Degree students for the purpose of accessing the Produced Segments and the Curriculum.  In addition, 2U shall provide asynchronous access to and use of the Platform to School faculty for the purpose of accessing the Produced Segments and the Curriculum.  2U shall not be responsible for the training or support of these users.

         (B)      Upon request by UC Berkeley, 2U shall make the Produced Segments and the Curriculum available to in-classroom students enrolled in any University program that does not offer an online degree through access to and use of the asynchronous portion of the Platform.  2U shall provide technical support of the Platform, but not customer support, with respect to such in-classroom students. 2U shall not be obligated to develop any additional content with respect to this Section 3(B) of this Schedule 1(H), provided that 2U may develop such additional content for an additional fee to be mutually agreed upon in writing by the parties.

         (C)      In exchange for the services 2U renders pursuant to Section 3(A) and 3(B) of this Schedule 1(H), UC Berkeley shall pay to 2U  $500 per student as a one-time fee for the student to use the Platform and the Produced Segments as set forth in (3)(A) and (B) above any time during the student's enrollment at the University, on the same schedule and as otherwise set forth in Section 3 of the Agreement.

(4)      Should the price per Program credit increase during the term as contemplated in Section 3(C)(iii) of the Agreement, each per student payment set forth in this Schedule 1(H) shall increase by the same percentage amount.

**SCHEDULE 1(H)(i)**
Specifications and Performance Standards for the Platform and
Related Service Level Agreements

This Service Level Agreement ("SLA") sets forth 2U's responsibilities as they apply to the Platform, pursuant to the terms of the Services Agreement between University and 2U. The purpose of this SLA is to ensure that the proper elements and commitment are in place to provide excellent and consistent data processing services.

**1)** Definitions

    a)    **Platform** is a technology platform for the Program that serves as an online communication portal for students, faculty, course coordinators, course assistants, and Program staff and that enables online applications, course delivery, Program communications, development and maintenance of student portfolios, career services and such other functions as are mutually agreed to by the parties. The Platform is the custom developed Learning Management System (LMS), Admissions and Student Information System. The Platform includes the technology for delivering the Produced Segments.

    b)    **Functions** include the ability to authenticate/authorize; submit an application; respond to applicants and track communications; accept the offer of admittance; transfer accepted applicant data to University systems; receive or submit all course material (video, documents, audio); receive and submit course assignments; view the "news feed"; leverage checklist for assignments; upload comments in written or video form; collaborate via synchronous sessions with video, audio, whiteboard, slide sharing; and delivery of dashboard style reports for student information throughout the student lifecycle with the Program.

    c)    **Initial Response** is contacting a User via email or phone to determine the details of such User's particular issue. Initial response is not an automated email but rather an individualized discussion.

    d)    **Mass Initial Response** is contacting a group of Users for communication of a known issue rather than communicating on a one-by-one basis.

    e)    **User or Users** is defined as Program students, staff and faculty related to the University School of Information online programs regardless of whether they work for 2U or University or a 3rd party. Any calculations based on Users would also be on this pool of students, staff, and faculty.

    f)    **Business Hours** are defined in Schedule 1(F).

    g)    **Organizational Data** is any data in any form associated with any University User.

    h)    **Vendor Vulnerability Patch** is any patch that will remediate a known security vulnerability for a product. These patches are not patches for routine bug fixes and program updates. For a patch to constitute a Vendor Vulnerability Patch, the Platform, Organizational Data, and or User systems must be at risk without the patch.

**2) 2U's Hosting Services** is any organization that 2U has contracted to house any and all of its computer hardware, software and peripherals.

**3) Service Description**

    a)    2U will provide, support, and be responsible for the availability of the hosting network, 2U's Hosting Services, any server operating system, the Platform, and any third party application required to operate the Platform.

    b)    2U will provide hosting support and maintenance, as set forth in this SLA, on the Platform including:

        i)    Initial development of the Platform; and

        ii)    Patches and upgrades to the Platform

    c)    The Platform will be accessible through the then-most popular browsers in their most popular configurations. These include the latest widely adopted production releases of Mozilla Firefox, MS Internet Explorer, Apple Safari and Google Chrome once they have been accepted, and past versions of those browsers within two years of release. The Platform may require a variety of plug-ins. 2U shall evaluate new releases of such browsers promptly, but no later than thirty days after their release.

**4)**    **Defects:** 2U will repair errors, bugs, or defects in the Platform, and respond promptly to University Users experiencing problems with the Platform.

    a)    2U characterizes Functions as Core, Minor or Ancillary as described below:

        i)    **Core** is defined as the ability to authenticate and log-in to the Platform, submit an assignment, watch or upload a video, join and/or run a course live session (Adobe Connect Pro), or elements of the Platform critical to the delivery of Produced Segments.

        ii)    **Minor** is defined as any Function that is student services-related but not learning-related such as, but not limited to, viewing the event calendar, verifying grades, or changing profile contact information.

        iii)    **Ancillary** is defined as any Function that is not student services-related or learning-related such as, but not limited to, writing on or viewing the chat wall.

    b)    2U characterizes defects as follows:

| 1-High Priority | A Core Function of the Platform is not operational for 5% or more of Users. |
|---|---|
| 2-Medium Priority | A Core Function of the Platform is not operational for a single User. |
| 3-Low Priority | A Minor or Ancillary Function of the Platform is not operational for one or more Users (who can continue to use other application Functions). A User has questions about a Platform Function, or needs administrative assistance. |

    c)    The 2U Help Desk prioritizes requests for support according to their priority-level. The priority level is determined by 1st line support generally without contacting the User. When additional information is needed to determine that priority, the User will be contacted for clarification. The time required for a User to receive an Initial

Response after reporting a problem to the Help Desk is below.  Once an issue is determined to be a Priority 1, the Help Desk may meet these requirements by sending a Mass Initial Response to those they reasonably believe are impacted.  All Users believed to be directly impacted by a Priority 1 issue shall be contacted and will receive regular communication on the progress of the issue's resolution.

Regular communications on the progress of the resolution of the issue will be sent to all Users until the issue is resolved.

| Priority | Initial Response Time |
|---|---|
| 1 | 2 business hours |
| 2 | 12 business hours |
| 3 | 48 hours |

d)      2U will provide a solution to a User problem based on the priority of the issue as follows:

| Priority | Solution Time |
|---|---|
| 1 | 24 hours, 90% of the time |
| 2 | 48 hours , 90% of the time |
| 3 | 5 business days, 90% of the time. |

**5)      Availability**

a)      Availability of the Platform will be guaranteed at 99% for any given calendar month, excluding the items defined in the Exceptions Section below.

b)      Should Availability of the Platform fall below 99.5% in any given month, 2U and the School will meet to discuss the impact of the Availability and reasonable, mutually agreeable steps to improve the Availability above 99.5%.

c)      Availability is measured as the percentage of a particular calendar month that access to the Platform is available by third parties via HTTP and HTTPS. For example, availability for a given month is calculated by subtracting downtime from the total available time in that month, and dividing the remainder by the total available time.

d)      Availability is measured by synthetic transactions using a third party contracted by 2U, and reasonably acceptable to the School, whose determinations shall be binding on the parties, or at the request of University upon receiving evidence contrary to or inconsistent with such third party's determination, jointly by the parties.

e)      Outages of a reasonable duration (generally less than three (3) hours) due to executing a Vendor Vulnerability Patch will not be included in the Availability calculation regardless of the scheduling and notification capability and those patches

will be applied at 2U's discretion.  In addition, Vendor Vulnerability Patching will be excluded from the calculation of Availability.

6)      **Exceptions:** The Availability guarantee set forth above shall not apply to the following service interruptions:

a)      Unscheduled necessary maintenance shall result in no more than one half hour of unavailability of the Platform during any calendar week.  2U will use reasonable efforts to give Users one (1) hour advance notice of unscheduled necessary maintenance.  Any unscheduled maintenance resulting in more than one half hour of unavailability of the Platform during any calendar week once will count against the Platform Availability calculation.

b)      Scheduled maintenance and upgrades:

i)      Routine scheduled maintenance means maintenance on the Platform that is scheduled at least 24 hours ahead and which results in less than one (1) hour of unavailability of the Platform.  2U will use reasonable efforts to schedule such routine maintenance between 6:00 AM and 11:00 AM ET on Mondays, Wednesdays and Fridays. 2U will give Users 24 hours advance notice of routine scheduled maintenance for any maintenance requiring more than 15 minutes of unavailability of the Platform. 2U will select a time for the outage with the lowest level of activity based on recent activity trends for the Program's use of the Platform, whenever reasonably possible, and the Platform more generally in all other instances.  A routine scheduled maintenance occurring more than once in any 24 hour period will count against the Platform Availability calculation.

ii)     Extensive scheduled maintenance means maintenance on the Platform that is scheduled at least 7 days ahead and which results in more than one (1) hour of unavailability of the Platform.  2U will schedule extensive scheduled maintenance during the lowest expected level of activity on the Platform based on recent activity on the Platform. 2U will give Users seven (7) days advance notice of extensive scheduled maintenance.  An extensive scheduled maintenance occurring more than once in one calendar month will count against the Availability calculation.

iii)    Upgrades are defined as updates to the Platform. Upgrades will be applied during a routine scheduled maintenance window or other mutually agreed timeframe.

c)      Outages due to School-requested events such as intrusive testing, data loading, custom export or usage outside SLA parameters.

d)      Domain Name Server (DNS) propagation or DNS issues outside the direct control of 2U.  Similarly, outages elsewhere on the Internet that hinder access to the Platform. 2U is not responsible for browser or DNS caching that may make the Platform appear inaccessible when others can still access it.

e)      Circumstances beyond 2U's reasonable control, including acts of any governmental body, war, insurrection, sabotage or other criminal act, armed conflict, embargo, fire,

flood, strike or other labor disturbance, interruption of or delay in transportation, unavailability of or interruption or delay in telecommunications or third party services, failure of third party Services contracted for use in the Platform or inability to obtain raw materials, supplies, or equipment needed for provision of this SLA, provided however, 2U shall take all reasonable measures to mitigate any outage and to restore services.

**7)    Disaster Recovery**

    a)    Geographically-redundant data backups are made on the following schedule:

        i)    Incremental backups are made every three (3) hours and kept for seven (7) days;

        ii)    Full backups are made weekly and kept for three (3) months;

    b)    The maximum recovery point data differential (or the amount of time for which work may be lost) in event of an unrecoverable hosting outage, is five (5) days.

    c)    The maximum time to service restoration following a disaster as declared by 2U's Hosting Services is five (5) days.

**8)    Remedies**

    a)    If the School believes that a service level commitment herein is not being met, it shall notify 2U of the perceived problem.  2U shall promptly investigate any such matter and respond within two business days by either (i) acknowledging the shortfall, and summarizing the steps and estimating the time necessary to correct it, or (ii) by disagreeing that any commitment has not been met and explaining its reasons. If more than one problem is asserted, 2U shall respond separately to each.

    b)    If the School believes that the response is insufficient, the parties shall meet in person as promptly as possible to discuss and attempt to resolve such differences. If the parties are unable to resolve all differences at that meeting, then they shall resolve such differences as they are able, and 2U shall proceed immediately and diligently in accordance with such resolution, and University may, if it thinks appropriate, send a notice of default as set forth in Section 5(C) of the Services Agreement with regard to any unresolved difference.

SCHEDULE 6(B)
*[University policies and/or code of conduct applicable to 2U or any of 2U's activities on behalf of or in the name of University hereunder as of the Effective Date]*

**Intellectual Property and Use of the University Name**

- Campus Online Activities Policy:
  http://technology.berkeley.edu/policy/online.html

- Patent Policy:
  http://policy.ucop.edu/doc/2500493/PatentPolicy

- Policy on Copyright Ownership:
  http://www.universityofcalifornia.edu/copyright/systemwide/pcoi.html

- Policy on Course Materials:
  http://policy.ucop.edu/doc/2100004/CourseMaterials

- Policy on the Use of the University Name, Seals, and Trademarks:
  http://ombo.berkeley.edu/forms/policies/campuspolicy

- Policy to Permit Use of the University Name:
  http://www.ucop.edu/ucophome/coordrev/da/da0864.html

- Policy to Permit Use of the University Seal:
  http://www.ucop.edu/ucophome/coordrev/da/da0865.html

- Representation of the University on Letterhead and Business Cards:
  http://www.ucop.edu/ucophome/coordrev/policy/9-28-99ltrhead.html

- UC Code of Conduct for Trademark Licensees:
  http://www.ucop.edu/ucophome/coordrev/policy/1-05-00code.pdf

**Student Information – Privacy and Access**

- Policies Applying To The Disclosure Of Information From Student Records:
  http://policy.ucop.edu/doc/2710533/PACAOS-130

- Business and Finance Bulletin RMP-4, Vital Records Policy:
  http://policy.ucop.edu/doc/7020458/BFB-RMP-4

- Business and Finance Bulletin RMP-7 on Privacy of and Access to Information
  Responsibilities: http://policy.ucop.edu/doc/7020462/BFB-RMP-7

- Business and Finance Bulletin RMP-8, Legal Requirements on Privacy of and Access to Information:
  http://policy.ucop.edu/doc/7020463/BFB-RMP-8

**Non-Discrimination and Harassment**

- Guidelines Applying To Nondiscrimination On The Basis Of Disability
  http://policy.ucop.edu/doc/2710534/PACAOS-140 and

- Student-Related Policy Applying To Nondiscrimination On The Basis Of Sex:
  http://policy.ucop.edu/doc/2710535/PACAOS-150

- Policy On Nondiscrimination:
  http://policy.ucop.edu/doc/2710522/PACAOS-20

- University of California Policy on Sexual Harassment and Procedures for Responding to Reports of Sexual Harassment:
  http://policy.ucop.edu/doc/4000385/SexualHarassment

**Student Rights and Student Conduct**

- Policy On University Obligations And Student Rights:
  \http://policy.ucop.edu/doc/2710537/PACAOS-170

- Berkeley Campus Code of Student Conduct:
  http://sa.berkeley.edu/code-of-conduct

**Electronic Information**
[(query whether 2u will be accessing a "resource" as defined in Appendix A)]

- Business and Finance Bulletin, IS-2 (Inventory, Classification, and Release of University Electronic Information):
  http://policy.ucop.edu/doc/7020447/BFB-IS-2

- IS-3 (Electronic Information Security)
  http://policy.ucop.edu/doc/7000543/BFB-IS-3

**Miscellaneous**

- Conflict of Interest Policy and Compendium of Specialized University Policies: Guidelines and Regulations Related Conflict of Interest (PDF):
  http://policy.ucop.edu/doc/1220367/BFB-G-39

- Regulations Governing Conduct of Non-Affiliates in the Buildings and on the Grounds of the University of California:
  http://policy.ucop.edu/doc/3000127/NonAffiliateRegs

**2U**

8201 Corporate Drive | Suite 900 | Landover, MD 20785

July 29, 2014

AnnaLee Saxenian
Professor and Dean
UC Berkeley School of Information
Berkeley, CA 94720-4600

Office of Business Contracts
and Brand Protection
UC Berkeley
Berkeley, CA 94720-1928

Dear Dean Saxenian:

I am writing to confirm our agreement regarding certain marketing rights that UC Berkeley has agreed to provide to 2U in exchange for the consideration listed below. 2U is both proud and confident that this arrangement will further solidify UC Berkeley's leadership position in the field of data science and provide the Program with additional resources to help manage future growth. All capitalized terms not defined herein shall have the same meaning as set forth in the January 18, 2013 Master Services Agreement between UC Berkeley and 2U (the "Agreement").

Subject to the terms of this letter, UC Berkeley hereby grants 2U the rights specified below in connection with a Competitive Program supported by 2U and the Southern Methodist University (the "Other Program") and agrees to amend certain terms of the Agreement.

1. *Other Program and 2U Marketing Measures.* Any provision in the Agreement to the contrary notwithstanding, UC Berkeley hereby grants 2U the permission to offer the Other Program with a target launch date in or around the spring term 2015, subject to the terms of this letter. In connection with the Other Program, and for the full term (*i.e.*, the initial term and any "Term Extensions") of the Agreement, UC Berkeley permits 2U to do the following:

- Include a checkbox option, in substantially the same form as the attached Exhibit A, on any landing page or other web property where an individual is provided the opportunity to input his or her contact information to request Program information which, when checked, requests 2U (identified only as UC Berkeley's "technology service provider") to provide information about the Other Program (without identifying that program by name or school) in addition to the information to be provided about the Program.

- Market the Other Program by name through a 2U letter in substantially the same form as the attached Exhibit B1 to leads/individuals who were accepted into but choose not to enroll in the Program and who have consented via checkbox option (*i.e.*, checkbox option as set forth in Exhibit A) to receive information regarding the Other Program.

1

**2U**

8201 Corporate Drive | Suite 900 | Lardover, MD 20785

- Market the Other Program by name through a 2U letter in substantially the same form as the attached Exhibit B2 to leads/individuals with incomplete Program applications who have consented via checkbox option (*i.e.*, checkbox option as set forth in Exhibit A) to receive information regarding the Other Program and (i) who have disengaged with 2U regarding the Program based on criteria to be determined by the parties; or (ii) whom 2U and UC Berkeley reasonably predict are not otherwise academically qualified or interested in the Program.

- Market the Other Program by name through a 2U letter in substantially the same form as the attached Exhibit C to Program applicants who were denied admission into the Program, and who have consented via checkbox option (*i.e.*, checkbox option as set forth in Exhibit A) to receive information regarding the Other Program.

- Market the Other Program by name to Program applicants who previously consented via checkbox option (*i.e.*, checkbox option as set forth in Exhibit A) to receive information about the Other Program, through a 2U letter in substantially the same form as the attached Exhibit D, which permits the Program applicant to request that the Program applicant's application be shared with the Other Program associated with UC Berkeley's "technology service provider" for consideration of admission into the Other Program.

2. *Special License*.   Any provision in the Agreement to the contrary notwithstanding, UC Berkeley hereby grants to 2U, solely to the extent necessary to enable 2U to exercise the rights granted by UC Berkeley to 2U herein, a non-exclusive, royalty-free license to use the following of the University's Intellectual Property: Program Applicant Information, and the trademarks and names of School of Information, Berkeley, datascience@berkeley, the University of California, UC, and the image of Campanile, only as shown in the attached exhibits.

The parties agree that the permissions and license granted in this Section 1 are expressly conditioned on the satisfaction by 2U of each of its payment obligations under Section 5 of this letter.

Further, 2U agrees that communications relating to the Other Program shall not (i) reference a "MIDS" or "Master of Information and Data Science" program or degree, or (ii) contain any of the University's Intellectual Property except as set forth in this letter and/or the Agreement or upon 2U having obtained the express written consent of UC Berkeley.  For the avoidance of doubt, nothing in this letter shall limit, or be deemed to limit, 2U's rights to recruit for or market the Other Program where 2U's communications or other materials do not reference a "MIDS" or "Master of Information and Data Science" program, or contain or otherwise utilize any of the University's Intellectual Property (including Program Applicant Information) or Confidential Information.

2U agrees that all branding of the Other Program shall be distinctive from the branding of the Program (*e.g.*, distinctive color palette, photography, iconography, tone, language style and other prominent branding elements). 2U further agrees the degree

offered via the Other Program shall not be named a "Master of Information and Data Science" degree.

3. *Amendments*.   To allow for the grant of rights by UC Berkeley in connection with the Other Program in Section 1 hereof, the Agreement is hereby amended as follows:

    a. Section 10)A)(i)(b) is hereby deleted in its entirety and replaced with the following language:  "and (b) 2U does not utilize the Curriculum, Work Product or other University materials or Confidential Information in offering such program, except as utilization of University materials or Confidential Information is expressly permitted by a certain letter agreement dated July 25, 2015 (including the exhibits appended thereto) ("Letter Agreement")";

    b. Section 10)A)(i)(c) is hereby deleted in its entirety and replaced by the following: "2U's launch of any Competitive Program does not occur prior to the two (2) year anniversary date of the Program Launch except for the Competitive Program expressly permitted by the Letter Agreement";

    c. The first sentence of Section 10)C) is hereby deleted in its entirety and replaced with the following language: "Any party offering Competitive Programs hereunder shall not utilize any Confidential Information obtained from the other party for the benefit of any Competitive Program, except to the extent 2U is allowed to use, consistent with the Letter Agreement, contact information about Program leads and Program Applicant Information (specifically including information regarding the completion status of Program applicants' Program applications, the University's admissions decisions with respect to Program applicants, and any Program applicant's decision not to matriculate into the Program), where any such individual has consented to receive information about the Competitive Program and/or elected to apply to the Competitive Program as contemplated by the Letter Agreement; and

    d. Section 10) is hereby amended by inserting at the end of Section 10) the following new Section 10)D): "Notwithstanding anything to the contrary contained herein, 2U shall be permitted to use the University's Intellectual Property and Confidential Information in connection with any Competitive Program solely as permitted by the Letter Agreement and/or as otherwise may be mutually agreed by the parties in writing."

4. *Notice*.   Should 2U send any communication in violation of the permissions granted by UC Berkeley in Section 1 above, 2U shall notify UC Berkeley of any such improper communication(s) within three (3) business days of 2U's knowledge thereof.

3

**2U**

8201 Corporate Drive | Suite 900 | Landover, MD 20785

5. _Compensation_. In exchange for the rights, exceptions, and licenses granted above, 2U agrees to pay to UC Berkeley fourteen (14) equal installments of $300,000 (collectively, "Compensation"), the first installment payable on or before July 1, 2015, with additional installments continuing on or before each annual anniversary thereafter, through and including July 1, 2028. UC Berkeley may use all amounts received hereunder at UC Berkeley's sole and exclusive discretion. 2U shall make such payments by check.

6. _UC Berkeley Right to Offset_. 2U expressly agrees that in the event of non-payment by 2U of any amount of Compensation when due (except for any amounts disputed in good faith), UC Berkeley may offset any of its obligation to pay 2U fees based on FTE students or repay 2U for 2U advance under Section 3 of the Agreement against any amount of 2U nonpayment of Compensation.

This letter is incorporated into and deemed a part of the Agreement. Except as expressly provided in this letter, all of the terms and provisions of the Agreement are and will remain in full force and effect. On and after the date of the full execution of this letter, each reference in the Agreement to "this Agreement," "the Agreement," "hereunder," "hereof," "herein" or words of like import will mean and be a reference to the Agreement as amended by this letter.

[*This space intentionally left blank*]

4

**2U**

6201 Corporate Drive | Suite 500 | Landover, MD 20785

I truly hope that you are as excited as I am about this arrangement.  If you are agreeable to the terms I have set forth above, please sign this letter below.

Very truly yours,

_Christopher J Paucek_
Christopher J Paucek (Jul 29, 2014)

Christopher Paucek, CEO
2U, Inc.


On behalf of UC Berkeley School of Information,
I agree to the terms set forth above.


By: _AnnaLee Saxenian, Dean_
Dean AnnaLee Saxenian

Date: _7/30/14_


On behalf of the Regents of University of California

By: _Maria K Rubinsky_
Title: _Director_
Office of Business Contracts
And Brand Protection

Date: _July 30, 2014_

5

# Exhibit A

## Sample Berkeley Lead Landing Page





## Exhibit B1

# Berkeley Declines

### Sample Email to Admitted Applicants Choosing Not to Enroll in MIDS



Dear Jennifer,

While we, a technology service provider of University of California, understand that you have chosen not to pursue your master's degree with UC Berkeley, there are other opportunities for you to pursue graduate education in data science.

With this in mind, we wanted to let you know about DataScience@SMU, the online Master of Science in Data Science program from SMU. This interdisciplinary program is designed and taught by the same SMU faculty members who teach on campus, and takes advantage of a state-of-the-art online learning platform to blend live, face-to-face online classes with dynamic self-paced coursework.

If you would like to learn more about this Master of Science in Data Science program, please call our Admissions Counselor at 1-888-555-1212 or click here.

We appreciate your interest and wish you the best of luck in your future endeavors.

Sincerely,

Sally Smith

*The letter above ("Letter") is sent on behalf of 2U, Inc., not the University of California (UC). UC does not approve or endorse, and is not responsible in any manner for the Letter or its content, accuracy, any opinions expressed or recommendations made therein. UC does not assume and will not have any liability or responsibility to you or any other person for any losses or damages arising out of or relating to the Letter or any other non-UC materials or web sites, products, or services. Datascience@berkeley*

## Exhibit B2
# Berkeley Incomplete Applications
### Sample Email to Applicants Who Have Not Completed Their MIDS Application



Dear Jennifer,

While we, a technology service provider of University of California, understand that you have chosen not to complete your application to the master's degree program with UC Berkeley, there are other opportunities for you to pursue graduate education in data science.

With this in mind, we wanted to let you know about DataScience@SMU, the online Master of Science in Data Science program from SMU. This interdisciplinary program is designed and taught by the same SMU faculty members who teach on campus, and takes advantage of a state-of-the-art online learning platform to blend live, face-to-face online classes with dynamic self-paced coursework.

If you would like to learn more about this Master of Science in Data Science program, please call our Admissions Counselor at 1-888-555-1212 or click here.

We appreciate your interest and wish you the best of luck in your future endeavors.

Sincerely,

Sally Smith

*The letter above ("Letter") is sent on behalf of 2U, Inc., not the University of California (UC). UC does not approve or endorse, and is not responsible in any manner for the Letter or its content, accuracy, any opinions expressed or recommendations made therein. UC does not assume and will not have any liability or responsibility to you or any other person for any losses or damages arising out of or relating to the Letter or any other non-UC materials or web sites, products, or services.     Datascience@berkeley*

# Exhibit C

# Berkeley Denieds

## Sample Email to Denied MIDS Applicants



Dear Jennifer,

Although the University of California ("UC") was unable to offer you admission, we as UC's technology service provider appreciate your interest in and desire to pursue a graduate degree in the data science field.

With this in mind, we wanted to let you know about DataScience@SMU, the online Master of Science in Data Science program from SMU. This interdisciplinary program is designed and taught by the same SMU faculty members who teach on campus, and takes advantage of a state-of-the-art online learning platform to blend live, face-to-face online classes with dynamic self-paced coursework.

If you would like to learn more about this Master of Science in Data Science program, please call our Admissions Counselor at 1-888-555-1212 or click here.

We wish you the best of luck in your future endeavors.

Sincerely,

Sally Smith

*The letter above ("Letter") is sent on behalf of 2U, Inc., not the University of California (UC). UC does not approve or endorse, and is not responsible in any manner for the Letter or its content, accuracy, any opinions expressed or recommendations made therein. UC does not assume and will not have any liability or responsibility to you or any other person for any losses or damages arising out of or relating to the Letter or any other non-UC materials or web sites, products, or services.* Datascience@berkeley

# Exhibit D
# Berkeley Submits

## Sample Email to Leads Who Have Opted-In and Who Submit an Application



Dear Jennifer,

We are a technology service provider of University of California and understand that you have submitted an application for a master's degree program with UC Berkeley. We also work with DataScience@SMU, the online Master of Science in Data Science program from SMU.

This interdisciplinary program is designed and taught by the same SMU faculty members who teach on campus, and takes advantage of a state-of-the-art online learning platform to blend live, face-to-face online classes with dynamic self-paced coursework.

You can choose to have your application separately reviewed for admission to SMU for their online Master of Science in Data Science program. To learn more about this option, please call 1-888-555-1212 or if you would like your application to be reviewed by DataScience@SMU, click the submit button below.

**Submit**

By clicking this button, I authorize my application to be shared with and reviewed by DataScience@SMU. I understand that my information will be shared with SMU, a university that is unaffiliated with the University of California. I may review the privacy policy for details.

*The letter above ("Letter") is sent on behalf of 2U, Inc., not the University of California (UC). UC does not approve or endorse, and is not responsible in any manner for the Letter or its content, accuracy, any opinions expressed or recommendations made therein. UC does not assume and will not have any liability or responsibility to you or any other person for any losses or damages arising out of or relating to the Letter or any other non-UC materials or web sites, products, or services.   Datascience@berkeley*