# Exhibit C-44

## ADDENDUM 3

This Addendum ("Addendum") dated as of ___11/19/15___, 2015, is a supplement to that certain License and Marketing Agreement ("Agreement") dated August 1, 2012 between Academic partnerships, LLC, A Delaware limited liability company ("AP"), and the University of Cincinnati (the "University") and is fully incorporated therein.

1. **NAME OF PARTICIPATING SCHOOL OR COLLEGE:**
   College of Engineering and Applied Science

2. **EFFECTIVE DATE OF PROGRAM:**
   May 9, 2016

3. **PROGRAMS:**
   Masters of Engineering in Computer Science/Software Engineering

4. **AP PROGRAM PERCENTAGE:**
   Program royalties shall be divided 40% to AP and 60% to UC.

All other terms and conditions in the Agreement remain in effect for this Addendum. In the event there are any conflicting terms between the Agreement and this Addendum, terms of this Addendum shall apply.

**ACADEMIC PARTNERSHIPS, LLC**

By: _____

Name: _____BRYCEN DUNCH_____

Title: _____CFO_____

Date: _____12/17/15_____

**UNIVERSITY OF CINCINNATI**

By: _____

Name: _____Daniel R. Beerck_____
~~Associate General Counsel~~
Assistant Contracting Officer

Title: _____

Date: _____11/18/15_____

## ADDENDUM 2

This Addendum ("Addendum") dated as of June 1, 2014, is a supplement to that certain License and Marketing Agreement ("Agreement") dated August 1, 2012 between Academic partnerships, LLC, A Delaware limited liability company ("AP"), and the University of Cincinnati (the "University") and is fully incorporated therein.

**NON APPLICABILITY:** The following sections of the Agreement do not apply to this Addendum: II, III, VII, IX, XI, XII-B, XII-C, XII-D, XIII-N. In the event there are any conflicting terms between the Agreement and this Addendum, terms of this Addendum shall apply.

### 1. NAME OF PARTICIPATING SCHOOL OR COLLEGE:
College of Engineering and Applied Science

### 2. EFFECTIVE DATE OF PROGRAM:
The term of this Addendum shall be until five years from the date of signing by both parties ("Term") and shall operate independently of the Agreement.

### 3. COURSES TO BE OFFERRED:
All Online Specialization Programs ("Programs") leading to a continuing education certificate. Specializations are envisioned to be comprised of 3 certificates; each certificate contributes to the body of knowledge. A certificate is envisioned to be comprised of 3 modules. A module is roughly equivalent to the content that would be covered in 4 weeks of a 3 credit college course. Specializations are intended to provide education that compliments a traditional university program. Specializations are not credit bearing and no university transcript is generated for the completion of the certificate. AP expects to market Specialization Programs, not individual certificates. However individuals wishing to complete the Specialization Program have the option of completing one certificate at a time. When an individual successfully completes the 3 appropriate certificates, the individual earns the Specialization.

The parties acknowledge that the structure of the Specialization Programs is still being developed and that this addendum will not need to be amended for modifications to the structure of the Specialization Programs that are agreed to by both parties. The parties will also develop mutually agreeable deadlines for the development and delivery of the Programs.

### 4. PROGRAMS:
Are set forth on Attachment A to this Addendum, which may be updated during the Term upon the mutual agreement of the parties.

### 5. AP PROGRAM PERCENTAGE:
Program royalties shall be divided 50% to AP and 50% to UC.

In the event the Specialization Programs are offered through a host university/institution, the University and AP shall split the net revenue received as set forth above after deduction for:

    1) a negotiated fee not to exceed 20% payable to any participating host university/institution, and

    2) any taxes and fees incurred by either the host university/institution or AP on the receipt of that revenue and on the transfer of the remaining funds to the US as may be directed by AP.

## 6. COLLECTION OF PAYMENT:

AP shall collect payment from the Students directly. AP shall distribute payments to the University and any Host Institution according to the terms of this Agreement and any applicable agreement between AP and a Host Institution. AP shall make payment to the University with 45 days of receipt tuition and shall continue to remit payments to the University for so long as any AP secured student continues to take courses within the Specializations Programs, even if beyond termination or expiration of this Agreement. AP shall provide reports with such information and at such times as are mutually agreed by the Parties.

## 7. EXCLUSIVITY:

AP shall be the exclusive vendor of the Specialization Programs listed in Attachment A during the Term. This exclusivity does not apply to the University's ability to offer the content of the topics in Attachment A other more traditional forms, like courses, certificates, minors, etc.

## 8. MARKETING LIMITATIONS:

In acknowledgement of the University's existing programs, AP agrees to allow the University the right to refuse to have any University of Cincinnati Specialization Programs marketed in China.

## 9. MAINTENANCE AND ISSUANCE OF CERTIFICATES:

University shall approve layout and text of Specialization Program certificates, which shall be provided in an automated manner upon students' completion of the Program requirements. AP shall provide University with a list of holders and certificates issued.

ACADEMIC PARTNERSHIPS, LLC

By: _____

Name: _Wes Brazell_

Title: _CFO_

Date: _6/5/2014_

UNIVERSITY OF CINCINNATI

By: _____

Name: _____Daniel R. Beerck_
      Associate General Counsel
Title: ___Assistant Contracting Officer_

Date: _7-31-14_

## ADDENDUM 2
## SPECIALIZATION PROGRAMS
### ATTACHMENT A

1. Manufacturing Systems Management
2. Quality Systems
3. Project Launch Management
4. Additive Manufacturing
5. Management for Engineers & Scientists
6. Renewable Energy

## University of Cincinnati
## Recommendation to the Board of Trustees
## For Action

**Date:**        September 10, 2012

**Title:**        APPROVAL OF DISTANCE LEARNING SERVICES CONTRACT

**Synopsis:**    A distance learning services contract to be entered into between the University of Cincinnati and Academic Partnerships LLC

It is recommended that the Board of Trustees approve a distance learning services contract to be entered into between the University of Cincinnati and Academic Partnerships LLC. Since the University began conducting distance learning in earnest in 2001, volume has increased significantly. While the University is pleased with its decade-long relationship with Embanet-Compass, it nonetheless sought proposals from additional vendors to leverage bargaining position and spread risk. A rigorous vetting process produced Academic Partnerships as the best candidate. The commercial terms reached with Academic Partnerships are reasonable and competitive. A form of the final contract with Academic Partnerships is attached. We seek the Board of Trustee's approval of the transaction and authorization for the President and/or Senior Vice President, Administration and Finance to enter into said contract on behalf of the University.

Prepared by: _____
Gregory Mohar
Interim General Counsel

Reviewed by: _____
Lawrence J. Johnson, PhD
Senior Vice President for Academic
Affairs and Provost

Reviewed by: _____
Robert F. Ambach
Senior Vice President
Administration and Finance

Attachment

| FOR BOARD OFFICE USE ONLY: | |
|---|---|
| Recommendation Number: _____ | |
| Date of Board Approval: _____ | Submitted by: _____ President |

## University of Cincinnati Recommendation
## to the Board of Trustees For Action

Date:       September 10, 2012

Title:      . APPROVAL  OF  DISTANCE  LEARNING  SERVICES  CONTRACT

Synopsis:   A  distance  learning  services  contract  to  be  entered  into  between  the
            University of Cincinnati and Academic Partnerships LLC

It is recommended that the Board of Trustees approve a distance learning services
contract to be entered into between the University of Cincinnati and Academic
Partnerships LLC. Since the University began conducting distance learning in earnest in
2001, *volume has increased significantly*. *While the University is pleased with its*
Decade-long relationship with Embanet-Compass, it nonetheless sought proposals from
additional vendors to leverage bargaining position and spread risk. A rigorous vetting
process produced Academic Partnerships as the best candidate.   The commercial terms
reached with Academic Partnerships are reasonable and competitive. A form of the final
contract with Academic Partnerships is attached.   We seek the Board of Trustee's
approval of the transaction and authorization for the President and/or Senior Vice
President, Administration and Finance to enter into said contract on behalf of the
University. .

Prepared by: _____
             Gregory Mohar
             Interim General Counsel.

Reviewed by: _____
             Lawrence J John son, PhD

APPROVED                      Senior Vice President for Academic
                              Affairs and Provost

SEP 1 2 2012

BOARD OF TRUSTEES ·          Reviewed by: _____

                             Robert F. Ambach
                             Senior Vice President
                             Administration and Finance

Attachment

| FOR BOARD OFFICE USE ONLY: |
| --- |
| Recommendation Number:  ld..Oq. /d,.DJ. |
| Date of Board Approval: 09) t [d. Ol:b   Submitted by:  _____ |
|                                                              President |

## MARKETING AND SERVICE AGREEMENT

This Marketing and Service Agreement ("Agreement") is entered into by and between Academic Patlnerships, LLC, a Delaware limited li ability company ("A P"), and University of Cincinnati, an Ohio state institution of higher education operated under Ohio revised code chapter 3361 (the "University") as of August 1, 2012 (the "Effective Date). AP and the University are sometimes referred to in this Agreement each as a "Party", and collectively as the "Parties".

### Recitals

A. The University offers undergraduate, graduate, and post-graduate courses both (i) in traditional classroom settings ("Offline Educational Courses") and (ii) online. Online courses for which AP provided service pursuant to Section II below are hereafter referred to as "Online Education al Courses".

B. AP provides services for Online Educational Courses;

C. Subject to the terms and conditions set forth herein, the University desires to engage AP to provide AP Resource Services in connection with the University's (i) development, maintenance and marketing of the University's Online Educational Courses and (ii) the conversion of Offline Educational Classes to Online Educational Classes.

1. Definitions. Capitalized terms used in this Agreement shall have the meaning described below or elsewhere in the Agreement.

   A. "AP Program Percentage" means a percentage of the tuition for each Online Education a l Course in which a Student is enrolled. For the first Program, and to the extent one or more new Programs are added during the Term of this Order, the Parties will enter into an Addendum to this Order, the purpose of which would be to set fotlh the AP Program Percentage for such new Program. Any such Addendum shall be in the form of Exhibit A attached hereto.

   B "AP Program Revenue" means the product of multiplying the AP Program Percentage times the Revenue.

   C. "Curriculum" means a group of related Online Educational Courses, instructional and assessment materials contained therein, the successful completion of which results in a degree or other credentialig.

   D. "Developed Materials" means any ideas, designs, development tools, know-how, concepts, or written materials developed by either Party.

   E. "Faculty" means persons appointed by the University to teach Online Educational Courses. F.

   "AP Material" means (i) AP Resource Services, (ii) Developed Materials created solely by AP, and (iii) any documentation or other materials associated with the foregoing.

   G. "AP Resource Services" means the resources and services provided to the University by AP when (i) developing Online Educational Courses. (ii) marketing such On line Educational Courses and (iii) converting the University's Offline Educational Courses to Online Educational Courses, (iv) providing student retention support and (v) development of best practices for online curriculum, instructional and assessment.

H.    "Intellectual Property" means any and all now known or hereafter existing rights associated with (i) work s of authorship, including exclusive rights, copyrights, moral rights and mask works; (ii) trade secret rights; (iii) trademark and trade name rights; (iv) patents, designs and other industrial property rights; (v) other intellectual and proprietary rights of every kind and nature whether arising by operation of l aw, by contract or li cense or otherwise; and (vi) all registrations, renewals, extensions, combinations, divisions, or reissues of any of the foregoing.

I.    "Program(s)" means units of stud y offered through Online Education al Courses that lead to a degree or other certification.

J.    "Revenue" means the tuition collected from Students for Online Education a l Courses, including Revenue from all general, prerequisite or co-requisite Online Educational Courses. Revenue does not include any application fees charged by the University nor any fee found on the University fee schedule except those found under the heading "Instructional Fee" and "Non-Resident Surcharge."

K.    "Student(s)" means an individual enrolled in one or more Online Educational Courses, and who, as is reflected in the individual's academic record with the University, is enrolled in a Program except for individuals whose tuition is waived in whole or in part through the University 's tuition remission benefit for University employees.

L.    "University Material" means the (i) Curriculum, (ii) lectures, documentation and other materials created by the University, including Developed Materials created by the University and (iii) Faculty.

M.    "AP Data Mapping Specifications" means the documentation provided by A P (and incorporated herein as Exhibit D) to specify format and/or methodology for which SIS data is to be delivered to AP by the University.

II.    AP Obligations

During the Term (defined herein) of this Agreement, AP shall have the follow ing obligations: A.

Sales and Marketing.

(i) market the University and its Programs using national field sales organization and digital marketing;

(ii) provide competitive research;

(iii) work with university on state or accrediting body regulatory requirements to expand the geographic reach of programs.

B.    Program Implementation. A P's implementation tea m will work with the University to launch the University's Program s. AP's implementation support will include:

(i) an integration tea m that works with the University's personnel (specific to each degree/certificate);

2

(ii) facilitation of Program planning sessions (faculty meetings, admission policies, course sequence and calendar);

(iii) facilitation of operational planning sessions with key University departments to review existing processes and recommend efficiencies;

(iv) development of a "Program Guidelines" document;

(v) facilitation of cross-functional meetings to manage implementation processes; and

(vi) project management services, including development of a detailed project plan (the "Plan") to drive program implementation activities, and weekly reporting of project progress against the Plan.

C. Assistance with Student Information System ("SIS") and Learning Management System ("LMS"). The University will provide AP data from its SIS and LMS. AP will utilize essential data from these systems to (i) create Program prototypes, (ii) assist faculty with curriculum development, (iii) facilitate student matriculation, (iv) assist in improving student retention, (v) monitor Program success and (vi) assist with and facilitate the growth of the University's On line Educational Courses. Essential SIS data and essential LMS data are set forth in Exhibit D, AP Data Mapping Specifications.

D. Curriculum Support Services. AP will work with faculty and the University with Program design, including but not limited to:

(i) Program / Course blueprinting and course conversion assistance;

(ii) Assist university in structuring multiple starts in a way that also assures financial aid eligibility;

(iii) Introduce best practices for online curriculum

E. Recruiting and Enrollment Specialist Representatives ("ESRs"). ESRs will serve as a primary point of contact for all prospective students for identified degree programs. The ESRs will help educate students about the University's Programs. AP's responsibilities include:

(i) providing a team of ESRs to contact potential students once a lead is received;

(ii) providing a toll free number and website for prospective students;

(iii) recruiting in compliance with the academic standards of the University; and

(iv) inform potential students of the program characteristics and refer potential students to the University regarding financial aid or academic questions.

F. Application Support.

(i) Inform applicant of all university application requirements

(ii) Contact applicant regarding upcoming dead lines

3

(iii) Remind applicant to submit necessary paperwork (transcripts, etc.);

(iv) Once applicant has been admitted by university, remind student of registration process, registration deadlines and payment deadlines

(v) Refer student to appropriate university resources if there are further questions about the academic program

**G. Student** Services.

(i) Follow up with student periodicaly to ensure satisfaction all the way through graduation

(ii) Refer student to university resources if academic questions persist

(iii) Welcome new students, provide upcoming registration dates and/or deadlines

(iv) Re-engage inactive students

(v) *Remind student of upcoming start dates, registration deadlines and payment deadlines.*

**H. Protection of Student Information.** The University has informed AP that Student specific information may be protected from disclosure pursuant to the provisions of the Family Educational Rights and Privacy Act (FERPA), (20 U.S.C. § 1232g; 34 CFR Part 99). Moreover, AP acknowledges that information relating to prospective Students constitute trade secrets of the University. AP expressly agrees that it shall (i) not disclose any such Student specific or prospective Student information to any third parties that are not AP vendors covered by the same protections that AP offers and (ii) take such measures as are reasonable and prudent to protect such Student specific or prospective Student information from inadveltent disclosure.

**I. Compliance.** AP agrees that in the course of carrying out its obligations under this Agreement, it shall comply with all applicable laws, including: (i) the US Department of Education's Program Integrity Rules, codified at 34 CFR 668.71-.75 and further clarified in the United States Depaltment of Education's March 17, 2011 Dear Colleague Letter re Implementation of Program Integrity Regulations; (ii) every requirement of the University's regional accreditor; and, (iii) the Telephone Consumer Protection Act, the FTC's Telemarketing Sales Rule, and the CAN-SPAM Act. Without limiting the generality of the foregoing:

(1) AP shall not provide any commission, bonus, or other incentive payments based directly or indirectly upon success in securing enrollments to any person or entity engaged in any student recruiting or admission activities, or any person directly supervising such person.

(2) AP shall not, except with prior approval of the University, make use of any marketing material (including telephone scripts, chat scripts, and online material) which provides any information about the University's programs, charges, the employability of its graduates, or that otherwise incorporates the name or trademarks of the University. AP shall, to the extent reasonably practical, provide and regularly update a list of every URL where any such material resides.

(3) In performing its obligations under this Agreement, AP shall not:

4

(a)    employ blind links;

(b)    require a prospective University student to click on a link or fill out a form in order to obtain some other benefit or result or to perform another function, such as leaving a web page or closing a window;

(c)    offer an inducement of any kind to click on a Link or fill out a form ;

(d)    use bots, macro programs, Internet agents or other automated means to generate referrals or inquiries;

(e)    use splogs (i.e. knowingly maintaining false information on a blog);

(f)    spam search engines;

(g)    stuff web pages (or their source code) with key words for purpose of search engine optimization;

(h)    build invisible gateway web pages that only search engines can read for the purpose of search engine optimization; or

(i)    engage in other practice that has the effect of deceiving prospective University students or search engine spiders or crawlers.

III.    University Obligations

The University shall maintain the sole authority in the (i) appointment of Faculty, (ii) admission of Students, (iii) delivery of Programs, (iv) the evaluation of Student performance and (v) the decision to award course credit and/or academic credentialing. During the Term of this Agreement, the University shall have the following obligations:

A.    Regulatory Approvals, Accreditations, and Licenses. The University will determine and obtain all necessary regulatory approvals and licenses for the Programs.

B.    Financial/Business Oversight. The University will oversee the financial management of the Programs.

C.    Intellectual Property Notices. The University will not remove, deface, or obscure any of AP's or its suppliers' copy right or trademark notices and/or legends or other proprietary notices associated with the AP Material.

D.    Access to Data. The University will provide SIS and LMS data per Exhibit D, AP Data Mapping Specification for AP to fulfill its obligations.

IV.    License Grants by AP

A.    AP Resource Services. During the Term of this Agreement, AP grants the University a limited, non-exclusive, license to use and modify the AP Resource Services for the specific and limited purpose of developing Programs.

B.    Trademarks. During the Term of this Agreement, AP grants the University a limited, nonexclusive license to use such AP trademarks, as are designated in writing by AP, for the specific and limited purpose of marketing the Programs. Exhibit  B  lists  the  initial  AP

5

trademarks that may be used per this Section. V.          License Grants by the University
A.    University Material. During the Term of this Agreement, the University grants AP a limited, non-exclusive license to use and modify the University Material for the specific and limited purpose of developing Programs.

B.    Trademarks. During the Term of this Agreement, the University grants AP a limited, non-exclusive license to such University trademarks, as designated in writing by the University, solely for the purpose of marketing the Programs. Exhibit C lists the initial University trademarks that may be used per this Section.

VI.  Ownership

A.    Ownership of AP Intellectual Property. AP retains all ownership and Intellectual Property rights in the AP Material.

B.    Ownership of University Material. The University retains all ownership and Intellectual Property rights in the University Material.

C.    Ownership of Developed Materials. Any right, title and interest in and to any Intellectual Property arising from or attributed to any of the work or activities undertaken as part of this Agreement shall belong solely to the Party that solely creates such Intellectual Propelty, unless mutually agreed otherwise in writing. Intellectual Property arising from or attributed to any of the work or activities undertaken as part of this Agreement shall belong jointly to the Parties, if created jointly.

VII.  Term

The term ("Term") of this Agreement commences on the Effective Date and ends on the fifth (5th) anniversary of the Effective Date, unless terminated under Section XII. The Term may renew for one three-year renewal term, by either Palty by written notice of renewal to the other Party at least 18 months before the expiration of the then current Term, unless such other Party rejects such notice of renewal in writing and within 30 days.

VIII.  Payment and Taxes

A.    AP Program Revenue. The University will collect all Revenue and will remit to AP the AP Program Revenue, which shall be due and payable to AP within ten days following the drop/add date of any Online Educational Course.

B.    Taxes. Each Party 'viii be responsible for any and all taxes due on their portion of Revenues received.

C.    Expenses. Any expenditure paid by the University on behalf of AP, such as advertising, may be withheld from AP's portion of the AP Program Revenue provided such costs were approved in writing by AP in advance.

6

D.   Acknowledgement by the University. The University acknowledges that a significant portion of AP's cost is incurred before a Student enrolls, and that AP's only method of cost recovery is through the continuing payments as a Student progresses through the Program. Therefore, for each Student who AP secures the enrollment of during the Term of this Agreement, the University will continue to remit payments to AP per Section VIIJ.A above for so long as the Student continues to take On Line Educational Courses at the University, for two years beyond the termination date of this Agreement.

IX.   Indemnification

A.   AP. AP will defend and indemnify the University, to the extent permitted by Texas Law, against a claim that (i) any AP Material furnished by AP infringes a United States copyright, (ii) arises as a result of A P's breach of any warranty provided by A P under this Agreement, or (iii) that is caused in any way by any agent or subcontractor of A P, provided, that: (a) the University notifies AP in writing within 90 days of the claim; (b) A P has sole control of the defense and all related settlement negotiations; and (c) the University provides A P with the assistance, information, and authority reasonably necessary to perform the above; reasonable out-of-pocket expenses incurred by the University in providing such assistance will be reimbursed by AP.

B.   Remedies. In the event that some or all of the AP Material is held or is believed by A P to infringe third party rights, AP shall have the option, at its expense to: (a) modify the A P Material to be non-infringing; or (b) obtain a license to continue using the A P Material. If it is not commercially feasible to perform either of the above options, then A P m ay require from the University the return of the infringing A P Material and all rights thereto. Upon return of the in fringing A P Material to A P, the University may terminate this Agreement with 10 days written notice.

X.   LIMITATION OF LIABILITY

NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES.

XI.   Warranties

A.   Authority. Each Party warrants, to the best of its knowledge, that it has the authority to enter into the Agreement and to perform its obligations set forth herein.

B.   Ownership by AP. AP warrants that it is the sole and exclusive owner of all AP Material or has the license to use and sub-license any Intellectual Property owned by third parties and incorporated into such AP Material, and that, to the best of its knowledge; such AP Material does not infringe any third-party rights.

C.   Ownership by the University. The University endeavors to ensure that any Intellectual Property owned by third parties and incorporated into the University Material is either licensed by the University or, in the context of the University's use hereunder, constitutes a fair use and, therefore, does not infringe any third-party rights.

7

D.     Compliance. AP warrants that it is and shall at all times during the term of this Agreement take all
       reasonable measures to insure that, both' for itself and as to the services performed on behalf of the,
       University, it shall remain in compliance with Program Integrity Rules, including Incentive
       Compensation and Misrepresentation requirements, and that it maintains a rigorous training program
       for its personnel and agents in regard to such rules and requirements.

E.     Regulatory Enforcement. AP warrants that, prior to the execution of this Agreement, AP has
       disclosed to the University the existence of any past federal or state decrees, orders, or consent
       agreements, and any pending formal or informal government investigations involving A P, its
       officers, directors, or principals (or that no such investigation or action is threatened). AP further
       warrants and agrees that if AP becomes involved or named in any action, investigation, complaint or
       other proceeding by or before any governmental or regulatory authority, or any private party
       (including any private lawsuit or class action), AP shall immediately provide notice of the same to
       the University, in which event the University may immediately terminate this Agreement.

XII.    Termination

A.     Material Breach. If either Party defaults in the full and timely observance or performance of its
       material covenants or obligations under this Agreement the other Party may terminate this
       Agreement upon providing 60 days prior written notice specifying the nature of the default and the
       steps to be taken to cure such default; provided, however, that if such default is cured by the
       defaulting Party within such 60-day period, such notice of termination shall be deemed null and
       void as if the same had never been given and the Agreement shall not be terminated pursuant
       thereto.

B.     Use in Violation of Agreement. If AP uses the University Material, or if the University uses
       the AP Material, in any manner that exceeds the licenses granted to such Party herein, and fails to
       immediately cease within 30 days after provided written notification of such unlicensed use, the other
       Party may immediately terminate this Agreement with written notice.

C.     University's Obligations. Upon expiration or termination of this Agreement, University must
       cease all use of AP Material and return any such material in its possession to AP provided that the
       University shall have the right to continue to use the AP Material for the sole purpose of
       permitting Students then enrolled in a Program to complete such Program.

D.     AP's Obligations.     Upon expiration or termination of this Agreement, AP must cease all
       distribution of University Material and return any such material in its possession to the University.

XIII. General

A.     Relationship Between the Parties. Each Party is an independent contractor and will be solely
       responsible for payment of all compensation owed to its employees, as well as employment related
       taxes. Each Party will maintain appropriate worker's compensation for its employees as well as
       general liability insurance. Neither this Agreement, nor any terms and conditions contained herein,
       shall be construed as creating a partnership, joint venture, agency or franchise relationship.

8

B.    **Governing Law and Jurisdiction.** This Agreement shall be governed by the laws of the State of Ohio. Any legal action or proceeding relating to this Agreement shall be instituted in Ohio.

C.    **Notice.** All notices, including notices of address change, required to be sent hereunder shall be in writing and shall be deemed to have been given when mailed by certified mail to:

If to AP:

    Academic Partnerships, LLC
    Attn: Chief Financial Officer
    160 Continental Ave.
    Dallas, TX 75207
    FAX: 214-210-3997

With copy to:

    Academic Partnerships, LLC
    Attn: Legal Dept.
    2200 Ross Ave., Suite 3800
    Dallas, TX 7520 1
    FAX No. 214-438-4133

If to the University:

    Department of Purchasing
    Room 320 University Hall
    University of Cincinnati
    51 Good man Drive
    Cincinnati, OH 45221-0089

The Parties agree that they each may treat documents faxed and/or email attachments and/or a signature sent electronically by the other Party as original documents; nevertheless, either Party may require the other to exchange original signed documents.

D.    **Severability.** In the event any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions of this Agreement will remain in full force.

E.    **Waiver.** The waiver by either Party of any default or breach of this Agreement shall not constitute a waiver of any other or subsequent default or breach. Except for actions for nonpayment or breach of either Party's intellectual property rights, no action, regardless of form, arising out of this Agreement may be brought by either Party more than two years after the cause of action has accrued.

F.    **Headings.** The headings appearing in this Agreement are inserted for convenience only, and will not be used to define, limit or enlarge the scope of this Agreement or any of the obligations herein.

G.    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which will be an original, and such counterparts together will constitute one and the same instrument.

H.    **Confidential Information.** Each Party agrees that it shall not use or disclose to any third party, except for the purpose of performing this Agreement, any business and technical information of the other Party which, in the exercise of reasonable judgment, should be recognized by such Party as confidential ("Confidential Information"). The obligation of confidentiality shall not apply to information which: (a) is or becomes part of the public

9

domain through no fault of the receiving Party; (b) is furnished by the disclosing Party to others without restrictions on use and disclosure; (c) becomes known or available to the receiving Party without restriction from a source other than the disclosing Party without breach of any Agreement with the disclosing Party; (d) is disclosed with prior written approval of the disclosing Patty; (e) is independently developed by the receiving Party without the use of any Confidential Information; (f) is previously known to the receiving Party on a non-confidential basis; or (g) is required by court order or government agency to be disclosed, in which case, the receiving Party shall give the disclosing Party as much notice as is reasonably practical so that the disclosing Party may seek a protective order or other confidential protection as the disclosing Party, in its sole discretion, may elect and the receiving Party shall reasonably cooperate with the disclosing Party in disclosing Party's efforts to obtain such order or protection.

I.    Audit. The University, at its own expense, shall have the right to audit online chats and telephone calls with prospective University students upon reasonable advance notice, to ensure compliance with Program Integrity Rules. Further, the University, at its own expense, shall have the right to have its Associate Vice President for Enrollment Management, its Internal Auditors, or similar officials (the "University's Auditor") perf0l1l1 an audit (the "University's Audit") of AP's compliance with the Program Integrity Rules, exercisable by written notice delivered to AP at least 20 days prior to such University's Audit. AP agrees to cooperate with the University and the University's Auditor, including providing reasonable access to the financial books, records and materials regarding the Online Educational Courses. .,

J.    Insurance. AP shall maintain commercially reasonable insurance and shall provide proof of the same to the University.

K.    Force Majeure. Neither Party will be liable for delays or failure in its performance hereunder to the extent such delay or failure is caused by any act of God, war, natural disaster, strike, lockout, labor dispute, work stoppage, fire, third-Party criminal act or act of government, or any other event beyond the reasonable control of that Party (an "Excusable Delay"). This Agreement may be terminated with written notice by either Party under this section should the Excusable Delay of the non-performing Party continue for more than 30 days.

L.    Entire Agreement. This Agreement and any exhibits hereto constitute the complete Agreement between the Parties and supersede all previous agreements, written or oral, concerning the subject matter of this Agreement. Neither this Agreement nor an exhibit may be modified or amended except in writing and signed by both Patties.

M.    Successors and Assigns. This Agreement will be binding upon, and will inure to the benefit of, the permitted successors and assigns of each Party hereto. Neither party may assign, this Agreement or any of its rights hereunder without the prior or written consent of the opposite, and any attempted assignment without such consent shall be void. AP may not subcontract any material duties of this Agreement, without the prior written consent of the University.

N.    Survivability
      The following Sections shall survive the expiration and termination of this Agreement: III.C, VI, VIII, IX, X, XI, XII, and XIII.

ACADEMIC PARTNERSIDPS, LLC          UNIVERSITY OF CINCINNATI

| | |
|---|---|
| Signature: _____ | Signature: _____ |
| Name: Michael J. Briskey __ __ __ __ __ __ | Na                                me: |
| Title:  CFO _____ | Title: _____ |
| Date: _____ | Date: _____ |

11

## ADDENDUM 1

This Addendum ("Addendum") dated as of August 1, 2012, is a supplement to that certain License and Marketing Agreement ("Agreement") dated as of August 1, 2012 between Academic Partnerships, LLC, a Delaware limited liability company ("AP"), and University of Cincinnati (the ·'University") and is fully incorporated therein.

### 1. NAME OF PARTICIPATING SCHOOL OR COLLEGE:

College of Business
College of Engineering and Applied Science

### 2. EFFECTIVE DATE OF PROGRAM:

August 1, 2012

### 3. COURSES TO BE OFFERED:

All online courses leading to an undergraduate or graduate degree, including general courses or prerequisite courses.

### 4. PROGRAMS AND/OR DEGREES:

All online programs or degrees with Colleges listed in number 1 above. It is anticipated that the initial degrees will be:

MS in Tax
MS in Finance
MS in Accounting
MBA
Bachelors in Business Administration
MS or MEng in Mechanical Engineering
MS or MEng in Electrical Engineering
MS or MEng in Civil Engineering
MS or MEng in Environmental Engineering

ACADEMIC PARTNERSHIPS, LLC

UNIVERSITY OF CINCINNATI

By_____

By_____

Name: Michael J Briskey

Name:

Title: CFO

Title:

12

13

Exhibit A

ADDENDUM

This Addendum ("Addendum") dated as of                    , is a supplement to that certain License and
Marketing Agreement ("Agreement") dated as of                    between Academic Partnerships, LLC, a
Delaware limited liability company ("AP"), and University of Cincinnati (the "University") and is fully
incorporated therein.

1. NAME OF PARTICIPATING SCHOOL OR COLLEGE:

2. EFFECTIVE DATE OF PROGRAM:

3. COURSES TO BE OFFERED:

4. PROGRAMS AND/OR DEGREES:

5. AP PROGRAM PERCENTAGE:


ACADEMIC PARTNERSIDPS, LLC                         UNIVERSITY OF CINCINNATI


By_____                          By_____

Name: Michael J.Briskey                           Name:

Title: CFO                                         Title:

14

**EXHIBIT B**

(AP Trademarks, including those of its affiliates)

1. ACADEMIC PARTNERSHIPS, LLC
2. ACADEMIC PARTNERSHIPS
3. AP
4. ACADEMIC PARTNERSHIPS INTERNATIONAL, LTD.
5. ACADEMIC PARTNERSHIPS INTERNATIONAL
6. API
7. UNIVERSITY PARTNERS
8. ACADEMIC PARTNERSHIPS LOGOS

15

**EXIITBITC**

(University Trademarks)

1.

# UNITERSITY OF

# cincinnati University

Branding Standards can be found using the following link:
http://www.uc.edu/content/dam/uc/ucomm/docs/UCBrandingStandards.pdf

16

**Exhibit D**

AP Data Mapping Specifications

**AMENDMENT 1**
**TO**
**ADDENDUM 1**

This First Amendment to Addendum 1 ("Addendum") dated as of October 1, 2014, is a supplement to Addendum 1, dated August 1, 2012, which is a supplement to the License and Marketing Agreement ("Agreement") approved by the University's Board of Trustees on September 10, 2012 between Academic Partnerships, LLC, a Delaware limited liability company ("AP"), and University of Cincinnati (the "University") (the Parties) and is fully incorporated therein.

## I.    Section 4 of Addendum 1 is hereby modified by adding the following:

Graduate Certificate in Individual Tax (GMAT waiver pathway for MS Tax)
Graduate Certificate in Corporate Tax (GMAT waiver pathway for MS Tax)
Graduate Certificate in Business Foundations (GMAT waiver pathway for MBA)
Graduate Certificate in Healthcare Administration, for MBA-DL students
Graduate Certificate in Healthcare Finance, for MBA-DL students
Graduate Certificate in Healthcare Operations, for MBA-DL students
Graduate Certificate in Healthcare Policy, for MBA-DL students

## II.   The following section is hereby added to Addendum 1:

### 5. AP Affiliate Program

The "AP Affiliate Program" is defined as a program whereby employers become an AP Affiliate by signing an agreement with AP to allow AP to share UC program information with the employer's employees, and to make employees and family members of AP Affiliate employers eligible for Affiliate scholarships.

To incentivize employers to join the program, the University will scholarship all AP Affiliate students in a Lindner College of Business online degree program (which currently include: (i) MS in Tax, and the (ii) online MBA) at the rate of $90 per credit hour.   If a student enrolls full-time (10 or more credit hours per semester) they will not receive more than $900 for that term.

Affiliate Scholarships may not be added to any other scholarships the University may award to any particular student. For example, if a student is eligible for a $90 per credit hour Affiliate Scholarship and is offered a $4,000 merit scholarship, the individual must choose one or the other scholarships and may not receive both. The parties acknowledge and agree that Revenue, as defined in the Agreement, does not include any tuition that the University does not collect because of a scholarship awarded to any Student.

UC will begin offering the Affiliate scholarship to cohorts beginning October 1, 2014 and thereafter.  Either party may terminate the AP Affiliate scholarship for

any reason upon providing 90 days prior written notice. Following termination, the University will honor AP Affiliate scholarships that have already been offered, but will not be obligated to offer any further such scholarships.

**ACADEMIC PARTNERSHIPS, LLC**

By: _____

Name: Wes Brazell

Title: CFO

Date: _____9/30/14_____

**UNIVERSITY OF CINCINNATI**

By: _Ellen S. Banks_

Name: _____Ellen S. Banks, Esq._____
          Assistant General Counsel

Title: _Assistant Contracting Officer_

Date: _____9/25/14_____