Kevin E. O'Malley (006420)
Hannah H. Porter (029842)
Gallagher & Kennedy
2575 E. Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone: 602.530.8000
Facsimile: 602.530.8500
Email: kevin.omalley@gknet.com
Email: hannah.porter@gknet.com

Steven M. Gombos (*pro hac vice*)
Virginia State Bar No. 30788
David A. Obuchowicz (*pro hac vice*)
Virginia State Bar No. 82483
Gombos Leyton, PC
11350 Random Hills Road, Suite 400
Fairfax, Virginia 22030
Telephone: 703.934.2660
Facsimile: 703.934.9840
Email: sgombos@glpclaw.com
Email: dobuchowicz@glpclaw.com
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Grand Canyon University,<br>　　　　　　　Plaintiff,<br>v.<br>Miguel Cardona, *et al*,<br>　　　　　　　Defendants. | No. 2:21-cv-00177-SRB<br><br>**Plaintiff's Reply in Support of its Motion to Complete the Administrative Record and Take Limited Discovery**<br><br>**(Oral argument requested)** |

Grand Canyon University has identified strong evidence that the administrative record improperly excludes relevant information that was, or should have been, considered by the Department in making its decision.

The plain language of Robin Minor's June 22 email, let alone reasonable inferences that can be drawn from it in GCU's favor, make the strong showing necessary for extra-record discovery, notwithstanding the Department's competing, self-serving explanation. In addition, the Department continues to evade several relevant issues, making limited discovery necessary to determine whether the agency considered all relevant factors in making its decision. On the present record, the Court cannot engage in the "thorough, probing, in-depth review" the APA requires. Extra-record discovery is necessary.

Moreover, the Department's opposition does nothing to undermine the need for the agency to complete the record either by adding or otherwise logging internal materials. The Department's argument that internal materials are irrelevant in APA cases is inconsistent with the prevailing view among district courts in the Ninth Circuit. And even under those cases on which the Department relies, it has excluded relevant materials from the agency record. Accordingly, the Court should grant GCU's motion to complete the administrative record and to take limited discovery.

**1. The plain language of Robin Minor's email raises competing inferences requiring limited discovery of agency bad faith.**

Ms. Minor's June 22 email confirmed that the Department had completed its review and was denying GCU's nonprofit status. The Department argues that GCU "overreads" Ms. Minor's email and suggests its own self-serving reading is conclusive. Opp. at 14. In support of its reading, the Department draws factual inferences in its favor and dismisses the plain language and competing inferences that can be drawn in GCU's favor. But that is not the standard this Court should follow.

Under the appropriate standard, this Court "should not overlook plausible, competing inferences that might be drawn from the evidence," and it should "weigh the limited means" GCU has at this stage to uncover evidence of agency bad faith. *Sokaogon Chippewa Community v. Babbitt*, 961 F. Supp. 1276, 1280-81 (W.D. Wis. 1997). "When that is done, there is sufficient reason to suspect that [the Department acted in bad faith] . . . so as to allow [GCU] an opportunity to further uncover evidence." *Id.* at 1280 (permitting limited discovery); *see also Stand Up for Cal.! v. U.S. Dep't. of Interior*, 315 F. Supp. 3d 289, 298 (D.D.C. 2018) (granting discovery).

*Sokaogon* is instructive. Plaintiffs in that case alleged improper political influence affected the government's decision denying their applications to acquire land. On reconsideration of its prior decision denying plaintiffs limited discovery, the court explained that, in evaluating whether the plaintiffs had made the required strong showing, it could not overlook reasonable inferences that could be drawn in their favor. 961 F. Supp. at 1281. The court noted that it was unreasonable to require plaintiffs to "come forward with conclusive evidence" at that stage of the proceeding, *id.* at 1281, and it must "weigh the [plaintiff's] limited means . . . to uncover political impropriety in determining whether they ha[d] made a strong showing of improper influence," *id.* at 1280.

So too here, it is improper to simply defer to the Department's denial of wrongdoing. *See id.* at 1281. The factual inferences the agency draws in its favor can also be drawn in GCU's favor. Indeed, the Department reads much into Ms. Minor's email that is not there and ignores much that is there but is inconvenient for its version.

- It downplays "the team and OGC" decision as a minor staff analysis, Opp. at 14, while ignoring that they have primary responsibility for nonprofit conversions, Ex. D-2 at 9.
- The Department asserts that it evaluates and makes a final decision on a change-in-ownership (CIO) application "only after" the transaction

2

occurs, Opp. at 4, ignoring the plain language of the June 22 email—"[The team and OGC] have concluded that . . . GCU would still be considered a for profit after the CIO," Ex. B-1.

- The Department asserts (without factual support) that Ms. Minor did not know the July 1 transaction date to be a firm "deadline," Opp. at 14, ignoring that GCU confirmed the deadline at least 5 weeks earlier, *see* AR-J-0112.

- The Department reads into the email that Ms. Minor was working to brief FSA leadership, Opp. at 14, ignoring that Ms. Minor was the FSA leader with ultimate approval authority, Ex. B-12.

- The Department interprets the offer to schedule a meeting for the team and OGC to explain the decision to Ms. Smith as proof Ms. Minor was "working to brief FSA leadership," opp. at 14, ignoring that Ms. Smith was subordinate to Ms. Minor and she immediately responded: "I thought this was old and done." Ex. B-1.

- Finally, the Department argues that the email does not reflect a final decision, opp. at 14, while ignoring the plain language in which Ms. Minor described the "results" of the "completed" analysis and the "conclu[sion]" to deny GCU's nonprofit status. Ex. B-1.

The Department also isolates Ms. Minor's email from its historical context and feigns ignorance about the agency's motive for withholding its decision. Opp. at 15. That history is important because it shows how political pressure led the Department to replace its clear process with an opaque one that permits the agency to decide nonprofit status at whim.

- **March 2, 2015.** The New York Times runs an article, titled "*Some Owners of Private Colleges Turn a Tidy Profit by Going Nonprofit*," raising

concerns from some critics of for-profit education about seller-financed nonprofit conversions. *See* AR-J-0344 (referencing the article).

- **April 27, 2015.** Members of Congress write to the Department asking the Secretary to "impose an immediate moratorium" on nonprofit conversion, citing the March 2015 article. *See* AR-J-0344 – 0346.
- **September 9, 2015.** The Department responds that (1) it cannot stop nonprofit conversions; (2) the IRS determines whether financial arrangements comply with nonprofit rules; and (3) the Department brings issues it identifies "to the attention of the IRS for review under that agency's standards." In addition, the Department identified then pending CIOs involving nonprofit conversions and noted that GCU had indicated it was contemplating nonprofit conversion. *See id.*
- **September 22, 2015.** Former Deputy Under Secretary Robert Shireman urges the Department to impose a moratorium on nonprofit conversion. Calling the Department's sole reliance on the IRS problematic, he argues for the Secretary to reinterpret the Department's definition of nonprofit institution as authorizing an independent assessment of nonprofit status. *See generally* AR-J-0322.
- **October 22, 2015.** Seven Senators write to the Department citing Shireman's article. The Senators urge the Department "to take a closer look at non-profit conversions," noting that two "publicly traded for-profit education companies" (one of which was GCU) had expressed interest in nonprofit conversion. Ex. B-13.
- **August 11, 2016.** For the first time in its history, the Department refuses to recognize an IRS approved 501(c)(3) as a nonprofit under Title IV. Ex. B-5. Filed alongside its decision letter, the Department issued a press

4

release warning schools considering nonprofit conversion—"Don't waste your time." AR-J-0328.

- **December 22, 2016.** After litigation challenging its August 11 decision was initiated, the Department acknowledged that it had departed from its prior practice of deferring to the IRS. AR-J-0333. The Department cited the new gainful employment rules (since revoked) as the reason why an "independent determination" of nonprofit status was needed for Title IV participation. *Id.* The agency issued no rules or guidance identifying the criteria by which it would determine nonprofit status.
- **January 11, 2018.** Senators write to the Secretary about "two troubling" CIOs (of which one was GCU's). The Senators urge the Department to approach both CIO applications with "extreme caution." Ex. B-8 at 3.
- **January 18, 2018.** GCU files its application requesting preacquisition review of its CIO by the Department. AR-J-0001.

Ignoring all that context, the Department contends it acted in good faith. But there is more than a "distinct possibility" that the Department withheld its decision in bad faith when all reasonable inferences are drawn in GCU's favor. *Sokaogon*, 961 F. Supp. at 1281. Indeed, it appears the Department decided to block GCU's nonprofit conversion,[1] which is why the agency refused to provide directional guidance,[2] identify MSA thresholds,[3] or

---

[1] This inference is further supported by the Department's distinct treatment of the Kaplan-Purdue CIO transaction. Despite substantially similar terms, the Department completed its preacquisition review in 3 months and provided substantive guidance to the two entities; in contrast, the Department provided no guidance to GCU over 6 months and refused even to ask GCU if the closing could be extended to ensure the agency could provide guidance.

[2] *See* Ex. E-1 (requesting any "directional guidance" from the Department).

[3] *See* AR-J-0128 (asking about "thresholds" on revenue sharing GCU should know about).

discuss necessary changes.[4] If the Department had articulated clear standards, it could not then deny GCU's application if it met them. *Stand Up for Cal.!*, 315 F. Supp. at 298 (allowing extra-record evidence into the agency's "unalterably closed mind"). This conclusion is further supported by the Department's actions when GCU proposed MSA modifications after the initial decision. The Department asked for revised transfer pricing studies, *see* AR-J-0313,[5] which GCU provided, *id.* at 94-95, only to later claim the studies were inapplicable despite Deloitte and BKD both concluding they confirmed the transaction's fairness, AR-A-0024-25. In short, so long as the Department withheld its standards and guidance from GCU, the Department could deny GCU's nonprofit status no matter what.

**2. Extra-record discovery is necessary to determine whether the Department considered all relevant evidence in making its decision.**

Limited discovery is also necessary to determine whether the record is complete and the Department considered all relevant factors. Determining whether an administrative record is complete depends, in large part, on the nature of the challenges to the decision. As detailed in GCU's motion, the agency record is silent as to several challenges alleged in the complaint. Although GCU first alerted the Department to every basis it later alleged in its complaint, *see* AR-J-0316-23, the administrative record wholly excludes evidence related to those matters. The Department simply ignored several challenges—i.e., those related to its policy change, lack of expertise, improper political influence, and disparate treatment of GCU—and argues now that, by choosing to ignore those challenges to its decision, it has properly excluded them from the record.

---

[4] *See* AR-J-0112 (asking the Department to identify any "changes [it] foresees [the parties] need to make" early enough that the parties have time to "work through issues").

[5] The Department failed to include the January 17 letter attached to its email at AR-J-0313. A true and correct copy is attached as Exhibit 1 to this reply brief and should be added to the record.

6

That argument mocks the APA's reasoned decisionmaking requirement. To allow an agency to ignore well-founded challenges to its decision, and thereby restrict the evidence before the court, "is inconsistent with the meaningful judicial review required by *Overton Park*." *Ctr. for Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1281 (D. Colo. 2010).

By way of example, the Department seeks to exclude the service contracts GCU made available to the Department. Opp. at 12. Asserting that GCU cannot prove the Department even accessed the similar service agreements "through the links" in GCU's submission, *id.*, the Department argues that supplementation is not justified. But when a plaintiff "seek[s] to supplement the record with a limited class of documents which should have been considered by the [agency] in reaching the challenged decision . . . it is appropriate to compel supplementation of the record with those documents." *See Ctr. for Native Ecosystems*, 711 F. Supp. 2d at 1281.

The Department's related response—that GCU can argue on the current record that the agency failed to address other service agreements (opp. at 16)—is an effort to denude the force and substance of GCU's arguments before addressing them on the merits. As is evident from the Department's briefing and prior communications, the agency does not concede the MSA is materially similar to the other service agreements. Without access to the other service agreements, how can this Court determine whether the failure to address them was arbitrary and capricious? Similarly, how can this Court assess whether the agency "departed from its past practice," opp. at 16, when the Department simply denies it (*see* Ex. A-4 at 2) but then excludes all evidence from the record? The only way is to permit limited discovery to determine whether the record is complete. *See generally Pac. Coast Fed'n of Fishermen's Ass'ns*, 2005 U.S. Dist. LEXIS 50662 at *5-6.

The Department also argues that its solicitation for outside experts to review its determination that the MSA creates a private benefit for GCE "is not evidence—much less clear evidence—of an incomplete record." Opp. at 11. But evidence the agency questioned

7

its own expertise to evaluate the MSA is highly relevant to this Court's "thorough, probing, in-depth review," particularly when the Department is analyzing complex IRS rules and regulations. The Department cannot claim deference to its judgment while hiding doubts about its own competence.

The transfer pricing analysis at the core of the Department's decision raises complex issues. In support of the transaction, GCU provided multiple reports prepared by teams specializing in transfer pricing analysis at national firms Deloitte LLP and BKD LLP. Both firms confirmed that the MSA complied with nonprofit requirements. In contrast, the Department cited an Investopedia.com article on transfer pricing studies. AR-A-0025. Nothing in the record suggests the Department conducted robust analysis of the issues or developed its own expertise applying IRS nonprofit requirements.

Moreover, while the Department concedes any expert review it considered or relied on would be record material, opp. at 11, it never denies that it retained an expert. And it fails to explain why, if the agency received an expert review but chose to ignore it, that review should be excluded. Limited discovery is appropriate here into the Department's need for expert review.

Finally, the Department seeks to exclude evidence its own prior statements confirm are relevant. The notion that the Department did not consider or rely upon advice by the CIO workgroup it established to ensure consistency in evaluating nonprofit conversions is ridiculous. *Contra* Opp. at 11. So too, the Department's claim that it did not "directly or indirectly" consider congressional correspondence referenced in its own briefing paper strains credibility. *Contra* Opp. at 12. The briefing paper describes correspondence in which senators referred to GCU's CIO application as "troubling" and urged the Department to use "extreme caution." Ex. B-8 at 3. Moreover, the Department prepared talking points to that correspondence while GCU's application was pending. *See id.* It is simply implausible

that the Department addressed the correspondence when reporting to Congress about its review of GCU's nonprofit conversion but not in actually deciding GCU's nonprofit status.

The briefing paper further underscores the need for limited discovery to determine whether the record is complete. The congressional letters GCU referenced in its opening brief, while representative of correspondence the Department received, is not exhaustive. The January 2018 letter described in the briefing paper—which directly addresses GCU's CIO application, calling it "troubling" and urging the Department to show "extreme caution"—is not in GCU's possession. Nor is the third-party correspondence from "left/center" think tanks described on page 1 of the briefing paper.

### 3. The Department's categorical exclusion diminishes this Court's review and is overbroad even on its own terms.

The Department maintains its decision to exclude all internal documents, claiming that predecisional, deliberative documents are not record materials. Opp. at 7-11. It looks for support to non-binding decisions with no persuasive value. Within this circuit, the prevailing view is that the "whole record" includes internal materials. This view, unlike the absolute rule the Department asks this Court to adopt, reconciles the tension between the APA's whole record requirement and the government's deliberative process privilege by requiring the government to log deliberative documents. The Department's view, on the other hand, deprives this Court of one of its primary functions in APA cases, and also invites gamesmanship by the government in assembling the record.

Perhaps by design, the Department gives the impression that its position reflects more recent consideration, citing only *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. 2019) and a handful of decisions adopting its reasoning. But *Oceana* reaffirmed decades-old D.C. Circuit authority. And the Ninth Circuit was well aware of those cases when it "indicated support for [the prevailing] approach" in this circuit. *See WildEarth Guardians v. Bernhardt*, 507 F.

9

Supp. 3d 1219, 1225 (C.D. Cal. Dec. 16, 2020) (citing *In re United States*, 875 F.3d 1200, 1210 (9th Cir. 2017).

The Department's spin on *In re United States* thus comes up flat. *See* Opp. at 8-9. Given the opportunity and asked to do so by the government, the Ninth Circuit did not "disturb" the prevailing trend. *See In re Clean Water Act Rulemaking*, 2020 U.S. Dist. LEXIS 211820, *15 (N.D. Cal. 2020) (citing *In re United States*, 875 F.3d at 1210). By arguing for the categorical exclusion of internal materials, the Department asks this Court to adopt the dissent's position. *See In re United States*, 875 F.3d at 1211 (Watford, J., dissenting).

Moreover, even on its own terms the Department's argument goes too far in at least three respects. First, the Department conflates internal materials with deliberative documents. But agency documents are deliberative only if they are predecisional and reflect the agency's thinking. The Department's exclusion of all internal materials is overbroad even under its suggested approach.

Second, while the Department relies on *Oceana*'s holding that "predecisional documents are irrelevant," opp. at 8, it seeks to shield internal documents that postdate the agency's decision. Internal materials made after the agency's decision and designed to explain it do not implicate the same concerns about affecting agency decision making as do predecisional documents. *See Lahr v. NTSB*, 569 F.3d 964, 981 (9th Cir. 2009) ("[P]ost-decisional records fall outside the deliberative process privilege.").

Long before the Department issued its opinion, it had decided to deny GCU nonprofit status after its CIO, as Robin Minor's June 22, 2018 email confirms. Consider too the Department's solicitation of an expert to "review . . . its **determination** that the MSA creates a prohibited substantial private benefit." Ex. B-6 at 4 (emphasis added). Contrary to the Department's claim that this communication is in "tension" with GCU's argument, opp. at 11, it further confirms it. It reiterates that the Department's decision had been made months before the agency issued its decision.

Third, and most importantly, the Department cannot hide the law it applies behind a veil of privilege. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867-68 (D.C. Cir. 1980). "[A]n agency [is] not permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'" *Id.* Yet that is precisely what the Department asks this Court to approve.

The Department claims to make an "independent determination" of nonprofit status but has neither promulgated regulations nor published guidance explaining what factors or criteria it considers when doing so. Although the Department's purported test for nonprofit status is the same standard applied by the IRS, the Department somehow reached the opposite conclusion about GCU's status. And despite approving similar service agreements between nonprofit institutions and for-profit service providers, the Department cites the MSA as its primary basis to deny GCU's nonprofit status.

Indeed, the Department claims to have "develop[ed] a robust review process" "separate and distinct from the IRS's 501(c)(3) designation," Ex. B-8 at 3-4, but what that process entails, including what factors and criteria the Department considers, or, in other words, what law the agency applies, is opaque and unclear. The Department cannot hide its internal policy, guidance, and determinations about nonprofit status behind the veil of privilege, while arguing that internal materials are irrelevant.

## Conclusion

For the reasons above and those in GCU's initial brief, GCU requests that the Court grant its motion to complete the agency record and permit GCU to take limited discovery of the Department to develop its bad faith claim and determine whether the record is complete.

Dated this November 30, 2021.

11

1
2
3
4
5
6
7
8
9

        Respectfully submitted,

        _____
        Kevin E. O'Malley
        Hannah H. Porter
        GALLAGHER & KENNEDY
        2575 E. Camelback Road, Suite 1100
        Phoenix, Arizona 85016

        /s/David A. Obuchowicz
        Steven M. Gombos
        David A. Obuchowicz
        GOMBOS LEYTON, P.C.
        11350 Random Hills Road, Suite 400
        Fairfax, VA 22030

        *Counsel for Plaintiff*

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**Certificate of Service**

I certify that on November 30, 2021, I electronically filed this reply using the Court's CM/ECF system.

*/s/ David A. Obuchowicz*