Kevin E. O'Malley (006420)
Hannah H. Porter (029842)
Gallagher & Kennedy
2575 E. Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone: 602.530.8000
Facsimile: 602.530.8500
Email: kevin.omalley@gknet.com
Email: hannah.porter@gknet.com

Steven M. Gombos (*pro hac vice*)
Virginia State Bar No. 30788
David A. Obuchowicz (*pro hac vice*)
Virginia State Bar No. 82483
Gombos Leyton, PC
11350 Random Hills Road, Suite 400
Fairfax, Virginia 22030
Telephone: 703.934.2660
Facsimile: 703.934.9840
Email: sgombos@glpclaw.com
Email: dobuchowicz@glpclaw.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Grand Canyon University,<br><br>                    Plaintiff,<br><br>v.<br><br>Miguel Cardona, *et al*,<br><br><br>                    Defendants. | No. 2:21-cv-00177-SRB<br><br>**Joint Appendix – Motion to Complete the Administrative Record and to Take Limited Discovery**<br><br>Hearing Date: January 13, 2022 |

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

# Table of Contents

## Volume I

1. U.S. Department of Education, Decision Letter Regarding Review of the Change in Ownership and Conversion of Nonprofit Status of Grand Canyon University (November 6, 2019) …………………………………………………………....JA1

2. U.S. Department of Education, Decision Letter Regarding Reconsideration Review of the Change in Ownership and Conversion to Nonprofit Status of Grand Canyon University (January 12, 2021)……………………………………………………JA19

3. Project Gazelle Survey of Select Service Provider Relationships with Post-Secondary Institutions through November 2017……………………………………………JA38

4. Gazelle University IRS 501(c)(3) Determination Letter (November 5, 2019)……..JA46

## Volume II

5. Brian E. Mueller Letter to Michael J. Frola (January 18, 2018)…………………..JA48

6. William Gonzalez Letter to Michael J. Frola (September 14, 2018)………………JA56

7. Michael J. Frola Letter to William Gonzalez (January 17, 2020)…………………JA59

8. Dennis M. Cariello Email to Donna Mangold (May 21, 2018)……………………JA61

9. Dennis M. Cariello Email to Donna Mangold (June 19, 2018)……………………JA62

10. Dennis M. Cariello Email to Donna Mangold (June 27, 2018)……………………JA65

11. Michael J. Frola Email to Brian Roberts (January 17, 2020)………………………JA67

12. Steven M. Gombos Letter with Exhibits to Michael J. Frola (August 14, 2020)…..JA68

13. Robin S. Minor Letter to Steven M. Gombos (August 28, 2020)…………………..JA99

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000



November 6, 2019

UPS Tracking #
1ZA879640294525311

Mr. Brian Mueller
President
Grand Canyon University
3300 West Camelback Road
Phoenix, AZ  85017

Re:   **Review of the Change in Ownership and Conversion to Nonprofit Status of Grand
Canyon University (OPE ID 00107400)**

Dear Mr. Mueller:

At your request, the U.S. Department of Education ("Department"), Federal Student Aid has
conducted a review of the change in ownership application for Grand Canyon University, OPEID
00107400 ("Institution" or "GCU").

Prior to July 1, 2018, GCU was owned and operated by Grand Canyon Education, Inc. ("GCE"),
a Delaware publicly traded corporation.  By way of a July 1, 2018 Asset Purchase Agreement
("APA"), GCE sold its School Assets (as set forth in APA at Recital B and as defined in APA
§2.1) to Gazelle University ("Gazelle"), an Arizona nonprofit corporation ("the Transaction").
Gazelle and GCE are hereinafter collectively referred to as the "APA Parties."[1]   Prior to the
Transaction, Gazelle was granted tax-exempt status by the Internal Revenue Service.  GCU seeks
approval of its change in ownership and request to convert to nonprofit status for purposes of its
participation in Title IV, HEA programs.  Although the parties had requested the Department to
conduct a pre-acquisition review, the Transaction closed on or about July 1, 2018, prior to
completion of the Department's pre-acquisition review.   This letter constitutes the Department's
post-closing decision on the change in ownership ("CIO") and requested change of status from
proprietary to nonprofit.

Following the closing of the Transaction, GCU timely submitted a materially complete
application and other documentation to satisfy the regulatory requirements set forth at 34 C.F.R.
§ 600.20(g) and (h).  GCU has also submitted additional documentation and information as

---

[1] After the Transaction, Gazelle changed its name to Grand Canyon University.  In documents submitted
to the Department, Gazelle has also been referred to as "GCU" and the "New GCU."  To avoid confusion,
the Department will refer to the APA Parties as "Gazelle" and "GCE," based on the names used in the
introductory paragraph of the APA: "Gazelle University" (the purchasing entity) and "Grand Canyon
Education, Inc." (the selling entity).  The sole member of Gazelle is Grand Canyon Foundation.



Grand Canyon University (OPE ID 00107400)
Page 2 of 18

requested by the Department during its review.[2]  A temporary provisional program participation
agreement ("TPPPA") was issued to GCU on August 20, 2018, and GCU has been participating
on a month to month basis since September 1, 2018.

## I.   BACKGROUND ON THE TRANSACTION

### A.  Overview of the APA

Pursuant to the APA, Gazelle purchased the School Assets,[3] which included Campus Property,
certain Personal Property, Assumed Contracts, Course Materials and intellectual property
embodied in the Course Materials and other identified intellectual property, and other assets, as
listed in APA §2.1.  Under APA §2.2, Services Assets remained the property of GCE, and
include assets not listed in APA §2.1 or the related schedules, Retained Property (including
GCE's headquarters building at 2600 West Camelback Road), and other assets (including cash
and cash equivalents) as further described in APA §2.2.

APA §2.3 identifies the liabilities assumed by Gazelle ("Assumed Liabilities") and APA §2.4
identifies the liabilities that are not assumed by Gazelle ("Excluded Liabilities").  Significantly,
the APA purports to insulate Gazelle from assuming Liabilities arising under Educational Laws.

The Purchase Price for the Transaction includes the assumption of the Assumed Liabilities, and
payment of the Base Purchase Price ($853,068,386.00 "plus []$1.00") and the Invested Amount.[4]
APA §3.1.  The Base Purchase Price was paid by Gazelle's delivery of the Senior Secured Note
and Credit Agreement ("CA").  APA §3.2.  Notably, the lender for the Transaction is GCE.  The
loan is secured by a first lien on all of Gazelle's property and the property of all of Gazelle's
subsidiaries, which are also guarantors of the loan.  CA § 7.12, CA § 7.13.  GCE also provides
funding for Gazelle's operations under the Credit Agreement.  CA § 2.01.

### B.  Overview of the Master Services Agreement

As part of the Transaction, the APA Parties also entered into a Master Services Agreement
("MSA") pursuant to which GCE provides Services to Gazelle/GCU and Gazelle/GCU pays a
part of its revenues to GCE.  Exhibit B to the MSA describes the Services that GCE provides to
Gazelle.  Gazelle further agreed that GCE is the exclusive provider (during the Term of the
MSA) of certain services, identified in the MSA as "Exclusive Services," for which Gazelle
agrees it will not contract with any third party absent GCE's approval (which is subject to GCE's
sole discretion).  MSA §3.1. The Exclusive Services are the following:  Marketing (MSA Exh. B

---

[2] Some information in this letter is shaded in grey as a result of the APA Parties' designation of that
information as confidential, consistent with the Department's directions when it requested documents
from the APA Parties.

[3] Words capitalized herein but not defined have the meaning set forth in the APA and/or the Master Services
Agreement entered into as part of the Transaction.

[4] At closing, Gazelle paid an additional $17 million, rounded, representing amounts contributed to, or paid
by, GCE in connection with GCU in the two months prior to the closing of the Transaction.  *See* Purchase
Price Adjustment Certificate.

2

Grand Canyon University (OPE ID 00107400)
Page 3 of 18

§1); Enrollment Services and Budget Consultations (MSA Exh. B §2); Student Support Services
Counseling (MSA Exh. B §3); and Technology (MSA Exh. B §12). The non-exclusive services
are the following: Document Intake (MSA Exh. B §4); Student Records Management (MSA
Exh. B §5); Curriculum Services (MSA Exh. B §6); Accounting Services (MSA Exh. B §7);
Financial Aid Services (MSA Exh. B §8); Procurement Services (MSA Exh. B §9); Audit
Services (MSA Exh. B §10); Human Resources (MSA Exh. B §11); Business Analytics Services
(MSA Exh. B §13); Faculty Operations (MSA Exh. B §14); and Compliance Monitoring and
Audits (MSA Exh. B §15). The MSA provides that GCE shall at all times provide at least three
services in addition to Enrollment Services. MSA Exh. B (introductory paragraph). However,
even if services are provided by a third party, Gazelle is still obligated to pay GCE its Services
Fees described in MSA §5. *See* MSA §3.1. GCE also has the right to subcontract any of the
services, as described in MSA §3.2.

Pursuant to MSA §5.1, the Services Fee is determined and paid in accordance with MSA Exhibit
D which provides that Gazelle is required to pay GCE a fee that is equal to 60% of Gazelle's
Adjusted Gross Revenue (excluding charitable contributions or other gifts used for purposes
other than payment of tuition and fees for students).[5] Adjusted Gross Revenue consists of all
revenue (net of refunds and scholarships accounted for as a discount to tuition) received by
Gazelle or its Affiliates from the following sources:

(a) Tuition (including tuition funded by third party sources and charitable contributions;
(b) Fee revenue from students for use of the online communications portal ("the Platform");
(c) Fee revenue from students and their related activities
(d) Fee revenue from students for use of the Canyon Connect learning resources platform;
(e) Fee revenue from students for student housing;
(f) Fee revenue from students for meal plans and other food services; and
(g) Other revenue including revenue from: (i) sales of athletic tickets; (ii)the operation of the
    Grand Canyon University Hotel and Conference Center; (iii) the operation of the
    Maryvale Golf Course; (iv) the operation of the Grand Canyon University Arena; and (v)
    the operation of Canyon Enterprises (apparel sales and other businesses).

MSA Exh. D §1. The MSA does not provide any cap on the total amount of the Services Fee
that must be paid to GCE in any year or cumulatively over the years.

Although the Services Fee is subject to review and adjustment pursuant to Exh. D §2(b), the first
Optional Adjustment Date does not occur until the tenth anniversary of the Effective Date, and
thereafter occurs on the first date of each Renewal Term (*i.e.,* at five-year increments thereafter).
Exh. D at 2(b) and (c), and MSA §6.1. The Initial Term of the MSA is 15 years, with automatic
renewals thereafter for successive five years terms ("Renewal Term") apparently in perpetuity.
MSA §6.1. Either party can elect not to renew at the end of the Initial Term or any Renewal
Term, but if Gazelle exercises that right, on the last day of such term it must pay GCE a Non-
Renewal Fee equal to 50% of the aggregate Services Fees paid or payable for the trailing twelve
month period ended as of the end of the immediately preceding month. MSA §6.2 and MSA

---

[5] The Services Fee is exclusive of all Tax, such that Gazelle must "pay and be liable for any and all Tax
imposed on, sustained, incurred, levied and measured by the cost, value or price of the Services" provided
under the MSA. MSA §7.1.

Grand Canyon University (OPE ID 00107400)
Page 4 of 18

Exh. A at A-5 (definition of Non-Renewal Fee). Although Gazelle has the right to terminate the MSA during the Initial Term, it must give notice 18 months in advance, and cannot elect do so before July 1, 2025 (seventh anniversary) or the date by which the Senior Secured Note is paid in full – whichever is later. MSA §6.3. If Gazelle exercises that right, on the effective date of termination it must pay GCE an Early Termination Fee equal to 50% of the aggregate Services Fees paid or payable for the trailing twelve-month period ended as of the end of the immediately preceding month. MSA §6.3 and MSA Exh. A at A-3 (definition of Early Termination Fee). The MSA may be terminated as a result of a Performance Failure (subject to notice and cure) only if the breach in performance has a materially adverse effect on the Non-Defaulting Party or its business. MSA §6.4.[6]

The MSA provides Gazelle with the right to assume Back Office Services (defined in MSA Exh. A at A-2 as Accounting Services, Financial Aid Services, Human Resources and Technology[7]), and if it does, Gazelle and GCE agree to negotiate an adjustment to the Services Fee to account for any transfer of costs. MSA §6.9. But the MSA requires Gazelle to assume those Back Office Services directly, so that it cannot retain any other service provider to perform the Back Office Services. MSA §6.9. By way of example only, this would preclude Gazelle from retaining an outside payroll provider if it assumed Accounting Services, despite the fact that GCE performs payroll services through a third-party payroll provider. *See* MSA Exhibit B §7.1.

## II.   REPORTS

The Department has also been provided with several reports and valuations that were commissioned to support the Transaction, including reports from Barclays Capital Inc. ("Barclays") and Deloitte Tax, LLP ("Deloitte).

### A.   Barclays

The report from Barclays ("the Barclays Report") is dated April 26, 2018 and entitled "Project Gazelle." It is marked "Preliminary/Subject to further review, diligence and revision." The Barclays Report describes the contents of the report as containing "material that was provided to the Board of Directors … of Gazelle [identified as 'the Company']." [8] On August 29, 2019,

---

[6] The MSA limits GCE's liability for any claim (other than one related to Confidentiality or Intellectual Property Rights, or based on GCE's gross negligence or willful misconduct) to the amount paid by Gazelle to GCE in the most recently completed three month period, and Gazelle "releases and waives any claim against GCE in excess of such amount, to the extent permitted by Applicable Law." MSA §11.

[7] "Technology" is designated as both a Back Office Service (MSA Exhibit A at A-2) and one of several Exclusive Services (MSA Exhibit B §12, identified with an *).

[8] While the Barclays Report states that it was prepared for/ provided to the Board of Directors of Gazelle (cover and at 1), Barclays was engaged by GCE and provided its analysis to the GCE Board as set forth in various places in GCE's board minutes. For example, both the November 21, 2017 and December 6, 2017 board minutes note the engagement of Barclays as GCE's "financial advisor." On February 21, 2018 the GCE Board and representatives of Barclays discussed how Barclays could best help the Board, and the potential merits and risks of the Transaction or "remaining as a for profit education company." *See*

4

**JA4**

Grand Canyon University (OPE ID 00107400)
Page 5 of 18

Jonathon Glass, (counsel for GCU) provided the Department with a "follow-on" report from
Barclays which was provided to the board of GCE "to confirm certain information in the final
days before the transaction closed ("Barclays Update")."[9]

The Barclays Report reviews the strategic options available to GCE, including separation of the
Institution and GCE, with GCE as the services provider as an alternative to the status quo.  One
of the considerations Barclays notes in regard to separation is "significant concentration of
revenue for GCE and reduced influence over University." Barclays Report at 14.  The Barclays
Report provides a side-by-side comparison of the Institution's operating costs in 2019 based on
two different assumptions – (1)  GCE continues to own the Institution and incurs the costs to
operate the Institution or (2)  the Transaction closes, and Gazelle is required to hire GCE to
perform some of the operational activities.  *See* Barclays Report at 33.  The comparison shows
that under the planned separation (and as effectuated on July 1, 2018) the costs to operate the
separated Institution increase from $810 Million to $1.496 Billion for fiscal year 2019, solely as
a result of the Service Fees paid to GCE.  Barclays Report at 33.  The increase is not because
GCE will be providing new or additional services, but solely because the MSA requires Gazelle
to pay GCE the Services Fee.[10]

Although the Barclays Report (dated April 26, 2018) assumes a 65%/35% revenue split on most
items, and a different split on housing (20%/80%), meals (5%/95%) and Canyon Connect
(5%/95%), the executed MSA provides for a straight 60%/40% split and includes sources of
revenue that are not included in the Barclays Report, including revenue from Gazelle Arena.
These differences would seem to only exacerbate Barclays' assessment that the separation of the
servicing functions from the Institution will result in a significant increased cost for the operation
of the Institution, with those increased funds flowing to the benefit of its prior owner, GCE.
Under the assumptions in the Barclays Report, the Services Fees under the MSA (estimated at
$697 million for fiscal year 2019), *see* Barclays Report at 33, are a 67% markup on GCE's $416
million costs of performance.  No evidence has been presented to the Department that would
suggest that the services provided post-Transaction would be markedly different or more

---

February 21, 2018 GCE Board Minutes at 2.  The Barclays Report was provided to the GCE Board and
discussed at the meeting held on April 26, 2018.  *See* April 25-26, 2018 Minutes at 3.  This is consistent
with references in the Barclays Report to the Company's "shareholders."  By contrast, the Gazelle board
minutes do not reflect any discussion of the Barclays Report, and it is not clear whether the Barclays
Report was provided to the Gazelle board prior to the approval of the Transaction.

[9] In his August 29th e-mail transmitting the Barclays Update, Mr. Glass explained that the Gazelle/GCU
board "did not see or receive the [Barclays Update] until following up with GCE re [the Department's
August 26, 2019] request."  The Barclays Update was discussed with the GCE Board at its June 20, 2018
meeting.  *See* June 20, 2018 GCE Board Minutes at 3-4.

[10] The cost for GCE's services is particularly high considering that GCE is not even performing the entirety
of the operational activities that were previously performed at a cost of $810 million.  Some services are
performed by Gazelle.

**JA5**

Grand Canyon University (OPE ID 00107400)
Page 6 of 18

expensive to provide.[11]   Once the Services Fees are added, GCE will incur 28% of total expenses ($416,000,000 of $1,496,000,000) and Gazelle will incur 72% of total expenses ($1,080,000,000 of $1,496,000,000), as can be extrapolated from the information contained in the report:

| OPERATING EXPENSE SPLIT POST-TRANSACTION | | | |
|---|---|---|---|
| Expenses in Millions $ | Total | GCE Share under MSA | Gazelle Share as Owner under MSA |
| Instructional | 476 | 105 | 371 |
| Marketing & Promotional | 125 | 125 | 0 |
| Admissions Advisory | 149 | 149 | 0 |
| General & Administrative | 49 | 37 | 12 |
| Subtotal | 799 | 416 | 383 |
| Share % | 100% | 52% | 48% |
| Gazelle Fees under MSA Agreement | 697 | 0 | 697 |
| Total | 1496 | 416 | 1080 |
| Share % | 100% | 28% | 72% |

*See* Barclays Report at 33 (source of information for the above chart).

### B. Deloitte

Perhaps trying to circumvent the somewhat obvious conclusion that under the MSA the Institution costs an additional $697 Million to operate in the first fiscal year, the parties have also provided the Department with a Transfer Pricing Report for the Fiscal year ending December 31, 2018, which was prepared by Deloitte ("Deloitte Report").  Deloitte performed an "Economic Profit Split" ("EPS") analysis in connection with the services provided by GCE to Gazelle during the 15 year period "beginning with fiscal year ending December 31, 2018," and the transfer of certain intangible assets and license of the technology platform from GCE to Gazelle during FY 2018.  Deloitte Report at 1.  An EPS is an analysis of what each party to a common economic enterprise contributes to revenue-generating activities.  Deloitte Report at 1.  The Department was provided with two Deloitte Reports, one clearly marked "Draft" and a virtually identical version.  Neither version is signed, identifies the person(s) responsible for the report's conclusions, nor provides an affirmation from an appropriate person that the report has been prepared according to the applicable standards.  However, the Department has confirmed with counsel for GCU that the version of the Deloitte Report that is not marked as a draft is the final version of the report.

---

[11] For purposes of this analysis, the Department assumes that the payments owed to GCE under the Credit Agreement are fair value.  When those payments are included in the analysis, GCE receives 95% of Gazelle's revenue.

6

Grand Canyon University (OPE ID 00107400)
Page 7 of 18

The first step in Deloitte's EPS analysis was to identify the "assets and activities" of the enterprise that generate revenue. *Id.* at 1. Based "on fact finding discussions with key management personnel" – which at the time would have consisted solely of GCE's management – Deloitte found that the Institution generates revenue from seven activities.[12] Deloitte concluded that virtually all of the Institution's revenue-generating activities are those that will be wholly or partially performed by GCE under the MSA. *Id.* at 19-30.  Because Deloitte was working from a prior draft of the MSA, its conclusion in this regard is not accurate. *See* discussion below regarding revenue from the arena, athletic tickets, etc.

Significantly, Deloitte did not identify the Institution's physical campus as revenue-generating, which is at odds with statements made by GCE to its shareholders. Notwithstanding the campus facilities' undeniable contribution to revenue, Deloitte did not consider it as a revenue-generating asset. According to GCE's 2017 Annual Report to shareholders, one of the competitive factors in the post-secondary education market is "the quality of the ground campus facilities." GCE 2017 Annual Report at 15.  In fact, GCE told its shareholders that one of the primary factors for its revenue increase in 2017 was due to "ancillary revenues resulting from the increased traditional student enrollment (e.g. housing, food, etc.)" and that a higher percentage of its students were residing on campus. *Id.* at 48.  GCE noted that its campus was also valuable to "provide our online students, faculty, and staff with a sense of connection to a traditional university." *Id.* at 14.  To continue increasing revenues, GCE planned to enhance the reputation of the ground campus by expanding campus infrastructure. *Id.* at 14.  According to the figures provided in the Barclays Report, over 27% of the Institution's tuition revenue is from on-campus students. *See* Barclays Report at 33.

According to Deloitte, the next step in the EPS analysis was to identify risks associated with the revenue-generating activities and assets and determine which party: contractually assumes the risk; encounters upside or downside consequences of the risk; controls the risk; mitigates the risk; and has the financial capacity to assume the risk.  Deloitte Report at 5-6.  Deloitte identified several risks associated with the seven revenue-generating activities it considered.  Those risks include negative perception of marketing campaigns, failure to develop course content that will prepare students to complete the course work, failure to attract prospective students, software bugs, inability to recruit and hire effective faculty, and workplace injuries, among others. *Id.* at 26-30.  In each instance, the Deloitte Report simply notes that the fixed costs are borne by both GCE and the Institution, and that both face risks related to the various functions.  However, the Deloitte Report wholly fails to assess which party assumes these risks, encounters upside or downside consequences of these risks, controls these risks, mitigates these risks, or has the financial capacity to assume these risks.  As the Deloitte Report states, this failure renders Deloitte's EPS analysis "incomplete." *Id.* at 5.

The principal focus of the Deloitte Report is the risk of fixed costs, defined as costs that do not vary with the quantity of services provided. *Id.* at 1, 33-35.  Deloitte claims that the party assuming fixed costs assumes greater risk justifying a greater share of profits. *Id.* at 5.  Although this information is not detailed in the report, Deloitte apparently determined which costs

---

[12] Based on discussion with "key management personnel," Deloitte concluded that the following functions constituted the "key value creating drivers": marketing; curriculum development; admissions advisory; IT and technology; back-office support; faculty services; and Executive Leadership.  Deloitte Report at 19.

**JA7**

Grand Canyon University (OPE ID 00107400)
Page 8 of 18

associated with the seven revenue-generating activities were fixed costs and what share of fixed costs Gazelle and GCE were contractually obligated to pay. *Id.* at 33. Nowhere does the Deloitte Report identify the specific costs Deloitte deemed fixed, let alone provide any analysis supporting the conclusion as to which party is responsible for paying such costs. Instead, the Deloitte Report simply states that GCE is responsible for paying approximately $270 million in fixed costs for the seven revenue-generating activities and that Gazelle is responsible for paying approximately $164 million. Deloitte Report at 36. The Deloitte Report is wholly devoid of any information that would allow the Department to assess the accuracy or reasonableness of this conclusion.

The Deloitte Report also appears to give significant weight in its determination of fixed costs to its consideration of off-balance sheet assets ("OBSA"). Deloitte apparently considered historic trial balance sheet financial data (from FY 2013 through FY 2017) to "capture any fixed costs incurred in the past accounting period that are tied to the revenue generated in FY 2017. These are the costs that generate OBSAs." Deloitte Report at 32. Presumably, because all of those earlier costs were incurred during the years prior to the separation, Deloitte's calculation of fixed costs gives GCE – and not Gazelle – the benefit of those historical costs that were incurred before the services function was separated on July 1, 2018.

GCE has recognized that an important competitive factor in the post-secondary education market is "qualified and experienced faculty." 2017 Annual Report at 15. As GCE described it, the high quality of the Institution's faculty contributed to student retention and was "critical" to the Institution's success. *Id.* at 6, 9. Although Deloitte included "faculty services" as one of the seven "key value driving factors," it is unclear how it evaluated the faculty's contribution to revenue generation or risks related thereto, given that Gazelle is responsible for most of the costs of "Instructional Cost and Services" (i.e.,. $371 Million for Gazelle and $105 Million for GCE). *See* Barclays Report at 33. The Deloitte Report does not include any discussion of whether or not Gazelle was responsible for fixed-cost risk in connection with the Institution's faculty.

In addition, because the Deloitte Report failed to identify the Institution's campus as a revenue-generating asset, it failed to consider the fact that Gazelle is incurring significant fixed-cost risk in connection with the campus. Gazelle owes a lump sum payment to GCE on July 1, 2025 of $853,068,386, which represents the purchase price for the campus. CA §1.01 (defining "Term Loan Commitment" and "Maturity Date") and §2.07(c). Gazelle also owes GCE a monthly interest payment of approximately $4.2 million. *Id.* §1.01 (defining "Applicable Rate" and "Interest Payment Date") and §§2.08 (a) and (f) (interest is payable at the Applicable Rate on each Interest Payment Date).

Despite the fact that the purpose of the Deloitte Report was to determine a reasonable range of remuneration by Gazelle to GCE as a percentage of Gazelle's Adjusted Gross Revenue, the Deloitte Report was premised on the inaccurate assumption that Adjusted Gross Revenue for calculating the Services Fees excluded sales of athletic tickets, operations of Gazelle's hotel and conference center, the operation of the Maryvale golf course, and the operation of Grand Canyon University Arena. *See* Deloitte Report at 3, and at n.4, and at 6. Apparently without considering these sources of revenue and the risks/costs related thereto, Deloitte concluded that the reasonable split is 62%/38% or 63%/37%. Under the executed MSA, all of those sources of revenue are included in calculating the 60% Services Fees. MSA at Exhibit D. In short, the

AR-A-0008

Grand Canyon University (OPE ID 00107400)
Page 9 of 18

revenue sources Deloitte uses to calculate each parties' percentage contribution to the seven revenue-generating activities identified is based on fundamentally flawed assumptions.

It also bears mentioning that the main opinions in the Deloitte Report do not appear to be based on information that Deloitte independently tested and analyzed on behalf of Gazelle. Rather, those opinions in key areas appear to have been based on information supplied by GCE management.[13] For example, Deloitte states that it identified revenue-generating activities based on "fact finding discussions with key management personnel," that the classification of fixed costs was made "in conjunction with GCE management," and that the calculation of the share of fixed costs Gazelle and GSA would each pay under the MSA was determined by "Deloitte Tax and GCE." *See, e.g.,* Deloitte Report at 19, 33.

## III.    THE DEPARTMENT'S REQUIREMENTS FOR NONPROFIT STATUS

The Department regulations identify certain covered transactions for an instituton that constitute a change in ownership which require the institution to apply for and obtain approval from the Department to continue participating in Title IV, HEA programs. These include instances where an institution is sold, is merged with one or more eligible institutions, experiences a change in the ownership of the controlling stock, has a transfer of assets that comprise a substantial portion of the education business of the institution, or has a change in status as a for-profit, nonprofit, or public institution. 34 C.F.R. § 600.31(d).

To establish eligibility and to continue participation in Title IV, HEA programs, an institution must demonstrate to the Department that, after the change, the institution qualifies to be certified to participate under 34 C.F.R. Part 668, Subpart B pursuant to 34 C.F.R. § 600.31(a)(3)(ii). *See also* 34 C.F.R. § 600.20(g) and (h) (requirements for temporary provisional certification following a change in ownership which results in a change of control).

Because Gazelle seeks to participate in Title IV, HEA programs as a nonprofit institution, it must meet the Department's requirements for that status. The Higher Education Act ("HEA") defines an institution of higher education as "a public or other nonprofit institution." HEA §101(a)(4), 20 U.S.C. §1001(a)(4); HEA §102(a)(1), 20 U.S.C. §1002(a)(1). The Department regulations define a nonprofit institution as an institution that:

(i)     Is owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private shareholder or individual; and

(ii)    Is legally authorized to operate as a nonprofit organization by each State in which it is physically located; and

---

[13] Although the Deloitte Report indicates at p. 19 that it conducted interviews with "University personnel," it appears to be referring to "management" which it describes as "GCE management."

AR-A-0009

**JA9**

Grand Canyon University (OPE ID 00107400)
Page 10 of 18

> (iii)    Is determined by the Internal Revenue Service to be an organization to which
> contributions are tax deductible under 26 U.S.C. §501(c)(3) of the Internal
> Revenue Code (26 U.S.C. § 501(c)(3)).

34 C.F.R. §600.2. [14]

Gazelle, an Arizona nonprofit corporation, now owns GCU, satisfying the "owned by one or
more nonprofit" entity requirement of the Department's definition of a nonprofit.  Gazelle is
also legally authorized to operate a private postsecondary degree-granting institution in Arizona,
the only location where GCU is located.  Arizona law does not require separate approval to
operate as a nonprofit, so GCU meets the requirement of legal authority to operate under
subsection (ii) of the Department's definition.  *See* April 27, 2018 Letter from the Arizona State
Board for Private Postsecondary Education and Arizona Secretary of State Website on Veteran's
Charity Organizations (explaining that only Veteran's Charities are required to register).  Gazelle
has been granted 501(c)(3) status by the IRS, meeting the requirement of subsection (iii) of the
definition.  *See* November 9, 2015 IRS Letter 947 for EIN 47-2507725.

The remaining issue (*i.e*, whether GCU is operated by a nonprofit and whether its net earnings
benefit any private shareholder or individual) requires a review of relevant authority under the
Internal Revenue Code and an analysis of the impact of the MSA on the regulatory requirements.

## IV.    AUTHORITY UNDER THE INTERNAL REVENUE CODE

The Department's definition of a nonprofit institution mirrors the statutory language for tax
exempt organizations found in 26 U.S.C. § 501(c)(3).  Under Treasury regulations, the taxpayer
has the burden to demonstrate that it is entitled to tax-exempt status pursuant to section
501(c)(3). [15] This includes the requirement for tax exempt entities to meet both an organizational
test and an operational test.  26 C.F.R. § 1.501(c)(3)-1(a)(1).

The organizational test requires a nonprofit organization to be organized exclusively for one or
more exempt purposes and its articles of organization must: "(a) Limit the purposes of such
organization to one or more exempt purposes; and (b) Do not expressly empower the
organization to engage, otherwise than as an insubstantial part of its activities, in activities which
in themselves are not in furtherance of one or more exempt purposes." 26 C.F.R. § 1.501(c)(3)-
1(b).  Gazelle's First Amended and Restated Articles of Incorporation are consistent with these
limitations.

---

[14] Similarly, the HEA defines a nonprofit entity as having "no part of the net earnings of which inures, or
may lawfully inure, to the benefit of any private shareholder or individual." HEA § 103(13), 20 U.S.C.A.
§ 1003(13) (West).

[15] 501(c)(3). Rule 142(a)(1), *Tax Court Rules of Practice and Procedure*; *Bubbling Well Church of
Universal Love, Inc. v. Commissioner*, 670 F.2d 104, 106 (9th Cir.1981).

Grand Canyon University (OPE ID 00107400)
Page 11 of 18

The focus of the operational test is on the prohibition against private benefit and private inurement, and the related Treasury regulations examine both the primary activities of the organization and its distribution of earnings.[16]  *See* 26 C.F.R. § 1.501(c)(3)-1(c)(1)(primary activities) and 26 C.F.R. § 1.501(c)(3)-1(c)(2)(distribution of earnings).  Although there is significant overlap in the analysis of prohibited substantial private benefit under the primary activities test and private inurement under the distribution of earnings test,[17] the prohibition on private benefit encompasses a greater range of activities. *See Am. Campaign Acad. v. C.I.R.,* 92 T.C. 1053, 1068–69 (Tax 1989*)*("while the private inurement prohibition may arguably be subsumed within the private benefit analysis of the operational test, the reverse is not true. Accordingly, when the Court concludes that no prohibited inurement of earnings exists, it cannot stop there but must inquire further and determine whether a prohibited private benefit is conferred").   Unlike private inurement, private benefit does not necessarily involve the flow of funds from an exempt organization to a related private party, it can also include other benefits from the activities of the exempt organization *to an unrelated party*. *See P.L.R. 200914063,* 2009 WL 889714 (IRS PLR Apr. 3, 2009) (citing Rev. Rul. 76-206, 1976-1 C.B. 154 which found that an organization formed to promote broadcasting and classical music in the community created a substantial financial benefit to an unrelated for-profit radio station); see also *Capital Gymnastics Booster Club, Inc. v. C.I.R.,* 106 T.C.M. (CCH) 154 (Tax 2013) ("Impermissible benefit to 'private interests' thus encompasses not only benefit to insiders but also benefits that an organization may confer on unrelated or even disinterested persons, *i.e.,* outsiders").

Under the primary activities test, the existence of even one non-exempt purpose, such as creating a private benefit, if substantial in nature, will destroy the organization's exempt status. *See Intl. Postgraduate Med. Foundation v. C.I.R.*, 56 T.C.M. (CCH) 1140, 1989 WL 3808 (Tax 1989)(the existence of a "single noneducational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes") (*citing Better Business Bureau of Washington D.C., Inc. v. United States*, 326 U.S. 279 (1945); *Nat. Assn. of American Churches v. Commissioner*, 82 T.C. 18, 28-29 (1984)). As the United States Tax Court stated in *Intl. Postgraduate Foundation,* "[w]hen a for-profit organization benefits substantially from the manner in which the activities of a related organization are carried on, the latter organization is not operated exclusively for exempt purposes within the meaning of section 501(c)(3), even if it furthers other exempt purposes." *Id.*  In concluding that the IRS had properly revoked the petitioner's exempt status, one of the significant findings of the Tax Court was that the owner of the for-profit business "formed the [nonprofit entity] to obtain customers for his tour business."

In looking at payments to a related for-profit enterprise, the focus is on whether "the entire enterprise is carried on in such a manner that the for-profit organization benefits substantially from the operation of the [nonprofit entity]." *Church By Mail, Inc. v. C.I.R.,* 765 F.2d 1387, 1392 (9th Cir. 1985)(citing *Est of Hawaii v. Commr. of Internal Revenue*, 71 T.C. 1067, 1080-81 (Tax

---

[16] The final element prohibits the organization from being involved in political or lobbying activities. 26 C.F.R. § 1.501(c)(3)-1(c)(3).

[17] *See Canada v. Commr. of Internal Revenue*, 82 T.C. 973, 981 (Tax 1984) ("In determining whether these conditions are satisfied, the 'operated exclusively for exempt purposes' and the 'private inurement' requirements often substantially overlap").

AR-A-0011

Grand Canyon University (OPE ID 00107400)
Page 12 of 18

1979)). Thus, "the purpose and objective to which the income of the [nonprofit entity] is devoted is the ultimate test in determining whether it is operated exclusively for an exempt purpose." *Church By Mail*, 765 F.2d at 1392. In *Church by Mail*, the Ninth Circuit found that the tax court did not err in determining that the church was operated "for a substantial non-exempt purpose of providing a market" for the printing and mailing services provided by the for-profit entity, where the employees of the for-profit spent a considerable portion of their time working on services provided to the church, and where the majority of the church's income was paid to the for-profit for payments on loan principal, interest, and commissions. 765 F.2d 1391-92.

Percentage of revenue contractual arrangements can lead to prohibited private benefit, and the scrutiny is heightened in arrangements where the compensation is based on an uncapped percentage of revenue. *See* P.L.R. 201235021, 2012 WL 3764677 (IRS PLR Aug. 31, 2012) ("This lack of cap limit entails that [the for profit company] can receive unlimited income that will more than compensate [the for profit company] for the services [it] renders to you. Thus, rather than devoting substantially all your income towards a purpose tax-exempt under § 501(c)(3), your income will be inuring to the benefit of [the for profit company]"). An uncapped percentage as low as 5% of donation receipts has been held to be a prohibited inurement to private shareholders and individuals. *Id.*; *see Spokane Motorcycle Club v. U.S., 222 F. Supp.* 151, 153-54 (E.D. Wash. 1963)(even a de minimis amount can be an impermissible private inurement).

## V.     THE DEPARTMENT'S DETERMINATION ON THE REQUESTED CHANGE TO NONPROFIT STATUS

### A.  The Impact of the MSA

Having reviewed voluminous materials provided to it, the Department has concluded that the primary purpose of the MSA, and by extension, the Transaction, was to drive shareholder value for GCE with GCU as its captive client – potentially in perpetuity. Notably, the Executive Summary of the Barclays Report includes the following:

- The Company's strong balance sheet and track record of performance position it to consider a broad range of strategic alternatives to continue to drive share price performance

  - However, perceived and tangible limitations on the Company's ability to aggressively pursue select alternatives as a for profit postsecondary provider must be considered

- Project Gazelle provides an attractive alternative for the Company ***and its shareholders*** to position the Company to:

  - Continue to provide an attractive (and enhanced), competitive offering, and therefore, grow its student population

  - Mitigate the potential risk (perceived or real) posed by its for profit status

12

Grand Canyon University (OPE ID 00107400)
Page 13 of 18

      o   Pursue additional growth vectors to ***drive incremental value for shareholders***

Barclays Report at 2 (emphasis added).

The Barclays Update, provided to the GCE board days prior to the July 1, 2018 closing on the Transaction contains similar language in an updated Executive Summary:

- Investors recognize the Company's pursuit of Project Gazelle, and have continued to show support and interest in the stock, reflecting a positive expected outlook for the Company

- Project Gazelle provides an attractive alternative for the Company ***and its shareholders*** to position the Company to: …. Pursue additional growth vectors ***to drive incremental value for shareholders***

Barclays Update at 1 (emphasis added).  The Barclays Update also includes a "Preliminary Discounted Cash Flow Analysis -Implied Value Transfer" analysis which notes that following the Transaction, "current shareholders ***retain ownership*** of GCE cash flows." Barclays Update at 7 (emphasis added).   Of course, the primary (if not sole) source of those cash flows is revenue generated from Gazelle/GCU pursuant to the MSA.  As explained in the Barclays Update, "following the transaction GCE, Inc. will have a single client, and as a result, a highly concentrated source of revenues," and further, "GCE, Inc.'s performance will be closely tied to that of Gazelle University – should Gazelle University's performance (or regulatory standing) be impacted in any way by (or following) the transaction, GCE, Inc. could also be negatively impacted." *See* Barclays Update at 9.

Similarly, the November 21, 2017 GCE board minutes reflect that the Board engaged in an extensive discussion about "Project Gazelle" including "the benefit to [GCE] and its stockholders." Board Minutes at 1.  And at a GCE board meeting immediately prior to the closing of the Transaction, Mr. Bachus (GCE Chief Financial Officer) explained that a post-closing appraisal might result in a higher fair value for the assets transferred, and although GCE would not benefit from that, the higher valuation would benefit GCU in connection with its composite score, and he further explained why a good composite score for GCU "ultimately benefited the Company," meaning GCE.  GCE June 28, 2018 Board Minutes at 2-3.

Not only was the Transaction structured so that the revenues generated by GCU are transferred to and retained by GCE for the benefit of its shareholders, the implementation of operations under the MSA results in an additional $697 Million to operate in the first fiscal year, solely resulting from the Services Fee paid to GCE.  *See* Barclays Report at 33.

As described above the Services Fee is paid on a variety of revenue generating items:
- tuition
- student use of the online platform
- "students and their related activities"
- Canyon Connect

13

Grand Canyon University (OPE ID 00107400)
Page 14 of 18

- student housing
- meal plans and other food services
- athletic tickets
- Grand Canyon University Hotel and Conference Center
- Maryvale Golf Course
- Grand Canyon University Arena
- Canyon Enterprises (apparel sales and other businesses)

MSA Exh. D §1.  Although GCE receives 60% of the revenue from all of these revenue generating operations, it does not appear that GCE actually provides services for a significant part of many of these operations – e.g., student housing, food services, operation of the hotel, conference center, golf course, arena or Canyon Enterprises.

Despite GCE only taking on the responsibilities of 28% of the operating costs, 60% of the gross adjusted revenue from the Institution would be paid to GCE under the MSA.  When payments on the Senior Secured Note are included in the analysis, GCE will be receiving approximately 95% of Gazelle's revenue.  It is also worth noting that if revenue increases at a rate faster than operating costs, GCE has the potential to be paid even significantly higher amounts over the costs of the services it provides. Therefore, instead of the increased revenue being used for GCU's exempt purpose of providing education, the additional revenues would primarily benefit the shareholders of GCE.

It is equally concerning that GCU is essentially a captive client.  As described above, the Initial Term of the MSA is 15 years, with automatic renewals thereafter for successive five years terms apparently in perpetuity.  MSA §6.1.  Although either party can elect not to renew at the end of the Initial Term or any Renewal Term, if Gazelle exercises that right, it has to pay GCE a Non-Renewal Fee (50% of the aggregate Services Fees paid or payable for the trailing twelve month period just ended).  MSA §6.2 and MSA Exh. A at A-5.  Gazelle has the right to terminate the MSA during the Initial Term, but it cannot elect do so before July 1, 2025 (seventh anniversary) or the date by which the Senior Secured Note is paid in full – whichever is later.  MSA §6.3.  If Gazelle exercises that right, it must pay GCE an Early Termination Fee (50% of the aggregate Services Fees paid or payable for the trailing twelve-month period just ended).  MSA §6.3 and MSA Exh. A at A-3.  Thus, Gazelle is locked into the agreement for at least seven years.   And even if Gazelle wanted to terminate the MSA after July 1, 2025 because it found a more competitive service provider, the required payment of the Senior Secured note is an arguably prohibitive termination fee.

On October 1, 2018, Mr. Glass (counsel for GCU) wrote to the Department, providing various documents and responding to a September 10, 2018 letter from the Department seeking further information on GCU's request to convert to nonprofit status.  ("October 1 Letter").  In part, the October 1 Letter described the approvals from the Higher Learning Commission ("HLC"), the IRS, the State of Arizona and other bodies, including the National Collegiate Athletic Association.  As described above however, the Department makes its own determination of nonprofit status for a school's participation in Title IV.   Although state and IRS approvals are required for nonprofit status under the Department's regulations, those approvals are not the sole determining factors, nor does the Department need to defer to those determinations.  In regard to

14

Grand Canyon University (OPE ID 00107400)
Page 15 of 18

the IRS designation of tax-exempt status, and as noted by the October 1 Letter, the IRS approval was issued three years prior to the Transaction. Even if the "basic structure" of the Transaction and a prior draft of the MSA were provided to the IRS at that time, there is no evidence that the IRS conducted a comprehensive review of the MSA or any of the studies that were later performed to support the MSA. Unlike the IRS's initial grant of tax-exempt status, the Department's determination of nonprofit status considers the structure and planned operations of the institution when its owner(s) apply for that change of status, and seeks to ensure that a nonprofit institution's revenues – a good portion of which are generated from Title IV funds – are primarily devoted to the mission of the school and not to other parties, including (as here) the shareholders of the prior owner.

Based on the tax authority cited above, the Department has determined that GCU does not meet the operational test's requirement that both the primary activities of the organization and its stream of revenue benefit the nonprofit itself. Rather, the materials that the Department has reviewed demonstrate that GCE and its shareholders – rather than Gazelle/GCU -- are the primary beneficiaries of the operation of GCU under the terms of the MSA. This violates the most basic tenet of nonprofit status – that the nonprofit be primarily operated for a tax-exempt purpose and not substantially for the benefit of any other person or entity.

### B. Other Factors

The Department has identified other factors related to the MSA that provide additional support for the Department's determination that granting nonprofit status to GCU is not warranted.

#### 1. Mr. Mueller's Dual Roles

The October 1 Letter explains that the GCE and Gazelle boards have adopted independent structures, and that the boards of GCE and Gazelle made independent decisions to retain Mr. Mueller in his positions as President of GCU and Chief Executive Officer of GCE. The October 1 Letter further notes that the terms of the MSA and Gazelle's bylaws "limit Mr. Mueller's direct involvement in the day to day oversight of the relationship with GCE" because direct oversight is vested in a Designee (*see* MSA §3.11), and because from Gazelle's side, management oversight is vested in a standing committee of the independent members of the board of trustees ("MSA Committee"). But not only is Mr. Mueller the President of GCU and the CEO of GCE, he is also a shareholder of GCE (even if he holds a de minimis percentage of stock). Thus, he is in the dual role of running both the Institution and its managed services provider – the major recipient of the Institution's revenues – and one of its shareholders. GCE's only client is GCU. Thus, as the CEO of GCE, he is the key executive responsible for providing the services under the MSA, with duties of loyalty to shareholders of GCE. Yet, as the Institution's President he will have responsibility to manage matters large and small with its primary service provider, notwithstanding the appointment of a Designee and the independent trustees who comprise the MSA Committee. Given those obviously conflicting loyalties, and the breadth of the services provided under the MSA, the Department is not satisfied that these structures are sufficient to ensure that Mr. Mueller's undivided loyalty is to the Institution.

15

Grand Canyon University (OPE ID 00107400)
Page 16 of 18

### 2. GCE's "Management and Oversight" of GCU

According to GCE's statements to Deloitte, GCE's 44-person "Executive Leadership is responsible for managing and overseeing the University." Deloitte Report at 26 ("the majority of their time relate [sic] to strategic activities that generate future benefits for the University"). Relying on the titles used in the Deloitte Report, the Department has determined that the Executive Leadership team (as of the date the Transaction closed) had 58 members, not 44 members, assuming that the CEO is also included in the team.[18] Upon closing of the Transaction, a significant number of these executives remained employed by GCE – they did not transition to become Gazelle/GCU employees. *See* APA Disclosure Schedules at Schedule 6.3(a)-2. Of the 58 executives, only seventeen transferred to Gazelle: the General Counsel, the Chief Academic Officer, eight academic deans of the various colleges, three senior vice presidents and four vice presidents. Brian Mueller, the CEO of GCE and the President of GCU, is identified in Schedule 6.3(a)-3 as the sole "Joint Employee." This means that nearly 75% of the executive team members responsible for managing and overseeing GCU and developing its strategic vision are employed by its service provider. As employees of GCE, these executive leaders have a primary fiduciary responsibility to the shareholders of GCE[19], a for-profit publicly traded corporation, while at the same time providing significant management and oversight of the Institution. This is particularly so given the scope of the activities GCE is performing under the MSA, including: marketing, enrollment services and budget consultations, student support services counseling, document intake, student records management, curriculum services, accounting services (payroll, accounts payable, general ledger, etc.), financial aid services, procurement services, audit services, human resources, technology, business analytics services, faculty operations, and compliance monitoring and audits. MSA at Ex. B §§1-15.

The Department is skeptical that any nonprofit could outsource the number and type of institutional functions that Gazelle has and still be deemed to operate the Institution. Given the enormous leverage GCE now has over Gazelle by virtue of the MSA and the fact that most of the Institution's key management personnel work for GCE, not Gazelle/GCU, the Department concludes that, as a practical matter, Gazelle is not the entity *actually operating* the Institution as is required under the Department's regulations. *See* 34 C.F.R. § 600.2 (definition of nonprofit at (1)(i)).

### VI. CONCLUSION

For the reasons discussed above, the Institution does not satisfy the Department's definition of a nonprofit. The Department approves the change in ownership application of the Institution from GCE to Gazelle (now known as Grand Canyon University) and approves the Institution as a for-

---

[18] While the Deloitte Report does not identify the Executive Leadership Team members by name, it states that the Team consists of those with the title of CFO, CIO, COO, CTO, Chief Academic Officer, General Counsel, EVP, SVP, VP, Director, and Dean. In regard to the designation of "Director," the Department only counted personnel with the title of "Executive Director," not all personnel with the designation "Director" in their titles.

[19] And at least some of these executives are GCE shareholders themselves.

AR-A-0016

Grand Canyon University (OPE ID 00107400)
Page 17 of 18

profit institution for purposes of its continued participation in the Title IV, HEA Programs. The Department denies the request for recognition of the Institution as a nonprofit.

The for-profit status of the Institution is for purposes of its participation in the Title IV, HEA programs. The Department does not take a position with respect to Gazelle's non-profit 501(c)(3) status with the Internal Revenue Service. However, GCU must cease any advertising or notices that refer to its "nonprofit status." Such statements are confusing to students and the public, who may interpret such statements to mean that the Department considers GCU a nonprofit under its regulations. The Department does not take a position regarding statements that GCU may make about its IRS status as a 501(c)(3) tax exempt organization.

The TPPPA under which the Institution has been operating since the CIO continued the prior approval for the Institution to participate under a for-profit status. The for-profit status for the continued participation of the Institution is therefore unchanged. The Institution is reminded that the Institution must meet the Title IV, HEA programs reporting and program eligibility requirements applicable to for-profit institutions, including the 90/10 eligibility requirements described in 34 C.F.R. §668.28 and any applicable gainful employment program requirements set out in 34 C.F.R. Subpart Q.

Under APA § 2.4, Gazelle does not assume any liabilities arising under Educational Laws related to or based on the conduct of the Institution prior to closing. The Department's approval of the CIO does not include the exclusion of liabilities arising under the Title IV, HEA programs, and the approval of the CIO is expressly conditioned on Gazelle/GCU's responsibility for both pre-closing and post-closing liabilities arising under Title IV. Notwithstanding this condition, GCE also retains responsibility for pre-closing liabilities arising under Title IV. The parties are not foreclosed from requiring GCE to indemnify Gazelle/GCU for any losses resulting from pre-closing Title IV liabilities.

The TPPPA will expire at the end of this month. The Department has included with this letter the provisional program participation agreement ("PPPA") for the Institution. The PPPA includes the approval of the new programs requested by GCU. If the Institution wants to continue to participate in Title IV programs without interruption, the PPPA should be signed and returned to the Department no later than November 25, 2019 (given the Thanksgiving holiday) for countersignature.

The APA Parties also previously inquired (through counsel) about whether GCE is considered an "unaffiliated third party" for purposes of the March 17, 2011 Dear Colleague Letter (GEN-11-05) that addressed the implementation of the program integrity regulations and the incentive compensation ban. That question is currently under review, and the Department will provide the parties with a separate response on that issue.

If the Institution has additional factual information or documents that it believes the Department should consider relating to the decisions set forth in this letter, GCU should submit a request for reconsideration. That request should be submitted to Jane Eldred (Jane.Eldred@ED.Gov) within 10 calendar days of the date of this letter. Please note that a request for reconsideration will not stay the expiration of the TPPPA which expires on November 30, 2019.

AR-A-0017

**JA17**

Grand Canyon University (OPE ID 00107400)
Page 18 of 18

Sincerely,

Michael J. Frola
Director,
Multi-Regional and Foreign Schools Participation
Division

cc:     The Higher Learning Commission (*email: Barbara Gellman-Danley, President -
        president@hlcommission.org, Anthea Sweeney, VP for Legal and Governmental Affairs -
        asweeney@hlcommission.org*)

        AZ State Board for Private Postsecondary Education (*email: Terr Stanfill, Executive
        Director - teri.stanfill@azppse.gov*)

        New Mexico Higher Education Department (*email: exec.admin@state.nm.us*)

        IRS
        Attn: EO Classification
        MC 4910 DAL
        1100 Commerce Street
        Dallas, TX  75242
        eoclass@IRS.gov

18



January 12, 2021

Mr. Brian Mueller, President                       UPS 2nd Day Delivery
Grand Canyon University                            Tracking #: 1Z A87 964 02 9588 2068
3300 West Camelback Road
Phoenix, AZ  85017-3030                            Sent via email to: ███████████

**Re: Reconsideration Review of the Change in Ownership and**
   **Conversion to Nonprofit Status of Grand Canyon University**
   **OPE ID: 00107400**

Dear Mr. Mueller:

At your request, the U.S. Department of Education ("Department"), Federal Student Aid has
conducted a reconsideration review of the request of Grand Canyon University, OPE ID
00107400 ("Institution" or "GCU") to convert to nonprofit status.

Prior to July 1, 2018, GCU was owned and operated by Grand Canyon Education, Inc. ("GCE"),
a Delaware publicly traded corporation.  By way of an Asset Purchase Agreement ("APA"),
dated July 1, 2018, GCE sold its School Assets (as set forth in APA at Recital B and as defined
in APA §2.1) to Gazelle University ("Gazelle"), an Arizona nonprofit corporation ("the
Transaction").

On November 6, 2019, the Department issued a letter setting forth its decision following its post-
closing review of the change in ownership ("CIO") and requested a change of status from
proprietary to nonprofit.  ("Decision"). [1]  The Department approved the CIO but denied GCU's
request to convert to nonprofit status, finding that GCU did not satisfy the Department's
requirements for a nonprofit institution.

The Decision provides details about the background of the Transaction, the Department's
requirements for nonprofit status, and a discussion about relevant authority under the Internal
Revenue Code.  Those details are not repeated here.   In summary, the Department determined

---

[1] After the Transaction closed, Gazelle changed its name to Grand Canyon University.  In documents submitted to the
Department, Gazelle has also been referred to as "GCU" and the "New GCU."  To avoid confusion, the Decision
referred to these parties as "Gazelle" and "GCE," based on the names used in the introductory paragraph of the APA:
"Gazelle University" (the purchasing entity) and "Grand Canyon Education, Inc." (the selling entity).  The sole
member of Gazelle is Grand Canyon Foundation.   This reconsideration letter continues the use of the names as they
were used in the Decision.



Grand Canyon University
OPE ID: 00107400
Page 2 of 19

that by virtue of the MSA[2] entered into between Gazelle and GCE at the time of the closing of the Transaction, GCE, not GCU/Gazelle, was the beneficiary of 60% of GCU's revenues. Accordingly, GCU did not qualify for nonprofit status for purposes of its participation in Title IV programs under the Higher Education Act.

Thereafter, GCU sought reconsideration of the Decision.  On January 8, 2020, GCU provided the Department with potential revised terms for the MSA and asked the Department to confirm that the changes would meet the Department's requirements for GCU to be recognized as a nonprofit for purposes of its participation in the Title IV programs.  On January 17, 2020, the Department requested that GCU provide additional documentation about the proposed revision.  GCU provided some responsive materials on May 6, 2020 and the remaining materials on May 12, 2020.  As it conducted its reconsideration review, the Department requested and received additional documents and information from GCU.

## I.  THE AMENDED AND RESTATED MASTER SERVICES AGREEMENT

The potential changes to the MSA are set forth in a draft Amended and Restated Master Services Agreement dated as of January 7, 2020 ("ARMSA").  Although the ARMSA generally tracks the MSA, there are some notable changes.  As set forth in ARMSA Exhibit B, GCE will no longer provide Curriculum Services or Faculty Operations:

**Services Provided (services marked with * are Exclusive Services[3])**

| Exhibit B | MSA | ARMSA |
|---|---|---|
| § 1* | Marketing | Revision: §1.1.3 (alliances with other educational institutions) is deleted |
| § 2* | Enrollment Services and Budget Consideration | No changes |
| § 3* | Student Support Services Counseling | No changes |
| § 4 | Document Intake | No changes |
| § 5 | Student Records Management | No changes |
| § 6 | Curriculum Services | Deleted |
| § 7 | Accounting Services | No changes |
| § 8 | Financial Aid Services | No changes |
| § 9 | Procurement Services | No changes |
| §10 | Audit Services | No changes |
| §11 | Human Resources | No changes |
| §12* | Technology | No changes |

[2] Words capitalized herein but not defined have the meaning set forth in the Decision, the APA and/or the MSA.

[3] In both the MSA and the ARMSA, GCE is the exclusive provider of certain services, identified in the MSA as "Exclusive Services," for which Gazelle agrees it will not contract with any third party absent GCE's approval (which is subject to GCE's sole discretion).  MSA §3.1; ARMSA §3.1.

Grand Canyon University
OPE ID: 00107400
Page 3 of 19

| §13 | Business Analytics Services | No changes |
|-----|------------------------------|------------|
| §14 | Faculty Operations | Deleted |
| §15 | Compliance Monitoring and Audits | No changes |

The parties also agreed that GCE shall always provide at least three services in addition to Enrollment Services. MSA Exhibit B (introductory paragraph). This has not been changed in the ARMSA.

Pursuant to MSA §5.1, the Services Fee is determined and paid in accordance with MSA Exhibit D which provides that Gazelle is required to pay GCE a fee that is equal to 60% of Gazelle's Adjusted Gross Revenue (excluding charitable contributions or other gifts used for purposes other than payment of tuition and fees for students). MSA Exhibit D § 2. Adjusted Gross Revenue consists of all revenue (net of refunds and scholarships accounted for as a discount to tuition) received by Gazelle or its Affiliates from the following sources:

(a) Tuition (including tuition funded by third party sources and charitable contributions);
(b) Fee revenue from students for use of the online communications portal ("the Platform");
(c) Fee revenue from students and their related activities;
(d) Fee revenue from students for use of the Canyon Connect learning resources platform;
(e) Fee revenue from students for student housing;
(f) Fee revenue from students for meal plans and other food services; and
(g) Other revenue including revenue from: (i) sales of athletic tickets; (ii) the operation of the Grand Canyon University Hotel and Conference Center; (iii) the operation of the Maryvale Golf Course; (iv) the operation of the Grand Canyon University Arena; and (v) the operation of Canyon Enterprises (apparel sales and other businesses).

MSA Exhibit D §1.

In the Decision, the Department noted that the Services Fee under the MSA was imposed on revenue generated from sources for which GCE provided no services (*e.g.,* campus housing, food services, athletic tickets, etc.). Under the ARMSA, instead of a 60% Services Fee on all of the above listed items, the ARMSA provides for a "Monthly Services Fee" ("Monthly Fee") which is 66.8% of Tuition and Fee Revenue (items (a) through (d) above). ARMSA Exhibit D §3(a). However, for any calendar year in which 59% of Adjusted Gross Revenue (defined as all categories above) is less than the total of the Monthly Fees paid that year, GCU is entitled to a credit for that difference, which is deducted from the Monthly Fee(s) for the following year. ARMSA Exhibit D §3(b). The MSA did not provide any cap on the total amount of the Services Fee that must be paid to GCE in any year or cumulatively over the years. The ARMSA does not change that.

The Department also notes some additional items that have been revised in the ARMSA (these items are not intended to be an exhaustive list of changes):

- Revisions to the Non-renewal and Termination Provisions, including the elimination of the Non-renewal Fee and reduction of the Termination Fee from 100% to 50%, reduction of the time period for Early Termination of the Initial Term, and eliminating the

AR-A-0021

**JA21**

Grand Canyon University
OPE ID: 00107400
Page 4 of 19

requirement that the Senior Secured Debt be paid in the event of Early Termination. ARMSA §§ 6.2 and 6.3[4]

- GCU has the right to hire a third party to perform Back Office Services Functions (not just assume them itself).  ARMSA §6.9

## II.  THE ECONOMIC STUDIES

As discussed in detail in the Decision, in August 2018 (following the closing of the Transaction) GCU provided the Department with a report prepared by Barclays Capital Inc. ("Barclays Report") and a transfer pricing report from Deloitte Tax, LLP (hereinafter "Deloitte 2018 TPR"). Prior to issuance of the Decision, the Department also received a "follow-on" report from Barclays ("Barclays Update").  The Decision sets forth the Department's analysis of these reports.  Of particular concern to the Department was the fact that, as detailed in the Barclay's Report, under the planned separation (and as effectuated on July 1, 2018) the costs to operate the separated GCU increase from $810 Million to $1.496 Billion for fiscal year 2019, solely as a result of the Service Fees paid to GCE.  Barclays Report at 33.[5]  As noted above, the revenue split set forth in the ARMSA is not appreciably different than the revenue split set forth in the MSA, providing for the lesser of 68.8% of Tuition and Fee Revenue, or 59% of Adjusted Gross Revenue (which includes Tuition and Fee Revenue).[6]

On May 6, 2020, GCU provided an updated transfer pricing report in support of its request for reconsideration, dated April 29, 2020 and entitled "Transfer Pricing Planning Report"  ("Deloitte

---

[4]  The Initial Term of the MSA is 15 years, with automatic renewals thereafter for successive five years terms apparently in perpetuity. MSA §6.1. This remains the same in the ARMSA.  ARMSA §6.1. The ARMSA has, however, eliminated the Non-Renewal fee.  ARMSA  §6.2. Gazelle has the right to terminate the ARMSA during the Initial Term, but it cannot elect do so before the fifth anniversary of the Effective Date (which is appears to be referring to the Effective Date of the MSA).  ARMSA §6.3.  If Gazelle exercises that right, it must pay GCE an Early Termination Fee (50% of the aggregate Services Fees paid or payable for the trailing twelve- month period just ended).  ARMSA §6.3 and MSA Exhibit A at A-3.  Thus, Gazelle is locked into the agreement for at least five years.  The ARMSA eliminates the requirement that the Senior Secured note be paid in full as a condition precedent for early termination.

[5]  Although the Barclays Report (dated April 26, 2018) assumed a 65%/35% revenue split on most items, and a different split on housing (20%/80%), meals (5%/95%) and Canyon Connect (5%/95%), the executed MSA provides for a straight 60%/40% split and included sources of revenue that are not included in the Barclays Report, including revenue from Gazelle Arena.  As noted in the Decision, these differences would seem to only exacerbate Barclays' assessment that the separation of the servicing functions from GCI will (and has) resulted in a significant increased cost for the operation of the Institution, with those increased funds flowing to the benefit of its prior owner, GCE.

[6] The Services Fee under the MSA is 60% of Adjusted Gross Revenue.  Adjusted Gross Revenue includes the same items in the ARMSA as are included in the MSA.  As described above, the Monthly Fee under the ARMSA is 68.8% of Tuition and Fee Revenue.  GCU's "largest primary component" of revenue is tuition, with online tuition accounting for "74% to 98% of total revenue."  *See* "Valuation of the Invested Capital of Grand Canyon University," as of January 7, 2020, prepared by BKD CPAs and Advisors, at 7.  "The second main revenue component is other revenue, which consists of fee income, room and board and other less meaningful sources."  *Id.*

AR-A-0022

Grand Canyon University
OPE ID: 00107400
Page 5 of 19

2020 TPPR").[7]  The Deloitte 2020 TPPR includes another pricing transfer study as Appendix B, described as "FY 2017 EPS Analysis Grand Canyon University - TP Report August-19-2019 – Original Analysis" (hereinafter "Deloitte 2019 TPR").[8]  the Deloitte 2020 TPPR refers to the Deloitte 2019 TPR as the "Original Analysis."  The Department does not adopt the term "Original Analysis" because use of that term is confusing given the existence of the Deloitte 2018 TPR,[9] which is the report discussed in the Decision.  The Deloitte 2018 TPR, the Deloitte 2019 TPR and the Deloitte 2020 TPPR are hereinafter collectively referred to as "the Deloitte Reports."

In its May 2020 submissions, GCU also provided three reports prepared by BKD CPAs & Advisors ("BKD"):  a "Valuation of the Invested Capital of Grand Canyon University," as of July 1, 2018 ("BKD 2018 Valuation"); a "Valuation of the Invested Capital of Grand Canyon University," as of January 7, 2020 ("BKD 2020 Valuation")[10]; and a "Review of a Pricing Transfer Analysis Prepared By a Third Party with Respect to Provision of Education Services by Grand Canyon Education, Inc. on Behalf of Grand Canyon University as of December 31, 2018 and December 31, 2019" ("BKD Review").  The BKD Review is a review of the Deloitte 2020 TPPR, which is referred to in the BKD Review as the "Transfer Pricing Study."

The methodology used in the Deloitte Reports and reviewed by BKD is an "Economic Profit Split" ("EPS") analysis.  *See* Decision at 6-9 for a discussion of the EPS analysis performed by Deloitte.  As described in the Deloitte Reports, there are various steps required to perform an EPS analysis (*i.e.,* identifying the "assets and activities" of the enterprise that generate revenue, identifying risks associated with the revenue-generating activities and assets; calculating a consolidated contribution margin; estimating the share of total fixed costs for each entity; splitting the contribution margin based on the fixed cost share of each entity; recreating an accounting income statement and determining the revenue split between GCU and GCE).  *See* Deloitte 2018 TPR at 32 and Deloitte 2020 TPPR at 39.

Although much of the verbiage in the three different Deloitte Reports is the same, the Deloitte 2020 TPPR contains a new discussion about the different methodologies for conducting transfer pricing studies.  *See* Deloitte 2020 TPPR at 32-38.  The EPS used by Deloitte is only one of several identified methods, as discussed more fully below.

[7] Not surprisingly, GCU has not provided any further analysis from Barclays in support of its request for reconsideration.

[8] The Deloitte 2019 TPR (Appendix B to the Deloitte 2020 TPPR) was not provided by GCU when it submitted the Deloitte 2020 TPPR in May 2020.  The Department requested and received the Deloitte 2019 TPR in November 2020.

[9] Although the Deloitte 2018 TPR and the Deloitte 2019 TPR are similar, they are not identical.

[10] Given the Decision's conclusion that the MSA prevented the Department from approving the requested conversion to nonprofit status, the Decision did not examine whether the purchase price was at fair value and was not based on a finding that the purchase price for the assets was not at fair value.  *See* Decision at 6 n.11.

Grand Canyon University
OPE ID: 00107400
Page 6 of 19

## III. THE DEPARTMENT'S REVIEW OF THE DELOITTE TPPR AND THE BKD REVIEW

The Department has extensively reviewed both the Deloitte 2020 TPPR and the BKD Review.[11] Neither document changes the Department's conclusion, expressed in its November 6, 2019 letter to GCU, that "the primary purpose of the MSA, and by extension, the Transaction, was to drive shareholder value for GCE with GCU as its captive client – potentially in perpetuity." Decision at 12.   Neither the Deloitte 2020 TPPR nor the BKD Review demonstrates that the Monthly Fee under the ARMSA (based on the lesser of 68.8% of Tuition and Fee Revenue or 59% of GCU's Adjusted Gross Revenue), potentially in perpetuity, constitutes anything other than a continuing revenue stream to its former owner GCE, the primary purpose of which is to drive shareholder value for GCE. [12]

<u>Transfer Pricing in General</u>

Transfer pricing assumes that a transaction is between related parties (referred to in the applicable regulations as "controlled taxpayers," as discussed below).  GCU and GCE have repeatedly insisted that GCU/Gazelle and GCE are independent of each other.  Neither the Deloitte 2020 TPPR nor the BKD Review acknowledge that GCU/Gazelle and GCE are ***not*** controlled parties and that this is ***not*** a controlled transaction.  Furthermore, the EPS method selected by Deloitte assumes that both entities have profits.  Gazelle, however, does not.   It has 501(c)(3) status under federal regulations and was incorporated as a nonprofit corporation under state law.  Neither Deloitte nor BKD even mention this fact.  The analysis used by both assumes that GCU/Gazelle has profits to contribute to a joint enterprise, but that assumption is erroneous – there is no joint enterprise – or at least there should not be if GCU is truly independent.

Transfer pricing is an accounting and tax practice that is used to determine whether prices charged between controlled taxpayers or entities (*e.g.*, two divisions of one corporation or two subsidiaries of a parent) are fair and at arms-length for tax purposes.  Indeed, the Deloitte 2020

---

[11] This letter includes an extensive discussion of the transfer pricing methodologies used by Deloitte.  The Department also notes the following qualifying language used by Deloitte – these are by way of example only:

- "Information and data provided by the Client, the completeness and accuracy of which we did not independently verify."  Deloitte 2020 TPPR at 2.
- "[w]e have assumed all related party transactions involving the University and its subsidiaries are priced at arm's length." *Id.*  (not clear to what "subsidiaries" Deloitte is referring).
- "For the fixed costs that generate OBSAs, based on the management confirmation, we rely on the estimates performed in the Original Analysis, for the lead time and useful lives of these costs to quantify the value of OBSAs and their amortization schedule."  Deloitte 2020 TPPR at 4.

[12]  The Department also notes the inconsistencies in the terminology used by Deloitte and the terminology used in the ARMSA.   For example, the Deloitte 2020 TPPR bases the EPS on a percentage of GCU's net revenues. *See e.g.*, Deloitte 2020 TPPR at p. 4 (§1.3(3)(e); p. 10 (§4); p. 43 (§6.2.1.3, Table 7); p.45-46 (§6.3).  BKD similarly states that "[b]ased on its analysis, Deloitte determined an arm's-length range for the share of revenue as a percentage of total net revenue . . .."  BKD Review at 14 (emphasis added).  In other places, the Deloitte 2020 TPPR refers to just "revenue."  The ARMSA and Exhibit D thereto refer to "adjusted gross revenue," not "net revenue" or "consolidated net revenue."  The ARMSA fee is based on a percentage of "Tuition and Fee Revenue" or "Adjusted Gross Revenue."  ARMSA at Exhibit D, §3.

Grand Canyon University
OPE ID: 00107400
Page 7 of 19

TPPR states at the beginning that the "analysis contained in this report *is solely for tax purposes . . .."* Deloitte 2020 TPPR at 1 (§ 1.1) (emphasis added).  "Transfer pricing is an accounting practice that represents the price that one division in a company charges another division for goods and services provided. Transfer pricing allows for the establishment of prices for the goods and services exchanged between a subsidiary, an affiliate, or commonly controlled companies that are part of the same larger enterprise. Transfer pricing can lead to tax savings for corporations, though tax authorities may contest their claims."  Shobhit Seth, Transfer Pricing, Corporate Finance & Accounting (Sept. 9, 2019) (available at https://www.investopedia.com/terms/t/transfer-pricing.asp) Transfer pricing is an "accounting and taxation practice that allows for pricing transactions internally within businesses and between subsidiaries that operate under common control or ownership. The transfer pricing practice extends to cross-border transactions as well as domestic ones."  *Id.*  Transfer pricing provides methods by which controlled taxpayers justify to the Internal Revenue Service (or other taxing authorities) how income and costs are being allocated amongst those taxpayers.  Section 482 of the Treasury Regulations (26 C.F.R. § 482 *et seq.*) "places a controlled taxpayer on a tax parity with an uncontrolled taxpayer *by determining the true taxable income of the controlled taxpayer*."  Treas. Regs. § 1.482-1(a)(1) (emphasis added).

Here, the issue is not whether two controlled parties have properly allocated income and costs between themselves for tax and accounting purposes.  Rather, the issue is whether requiring GCU to actually pay out to GCE, an independent entity, a substantial share of its revenues (*i.e.,* actual money out the door, not just a paper exercise of putting dollars in one column or another for accounting and tax purposes) for services under the MSA/ARMSA is the type of benefit that disqualifies GCU from being recognized by the Department as a nonprofit institution.

Treasury Regulations

The Internal Revenue Service has promulgated a complex set of regulations to determine for tax purposes whether the allocation of income, profit and expenses among related taxpayers is arms-length.  The underlying premise of transfer pricing is that the entities involved are "controlled" entities.  "The purpose of section 482 [Treasury's transfer pricing regulations] is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes with respect to such transactions. Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer."  Treas. Reg. 1.482-1.  The following pertinent definitions apply:

- "Controlled" is defined by Treas. Reg. 1.482-1(i)(4) as "any kind of control, direct or indirect, whether legally enforceable or not, and however exercisable or exercised, including control resulting from the actions of two or more taxpayers acting in concert or with a common goal or purpose. It is the reality of the control that is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted."
- "Controlled group" is defined by Treas. Reg. 1.482-1(i)(6) means "the taxpayers owned or controlled directly or indirectly by the same interests."
- "Controlled taxpayer" is defined by Treas. Reg. 1.482-1(i)(5) as "any one of two or more taxpayers owned or controlled directly or indirectly by the same interests, and includes

Grand Canyon University
OPE ID: 00107400
Page 8 of 19

the taxpayer that owns or controls the other taxpayers. Uncontrolled taxpayer means any one of two or more taxpayers not owned or controlled directly or indirectly by the same interests."

- "Controlled transaction or controlled transfer" is defined by Treas. Reg. 1.482-1(i)(8) defines as "any transaction or transfer between two or more members of the same group of controlled taxpayers. The term uncontrolled transaction means any transaction between two or more taxpayers that are not members of the same group of controlled taxpayers."

According to GCE's 2020 10-K, "GCU is a separate non-profit entity **under the control of an independent board of trustees, none of whose members have ever served in a management or corporate board role at the Company. Accordingly, the Company's relationship with GCU, both pursuant to the Master Services Agreement and operationally, is no longer as owner and operator, but as a third-party service provider to an independent customer.**" Feb. 20, 2020 10-K at 23 (emphasis added). Taking this public pronouncement, as well as the parties' various representations to the Department as true, GCU/Gazelle does not control GCE and GCE does not control GCU/Gazelle.

Neither the Deloitte 2020 TPPR nor the BKD Review address these terms and definitions, much less explain why transfer pricing is an appropriate tool to evaluate a price being charged between two supposedly independent entities.

In addition to ignoring that these are not parties subject to common control, the BKD Review does not establish that the revenue-based pricing scheme is in fact arm's length nor does it establish that GCU could not purchase the same or better or more innovative service from other vendors at a better price. Nor does it address in any meaningful way the fact that given GCU's size and the revenue it generates, it would also seem that some of the services could be managed by GCU itself with the appropriate staff. This is exactly what it did before the two entities were separated in July 2018.

Nor does the BKD Review in any way address or challenge the conclusion set forth in the Decision that the revenue sharing arrangement between GCU and GCE precludes GCU from being recognized as a nonprofit institution for purposes of Title IV programs. While the Department considers the application of a transfer pricing analysis here to be questionable, it nevertheless wants to address the conclusions reached by Deloitte and BKD.

Transfer Pricing Methods

The main authorities for methods of transfer pricing used by U.S. companies are the Treasury Regulations 1.482-1 *et seq.* and the guidelines issued by the Organization for Economic Co-Operation and Development ("OECD"). OECD is an international organization that promulgates guidelines for evaluating transfer pricing in international transactions. The United States is a party to the OECD Convention and agrees to follow OECD policies/standards for *international* transactions. The Transaction at issue is *not* an international transaction. However, the transfer pricing method that Deloitte used in this case (the EPS) is a method that comes from OECD and is not recognized by the Treasury regulations for domestic transactions (and therefore

AR-A-0026

Grand Canyon University
OPE ID: 00107400
Page 9 of 19

presumably would constitute an "unspecified method" under the Treasury regulations, as discussed below). [13]

Section 1.482-9 of the Treasury Regulations sets forth the following transfer pricing methods for determining taxable income in connection with a controlled services transaction: (1) services cost method; (2) the comparable uncontrolled services price method; (3) the gross services margin method; (4) the cost of services plus method; (5) the comparable profits method; (6) the profit split method; and (7) unspecified methods.  *See* Treas. Reg. §1.482-9(a) (listing methods).   By cross-reference to § 1.482-1(c), §1.482-9(a) of the regulations requires that the best method be used: "Best method rule—(1) In general. The arm's length result of a controlled transaction must be determined under the method that, under the facts and circumstances, ***provides the most reliable measure of an arm's length result***."  Treas. Regs. 1.482-1(c) (emphasis added).  Thus, the methods identified in §1.482-9(a) must be applied "in accordance with the provisions of §1.482-1, including the best method rule of §1.482-1(c), the comparability analysis of §1.482-1(d), and the arm's length range of §1.482-1(e), except as those provisions are modified in this section [§1.482-9]."

The BKD Review acknowledges that the taxpayer must demonstrate why the selected method was chosen and why the alternatives methods were rejected.  Neither the Deloitte 2020 TPPR nor the BKD Review analytically demonstrate that the unspecified method chosen (EPS) is the most reliable methodology here, nor do they explain in anything more than a perfunctory way why the other methods were rejected.  Notably, the Deloitte 2018 TPR fails to even mention any of the other methodologies, instead simply adopting the EPS method.

As noted above, the factual predicate for all the transfer pricing methods is that the entities and taxpayers are "controlled," a factor that does not exist here.  Additionally, the Department notes that both the Deloitte 2020 TPPR and the BKD Review are, for the most part, superficial.  Neither analyzes the applicable regulations (or the various examples contained therein), in any depth.  Notwithstanding that these are not "controlled" parties and the Department therefore questions the appropriateness of using a transfer pricing study (especially an "unspecified" one under the Treasury regulations) to support a request to convert to nonprofit status, the following provides a summary of the Department's concerns about the conclusions reached by Deloitte and BKD as to the specific methodologies.

1. Services Cost Method ("SCM") - Treas. Reg. § 1.482-9(a)(1), (b)):
The SCM evaluates "whether the amount charged for certain services is arm's length by reference to the total services costs (as defined in paragraph (j) of this section [1.482-9(b)]) with no markup." Treas. Reg. § 1.482-9(b)(1).  Deloitte's "analysis" and rejection of the SCM method consists of one sentence: "The Education Support Services provided by the GCE to GCU contribute significantly to the key competitive advantages of the *Company*. Under Treas. Reg. Section 1.482-9(b)(4)(vi) (research, development or experimentation type of service transactions) and Treas. Reg. Section 1.482-9(b)(4)(vii) (engineering or scientific type of service

---

[13] In fact, the Deloitte 2020 TPPR includes references to an "MNE" without any explanation.  *See* Deloitte 2020 TPPR at 15-17.  "MNE" means a "multinational enterprise … A group of associated companies with business establishments in two or more countries."  OECD Guidelines (2017) at 28.

Grand Canyon University
OPE ID: 00107400
Page 10 of 19

transactions) are ineligible for the SCM method and therefore, the SCM cannot be used as the best method/most reliable method." Deloitte 2020 TPPR at p.33, §6.1.1.2 (emphasis added). The BKD Review discusses this conclusion at pages 5 (§II.A.3(a)) and 9 (§II.B.1). Although the Deloitte 2020 TPPR does not define "Company," BKD substitutes "GCU" in place of "Company" in its Review. BKD Review at 9. However, the regulation discusses contributions to key competitive advantages of the "controlled group" (§1.482-9(b)(5)) which would have to include both GCU and GCE. As explained at the outset of this discussion, however, GCU and GCE are not controlled entities and therefore there is no "controlled group," which begs the question of whether the services do or do not "contribute significantly to the key advantages" of a controlled group. Moreover, the BKD Review states "[w]hile the Back Office Support component of the Education Support Services could potentially be eligible for SCM treatment, it is not a requirement that the taxpayer elect the SCM method (*i.e.*, it is a voluntary election)." While it may not be a *requirement* that a taxpayer elect the SCM method, the taxpayer is required to explain why SCM is rejected as an alternative method to evaluate services (like back office support) that are routine and do not contribute significantly to the success or failure of GCU. Neither Deloitte nor BKD have adequately done so here.

2. Comparable Uncontrolled Services Price Method ("CUSP") - Treas. Reg. § 1.482-9(a)(2),(c):
The CUSP method evaluates "whether the amount charged in a controlled services transaction is arm's length by reference to the amount charged in a comparable uncontrolled services transaction." Treas. Regs. § 1.482(c)(1). Deloitte rejected the CUSP method in part because "due to the specificity of the transaction and the industry, no external CUSP/CUP[14] method analyzing the transactions between two unrelated parties, is available." Deloitte 2020 TPPR at p. 33 (§6.1.2.2) (footnote added). BKD agreed. BKD Review at 9-10. However, neither the Deloitte 2020 TPPR nor the BKD Review identified which transactions they reviewed and on what basis those transactions were not similar. Although "similarity of services rendered, and of the intangible property (if any) used in performing the services, generally will have the greatest effects on comparability under this method," neither BKD nor Deloitte discussed whether or not "adjustments [could be made] to account for any differences." Treas. Regs. § 1.482-9(c)(2)(ii)(A).

3. Gross Services Margin Method ("GSMM")- Treas. Reg. § 1.482-9(a)(3), (d):
The GSMM "evaluates whether the amount charged in a controlled services transaction is arm's length by reference to the gross profit margin realized in comparable uncontrolled transactions." Treas. Regs. §1.482-9(d)(1). Similar to the brevity of its analysis and rejection of the SCM, Deloitte rejects the GSMM in two sentences: "Neither GCU [n]or GCE provide comparable services with third parties, and we are unaware of instances where two third parties jointly provide comparable services in a comparable market. Therefore, we reasonably concluded that the GSMM/RPM[15] method is not the best method/most reliable method to determine the arm's length nature of the Covered Transaction." Deloitte 2020 TPPR at 34 (§6.1.3.2) (footnote added). Both Deloitte and BKD fail to acknowledge that the claimed lack of comparability is a creature of the unique structure of this transaction: taking a fully integrated proprietary

---

[14] "CUP" refers to "comparable uncontrolled price" method which is a method used by OECD but not the Treasury Department for domestic transactions. The OECD methods are discussed further below.

[15] "RPM" refers to "resale price method" which is a method used by OECD but not the Treasury Department for domestic transactions.

Grand Canyon University
OPE ID: 00107400
Page 11 of 19

institution and separating its academic and campus structure into a nonprofit entity, retaining the "servicing" functions in the publicly-traded for-profit former owner for which the institution is the primary, if not only client, and providing services for a fee that is 59.9% of Tuition and Fee Revenue.

4.   Cost of Services Plus Method ("CSPM") - Treas. Reg. § 1.482-9(a)(4), (e):

The CSPM "evaluates whether the amount charged in a controlled services transaction is arm's length by reference to the gross services profit markup realized in comparable uncontrolled transactions."  Treas. Regs. § 1.482-9(e)(1).[16]  This method "is ordinarily used in cases where the controlled service renderer provides the same or similar services to both controlled and uncontrolled parties."  Treas. Regs. § 1.482-9(e)(1).  CSPM "measures an arm's length price by adding the appropriate gross services profit to the controlled taxpayer's comparable transactional costs."  Treas. Regs. § 1.482-9(e)(2).

In determining that the CSPM was not applicable, Deloitte states, in part: "No internal CSP/Cost Plus transactions were identified for Covered Transaction. As stated above, GCE does not provide similar services to any other third-party entities. An external CSP/Cost Plus approach is also not available due to lack of sufficient information on similar service transactions involving third parties in the given industry."  Deloitte 2020 TPPR at p. 34 (§6.1.4.2).  Using those statements as support, BKD agreed with Deloitte.  BKD Review at pp. 11-12.  However, the regulations provide: "*If possible*, the appropriate gross services profit markup should be derived from comparable uncontrolled transactions of the same taxpayer participating in the controlled services transaction because similar characteristics are more likely to be found among services provided by the same service provider than among services provided by other service providers. *In the absence of such services transactions, an appropriate gross services profit markup may be derived from comparable uncontrolled services transactions of other service providers.*"  Treas. Regs. § 1.482-9(e)(3)(ii)(A) (emphasis added).  Neither the Deloitte 2020 TPPR nor the BKD Review address this alternative approach.  Nor, as described below, did Deloitte or BKD seem to make any attempt to identify any companies that provide individual components of the services provided under the ARMSA.

5.   Comparable Profits Method ("CPM") – Treas. Regs. §1.482-9(a)(5), (f):

The CPM "evaluates whether the amount charged in a controlled transaction is arm's length, based on objective measures of profitability (profit level indicators) derived from uncontrolled taxpayers that engage in similar business activities under similar circumstances."  Treas. Regs. § 1.482-9(f)(1).  Deloitte concluded, and BKD agreed, that CPM is not the best transfer pricing method.  Deloitte 2020 TPPR at 35-36 (§6.1.5.2);[17]  BKD Review at 11.

---

[16]   Deloitte combines its discussion of the CSPM with a discussion of the Cost Plus Method which is an OECD method used in "circumstances where semi-finished goods are sold between related parties, where related parties have concluded joint facility agreements or long-term buy-and-supply arrangements."  Deloitte 2020 TPPR at p. 34 (§6.1.4.1).  It is unclear why Deloitte included the discussion of the Cost Plus Method.  Not only is the Cost Plus Method not included in the Treasury Regulations, the ARMSA does not involve the sale of goods.

[17]   Deloitte also analyzed the OECD's transactional net margin method ("TNMM").  TNMM is not a method recognized by the Treasury Department for domestic transactions.

AR-A-0029

Grand Canyon University
OPE ID: 00107400
Page 12 of 19

In agreeing with Deloitte's conclusion, BKD points to the "highly integrated nature of GCE and GCU and the non-routine nature of the services being provided by GCE."  BKD Review at 11. "Routine" and "non-routine" are not terms that are used in the regulatory discussion of the CPM. BKD defines "routine" service providers as entities that do not hold valuable intangible assets. BKD Review at p. 11.  Although § 1.482-9(f) does not itself refer to valuable intangible assets, §1.482-5, which it cross-references does:  "Consequently, **in most cases** the tested party will be the least complex of the controlled taxpayers and will not own valuable intangible property or unique assets that distinguish it from potential uncontrolled comparables."  Treas. Regs. § 1.482-5(b)(2)(i)(emphasis added).   Thus, contrary to what BKD suggests, holding valuable intangible property is not disqualifying, it just may not occur "in most cases."   Moreover, as to vertical integration, the Deloitte 2020 TPPR explains that vertical integration is something that happens "within the same organization."  Deloitte 2020 TPPR at 13 (§4.1.3) (quoting Joskow, Paul. Vertical integration, Handbook of New Institutional Economics, Kluwer, 2003).  Clearly, GCE and GCU are not within the same organization.  Yet, neither the Deloitte 2020 TPPR nor BKD Review acknowledges this fact and do not explain why they are discussing a vertically integrated organization when that is not the pattern here.  Moreover, neither Deloitte nor BKD apparently made any effort to analyze the component parts of the ARMSA (or the MSA) to determine whether other companies (for which data is available) provide services that can be compared to the various components of the ARMSA.  By way of example only -- companies that provide institutions with financial aid servicing, or companies that provide marketing or student support services.

6.  Profit Split Method ("PSM") – Treas. Regs. §1.482-9(a)(6), (g):
The PSM "evaluates whether the allocation of the combined operating profit or loss attributable to one or more controlled transactions is arm's length by reference to the relative value of each controlled taxpayer's contribution to that combined operating profit or loss."  Treas. Regs. §1.482-9(g)(1).  There are two types of profit splits – comparable and residual.  Treas. Regs. §1.482-9(g)(1); *see also* §1.482-6(c).  Deloitte rejected the comparable split method because "it did not identify publicly available information on uncontrolled companies, the transactions and activities of which are sufficiently comparable to the Covered Transaction. Further, it is highly unlikely that an arrangement sufficiently comparable to the Covered Transaction can be found." the Deloitte 2020 TPPR at p. 36 (§ 6.1.6.3).  Again, as noted above, this "lack of comparables" results from the way this Transaction was structured (separating the academic and servicing functions) to maintain the continued revenue stream to GCE from GCU's operations.

BKD's review of Deloitte's rejection of PSM consists of block quotes from the Deloitte 2020 TPPR and then just one sentence of "analysis": "The Preparer rejected both forms of the PSM, the comparable PSM and the RPSM.  Given the lack of comparable profit split transaction information, Deloitte's rejection of the comparable PSM is appropriate."  BKD Review at 12. This is hardly an analysis, and demonstrates the lack of any consideration of whether the component parts of the services could be examined.

7.  Unspecified Method – Treas. Regs. § 1.482-9(a)(7), (h):
Treasury Regulations § 1.482-9(h) provides that "[m]ethods not specified in paragraphs (b) through (g) of this section [§ 1.482-9] may be used to evaluate whether the amount charged in a controlled services transaction is arm's length. Any method used under this paragraph (h) must

AR-A-0030

Grand Canyon University
OPE ID: 00107400
Page 13 of 19

be applied in accordance with the provisions of §1.482-1."  The regulation cautions however that "an unspecified method will not be applied unless it provides the most reliable measure of an arm's length result under the principles of the best method rule."  Treas. Regs. § 1.482-9(h) (citing § 1.482-1(c)).

Deloitte determined that the economic profit split ("EPS"), an unspecified method, was the most reliable transfer pricing method.  Deloitte's analysis of the EPS is based on the OECD's guidance because OECD has identified EPS as a transfer pricing method; the Treasury Regulations have not.  Indeed, the Treasury Regulations specifically provide that "the allocation of profit or loss under the profit split method must be made in accordance with one of the following allocation methods – (i) the comparable profit split … ; or (ii) the residual profit split … ."  As described immediately above, Deloitte rejected both of these methods for another "profit split" method – the EPS.

The EPS method (also referred to as the Transactional Profit Split Method):

> . . . first identifies the profits to be split from the controlled transactions—the relevant profits—and then splits them between the associated enterprises on an economically valid basis that approximates the division of profits that would have been agreed at arm's length. As is the case with all transfer pricing methods, the aim is to ensure that profits of the associated enterprises are aligned with the value of their contributions and the compensation which would have been agreed in comparable transactions between independent enterprises for those contributions. The transactional profit split method is particularly useful when the compensation to the associated enterprises can be more reliably valued by reference to the relative *shares* of their contributions to the profits arising in relation to the transaction(s) than by a more direct estimation of the value of those contributions.

C.1. ¶2.114, OECD Guidelines (2018) (emphasis in original).[18]  The OECD explains further:

> The main strength of the transactional profit split method is that it can offer a solution for cases where both parties to a transaction make unique and valuable contributions (e.g. contribute unique and valuable intangibles) to the transaction. *In such a case, independent parties might effectively price the transaction in proportion to their respective contributions, making a two-sided method more appropriate.*

---

[18] OECD issued comprehensive guidelines in 2017 (referred to herein as "OECD Guidelines (2017)").  In June 2018 OECD issued "Revised Guidance on the Application of the Transactional Profit Split Method" (referred to herein as ("OECD (2018)").

AR-A-0031

Grand Canyon University
OPE ID: 00107400
Page 14 of 19

C.2.1. ¶2.119, OECD Guidelines (2018) (emphasis added).  Yet Deloitte and BKD have failed to establish that any of the services provided by GCE are truly unique or valuable[19] or to examine what price independent parties would have put on the services provided here.

Further, Deloitte and BKD fail to explain why EPS is the most reliable method for evaluating the revenue sharing fee structure in the ARMSA when (1) there is no controlled transaction because GCU and GCE are not controlled taxpayers; (2) there are no profits to split because under Internal Revenue Service ("IRS") and state authority Gazelle is a nonprofit entity; and (3) GCU/Gazelle and GCE are not "associated enterprises."  The MSA is a revenue sharing agreement between two uncontrolled (*i.e.*, supposedly independent) parties; it is not a profit splitting allocation between two related entities.  The proposed revised terms for the arrangement, as set forth in the ARMSA, do not change the fact that most of the revenue being generated by Gazelle/GCU is going out the door to another entity – GCE – for the benefit of its shareholders.  The Department located no authority, nor have either Deloitte or BKD cited any sources, that support a profit-splitting transfer pricing method as the correct methodology to evaluate a transaction in which one of the parties is organized as a nonprofit entity under state law.

EPS is, according to Deloitte, appropriate when, among other factors, the "business operations are highly integrated such that the contributions of the parties cannot be reliably evaluated in isolation from each other[.]" Deloitte 2020 TPPR at 16 (§4.1.7).   Similarly, Deloitte describes GCU and GCE as entities "in a corporate group."  Deloitte 2020 TPPR at 38 (§ 6.2).  As noted *supra*, however, GCU and GCE are represented to the Department as separate, independent entities – they do not constitute, and are not part of, a "highly integrated" taxpayer and they are not entities in a "corporate group."[20]   Even more significant is the fact that the EPS is a method that allocates profits from a controlled transaction to each entity based on their relative contribution.  Deloitte 2020 TPPR at 17-18 (§ 4.1.8).   According to Deloitte, GCU and GCE "should share the profits in a manner proportional to each entity's relative value contribution."  Deloitte 2020 TPPR at 38 (§6.1.7).  Deloitte "selected the EPS method to recommend an

---

[19] Functions performed or assets used are "'unique and valuable' in cases where (i) they are not comparable to contributions made by uncontrolled parties in comparable circumstances, and (ii) they represent a key source of actual or potential economic benefits in the business operations."  OECD (2018) at 15 ("The Glossary of the Transfer Pricing Guidelines will be amended to add a definition of 'Unique and valuable contributions'").  The Department views the services provided by GCE as garden variety services in higher education.  Either typically performed in-house, or by one or more services providers.  Indeed, Deloitte explains that GCE relies on four third parties to provide the IT platforms, although those platforms are apparently enhanced by GCE ("GCE subscribes or pays for third-party platforms because it is more efficient for the third-party providers to maintain the systems").  *See* Deloitte 2020 TPPR at 23.  Deloitte notes that GCE employs "roughly 14" people to support one of the platforms.  There is absolutely no examination of why these functions cannot be performed by GCU employees, as they certainly were before the July 1, 2018 CIO which resulted in two entities – Gazelle and GCU.

[20] Although both Deloitte and BKD use the term "corporate group" in their respective documents, neither document defines the term.  The term does not appear in either the relevant Treasury regulations or OECD's guidelines.  The Department assumes that Deloitte means a group of entities that are either within a parent/subsidiary or brother/sister corporate chain.  GCU and GCE do not share such an organizational relationship and the Department does not consider them part of a "corporate group."

14

Grand Canyon University
OPE ID: 00107400
Page 15 of 19

appropriate range with respect to the allocation of overall profits between GCU and GCE," and explains that the steps in the EPS method are intended "to arrive at an eventual allocation of profits to each entity in the corporate group based on their relative contribution."  Deloitte 2020 TPPR at 38 (§§6.1.8, 6.2).[21]  The Deloitte 2020 TPPR does not explain why it is appropriate to "allocate profits" between two independent, unrelated, uncontrolled taxpayers, one of which is for-profit and the other of which is organized as a nonprofit.

Indeed, Deloitte notes that "at arm's length, each party to a transaction optimize their own value."  Deloitte 2020 TPPR at 14.  That is what should govern the relationship between GCU and GCE.  Contrary to how parties work at arm's length, Deloitte explains that "companies by definition optimize value of the group as a whole."  *Id.*  There is no singular "company here" nor is there a "corporate group."  GCE and GCU are not controlled taxpayers; there is no controlled transaction; and there are no profits to split – GCU is a tax-exempt entity and is organized as a nonprofit entity under state law.  Neither the Deloitte 2020 TPPR nor the BKD Review address these factors.  In fact, in agreeing with Deloitte's selection of the EPS method, BKD simply block-quoted from the Deloitte 2020 TPPR and then concluded, "[g]iven that both GCU and GCE make significant contributions to the creation of intangible assets and the lack of comparable transactions/comparable companies, a profit split-based method appears to be reasonable in this instance."  BKD Review at 13.[22]  With respect to the profit factor, if GCU wants to stand by Deloitte's and BKD's characterization of it as earning profits that can be "split," then it seems to be acknowledging that it operates as a for-profit.

The common thread running through both the Deloitte 2020 TPPR and the BKD Review transfer pricing analysis is that "no comparables" exist.  Yet the OECD defines47 transactions as "comparable if none of the differences between the transactions could materially affect the factor being examined in the methodology (e.g., price or margin), or if reasonably accurate adjustments can be made to eliminate the material effects of any such differences."  OECD Guidelines (2017) at 24.  OECD's revised guidance on the transactional profit split method further explains:

---

[21] The "steps" identified by Deloitte principally focus on the risk of fixed costs, defined as costs that do not vary with the quantity of services provided.  Deloitte 2018 TPR at 1, 33-35; Deloitte 2020 TPPR at 1, 39-44.  Deloitte claims that the party assuming fixed costs assumes greater risk justifying a greater share of profits.  Deloitte 2018 TPR at 5; Deloitte 2020 TPPR at 10-11.  Deloitte apparently determined which costs associated with the seven revenue-generating activities were fixed costs and what share of fixed costs Gazelle and GCE were contractually obligated to pay. Deloitte 2018 TPR at 33; Deloitte 2020 TPPR at 44 (and Appendix C at 11 and Appendix D at 11). The Deloitte 2020 TPPR (as did the Deloitte 2018 TPR) also appears to give significant weight in its determination of fixed costs to its consideration of off-balance sheet assets ("OBSA").  Deloitte states that it considered historic trial balance sheet financial data to "capture any fixed costs incurred in the past accounting period that are tied to the revenue generated in FY 2018 and FY 2019.  These are the costs that contribute to the generation of OBSAs." Deloitte 2020 TPPS at 39; *see also* Deloitte 2018 TPR at 32.  As noted previously in the Decision, because all of those earlier costs were incurred during the years prior to the separation, Deloitte's calculation of fixed costs gives GCE – and not GCU – the benefit of those historical costs that were incurred before the services function was separated on July 1, 2018.  Indeed, Deloitte divides the OBSAs into three categories:  marketing; technology development; and executive strategy and explains: "further refinement of these OBSAs is not as reliable due to the interrelated nature of GCE's business model."  Deloitte 2020 TPPR at 39-40.

[22] Although BKD more thoroughly recounted *how* Deloitte applied each step of the method (*e.g.,* how it identified economic risks), it failed to analyze the appropriateness of selecting the EPS method in the first place.

15

Grand Canyon University
OPE ID: 00107400
Page 16 of 19

In general, it will tend to be the case that the presence of factors indicating that a transactional profit split is the most appropriate method will correspond to an absence of factors indicating that an alternative transfer pricing method—one which relies entirely on comparables—is the most appropriate method, determined in accordance with paragraph 2.2 of these Guidelines. ***Put another way, if information on reliable comparable uncontrolled transactions is available to price the transaction in its entirety, it is less likely that the transactional profit split method will be the most appropriate method. However, a lack of comparables alone is insufficient to warrant the use of a transactional profit split.*** See paragraph 2.128.

C.2.3 ¶2.143, OECD Guidelines (2018) (emphasis added).  Paragraph 2.128 states:

A lack of closely comparable, uncontrolled transactions which would otherwise be used to benchmark an arm's length return for the party performing the less complex functions should not *per se* lead to a conclusion that the transactional profit split is the most appropriate method. Depending on the facts of the case, ***an appropriate method using uncontrolled transactions that are sufficiently comparable, but not identical to the controlled transaction is likely to be more reliable than an inappropriate use of the transactional profit split method***. …

C.2.2. ¶2.128, OECD Guidelines (2018) (emphasis added).   Paragraph 2.129 cautions: "if independent parties engaged in comparable transactions are found to make use of other pricing methods, this should also be taken into account in determining the most appropriate transfer pricing method." C.2.2. ¶2.129, OECD Guidelines (2018).  None of these additional provisions of the OECD Guidelines were discussed by either Deloitte or BKD.

BKD states that it reviewed 24 agreements between service providers and higher educational institutions and that of those, ten agreements used a revenue-sharing fee structure.  According to BKD, the percentage of revenues used in those agreements ranged from 12.5% to 80%, with an interquartile range of 45.9% to 62.4%, with a median of 50.0%.  BKD Review at16.  BKD then states:

We note that the Preparer's concluded TY 2018 range of revenue split in the Transfer Pricing Study of 60.22% to 60.71% falls within the interquartile range of the ten agreements. Further, we note that the Preparer's concluded TY 2019 range of revenue split to the renderer of the services in the Transfer Pricing Study of 59.32% to 59.72% also falls within the interquartile range of the agreements. Accordingly, the Preparer's concluded results for TY 2018 and TY 2019 in the Transfer Pricing Study do not appear unreasonable.

BKD Review at 16.   BKD's analysis is striking for what it does *not* address.  For example, what is the relationship between the institution and the service provider – were they formerly one and the same?  Why is it reasonable to charge GCU a fee equal to 59.9% - 68.8% of revenues (as described in ARMSA Exhibit D §3) when the range of the

**JA34**

Grand Canyon University
OPE ID: 00107400
Page 17 of 19

ten agreements BKD cites included a low of 12%?[23]  Why is it reasonable to charge GCU that fee when the median of the ten agreements reviewed is 50%?  Does the increase over the low of 12% or the median of 50% indicate the purpose of the ARMSA is to benefit GCE stockholders?

And what are the fee structures in the remaining 14 agreements?  Why were those fee structures not analyzed as alternatives to the revenue sharing fee used in the ARMSA? The failure to do so is especially concerning, given that GCE has very recently advised its shareholders and the public that "[i]n  recent years, an alternative unbundled fee-for-service model has emerged, in which the companies offer the same services, or some subset of services, *for the market price of those services*."  8/28/20 GCE 8-K at 9 (emphasis added).  Neither the Deloitte 2020 TPPR nor the BKD Review reflect any examination of such alternative models – nor did they appear to analyze unbundled services to compare them to the components of the services provided under the ARMSA.

## IV.  THE DEPARTMENT'S RECONSIDERATION DETERMINATION

In both its initial request for nonprofit status and in its request for reconsideration of the Decision, GCU has pointed to the fact that Gazelle is an Arizona nonprofit corporation, the IRS granted Gazelle tax-exempt status and GCU's accreditor (the Higher Learning Commission ("HLC")) has approved nonprofit status.  However, unlike the IRS's initial grant of tax-exempt status and state organization as a nonprofit, the Department's determination of nonprofit status considers the structure and planned operations of the institution when its owner(s) apply for that change of status, and seeks to ensure that a nonprofit institution's revenues – a good portion of which are generated from Title IV funds – are primarily devoted to the mission of the school and not to other parties, including (as here) the prior owner and its shareholders.  The Department makes its own determination regarding nonprofit status, and the fact that HLC may have reached a different conclusion is neither binding nor persuasive.

Although the revenue sharing percentages have changed somewhat under the ARMSA, the basic structure whereby a substantial portion of GCU's revenues benefits GCE remains unchanged. Based on the tax authority cited in the Decision, the Department has determined that, under the ARMSA, GCU will still not meet the requirement that both the primary activities of the organization and its stream of revenue benefit the nonprofit itself.  The Deloitte 2020 TPPR and the BKD Review have not convinced the Department otherwise.

GCU has repeatedly tried to convince the Department that it should be granted nonprofit status because of GCU's positive accomplishments on campus and in the community.  Although those

---

[23]  Deloitte recognizes that curriculum is "the heart of any learning institution."  (Deloitte 2018 TPR at 26, Deloitte 2020 TPPR at 27).  However, as noted above, Curriculum Services and Faculty Operations services have been eliminated from the ARMSA, and therefore, the risks related to curriculum and faculty are primarily borne by GCU. Deloitte 2020 TPPR at 27.  Presumably, both a strong curriculum and talented faculty – the risks and costs of which are borne by GCU -- are primary drivers of enrollment, and thereby, GCU's revenue.   Yet, the Monthly Fee payable to GCE under the ARMSA is 68.8% of Tuition and Fee Revenue (or 59% of Adjusted Gross Revenue).  Deloitte and BKD do not discuss why the revenue sharing percentages were not significantly reduced given this change in risk and responsibility.

Grand Canyon University
OPE ID: 00107400
Page 18 of 19

activities are worthwhile and commendable, they are not remarkable for an institution of higher education – whether proprietary, nonprofit, or public. And they do not change the Department's conclusion that the arrangement between GCU and GCE under the ARMSA precludes approval of GCU's request to convert to nonprofit status.

Beyond the continuing revenue stream to GCE, the Decision also noted your (Brian Mueller's) dual roles as a concerning factor. You remain the President of GCU and the Chief Executive Officer of GCE. You are also Chairman of GCE's board. In a Memorandum to the Board of Directors of GCE from the Board of Directors of GCU (updated as of January 7, 2020), GCU's Board stated, "[g]iven President Mueller's critical importance to the ongoing operations of the University, we are not willing to concede this point and we intend to reiterate our insistence to the Department that President Mueller retain his position as President of the University." Although the Department is not directing GCU to remove you as President of the University, your multiple roles continue to be of concern to the Department. Of course, nothing would prevent you from severing ties with GCE if you (and the GCU Board) thought it was more important for you to stay with GCU instead of serving in two potentially conflicting positions. As the Decision explained regarding your dual role of running both GCU and GCE (and as one of GCE's shareholders):

> [A]s the CEO of GCE, [Mr. Mueller] is the key executive responsible for providing the services under the MSA, with duties of loyalty to shareholders of GCE. Yet, as the Institution's President he will have responsibility to manage matters large and small with its primary service provider, notwithstanding the appointment of a Designee and the independent trustees who comprise the MSA Committee. Given those obviously conflicting loyalties, and the breadth of the services provided under the MSA, the Department is not satisfied that these structures are sufficient to ensure that Mr. Mueller's undivided loyalty is to the Institution.

Decision at 15. The Decision also noted the Department's skepticism that any nonprofit could outsource the number and type of institutional functions that Gazelle has and still be deemed to operate the Institution. Curriculum Services and Faculty Operations have now been transferred to GCU. Given the Department's conclusion in this reconsideration determination that the continued revenue stream under the ARMSA (if executed) would prevent the Department from approving GCU's requested conversion to nonprofit status, there is no need for the Department to re-examine this issue.[24]

---

[24] Given the Department's conclusion that the continuing revenue stream to GCE (whether under the MSA or the ARMSA) prevents the Department from approving the requested conversion to nonprofit status, this reconsideration determination is not based on an examination of the purchase price valuation. The BKD 2018 Valuation and the BKD 2020 Valuation conclude that the range of value for the purchased assets was between $1,100,000,000 to $1,400,000,000 which exceeded the purchase price of $877,459,000. However, as noted in the Decision, at a GCE board meeting immediately prior to the closing of the Transaction, Mr. Bachus (GCE Chief Financial Officer) explained that "[w]hile the purchase price for the assets will be at book value, which approximates fair value based on the appraisals received … it was expected that Gazelle would seek a new appraisal post-closing on certain assets including the land being sold. To the extent the new appraisal showed a higher fair value for those assets, [GCE] would not get the benefit from that." GCE June 28, 2018 Board Minutes at 1. However, Mr. Bachus further explained that "a higher fair value, and a resulting margin between fair value and book value, benefitted Gazelle in

AR-A-0036

Grand Canyon University
OPE ID: 00107400
Page 19 of 19

## V.  CONCLUSION

For the reasons discussed above, GCU does not satisfy the Department's definition of a nonprofit.  Accordingly, the Department rejects GCU's request to reconsider the Department's decision denying GCU's request to convert to nonprofit status.

As explained in the Decision, GCU's status as a proprietary institution is for purposes of its participation in the Title IV, HEA programs.  The Department does not take a position with respect to Gazelle's non-profit 501(c)(3) status with the Internal Revenue Service.  However, GCU/Gazelle must not engage in any advertising or other communications that refer to GCU as a "nonprofit."  Such statements are confusing to students and the public, who may interpret such statements to mean that the Department has approved GCU as a nonprofit under its regulations. The Department does not take a position regarding statements that GCU or Gazelle may make about Gazelle's status as a 501(c)(3) tax exempt organization.

The PPPA under which the Institution has been operating since November 14, 2019 continued the prior approval for GCU to participate under a proprietary status.  The proprietary status for GCU's continued participation is therefore unchanged.  GCU is reminded that it must meet the Title IV, HEA programs reporting and program eligibility requirements applicable to for-profit institutions, including the 90/10 eligibility requirements described in 34 C.F.R. §668.28.

Sincerely,

Martina Fernandez-Rosario, Director
School Eligibility and Oversight Service Group

cc:  The Higher Learning Commission (*email: Barbara Gellman-Danley, President -*
*president@hlcommission.org, Anthea Sweeney, VP for Legal and Governmental Affairs -*
*asweeney@hlcommission.org*)
AZ State Board for Private Postsecondary Education (*email:* Kevin.LaMountain@azppse.gov)
New Mexico Higher Education Department (*email: exec.admin@state.nm.us*)
IRS
     Attn: EO Classification
     MC 4910 DAL
     1100 Commerce Street
     Dallas, TX  75242
     eoclass@IRS.gov

---

connection with its composite score." *Id.*  Although no details are provided, Mr. Bachus apparently further explained "why a good composite score for Gazelle ultimately benefited the Company [*i.e.,* GCE]." *Id.* at 1-2.

PROJECT GAZELLE

SURVEY OF SELECT EDUCATION SERVICE PROVIDER RELATIONSHIPS
WITH POST-SECONDARY INSTITUTIONS

*Through November 2017*

I. Publically Available Agreements/Data

| # | Service Provider | Institution | Relationship | Term | Revenue Share | Source |
|---|---|---|---|---|---|---|
| 1. | 2U, Inc. | University of Southern California | Online graduate degree platforms, including admission processing, customer service and counseling, curriculum design, production and deployment, etc. | Varies per program | Marked as confidential | Agreement and amendment filed as SEC exhibit |
| 2. | 2U, Inc. | Cal – Berkeley | Online graduate program (Master of Information and Data Science) development and administration | 15 years (ending June 30, 2029) | **Per student fee based on number of FTE students: $39k Base Fee per student,** decreasing per student at certain enrollment thresholds, and automatically adjust for tuition increases | Agreement |
| 3. | Academic Partnerships, LLC | Augusta State University | Development and promotion of certain online degree programs | 1 year initial term, subsequently extended for 1 year terms (7/21/2011); **likely expired or amended** | **50% to 62.5%** of tuition, depending on the program costs | Agreement |

AR-C-1775

| # | Service Provider | Institution | Relationship | Term | Revenue Share | Source |
|---|---|---|---|---|---|---|
| 4. | Academic Partnerships, LLC | Arizona State University | Collaboration in development and promotion of certain online degree programs (nursing, master's in education) | Unknown | <u>Pre-April 2012</u>: **65%** of revenue for first 2,000 students<br>**60%** of revenue collected beyond 2,000 students<br><br><u>Post-April 2012</u>: **50%** of revenues | Agreement |
| 5. | Academic Partnerships, LLC | Boise State University | Development and promotion of certain online degree programs | 5 year initial term, automatically renewing for 3 year terms unless terminated | **45%** of revenues, decreases to **40%** when two additional degree programs are added | Idaho Board of Education meeting minutes (see page 121) |
| 6. | Academic Partnerships, LLC | University of Cincinnati | Development, maintenance, and marketing of online programs and transition of offline courses to online platform | 5 year initial term that may be renewed for a 3-year term | **40%** for masters of CSE<br>**50%** for certain engineering undergrad programs | Agreement |
| 7. | Academic Partnerships, LLC | Eastern Michigan University | Marketing/promotion, recruiting, program development/support, academic support, student support, enrollment/application support | 5 year initial term, automatically renewing for 2 year terms unless terminated (commenced on 9/1/16) | **50%** of revenue per student, generally<br>**47%** of revenue per nursing student | Agreement |

| # | Service Provider | Institution | Relationship | Term | Revenue Share | Source |
|---|---|---|---|---|---|---|
| 8. | Academic Partnerships, LLC | Lamar State University Port Arthur | Development and promotion of certain online degree programs | 7 year initial term, automatically renewing for one 5 year term (commenced on 10/1/2010) | **50%** of tuition and fees, for in-state, non-nursing students **70%** of tuition of nursing students **66 2/3%** of tuition of all out-of-state | Agreement |
| 9. | Academic Partnerships, LLC | Lamar University | Development and promotion of certain online degree programs | Unknown | **Varies based on program:** **50%** of revenues for education, nursing MBA programs, and certain other masters programs **40%** for certain non-nursing undergraduate programs | Agreement; Subsequent amendment |
| 10. | Academic Partnerships, LLC | Louisiana State University | Expanding flexible and affordable online degree and certificate offerings | 3 years (commenced on 2/1/2013); **likely renewed or expired** | **50%** of revenues, capped at $5.8m | Agreement; Southern University faculty minutes |
| 11. | Academic Partnerships, LLC | Stephen F. Austin University | Development and promotion of certain online degree programs | 5 year initial term, automatically renewing for 3 year terms unless terminated | **70%** of revenues | Agreement |

AR-C-1777

| # | Service Provider | Institution | Relationship | Term | Revenue Share | Source |
|---|---|---|---|---|---|---|
| | | | | (commenced on 5/13/11) | | |
| 12. | Academic Partnerships, LLC | Texas A&M University – Commerce | Development and promotion of certain online degree programs | 5 years (commenced on 9/23/2010); **likely renewed or expired** | **70-75%** of tuition and fees, depending on program and year | Agreement |
| 13. | Academic Partnerships, LLC | University of Florida West | Development and promotion of certain online degree programs | 5 year initial term, automatically renewing for 5 year terms unless terminated (5/27/2011) | **50%** of revenues | Agreement |
| 14. | Academic Partnerships, LLC | University of North Carolina – Wilmington | Development, maintenance, and marketing of online undergrad, graduate, and post-graduate coursework, and conversion of offline classes to online classes | 10 years, with each program launched under the MSA lasting 12 months, with the option to renew each program for 3 additional years | **50%** of tuition | Agreement |
| 15. | Academic Partnerships, LLC | University of South Carolina | Exclusive right to design and market certificate programs | 5 years | **50%** of tuition and fees where AP recruited student | Board of trustees minutes |
| 16. | Academic Partnerships, LLC | University of South Carolina | Full services agreement for online course development | 2-3 year initial term, extended recently to four 1 year terms | **40%** of tuition charged for any course | Board of trustees minute / Press release |
| 17. | Academic Partnerships, LLC | University of Texas System | Master services agreement for all UT system institutions | 1 year initial term, with option | **50%**, generally, to be defined specifically in | Agreement |

| # | Service Provider | Institution | Relationship | Term | Revenue Share | Source |
|---|---|---|---|---|---|---|
| | | | | to renew 1-year terms | separate agreements | |
| 18. | Academic Partnerships, LLC | University of Texas – Arlington | Development and promotion of certain online degree programs | 7 years (commenced on February 7, 2008; extended to 2022) | **80%** of tuition originally, negotiated down to **36 – 49%** depending on program | Agreement |
| 19. | Academic Partnerships, LLC | University of Texas – Pan-American | Development and promotion of certain online degree programs (MPA, master's in education) | 5 years (commenced on 3/19/2012) | <u>Per program</u>: **50%** of tuition collected *or* % equal to the result of dividing $4,300 by total program tuition , whichever is greater | Agreement |
| 20. | Academic Partnerships, LLC | University of Texas – Tyler | Development and promotion of certain online degree programs | 5 year initial term, automatically renewing for 5 year terms unless terminated (commenced on 1/20/2012) | <u>Per program</u>: **50%** of tuition collected *or* % equal to the result of dividing $4,300 by total program tuition , whichever is greater | Agreement |
| 21. | Bisk | Michigan State University | Development, marketing, and support services for undergraduate, graduate, and certificate programs | 10 years | **Varies per program** (each calculated from gross revenues)**:** **50%** for supply chain mgmt certificate | Agreement |

| # | Service Provider | Institution | Relationship | Term | Revenue Share | Source |
|---|---|---|---|---|---|---|
| | | | | | **70% for** hospitality business certificate **65% leadership** certificate **50%-70%** depending on (i) source of enrollment (less to Bisk for MSU generated enrollment) and (ii) gross revenues (less to Bisk as revenues increase) | |
| 22. | Bisk | University of Florida | Creating, marketing, promoting, and delivering an online program to working professional and non-traditional learners | 7 years (commenced on 2/22/12) | **80% of revenue** | Agreement |
| 23. | Blackboard (Blackboard Consulting) | Alcorn State University | Business development for online courses | 2.5 years | ~**$432k** single payment | Board minutes |
| 24. | Blackboard (Blackboard Consulting) | Southern Mississippi University | Course content hosting and design; marketing; business process improvement (e.g., course scheduling); financial modeling, etc. | 5 years | **$502k** increasing **to $532k** fixed annual payments, | Board minutes BlackBoard case study |
| 25. | Everspring | Auburn University | Market analysis, faculty support, instructional design, application preparation support, and student enrollment and retention support | 5 year initial term, option to renew for two 2-year periods (commenced on at least by | **Varies based on credit hours taught:** **50.0%** for ≤50k **47.5%** for 50-70k **45.0%** for 70-90k | Agreement |

WEST 268295521.2

AR-C-1780

**JA43**

| # | Service Provider | Institution | Relationship | Term | Revenue Share | Source |
|---|---|---|---|---|---|---|
| | | | | 2/1/17); **University may terminate for convenience with 30 days' notice** | **42.5%** for 90-110k<br><br>**40.0%** for >110k | |
| 26. | Kaplan | Purdue University | Technology support, help-desk functions, human resources support, admissions support, financial aid administration, marketing and advertising, back-office business functions, international student recruiting and certain test preparation services | 30 years, with a buyout option at 6 years | **Up to 12.5%** of revenues, assuming other expenses are paid first | [Kaplan 8-K](#) |
| 27. | Pearson | Arizona State University | Develop, provide, and promote online degree programs | 3.5 year initial term (ending August 2018), then two year term (ending August 2020) unless notice of cancellation is given 120 days before end of initial term | Varies based on volume of students and services offered, plus extra fees for certain programs:<br><br>**Max: 56.45%**<br>**Min: 33.00%** | [Pearson case study](#)<br><br>[News article](#) |
| 28. | Pearson | Northern Arizona University | Development of online undergraduate degree programs on a "competency based" model | 3 year initial term (commenced in January 2013) | **$875** per student enrolled | [News article](#) |
| 29. | Pearson | Washington State University | Online programs and services for the business school | 10 year initial term, option renewal of 10 years | **75-60%** | [Agreement](#) |

WEST\268295521.2

AR-C-1782

INTERNAL REVENUE SERVICE                          DEPARTMENT OF THE TREASURY
P. O. BOX 2508
CINCINNATI, OH  45201

Date:  **NOV 0 9 2015**

                                    Employer Identification Number:
                                    ▮▮▮▮▮▮▮
                                    DLN:
GAZELLE UNIVERSITY                    17053292313005
3300 WEST CAMELBACK RD BLD 3        Contact Person:
PHOENIX, AZ  85017-3030              ROGER W VANCE              ID# 31173
                                    Contact Telephone Number:
                                     (877) 829-5500
                                    Accounting Period Ending:
                                     June 30
                                    Public Charity Status:
                                     170(b)(1)(A)(ii)
                                    Form 990/990-EZ/990-N Required:
                                     Yes
                                    Effective Date of Exemption:
                                     November 20, 2014
                                    Contribution Deductibility:
                                     Yes
                                    Addendum Applies:
                                     No

Dear Applicant:

We're pleased to tell you we determined you're exempt from federal income tax
under Internal Revenue Code (IRC) Section 501(c)(3). Donors can deduct
contributions they make to you under IRC Section 170. You're also qualified
to receive tax deductible bequests, devises, transfers or gifts under
Section 2055, 2106, or 2522. This letter could help resolve questions on your
exempt status. Please keep it for your records.

Organizations exempt under IRC Section 501(c)(3) are further classified as
either public charities or private foundations. We determined you're a public
charity under the IRC Section listed at the top of this letter.

If we indicated at the top of this letter that you're required to file Form
990/990-EZ/990-N, our records show you're required to file an annual
information return (Form 990 or Form 990-EZ) or electronic notice (Form 990-N,
the e-Postcard). If you don't file a required return or notice for three
consecutive years, your exempt status will be automatically revoked.

If we indicated at the top of this letter that an addendum applies, the
enclosed addendum is an integral part of this letter.

For important information about your responsibilities as a tax-exempt
organization, go to www.irs.gov/charities. Enter "4221-PC" in the search bar
to view Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities,
which describes your recordkeeping, reporting, and disclosure requirements.

                                              Letter  947

-2-

GAZELLE UNIVERSITY

Sincerely,

Jeffrey I. Cooper
Director, Exempt Organizations
Rulings and Agreements

Letter 947

**JA47**

**Certificate of Service**

I certify that on December 15, 2021, I electronically filed this Joint Appendix using the Court's CM/ECF system.

*/s/ David A. Obuchowicz*