Kevin E. O'Malley (006420)
Hannah H. Porter (029842)
Gallagher & Kennedy
2575 E. Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone: 602.530.8000
Facsimile: 602.530.8500
Email: kevin.omalley@gknet.com
Email: hannah.porter@gknet.com

Steven M. Gombos (*pro hac vice*)
Virginia State Bar No. 30788
David A. Obuchowicz (*pro hac vice*)
Virginia State Bar No. 82483
Gombos Leyton, PC
11350 Random Hills Road, Suite 400
Fairfax, Virginia 22030
Telephone: 703.934.2660
Facsimile: 703.934.9840
Email: sgombos@glpclaw.com
Email: dobuchowicz@glpclaw.com
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Grand Canyon University,<br>　　　　　　　Plaintiff,<br><br>v.<br><br>Miguel Cardona, *et al*,<br><br><br>　　　　　　　Defendants. | No. 2:21-cv-00177-SRB<br><br>**Joint Appendix – Motion to Complete the Administrative Record and to Take Limited Discovery**<br><br>Hearing Date: January 13, 2022 |

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

# Table of Contents

## Volume I

1. U.S. Department of Education, Decision Letter Regarding Review of the Change in Ownership and Conversion of Nonprofit Status of Grand Canyon University (November 6, 2019) …………………………………………………….....JA1

2. U.S. Department of Education, Decision Letter Regarding Reconsideration Review of the Change in Ownership and Conversion to Nonprofit Status of Grand Canyon University (January 12, 2021)…………………………………………………JA19

3. Project Gazelle Survey of Select Service Provider Relationships with Post-Secondary Institutions through November 2017…………………………………………….JA38

4. Gazelle University IRS 501(c)(3) Determination Letter (November 5, 2019)……..JA46

## Volume II

5. Brian E. Mueller Letter to Michael J. Frola (January 18, 2018)……………………JA48

6. William Gonzalez Letter to Michael J. Frola (September 14, 2018)………………JA56

7. Michael J. Frola Letter to William Gonzalez (January 17, 2020)…………………JA59

8. Dennis M. Cariello Email to Donna Mangold (May 21, 2018)……………………JA61

9. Dennis M. Cariello Email to Donna Mangold (June 19, 2018)……………………JA62

10. Dennis M. Cariello Email to Donna Mangold (June 27, 2018)……………………JA65

11. Michael J. Frola Email to Brian Roberts (January 17, 2020)………………………JA67

12. Steven M. Gombos Letter with Exhibits to Michael J. Frola (August 14, 2020)…..JA68

13. Robin S. Minor Letter to Steven M. Gombos (August 28, 2020)…………………JA99

# GRAND CANYON UNIVERSITY™

3300 West Camelback Road | Phoenix, Arizona 85017 | 602.639.7500 | Toll Free 800.800.9776 | www.gcu.edu

January 18, 2018

Michael J. Frola
Director
Multi-Regional and Foreign Schools Participation Division
U.S. Department of Education
830 First Street NE, 7th Floor
Washington, DC  20202

> Re:  Grand Canyon University (OPEID 00107400) Request for Pre-Acquisition Review of a Proposed Change in Ownership

Dear Mr. Frola:

Enclosed are documents for your review in connection with Grand Canyon University's ("GCU" or the "University") proposed change of control. As contemplated, this transaction would involve the following:

- The parties to the transaction would be Grand Canyon Education, Inc., a Delaware corporation within which the University is currently operated ("GCE"), and Gazelle University, an Arizona nonprofit corporation qualified as a 501(c)(3) organization ("New GCU"). New GCU is structured as a subsidiary of a parent 501(c)(3) entity named the Grand Canyon University Foundation.

- GCE would sell to New GCU the academic-related assets, real estate and associated intangibles related to GCU which together would be sufficient for New GCU to achieve status as a Higher Learning Commission ("HLC")-accredited institution. The purchase price for the transferred real property that constitutes the Grand Canyon University campus (campus land, dormitories, classrooms, parking garages, athletic facilities) would be determined following receipt of third party appraisals and subsequent negotiation, and would be paid in the form of a long-term note from New GCU to GCE subject to customary commercial credit terms. The purchase price will correspond to the fair market value of the real estate plus $1 for the academic and intangible assets. GCU's current faculty, academic leadership and related staff would become employed by New GCU and New GCU would be governed by the current institutional board of trustees of GCU. GCE would retain all other employees and assets necessary to perform the third-party services contemplated by the sale, including an office complex where most services-related personnel are currently located.  At closing, New GCU would change its name to "Grand Canyon University."

- GCE and New GCU would enter into a long-term master services agreement pursuant to which GCE would provide identified technological, marketing, promotional, financial aid

FIND YOUR PURPOSE



# GRAND CANYON UNIVERSITY®

3300 West Camelback Road | Phoenix, Arizona 85017 | 602.639.7500 | Toll Free 800.800.9776 | **www.gcu.edu**

and other support services to New GCU in return for an agreed upon share of New GCU's tuition and fee revenue. The revenue share between the two entities remains subject to completion of a transfer pricing study and subsequent negotiation, but is expected to be comparable to other shared services arrangements currently in use in the higher education marketplace and to reflect the level of services that GCE would be providing to New GCU. The terms of the master services agreement would comply with the HLC's recently adopted guidelines on shared services arrangements as well as the Department's guidance on "bundled services" agreements and requirements for "third party servicer" contracts.

On January 18, 2018, GCU submitted electronic documents requesting a preacquisition review of the proposed transaction. The attached documents should provide almost all of the materials necessary to constitute a "materially complete" application for GCU, as defined in 34 C.F.R. § 600.20(g)(2). We appreciate the Case Team's willingness to begin its preacquisition review based on these documents, which are quite substantial. We understand that the Department requires a broader range of documents in connection with such non-profit transactions and therefore we have attached the following:

- Signature page for the University's application;
- Audited financial statements of the University for the two most recently completed fiscal years that are prepared in accordance with Generally Accepted Accounting Principles ("GAAP") and audited in accordance with Generally Accepted Government Auditing Standards ("GAGAS"), which have previously been submitted and reviewed by the Department through the e-Z Audit application;
- The University's most recent catalog can be accessed directly at https://www.gcu.edu/academics/academic-policies.php;
- The University's policy manual can be accessed directly at https://www.gcu.edu/Documents/University-Handbooks/University-Policy-Handbook-010818.pdf;
- The University's legal authorization;
- The University's most recent statement of accreditation;
- A chart showing the current and proposed post-transaction structure for GCU;
- Articles of incorporation for New GCU;
- By-laws for New GCU;
- The 501(c)(3) determination letter from the Internal Revenue Service for New GCU;
- Articles of Incorporation for Grand Canyon University Foundation;
- By-laws for Grand Canyon University Foundation;
- The 501(c)(3) determination letter from the Internal Revenue Service for Grand Canyon University Foundation;
- A list of members of the respective boards for GCE, New GCU and the Grand Canyon University Foundation;
- The draft Asset Purchase Agreement for the proposed transaction, which has been negotiated and is substantially complete;



- The draft Credit Agreement between GCE and New GCU to finance the asset purchase, which has been negotiated and is substantially complete;
- The draft Master Services Agreement governing the shared services arrangement between GCE and New GCU, which has been negotiated and is substantially complete; and
- A list of proposed executives for New GCU post-transaction.
- In addition, audited financial statements of Grand Canyon University Foundation for the two most recently completed fiscal years that are prepared in accordance with GAAP and audited in accordance with GAGAS will be filed within the next few days;

**Background and Reasons for the Proposed Transaction**

GCU was founded in Prescott, Arizona in 1949 as a traditional, private, non-profit college under the name Grand Canyon College and moved to its existing campus in Phoenix, Arizona in 1951. Established as a Baptist-affiliated institution with a strong emphasis on religious studies, the school initially focused on offering bachelor's degree programs in education. The college obtained regional accreditation in 1968 from the Commission on Institutions of Higher Education, North Central Association of Colleges and Schools, the predecessor to the Higher Learning Commission ("HLC"), and began offering nursing programs and master's degree programs in education and business in the 1980s. In 1989, it achieved university status and became Grand Canyon University. In early 2000, it discontinued its Baptist affiliation and became an interdenominational Christian university.

By late 2003, the University was over $20 million in debt and teetering on the verge of insolvency. Without a significant donor base, the University's only alternative to bankruptcy was to sell the school to a group of investors who quickly implemented a new business plan that included selling and leasing back the campus and instituting online programs designed for working adults.

During the period between 2004 and mid-2008, GCU continued to focus on its financial stability and growth primarily through online education while the ground campus continued to lose money and ground campus enrollment remained stagnant. Then, in June 2008, during the process leading to the University's initial public offering in November 2008, the school hired a new management team led by President Brian Mueller and Executive Vice President Dr. Stan Meyer. This team had extensive experience operating another publicly traded education company with a large online student population as well as in the area of campus-based, private, Christian education.

Beginning in 2009, the management team turned the focus of Grand Canyon University to reinvigorating its ground campus and creating a university that, in many respects, is indistinguishable from the traditional private nonprofit universities with which it competes. Since repurchasing the campus in 2009, the University has nearly doubled the campus footprint to over 270 acres and has invested over $1 billion in educational infrastructure including new classrooms, dormitories, technology, and athletic and parking facilities. For the fall of 2017, the University has approximately 19,000 students enrolled on its ground campus and an additional

FIND YOUR PURPOSE



approximately 67,000 non-traditional students attending online. The growth has been accomplished with tuition rates that are comparable to tuition rates for in-state students at state universities and that are often 1/3 the rates charged by private nonprofit universities. The painstaking re-engineering of the University has made a private, Christian education possible for many who previously could only dream of such an opportunity.

Despite Grand Canyon University's indisputable success, and its strong belief that such success is poised to continue, the University's Board of Trustees believes that it is in the best interest of the University's students, faculty and staff, and community to return to its historic not-for-profit status. Its current classification as a for-profit university puts the University at a significant disadvantage against other universities with which it competes academically and athletically, and handicaps the University's ability to continue to offer very low tuition rates to its students. To solve these and related issues, the Board of Trustees and administration of GCU and the Board of Directors of GCE, have proposed, by the transaction described herein, to re-establish the University as a traditional private non-profit University.

We hope it is self-evident that this transaction is not in the least intended to "evade" the regulations applicable to proprietary institutions, as is sometimes alleged. The University's Title IV revenue percentage under the "90/10 Rule" has consistently been far below the 90 percent threshold. Moreover, none of its programs had failing rates under the Gainful Employment Rule, which we believe confirms that University's commitment to hold down tuition, and therefore student borrowing, as well as to deliver high quality programs.

**Other Parties**

Gazelle University (referred to herein as "New GCU") is a private, non-profit corporation that has been incorporated in the State of Arizona and is an educational institution exempt from Federal taxation pursuant to Section 509(a)(1) of the Internal Revenue Code and eligible to receive tax-deductible contributions pursuant to Section 501(c)(3) of the Internal Revenue Code. Under Arizona law, the control and governance of New GCU's affairs and disposition of its funds are vested in its Board of Trustees. The transaction would not lead to any changes in the legal status or the governing documents of New GCU, except that, upon closing of the transaction, Gazelle University would change its legal name to "Grand Canyon University."

Grand Canyon University Foundation ("GCUF") is a private, non-profit corporation that has been incorporated in the State of Arizona since 2010 and is exempt from Federal taxation pursuant to Section 509(a)(1) of the Internal Revenue Code and eligible to receive tax-deductible contributions pursuant to Section 501(c)(3) of the Internal Revenue Code. GCUF is the sole member of New GCU and serves as its nonprofit parent. Historically, one of GCUF's main activities has been organizing the "Run to Fight Children's Cancer," a local fundraising event that involves significant volunteer staff time and thousands of participants and spectators. GCUF is now completing the financial audits for its fiscal years ended December 31, 2015 and December 31, 2016, which will be provided to the Department in the near future. The Board members of GCUF and New GCU are identical and all of the members are long-standing

**GRAND CANYON UNIVERSITY**

3300 West Camelback Road | Phoenix, Arizona 85017 | 602.639.7500 | Toll Free 800.800.9776 | www.gcu.edu

members of the Board of Trustees of Grand Canyon University.  Upon the closing of the transaction, with the exception of Brian Mueller, there will be no overlapping board members, officers or employees of New GCU and GCUF on the one hand and GCE on the other hand. New GCU and GCUF will have no affiliation with, and will be completely autonomous from, GCE upon the closing of the transaction.

GCE is incorporated in the State of Delaware and is a publicly-traded tax-paying business corporation. It is expected that, upon the closing of the transaction, it would continue as a publicly-traded corporation operating pursuant to its existing certificate of incorporation and bylaws.  Upon the closing of the transaction, with the exception of Brian Mueller, there will be no overlapping board members, officers or employees of GCE on the one hand and New GCU and GCUF on the other hand.  GCE will have no affiliation with, and will be completely autonomous from, New GCU and GCUF upon the closing of the transaction.

**The Transaction**

Subject to receipt of required approvals and satisfaction of other closing conditions, the parties anticipate the closing of the proposed transaction to occur on or about April 1, 2018. As discussed in the Asset Purchase Agreement, GCE would sell, and New GCU would employ all academic-related staff and purchase all assets necessary to operate GCU as an HLC-accredited institution of higher education, including:

- the real property that constitutes the Grand Canyon University campus and all appurtenances, improvements, certain personal property and certain intangible property related thereto (collectively, the "Property");
- certain intangible property identified in the Asset Purchase Agreement, which shall include certain:
  - contracts, including faculty contracts and student relationships (the "Assumed Contracts");
  - intellectual property rights, including the name "Grand Canyon University" (the "Intellectual Property Assets");
  - syllabi and resource material and content for the graduate degree, undergraduate degree and other programs of study (the "Course Materials");
  - intellectual property rights in the Course Materials; and
  - other assets and rights of Seller

GCE is structured as a single corporate entity and currently operates GCU within that entity. Following the closing of the anticipated transaction, New GCU would operate the university as the Level 1 owner.  GCUF, as the parent nonprofit corporation of New GCU, would be the Level 2 owner and the entity level at which New GCU would report its financial statements.

New GCU will finance the purchase of these assets through a Credit Agreement with GCE that provides for (a) a maturity date of seven years following the closing, (b) a market interest rate, (c) payments of interest-only, and (d) other market standard terms.  Under the proposed Credit

## GRAND CANYON UNIVERSITY

3300 West Camelback Road | Phoenix, Arizona 85017 | 602.639.7500 | Toll Free 800.800.9776 | www.gcu.edu

Agreement, New GCU has the ability to request that GCE fund budgeted capital expenditures for the first three years following closing, which amounts, if funded, would be added to the principal balance due.

At closing, New GCU would enter into the Master Services Agreement with GCE. This service company relationship is a model that has been used at institutions throughout the country, including in a recent transaction approved by the Department involving a newly created online university within a high profile state university system which adopted a similar service agreement in conjunction with a purchase of assets from a for-profit education company.

Consistent with HLC accreditation principles and industry practices, GCE would provide certain technological, marketing, promotional, development, financial aid and/or support services to New GCU. These services fit within the bundled service provider discussion in the Dear Colleague Letter GEN-11-05 (March 17, 2011) ("March 2011 DCL"). Any persons involved with recruitment or financial aid providing services to New GCU will not be paid incentive compensation in compliance with 34 C.F.R. § 668.14(b)(22) consistent with the March 2011 DCL. As contemplated by the DCL, GCE will be independently owned and operated from New GCU, both as a corporate matter and as a decision-maker with regard to the institution, which the Department states it views as a significant safeguard from abuses it has observed. Importantly, New GCU would retain all decision-making authority related to the admission and enrollment of students, and control of faculty and academic matters, as well as over campus life, finance and operations departments, strategic educational alliances, public safety, athletics, and advancement and fundraising. In addition to separate governance, New GCU will also have numerous tools incorporated into the Master Services Agreement with which it will be able to exercise oversight over GCE's provision of services (including rights to audit service quality levels).

The majority of the current corporate management team at GCE would remain in their current positions at GCE, while the academic leadership and administration of GCU, including the Provost, college deans and faculty, would transfer to, and become employed by, New GCU. Based on their current positions and roles, the remaining employees of GCE would be allocated between New GCU and GCE depending upon their current job function. Aside from Mr. Mueller, there would be no overlap between the management and employees of New GCU and the management and employees of GCE. However, in an effort to promote stability in the leadership of the organizations, Mr. Mueller, who has served as the Chief Executive Officer of GCE since 2008 and as the President of GCU since 2012, would, upon the closing of the transaction, remain as Chief Executive Officer of GCE and would become the President of New GCU as is desired by the respective Boards. Upon the closing, Mr. Mueller will be compensated by GCE and New GCU in manner reflecting his respective role at each entity.

At the closing, the members of GCU's existing institutional Board of Trustees would become the members of the Board of Trustees of New GCU. Mr. Mueller would also remain as one of five members of the board of directors of GCE. Aside from Mr. Mueller, there would be no overlap between the Board of Trustees of New GCU and the board of directors of GCE. The five

FIND YOUR PURPOSE

# GRAND CANYON UNIVERSITY™

3300 West Camelback Road | Phoenix, Arizona 85017 | 602.639.7500 | Toll Free 800.800.9776 | www.gcu.edu

members of the New GCU Board of Trustees would be Will Gonzalez, Dr. Fred Miller, Dr. Jim Rice, Don Andorfer, and Brian Mueller.

**Requested guidance**

GCU has been candid and transparent in providing the information about the transaction and GCE has publicly disclosed the details of the proposed transaction in its Securities and Exchange Commission filings[1]. We hope this information is helpful and can assist the Department in responding to a critical question related to this transaction.

As described, GCE will be organized and operated independently from New GCU (and its ownership structure) from an ownership and corporate perspective. In this regard, it is important to note that both New GCU and its parent, GCUF, are nonprofit corporations that have no equity owners. GCE will be a bundled service provider to New GCU and be providing such services, including those related to recruitment or financial aid, in exchange for a share of tuition revenue at market rates. This arrangement is consistent with HLC's new guidelines on shared services agreements, including HLC's standards for representatives of the shared service provider having a role in management or on a governing board of a client institution.[2] Importantly, GCE will not pay persons involved in such services with improper incentive compensation. Also, New GCU will, at all times, control admissions to the University and all academic matters related to the University. While New GCU is confident that this arrangement is consistent with the intent of the March 2011 DCL and prohibitions on the payment of improper incentive compensation, we respectfully request written confirmation from the Department in its pre-acquisition response letter that our conclusion is in fact correct. Specifically, New GCU would appreciate a statement from the Department confirming that the transactions and proposed relationships described in this letter and as set forth in the documents provided to the Department would not create or give rise to any prohibited "affiliation" between GCE and New GCU that could render payments under the Master Services Agreement improper under the Higher Education Act as interpreted by the Department in the March 11, 2011 DCL. As this matter of critical importance going forward, we request the opportunity to discuss the issue with the Department so there are no misunderstandings and so that any guidance provided will be definitive.

**Other Matters in the E-App**

In addition to the proposed transaction, we have also requested that the Department add some additional programs to GCU's ECAR at the certificate credential level. In response to the strong demand for computer programmers in Arizona, GCU has decided to offer three intensive, 16-credit, undergraduate certificate programs: Undergraduate Certificate of Completion in Java Programming, Undergraduate Certificate of Completion in PHP, and Undergraduate Certificate of Completion in Cybersecurity Foundations. Currently, GCU offers Bachelor's Degree

---

[1] See https://www.sec.gov/Archives/edgar/data/1434588/000119312518003723/d520011d8k.htm.
[2] Attached please find a copy of the new HLC standards governing this type of shared services arrangement and a chart setting forth how the proposed structure complies with those standards.

FIND YOUR PURPOSE
**JA54**

# GRAND CANYON UNIVERSITY™

3300 West Camelback Road | Phoenix, Arizona 85017 | 602.639.7500 | Toll Free 800.800.9776 | www.gcu.edu

programs in these subject areas and the certificate programs are built from those Bachelor's program courses.  GCU will offer these programs at an affordable tuition rate of $8,000 – roughly 30 % below the national average for bootcamp-style programs.[3] Given the typically high salaries for computer programmers, GCU believes these programs will be an attractive way of addressing a true labor need in Arizona and the country.  In addition, all of the credits earned in these courses will be fully transferable to GCU's bachelor's program.

We are currently in the process of obtaining state approvals for these programs and expect such approval within thirty (30) days.  Once received, we will provide this approval to the Department.  Please note that our accrediting agency, HLC, does not require a separate approval for these certificate programs since they are derived from our currently accredited higher level programs.  As such, we would appreciate the Department's willingness to include these programs as a part of this application, and provide its approval when the official state approval is received.

On behalf of the students, faculty and staff of GCU, we appreciate your consideration of our application and request your approval of the transaction contemplated hereby.

Sincerely,


Brian E. Mueller
President
Grand Canyon University

Attachments

---

[3] According to the 2017 Coding Bootcamp Market Size Report published by Coursereport.com, the tuition of comparable programs averages $11,400.

FIND YOUR PURPOSE



GRAND CANYON UNIVERSITY™

3300 West Camelback Road  |  Phoenix, Arizona 85017  |  602.639.7500  |  Toll Free 800.800.9776  |  **www.gcu.edu**

January 8, 2020

Michael J. Frola
Director, Multi-Regional and Foreign Schools Participation Division
U.S. Department of Education
400 Maryland Ave. S.W.
Washington, D.C. 20202

Dear Mr. Frola:

On behalf of the hundreds of thousands of GCU students, faculty, staff and alumni across the country, we want to thank you for meeting with us on December 16, 2019.  While we continue to disagree with the Department's position regarding the University's nonprofit status for Title IV, HEA purposes, and are reserving our rights to challenge the Department's decision, we are setting forth several proposals below in response to the Department's November 6, 2019 letter. Our objective remains to meet the Department's standards for recognition as a nonprofit institution for Title IV, HEA purposes and our hope is that we can work cooperatively with the Department to achieve this objective.

From the beginning when we first met with the Department in September 2014, we have attempted to be as transparent as possible about our intentions in returning the University to its historical, nonprofit status.  The University has been structured as a nonprofit institution for 56 of its 70-year history and we have consistently reinforced to the Department that the purpose of the nonprofit transaction was to preserve the long-term legacy of the institution and afford GCU's students and faculty all of the benefits of, and full recognition as, a member of the academy.

During our brief time together, we were able to share that since completing the University's conversion back to its historical nonprofit status, GCU has continued to freeze its tuition for the 12th straight year, generated $123.8 million in cash from operating activities, invested $195.4 million into the University's educational infrastructure, and repaid $100 million on its outstanding line of credit.  GCU closed its first fiscal year of operations with $325 million in cash and generated a composite score of 1.6.  In addition, we shared that the University believes that it will be capable of self-funding all of its future capital expenditures which are expected to total $500 million over the next 5 years to meet the projected student growth.  GCU is receiving overwhelming support from its many constituents and has very few critics.  The few critics it has, though, predicted that GCU would struggle financially as a result of the transaction, but the financial results we came to share obviously prove that those predictions were wrong.  GCU also has continued its strong record of regulatory compliance by far exceeding the Department's regulatory requirements, including:

FIND YOUR PURPOSE

- achieving a 5.6% cohort default for the Department's most recent calculation for 2016 (well below the national average of 10.1%);
- continuing its declining reliance on Title IV financial aid with a 90/10 calculation of 70.05% in 2018; and
- having no failing programs under the gainful employment rules.

Furthermore, GCU continues to receive stellar reviews from independent, third party experts in higher education with 13 different accrediting and regulatory bodies having visited and fully evaluated GCU's operations over the last 5 years with no findings and either full approval or a recommendation of full approval.

As we discussed, the major challenges in higher education today are that university education is too expensive, students are taking on too much debt, bachelor's degrees are taking too long to complete, and programs are not targeted enough toward current careers. During our one-hour meeting, we were able to share how GCU has addressed all of these issues with the following results:

- GCU students graduate with less debt on average ($18,750 according to the latest College Scorecard data) than at public and private nonprofit universities ($28,650 according to 2017 data from the Institute for College Access & Success);
- 40% of GCU's traditional campus graduates are completing in 3 years;
- 75.3% of campus students are studying in high-demand STEM + Business programs;
- approximately 50% of online students are studying at the Masters or Doctoral level; and
- GCU has frozen its traditional campus tuition for 12 years with less than 1% annual increases for online programs.

We were hopeful at our meeting that the presentation of the University's many positive accomplishments over the last 18 months might cause the Department to pause in recommending changes to a structure that is clearly working for thousands of students and their families while far exceeding the Department's regulatory standards. We believe that the prior approval of GCU's structure by HLC and AZPPSE, combined with these positive results, prove that the transaction was well structured and that the University is well positioned to continue operating in a manner that serves its educational purpose. It was therefore disappointing to hear at the end of our meeting that the Department considered these results to be irrelevant and that, instead, the University should focus its attention on the issues outlined in the Department's November 6 letter.

In accordance with your directive, we met and discussed potential changes to the structure of our service agreement with Grand Canyon Education (GCE). At a special meeting of the Board of Trustees held December 23, 2019, we approved a proposal that was presented to GCE for consideration. The GCE Board of Directors met on December 26, 2019 to consider our proposal and, while accepting most of the terms of our proposal, countered with some clarifications and a counter-proposal. The Board of Trustees met on January 7, 2020 to consider GCE's response and adopt a revised counterproposal that was ultimately accepted by the GCE Board of Directors. As a result of these negotiations, we are pleased to present the revised terms set forth in the negotiated term sheet and Amended and Restated Master Services Agreement, both of

FIND YOUR PURPOSE

which are attached hereto on Exhibit A.  The effectiveness of these changes have been approved by both Boards and are contingent upon an updated transfer pricing study that ensures these terms are at or below fair market standards and the acknowledgement that these changes will satisfy the Department's requirements for recognizing GCU as a nonprofit institution for Title IV, HEA purposes.  We will provide the Department with a copy of the transfer pricing study as soon as it is available.  We believe these changes satisfactorily address the issues outlined in the Department's November 6 letter.

We ask that the Department confirm that these changes will meet the Department's requirements and allow the University to be properly recognized as a nonprofit institution for Title IV, HEA purposes.  We also ask that the Department confirm that GCE is, and at all times has been, an "unaffiliated third party" for purposes of the Department's regulations.  Upon receipt of the Department's confirmation of these two positions, and the completion of the updated transfer pricing study, the parties will execute an amended service agreement based on these terms and provide a copy to the Department.

Given the urgency of this matter to the University, we respectfully request that the Department respond by January 24, 2020.

Sincerely,
On behalf of the Board of Trustees of Grand Canyon University

Will Gonzalez
Chairman, Board of Trustees

FIND YOUR PURPOSE



January 17, 2020

Mr. Will Gonzalez
Chairman, Board of Trustees
Grand Canyon University
300 West Camelback Road
Phoenix, Arizona 28017

Dear Mr. Gonzalez:

I am writing to provide an update in response to the letter you sent me on January 8, 2020 regarding the revised terms in the negotiated term sheet and Amended and Restated Master Services Agreement.  In the letter, you requested that the Department confirm that these changes will meet the Department's requirements for Grand Canyon University (the University) to be recognized as a nonprofit institution for Title IV, HEA purposes.  Additionally, you asked the Department to confirm whether Grand Canyon Education Inc. (GCE) is, and at all times has been, an "unaffiliated third party" for purposes of the Department's regulations.

First, I would like to thank you for the presentation GCU provided to the Department on December 16, 2019.  The Department recognizes the barriers that GCU has overcome and the positive accomplishments achieved over the past few years.  Although the Department is supportive of GCU's success, these accomplishments are not determinant factors in the evaluation of whether GCU is recognized as a nonprofit institution for Title IV, HEA purposes.

The Department is not able to re-determine its decision regarding GCU's for-profit status for Title IV, HEA purposes based solely on the information in the revised term sheet and the Amended and Restated Master Service Agreement. In your letter, you indicate that an updated transfer pricing study (Updated Study) is forthcoming. The Department must still determine that the revised terms in the agreements do not provide an excessive benefit to GCE. Please note that while the vendor providing the Updated Study may be jointly retained by both GCU and GCE, the Department requires that the Updated Study and the Amended and Restated Agreement be reviewed by an independent expert and that the expert render an opinion regarding the fairness of the Amended Agreement to GCU.  The expert providing that opinion must be retained solely by GCU. The Department will undertake a review of the revised term sheet, the Amended and Restated Master Services Agreement, and the other modifications set forth in the Board memorandum once it receives and analyzes the Updated Study and the independent expert's opinion.

Counsel retained by GCE previously inquired whether GCE is considered an "unaffiliated third party" for purposes of the March 17, 2011 Dear Colleague Letter (GEN-11-05) that addressed the implementation of the program integrity regulations and the incentive compensation ban.  That question is currently under review, and needs to be reviewed in the context of the Amended



Federal Student Aid, Multi-Regional and Foreign School Participation Division
830 First Street NE, Union Center Plaza, 7th Floor, Washington, DC 20202-5340
www.FederalStudentAid.ed.gov

Grand Canyon University Response to 01-08-2020 Letter
Page 2 of 2

Agreement. The Department will provide the parties with a response on that issue once the review is completed.

The Department remains committed to its continued engagement with GCU regarding the institution's nonprofit status for the purpose of the Title IV programs.

Sincerely,

Michael Frola
Division Director
Multi-Regional and Foreign Schools Participation Division

CC:     Will Gonzalez, Chairman, Board of Trustees Grand Canyon University
        (*email:* ▮▮▮▮▮▮▮▮▮▮▮)
        Brian Roberts, Chief Administrative Officer & General Counsel, Grand Canyon University
        (*email:* ▮▮▮▮▮▮▮▮▮▮)

**Dennis M. Cariello**

| | |
|---|---|
| **From:** | Dennis M. Cariello |
| **Sent:** | Monday, May 21, 2018 4:00 PM |
| **To:** | Mangold, Donna |
| **Cc:** | Frola, Michael; Arthur, Julie; Jonathon C. Glass (jglass@cooley.com) |
| **Subject:** | RE: Grand Canyon |

Sorry for the bad message.  You have it right - I just called to let you know that our obligation to HLC is to inform them by May 31 when we are closing (we need to give them 30 days' notice).  We do not need to give HLC your letter by May 31.  We would like to have your letter by then if possible (which will give us time to work through issues, etc.), but we don't have to give that to HLC by May 31.

We will be informing HLC that we will close as of 12:01 am on July 1.  We are also supposed to inform HLC of any changes to the transaction.  So, if there are changes you foresee we need to make, it would be very helpful if you could let us know.

Thanks,

Dennis

**From:** Mangold, Donna [mailto:Donna.Mangold@ed.gov]
**Sent:** Monday, May 21, 2018 3:34 PM
**To:** Dennis M. Cariello
**Cc:** Frola, Michael; Arthur, Julie
**Subject:** Grand Canyon

Hi Dennis,

Got your message, but part of it at the beginning seemed to be cut out – So confirming that your message was that the 5/31 deadline is for GCU to let HLC know when you plan to close, and that you intend to tell HLC that the date is 7/1.  That you don't need our letter to go to HLC by 5/31.

Donna

_____

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com
_____

_____

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com
_____

**Dennis M. Cariello**

| | |
|---|---|
| **From:** | Dennis M. Cariello |
| **Sent:** | Tuesday, June 19, 2018 7:37 PM |
| **To:** | Mangold, Donna |
| **Subject:** | RE: GCU |

Donna,

I'm trying to get you answers here (as I understand it, Deloitte expects to finishing fairly close to the closing) - but would you just rather talk with Deloitte? I know this stuff is complex and it may be easier to just have Deloitte walk through it with the relevant Department folks.

Also, what role does this information play in the Department's analysis? Are there thresholds we should be aware of - or is the Department looking at this in a broader context?

Thanks again,

Dennis


-----Original Message-----
From: Mangold, Donna [mailto:Donna.Mangold@ed.gov]
Sent: Tuesday, June 19, 2018 2:09 PM
To: Dennis M. Cariello
Subject: RE: GCU

Dennis,

I don't think there is anything we need walking through on right now -- but it might help if we had a few extra documents/info:

1. Has Deloitte finalized its report?
2. The trial balances referenced in footnote 36 of Deloitte's report.
3. In the Deloitte report, what trial balance costs were deemed to be paid by which entity (Gazelle or GCE)?

Thanks,
Donna


-----Original Message-----
From: Dennis M. Cariello [mailto:dennis.cariello@hmbr.com]
Sent: Tuesday, June 19, 2018 1:40 PM
To: Mangold, Donna
Subject: Re: GCU

First - thank you for this. I won't forward given the other note.

Is there anything I can do to help walk folks through it? I think we believe this is pretty close to Purdue Kaplan (president Daniels has said they lifted our documents, for example).

Is there a particular issue that is a sticking point?

Thanks,

Dennis

Sent from my iPhone

> On Jun 19, 2018, at 11:41 AM, Mangold, Donna <Donna.Mangold@ed.gov> wrote:
>
> Dennis,
>
> GCU is still under review by FSA staff and DPE. After that review, the proposed transaction has to go to FSA leadership for review. This is a complex transaction that is taking significant effort to review and analyze - as it is unlike any prior nonprofit conversion. As you know -- even limited to the matters in which you and your firm are involved -- the FSA staff and DPE have competing demands on their time not only on a daily basis, but on an hourly basis. And that is in a routine week, let alone in a week that brings unexpected events in a transaction that was reviewed previously. We can't give you an ETA at this point.
>
> Donna
> (responded to you only -- because of my "unexpected events" comment).
>
> -----Original Message-----
> From: Dennis M. Cariello [mailto:dennis.cariello@hmbr.com]
> Sent: Tuesday, June 19, 2018 8:20 AM
> To: Mangold, Donna
> Cc: Jonathon C. Glass
> Subject: GCU
>
> Donna,
>
> I hope all is well. Jonathan and I have board meetings this week with our respective clients and we just wanted to get a status update (and an ETA) for the preacq response letter. We just need to let the boards know the most up-to-date information.
>
> And I really appreciate your work on all of this. I know you are swamped.
>
> Thanks
>
> Dennis
> 646-415-4471
>
> Sent from my iPhone
>
> _____ > This email has

**JA63**

been scanned by the Symantec Email Security.cloud service.
> For more information please visit http://www.symanteccloud.com > _____
_____
>
> _____ > This email has
been scanned by the Symantec Email Security.cloud service.
> For more information please visit http://www.symanteccloud.com > _____
_____

_____
This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com _____
_____

_____
This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com _____
_____

_____
This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com _____
_____

**Dennis M. Cariello**

| | |
|---|---|
| **From:** | Dennis M. Cariello |
| **Sent:** | Wednesday, June 27, 2018 12:13 PM |
| **To:** | Mangold, Donna; Frola, Michael |
| **Cc:** | Jonathon C. Glass (jglass@cooley.com) |
| **Subject:** | RE: GCU |

Thanks for this.  Jonathan and I just left you a voicemail.  Can we speak later today?  I understand the difficulty with the letter, but even hearing orally the direction the Department is headed would be somewhat helpful.

Let me know what works.

And as always, thanks.

Dennis

Dennis M. Cariello
Shareholder



| | |
|---|---|
| **E-MAIL** | DENNIS.CARIELLO@HMBR.COM |
| **MAIN** | 212.422.4900 |
| **DIRECT** | 212.422.4909 |
| **MOBILE** | 646.415.4471 |
| **FAX** | 312.946.9818 |

40 BROAD STREET • 7TH FLOOR • NEW YORK, NY 10004
WWW.HMBR.COM

**Visit our Higher Education Blog:** www.higheredlawblog.com
NOTICE OF CONFIDENTIALITY: This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of any kind is strictly prohibited. If you are not the intended recipient, contact the sender via reply e-mail and destroy all copies of the original message.

---

**From:** Mangold, Donna [mailto:Donna.Mangold@ed.gov]
**Sent:** Wednesday, June 27, 2018 11:58 AM
**To:** Dennis M. Cariello; Frola, Michael
**Cc:** Jonathon C. Glass (jglass@cooley.com)
**Subject:** RE: GCU

Thanks for the study.  I don't have an estimate for the pre-acq response, but will try to check in with you again tomorrow or Friday.

---

**From:** Dennis M. Cariello [mailto:dennis.cariello@hmbr.com]
**Sent:** Tuesday, June 26, 2018 12:06 PM
**To:** Mangold, Donna; Frola, Michael
**Cc:** Jonathon C. Glass (jglass@cooley.com)
**Subject:** GCU

Donna,

As requested, attached is the transfer pricing study from Deloitte.  Please let me know if you have any questions or would like to discuss this further.

While I have you – any word on an ETS on the pre-acquisition review?

Thanks,

Dennis

Dennis M. Cariello
Shareholder



HOGAN MARREN
BABBO & ROSE, LTD

**E-MAIL**    [DENNIS.CARIELLO@HMBR.COM](mailto:DENNIS.CARIELLO@HMBR.COM)
**MAIN**    212.422.4900
**DIRECT**    212.422.4909
**MOBILE**    646.415.4471
**FAX**    312.946.9818

40 BROAD STREET • 7TH FLOOR • NEW YORK, NY 10004
[WWW.HMBR.COM](http://WWW.HMBR.COM)

**Visit our Higher Education Blog:** [www.higheredlawblog.com](http://www.higheredlawblog.com)

NOTICE OF CONFIDENTIALITY: This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of any kind is strictly prohibited. If you are not the intended recipient, contact the sender via reply e-mail and destroy all copies of the original message.

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

**Frola, Michael**

| | |
|---|---|
| **From:** | Frola, Michael |
| **Sent:** | Friday, January 17, 2020 11:35 AM |
| **To:** | 'Brian Roberts'; Mangold, Donna; Jones, Diane; Valentine, Ingrid; Finley, Steve |
| **Cc:** | wgonzalez2; Frola, Michael |
| **Subject:** | RE: GCU Meeting Follow Up |
| **Attachments:** | Grand Canyon Univ. Dept. Response 1.17.2020.pdf |

Dear Mr. Roberts,

Please see attached Department response letter to Grand Canyon University's letter to me dated January 8, 2020.

Sincerely,
Michael Frola
Director
Multi-Regional and Foreign School Participation Division
Office: (202) 377-3364
michael.frola@ed.gov
StudentAid.gov



---

**From:** Brian Roberts [mailto██████████████]
**Sent:** Wednesday, January 08, 2020 7:39 PM
**To:** Frola, Michael; Mangold, Donna; Jones, Diane; Valentine, Ingrid; Finley, Steve
**Cc:** wgonzalez2
**Subject:** GCU Meeting Follow Up

Good evening everyone – thank you again for meeting with us in December.  Please see the attached letter and attachments from our Chairman, Will Gonzalez.  I missed the Fed Ex deadline today, but I will send hard copies tomorrow.  I am available to discuss at any time.  Thank you, -Brian

**Brian M. Roberts**
**Chief Administrative Officer & General Counsel**

**Grand Canyon University**
3300 W. Camelback Road
Phoenix, AZ  85017
T ████████████
M ████████████
████████████████

This message is private and confidential. If you have received it in error, please notify the sender and remove it from your system.



Steven M. Gombos

703-934-9831 Direct
sgombos@glpclaw.com

# GOMBOS | LEYTON PC

### ATTORNEYS

11350 Random Hills Road | Suite 400 | Fairfax, Virginia 22030
703.934.2660 Main | 703.934.9840 Fax | www.glpclaw.com

August 14, 2020

**By email only**

Michael J. Frola, Director
Multi-Regional and Foreign School
Participation Division
U.S. Department of Education
Union Center Plaza, 73C3
830 First Street, NE
Washington, DC 20202

Re:        **Grand Canyon University's Nonprofit Status**

Mr. Frola:

Grand Canyon University ("GCU") has hired our firm regarding its request to be recognized as a nonprofit institution.

As you know, GCU proposed several amendments earlier this year to its transaction with Grand Canyon Education ("GCE"), all in response to concerns your office raised for the first time some 16 months after the deal closed. The University also provided the Department, nearly three months ago, with independent studies your office requested, which show the transaction's enormous benefit to GCU and its students.

My client's general counsel, Brian Roberts, wrote to you on July 1, 2020, asking for an update on the status of the Department's review, but, to date, the Department has not responded. Because GCU addressed all of your concerns and also because the Department has no basis to deny GCU's status as a nonprofit, we request that the Department issue a final agency decision confirming GCU's nonprofit status.

The Department's ongoing delay in recognizing GCU's nonprofit status is inexplicable as a legal matter. GCU is a nonprofit institution operating under all of the restrictions that status imposes, notwithstanding this agency's contrary decision. Moreover, that decision is indefensible. Under even the broadest conception of the Department's purported authority to determine nonprofit status under 34 CFR 600.2, the Department's analysis is arbitrary and capricious.

Michael J. Frola, Branch Chief
August 14, 2020
Page 2

The crux of the Department's decision is an analysis of the reasons why GCE considered the deal to be beneficial—not GCU. It has been previously pointed out that GCU did not rely on the Barclays Report cited so frequently in the Department's decision. GCU's motivation and basis for executing the transaction lay elsewhere. A commitment to its students and its Christian mission lay at the heart of its decision to seek nonprofit status.

Moreover, the Department questioned the terms of the Master Service Agreement between GCE and GCU. But the Department has approved transactions involving similar revenue-sharing arrangements and comparable terms, including the recent Kaplan-Purdue transaction, which is very close to the structure GCU followed. Added to that is the fact the Department has no regulations prohibiting such arrangements, which are common among many institutions of higher education. In any event, both GCE and GCU agreed to significant proposed amendments to the MSA in response to the Department's concerns. So whatever can be said of the merits of the Department's decision denying GCU nonprofit status, in an effort to avoid litigation, GCU has proposed modifications to resolve those concerns.

Finally, broader than any specific factual conclusion in the initial decision, the Department's starting premise, that 600.2's definition of nonprofit institution authorizes it to independently assess nonprofit status, fails. *See* Letter from U.S. Dept. of Educ. to Brian Mueller at 14 (Nov. 6, 2019).

1.  **It is incompatible with the Department's regulatory framework**. 600.2 simply defines what nonprofit means when used in 34 CFR Part 600. It is not a substantive regulation. Indeed, it is a guide to understanding the substantive regulations in Part 600 that use the term nonprofit—like 600.20(b)(2)(iii) or 600.31(d)(7).

    The definition cannot authorize what you claim it does without rewriting those provisions. 600.31(d)(7) tells us that the change from proprietary to nonprofit status—read nonprofit here as 600.2 defines it—is a change in control that causes an institution to lose eligibility when the change occurs. The institution must then reestablish its eligibility by showing the Secretary it remains eligible **after** the change in control—in this case, **after** it changes from proprietary to nonprofit status. See 600.31(a)(3); 34 CFR 600.20(b)(2) (an institution must reapply to the Secretary to establish its eligibility "**after** the institution changes its status as a proprietary, nonprofit, or public institution") (emphasis added).

    By way of example: GCU lost eligibility on July 1, 2018, the day the transaction closed. That change from proprietary to nonprofit status occurred by operation of law and without the Department's approval. It also meant GCU had to reapply to participate in Title IV programs **after** it changed from proprietary to nonprofit status.



Michael J. Frola, Branch Chief
August 14, 2020
Page 3

If 600.2 embodies what your team says it does—i.e., that the Department must approve an institution's change from proprietary to nonprofit status—then both 600.31(d)(7) and 600.20(b)(2) fall apart. A key sign the position the Department has taken is wrong. The Department's position creates an internal inconsistency: If it is the Department that decides, during the reapplication phase, whether the institution has changed from proprietary to nonprofit status, how can an institution's change from proprietary to nonprofit status be the triggering event that causes it to lose eligibility and requires it to reapply in the first instance? The answer is obvious: It cannot be.

And the contrary notion that the Department seems to have in mind—that state authorization and IRS approval trigger the change from proprietary to nonprofit status for 600.31(d)(7), but the Department decides nonprofit status for Title IV purposes under 600.2—does not work. There's only the one definition of nonprofit after all—600.2. So every reference in Part 600 to an institution's nonprofit status must be given the same meaning. And that cannot happen under the Department's approach which equivocates on the meaning of nonprofit.

Simply put, a court will not accept the Department's interpretation of 600.2, because it is contrary to the broader regulatory framework.

2. **It contradicts the Department's past statements on nonprofit conversion**. The very reason the Secretary designated the change from proprietary to nonprofit status as a change in control was in recognition of the fact that an institution could change to nonprofit status with "little formality," without Department approval, without reconstituting itself as a new corporation, and while "keep[ing] the very same faculty, management, programs and facilities." 59 Fed. Reg. 22324, 22333. As one commenter noted, and the Secretary agreed, the change-in-control provision was necessary to give the Department some role in scrutinizing institutions that convert from proprietary to nonprofit. *See Id.*

But that role is limited. As the Department explained to Congress, in 1995, because "institutions can easily switch from profit status to non-profit status," the Department would "subject schools that do change from profit to non-profit . . . to the same requirements of their previous designation for a certain period of time."[1] *Abuses in Federal Student Grant Programs Proprietary School Abuses: Hearing before the S. Perm. Subcomm. on Investigations*, S. Hrg. 104-

---

[1] The Department later put that thought into practice, as shown in the 2014-15 FSA Handbook, Vol. 2, ch. 4 at 2-60, which notes that an institution that converts to nonprofit status must comply with 90/10 for the first year of its nonprofit status. Or look to the Department's internal change-in-ownership guidance, Ex. A at 3-51 or 3-120, which, again, makes clear that the Department's oversight of nonprofit conversion is exclusively after-the-fact by way of limited provisional conditions.



Michael J. Frola, Branch Chief
August 14, 2020
Page 4

477 at 222 (written answers of David A. Longanecker, Assist. Sec. for Postsecondary Educa-
tion). But implicit in that statement and inherent in the change-in-control provisions is the
recognition that an institution changes from for-profit to nonprofit status, even for Title IV
purposes, without the Department's approval.

The Department reiterated that point more recently. In 2010, the Department added a new
paragraph about foreign institutions to the nonprofit definition in 600.2. The new para-
graph, the Department explained, was meant to be "as comparable as possible to those ap-
plicable to domestic institutions." 75 Fed. Reg. 42192.

> [T]o make the proposed regulations as comparable as possible to those applica-
> ble to domestic institutions, the Department proposed, and the Committee
> agreed, that a determination that an institution is nonprofit by an entity in the
> institution's foreign country would qualify an institution as nonprofit only if
> the determination is made by a recognized tax authority of the country, and the
> Secretary has recognized that tax authority as one that can make a determina-
> tion using criteria that are similar to those used by the U.S. IRS.

*Id.*

In other words, if the Secretary determined that a foreign tax authority used similar criteria
to the IRS, then the Secretary "would **automatically accept**" that tax authority's judgment
"for purposes of making determinations of an institution's nonprofit status for Title IV,
HEA purposes." *Id.* (emphasis added).

All this makes the following clear: An institution's change from proprietary to nonprofit
status, even for purposes of the Title IV programs, takes place without the Department's
approval.

The Department's newly adopted contrary view counters its own regulations, contradicts
its own prior statements, and gives greater credence to foreign tax authorities than it does
the IRS.

3.  **It departs from the Department's longstanding practice**. Consistent with the change-in-
    control provisions and the Department's past statements, 501(c)(3) status has historically
    been conclusive of an institution's nonprofit status for purposes of Title IV programs.

    The Department's decision to depart from that longstanding practice creates several inde-
    pendent problems. Apart from the fact the Department's interpretation of 600.2 is untena-
    ble as explained above, the Department has yet to formally acknowledge its change in prac-
    tice. And it has not offered a reasonable explanation why the change was necessary. Both
    failures are strong indicators of arbitrary and capricious agency action.



**JA71**

Michael J. Frola, Branch Chief
August 14, 2020
Page 5

All of this started when the Department denied nonprofit status to Center for Excellence in Higher Education in 2016. Given your involvement in that case, this letter will exclude some detail that you are familiar with. The important point is that case highlights the Department's change in practice. Consistent with its regulations and past practice, the Department acknowledged, in 2012, that CEHE's planned acquisition of four existing for-profit colleges would mark "a change in structure for the institutions from proprietary to not-for-profit." That was because the IRS recognized CEHE as a 501(c)(3). And the Department informed CEHE during preacquisition review that it would have to report 90/10 numbers for the four colleges during the first fiscal year after the conversion. That comes directly from the FSA Handbook guidance available to colleges at the time.

Four years later, however, the Department denied CEHE's nonprofit status—to our knowledge, the first time the Department ever denied nonprofit status to any recognized 501(c)(3). In doing so, the Department ignored its prior contrary statements in the preacquisition review. It did not acknowledge that it had departed from its longstanding practice. And it offered no reasoned explanation why the change in policy was necessary.

Instead former Secretary John King and former Under Secretary Ted Mitchell made public comments threatening for-profit institutions that were thinking about taking the perfectly legal step of changing their business form: "Don't waste your time." Ex. B. So far as warnings go that is the 21st century equivalent of heads on pikes.

Needless to say, that is not in step with the Administrative Procedure Act. It was only after the fact and after our firm challenged the Department's denial, that the Department attempted to create a basis for its policy change. For the first time, after it denied CEHE's nonprofit status, the Department admitted that in the past it had approved nonprofit status for Title IV purposes based on state approval and IRS designation. The Department also conceded that it mitigated the risk that institutions might convert to nonprofit status to avoid oversight by imposing "a transition requirement for the institution to continue to meet the 90/10 revenue requirement for one additional year." Ex. C at 3. Finally, the Department asserted that the new gainful employment regulations created more incentive for for-profits to convert and explained that warranted a more detailed examination before approving nonprofit status.

That is where things sit now. As you know, CEHE's legal challenge ended in a settlement agreement that saw the Department approve the colleges as nonprofits. So the Department's after-the-fact explanation has yet to be tested in court. But our firm remains confident the Department's policy change violates the Administrative Procedure Act. Initially the gainful employment regulations were not in effect when CEHE acquired its colleges. So the purported explanation was a non sequitur. Nor were the gainful employment regulations in effect when the Department denied GCU nonprofit status. So there is reason to



**JA72**

Michael J. Frola, Branch Chief
August 14, 2020
Page 6

question the only explanation the Department has offered for the claimed policy change. On top of that the Department has never explained why its prior provisional certification approach was inadequate to check nonprofit conversions designed to evade for-profit regulations. Recall that is why the Department adopted the current change-in-control provisions. That failure alone makes the policy change arbitrary and capricious under the APA.

4.   **It has led to inconsistent treatment**. Because the Department has no substantive regulations on nonprofit conversion and also because the purported reason for the detailed examination no longer exists, the Department's approach to nonprofit conversion has been ad hoc and inconsistent. Even though GCU closely modeled its transaction on the Purdue-Kaplan model the Department approved, for example, the Department still denied GCU nonprofit status. And if GCU cannot determine what it must do to convert to nonprofit status, with the significant resources it has available to it, then no college can. Of course, if that is the Department's main goal, it is improper. The Department's actions reveal an agency whose aim is not to check that institution's convert to nonprofit status for the right reasons, but simply to afford the agency the freedom to arbitrarily choose which will be recognized as a nonprofit educational institution and which will not.

My client has sought to avoid litigation by attempting to work with the Department to resolve its nonprofit status. It is much more effective than litigation and GCU values its relationship with the Department. But you know our law firm has already gone down that path with the Department on this very issue, and we feel confident doing so again. We believe the likelihood a court will grant discovery, particularly in the absence of any controlling regulations or agency guidance and given approvals of similarly structured deals, are strong reasons why the Department should resolve this issue without litigation. Indeed, we believe those reasons played a primary role in why the Department of Justice approached CEHE about settling its lawsuit with the Department of Education.

A quick note on that last point about the administrative record. We know from other litigation and subsequent FOIAs that the administrative record filed in the CEHE lawsuit was incomplete. The administrative record did not disclose, for example, the fact the Department referred CEHE to the IRS for a determination of its continued 501(c)(3) status. It did not include correspondence summaries and other change-in-ownership memos we now know were circulated internally within the Department. Nor did it include any contemporaneous internal guidance, memoranda, or analysis supporting the Department's decision to change its longstanding practice of accepting IRS's nonprofit designation. Finally, it failed to include information about or analysis of other transactions, even though CEHE's complaint alleged inconsistent treatment of similarly situated parties. If we cannot resolve this dispute, the Department is on notice now that the administrative record should include those materials as they relate to this case.



**JA73**

Michael J. Frola, Branch Chief
August 14, 2020
Page 7

Finally, we are confused as to why the Department under this administration wants to continue the Obama Administration's political attack on for-profit colleges.

At the core it is animus against for-profit institutions that has motivated the Department's current treatment of nonprofit conversions. Absolutely no one at the Department read 600.2 to give it authority to decide nonprofit status before former Deputy Under Secretary Robert Shireman raised the issue in his September 2015 article The Covert For-Profit. Indeed, that same month Under Secretary Mitchell, Mr. Shireman's former boss, explained to several Congressmen that questions about nonprofit conversions were for the IRS to determine under that agency's standards. Ex. D. So what accounts for the quick policy change?

More than any other reason, the Department changed how it approached nonprofit conversion because the prior administration successfully stigmatized the for-profit college label and wanted to force colleges, including GCU, to bear it. The ability to convert to nonprofit status under clear standards defeated that objective. So the prior administration put nonprofit conversion in a black box so it could arbitrarily pick and choose at whim when it would recognize nonprofit status.

Sadly, it seems the Department is now repeating the same process with respect to revenue-sharing arrangements—again following the path laid out by Mr. Shireman. The list of colleges that share tuition with service providers is long. Perhaps the Department should consider adopting guidance about tuition sharing arrangements, including parameters on how colleges set the percentage share service providers receive. But the Department does not have regulations addressing that issue. And the Department does not provide any guidance that institutions can follow to order their affairs. Again, another black box that allows the Department to subjectively approve or disapprove arrangements based solely on whim. Indeed, GCU negotiated its revenue split with GCE after analyzing publicly available data about other revenue-sharing contracts, including the Kaplan-Purdue deal the Department approved, only for the Department to cite the revenue split as the basis to deny GCU nonprofit status.

We are open to meeting with the Department to discuss GCU's nonprofit status if the Department is open to working through this issue with the University. As you know, however, my client has already proposed several concessions that address the Department's concerns about its nonprofit status.

Accordingly, we request a response to the information provided by GCU to resolve the matter no later than August 28, 2020, informing us of the Department's decision about GCU's nonprofit status. GCU has consistently tried to work with the Department, even though the decision denying nonprofit status is wrong as a legal matter. My client voluntarily proposed amendments to the service agreement to answer your concerns, which it had no obligation to do. And my client incurred the expense of additional valuation reports to confirm the value of the transaction, again in an effort to work with the Department to resolve this issue. But my



**JA74**

Michael J. Frola, Branch Chief
August 14, 2020
Page 8

client cannot continue to wait when the Department has given no indication (not even updating Mr. Roberts about the status of its review) that it intends to meaningfully engage. The Department's decision denying GCU's nonprofit status violates the law, and it is causing ongoing harm to my client. If we do not have a response by August 28, 2020, the University believes that the Department will have left it with no other option than to file suit to challenge the Department's decision letter and, astoundingly, force the Department to at a minimum communicate with the University.

Respectfully,



Steven M. Gombos

c:     Secretary Betsy DeVos
       Reed Rubinstein
       Diane Auer Jones
       Donna Mangold



# EXHIBIT A



shows the new information to the PIPSG Eligibility Liaison. Include an explanation of the action to be taken.

After PEPS has been updated:

7. The new agency will be in PEPS. Select it and review the state agency side by side

8. If it is the same state agency, select the **It has been determined that the state agency entered by the institution is the same as this one in PEPS** radio button. Click **OK**.

9. If it is not the same, click **Cancel**

10. A pop up box will display asking if you are sure you want to replace the state agency. Check again to ensure the state agency is being replaced by the correct state agency.

11. If it is, click **OK** to confirm that you want to replace the state agency entered by the institution. If they are not the same agency, click **Cancel**.

12. Another screen will display indicating that the Agency has been replaced. Click **OK** to clear the screen.

> **NOTE** *Clicking **Cancel** at any of the three previous steps will cancel the replacement.*



(b)(7)(E)

> **NOTE** (b)(7)(E)

### 3.3.7.3 Section C – Institutional Control and Structure

**Question 18 – Identify the type of institutional structure – Public, Private nonprofit, or Proprietary.**

Verify with the SPD's financial analyst that the response to this question is consistent with the audited financial statements. Determine if the institution changed institutional structure. If it changed from profit (proprietary) to nonprofit or vice versa, the corresponding provisional condition will apply. Also the type of audit the institution must submit will change. When the application has been approved, the EA must alert eZ-audit of the change in institution type.

For Internal SESG Use Only
Version: November 2, 2012
Updated July 17, 2014

3-51

AR-J-0325

JA77



**Eligibility Procedures**

PROUD SPONSOR *of the* AMERICAN MIND™

- The EA must check **IRS Designation** check box on the **Team Recommendation** screen, if the institution is a private nonprofit institution and submitted documentation of its 501(c)(3) status.



*If the institution offers only graduate programs, it is not eligible for PELL, ACG, National SMART, or SEOG. If the institution offers only short-term programs, then it is only eligible for Direct Loan.*

In addition to the "Change in Ownership" provisional condition, which is used for **all** non-excluded change in ownership applications, the EA must select all provisional conditions that apply to the institution (refer to the *Eligibility Checklist*) from the pick-list that appears after the EA clicks on the **Provisional** button. The conditions are noted in the chart below. Please refer to Section 10.0 – *Provisional Conditions and Additional Considerations* for more detail on when to use these provisional conditions.

| PEPS Provisional Reason Code | | Provisional Condition Title |
|---|---|---|
| (b)(7)(E) | | *Requirement of Funding Arrangement Other Than Advance Funding, and Requirement of Surety For Not Less Than 10% of Title IV, HEA Funds* |
| | | *FFEL/Direct Loan Cohort Default Rate Condition* |
| | | *Unresolved Audit or Audit Liabilities Condition* |
| | | *Program Review Condition* |
| | | *Change in Ownership* |
| | | *Restrictions, Conditions or Limitations Imposed by Accrediting Agency* |
| | | *Fundamentals of Title IV Administration Training Requirement* |
| | | *Federal Perkins Loan Default Rate Condition* |
| | | *Unpaid Accounts Receivable Condition* |
| | | *Late Submission of Compliance Audits* |
| | | *Restrictions Resulting from Conversion to Nonprofit Status* |
| | | *IPEDS Surveys* |
| | | *Unpaid Accounts Receivable of Institution Owner* |
| | | *Deficiencies in Administrative Capability* |
| | | *Restrictions, Conditions or Limitations Imposed by State Approving Agency* |

*Provisional Conditions Used for Change in Ownership*

# EXHIBIT B

**From:** U.S. Department of Education <OPA@ed.gov>
**Sent:** Thursday, August 11, 2016 10:32 AM
**To:** U.S. Department of Education
**Subject:** EMBARGOED: Department Denies Request for Chain of For-Profit Colleges to Convert to Non-Profit Status

## EMBARGOED UNTIL 11 A.M. ET ON THURSDAY, AUG. 11, 2016.

**U.S. Department of Education**
**Office of Communications & Outreach, Press Office**
**400 Maryland Ave., S.W.**
**Washington, D.C. 20202**

**FOR IMMEDIATE RELEASE:**
Aug. 11, 2016

**CONTACT:**
Press Office, (202) 401-1576 or press@ed.gov

### Department Denies Request for Chain of For-Profit Colleges to Convert to Non-Profit Status
*Center for Excellence in Higher Education campuses must continue to be accountable to taxpayers, students through federal regulations*

The U.S. Department of Education today denied a request from the Center for Excellence in Higher Education (CEHE), a Utah-based chain of for-profit career colleges, to convert to non-profit status for purposes of federal financial student aid. The denial means that the colleges' programs must continue to meet requirements under the federal Gainful Employment regulations[ed.gov].

"This should send a clear message to anyone who thinks converting to non-profit status is a way to avoid oversight while hanging onto the financial benefits: Don't waste your time," said U.S. Education Secretary John B. King Jr.

This denial does not directly affect the approximately 12,000 students who attend the four institutions owned by CEHE - Stevens-Henager[stevenshenager.edu] in Utah and Idaho, CollegeAmerica Denver[collegeamerica.edu], CollegeAmerica Arizona[collegeamerica.edu], California College San Diego[cc-sd.edu] and CollegeAmerica Services[collegeamerica.edu] - but it does mean that the Department will continue to limit the colleges to getting no more than 90 percent their revenue from Title IV federal student aid. It also means that the institutions must meet all federal regulations for for-profit colleges.

CEHE first applied for non-profit status with the Department in the fall of 2012. In reviewing that request, the Department determined that CEHE, which had been a small educational non-profit that did not provide educational services, acquired four for-profit college companies

Exhibit 13 - 001

**JA80**

owned by the Carl Barney Living Trust. CEHE promised to pay the Trust more than $400 million dollars, and the colleges were merged into CEHE. When that happened, Mr. Barney became the board chairman of CEHE, and because of the way the transaction was structured, retained significant control of the colleges, despite the change in ownership to CEHE.

While CEHE is recognized by the Internal Revenue Service as a non-profit company, the colleges' tuition revenue continues to flow to Mr. Barney through the Trust to pay off the debt that CEHE owes from acquiring the colleges, and through the rent that some of Mr. Barney's other companies receive as landlords for several of the college campuses. Under 34 C.F.R. § 600.2 of the Higher Education Act[www2.ed.gov] regulations, non-profit institutions must be owned and operated by a non-profit where no part of the net earnings benefit any private shareholder or individual.

"Schools that want to convert to non-profit status need to benefit the public," said U.S. Under Secretary of Education Ted Mitchell. "If the primary beneficiary of the conversion is the owner of the for-profit school, that doesn't meet the bar. It's not even close."

Since 2012, the four institutions have continued participating in the Title IV financial aid programs on month-to-month agreements as for-profit institutions. In a letter to the company's CEO, Eric Juhlin, the Department approved the change in ownership that CEHE requested but continues to recognize Mr. Barney as maintaining significant control of the institutions and the Title IV revenue they produce.

During the review of the change in ownership request, the Department requested additional documentation from CEHE. The company provided information to the Department but marked much of it as confidential, and that information has been removed from copies of the letter made available for public review. Documents subject to CEHE's confidentiality designation would have to be requested for public review under the Freedom of Information Act.

During the time the applications were under review, risk factors identified in CEHE's financial statements - including a lawsuit against one of the institutions filed by the Colorado Attorney General - led the Department to require CEHE to provide a $42.9 million surety, which is 30 percent of the annual federal student aid funding for 2013 for the four institutions. That surety remains in place but is subject to adjustment based on CEHE's financial condition and other risks.

To qualify for federal student aid, the law requires that most for-profit programs and certificate programs at private non-profit and public institutions prepare students for gainful employment in a recognized occupation.

###

Exhibit 13 - 002

# EXHIBIT C



December 22, 2016

Eric Juhlin                                                  Certified Mail: #7013 3020 0000 7223 5759
Chief Executive Officer
Center for Excellence in Higher Education
4021 South 700 East, Suite 400
Salt Lake City, Utah 84107

Re:    **Reconsideration Decision on Change of Ownership for:**
        **Stevens Henager College, OPE 003674**
        **CollegeAmerica Denver, OPE 025943**
        **CollegeAmerica Arizona, OPE 031203**
        **California College San Diego, OPE 021108**

Dear President Juhlin:

I have reviewed the Center for Excellence in Higher Education's ("CEHE") August 21, 2016 request for reconsideration ("Reconsideration Request) of the Department's August 11, 2016 decision letter ("Decision" or "Decision Letter") which denied the application of the above named institutions ("the Colleges") to convert to nonprofit status. In response to the Department's request, on September 30, 2016, CEHE provided supplemental information and documents. ("CEHE September 2016 Response"). Upon review of the Decision Letter, the Reconsideration Request, and related materials, to include the CEHE September 2016 Response, the Reconsideration Request to recognize the Colleges as nonprofit institutions is hereby denied.

CEHE was established as an Indiana public benefit corporation in December 2006, and was issued a 501(c)(3) tax exemption by the IRS. CEHE's request for conversion of the Colleges to nonprofit status results from a merger transaction that occurred as of December 31, 2012 ("the Transaction"). As a result of the Transaction, CEHE acquired the Colleges and a services company owned by five separate corporations ("Acquired Corporations") that had previously been owned by the Carl Barney Trust ("Barney Trust"). The Colleges had historically operated as proprietary, for-profit institutions. Prior to the Transaction, CEHE was a philanthropic organization engaged in educational reform; following the Transaction, CEHE was transformed into an entity primarily delivering educational services through the Colleges.

**I.    The Decision to Deny the Colleges' Conversion to Nonprofit Status was not Based on any Improper Motive or Agenda**



830 First St., N.E. Washington, D.C. 20202
StudentAid.gov

Exhibit 19 - 001

        **JA83**

In its Reconsideration Request, CEHE characterizes the Decision as "assign[ing] malicious motives to perfectly moral and lawful activities," and CEHE echoes this theme throughout the Reconsideration Request. *See, e.g.,* Reconsideration Request at 3. Despite CEHE's characterization, the Department's decision to deny the conversion to nonprofit status depends on the structure and impact of the Transaction in the context of the regulatory requirements for a nonprofit institution set forth in 34 C.F.R. § 600.2. A transaction can be perfectly "moral and lawful," yet an institution may not qualify as a nonprofit under the Department's regulations. In a similar vein, CEHE excoriates the Decision as politically motivated, asserting that "evidence shows that the Decision is driven by an agenda" of a former Department official, as well as Congressional pressure. Reconsideration Request at 3-4. That the Decision reached a determination that may appear consistent with the views of some who have criticized the for-profit industry does not provide "evidence" that the Decision was reached to champion (or even to mollify) those critical voices. There were two potential outcomes for the Decision: approve the conversion (or approve it with conditions), or deny it. On either side of those choices there are critics and proponents. The Decision was driven by neither, and neither is this decision on the Reconsideration Request.

CEHE alights on a phrase in the Decision Letter which referred to the Transaction as not "traditional" in that the Colleges were not acquired by a new owner with the former owner no longer playing a role in the continued operation of the institution. Reconsideration Request at 3. The Decision's use of the word "traditional" was descriptive, but not material. The Decision was based on a full analysis of the Transaction (and its execution), including voluminous documents CEHE provided in response to multiple requests from the Department. The Department concluded that nonprofit status was not warranted because of numerous factors in combination, not because the Transaction was "not traditional." Nor does the Decision imply that Mr. Barney's continued involvement is "wrong" or "bad." *See* Reconsideration Request at 3. The Decision simply concludes that his control and the continuing stream of revenue flowing to him, coupled with other factors discussed fully in the Decision and below, precludes the Department from approving the Colleges as nonprofit institutions.

## II.     The Transaction Resulted in Continued Financial Benefit to Mr. Barney and the Trust

### A.     There was no Independent Determination of Value by the CEHE Board

Without regard to either CEHE's or Barney's motivation in entering into the Transaction, or in structuring it, the Transaction was structured so that the Trust retained the benefit of a continued stream of Title IV revenues, and Mr. Barney retained control of the Colleges by obtaining significant control of CEHE. The financing of the Transaction results in financial benefit which inures to Mr. Barney's beneficial interest via the Trust; lease payments to entities controlled by Mr. Barney provided additional economic benefit to him; Mr. Barney has retained control of the Colleges through his role originally as the sole member, and now as one of three members of CEHE, and as Board Chairman of CEHE's Board; and Mr. Barney retained additional control through the covenants contained in various note agreements with the Trust.

2

Exhibit 19 - 002

AR-J-0332

JA84

To challenge the determination set forth in the Decision Letter, CEHE has provided argument and additional documents, both attached to its Reconsideration Request, and in response to the Department's September 15, 2016 request for supplemental documents. Having reviewed all of the supplemental material, CEHE has provided no evidence or argument from which I can conclude that the denial of the Colleges' conversion to nonprofit status should be changed.

The Department regulations define a nonprofit institution as an institution that:

(i) Is owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private shareholder or individual;

(ii) Is legally authorized to operate as a nonprofit organization by each State in which it is physically located; and

(iii) Is determined by the Internal Revenue Service to be an organization to which contributions are tax deductible under 26 U.S.C. §501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3)).

34 C.F.R. §600.2. An institution's state authorization and Internal Revenue Service ("IRS") determination do not themselves confer nonprofit status for Title IV purposes. This is because the IRS determination of tax exempt status for an institution reflects an initial approval of an entity from a limited application process, or could reflect an approval that may have pre-dated the entity's ownership and operation of the institution. IRS review of the entity's tax exempt status takes place on an ongoing basis, with later reviews and/or compliance audits to examine whether tax exempt status should be revoked.

In prior years the Department primarily depended on the state approval and the IRS's designation of the owner's tax exempt status in determining whether an institution qualified for nonprofit status under the HEA and the Department's regulations. For an institution that was approved to participate in the Title IV programs as a proprietary, for-profit institution that applied to convert to a non-profit institution, the Department would also accept the state and IRS designations, but included a transition requirement for the institution to continue to meet the 90/10 revenue requirement for one additional year. This requirement was used to mitigate the possibility that the conversion was intended to evade the application of the 90/10 rule.

Since that time, additional requirements have been established by regulation for proprietary institutions that offer programs to prepare students for gainful employment in recognized occupations, so that proprietary institutions may have greater incentives to convert to a non-profit status that exempts degree programs from the gainful employment requirements. In response to this change, the Department has determined that a more detailed examination of an institution is needed before approving it for non-profit status.

With respect to the Colleges, CEHE had obtained its tax exempt status (as a public charity) in 2007, five years before the Transaction. See Decision Letter at n.1. Following the Transaction, CEHE sought classification as an educational institution under 26 U.S.C. §

3

Exhibit 19 - 003

AR-J-0333

JA85

170(b)(1)(A)(iii), by submitting a letter from its counsel with a summary description of the Transaction and limited documentation. *See* CEHE September 2016 Response at Exhibit 5. In its response to CEHE's request, the communication from the IRS does not indicate a thorough review of the Transaction, or even of the submitted documentation. The response noted that CEHE had been determined to be a public charity in September 2007 under § 170(b)(1)(A)(vi) of the Internal Revenue Code, and simply stated that it had "updated your public charity status in our records as you requested." The IRS also stated that CEHE's exempt status under 501(c)(3) "wasn't under consideration." Letter from IRS to Ofer Lion, dated July 25, 2014.

Especially given CEHE's substantial changes in mission and operating size from the public charity that was granted tax exempt status in 2007, where substantial control shifted to the party from whom the Colleges were acquired, the Decision reflected the appropriate independent determination of whether the Colleges were "owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private shareholder or individual." This is a determination that the Department must make based on its independent review of each nonprofit conversion, with a detailed review of the individual facts and circumstances present in each. The Department's review has three principal and interrelated elements: the institution's ownership, its operation and control, and who reaps the financial benefit from the institution's operation. These elements involve consideration of myriad facts, including the structure of the transaction, the financing of the transaction, the value of the transaction, and the governance of the nonprofit entity. The Decision correctly determined, following a consideration of all of these factors, that the Colleges were not "owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private shareholder or individual."

The details of the Transaction are set forth in the Decision Letter, and are not repeated in detail here. As discussed in the Decision Letter, a key element for the Department's determination was the nature of the financing for the Transaction, and whether it constituted an excess benefit or personal inurement to Mr. Barney or the Trust for purposes of the nonprofit status of the Colleges. The level of the CEHE Board's independent assessment of value prior to entering into the Transaction was properly considered in the Decision Letter. Rather than a straight asset or stock sale using bank (or a similar) financing from an unrelated party, CEHE and the Trust entered into a Note Purchase Agreement ("NPA") whereby the Trust purchased two notes from CEHE in the aggregate amount of $431,000,000 ("Term Note A" and "Term Note B"). The Transaction was approved by CEHE's Board (Messrs. Curtis, Dennis and Zywicki) at a Board meeting on December 27, 2012. When analyzing the existence of "fair value," the Department appropriately looked at both the Merger Agreements, and the Board minutes of that December 2012 meeting. Although the minutes of the meeting recite that the decision to approve the acquisition was based on "substantial due diligence," the Merger Agreements themselves state that CEHE performed "limited due diligence review." *See, e.g.,* CASI Merger Agreement at ¶5.8, SH Merger Agreement at ¶5.9, CAA Merger Agreement at ¶5.9 (no merger consideration was allocated to CAD or CCSD). The limitations of that review are relevant to whether the Transaction was based on a valuation that results in benefit to the Trust, rather than a fair determination of value. The Reconsideration Request attempts to obfuscate the Department's statements on the level of the due diligence by asserting that:

4

Exhibit 19 - 004

AR-J-0334

**JA86**

[T]he Department has misrepresented [CEHE attorney Jay] Mercer's characterization of the due diligence conducted by Mercer and the CEHE board when it contends that "the Merger Agreements state that CEHE performed 'limited due diligence review.'" The Department has construed Mercer's statement [relating to "minimal due diligence" recommended] to be exactly the opposite of what it says.

Reconsideration Request at 14. The Decision Letter is plainly not referring to "Mercer's statement" as reflected in either his Affidavit (Exhibit 17 to Reconsideration Request) or his Memorandum to the Board (contained in Exhibit 2 of the CEHE September 2016 Response) – both of these Mercer documents were provided to the Department *after* the Decision Letter was issued. It is clear that the Decision Letter quotes the Merger Agreements themselves, which clearly state that "the Purchaser acknowledges that it has completed *limited due diligence review* with respect to the Corporation and the College." *See* CASI Merger Agreement at ¶5.8, SH Merger Agreement at ¶5.9, CAA Merger Agreement at ¶5.9 (emphasis added). Mr. Mercer's current characterization of "substantial due diligence" – although it mimics the words of the December 2012 board minutes – conflicts with his own assessment at the time of the Transaction: in his draft comments to the Merger Agreement, Mr. Mercer himself added the language in ¶5.9 about CEHE's "limited due diligence"; he added additional language to ¶5.9 (not included in the final agreement) about other limitations in CEHE's review of the Acquired Corporation's documents; he commented in reference to ¶6.4 about the "limited due diligence" being conducted. *See* CEHE September 2016 Response at Exhibit 3 ("JSM Draft"). The evidence is consistent with the words of the Merger Agreements – the due diligence conducted by the CEHE Board prior to the Transaction was "limited."

The Internal Revenue Service ("IRS") evaluates nonprofit status by, *inter alia,* whether there is personal inurement to an insider, or whether there is excess benefit to a disqualified person. *See generally,* "Nonprofit Law Guide" (contained in Exhibit 2 to the CEHE September 2016 Response). Mr. Mercer noted both of these issues in his due diligence process, and in his communications to the CEHE board. His focus was principally on the board member's potential liability resulting from these issues, rather than the impact of those issues on the resulting nonprofit status of the Colleges. The CEHE September 2016 Response contains documents relating to CEHE's August 28, 2012 board meeting (at Exhibit 2), and documents relating to CEHE's due diligence in October 2012 (Exhibit 3). Notably, Mr. Mercer expresses concern about private inurement and excess benefit to Mr. Barney resulting from the proposed transaction. *See, e.g.,* CEHE September 2016 Response at Exhibit 2 (board meeting agenda); CEHE September 2016 Response at Exhibit 3 (Memorandum to CEHE Board).

The foundation of the IRS rulings relied upon by CEHE is that fair value is actually determined by the nonprofit board so as to avoid an excess benefit. *See* discussion in Section II B., *infra.* Indeed, that concept is reflected in Mr. Mercer's agenda for the August 2012 board meeting and the minutes of that meeting, where he apparently advised that the valuation "is very important" in determining whether there was an excess benefit. CEHE September 2016 Response at Exhibit 2. While the CEHE Board was considering the potential acquisition, CEHE understood that it was buying "hard assets in the form of real estate, equal to about 10% of the value, as well as another 5% of tangible assets. The remainder will come in the form of goodwill ... ." *Id.* (August 28, 2012 Board Minutes). In a follow-up memorandum to the CEHE Board

5

Exhibit 19 - 005

AR-J-0335                                                                    **JA87**

(undated, but included in the August 2012 materials in Exhibit 2 to the CEHE September 2016 Response), Mr. Mercer sets forth his "assumption" that Barney would "contribute as a charitable gift the value of the goodwill of the colleges," and that "CEHE will purchase the tangible assets at fair market value." Clearly, this is not what happened, and there is no documentary evidence submitted by CEHE to explain how this fundamental assumption was altered, resulting in a $431 million purchase price, of which $419 million was goodwill.

The Decision Letter notes that "there is no evidence that CEHE – as opposed to Mr. Barney – conducted any valuation of the Colleges before entering into the Merger Agreement and resulting financing which obligated CEHE to $431,000,000 in indebtedness to the Trust with $419,000,000 of that amount representing goodwill." Decision Letter at 4. The Reconsideration Request challenges this conclusion, and for the first time,[1] CEHE explains that its Board retained Blue & Company to provide "an independent evaluation of Barrington's appraisal." Reconsideration Request at 14. For whatever reason, when CEHE submitted its Reconsideration Request, it failed to provide the actual the Blue & Company Summary Appraisal Review Report ("Blue Review")(it submitted just the cover, the table of contents, and the curriculum vitae of its analysts). Yet, it relies on that review to support the fair value of the Transaction, and accordingly, the Department requested the Blue Review along with other referenced documents on September 15, 2016. The Blue Review was transmitted along with other requested materials on September 30, 2016. (Exhibit 1 to CEHE September 2016 Response).

The Blue Review is not an independent appraisal of the Colleges' value, but rather, a summary review of work performed by another valuation company (Barrington Resources) for the Trust. As noted in the Decision Letter, the December 27, 2012 Board Minutes reflect that the Board reviewed a "qualified appraisal" of the Companies, but it is now unclear what that refers to – because it is not clear whether the CEHE Board ever actually examined the valuations prepared by Barrington Research (hereinafter "Barrington Valuations"). The Barrington Valuations were commissioned by Mr. Barney for use by the "Company" (defined in the valuation as "College America"), and each state that they were prepared "for tax purposes," (Barrington Valuation at 4, Item G), further supporting the Department's conclusion that this valuation was prepared for the Trust, and was not prepared for purposes of *the CEHE Board's* due diligence. None of the Board minutes produced to the Department reflect a specific examination – by the individual CEHE Board members, or the Board as a whole – of either the Barrington Valuations or the Blue Review. Attached as Appendix B to the Blue Review is a set of power point slides apparently prepared by Barrington and identified as "Presentation to *College America* Board of Directors Valuation Presentation." (Emphasis added). Although the Blue Review (at page 1) suggests that this presentation was to the CEHE Board, it does not appear so from the face of the slide presentation. The Blue Review also erroneously states that the Barrington Valuations ("the appraisal") was prepared for the CEHE Board; as stated above, and in the Valuations, Barrington was engaged by the Trust, not CEHE.

---

[1] In its September 15, 2016 specific request for the Blue Review, the Department noted that the Report should have been provided in response to the Department's request (on June 13, 2016) for any appraisals related to the merger consideration as required by the Merger Agreements. In the CEHE September 2016 Response, CEHE contended that the Blue Review was not responsive to the June request. In any event, the Blue Review has now been submitted, and has been reviewed for purposes of evaluating the Reconsideration Request.

6

Exhibit 19 - 006

**JA88**

The record, even as supplemented by the CEHE September 2016 Response, reflects no substantive value analysis or discussion by the CEHE Board of the fact that the Transaction would result in $419,000,000 of goodwill.  At most, it appears that a board conference call was held on November 15, 2012 and reflects that CEHE's executive director (Frederic Fransen) reported to the CEHE Board "on various aspects of CEHE's due diligence including a review of the appraisal conducted by Blue & Co. and a compensation review of the CEO of College America ... . In both cases, the reviews supported the underlying assumptions about the appropriateness of the transaction." CEHE September 2016 Response, Exhibit 4.  Significantly, the summary of the conference call states that "no materials were prepared prior to the meeting," leading to the reasonable assumption that Mr. Fransen's "report" on the due diligence efforts did not include providing the Blue Review itself, or other related documents, to the CEHE board members.

Even if CEHE board minutes had reflected an actual review, discussion and analysis of the Blue Review by its board members, such a review would not have provided the CEHE board with a basis upon which to independently determine the fair value of the Transaction to establish the merger consideration.  As noted above, the Blue Review is just a summary review of Barrington's conclusions.  It did not provide the CEHE Board with an independent valuation.  Moreover, the Blue Review makes it clear that its "summary review" was only of the Barrington power point slides ("the Presentation"), not the Barrington Valuations themselves.  The Blue Review notes that it requested "the underlying valuation report" from CEHE and from Barrington, but did not receive it.  Blue Review at 3, 10.  It also appears that, beyond the Presentation, Blue's analysts had no other documentation specifically referring to the Acquired Companies and the Colleges – the financial information available to Blue appeared to be limited to what was in the slides.  Blue Review at 3, 10.  The Blue Review also notes certain issues with the Presentation that required "further scrutiny" and "considering the nature and amount of information included in a presentation format *as opposed to a fully-contained appraisal report* as defined by [the Standards for Valuation Services], we cannot draw any conclusions as to the effect of the underlying information that we did not receive." Blue Review at 5 (emphasis added); *see also* Blue Review at 10-11.  The Blue Review further notes that the "analyses used in this report are based on estimates, assumptions, and other information provided to us by the representatives of the owners of the Company [defined as College America], Barrington and legal counsel." *Id.* at 6.  The Blue Review concludes that "excluding those points noted previously," the conclusion of value stated in the Barrington Presentation "is likely fairly stated and consistent with fair market value." Yet the conclusion comes with an unambiguous caveat: "However, we requested additional information and have not received that as of the date of this report.  The information requested, but not received as of the date of this report *may have had a significant impact on our conclusion."* (Emphasis added).  Based upon a review of this additional information, the Department can reasonably conclude that the CEHE board, in agreeing to a $431,000,000 Transaction (of which $419,000,000 represented goodwill), did not independently make a determination of the Transaction's fair value.

7

Exhibit 19 - 007

AR-J-0337                                    **JA89**

**B.    The Note Agreements do not Constitute True Debt Obligations, Particularly Given Barney's Ongoing Control of the Colleges**

Another factor considered in the Decision Letter is that the obligations under the various (and evolving) note agreements with the Trust do not actually constitute evidence of a legitimate debt. CEHE argues that the Decision ignores how loans and lease payments are "classified" on financial statements and balance sheets pursuant to Generally Accepted Accounting Standards and Financial Accounting Standards Board standards. Reconsideration Request at 10. These classifications clearly are not determinative of nonprofit status, and scores of tax cases[2] have analyzed (in both the profit and nonprofit context) whether a payment pursuant to a debt instrument is a true debt or an equity interest, without regard to how it is characterized on the entity's financial statements.

As set forth above, the Transaction was financed pursuant to an NPA whereby CEHE executed Term Notes A and B (collectively, the "Term Notes") effective as of December 31, 2012. The Notes provided for the accrual and quarterly payment of interest at the rate of 1% per annum ("Fixed Rate"), with a Floating Rate adjustment as defined in the Notes. Notes at ¶2. *See* CEHE 2012 Audited Financial Statements at Note 8. Significantly, the Notes also required quarterly mandatory prepayments of the greater of 75% of the Excess Cash Flow[3] of CEHE, or 10% of CEHE's total revenues. Notes at ¶5.1. Term Note A matured the earlier of December 31, 2017, or the first fiscal year in which CEHE has at least $50,000,000 Change in Net Assets (as defined in the NPA). Term Note A at ¶4. Term Note B matured the earlier of December 31, 2019, or the first fiscal year in which CEHE has at least $75,000,000 Change in Net Assets (as defined in the NPA). *See* CEHE 2012 Audited Financial Statements at Note 8; CEHE 2015 Audited Financial Statements at Note 7.

Subsequent to the closing of the Transaction in December 2012, and with the agreement of the Trust, CEHE's obligation to the Trust under the Notes was modified on two separate occasions. On March 17, 2015, the CEHE Board canceled the NPA and the Term Notes, and replaced those instruments with a Contingent Note Agreement ("CNA") and Contingent Notes A and B. *See* CEHE 2015 Audited Financial Statements at Note 7. Pursuant to the CNA, the Note payments remained conditioned on CEHE's Excess Cash Flow, and eliminated the alternative

---

[2] *See, e.g., Graffia v. C.I.R.,* 106 T.C.M. (CCH) 261, 2013 WL 4789771106, *15 (T.C. 2013), *aff'd,* 580 F. App'x 474 (7th Cir. 2014)(and cases cited therein)(conditional nature of the supposed obligation lends additional support to Tax Court conclusion that the obligation, which was to be repaid from profits of the business, was not a true debt); *Principal Life Ins. Co. v. U.S.,* 70 Fed.Cl. 144, 160 (2006) (identifying some of the factors that courts have employed in distinguishing between debt and equity in determining whether notes received by shareholders transferring property to their controlled corporation are viewed as true debt versus disguised equity). *See also, Restland Memorial Park of Dallas v. United States,* 509 F.2d 187 (5th Cir. 1975); *Rose Hills Memorial Park Association v. United States,* 463 F.2d 425 (Ct. Cl. 1972), *cert. den.,* 414 U.S. 822; and *Knollwood Memorial Gardens v. Commissioner,* 46 T.C. 764 (1966) (and cases cited therein).

[3] Pursuant to the definitions of the NPA, "Excess Cash Flow" is measured by the Change in Net Assets ("CNABIDA") less certain identified expenses.

8

Exhibit 19 - 008

AR-J-0338

**JA90**

calculation based on 10% of revenues, as well as the accrual and payment of interest.  CNA at 4, 6 and ¶2.5.1 (75% of CEHE's Excess Cash Flow each quarter).  In an e-mail related to the approval of the CNA, CEHE's Chief Financial Officer commented that the changes to the Notes "reflected the original intent of Mr. Barney that the debt would be contingent on CEHE *making money* and having available excess cash flow to make debt payments."  March 17, 2015 e-mail from Paul Gardner (emphasis added).

CEHE's obligation for payments to the Trust was further modified in November 2015.  CEHE 2015 Audited Financial Statements at Note 7.    On November 6, 2015 (as discussed in the Decision Letter), pursuant to a Confidential Settlement Agreement ("Settlement Agreement"),   Contingent Note B was canceled and Contingent Note A was restated and reduced to $75,000,000.  Restated Contingent Note A re-imposed the Fixed Rate and Floating Rate interest accrual and quarterly payments, and retained the mandatory quarterly payments based on 75% of CEHE's Excess Cash Flows. CEHE 2015 Audited Financial Statements at Note 7.  The Maturity Date for the outstanding principal and interest was defined as "90 days after the end of the first Fiscal Year in which *the Barney Trust* has at least Fifty Million ($50,000,000) in Change of Net Assets [and if CEHE is able to refinance the Note].  Restated Contingent Note A at ¶2.1 (erroneously designated as ¶3.1), ¶3, and ¶4.1(a) (erroneously designated as ¶5.1(a)) (emphasis added).  The significant reduction reasonably suggests that the initial consideration of $431,000,000 (and the corresponding indebtedness) was highly inflated.  The Decision reasonably concluded that CEHE's obligations under the Term, Contingent, and Restated Contingent Notes, which are and were contingent on CEHE "making money," did not have the classic hallmarks of debt.  As such, the Transaction results in a situation where the net income of the Colleges inures to the benefit of the Trust (and to Mr. Barney via the real estate leases).

In its Reconsideration Request, CEHE argues that the Decision misapplies the law and ignores "controlling" IRS precedent.  Reconsideration Request at 3, 6-10.  Although the revenue rulings can provide guidance on the issues relevant here, those rulings are not "controlling" on the Department's determination of nonprofit status under its own regulations.[4]  An institution that participates in Title IV, HEA programs is a fiduciary of the Department's funds.  The 501(c)(3) designation by the IRS results in an entity being tax exempt, and contributions being deductible by the donor, but funds from the federal fisc are not directly involved.  In any event, the authority cited by CEHE does not warrant granting the Reconsideration Request.[5]  CEHE

---

[4] Indeed, revenue rulings are not even regarded as precedential or controlling in the Tax Court: they "merely represent the position of the Commissioner of Internal Revenue on a particular issue." *Estate of Beyer v. Comm'r of Internal Revenue,* 112 T.C.M. (CCH) 356 (T.C. 2016) (citing *Alumax, Inc. v. Comm'r,* 109 T.C. 133, 163 n.12 (1997), *aff'd,* 165 F.3d 822 (11th Cir. 1999)).

[5] CEHE's reliance on the Transaction Exemption, which provides a *rebuttable* presumption that a transaction is not an excess benefit transaction, simply does not apply here. *See* Reconsideration Request at 9 (citing Treasury Regulation §53.4958-6, *Comm'r of Internal Revenue v. Johnson,* 267 F.2d 382 (1st Cir. 1959), *United Cancer Council, Inc. v. Comm'r of Internal Revenue,* 165 F.3d 1173 (7th Cir. 1999)).  In the first instance, the Department is not bound by regulatory presumptions  imposed on the Commissioner of the IRS.  Even if the Transaction Exemption is considered however,  CEHE could not establish its entitlement to the Exemption.  For an entity to take advantage of the presumption of fair market value, the tax-exempt organization must establish fair value by "appropriate data of comparability."  §53-4958-6(a)(1) and (c)(2), including independent appraisals of value.  In *United Cancer* (cited in the Reconsideration Request at 6), the entity that was the subject of the IRS's focus was an

9

Exhibit 19 - 009

AR-J-0339                                              **JA91**

argues that the Department has approved other conversions where the former for-profit owner "remained involved," relying on Revenue Ruling 76-91 and 76-441. Reconsideration Request at 6.[6] Mr. Barney did not simply "remain involved." By virtue of his roles as lender (via the negative covenants as described in the Decision Letter), and as a CEHE member, and as Chairman of CEHE's Board, Mr. Barney has the type of control over CEHE that is inconsistent with a true debtor-creditor relationship. *See* Decision Letter 9-10. CEHE does not contest Mr. Barney's level of control, it just argues that the IRS regularly allows nonprofits to be founded and controlled by a single individual or family. Reconsideration Request at 7. The IRS also regularly examines whether revenue inures to the person or family in control.

CEHE also argues that negative covenants are "customary in commercial lending." Reconsideration Request at 10-11. Again, CEHE misses the point of the Decision. The Department's denial of nonprofit status was not based solely on the negative covenants, or even the fact that Mr. Barney retains control of the Colleges by virtue of the combined power of the negative covenants, his position as a CEHE member, and his position as Board Chair.[7] Rather, it is the combination of all of the factors cited in the Decision Letter: Barney's pervasive control; the lack of an independent fair market valuation by the CEHE Board in agreeing to the $431 million Merger Consideration; the fact that the various note agreements and notes do not reflect a true debt obligation; and the continuing flow of revenue to Mr. Barney and the Trust.[8]

---

outside fundraising firm – not an insider like Mr. Barney. The Seventh Circuit found that inurement (the only basis upon which the Tax Court upheld the IRS's revocation of the charity's exemption) did not apply because the fundraising firm, although its contract was advantageous, was not an insider. That is simply not the situation presented here. The *United Cancer* Court did however, leave open the question of private benefit for consideration by the Tax Court on remand. Nor does *Johnson* provide any support to CEHE. There, the First Circuit determined that "the bonds were true evidences of indebtedness and the voting rights only served as additional security for the payment of the purchase price and not to reserve to the sellers a proprietary interest in the business." 267 F.2d at 385. Again, that is not the situation here.

[6] These revenue rulings are distinguishable on other grounds. In 76-91, there is no mention of owner financing, and in 76-441 two situations are presented. In Situation 1, the IRS determined that the school qualified for tax exemption, based on the fact that "personal property" of the former for-profit school was purchased at fair market value, lease payments were at "fair market" and salaries paid to the former owners were "reasonable." In Situation 2, the IRS determined that the school did not qualify for tax exemption, based on the fact that the notes to the former owner exceeded the "fair market value of [the transferred] assets."

[7] As described in the Decision Letter, the November 2015 Settlement Agreement also required the appointment of two other members to CEHE. Mr. Barney himself chose the two new members, and regardless of whether two or twenty members were added, they cannot "out-vote" Mr. Barney, because approval of any action by the members requires unanimous consent. *See* September 1, 2015 Action by Unanimous Consent, amending §2.01 of the Bylaws (which provided for voting under Indiana law). Thus, Mr. Barney retained the ability to block any action requiring member approval, including with regard to the Negative Covenants in the CNA, and the extensive member approval items in the February 2014 Bylaw amendments, and he thereby retained the power to unilaterally withhold consent for a variety of CEHE actions.

[8] CEHE attempts to draw a comparison between the debt in its acquisition of the Colleges and the debt of nonprofit institutions (naming Columbia and Stanford), suggesting that the analysis set forth in the Decision would render those institutions as "for profit." Reconsideration Request at 9, and Exhibit 14 (excerpt from Columbia 990) and Exhibit 15 (excerpt for Stanford 990). This comparison is so lacking in legitimacy that it can be dispatched with little ink: unlike Mr. Barney, the Columbia and Stanford bondholders do not control those institutions, nor is there

10

Exhibit 19 - 010

AR-J-0340          **JA92**

### C.   Other Financial Benefits also Flowed to Mr. Barney

Another element of economic benefit flows to Mr. Barney as a result of nine lease agreements between the Colleges and real estate entities owned or controlled by Mr. Barney. At the time of the Transaction, seven of those leases were already in place, with lease expiration dates ranging from 2015 to 2020.   In October 2012, Mr. Mercer was allowed to review documents in CollegeAmerica's data room.   CEHE September 2016 Response at Exhibit 3 (Memorandum to CEHE Board).   He noted certain issues "of concern," including the potential of private inurement and excess benefit to Mr. Barney as a result of the leases.   He stated his understanding that the real estate properties the Colleges leased would be donated by Mr. Barney, and if they were not donated, an excess benefit, conflict of interest, and private benefit analysis would have to be performed, to determine whether the leases from Mr. Barney's real estate company were "in the best interest of the Colleges: location, cost, size, [etc.]". *Id.* at 2, 5. The documents submitted by CEHE provide no evidence that any such analysis was ever performed, whether by Mr. Mercer, or a real estate expert, or the Board itself, despite a bare recitation in the December 27, 2012 Board Minutes that the Board has "reviewed the leases" and other "Related Party Agreements" and the terms are "equal to fair market value or better." December 27, 2012 Minutes at 6.   As set forth in the Colleges' and CEHE's audited financial statements, from the date of the Transaction through 2015, those leases resulted in nearly $15 million in payments to Mr. Barney's real estate companies.   The Decision Letter correctly concluded that this benefit to Mr. Barney was an additional factor supporting denial of the conversion of the Colleges to nonprofit status.

In addition, CEHE also provided a revised schedule of compensation and expense reimbursement when it submitted the CEHE September 2016 Response (at Exhibit 6).[9]   That schedule reveals that Mr. Barney received compensation as "Chief Marketing Officer" up until early January 2015.   He was paid $95,833 in 2013, and $100,000 in 2014.   Yet, there does not appear to be any determination by the CEHE board that this was appropriate compensation for the position -- the only compensation related information pertained to Mr. Juhlin (compensation analysis contained in Exhibit 4 of the CEHE September 2016 Response).   The compensation to Mr. Barney as marketing director thus provides further evidence of personal benefit to him from the Colleges.

### III.   The Denial of Nonprofit Status was Warranted

---

any suggestion (let alone evidence) that the tax-exempt bonds were issued in anything other than a transaction at fair market value.

[9] In its response to the Department's June 13, 2016 request for information and documents, CEHE identified the amounts of "Annual Compensation & Expense Reimbursement Paid for Services *as* CEHE Member or Director." (Emphasis Added).   *See* Exhibit 3 to CEHE June 29, 2016 response to the Department's June 2016 request.   When the Department requested additional information to evaluate the Reconsideration Request, it advised CEHE that its June 2016 request for information about "compensation or reimbursements" paid to members and directors was not limited to compensation relating to services *as member or director*.

11

Exhibit 19 - 011

AR-J-0341

JA93

The Decision represents the reasoned determination of the Department that the Transaction, because of the continued benefit to Mr. Barney and the Trust coupled with his significant control, deprives the Colleges from converting to nonprofit status as a result of their ownership by CEHE. I have reviewed the record supporting the Decision, as well as the additional information and documents submitted with, and subsequent to, CEHE's Reconsideration Request, and conclude that there is no basis to reverse or modify the Decision. CEHE's request to convert the Colleges to nonprofit status is denied. The status of the Colleges can be re-examined when the institutions apply for recertification at the end of the provisional participation agreements, and changes in the relationship and agreements between Mr. Barney and CEHE during the intervening period may lead to a different determination in the future.

This is a final decision of the Department.

Sincerely,

Ron Bennett
Director, School Eligibility Service Group

cc:

Stevens Henager College
1890 South 1350 West
West Haven, UT 84401
Lana Moon, Lana.Moon@stevenshenager.edu

CollegeAmerica Denver
CollegeAmerica Arizona
California College of San Diego
1385 South Colorado Blvd, 5th Floor
Denver, CO 80222
Sonia Martinez, Sonia.Martinez@collegeamerica.edu

12

Exhibit 19 - 012

AR-J-0342

JA94

# EXHIBIT D



UNITED STATES DEPARTMENT OF EDUCATION

THE UNDER SECRETARY

September 9, 2015

Honorable Rosa L. DeLauro
House of Representatives
Washington, DC 20515

Dear Congresswoman DeLauro:

Thank you for your April 27, 2015, letter to Secretary Duncan regarding the conversion of for-profit colleges to nonprofit institutions. Your letter was forwarded to the Department of Education's (Department's) Office of the Under Secretary, and I am pleased to respond on behalf of the Secretary. A copy of this response is also being sent to the cosigners of your letter.

The Department acknowledges and understands your view that the nature of proprietary ownership of a school is to provide private benefits to its owners, and this framework may be at odds with the objective of a nonprofit entity to provide quality educational services to benefit the public without providing undue financial benefits to the individuals in control. The Department shares your concern that when a proprietary school owner converts a school to nonprofit status, the arrangement might be structured to retain the for-profit incentives and the management behaviors for the former owner who continues to hold a significant role at the institution.

Your letter refers to an article in the New York Times dated March 2, 2015, entitled "*Some Owners of Private Colleges Turn a Tidy Profit by Going Nonprofit,*" and notes certain arrangements and conditions that may provide significant revenues to the former proprietary school owner(s).

You also refer to a situation where a former proprietary school owner is a major creditor to the nonprofit entity, and has sole power to create and disband the college's board of trustees. You ask whether these payments by the nonprofit entity to a former owner would violate the Anti-Deficiency Act. These examples would not be violations of that Act as the Federal student aid funds are provided to the nonprofit entity for the institution to use for its eligible students. The amount of Federal student aid funds is based upon the students and programs at the institution. In addition, eligible loan funds are mandatory and not subject to appropriations. With respect to the Federal student aid funds earned by the nonprofit institution, there is a separate question of whether it is appropriate for the nonprofit entity to engage in the types of arrangements identified above, and the Internal Revenue Service (IRS) would determine whether those activities are permissible under the nonprofit rules.

Your letter also asks whether the Department has consulted with the IRS when reviewing applications to approve a conversion of a for-profit institution to a nonprofit institution regarding a number of scenarios where the former owner retains some type of relationship with the institution.

Page 2

The issues raised in your letter concerning whether the payments and services provided to the former owners of a nonprofit are noted by the Department during a review, and are brought to the attention of the IRS for review under that agency's standards. Where appropriate, the Department has made referrals to the IRS for a review of information received through the application process.

As part of our current procedures, we review the application for approval of the conversion submitted to the Department, and also request supporting documents that may include:

- the sales agreement and any other related party agreements;

- obtaining from the institution a narrative explanation of the roles of the former owners and executives of the for-profit school in the management of the nonprofit after the sale; and

- identifying any purported donation of assets by the for-profit owners to the nonprofit enterprise, and the impact that such donations might have on the control of the nonprofit.

As a part of this process, the Department reviews the sales documents and other agreements to gain an understanding of the structure and operations of the nonprofit entity, and to identify any continuing responsibilities, executive positions, and services to the nonprofit entity provided by the former owners or related parties. The executive officers or key employees of the nonprofit entity are checked to see if any have been debarred from participating in Title IV programs. The financial statements of the nonprofit entity are reviewed, and when questions arise, the audit work papers are also reviewed. In the past, the Department has not encountered issues where the value of a donated asset was material, but will consider this question in more detail going forward. The Department continues to assess ways to improve our existing procedures and enhance our coordination with the IRS regarding our respective reviews of for-profit conversions to nonprofit.

Regarding your request that the Department impose an immediate moratorium on new approvals, the Department cannot stop institutions from undergoing changes of ownership or conversions from one type of institution to another and then applying to the Department for new approval. The number of these types of conversion from for-profit to nonprofit has been minimal in the last decade. The Department carefully reviews all conversion applications, and during the review, which may include an extended review period, the institution may continue to participate on a temporary approval that runs from month to month until a final decision is issued on the application. If the application is approved, the institution then participates under provisional certification. When an institution participates on a provisional basis, the institution's Program Participation Agreement with the Secretary includes provisional conditions that the institution must abide by in order to maintain its approval to participate in the Title IV, HEA programs. The provisional period may be from one to three years, during which the Department exercises an increased level of monitoring and oversight of the institution's Title IV participation.

**JA97**

Page 3

You also asked if the consumer information in our College Navigator site accurately portrays an institution's nonprofit status. College Navigator is populated with data provided by institutions through an annual survey submission and from other Department resources (e.g., Cohort Default Rates). Data are validated on an annual basis for data fields such as the not-for-profit status and, if determined to be in error, are corrected for the next annual release. An institution's nonprofit status is reviewed annually by the Department through the audited financial statements and compliance audits that institutions are required to submit annually in addition to any application submitted to the Department for a change in ownership that may include a conversion from a for-profit to nonprofit status.

In reference to the details regarding conversions to nonprofit status from current for-profit institutions, the Department currently has two open cases regarding conversion applications, for Herzing University and the Center for Excellence in Higher Education; both of these are still undergoing substantive review. The Department is not aware of any recent conversion application or request for guidance from Career Education Corporation regarding a change to nonprofit. However, Grand Canyon University has informed me and other Department officials that it is contemplating, and has shared general information about, potentially converting to a nonprofit entity. In response to your question, the University has not submitted an application for a change in ownership.

Finally, you requested information regarding past conversion requests that have been approved. The conversion request from Everglades University was approved in 2002, Keiser University's conversion was approved in 2011, and Education America Remington College's conversion was approved in 2013.

Should you have other questions regarding this matter, please contact Lloyd Horwich, Acting Assistant Secretary in the Office of Legislation and Congressional Affairs, at 202-401-0020.

Sincerely,

Ted Mitchell



August 28, 2020                                    By Electronic Mail:
                                                  sgombos@glpclaw.com


Mr. Steven M. Gombos
Counsel for Grand Canyon University
11350 Random Hills Road
Suite 400
Fairfax, VA  22030


RE:  Grand Canyon University, OPE ID 00107400

Dear Mr. Gombos:

Thank you for your correspondence dated August 14, 2020 to Secretary of Education Betsy
DeVos regarding Grand Canyon University ("GCU").  Your letter was forwarded to the U.S.
Department of Education's ("Department's") Federal Student Aid ("FSA") office for review and
response.

Your letter requests "that the Department join the Internal Revenue Service, the State of Arizona,
and the Higher Learning Commission, in recognizing the University's nonprofit status." In
addition, you have asked the Department "to formally respond to [GCU's] letter to Mr. Frola no
later than August 28, 2020."

FSA has oversight of institutions that participate in the federal student aid programs authorized
pursuant to Title IV of the Higher Education Act of 1965, (HEA), as amended and specifically
institutions' adherence to federal financial aid regulations.  On November 6, 2019, the
Department issued a letter approving GCU's continued participation under its new ownership but
denying GCU's request to convert to nonprofit status for purposes of its participation in Title IV
programs ("November 6, 2019 Letter").  That letter noted that the Department makes its own
determination of nonprofit status for a school's participation in Title IV.   Although state and IRS
approvals are required for nonprofit status under the Department's regulations, those approvals
are not the sole determining factors, nor does the Department simply defer to those
determinations.  In regard to the IRS designation of tax-exempt status, and as noted by the
November 6, 2019 Letter, the IRS approval was issued three years prior to the transaction that
closed on July 1, 2018, and there is no evidence that the IRS conducted a comprehensive review
of the transaction.  Unlike the IRS's initial grant of tax-exempt status, the Department's
determination of nonprofit status considers the structure and planned operations of the institution
when its owner(s) apply for that change of status, and seeks to ensure that a nonprofit
institution's revenues – a good portion of which are generated from Title IV funds – are
primarily devoted to the mission of the school and not to other parties, including (as here) the
shareholders of the prior owner.  The November 6, 2019 Letter identified a number of factors
contributing to the Department's determination that GCU did not meet the regulatory definition



S. Gombos, re: Grand Canyon University
Page 2

of a nonprofit. As detailed in the letter, a significant factor was the Master Services Agreement entered into between GCU and its former owner, Grand Canyon Education, Inc. ("GCE"), pursuant to which there is an ongoing relationship between the parties where sixty percent of GCU's revenue is paid to GCE.

As you know, the parties to the GCU transaction closed the transaction without the benefit of a pre-acquisition review by the Department. That decision was certainly within the parties' rights to do so. On August 30, 2018, the Department countersigned the Temporary Provisional Program Participation Agreement ("TPPPA") which allowed GCU to continue its participation in Title IV programs while the Department conducted a post-closing review of the transaction and the request to convert to nonprofit status. In December 2018, at GCU's request, the Department approved some new programs that had been added prior to July 1, 2018, and in January 2019, the Department approved additional programs that GCU added after July 1, 2018.

Immediately following the July 1, 2018 closing of the transaction, the Department requested additional documents to conduct its post-closing review of the transaction. Over the course of the following months there were additional requests for information or documents, and GCU provided the information that was requested. Many thousands of pages of documents were carefully reviewed and analyzed by the Department before the November 6, 2019 Letter was issued. The documents included voluminous valuations of real property and other assets, as well as a report analyzing the strategic options available to GCE, including transferring GCU to new ownership, with GCE as the services provider as an alternative to the status quo where GCU remained under GCE ownership, as well as another report containing a transfer pricing study.

On November 14, 2019, the Department and GCU entered into (effective by the Department's countersignature) a Provisional Program Participation Agreement ("PPPA") which authorized GCU's continued participation in the Title IV programs under its new ownership, albeit continuing that participation as a proprietary school. The PPPA continues GCU's participation through September 30, 2022.

Following its receipt of the November 6, 2019 Letter, GCU requested a meeting with Department representatives. That meeting was held on December 16, 2019, and included six representatives of GCU, and six representatives of the Department. The principal focus of the meeting was GCU's presentation of a power point featuring students and community members praising GCU's accomplishments on campus and in the community. The Department agreed with the GCU representatives that those activities are worthwhile and commendable, however explained that they do not change the factors identified in the November 6, 2019 Letter which the Department determined precluded its approval of nonprofit status for GCU.

On January 8, 2020, the Department received a letter from Will Gonzalez, Chairman of the GCU Board of Trustees, which included a term sheet and an amended services agreement, and requested that the Department reconsider GCU's request to convert to nonprofit status as a result of those changes. On January 17, 2020, the Department responded to Mr. Gonzalez's letter, advising him that the Department would not be able to re-determine GCU's status based on the materials he provided, but that additional documents and information would be needed, including the proposed amendment to the purchase agreement (not just a term sheet), updated valuation studies and an opinion from an independent expert.

S. Gombos, re: Grand Canyon University
Page 3

The requested valuation and review documents were submitted to the Department on May 6 and May 13, 2020.  On July 1, 2020 – only six weeks later, GCU wrote to the Department seeking a status update on the Department's review of these new materials,[1] despite the fact that it took nearly four months for these materials to be submitted to the Department.  Now the Department must conduct another thorough review and analysis of these new studies and the proposed new agreement.

In addition to GCU's request to conduct a second post-closing review of the transaction, the Department has numerous other change in ownership applications currently under review, some of which are also proprietary to nonprofit conversion applications.  All these applications require a substantive review— the Department does not simply conduct a box-checking exercise.  The Department attempts to process applications and requests for reconsideration in the order received, while taking into consideration that reviews arise during different times of the change of ownership cycle, the nature of the review, the issues presented, and the complexity of the transaction all necessarily impact the timeline for any given review.  With respect to GCU's request, the Department has already devoted significant time and resources to its original determination, and this supplemental review will not displace other reviews already in process.  We understand that the parties want to restructure their transaction for purposes of seeking a reconsideration of the original determination, and we anticipate that the review will be completed within the next few months.  Although the Department tries to process a number of reviews at a time, that process is necessarily impacted by the workload of the Department personnel involved in these reviews.

Although classified as a proprietary institution for Title IV purposes, the only additional regulatory requirement is that GCU must continue to meet the 90/10 eligibility requirements described in 34 C.F.R. §668.28.  The gainful employment program requirements previously set out in 34 C.F.R. Subpart Q are no longer in effect as of July 1, 2020.

There has been no interruption to the flow of Title IV funding to GCU throughout this process.  The Department notes GCU's title IV funding has increased steadily over the past 3 fiscal years.  For year ended June 30, 2018 - $960,066,272.91; for year ended June 30, 2019 - $1,013,596,260.35; and for the year ended June 30, 2020 - $1,165,945,308.25.

In addition to the increase in Title IV funding the Department notes that as of June 30, 2019, GCU's enrollment had grown to 87,590, which was an increase of 7.3% from the prior fiscal year (*see* August 6, 2019 8K filed by GCE).  For the current year, as of June 30, 2020, GCU's enrollment had grown to 94,606, which is an increase of 8% from the prior fiscal year (*see* August 4, 2020 8K filed by GCE).

The Department's goal for completing its review of this matter is November 15, 2020, contingent on whether additional materials are needed to complete the Department's review.  The Department will contact GCU if further information or documents are needed.

---

[1] Although the Department endeavors to provide status updates when requested, we are inundated with such requests, in addition to processing all of the substantive work.  As a result, sometimes a status request may be missed.  Usually, an institution will follow up with FSA with a courtesy reminder of the request.

S. Gombos, re: Grand Canyon University
Page 4

If you have any additional questions, please contact Michael Frola, Division Chief for the Multi-Regional & Foreign School's Division at 202-377-3364 or via email at Michael.Frola@ed.gov.

Sincerely,

*Robin S. Minor*

Robin S. Minor
Deputy Chief Operating Officer
Office of Partner Participation and Oversight

cc:    Brian Roberts, GCU Chief Administrative Officer, General Counsel, and Secretary

**Certificate of Service**

I certify that on December 15, 2021, I electronically filed this Joint Appendix using the Court's CM/ECF system.

*/s/ David A. Obuchowicz*