Kevin E. O'Malley (006420)
Hannah H. Porter (029842)
Gallagher & Kennedy
2575 E. Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone: 602.530.8000
Facsimile: 602.530.8500
Email: kevin.omalley@gknet.com
Email: hannah.porter@gknet.com

Steven M. Gombos (*pro hac vice*)
Virginia State Bar No. 30788
David A. Obuchowicz (*pro hac vice*)
Virginia State Bar No. 82483
Gombos Leyton, PC
11350 Random Hills Road, Suite 400
Fairfax, Virginia 22030
Telephone: 703.934.2660
Facsimile: 703.934.9840
Email: sgombos@glpclaw.com
Email: dobuchowicz@glpclaw.com
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Grand Canyon University,<br>　　　　　　Plaintiff,<br><br>v.<br><br>Miguel Cardona, *et al*,<br><br><br>　　　　　Defendants. | No. 2:21-cv-00177-SRB<br><br>**Plaintiff's Motion for Summary Judgment and Memorandum in Support**<br><br>**(Oral argument requested)** |

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

1

Table of Contents

Introduction………………………………………………………………….1

Background…………………………………………………………………..2

Standard of Review………………………………………………...………...10

Argument……………………………………………………………………10

1. The Department acted contrary to law by changing its nonprofit definition to include substantive criteria beyond the scope of the student financial aid programs……………10

    1.1 The definition of nonprofit institution at 34 CFR 600.2 cannot be read to give the Secretary authority to determine nonprofit status………………………………10

    1.2 The most natural reading of 600.2, which the Department long endorsed, is that IRS approval controls nonprofit status for Title IV participation…………….…..…12

    1.3 The Department cannot amend its change-in-control regulations under the guise of interpreting 600.2's definition of nonprofit institution…………………..14

    1.4 Even if the Department were authorized to decide nonprofit status under its regulations, the agency's application as to GCU fails as a matter of law………….16

2. The Department arbitrarily and capriciously denied Grand Canyon's nonprofit status, given the agency's longstanding deferral to the IRS and explicit endorsement of revenue-based contracts…………………………………………………………………….18

    2.1 The Department has not adequately explained its reinterpretation of 600.2 to the detriment of GCU, which relied on the Department's past practices……..…..18

    2.2 The Department's failure to explain its policy change and develop clear standards for nonprofit status has led to inconsistent treatment…………………..20

    2.3 The Department considered irrelevant factors it had no authority to consider…………………………………………………………………….22

    2.4 The Department ignored the most relevant information related to Grand Canyon's nonprofit status…………………………………………………….23

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

2.4.1 The Department had no basis to dismiss the findings of the IRS…….24

2.4.2 The Department failed to give appropriate deference to HLC's findings……………………………………………….........................25

2.4.3 The Department misapplied tax law in erroneously discrediting the opinions of independent experts…………………………………………27

3. The Department violated Grand Canyon's First Amendment rights of free speech by prohibiting the university from accurately describing itself as nonprofit…………………30

Conclusion………………………………………………………………………31

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

### Table of Authorities

**Cases**

*Busher v. Barry*, 2019 U.S. Dist. LEXIS 220082 (S.D.N.Y. Dec. 18, 2019) .......................17

*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983)........................................................31

*Bonnichsen v. U.S.*, 969 F. Supp. 628 (D. Or. 1997).................................................................24

*Broadway Theater League of Lynchburg v. United States*, 293 F. Supp. 346 (W.D. Va. 1968) .......................................................................................................................................23

*Center for Excellence in Higher Education v. King*, et al., 16-cv-00911 (D. Utah) ................. 6

*Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980) .....31

*Edenfield v. Fane*, 507 U.S. 761 (1993) ....................................................................................31

*Erringer v. Thompson*, 371 F.3d 625 (9th Cir. 2004)................................................................ 14

*FCC v. Fox TV Stations, Inc.*, 556 U.S. 502 (2009)....................................................18, 19, 20

*Friends of Animals v. Pendley*, 523 F. Supp. 3d 39 (D.D.C. 2021) .......................................... 10

*Gonzalez v. Oregon*, 546 U.S. 243 (2006) .................................................................................24

*Groder v. U.S.*, 816 F.2d 139 (4th Cir. 1987).............................................................................24

*Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082 (9th Cir. 2003) ....................................................15

*In re Nat'l Sec. Letter v. Sessions*, 863 F.3d 1110 (9th Cir. 2017) .......................................... 30

*Kisor v. Wilkie*, 139 S.Ct. 2400 (2019) .............................................................................. 18, 24

*Kreis v. Sec'y of Air Force*, 406 F.3d 684 (D.C. Cir. 2005) ......................................................22

*M.M. v. School Dist. of Greenville Cty.*, 303 F.3d 523 (4th Cir. 2002) ................................. 26

*Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .............................................................................................................. 24, 27

*Navy v. FLRB*, 836 F.2d 1409 (3d Cir. 1988).......................................................................... 10

*Science and Research Foundation, Inc. v. United States*, 181 F. Supp. 526 (S.D.Ill. 1960) .... 23

*Tsosie v. Califano*, 651 F.2d 719 (10th Cir. 1981).................................................................... 30

*United Cancer Council, Inc. v. Comm'r*, 165 F.3d 1173 (7th Cir. 1999) ........................ 20, 23

*USA Group Loan Service, Inc. v. Riley*, 82 F.3d at 708 (7th Cir. 1996)...............................15

*Wheeler v. Barrera*, 417 U.S. 402 (1974) ...............................................................................22

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ........................................................22

**Statutes**

20 USC 1094(a)(24). .................................................................................................................. 6

20 USC 1098a...............................................................................................................................15

20 USC 1099b ............................................................................................................................25

20 USC 1099b(c) ........................................................................................................................26

20 USC 1232a ...............................................................................................................8, 22, 25

20 USC 3403 ............................................................................................................ 25

20 USC 3403(a). ...................................................................................................... 22

26 USC 4958 ............................................................................................................ 27

5 USC 553 ................................................................................................................ 15

5 USC 706(2)(A) ..................................................................................................... 12

**Other Authorities**

*Abuses in Federal Student Grant Programs: Hearing before the S. Perm. Subcomm. on Investigations*, S. Hrg. 104-477 at 222 ............................................................. 12

59 Fed. Reg. 22,324, 22,334 (Apr. 29, 1994) ............................................... 12, 17

75 Fed. Reg. 42,190 42,192 (July 20, 2010). ....................................................... 13

85 Fed. Reg. 18,649 (April 2, 2020). ..................................................................... 14

Inside Higher Education, *Surprise for Grand Canyon's Nonprofit Conversion* (Nov. 7, 2019), available at https://www.insidehighered.com/news/2019/11/07/education-department-calls-grand-canyon-profit-raising-questions-about-conversion ................... 8

Internal Revenue Manual, pt. 4, ch. 61, sec. 4.61.3. ............................................ 28

U.S. GOV'T ACCOUNTABILITY OFFICE, EDUCATION NEEDS TO STRENGTHEN ITS APPROACH TO MONITORING COLLEGES' ARRANGEMENTS WITH ONLINE PROGRAM MANAGERS 11 (April 2022) ....................................................................... 20, 22

**Regulations**

26 CFR 1.482-1(b)(1) .............................................................................................. 29

26 CFR 1.482-1(c) ................................................................................................... 28

26 CFR 1.501(a)-1(a)(2) ......................................................................................... 25

26 CFR 1.501(c)(3)-1(a)(1) .................................................................................... 16

26 CFR 1.501(c)(3)-1(a)(1)) ................................................................................... 16

26 CFR 1-482-1(b)(1) .............................................................................................. 29

34 CFR 600.2 .................................................................................................... passim

34 CFR 600.2 (2019) .............................................................................................. 14

34 CFR 600.20 ......................................................................................................... 11

34 CFR 600.20(b)(2) ............................................................................................... 11

34 CFR 600.31 .................................................................................................... 8, 11

34 CFR 600.31(a)(3) ............................................................................................... 11

34 CFR 600.31(d)(1),(7) ..................................................................................... 5, 11

34 CFR 600.4(a) ...................................................................................................... 11

34 CFR 602.22 ......................................................................................................... 26

34 CFR 668.25 ......................................................................................................... 23

34 CFR 668.25(a) ...................................................................................................... 8

**Introduction**

For decades the Department of Education recognized all IRS-approved tax-exempt entities as nonprofits for Title IV purposes. It deferred to the IRS's expertise and accepted its determination. The Department now asserts it too must decide Grand Canyon University's nonprofit status to ensure Title IV funds are devoted to the institution's educational mission. But even the Department conceded, in a fit of honesty, that GCU's status has no impact "on the flow of Title IV funding to GCU." AR-J-0350. So what's it all really about?

Over the last decade or so, critics of for-profit education, among them politicians, have vilified for-profit colleges. Senator Elizabeth Warren, for instance, has called for a ban on federal funding to for-profit colleges.[1] The for-profit label has been poisoned. One might think nonprofit conversions are good in those critics' eyes. But having made the for-profit label a slur, those critics want to force colleges to wear it. Nonprofit conversion defeats that punitive goal.

That is why the Department refused to recognize GCU's nonprofit status. That is why the Department decided to reject GCU's status before the transaction date but withheld its decision from GCU for 16 months. That is why the Department second guessed GCU's tax-exempt status under controlling IRS authorities—and not Department standards, policies, or rules, because there are none. And that is why the Department is barring GCU from publicly referring to its nonprofit status.

The aim is simply to brand GCU as a for-profit college despite the fact GCU is a tax-exempt nonprofit bound by state and federal law. And the Department was willing to do whatever necessary to achieve this objective, even if it was arbitrary, capricious, or contrary to law, as demonstrated below.

---

[1] *See* My Plan to Cancel Student Loan Debt on Day One of My Presidency, available at https://elizabethwarren.com/plans/student-loan-debt-day-one.

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

1

**Background**

2     **1. GCU's nonprofit status.** For most of its 70-year history, GCU operated as a

3  nonprofit university. That is consistent with GCU's goal of making a private, Christian

4  higher education more broadly available regardless of economic status. Financial troubles in

5  the early 2000s led the university's Board of Trustees to sell the school to the for-profit

6  entity Grand Canyon Education, Inc. (GCE), whose access to public funds stabilized the

7  university. In 2014, the Board of Trustees voted to return GCU to its historical nonprofit

8  status, confident in GCU's educational model and continued financial strength. AR-J-0001

9  – 0008.

10     The Board of Trustees decided that reestablishing GCU as a traditional private

11  nonprofit university was in the best interest of GCU's students, faculty, and staff, as well as

12  the broader community. Tax savings would allow GCU to continue to offer low tuition rates

13  to its students and to reinvest in community outreach projects. AR-J-0004. And nonprofit

14  status would allow GCU to participate in academic, co-curricular, and governance

15  opportunities with peer universities and provide GCU students and faculty grant writing

16  and research opportunities. In the Board's view, then, returning GCU to nonprofit status

17  meant embracing the fullness of the academy. AR-J-0001 – 0008.

18     **2. The conversion process.** GCU's Board of Trustees began the nonprofit conversion

19  process in 2014. AR-F-0066 – 0077. It formed a new Arizona nonprofit entity, Gazelle

20  University, which would be used to purchase GCU's educational assets, name and

21  trademarks, and Phoenix campus from GCE. *Id.*[2] The Board of Trustees members—who

22  had final oversight of GCU's academic administration and were separate from GCE's Board

23  of Directors—constituted the board members of Gazelle University. AR-J-0004 – 0005.

24

---

25  [2] Gazelle University was created to acquire the university so that it would be owned and
26  operated by a nonprofit corporation. After acquiring the university, Gazelle changed its
name to Grand Canyon University.

William Gonzalez, a Phoenix attorney and GCU alumnus, served as Board Chairman and led Gazelle's negotiations to acquire GCU's assets.

In negotiating the transaction, Gazelle University focused on key principles:

A   The university must become a nonprofit entity. If that was not achievable, then continuing to operate within GCE was the next best option, in the Board's judgment.

B   The nonprofit conversion must not put undue financial strain on the university. While Gazelle would have to purchase the transferred assets at fair market value, it must be structured in a way to minimize its financial burden and ensure its long-term future.

Gazelle University negotiated and structured the planned transaction to achieve both goals. Gazelle would purchase the transferred assets of GCU from GCE at fair market value but would not be required to pay cash up front. AR-G-0048. Instead, Gazelle would enter into a seven-year interest only credit agreement with GCE for the principal amount. *Id.* The credit agreement also allowed Gazelle to require GCE to finance GCU's capital expenditures for the first three years, with those amounts being added to the note balance, which would allow Gazelle to build up its cash reserves. *Id.* Gazelle believed at the time it would have the ability to refinance the amount owed to GCE during the seven-year term of the credit agreement. (The university later refinanced the note owed to GCE by issuing private bonds.) Finally, Gazelle negotiated the Master Services Agreement (MSA) with GCE to include a revenue share arrangement to reduce Gazelle's financial risk. *Id.* A set fee payment could financially strap Gazelle in the event its revenue declined, whereas, under the MSA, Gazelle only paid amounts equal to a set percentage of revenue received.

**2.1 IRS review and approval.** In October 2015, Gazelle University filed an application with the Internal Revenue Service (IRS) for tax-exempt status. The application—IRS Form 1023—required comprehensive information about Gazelle University, including, most

relevant here, details about its organization, planned operations, and contracts with non-exempt, for-profit entities. AR-F-0001 – 0064. For example, Gazelle University disclosed the terms of its anticipated master services agreement with GCE in response to at least 10 questions. *Id.* at 29-32, 33-34, 38, 40-42, 46, 49, 55.

Every issue the Department of Education would later raise, based on its flawed interpretation of controlling tax law, Gazelle University already disclosed to the IRS. Gazelle explained in its application that it was organized to acquire and then operate GCU; that it would operate in furtherance of its nonprofit purpose by acquiring the university; and that the planned acquisition involved Gazelle's purchase of GCU and the establishment of a services agreement between Gazelle and GCE. AR-F-0028 – 0032.

Gazelle also disclosed that Brian Mueller would continue as GCE's Chief Executive Officer post-transaction and also serve as president of the university. AR-F-0037 – 0038. And Gazelle University enclosed with its Form 1023, draft transaction documents, including the Asset Purchase Agreement, Master Services Agreement, Credit Agreement, and Conflict of Interest Policy for President Mueller. *Id.* at 0101 – 0137, 0179 – 0226, 0095-0099.

Following its review of the Form 1023 and attached documents, the IRS approved Gazelle University as a 501(c)(3) tax-exempt entity. AR-F-0607 – 0608.

**2.2 HLC review and approval.** The university also sought approval of the proposed transaction from its accreditor the Higher Learning Commission. HLC's staff prepared a summary report, in January 2018, assessing the anticipated change of control, structure, governance, and ownership of GCU, based on its review of the transaction documents and after a multi-day site visit to GCU's Phoenix campus. HLC concluded the transaction would not financially burden the university, determined that the university maintained sufficient controls over President Mueller to permit his dual roles, and, in March 2018, approved the proposed transaction. AR-G-0010 – 0049, 0052 – 0053.

**2.3 Preacquisition review.** While HLC's review was ongoing, the university requested the Department's review of the proposed change in ownership and control under the Department's preacquisition review process. AR-J-0001 – 0008; AR-L-0001 – 0028. Under the Department's regulations, Gazelle's purchase of GCU and GCU's conversion from for-profit to nonprofit status both constitute changes in control. 34 CFR 600.31(d)(1),(7). When an institution undergoes a change in control, it immediately loses its eligibility to participate in Title IV programs. *Id.* at (a)(1). To alleviate the harshness of this rule, the Department allows institutions considering such changes to request review before making any changes.

With its January 18, 2018 preacquisition review request, GCU provided Gazelle's 501(c)(3) approval from the IRS as well as draft transaction documents. GCU also detailed the planned MSA, which it described as similar to other arrangements "used at institutions throughout the country, including in a recent transaction approved by the Department[.]" AR-J-0006 (referencing Purdue Global deal with Kaplan University). In response to the Department's later requests, GCU also provided reports prepared by valuation experts Gazelle hired, who collectively valued the acquired assets at $1.2 billion—nearly $323 million more than the final purchase price.[3] GCU also submitted a transfer pricing study prepared by Deloitte LLP, which confirmed the MSA's revenue sharing arrangement fairly compensated GCE for the services it provided under the MSA and the risk it shouldered. AR-C-0099 – 0140.

**3. The Department's approach to nonprofit status**. For decades, the Department automatically accepted 501(c)(3) approval as conclusive proof of nonprofit status for Title IV participation. Two decades worth of public statements bear this out. *See* argument section 1.2, below. Rather than second guess the IRS's judgment, the Department instead adopted an after-the-fact role. *Id.* It promulgated new rules making nonprofit conversion a change-in-control which required institutions to reapply *after* the change occurred. *Id.* And

---

[3] *See* AR-C-0519 – 0525; 0526 – 0546; 0547 – 0636; 0637 – 0712; 0713 – 0733.

1  it required institutions that converted to nonprofit status to comply with the 90/10 rule

2  (which applies only to for-profits) for the first year after converting.[4]

3      Although this approach worked for decades, some critics of for-profit education

4  advocated change. Robert Shireman, who served as Deputy Undersecretary of Education

5  from 2009 to 2010, spearheaded that effort. In September 2015, he wrote an article, titled

6  *Covert For-Profits*, in which he urged the Department to reinterpret its definition of

7  nonprofit institution in 600.2 to take into its own hands the decision whether an institution

8  is a nonprofit. *See* AR-M-0075. He acknowledged, though, that the Department had always

9  deferred to the IRS. AR-M-0076.

10     Leading critics of for-profit higher education in Congress began pressuring the

11  Department along the same lines. *Id.* At the time, the Department itself pushed back,

12  explaining that the IRS, not the Department, was responsible for determining whether

13  arrangements between nonprofit institutions and for-profits entities were permissible under

14  nonprofit rules, even "with respect to the Federal student aid funds earned by the

15  institution." AR-J-0344. But the political pressure continued unabated, including express

16  calls from some congressional officials to deny GCU's nonprofit conversion. AR-M-0079.

17     And somewhere along the line, the Department relented to that pressure. Without

18  acknowledging its departure from its past practice, the Department for the first time, in

19  2016, rejected the nonprofit status of an IRS approved 501(c)(3).[5] AR-J-0322. The

20  Department later half-acknowledged that it had departed from its prior practice and sought

21  to justify its decision through its interpretation of the definition of "nonprofit institution"

22  in 600.2 AR- J-0333.

23  _____

24  [4] The 90/10 rule requires a for-profit institution to derive at least ten percent of its
    revenue from nonfederal sources. 20 USC 1094(a)(24).

25  [5] The institution involved challenged the Department's denial as arbitrary and capricious.

26  *See Center for Excellence in Higher Education v. King*, et al., 16-cv-00911 (D. Utah). The
    case settled, and the institution is recognized by the Department as a nonprofit institution.

1   But the Department failed to consider whether reading 600.2 to authorize it to decide

2   nonprofit status conflicted with its own change-in-control regulations. Nor did the

3   Department consider whether reliance interests had developed from its longstanding

4   practice or even if its prior approach addressed its new concerns. And that failed

5   consideration is because the Department simply wanted to prevent nonprofit conversions.

6   The "for-profit" label had become pejorative in higher education after years of

7   politically centered attacks. And allowing colleges to convert to nonprofit status (even

8   though that status imposes significant restrictions) evaded the political labeling sought by

9   many at the Department. So, the Education Secretary said, in a press release accompanying

10  the 2016 nonprofit denial, to those schools seeking to convert to nonprofit status: "Don't

11  waste your time." AR-J-0328.

12  **4. The Department's initial arbitrary and capricious denial.** The Department finally

13  issued its decision on November 16, 2019, nearly 16 months after GCU's transaction closed.

14  While it approved the university's change in ownership, from GCE to Gazelle (now going

15  by GCU), it refused to recognize GCU's nonprofit status. It advanced three primary reasons

16  for its decision. AR-A-0001 – 0018.

17  First, the Department concluded that GCU failed the IRS's operational test under

18  controlling tax authority. *Id.* at 15. The Department openly conceded that the IRS's

19  regulations were the relevant criteria—and not any Department rules or requirements. *Id.*

20  at 10. And while the Department noted that GCU had the burden of demonstrating its

21  exempt status under IRS regulations (*Id.*), it disregarded the fact GCU had necessarily met

22  that burden since the IRS granted GCU's tax-exempt status based on the specific

23  transaction before the Department. Moreover, in analyzing the IRS's operational test, the

24  Department relied primarily on financial reports exclusively prepared for and reviewed by

25  GCE. AR-A-0012 – 0013.

26

Second, the Department referenced Mr. Mueller's dual roles as GCU's President and GCE's Chief Executive Officer. AR-A-0015. The Department identified no tax authority or education regulation prohibiting such dual roles. Nor did it address federal law's express prohibition against federal interference in education (20 USC 1232a) which bars the Department from exercising any control over the personnel or administration of any educational institution.

Third, the Department expressed skepticism that GCU could contract for the type and number of services contracts for under the MSA and "still be deemed to operate the institution." AR-A-0016. The Department made no effort to square that statement with 34 CFR 668.25(a)—under which an institution may contract out "any aspect of the institution's participation in any Title IV, HEA program." Nor did it resolve the conflict between suggesting GCE continued to operate the university while simultaneously approving GCU's change in ownership *resulting in a change in control* of the university under 34 CFR 600.31. AR-A-0017.

Finally, the Department instructed GCU to "cease any advertising or notices that refer to its 'nonprofit status.'" AR-A-0017.

**5. GCU's response.** The Department's decision was a shock—not only to GCU, but also to the broader higher education sector. One higher education analyst put a fine point on it by exclaiming: "Holy s\*\*t."[6]

After receiving the decision, GCU first tried to meet with the Department. GCU officials flew to Washington, D.C., to meet with Department employees in December of 2019. AR-L-0104; AR-J-0306. The university officials explained the purpose of the conversion, identified mistakes in the Department's analysis, and demonstrated how GCU's students and wider community had benefitted from the university's nonprofit

---

[6] Inside Higher Education, *Surprise for Grand Canyon's Nonprofit Conversion* (Nov. 7, 2019), available at https://www.insidehighered.com/news/2019/11/07/education-department-calls-grand-canyon-profit-raising-questions-about-conversion.

conversion 17 months earlier. AR-L-0104 – 0117. The Department officials sat through the meeting but offered no substantive response.

Later, GCU officials proposed MSA modifications GCU was willing to make (with GCE's sign off) to alleviate the Department's concerns. AR-B-2247 – 2328. Specifically, GCU proposed three changes:

A    shrinking the revenue pool from which GCE's revenue share was calculated (AR-B-2309 - 2310).

B    eliminating the non-renewal fee so GCU could walk away after the initial term without owing GCE any fee (AR-B-2263).

C    allowing GCU to terminate the MSA earlier—at 5 years rather than 7 years—and removing the provision requiring GCU to repay the seller note before it could terminate the MSA (AR-B-2263).

In conveying these proposed changes, GCU noted that it intended to ask Deloitte LLP to conduct a new transfer pricing study for its use. Officials with the Department requested a copy of the completed study and asked GCU to retain an independent expert to evaluate the Deloitte study. Those studies were provided to the Department in May 2020. AR-A-0020.

**6. The Department's second arbitrary and capricious decision.** Eight months later, in early 2021, the Department issued a second decision again refusing to recognize GCU's nonprofit status. AR-A-0019 – 0037. The second decision was as disingenuous as the first. The Department suggested that, in contrast to the IRS, its review of nonprofit status was necessary to ensure Title IV funds were "primarily devoted to the mission of the school and not other parties, including (as here) the prior owner and its shareholders." AR-A-0035. But the Department itself acknowledged—and, indeed, it is true—GCU's status has no impact on "the flow of Title IV funding to GCU." AR-J-0350. Simply put, the Department

knows the decision in no way affects GCU's revenue share payments to GCE. In contrast, when the IRS denies exempt status, an entity is actually subject to paying taxes.

The Department's purported role is a sham. Its disingenuous analysis papered over its real purpose. It is certainly not about how GCU used Title IV funds. The point is simply to stop the university from "refer[ing] to GCU as a nonprofit." AR-A-0037.

GCU filed this lawsuit in response, challenging both decisions as arbitrary, capricious, and contrary to law, as well as in violation of the First Amendment.

## Standard of Review

Whether an agency action is arbitrary, capricious, or contrary to law under the APA is a legal question reviewed *de novo*. Cross-motions for summary judgment are the mechanism for determining whether the agency action is supported by the administrative record or is consistent with the APA's standard of review. *See Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 51-52 (D.D.C. 2021) (noting that the standard set forth in Rule 56 does not apply). Because the Department's decisions are based on "controlling tax authority" under the Internal Revenue Code, AR-A-0010, the Department is entitled to no deference. *See Dept. of the Navy v. FLRB*, 836 F.2d 1409, 1410 (3d Cir. 1988).

**1. The Department acted contrary to law by changing its nonprofit definition to include substantive criteria beyond the scope of the student financial aid programs.**

**1.1. The definition of nonprofit institution at 34 CFR 600.2 cannot be read to give the Secretary authority to determine nonprofit status.**

The Department's decision starts from the premise that 34 CFR 600.2's definition of "nonprofit institution" gives the agency authority to determine nonprofit status. AR-A-0009. But that reading is incompatible with the Department's change-in-control regulations. *See* 34 CFR 600.20; 600.31.

Section 600.2 simply defines what "nonprofit institution" means when used in 34 CFR Part 600. It is not a substantive regulation. Instead, it is a guide to understanding the

substantive regulations in Part 600 that use the term "nonprofit institution"—e.g., 600.20(b)(2)(C) or 600.31(d)(7).

Short of rewriting those provisions, the definition of "nonprofit institution" cannot be read to authorize the agency to determine nonprofit status. For example, Section 600.31(d)(7) says that a change in status from a proprietary to a nonprofit institution—read *nonprofit* here as 600.2 defines it—is a change in control that causes an institution to lose Title IV eligibility when the change occurs. The institution must then reestablish eligibility by showing the Secretary it remains eligible "after" the change in control—here, after GCU changed from proprietary to nonprofit status. *See* 34 CFR 600.31(a)(3); *see also* 34 CFR 600.20(b)(2) (an institution must reapply "**after** the institution changes its status as a proprietary, nonprofit, or public institution") (emphasis added).

By way of example: GCU lost eligibility on July 1, 2018, the day the transaction closed. That change from proprietary to nonprofit status occurred by operation of state law and without the Department's approval. It also meant that GCU had to reapply to participate in Title IV programs *after* it changed from proprietary to nonprofit status. *See* 34 CFR 600.4(a) (identifying eligibility criteria for nonprofit institutions).

Thus, reading 600.2 to authorize the Secretary to determine nonprofit status contravenes the change-in-control regulations. The Department's position creates an internal inconsistency. An institution's change from proprietary to nonprofit status cannot trigger the loss of eligibility and the requirement to reapply to participate in Title IV programs *after* the change in status, if it is the Department that decides during that reapplication phase whether the institution has really changed from proprietary to nonprofit status.

Simply put, the Department's change-in-control regulations plainly state that becoming a nonprofit institution (as that term is defined in 600.2) is the first step—the triggering

event—in the change-in-control process, not the outcome of the Department's analysis *after* the change-in-control.

Because the starting premise of the Department's decision fails, the Court can stop reading here and reverse the agency's decision as contrary to law. *See* 5 USC 706(2)(A).

### 1.2. The most natural reading of 600.2, which the Department long endorsed, is that IRS approval controls nonprofit status for Title IV participation.

GCU prevails under the plain language of the change-in-control regulations. Nonprofit status for Title IV purposes is a function of state law and IRS approval. The Department's own prior statements confirm this conclusion.

Importantly, when the Department promulgated the change-in-control regulations, it specifically addressed the fact that an institution could change to nonprofit status with "little formality," without Department approval, and without reconstituting itself as a new corporation. 59 Fed. Reg. 22,324, 22,334 (Apr. 29, 1994). As one commenter noted, and the Secretary agreed, making nonprofit conversion a change-in-control was necessary to give the Department some role in scrutinizing institutions that convert from proprietary to nonprofit status. *See Id.* But that role is limited.

As the Department explained to Congress in 1995, because "institutions can easily switch from profit status to nonprofit status," the Department would "subject schools that do change from profit to non-profit . . . to the same requirements of their previous designation for a certain period of time." *Abuses in Federal Student Grant Programs: Hearing before the S. Perm. Subcomm. on Investigations*, S. Hrg. 104-477 at 222 (written answers of David A. Longanecker, Assist. Sec. for Postsecondary Education). Implicit in that statement and inherent in the change-in-control regulations, however, is the recognition that an institution can change from for-profit to nonprofit status, even for Title IV purposes, without the Department's approval.

The Department reiterated this point more recently. In 2010, the Department added a new paragraph about foreign institutions to the nonprofit definition in 600.2. The new paragraph, the Department explained, was meant to be "as comparable as possible to those applicable to domestic institutions." 75 Fed. Reg. 42,190 42,192 (July 20, 2010). In order to achieve that goal:

> [T]he Department proposed . . . that a determination that an institution is nonprofit by entity in the institution's foreign country would qualify an institution as nonprofit only if the determination is made by a recognized tax authority of the country, and the Secretary has recognized that tax authority as one that can make a determination using criteria that are similar to those used by the U.S. IRS . . . .
>
> The Department believes that the only entities it should recognize across the board for making determinations of nonprofit status are those that are responsible for administrating the country's tax laws.

*Id.* Simply put, if a foreign tax authority used similar criteria to the IRS, then the Secretary "would *automatically accept*" that tax authority's judgment "for purposes of making determinations of an institution's nonprofit status for Title IV, HEA purposes." *Id.* (emphasis added).

Finally, five months after the Department refused to acknowledge GCU's nonprofit status, the agency again modified 600.2's definition of nonprofit institution to remove what the Department called a simple **redundancy**. That change removed a provision that unambiguously conferred nonprofit status on any institution recognized by the IRS as a 501(c)(3). 34 CFR 600.2 (2019).[7] The Department removed the provision  because it "repeat[ed] the language of the [current definition] **stipulating** that an institution is a 'nonprofit institution' if it is determined by the U.S. Internal Revenue Service to be a[] . . .

_____

[7] The removal of this provision did not go into effect until July 1, 2021. Thus, at the time of GCU's July 2018 application, it unambiguously met the Department's nonprofit definition.

13

501(c)(3)." 85 Fed. Reg. 18,649 (April 2, 2020). In short, as recently as 2020, the Department confirmed nonprofit status turns on 501(c)(3) approval.

All this makes the following clear: An institution's nonprofit status, even for purposes of Title IV participation, is a function of state law and IRS approval. The Department's attempt to independently determine GCU's nonprofit status in this case, therefore, contradicts its change-in-control regulations and longstanding interpretation of 600.2's nonprofit definition.

### 1.3. The Department cannot amend its change-in-control regulations under the guise of interpreting 600.2's definition of nonprofit institution.

The Department's effort to reinterpret 600.2's nonprofit definition to authorize itself to decide nonprofit status contradicts and substantively rewrites the change-in-control regulations. Rather than treat an institution's change in status from for-profit to nonprofit as a factual occurrence that triggers the change-in-control process, as its regulations provide, the Department instead, in the guise of reinterpreting 600.2's nonprofit definition, has taken upon itself to decide whether an institution is a nonprofit. That contradicts the change-in-control regulations.

Agencies cannot, however, amend or change substantive regulations through the disingenuous process of reinterpreting an existing rule. *See Erringer v. Thompson*, 371 F.3d 625, 632 (9th Cir. 2004). When an agency attempts to reinterpret a rule in a manner that contradicts an existing regulation, it is amending its regulations and must act through notice-and-comment rulemaking. *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003).

APA § 553 (5 USC 553) requires agencies to use notice-and-comment procedures in adopting regulations. This requirement applies not only to the adoption of new substantive regulations but also when an agency seeks to amend existing regulations. And even when an agency purports to change its interpretation of a rule, if it is inconsistent with substantive regulations, then notice-and-comment is required. *Hemp*, 333 F.3d at 1088.

14

Even more so than the APA, the HEA is solicitous of public input in the rulemaking process. 20 USC 1098a requires the Department to "obtain public involvement in the development" of regulations through a negotiated rulemaking process that considers "the advice of and recommendation from" the "groups involved in student financial assistance programs." *See Id.* at (a)(2); *see USA Group Loan Service, Inc. v. Riley*, 82 F.3d at 708, 715 (7th Cir. 1996) (noting that the HEA's negotiated rulemaking process "creates a consultative process in advance of the more formal arms' length procedure of notice and comment").

In its decision denying GCU nonprofit status, the Department sidestepped this process, functionally rewriting its change-in-control regulations in the guise of interpreting 600.2. To properly amend its change-in-control regulations and create a process for the Department to decide nonprofit status, the Department must promulgate legislative rules through negotiated rulemaking and after notice and comment, a process it has just begun, albeit years after denying GCU's nonprofit status. The Department's ongoing rulemaking process for its change-in-control regulations, including proposed substantive criteria institutions must meet for nonprofit status, can be found on the Department's website.[8]

The APA and HEA both require public input in the rulemaking process because regulated parties are entitled to know the law that binds them. The Department's purported denial of GCU's nonprofit status is a powerful negative example of this principle. In denying GCU's nonprofit status, the Department created new substantive standards GCU had no means of knowing and it treated GCU differently than numerous other universities with comparable service agreements.

---

[8] U.S. Department of Education, Negotiated Rulemaking for Higher Education 2021-22, available at https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html#ipec.

15

Because the Department substantively amended its change-in-control regulations without undertaking notice-and-comment procedures, the Court should find the decision invalid and contrary to law.

### 1.4. Even if the Department were authorized to decide nonprofit status under its regulations, the agency's application as to GCU fails as a matter of law.

Putting aside the broad regulatory conflict created by the Department's reading of 600.2 and failure to comply with procedural requirements, the Department's application of its nonprofit definition to GCU fails. According to the Department, its definition of nonprofit in 600.2 "mirrors" the IRS's requirements for tax-exempt status under 501(c)(3), including the IRS's organizational and operational test. *See* AR-A-0010 (citing 26 CFR 1.501(c)(3)-1(a)(1)). While GCU is organized for an exempt purpose, the Department asserts GCU fails the operational test because it fails the IRS's primary activities test. *See* AR-A-0010 – 0011.

But unlike the IRS's tax-exempt definition, the Department's nonprofit definition does not authorize it to consider whether an institution is operating exclusively for an exempt purpose.[9] That test is only relevant to tax-exempt status under 501(c)(3).

| 26 CFR 1.501(c)(3)-1(a)(1) – *tax-exempt status* | 34 CFR 600.2 – *nonprofit institution* |
|---|---|
| (a) Organizational and operational tests.<br><br>(1) In order to be exempt as an organization described in section 501(c)(3), an organization must be both **organized and operated exclusively for one or more of the purposes specified in such section**. If an organization fails to meet either the organizational test | (i) Is **owned and operated by one or more nonprofit corporations** or associations, no part of the net earnings of which benefits any private shareholder or individual;<br><br>(ii) Is legally authorized to operate as a nonprofit organization by each State in which it is physically located; and<br><br>(iii) Is determined by the U.S. Internal Revenue Service to be an organization to which |

---

[9] *See* AR-A-0010 (explaining that the Department's decision as to GCU is derived from subparagraph (i) of 600.2 and acknowledging that GCU meets subparagraphs (ii) and (iii)).

| | |
|---|---|
| or the operational test, it is not exempt. | contributions are tax-deductible in accordance with section 501(c)(3) of the Internal Revenue Code (26 U.S.C. 501(c)(3)). |
| (emphasis added) | (emphasis added) |

To be owned and operated exclusively for an exempt purpose (under 501(c)(3)) is different than simply being owned and operated by a nonprofit (under 600.2). Nonprofit status is a state law concept. Although nonprofit institutions may be eligible for federal tax-exempt status, they must meet the IRS's additional requirements for tax exemption. *See, e.g., Busher v. Barry*, 2019 U.S. Dist. LEXIS 220082, *37 (S.D.N.Y. Dec. 18, 2019) (citing the IRS's tax-exemption website); *see also* 59 Fed. Reg. 22,324, 22,334 (Apr. 29, 1994) (the Department of Education noting that 501(c)(3) status imposes more stringent requirements than nonprofit status).

The Department's nonprofit definition does not incorporate the IRS's operational test because that language derives from 501(c)(3)'s requirement than an entity be organized and operated exclusively for an exempt purpose. The Department's bare assertion that 600.2 incorporates the IRS's tax-exempt tests is not consistent with 600.2's plain language and does not flow from any interpretive process. Nowhere in the Department's decision, or at any prior point, has the Department explained how it reads "owned and operated by a nonprofit" to mean "owned and operated exclusively for an exempt purpose."

In truth, the language of 600.2 is clear and does not authorize the Department to determine whether an entity meets tax-exempt requirements. *See Kisor v. Wilkie*, 139 S.Ct. 2400, 2414 (2019) ("[T]he possibility of deference can arise only if a regulation is genuinely ambiguous. And when we use that term, we mean it—genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation."). To the extent the nonprofit

definition in 600.2 empowers the Department at all, it is limited to the presence of private inurement—an analysis the Department did not undertake with respect to GCU. AR-A-0015 (concluding that GCU does not meet the operational test's primary activities requirement).

Because the Department's nonprofit definition does not permit the agency to decide whether GCU is "owned and operated exclusively for an exempt purpose," the Department's decision denying GCU's nonprofit status on that basis is contrary to law.

**2. The Department arbitrarily and capriciously denied Grand Canyon's nonprofit status, given the agency's longstanding deferral to the IRS and explicit endorsement of revenue-based contracts.**

**2.1. The Department has not adequately explained its reinterpretation of 600.2 to the detriment of GCU, which relied on the Department's past practices.**

In Denying GCU's nonprofit status, the Department deviated from its long-established policies—policies the Department knew GCU relied on to structure the transaction. Before closing the transaction, GCU specifically asked if there were any additional requirements. But the Department never responded before denying GCU's nonprofit status based on new, unforeseeable grounds. To survive APA scrutiny, the Department cannot depart from prior policy *sub silentio* or simply disregard rules still on the books. *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).

The Department always deferred to IRS tax-exempt approval for determining nonprofit status. *See* 1.2, above. And, more specifically, the Department acknowledged that, even with regard to Title IV funds, it is the IRS that "determine[s] whether [] activities are permissible under the nonprofit rules." AR-L-0101 – 0102.

The decisions deviate from those policies, but the Department has not acknowledged that it applied new rules to GCU. And it certainly has not explained why doing so was appropriate in light of GCU's substantial reliance interests. "It [was] arbitrary and capricious to ignore such matters." *Fox TV Stations*, 556 U.S. at 515-16.

Under the Department's prior practice, institutions who changed to nonprofit status had to comply with 90/10 for one additional year. For Title IV purposes, that is the only eligibility requirement applicable exclusively to proprietary institutions. AR-J-0350. The Department has not explained why its prior policy of requiring compliance with 90/10 for a limited period after the transaction is no longer sufficient to protect the Department's legitimate interests.  And GCU is in no danger of failing 90/10, so there is no basis to conclude GCU returned to nonprofit status to evade Title IV requirements. AR-J-0004.

The Department's failure to acknowledge and explain its change in policy has left institutions in the blind. Even Department officials have acknowledged that, in the absence of Department guidance, institutions and their counsel do not know what the Department's review entails. (Compl. ¶ 84, ECF 1; Answer ¶ 84, ECF 21) (Dec. 4, 2018 email to Jonathan Glass) (acknowledging the need to "provid[e] guidance to re-set expectations on review of these deals[]" and recognizing that "**[e]very attorney and school out there** says nothing to look at, simple deal.").[10] Indeed, the Department's only guidance on revenue-sharing service agreements (like the MSA) expressly approves them. AR-K-0011 – 0012. Prior to closing the transaction, GCU told the Department it was relying on that guidance and repeatedly asked whether it should be aware of any other requirements or standards. AR-J-0007, 0128. The Department's failure to take GCU's reliance interests into account violates the APA. *Fox TV Stations*, 556 U.S. at 515-16.

---

[10] While the Department admitted the accuracy of the email in paragraph 84 its Answer (ECF 21), it redacted the email in the administrative Record. AR-J-0181 – 0182. Though the email itself involved another school, GCU's counsel at the time included the email in a communication based on concerns that there were no standards or guidance informing the Department's review of the transaction. The redacted portions directly relate to the review of GCU's change-in-ownership application. It is telling that the Department seeks to redact non-privileged Department admissions confirming the inherent unfairness of its review process.

### 2.2. The Department's failure to explain is policy change and develop clear standards for nonprofit status has led to inconsistent treatment.

Following its unexplained change in policy, the Department conceded it has not developed "departmental guidance or separate standards," and instead decides nonprofit status on a "case-by-case basis." (Jan. 13, 2022 Hr'g Tr. 22:22 – 23:2). But deciding nonprofit status case-by-case is "no standard at all, and makes the tax status of charitable organizations [] a matter of the [Department's] whim." *United Cancer Council, Inc. v. Comm'r*, 165 F.3d 1173, 1179 (7th Cir. 1999). Frankly, it encourages disparate treatment.

That is the case here. At the outset, the Department does not monitor service agreements of existing nonprofits for compliance with nonprofit standards.[11] Hundreds of other nonprofit and public universities use third-party service agreements. U.S. GOV'T ACCOUNTABILITY OFFICE, EDUCATION NEEDS TO STRENGTHEN ITS APPROACH TO MONITORING COLLEGES' ARRANGEMENTS WITH ONLINE PROGRAM MANAGERS 11 (April 2022) ("GAO Report").[12] The Department's heavy scrutiny of the MSA is *sui generis*. Put another way, the Department singled GCU out.

Indeed, the Department recently approved a change-in-ownership application involving a service agreement with materially similar terms. The transaction involved Purdue University entering an agreement with for-profit Kaplan University to provide essentially the same services included in the MSA. (Compl. ¶¶ 200, 204; Ans. ¶¶ 200, 204).

While GCU's transaction was nearly identical to the Purdue Global transaction, the Department's treatment of them was irreconcilable. Purdue Global's services agreement

---

[11] In its Complaint, GCU identified dozens of nonprofit and public institutions alleged to use service agreements with for-profit companies, but the Department claimed that it lacked sufficient knowledge to confirm or deny the existence of those relationships. (Comp. ¶¶ 215-216; Ans. ¶¶ 215-16).

[12] The GAO report is attached as Exhibit B to Plaintiff's Motion to Supplement the Administrative Record and Take Judicial Notice and is also available from GAO's website at: https://www.gao.gov/assets/gao-22-104463.pdf.

with its former for-profit owner was acceptable notwithstanding its **30-year initial term**. (Compl. ¶ 208; Ans. ¶ 208). But when commenting on the MSA's **15-year initial term**, the Department classified GCU as a "captive client." AR-A-0014. And although the Department approved the Purdue Global agreement's early termination penalty of **125 percent** of the total revenue earned over the trailing twelve months (Compl. ¶ 211; Ans. ¶ 211), it said the MSA's early termination fee of **50 percent** of the total revenue earned over the trailing twelve months was "an arguably prohibitive termination fee." AR-A-0014.

That disparate treatment is not just a one-off example. As detailed in the summary chart below, the terms of the MSA are consistent with, and in many cases, more favorable than, agreements used by other schools. AR-C-1775 – 1784.

|  | GCU (Amended MSA) | Other Nonprofit/Public Institutions | |
|---|---|---|---|
| **Revenue Share** | 60% | 60-75%<br>70%<br>70%-75%<br>80% | **Washington St. Univ.**<br>Stephen F. Austin Univ.<br>Texas A&M – Commerce<br>University of Florida |
| **Initial Term** | 15 years | 10 years<br>10 years<br>15 years<br>30 years | UNC Wilmington<br>Washington St. Univ.<br>Univ. of California – Berkley<br>Purdue Global |

The Government Accountability Office recently reported on the prevalence of shared services agreements in higher education. At least 550 colleges have revenue sharing agreements, **ninety percent** of those are nonprofit and public colleges. GAO Report at 11. According to studies cited in the GAO report, most service agreements involve revenue shares between 40 and 65 percent. *Id.* at 15-16.

The Department faulted the MSA based on terms that are the same as those used by other schools and failed to even consider this disparate treatment. That is the epitome of arbitrary and capricious. *Kreis v. Sec'y of Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005) ("An agency must treat similar cases in a similar manner[.]")

**2.3. The Department considered irrelevant factors it had no authority to consider.**

Federal law limits the Department's authority to interfere with GCU's administration and personnel. Congress expressly bars the Department from construing its regulations to "exercise any direction, supervision, or control, over the . . . administration, or personnel of any educational institution." 20 USC 1232a. *See also Wheeler v. Barrera*, 417 U.S. 402, 416 (1974) (recognizing the "pronounced aversion in Congress to 'federalization'" of educational decisions.").[13] Oversight of those matters is delegated to the states and nationally recognized accreditors. *See* 2.4.2, below. And rather than credit the conclusions of Arizona, the IRS or HLC, the Department instead based its decision on irrelevant factors.

The Department interprets its "nonprofit" definition as an exception to the limitations of 20 USC 1232a. Despite that section's express bar, the Department conditioned GCU's nonprofit status on removing its chosen president and renegotiating its contracts. Congress plainly did not intend its definition of "nonprofit" to expand the Departments' authority in this way. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). "Congress . . . does not . . . hide elephants in mouseholes.").

Moreover, the Department's own regulations permit GCU to contract with GCE "for the administration of **any** aspect of the institution's participation in any Title IV, HEA program." 34 CFR 668.25 (emphasis added). So it cannot now credibly claim that GCU contracts too many services to GCE.

Finally, to the extent the Department has authority to determine nonprofit status, 600.2 only concerns whether GCU's net earnings inure to the benefit of any private shareholder or individual, also known as private inurement. The prohibition on private inurement "**clearly and without question** refers to the [nonprofit] and not to any disassociated organization . . . who has a bona fide contractual relationship with the [nonproft]. *Broadway*

---

[13] When Congress subsequently created the Department of Education, it confirmed that the Department "shall not increase the authority of the Federal Government over education." 20 USC 3403(a).

1   *Theater League of Lynchburg v. United States*, 293 F. Supp. 346, 354 (W.D. Va. 1968) (citing

2   *Science and Research Foundation, Inc. v. United States*, 181 F. Supp. 526, 529 (S.D.Ill. 1960)

3   (emphasis added). The Department did not allege GCU or its insiders improperly benefit

4   from GCU's net earnings. Instead, the Department focused almost entirely on the profits

5   and expenses of GCE, which is irrelevant to the question of private inurement. *United*

6   *Cancer*, 165 F.3d at 1178.

7        Nonetheless the Department seized on a report from Barclays Capital, Inc. that was

8   prepared for GCE as part of its own due diligence prior to the transaction. AR-A-0004 –

9   0007. The Department goes out of its way to characterize the report as evidence the MSA

10  is financially detrimental to GCU. But its analysis is based on simple mathematical errors.

11  The Department erroneously claims that GCU's operating expenses increased from $810

12  million to $1.46 billion as a result of the transaction. *Id.* at 0005. That is obviously wrong.

13  The "consolidated figure" on which the Department relies represents both GCE's and

14  GCU's operating expenses, including the service charges to GCE. In other words, the

15  consolidated figure counts the service charges twice. AR-C-0041.

16   **2.4. The Department ignored the most relevant information related to Grand**
17        **Canyon's nonprofit status.**

18       The Department has **no standards** or precedents for assessing compliance with

19  nonprofit requirements. It looks exclusively to IRS tax law, while illogically ignoring the

20  IRS's decision approving GCU's tax-exempt status. The Department has no expertise

21  warranting deference over the findings of, not only the IRS, but also HLC, the State of

22  Arizona, Deloitte, and BKD. *See Gonzalez v. Oregon*, 546 U.S. 243, 269 (2006) (finding that

23  an agency's deference was tempered by the agency's lack of expertise and apparent absence

24  of any consultation with anyone who might aid in a reasoned judgment); *see also Kisor v.*

25  *Wilkie*, 139 S. Ct. 2400, 2417 (2019) (An agency's "deference ebbs when the subject matter

26

of a dispute is distant from the agency's ordinary duties or falls within the scope of another agency's authority") (internal citations omitted).

Indeed, the weight of authority in the record, including the IRS and all expert reports, confirm GCU's compliance with nonprofit requirements. The Department chose not to obtain expert analysis of its own, and it cannot just disregard the overwhelming consensus of those experts who did analyze the transaction and the MSA by merely raising questions or simply saying it disagrees (Jan. 13, 2022 Hr'g Tr. 16:18 – 21); *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### 2.4.1.  The Department had no basis to dismiss the findings of the IRS.

The IRS's finding that GCU meets 501(c)(3) requirements, specifically based on the facts of the transaction with GCE, is entitled to substantial, if not total, deference. "The administration of the revenue laws is a function which by congressional direction and by expertise belongs to the IRS." *Groder v. U.S.*, 816 F.2d 139, 143 (4th Cir. 1987). In contrast, the Department's application of the IRS's regulations is entitled to none. *See Bonnichsen v. U.S.*, 969 F. Supp. 628, 644-45 (D. Or. 1997) ("deference is not afforded to an agency's interpretation of a statute that it does not administer, or of regulations that were promulgated by other agencies").

To be sure, the Department's decisions are based entirely on its self-serving interpretation of IRS tax law—which is not surprising given its lack of any standards or guidance of its own. But under IRS law, GCU is entitled to rely on the IRS's findings, without interference from the Department. The IRS's regulations are clear: "Subject **only** to the Commissioner's inherent power to revoke rulings . . . an organization that has been determined by the Commissioner [] to be exempt under section 501(a). . . **may rely upon such determination** so long as there are no substantial changes in the organization's character, purposes, or methods of operation." 26 CFR 1.501(a)-1(a)(2) (emphasis added).

The Department does not contend GCU's operations differ in any material way from what it presented in its 1023 application.

Instead, the Department undermined the IRS's authority and integrity by concluding "there is no evidence that the IRS conducted a comprehensive review of the MSA," and asserted that the IRS does not "consider[] the structure and planned operations of the institution." AR-A-0015. But the Department cites no evidence in support of its finding that IRS failed to faithfully administer federal tax law. And it strains credulity to think the IRS failed to review an application involving the acquisition of more than $1 billion in assets from a publicly traded company, or that it continues this failure in its ongoing oversight of GCU.

### 2.4.2.  The Department failed to give appropriate deference to HLC's finding.

Next, the Department's refusal to consider HLC's findings that GCU's retained full autonomy and control over its operations was arbitrary and capricious.

As discussed above, federal law bars the Department's interference in personnel and administration decisions. 20 USC 1232a. Direct oversight of those areas is left to the states and Department-recognized accreditors, like HLC, to ensure colleges are effectively meeting their educational missions. 20 USC 1099b; 20 USC 3403. And both the HEA and the Department's regulations require that accreditors have substantive change-in-control review mechanisms. 20 USC 1099b(c); 34 CFR 602.22. Given these federally mandated oversight responsibilities, it was arbitrary and capricious for the Department to simply disregard HLC's detailed findings. *M.M. v. School Dist. of Greenville Cty.*, 303 F.3d 523, 533 (4th Cir. 2002) (administrative officers "must give appropriate deference to the decisions of professional educators").

After a "comprehensive evaluation," HLC concluded that "[GCU's] Board of Trustees has sufficient independence to ensure it is free from undue influence of the part of . . . GCE or its stockholders." AR-G-0034. As HLC confirmed, the MSA requires GCE to comply with all policies and standards of GCU—not the other way around. *Id.* at 0028; AR-B-1284

– 1289. Indeed, GCU retains express oversight over the services performed by GCU and has the unilateral ability to audit GCE at any time to ensure compliance with GCU's requirements. AR-B-1292 – 1294; *Id.* at 1324 – 1338.

That finding directly contradicts the Department's unsupported conclusion that GCU is "not the entity *actually operating* the Institution." AR-A-0016 (emphasis in original). But while HLC based its conclusion on a comprehensive review of the MSA's terms and GCU's bylaw and policies, the Department baselessly concluded that GCE executives manage and oversee GCU. *Id.*

That is not so. The Department disingenuously conflated GCU's operations before and after the transaction. The "Executive Leadership team" cited in the decision managed and oversaw the university **before** the transaction. But **after** the transaction, the executives who remained with GCE no longer had authority to do so, as HLC recognized in its approval.

The Department also had no legitimate basis to dismiss HLC's conclusion that Mr. Mueller's dual roles did not threaten GCU's autonomy. AR-G-0021. HLC confirmed that GCU retained appropriate authority over Mr. Mueller and could terminate him at any time, with or without cause. *Id.* HLC also commended the MSA's requirement that Mr. Mueller be excluded from any oversight over the relationship with GCE as well as GCU's creation of an "MSA Committee" to oversee the relationship. *Id.* at 0025 – 0026. Based on those policies and agreements, HLC concluded that GCU's policies precluded even an "apparent conflict of interest." *Id.* at 0025. And, as with the IRS, HLC approved these structures with the understanding that Mr. Mueller would also serve on GCU's Board of Trustees. *Id.* As it stands, though, both boards are wholly independent. GCU (Gazelle at the time) ultimately decided not to include Mr. Mueller on its Board.

In response to HLC's thorough review and analysis, the Department merely stated it "is not satisfied" those structures are sufficient. Yet it cited no evidence, rule, standard, or independent analysis in support of that bare assertion (or its authority to even make that

assertion). That fails the APA's requirement to fairly consider the relevant evidence before it. *Motor Vehicle Mfrs.*, 463 U.S. at 43.

### 2.4.3. The Department misapplied tax law in erroneously discrediting the opinions of independent experts.

Finally, the Department misstates tax law to generate specious reasons to ignore multiple professional, independent studies confirming that the terms of the MSA comply with 501(c)(3) requirements. At the outset, neither the IRS nor the Department require a transfer pricing study to meet 501(c)(3) requirements. GCU obtained the transfer pricing study from Deloitte (a reputable, nationally recognized professional services firm) to aid in negotiating a fair price under the MSA and as a prophylactic measure against potential excess benefit penalties in the future. *See* 26 USC 4958. And at the Department's request, GCU retained another independent expert, BKD, LLP (also a reputable, nationally recognized professional services firm) to independently review Deloitte's analysis and confirm it produced a fair result to GCU. AR-J-0092.

Next, the Department misapprehends the IRS's "best method rule." Contrary to the Department's decision (AR-A-0027), the best method rule did not require Deloitte to conclusively demonstrate why alternative transfer pricing methods were rejected. 26 CFR 1.482-1(c). In fact, Deloitte could pick the best method "**without** establishing the inapplicability of another method." *Id.* (emphasis added).

The Department's misapprehension of the best method rule stems from an obvious typo in BKD's report. (Decl. of Jason Eberhardt ¶¶ 8-12).[14] Notably, the decision cites BKD's typo and not 1.482-1(c)'s plain language to the contrary. That is disingenuous at best, and, in any event, plainly inaccurate. And even if the Department were justified in relying on the typo, Deloitte's study contains a lengthy discussion of the various transfer pricing methods

---

[14] Mr. Eberhardt's declaration is attached as Exhibit A to Plaintiff's Motion to Supplement the Record and Take Judicial Notice.

and its reasons for concluding each was not the most reliable method. AR-C-0258 – 0264. BKD reviewed Deloitte's analysis and concluded it was reasonable. AR-C-0330.

Moreover, the best method rule does not grant the IRS (and especially not the Department) authority to flatly disregard a transfer pricing study. The best method rule states, "**if** another method subsequently is shown to produce a more reliable measure of an arm's length result, such other method must be used." 26 CFR 1.482-1(c) (emphasis added). But the Department has not shown that another method was more reliable. Nor has it shown the method Deloitte selected was not reliable. In other words, the Department has no basis to conclude that Deloitte and BKD analyses are wrong.

"[T]ransfer pricing examinations are factually intensive and require a thorough analysis." Internal Revenue Manual, pt. 4, ch. 61, sec. 4.61.3.[15] Even when the IRS disagrees with a taxpayer's best method analysis, before choosing an alternate method, it consults a Transfer Pricing Review Panel that generally consists of multiple directors and senior advisors. *Id.* § 4.61.3.4.12.1. In contrast to the complex IRS review process necessary to dispute a taxpayer's transfer pricing conclusions, the Department cited and apparently relied on *Investopedia.com.* AR-A-0025. The Department did not identify a more reliable method than the one Deloitte chose, and it certainly did not undertake a supporting analysis for why Deloitte was wrong.

Every analysis undertaken with respect to the fairness of the MSA confirms that the revenue share represents an arm's-length result. That is the only relevant inquiry in a transfer pricing analysis. 26 CFR 1-482-1(b)(1). BKD went a step further and performed a corroborative analysis in which it reviewed numerous other higher-education service agreements. AR-A-0034. That review also confirmed that GCU's revenue share with GCE

---

[15] Part 4 of the IRM is available on the IRS's website at:
https://www.irs.gov/irm/part4/irm_04-061-003#idm139827281327616

was in line with the payments under those other agreements. That is, the MSA fairly represented an arm's-length transaction. AR-C-0332 – 0333.

The Department, on the other hand, stood by its "case-by-case" analysis and refused to consider any comparable agreements at all. *See* 2.2, above. Notwithstanding its own refusal to consider other agreements, the Department faulted BKD for not addressing why GCU did not pay the median or lower end of the percentage-based revenue shares. AR-A-0034-35. And it questioned BKD's failure to assess alternatives to revenue shares or arrangements involving unbundled services. *Id.* But those questions are plainly irrelevant to whether the agreement GCU and GCE **did** enter was fair-market value. That is all that matters.

The Department also seized on hyper-technical nits that evaded the fundamental findings of tax professionals. For example, the Department claimed Deloitte's use of the economic profit split method conceded that GCU earned "profits." *Id.* at 0033. "Profits" in this case was simply convenient shorthand for "net revenue" or "surplus." The Department also questioned the use of transfer pricing analysis altogether because they generally concern "controlled" transactions, and GCE and GCU are not controlled entities. *Id.* at 0024 – 0025. But transfer pricing seeks to find the arm's length result of a transaction regardless of the status of the buyer and seller. 26 CFR 1.482-1(b)(1). That the parties actually negotiated at arms-length (because they were independent entities) makes the analysis more reliable, not less. The Department has it backwards.

The Tenth Circuit in *Tsosie v. Califano* aptly described the type of analysis the Department employed:

> We find the Secretary's interpretation unduly legalistic and technical. It relies on the literal meaning of isolated phrases. Little weight is given to the purpose and spirit of the voluminous rules from which the phrases have been lifted. The Secretary is like one who listens to music for individual notes rather than for the melody: he misses the theme.

651 F.2d 719, 722 (10th Cir. 1981).

The record evidence confirms GCU's compliance with IRS and Department requirements with respect to nonprofit recognition. But refusing to accept that reality, the Department ignored its own guidance and policies, contorted settled nonprofit law, and gave no deference to the conclusion of those with actual expertise. Here, too, the Department misses the theme: GCU is a nonprofit.

**3. The Department violated Grand Canyon's First Amendment rights of free speech by prohibiting the university from accurately describing itself as a nonprofit.**

The Department's order prohibiting GCU from calling itself a nonprofit is an unconstitutional prior restraint on GCU's freedom of speech. GCU is a nonprofit under state and federal law. The Department identified no evidence justifying its ban, which prevents GCU from making factually accurate statements. This strongly suggests that the Department just wants to brand GCU with the pejorative label "for-profit" to unfairly disparage the quality of GCU's educational offerings and to cause GCU economic harm.

The Department prohibits GCU from referring to itself as nonprofit in all public statements—not just advertisements. AR-A-0037. Thus, the prohibition is subject to strict scrutiny. *In re Nat'l Sec. Letter v. Sessions*, 863 F.3d 1110, 1123 (9th Cir. 2017). But even under the intermediate scrutiny standard applicable to purely commercial speech, the Department fails. *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 566 (1980). Under that standard, the Department must identify a "substantial" state interest and prove that the prohibition "directly advances" that interest and "is not more extensive than is necessary to serve that interest." *Id.* It is the Department's burden to justify its restriction on commercial speech, and it has not done so. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 71, n. 20 (1983).

Purportedly, the Department's ban would prevent students from becoming confused about what sort of institution they might attend. AR-A-0017. But there is no evidence in the record that students place any importance on the Department's elusive nonprofit/for-profit

1    distinction. *See Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) ([The Department] must

2    demonstrate that the harms it recites are real[.]"). The Department conceded that the only

3    additional requirement GCU must meet as a for-profit is 90/10 (AR-J-350) but provided no

4    evidence that 90/10 is meaningful to students. *Edenfield*, 507 U.S. at 770-71 ("The

5    Department's] burden is not satisfied by mere speculation or conjecture[.]"). It is far from

6    self-evident that students make decisions based on 90/10.

7         The failure to describe any actual harm caused by GCU's use of the word "nonprofit"

8    confirms that the Department's ban serves no substantial government interest. It also

9    reveals the Department's concern lies not with students, but in picking winners and losers

10   and retaliating against GCU for its former proprietary status.

## Conclusion

12        For these reasons, GCU asks that the Court vacate the Department's decision denying

13   GCU nonprofit status for purposes of Title IV participation, order the Department to treat

14   GCU as a nonprofit for purposes of its Title IV participation, and prohibit the Department

15   from restricting GCU's First Amendment right to accurately describe itself as a nonprofit.

16        Dated this May 16, 2022.

17                                              Respectfully submitted,

18                                              /s/Steven M. Gombos
                                                Steven M. Gombos
19                                              David A. Obuchowicz
                                                GOMBOS LEYTON, P.C.
20                                              11350 Random Hills Road, Suite 400
                                                Fairfax, VA 22030
21

22                                              _____
                                                Kevin E. O'Malley
23                                              Hannah H. Porter
                                                GALLAGHER & KENNEDY
24                                              2575 E. Camelback Road, Suite 1100
                                                Phoenix, Arizona 85016
25

26                                              *Counsel for Plaintiff*

1

**Certificate of Service**

2

3        I certify that on May 16, 2022, I electronically filed this Memorandum in Support of
Plaintiff's Motion for Summary Judgment using the Court's CM/ECF system.

4

5                                                          _/s/ Steven M. Gombos_____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26