

November 6, 2019

Mr. Brian Mueller
President
Grand Canyon University
3300 West Camelback Road
Phoenix, AZ  85017

<u>UPS Tracking #</u>
1ZA879640294525311

Re:   **Review of the Change in Ownership and Conversion to Nonprofit Status of Grand Canyon University (OPE ID 00107400)**

Dear Mr. Mueller:

At your request, the U.S. Department of Education ("Department"), Federal Student Aid has conducted a review of the change in ownership application for Grand Canyon University, OPEID 00107400 ("Institution" or "GCU").

Prior to July 1, 2018, GCU was owned and operated by Grand Canyon Education, Inc. ("GCE"), a Delaware publicly traded corporation.  By way of a July 1, 2018 Asset Purchase Agreement ("APA"), GCE sold its School Assets (as set forth in APA at Recital B and as defined in APA §2.1) to Gazelle University ("Gazelle"), an Arizona nonprofit corporation ("the Transaction"). Gazelle and GCE are hereinafter collectively referred to as the "APA Parties."[1]  Prior to the Transaction, Gazelle was granted tax-exempt status by the Internal Revenue Service.  GCU seeks approval of its change in ownership and request to convert to nonprofit status for purposes of its participation in Title IV, HEA programs.  Although the parties had requested the Department to conduct a pre-acquisition review, the Transaction closed on or about July 1, 2018, prior to completion of the Department's pre-acquisition review.   This letter constitutes the Department's post-closing decision on the change in ownership ("CIO") and requested change of status from proprietary to nonprofit.

Following the closing of the Transaction, GCU timely submitted a materially complete application and other documentation to satisfy the regulatory requirements set forth at 34 C.F.R. § 600.20(g) and (h).  GCU has also submitted additional documentation and information as

---

[1] After the Transaction, Gazelle changed its name to Grand Canyon University.  In documents submitted to the Department, Gazelle has also been referred to as "GCU" and the "New GCU."  To avoid confusion, the Department will refer to the APA Parties as "Gazelle" and "GCE," based on the names used in the introductory paragraph of the APA: "Gazelle University" (the purchasing entity) and "Grand Canyon Education, Inc." (the selling entity).  The sole member of Gazelle is Grand Canyon Foundation.



Federal Student Aid, Multi-Regional and Foreign School Participation Division
830 First Street NE, Union Center Plaza, 7th Floor, Washington, DC 20202-5340
www.FederalStudentAid.ed.gov

Grand Canyon University (OPE ID 00107400)
Page 2 of 18

requested by the Department during its review.[2] A temporary provisional program participation agreement ("TPPPA") was issued to GCU on August 20, 2018, and GCU has been participating on a month to month basis since September 1, 2018.

## I. BACKGROUND ON THE TRANSACTION

### A. Overview of the APA

Pursuant to the APA, Gazelle purchased the School Assets,[3] which included Campus Property, certain Personal Property, Assumed Contracts, Course Materials and intellectual property embodied in the Course Materials and other identified intellectual property, and other assets, as listed in APA §2.1. Under APA §2.2, Services Assets remained the property of GCE, and include assets not listed in APA §2.1 or the related schedules, Retained Property (including GCE's headquarters building at 2600 West Camelback Road), and other assets (including cash and cash equivalents) as further described in APA §2.2.

APA §2.3 identifies the liabilities assumed by Gazelle ("Assumed Liabilities") and APA §2.4 identifies the liabilities that are not assumed by Gazelle ("Excluded Liabilities"). Significantly, the APA purports to insulate Gazelle from assuming Liabilities arising under Educational Laws.

The Purchase Price for the Transaction includes the assumption of the Assumed Liabilities, and payment of the Base Purchase Price ($853,068,386.00 "plus []$1.00") and the Invested Amount.[4] APA §3.1. The Base Purchase Price was paid by Gazelle's delivery of the Senior Secured Note and Credit Agreement ("CA"). APA §3.2. Notably, the lender for the Transaction is GCE. The loan is secured by a first lien on all of Gazelle's property and the property of all of Gazelle's subsidiaries, which are also guarantors of the loan. CA § 7.12, CA § 7.13. GCE also provides funding for Gazelle's operations under the Credit Agreement. CA § 2.01.

### B. Overview of the Master Services Agreement

As part of the Transaction, the APA Parties also entered into a Master Services Agreement ("MSA") pursuant to which GCE provides Services to Gazelle/GCU and Gazelle/GCU pays a part of its revenues to GCE. Exhibit B to the MSA describes the Services that GCE provides to Gazelle. Gazelle further agreed that GCE is the exclusive provider (during the Term of the MSA) of certain services, identified in the MSA as "Exclusive Services," for which Gazelle agrees it will not contract with any third party absent GCE's approval (which is subject to GCE's sole discretion). MSA §3.1. The Exclusive Services are the following: Marketing (MSA Exh. B

---

[2] Some information in this letter is shaded in grey as a result of the APA Parties' designation of that information as confidential, consistent with the Department's directions when it requested documents from the APA Parties.

[3] Words capitalized herein but not defined have the meaning set forth in the APA and/or the Master Services Agreement entered into as part of the Transaction.

[4] At closing, Gazelle paid an additional $17 million, rounded, representing amounts contributed to, or paid by, GCE in connection with GCU in the two months prior to the closing of the Transaction. *See* Purchase Price Adjustment Certificate.

2

Grand Canyon University (OPE ID 00107400)
Page 3 of 18

§1); Enrollment Services and Budget Consultations (MSA Exh. B §2); Student Support Services Counseling (MSA Exh. B §3); and Technology (MSA Exh. B §12). The non-exclusive services are the following: Document Intake (MSA Exh. B §4); Student Records Management (MSA Exh. B §5); Curriculum Services (MSA Exh. B §6); Accounting Services (MSA Exh. B §7); Financial Aid Services (MSA Exh. B §8); Procurement Services (MSA Exh. B §9); Audit Services (MSA Exh. B §10); Human Resources (MSA Exh. B §11); Business Analytics Services (MSA Exh. B §13); Faculty Operations (MSA Exh. B §14); and Compliance Monitoring and Audits (MSA Exh. B §15). The MSA provides that GCE shall at all times provide at least three services in addition to Enrollment Services. MSA Exh. B (introductory paragraph). However, even if services are provided by a third party, Gazelle is still obligated to pay GCE its Services Fees described in MSA §5. *See* MSA §3.1. GCE also has the right to subcontract any of the services, as described in MSA §3.2.

Pursuant to MSA §5.1, the Services Fee is determined and paid in accordance with MSA Exhibit D which provides that Gazelle is required to pay GCE a fee that is equal to 60% of Gazelle's Adjusted Gross Revenue (excluding charitable contributions or other gifts used for purposes other than payment of tuition and fees for students).[5] Adjusted Gross Revenue consists of all revenue (net of refunds and scholarships accounted for as a discount to tuition) received by Gazelle or its Affiliates from the following sources:

(a) Tuition (including tuition funded by third party sources and charitable contributions;
(b) Fee revenue from students for use of the online communications portal ("the Platform");
(c) Fee revenue from students and their related activities
(d) Fee revenue from students for use of the Canyon Connect learning resources platform;
(e) Fee revenue from students for student housing;
(f) Fee revenue from students for meal plans and other food services; and
(g) Other revenue including revenue from: (i) sales of athletic tickets; (ii) the operation of the Grand Canyon University Hotel and Conference Center; (iii) the operation of the Maryvale Golf Course; (iv) the operation of the Grand Canyon University Arena; and (v) the operation of Canyon Enterprises (apparel sales and other businesses).

MSA Exh. D §1. The MSA does not provide any cap on the total amount of the Services Fee that must be paid to GCE in any year or cumulatively over the years.

Although the Services Fee is subject to review and adjustment pursuant to Exh. D §2(b), the first Optional Adjustment Date does not occur until the tenth anniversary of the Effective Date, and thereafter occurs on the first date of each Renewal Term (*i.e.*, at five-year increments thereafter). Exh. D at 2(b) and (c), and MSA §6.1. The Initial Term of the MSA is 15 years, with automatic renewals thereafter for successive five years terms ("Renewal Term") apparently in perpetuity. MSA §6.1. Either party can elect not to renew at the end of the Initial Term or any Renewal Term, but if Gazelle exercises that right, on the last day of such term it must pay GCE a Non-Renewal Fee equal to 50% of the aggregate Services Fees paid or payable for the trailing twelve month period ended as of the end of the immediately preceding month. MSA §6.2 and MSA

---

[5] The Services Fee is exclusive of all Tax, such that Gazelle must "pay and be liable for any and all Tax imposed on, sustained, incurred, levied and measured by the cost, value or price of the Services" provided under the MSA. MSA §7.1.

Grand Canyon University (OPE ID 00107400)
Page 4 of 18

Exh. A at A-5 (definition of Non-Renewal Fee). Although Gazelle has the right to terminate the MSA during the Initial Term, it must give notice 18 months in advance, and cannot elect do so before July 1, 2025 (seventh anniversary) or the date by which the Senior Secured Note is paid in full – whichever is later. MSA §6.3. If Gazelle exercises that right, on the effective date of termination it must pay GCE an Early Termination Fee equal to 50% of the aggregate Services Fees paid or payable for the trailing twelve-month period ended as of the end of the immediately preceding month. MSA §6.3 and MSA Exh. A at A-3 (definition of Early Termination Fee). The MSA may be terminated as a result of a Performance Failure (subject to notice and cure) only if the breach in performance has a materially adverse effect on the Non-Defaulting Party or its business. MSA §6.4.[6]

The MSA provides Gazelle with the right to assume Back Office Services (defined in MSA Exh. A at A-2 as Accounting Services, Financial Aid Services, Human Resources and Technology[7]), and if it does, Gazelle and GCE agree to negotiate an adjustment to the Services Fee to account for any transfer of costs. MSA §6.9. But the MSA requires Gazelle to assume those Back Office Services directly, so that it cannot retain any other service provider to perform the Back Office Services. MSA §6.9. By way of example only, this would preclude Gazelle from retaining an outside payroll provider if it assumed Accounting Services, despite the fact that GCE performs payroll services through a third-party payroll provider. *See* MSA Exhibit B §7.1.

## II. REPORTS

The Department has also been provided with several reports and valuations that were commissioned to support the Transaction, including reports from Barclays Capital Inc. ("Barclays") and Deloitte Tax, LLP ("Deloitte).

### A. Barclays

The report from Barclays ("the Barclays Report") is dated April 26, 2018 and entitled "Project Gazelle." It is marked "Preliminary/Subject to further review, diligence and revision." The Barclays Report describes the contents of the report as containing "material that was provided to the Board of Directors … of Gazelle [identified as 'the Company']."[8] On August 29, 2019,

---

[6] The MSA limits GCE's liability for any claim (other than one related to Confidentiality or Intellectual Property Rights, or based on GCE's gross negligence or willful misconduct) to the amount paid by Gazelle to GCE in the most recently completed three month period, and Gazelle "releases and waives any claim against GCE in excess of such amount, to the extent permitted by Applicable Law." MSA §11.

[7] "Technology" is designated as both a Back Office Service (MSA Exhibit A at A-2) and one of several Exclusive Services (MSA Exhibit B §12, identified with an \*).

[8] While the Barclays Report states that it was prepared for/ provided to the Board of Directors of Gazelle (cover and at 1), Barclays was engaged by GCE and provided its analysis to the GCE Board as set forth in various places in GCE's board minutes. For example, both the November 21, 2017 and December 6, 2017 board minutes note the engagement of Barclays as GCE's "financial advisor." On February 21, 2018 the GCE Board and representatives of Barclays discussed how Barclays could best help the Board, and the potential merits and risks of the Transaction or "remaining as a for profit education company." *See*

4

Grand Canyon University (OPE ID 00107400)
Page 5 of 18

Jonathon Glass, (counsel for GCU) provided the Department with a "follow-on" report from Barclays which was provided to the board of GCE "to confirm certain information in the final days before the transaction closed ("Barclays Update")."[9]

The Barclays Report reviews the strategic options available to GCE, including separation of the Institution and GCE, with GCE as the services provider as an alternative to the status quo. One of the considerations Barclays notes in regard to separation is "significant concentration of revenue for GCE and reduced influence over University." Barclays Report at 14. The Barclays Report provides a side-by-side comparison of the Institution's operating costs in 2019 based on two different assumptions – (1) GCE continues to own the Institution and incurs the costs to operate the Institution or (2) the Transaction closes, and Gazelle is required to hire GCE to perform some of the operational activities. *See* Barclays Report at 33. The comparison shows that under the planned separation (and as effectuated on July 1, 2018) the costs to operate the separated Institution increase from $810 Million to $1.496 Billion for fiscal year 2019, solely as a result of the Service Fees paid to GCE. Barclays Report at 33. The increase is not because GCE will be providing new or additional services, but solely because the MSA requires Gazelle to pay GCE the Services Fee.[10]

Although the Barclays Report (dated April 26, 2018) assumes a 65%/35% revenue split on most items, and a different split on housing (20%/80%), meals (5%/95%) and Canyon Connect (5%/95%), the executed MSA provides for a straight 60%/40% split and includes sources of revenue that are not included in the Barclays Report, including revenue from Gazelle Arena. These differences would seem to only exacerbate Barclays' assessment that the separation of the servicing functions from the Institution will result in a significant increased cost for the operation of the Institution, with those increased funds flowing to the benefit of its prior owner, GCE. Under the assumptions in the Barclays Report, the Services Fees under the MSA (estimated at $697 million for fiscal year 2019), *see* Barclays Report at 33, are a 67% markup on GCE's $416 million costs of performance. No evidence has been presented to the Department that would suggest that the services provided post-Transaction would be markedly different or more

---

February 21, 2018 GCE Board Minutes at 2. The Barclays Report was provided to the GCE Board and discussed at the meeting held on April 26, 2018. *See* April 25-26, 2018 Minutes at 3. This is consistent with references in the Barclays Report to the Company's "shareholders." By contrast, the Gazelle board minutes do not reflect any discussion of the Barclays Report, and it is not clear whether the Barclays Report was provided to the Gazelle board prior to the approval of the Transaction.

[9] In his August 29th e-mail transmitting the Barclays Update, Mr. Glass explained that the Gazelle/GCU board "did not see or receive the [Barclays Update] until following up with GCE re [the Department's August 26, 2019] request." The Barclays Update was discussed with the GCE Board at its June 20, 2018 meeting. *See* June 20, 2018 GCE Board Minutes at 3-4.

[10] The cost for GCE's services is particularly high considering that GCE is not even performing the entirety of the operational activities that were previously performed at a cost of $810 million. Some services are performed by Gazelle.

Grand Canyon University (OPE ID 00107400)
Page 6 of 18

expensive to provide.[11]  Once the Services Fees are added, GCE will incur 28% of total expenses ($416,000,000 of $1,496,000,000) and Gazelle will incur 72% of total expenses ($1,080,000,000 of $1,496,000,000), as can be extrapolated from the information contained in the report:

| OPERATING EXPENSE SPLIT POST-TRANSACTION | | | |
|---|---|---|---|
| Expenses in Millions $ | Total | GCE Share under MSA | Gazelle Share as Owner under MSA |
| Instructional | 476 | 105 | 371 |
| Marketing & Promotional | 125 | 125 | 0 |
| Admissions Advisory | 149 | 149 | 0 |
| General & Administrative | 49 | 37 | 12 |
| **Subtotal** | **799** | **416** | **383** |
| **Share %** | **100%** | **52%** | **48%** |
| Gazelle Fees under MSA Agreement | 697 | 0 | 697 |
| **Total** | **1496** | **416** | **1080** |
| **Share %** | **100%** | **28%** | **72%** |

*See* Barclays Report at 33 (source of information for the above chart).

### B. Deloitte

Perhaps trying to circumvent the somewhat obvious conclusion that under the MSA the Institution costs an additional $697 Million to operate in the first fiscal year, the parties have also provided the Department with a Transfer Pricing Report for the Fiscal year ending December 31, 2018, which was prepared by Deloitte ("Deloitte Report"). Deloitte performed an "Economic Profit Split" ("EPS") analysis in connection with the services provided by GCE to Gazelle during the 15 year period "beginning with fiscal year ending December 31, 2018," and the transfer of certain intangible assets and license of the technology platform from GCE to Gazelle during FY 2018. Deloitte Report at 1. An EPS is an analysis of what each party to a common economic enterprise contributes to revenue-generating activities. Deloitte Report at 1. The Department was provided with two Deloitte Reports, one clearly marked "Draft" and a virtually identical version. Neither version is signed, identifies the person(s) responsible for the report's conclusions, nor provides an affirmation from an appropriate person that the report has been prepared according to the applicable standards. However, the Department has confirmed with counsel for GCU that the version of the Deloitte Report that is not marked as a draft is the final version of the report.

---

[11] For purposes of this analysis, the Department assumes that the payments owed to GCE under the Credit Agreement are fair value. When those payments are included in the analysis, GCE receives 95% of Gazelle's revenue.

Grand Canyon University (OPE ID 00107400)
Page 7 of 18

The first step in Deloitte's EPS analysis was to identify the "assets and activities" of the enterprise that generate revenue. *Id.* at 1. Based "on fact finding discussions with key management personnel" – which at the time would have consisted solely of GCE's management – Deloitte found that the Institution generates revenue from seven activities.[12] Deloitte concluded that virtually all of the Institution's revenue-generating activities are those that will be wholly or partially performed by GCE under the MSA. *Id.* at 19-30. Because Deloitte was working from a prior draft of the MSA, its conclusion in this regard is not accurate. *See* discussion below regarding revenue from the arena, athletic tickets, etc.

Significantly, Deloitte did not identify the Institution's physical campus as revenue-generating, which is at odds with statements made by GCE to its shareholders. Notwithstanding the campus facilities' undeniable contribution to revenue, Deloitte did not consider it as a revenue-generating asset. According to GCE's 2017 Annual Report to shareholders, one of the competitive factors in the post-secondary education market is "the quality of the ground campus facilities." GCE 2017 Annual Report at 15. In fact, GCE told its shareholders that one of the primary factors for its revenue increase in 2017 was due to "ancillary revenues resulting from the increased traditional student enrollment (e.g. housing, food, etc.)" and that a higher percentage of its students were residing on campus. *Id.* at 48. GCE noted that its campus was also valuable to "provide our online students, faculty, and staff with a sense of connection to a traditional university." *Id.* at 14. To continue increasing revenues, GCE planned to enhance the reputation of the ground campus by expanding campus infrastructure. *Id.* at 14. According to the figures provided in the Barclays Report, over 27% of the Institution's tuition revenue is from on-campus students. *See* Barclays Report at 33.

According to Deloitte, the next step in the EPS analysis was to identify risks associated with the revenue-generating activities and assets and determine which party: contractually assumes the risk; encounters upside or downside consequences of the risk; controls the risk; mitigates the risk; and has the financial capacity to assume the risk. Deloitte Report at 5-6. Deloitte identified several risks associated with the seven revenue-generating activities it considered. Those risks include negative perception of marketing campaigns, failure to develop course content that will prepare students to complete the course work, failure to attract prospective students, software bugs, inability to recruit and hire effective faculty, and workplace injuries, among others. *Id.* at 26-30. In each instance, the Deloitte Report simply notes that the fixed costs are borne by both GCE and the Institution, and that both face risks related to the various functions. However, the Deloitte Report wholly fails to assess which party assumes these risks, encounters upside or downside consequences of these risks, controls these risks, mitigates these risks, or has the financial capacity to assume these risks. As the Deloitte Report states, this failure renders Deloitte's EPS analysis "incomplete." *Id.* at 5.

The principal focus of the Deloitte Report is the risk of fixed costs, defined as costs that do not vary with the quantity of services provided. *Id.* at 1, 33-35. Deloitte claims that the party assuming fixed costs assumes greater risk justifying a greater share of profits. *Id.* at 5. Although this information is not detailed in the report, Deloitte apparently determined which costs

---

[12] Based on discussion with "key management personnel," Deloitte concluded that the following functions constituted the "key value creating drivers": marketing; curriculum development; admissions advisory; IT and technology; back-office support; faculty services; and Executive Leadership. Deloitte Report at 19.

7

Grand Canyon University (OPE ID 00107400)
Page 8 of 18

associated with the seven revenue-generating activities were fixed costs and what share of fixed costs Gazelle and GCE were contractually obligated to pay. *Id.* at 33. Nowhere does the Deloitte Report identify the specific costs Deloitte deemed fixed, let alone provide any analysis supporting the conclusion as to which party is responsible for paying such costs. Instead, the Deloitte Report simply states that GCE is responsible for paying approximately $270 million in fixed costs for the seven revenue-generating activities and that Gazelle is responsible for paying approximately $164 million. Deloitte Report at 36. The Deloitte Report is wholly devoid of any information that would allow the Department to assess the accuracy or reasonableness of this conclusion.

The Deloitte Report also appears to give significant weight in its determination of fixed costs to its consideration of off-balance sheet assets ("OBSA"). Deloitte apparently considered historic trial balance sheet financial data (from FY 2013 through FY 2017) to "capture any fixed costs incurred in the past accounting period that are tied to the revenue generated in FY 2017. These are the costs that generate OBSAs." Deloitte Report at 32. Presumably, because all of those earlier costs were incurred during the years prior to the separation, Deloitte's calculation of fixed costs gives GCE – and not Gazelle – the benefit of those historical costs that were incurred before the services function was separated on July 1, 2018.

GCE has recognized that an important competitive factor in the post-secondary education market is "qualified and experienced faculty." 2017 Annual Report at 15. As GCE described it, the high quality of the Institution's faculty contributed to student retention and was "critical" to the Institution's success. *Id.* at 6, 9. Although Deloitte included "faculty services" as one of the seven "key value driving factors," it is unclear how it evaluated the faculty's contribution to revenue generation or risks related thereto, given that Gazelle is responsible for most of the costs of "Instructional Cost and Services" (i.e.,. $371 Million for Gazelle and $105 Million for GCE). *See* Barclays Report at 33. The Deloitte Report does not include any discussion of whether or not Gazelle was responsible for fixed-cost risk in connection with the Institution's faculty.

In addition, because the Deloitte Report failed to identify the Institution's campus as a revenue-generating asset, it failed to consider the fact that Gazelle is incurring significant fixed-cost risk in connection with the campus. Gazelle owes a lump sum payment to GCE on July 1, 2025 of $853,068,386, which represents the purchase price for the campus. CA §1.01 (defining "Term Loan Commitment" and "Maturity Date") and §2.07(c). Gazelle also owes GCE a monthly interest payment of approximately $4.2 million. *Id.* §1.01 (defining "Applicable Rate" and "Interest Payment Date") and §§2.08 (a) and (f) (interest is payable at the Applicable Rate on each Interest Payment Date).

Despite the fact that the purpose of the Deloitte Report was to determine a reasonable range of remuneration by Gazelle to GCE as a percentage of Gazelle's Adjusted Gross Revenue, the Deloitte Report was premised on the inaccurate assumption that Adjusted Gross Revenue for calculating the Services Fees excluded sales of athletic tickets, operations of Gazelle's hotel and conference center, the operation of the Maryvale golf course, and the operation of Grand Canyon University Arena. *See* Deloitte Report at 3, and at n.4, and at 6. Apparently without considering these sources of revenue and the risks/costs related thereto, Deloitte concluded that the reasonable split is 62%/38% or 63%/37%. Under the executed MSA, all of those sources of revenue are included in calculating the 60% Services Fees. MSA at Exhibit D. In short, the

8

revenue sources Deloitte uses to calculate each parties' percentage contribution to the seven revenue-generating activities identified is based on fundamentally flawed assumptions.

It also bears mentioning that the main opinions in the Deloitte Report do not appear to be based on information that Deloitte independently tested and analyzed on behalf of Gazelle. Rather, those opinions in key areas appear to have been based on information supplied by GCE management.[13] For example, Deloitte states that it identified revenue-generating activities based on "fact finding discussions with key management personnel," that the classification of fixed costs was made "in conjunction with GCE management," and that the calculation of the share of fixed costs Gazelle and GSA would each pay under the MSA was determined by "Deloitte Tax and GCE." *See, e.g.,* Deloitte Report at 19, 33.

### III. THE DEPARTMENT'S REQUIREMENTS FOR NONPROFIT STATUS

The Department regulations identify certain covered transactions for an instituton that constitute a change in ownership which require the institution to apply for and obtain approval from the Department to continue participating in Title IV, HEA programs. These include instances where an institution is sold, is merged with one or more eligible institutions, experiences a change in the ownership of the controlling stock, has a transfer of assets that comprise a substantial portion of the education business of the institution, or has a change in status as a for-profit, nonprofit, or public institution. 34 C.F.R. § 600.31(d).

To establish eligibility and to continue participation in Title IV, HEA programs, an institution must demonstrate to the Department that, after the change, the institution qualifies to be certified to participate under 34 C.F.R. Part 668, Subpart B pursuant to 34 C.F.R. § 600.31(a)(3)(ii). *See also* 34 C.F.R. § 600.20(g) and (h) (requirements for temporary provisional certification following a change in ownership which results in a change of control).

Because Gazelle seeks to participate in Title IV, HEA programs as a nonprofit institution, it must meet the Department's requirements for that status. The Higher Education Act ("HEA") defines an institution of higher education as "a public or other nonprofit institution." HEA §101(a)(4), 20 U.S.C. §1001(a)(4); HEA §102(a)(1), 20 U.S.C. §1002(a)(1). The Department regulations define a nonprofit institution as an institution that:

(i) Is owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private shareholder or individual; and

(ii) Is legally authorized to operate as a nonprofit organization by each State in which it is physically located; and

---

[13] Although the Deloitte Report indicates at p. 19 that it conducted interviews with "University personnel," it appears to be referring to "management" which it describes as "GCE management."

Grand Canyon University (OPE ID 00107400)
Page 10 of 18

> (iii) Is determined by the Internal Revenue Service to be an organization to which contributions are tax deductible under 26 U.S.C. §501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3)).

34 C.F.R. §600.2.[14]

Gazelle, an Arizona nonprofit corporation, now owns GCU, satisfying the "owned by one or more nonprofit" entity requirement of the Department's definition of a nonprofit. Gazelle is also legally authorized to operate a private postsecondary degree-granting institution in Arizona, the only location where GCU is located. Arizona law does not require separate approval to operate as a nonprofit, so GCU meets the requirement of legal authority to operate under subsection (ii) of the Department's definition. *See* April 27, 2018 Letter from the Arizona State Board for Private Postsecondary Education and Arizona Secretary of State Website on Veteran's Charity Organizations (explaining that only Veteran's Charities are required to register). Gazelle has been granted 501(c)(3) status by the IRS, meeting the requirement of subsection (iii) of the definition. *See* November 9, 2015 IRS Letter 947 for EIN 47-2507725.

The remaining issue (*i.e*, whether GCU is operated by a nonprofit and whether its net earnings benefit any private shareholder or individual) requires a review of relevant authority under the Internal Revenue Code and an analysis of the impact of the MSA on the regulatory requirements.

## IV. AUTHORITY UNDER THE INTERNAL REVENUE CODE

The Department's definition of a nonprofit institution mirrors the statutory language for tax exempt organizations found in 26 U.S.C. § 501(c)(3). Under Treasury regulations, the taxpayer has the burden to demonstrate that it is entitled to tax-exempt status pursuant to section 501(c)(3).[15] This includes the requirement for tax exempt entities to meet both an organizational test and an operational test. 26 C.F.R. § 1.501(c)(3)-1(a)(1).

The organizational test requires a nonprofit organization to be organized exclusively for one or more exempt purposes and its articles of organization must: "(a) Limit the purposes of such organization to one or more exempt purposes; and (b) Do not expressly empower the organization to engage, otherwise than as an insubstantial part of its activities, in activities which in themselves are not in furtherance of one or more exempt purposes." 26 C.F.R. § 1.501(c)(3)-1(b). Gazelle's First Amended and Restated Articles of Incorporation are consistent with these limitations.

---

[14] Similarly, the HEA defines a nonprofit entity as having "no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual." HEA § 103(13), 20 U.S.C.A. § 1003(13) (West).

[15] 501(c)(3). Rule 142(a)(1), *Tax Court Rules of Practice and Procedure*; *Bubbling Well Church of Universal Love, Inc. v. Commissioner*, 670 F.2d 104, 106 (9th Cir.1981).

The focus of the operational test is on the prohibition against private benefit and private inurement, and the related Treasury regulations examine both the primary activities of the organization and its distribution of earnings.[16] *See* 26 C.F.R. § 1.501(c)(3)-1(c)(1)(primary activities) and 26 C.F.R. § 1.501(c)(3)-1(c)(2)(distribution of earnings). Although there is significant overlap in the analysis of prohibited substantial private benefit under the primary activities test and private inurement under the distribution of earnings test,[17] the prohibition on private benefit encompasses a greater range of activities. *See Am. Campaign Acad. v. C.I.R.*, 92 T.C. 1053, 1068–69 (Tax 1989)("while the private inurement prohibition may arguably be subsumed within the private benefit analysis of the operational test, the reverse is not true. Accordingly, when the Court concludes that no prohibited inurement of earnings exists, it cannot stop there but must inquire further and determine whether a prohibited private benefit is conferred"). Unlike private inurement, private benefit does not necessarily involve the flow of funds from an exempt organization to a related private party, it can also include other benefits from the activities of the exempt organization *to an unrelated party*. *See P.L.R. 200914063*, 2009 WL 889714 (IRS PLR Apr. 3, 2009) (citing Rev. Rul. 76-206, 1976-1 C.B. 154 which found that an organization formed to promote broadcasting and classical music in the community created a substantial financial benefit to an unrelated for-profit radio station); *see also Capital Gymnastics Booster Club, Inc. v. C.I.R.*, 106 T.C.M. (CCH) 154 (Tax 2013) ("Impermissible benefit to 'private interests' thus encompasses not only benefit to insiders but also benefits that an organization may confer on unrelated or even disinterested persons, *i.e.*, outsiders").

Under the primary activities test, the existence of even one non-exempt purpose, such as creating a private benefit, if substantial in nature, will destroy the organization's exempt status. *See Intl. Postgraduate Med. Foundation v. C.I.R.*, 56 T.C.M. (CCH) 1140, 1989 WL 3808 (Tax 1989)(the existence of a "single noneducational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes") (*citing Better Business Bureau of Washington D.C., Inc. v. United States*, 326 U.S. 279 (1945); *Nat. Assn. of American Churches v. Commissioner*, 82 T.C. 18, 28-29 (1984)). As the United States Tax Court stated in *Intl. Postgraduate Foundation,* "[w]hen a for-profit organization benefits substantially from the manner in which the activities of a related organization are carried on, the latter organization is not operated exclusively for exempt purposes within the meaning of section 501(c)(3), even if it furthers other exempt purposes." *Id.* In concluding that the IRS had properly revoked the petitioner's exempt status, one of the significant findings of the Tax Court was that the owner of the for-profit business "formed the [nonprofit entity] to obtain customers for his tour business."

In looking at payments to a related for-profit enterprise, the focus is on whether "the entire enterprise is carried on in such a manner that the for-profit organization benefits substantially from the operation of the [nonprofit entity]." *Church By Mail, Inc. v. C.I.R.*, 765 F.2d 1387, 1392 (9th Cir. 1985)(citing *Est of Hawaii v. Commr. of Internal Revenue*, 71 T.C. 1067, 1080-81 (Tax

---

[16] The final element prohibits the organization from being involved in political or lobbying activities. 26 C.F.R. § 1.501(c)(3)-1(c)(3).

[17] *See Canada v. Commr. of Internal Revenue*, 82 T.C. 973, 981 (Tax 1984) ("In determining whether these conditions are satisfied, the 'operated exclusively for exempt purposes' and the 'private inurement' requirements often substantially overlap").

Grand Canyon University (OPE ID 00107400)
Page 12 of 18

1979)). Thus, "the purpose and objective to which the income of the [nonprofit entity] is devoted is the ultimate test in determining whether it is operated exclusively for an exempt purpose." *Church By Mail*, 765 F.2d at 1392. In *Church by Mail,* the Ninth Circuit found that the tax court did not err in determining that the church was operated "for a substantial non-exempt purpose of providing a market" for the printing and mailing services provided by the for-profit entity, where the employees of the for-profit spent a considerable portion of their time working on services provided to the church, and where the majority of the church's income was paid to the for-profit for payments on loan principal, interest, and commissions. 765 F.2d 1391-92.

Percentage of revenue contractual arrangements can lead to prohibited private benefit, and the scrutiny is heightened in arrangements where the compensation is based on an uncapped percentage of revenue. *See* P.L.R. 201235021, 2012 WL 3764677 (IRS PLR Aug. 31, 2012) ("This lack of cap limit entails that [the for profit company] can receive unlimited income that will more than compensate [the for profit company] for the services [it] renders to you. Thus, rather than devoting substantially all your income towards a purpose tax-exempt under § 501(c)(3), your income will be inuring to the benefit of [the for profit company]"). An uncapped percentage as low as 5% of donation receipts has been held to be a prohibited inurement to private shareholders and individuals. *Id.*; *see Spokane Motorcycle Club v. U.S., 222 F. Supp.* 151, 153-54 (E.D. Wash. 1963)(even a de minimis amount can be an impermissible private inurement).

## V. THE DEPARTMENT'S DETERMINATION ON THE REQUESTED CHANGE TO NONPROFIT STATUS

### A. The Impact of the MSA

Having reviewed voluminous materials provided to it, the Department has concluded that the primary purpose of the MSA, and by extension, the Transaction, was to drive shareholder value for GCE with GCU as its captive client – potentially in perpetuity. Notably, the Executive Summary of the Barclays Report includes the following:

- The Company's strong balance sheet and track record of performance position it to consider a broad range of strategic alternatives to continue to drive share price performance
    - However, perceived and tangible limitations on the Company's ability to aggressively pursue select alternatives as a for profit postsecondary provider must be considered

- Project Gazelle provides an attractive alternative for the Company ***and its shareholders*** to position the Company to:
    - Continue to provide an attractive (and enhanced), competitive offering, and therefore, grow its student population
    - Mitigate the potential risk (perceived or real) posed by its for profit status

12

Grand Canyon University (OPE ID 00107400)
Page 13 of 18

        o   Pursue additional growth vectors to ***drive incremental value for shareholders***

Barclays Report at 2 (emphasis added).

The Barclays Update, provided to the GCE board days prior to the July 1, 2018 closing on the Transaction contains similar language in an updated Executive Summary:

- Investors recognize the Company's pursuit of Project Gazelle, and have continued to show support and interest in the stock, reflecting a positive expected outlook for the Company

- Project Gazelle provides an attractive alternative for the Company ***and its shareholders*** to position the Company to: .... Pursue additional growth vectors ***to drive incremental value for shareholders***

Barclays Update at 1 (emphasis added). The Barclays Update also includes a "Preliminary Discounted Cash Flow Analysis -Implied Value Transfer" analysis which notes that following the Transaction, "current shareholders ***retain ownership*** of GCE cash flows." Barclays Update at 7 (emphasis added). Of course, the primary (if not sole) source of those cash flows is revenue generated from Gazelle/GCU pursuant to the MSA. As explained in the Barclays Update, "following the transaction GCE, Inc. will have a single client, and as a result, a highly concentrated source of revenues," and further, "GCE, Inc.'s performance will be closely tied to that of Gazelle University – should Gazelle University's performance (or regulatory standing) be impacted in any way by (or following) the transaction, GCE, Inc. could also be negatively impacted." *See* Barclays Update at 9.

Similarly, the November 21, 2017 GCE board minutes reflect that the Board engaged in an extensive discussion about "Project Gazelle" including "the benefit to [GCE] and its stockholders." Board Minutes at 1. And at a GCE board meeting immediately prior to the closing of the Transaction, Mr. Bachus (GCE Chief Financial Officer) explained that a post-closing appraisal might result in a higher fair value for the assets transferred, and although GCE would not benefit from that, the higher valuation would benefit GCU in connection with its composite score, and he further explained why a good composite score for GCU "ultimately benefited the Company," meaning GCE. GCE June 28, 2018 Board Minutes at 2-3.

Not only was the Transaction structured so that the revenues generated by GCU are transferred to and retained by GCE for the benefit of its shareholders, the implementation of operations under the MSA results in an additional $697 Million to operate in the first fiscal year, solely resulting from the Services Fee paid to GCE. *See* Barclays Report at 33.

As described above the Services Fee is paid on a variety of revenue generating items:
- tuition
- student use of the online platform
- "students and their related activities"
- Canyon Connect

- student housing
- meal plans and other food services
- athletic tickets
- Grand Canyon University Hotel and Conference Center
- Maryvale Golf Course
- Grand Canyon University Arena
- Canyon Enterprises (apparel sales and other businesses)

MSA Exh. D §1. Although GCE receives 60% of the revenue from all of these revenue generating operations, it does not appear that GCE actually provides services for a significant part of many of these operations – e.g., student housing, food services, operation of the hotel, conference center, golf course, arena or Canyon Enterprises.

Despite GCE only taking on the responsibilities of 28% of the operating costs, 60% of the gross adjusted revenue from the Institution will be paid to GCE under the MSA. When payments on the Senior Secured Note are included in the analysis, GCE will be receiving approximately 95% of Gazelle's revenue. It is also worth noting that if revenue increases at a rate faster than operating costs, GCE has the potential to be paid even significantly higher amounts over the costs of the services it provides. Therefore, instead of the increased revenue being used for GCU's exempt purpose of providing education, the additional revenues would primarily benefit the shareholders of GCE.

It is equally concerning that GCU is essentially a captive client. As described above, the Initial Term of the MSA is 15 years, with automatic renewals thereafter for successive five years terms apparently in perpetuity. MSA §6.1. Although either party can elect not to renew at the end of the Initial Term or any Renewal Term, if Gazelle exercises that right, it has to pay GCE a Non-Renewal Fee (50% of the aggregate Services Fees paid or payable for the trailing twelve month period just ended). MSA §6.2 and MSA Exh. A at A-5. Gazelle has the right to terminate the MSA during the Initial Term, but it cannot elect do so before July 1, 2025 (seventh anniversary) or the date by which the Senior Secured Note is paid in full – whichever is later. MSA §6.3. If Gazelle exercises that right, it must pay GCE an Early Termination Fee (50% of the aggregate Services Fees paid or payable for the trailing twelve-month period just ended). MSA §6.3 and MSA Exh. A at A-3. Thus, Gazelle is locked into the agreement for at least seven years. And even if Gazelle wanted to terminate the MSA after July 1, 2025 because it found a more competitive service provider, the required payment of the Senior Secured note is an arguably prohibitive termination fee.

On October 1, 2018, Mr. Glass (counsel for GCU) wrote to the Department, providing various documents and responding to a September 10, 2018 letter from the Department seeking further information on GCU's request to convert to nonprofit status. ("October 1 Letter"). In part, the October 1 Letter described the approvals from the Higher Learning Commission ("HLC"), the IRS, the State of Arizona and other bodies, including the National Collegiate Athletic Association. As described above however, the Department makes its own determination of nonprofit status for a school's participation in Title IV. Although state and IRS approvals are required for nonprofit status under the Department's regulations, those approvals are not the sole determining factors, nor does the Department need to defer to those determinations. In regard to

Grand Canyon University (OPE ID 00107400)
Page 15 of 18

the IRS designation of tax-exempt status, and as noted by the October 1 Letter, the IRS approval was issued three years prior to the Transaction. Even if the "basic structure" of the Transaction and a prior draft of the MSA were provided to the IRS at that time, there is no evidence that the IRS conducted a comprehensive review of the MSA or any of the studies that were later performed to support the MSA. Unlike the IRS's initial grant of tax-exempt status, the Department's determination of nonprofit status considers the structure and planned operations of the institution when its owner(s) apply for that change of status, and seeks to ensure that a nonprofit institution's revenues – a good portion of which are generated from Title IV funds – are primarily devoted to the mission of the school and not to other parties, including (as here) the shareholders of the prior owner.

Based on the tax authority cited above, the Department has determined that GCU does not meet the operational test's requirement that both the primary activities of the organization and its stream of revenue benefit the nonprofit itself. Rather, the materials that the Department has reviewed demonstrate that GCE and its shareholders – rather than Gazelle/GCU -- are the primary beneficiaries of the operation of GCU under the terms of the MSA. This violates the most basic tenet of nonprofit status – that the nonprofit be primarily operated for a tax-exempt purpose and not substantially for the benefit of any other person or entity.

### B. Other Factors

The Department has identified other factors related to the MSA that provide additional support for the Department's determination that granting nonprofit status to GCU is not warranted.

#### 1. Mr. Mueller's Dual Roles

The October 1 Letter explains that the GCE and Gazelle boards have adopted independent structures, and that the boards of GCE and Gazelle made independent decisions to retain Mr. Mueller in his positions as President of GCU and Chief Executive Officer of GCE. The October 1 Letter further notes that the terms of the MSA and Gazelle's bylaws "limit Mr. Mueller's direct involvement in the day to day oversight of the relationship with GCE" because direct oversight is vested in a Designee (*see* MSA §3.11), and because from Gazelle's side, management oversight is vested in a standing committee of the independent members of the board of trustees ("MSA Committee"). But not only is Mr. Mueller the President of GCU and the CEO of GCE, he is also a shareholder of GCE (even if he holds a de minimis percentage of stock). Thus, he is in the dual role of running both the Institution and its managed services provider – the major recipient of the Institution's revenues – and one of its shareholders. GCE's only client is GCU. Thus, as the CEO of GCE, he is the key executive responsible for providing the services under the MSA, with duties of loyalty to shareholders of GCE. Yet, as the Institution's President he will have responsibility to manage matters large and small with its primary service provider, notwithstanding the appointment of a Designee and the independent trustees who comprise the MSA Committee. Given those obviously conflicting loyalties, and the breadth of the services provided under the MSA, the Department is not satisfied that these structures are sufficient to ensure that Mr. Mueller's undivided loyalty is to the Institution.

AR-A-0015

### 2. GCE's "Management and Oversight" of GCU

According to GCE's statements to Deloitte, GCE's 44-person "Executive Leadership is responsible for managing and overseeing the University." Deloitte Report at 26 ("the majority of their time relate [sic] to strategic activities that generate future benefits for the University"). Relying on the titles used in the Deloitte Report, the Department has determined that the Executive Leadership team (as of the date the Transaction closed) had 58 members, not 44 members, assuming that the CEO is also included in the team.[18] Upon closing of the Transaction, a significant number of these executives remained employed by GCE – they did not transition to become Gazelle/GCU employees. *See* APA Disclosure Schedules at Schedule 6.3(a)-2. Of the 58 executives, only seventeen transferred to Gazelle: the General Counsel, the Chief Academic Officer, eight academic deans of the various colleges, three senior vice presidents and four vice presidents. Brian Mueller, the CEO of GCE and the President of GCU, is identified in Schedule 6.3(a)-3 as the sole "Joint Employee." This means that nearly 75% of the executive team members responsible for managing and overseeing GCU and developing its strategic vision are employed by its service provider. As employees of GCE, these executive leaders have a primary fiduciary responsibility to the shareholders of GCE[19], a for-profit publicly traded corporation, while at the same time providing significant management and oversight of the Institution. This is particularly so given the scope of the activities GCE is performing under the MSA, including: marketing, enrollment services and budget consultations, student support services counseling, document intake, student records management, curriculum services, accounting services (payroll, accounts payable, general ledger, etc.), financial aid services, procurement services, audit services, human resources, technology, business analytics services, faculty operations, and compliance monitoring and audits. MSA at Ex. B §§1-15.

The Department is skeptical that any nonprofit could outsource the number and type of institutional functions that Gazelle has and still be deemed to operate the Institution. Given the enormous leverage GCE now has over Gazelle by virtue of the MSA and the fact that most of the Institution's key management personnel work for GCE, not Gazelle/GCU, the Department concludes that, as a practical matter, Gazelle is not the entity *actually operating* the Institution as is required under the Department's regulations. *See* 34 C.F.R. § 600.2 (definition of nonprofit at (1)(i)).

### VI. CONCLUSION

For the reasons discussed above, the Institution does not satisfy the Department's definition of a nonprofit. The Department approves the change in ownership application of the Institution from GCE to Gazelle (now known as Grand Canyon University) and approves the Institution as a for-

---

[18] While the Deloitte Report does not identify the Executive Leadership Team members by name, it states that the Team consists of those with the title of CFO, CIO, COO, CTO, Chief Academic Officer, General Counsel, EVP, SVP, VP, Director, and Dean. In regard to the designation of "Director," the Department only counted personnel with the title of "Executive Director," not all personnel with the designation "Director" in their titles.

[19] And at least some of these executives are GCE shareholders themselves.

Grand Canyon University (OPE ID 00107400)
Page 17 of 18

profit institution for purposes of its continued participation in the Title IV, HEA Programs. The Department denies the request for recognition of the Institution as a nonprofit.

The for-profit status of the Institution is for purposes of its participation in the Title IV, HEA programs. The Department does not take a position with respect to Gazelle's non-profit 501(c)(3) status with the Internal Revenue Service. However, GCU must cease any advertising or notices that refer to its "nonprofit status." Such statements are confusing to students and the public, who may interpret such statements to mean that the Department considers GCU a nonprofit under its regulations. The Department does not take a position regarding statements that GCU may make about its IRS status as a 501(c)(3) tax exempt organization.

The TPPPA under which the Institution has been operating since the CIO continued the prior approval for the Institution to participate under a for-profit status. The for-profit status for the continued participation of the Institution is therefore unchanged. The Institution is reminded that the Institution must meet the Title IV, HEA programs reporting and program eligibility requirements applicable to for-profit institutions, including the 90/10 eligibility requirements described in 34 C.F.R. §668.28 and any applicable gainful employment program requirements set out in 34 C.F.R. Subpart Q.

Under APA § 2.4, Gazelle does not assume any liabilities arising under Educational Laws related to or based on the conduct of the Institution prior to closing. The Department's approval of the CIO does not include the exclusion of liabilities arising under the Title IV, HEA programs, and the approval of the CIO is expressly conditioned on Gazelle/GCU's responsibility for both pre-closing and post-closing liabilities arising under Title IV. Notwithstanding this condition, GCE also retains responsibility for pre-closing liabilities arising under Title IV. The parties are not foreclosed from requiring GCE to indemnify Gazelle/GCU for any losses resulting from pre-closing Title IV liabilities.

The TPPPA will expire at the end of this month. The Department has included with this letter the provisional program participation agreement ("PPPA") for the Institution. The PPPA includes the approval of the new programs requested by GCU. If the Institution wants to continue to participate in Title IV programs without interruption, the PPPA should be signed and returned to the Department no later than November 25, 2019 (given the Thanksgiving holiday) for countersignature.

The APA Parties also previously inquired (through counsel) about whether GCE is considered an "unaffiliated third party" for purposes of the March 17, 2011 Dear Colleague Letter (GEN-11-05) that addressed the implementation of the program integrity regulations and the incentive compensation ban. That question is currently under review, and the Department will provide the parties with a separate response on that issue.

If the Institution has additional factual information or documents that it believes the Department should consider relating to the decisions set forth in this letter, GCU should submit a request for reconsideration. That request should be submitted to Jane Eldred (Jane.Eldred@ED.Gov) within 10 calendar days of the date of this letter. Please note that a request for reconsideration will not stay the expiration of the TPPPA which expires on November 30, 2019.

Grand Canyon University (OPE ID 00107400)
Page 18 of 18

                                      Sincerely,

                                      *[signature: Michael J. Frola]*

                                    Michael J. Frola
                                    Director,
                                    Multi-Regional and Foreign Schools Participation
                                    Division

cc:    The Higher Learning Commission (*email: Barbara Gellman-Danley, President - president@hlcommission.org, Anthea Sweeney, VP for Legal and Governmental Affairs - asweeney@hlcommission.org*)

       AZ State Board for Private Postsecondary Education (*email: Terr Stanfill, Executive Director - teri.stanfill@azppse.gov*)

       New Mexico Higher Education Department (*email: exec.admin@state.nm.us*)

       IRS
       Attn: EO Classification
       MC 4910 DAL
       1100 Commerce Street
       Dallas, TX  75242
       eoclass@IRS.gov