

January 12, 2021

Mr. Brian Mueller, President  
Grand Canyon University  
3300 West Camelback Road  
Phoenix, AZ  85017-3030

UPS 2nd Day Delivery  
Tracking #: 1Z A87 964 02 9588 2068

Sent via email to: *brian.mueller@gcu.edu*

**Re: Reconsideration Review of the Change in Ownership and  
    Conversion to Nonprofit Status of Grand Canyon University  
    OPE ID: 00107400**

Dear Mr. Mueller:

At your request, the U.S. Department of Education ("Department"), Federal Student Aid has conducted a reconsideration review of the request of Grand Canyon University, OPE ID 00107400 ("Institution" or "GCU") to convert to nonprofit status.

Prior to July 1, 2018, GCU was owned and operated by Grand Canyon Education, Inc. ("GCE"), a Delaware publicly traded corporation.  By way of an Asset Purchase Agreement ("APA"), dated July 1, 2018, GCE sold its School Assets (as set forth in APA at Recital B and as defined in APA §2.1) to Gazelle University ("Gazelle"), an Arizona nonprofit corporation ("the Transaction").

On November 6, 2019, the Department issued a letter setting forth its decision following its post-closing review of the change in ownership ("CIO") and requested a change of status from proprietary to nonprofit.  ("Decision"). [1]  The Department approved the CIO but denied GCU's request to convert to nonprofit status, finding that GCU did not satisfy the Department's requirements for a nonprofit institution.

The Decision provides details about the background of the Transaction, the Department's requirements for nonprofit status, and a discussion about relevant authority under the Internal Revenue Code.  Those details are not repeated here.   In summary, the Department determined

---

[1] After the Transaction closed, Gazelle changed its name to Grand Canyon University.  In documents submitted to the Department, Gazelle has also been referred to as "GCU" and the "New GCU."  To avoid confusion, the Decision referred to these parties as "Gazelle" and "GCE," based on the names used in the introductory paragraph of the APA: "Gazelle University" (the purchasing entity) and "Grand Canyon Education, Inc." (the selling entity).  The sole member of Gazelle is Grand Canyon Foundation.   This reconsideration letter continues the use of the names as they were used in the Decision.



830 First Street NE, Union Center Plaza, 7th Floor, Washington, DC 20202-5340  
www.FederalStudentAid.ed.gov  
AR-A-0019

that by virtue of the MSA[2] entered into between Gazelle and GCE at the time of the closing of the Transaction, GCE, not GCU/Gazelle, was the beneficiary of 60% of GCU's revenues. Accordingly, GCU did not qualify for nonprofit status for purposes of its participation in Title IV programs under the Higher Education Act.

Thereafter, GCU sought reconsideration of the Decision.  On January 8, 2020, GCU provided the Department with potential revised terms for the MSA and asked the Department to confirm that the changes would meet the Department's requirements for GCU to be recognized as a nonprofit for purposes of its participation in the Title IV programs.  On January 17, 2020, the Department requested that GCU provide additional documentation about the proposed revision.  GCU provided some responsive materials on May 6, 2020 and the remaining materials on May 12, 2020.  As it conducted its reconsideration review, the Department requested and received additional documents and information from GCU.

## I.  THE AMENDED AND RESTATED MASTER SERVICES AGREEMENT

The potential changes to the MSA are set forth in a draft Amended and Restated Master Services Agreement dated as of January 7, 2020 ("ARMSA").  Although the ARMSA generally tracks the MSA, there are some notable changes.  As set forth in ARMSA Exhibit B, GCE will no longer provide Curriculum Services or Faculty Operations:

**Services Provided (services marked with * are Exclusive Services[3])**

| Exhibit B | MSA | ARMSA |
|---|---|---|
| § 1* | Marketing | Revision: §1.1.3 (alliances with other educational institutions) is deleted |
| § 2* | Enrollment Services and Budget Consideration | No changes |
| § 3* | Student Support Services Counseling | No changes |
| § 4 | Document Intake | No changes |
| § 5 | Student Records Management | No changes |
| § 6 | Curriculum Services | Deleted |
| § 7 | Accounting Services | No changes |
| § 8 | Financial Aid Services | No changes |
| § 9 | Procurement Services | No changes |
| §10 | Audit Services | No changes |
| §11 | Human Resources | No changes |
| §12* | Technology | No changes |

---

[2] Words capitalized herein but not defined have the meaning set forth in the Decision, the APA and/or the MSA.

[3] In both the MSA and the ARMSA, GCE is the exclusive provider of certain services, identified in the MSA as "Exclusive Services," for which Gazelle agrees it will not contract with any third party absent GCE's approval (which is subject to GCE's sole discretion).  MSA §3.1; ARMSA §3.1.

| §13 | Business Analytics Services | No changes |
| §14 | Faculty Operations | Deleted |
| §15 | Compliance Monitoring and Audits | No changes |

The parties also agreed that GCE shall always provide at least three services in addition to Enrollment Services. MSA Exhibit B (introductory paragraph). This has not been changed in the ARMSA.

Pursuant to MSA §5.1, the Services Fee is determined and paid in accordance with MSA Exhibit D which provides that Gazelle is required to pay GCE a fee that is equal to 60% of Gazelle's Adjusted Gross Revenue (excluding charitable contributions or other gifts used for purposes other than payment of tuition and fees for students). MSA Exhibit D § 2. Adjusted Gross Revenue consists of all revenue (net of refunds and scholarships accounted for as a discount to tuition) received by Gazelle or its Affiliates from the following sources:

(a) Tuition (including tuition funded by third party sources and charitable contributions);
(b) Fee revenue from students for use of the online communications portal ("the Platform");
(c) Fee revenue from students and their related activities;
(d) Fee revenue from students for use of the Canyon Connect learning resources platform;
(e) Fee revenue from students for student housing;
(f) Fee revenue from students for meal plans and other food services; and
(g) Other revenue including revenue from: (i) sales of athletic tickets; (ii) the operation of the Grand Canyon University Hotel and Conference Center; (iii) the operation of the Maryvale Golf Course; (iv) the operation of the Grand Canyon University Arena; and (v) the operation of Canyon Enterprises (apparel sales and other businesses).

MSA Exhibit D §1.

In the Decision, the Department noted that the Services Fee under the MSA was imposed on revenue generated from sources for which GCE provided no services (*e.g.,* campus housing, food services, athletic tickets, etc.). Under the ARMSA, instead of a 60% Services Fee on all of the above listed items, the ARMSA provides for a "Monthly Services Fee" ("Monthly Fee") which is 66.8% of Tuition and Fee Revenue (items (a) through (d) above). ARMSA Exhibit D §3(a). However, for any calendar year in which 59% of Adjusted Gross Revenue (defined as all categories above) is less than the total of the Monthly Fees paid that year, GCU is entitled to a credit for that difference, which is deducted from the Monthly Fee(s) for the following year. ARMSA Exhibit D §3(b). The MSA did not provide any cap on the total amount of the Services Fee that must be paid to GCE in any year or cumulatively over the years. The ARMSA does not change that.

The Department also notes some additional items that have been revised in the ARMSA (these items are not intended to be an exhaustive list of changes):

- Revisions to the Non-renewal and Termination Provisions, including the elimination of the Non-renewal Fee and reduction of the Termination Fee from 100% to 50%, reduction of the time period for Early Termination of the Initial Term, and eliminating the

Grand Canyon University
OPE ID: 00107400
Page 4 of 19

> requirement that the Senior Secured Debt be paid in the event of Early Termination. ARMSA §§ 6.2 and 6.3[4]
> - GCU has the right to hire a third party to perform Back Office Services Functions (not just assume them itself).  ARMSA §6.9

## II. THE ECONOMIC STUDIES

As discussed in detail in the Decision, in August 2018 (following the closing of the Transaction) GCU provided the Department with a report prepared by Barclays Capital Inc. ("Barclays Report") and a transfer pricing report from Deloitte Tax, LLP (hereinafter "Deloitte 2018 TPR"). Prior to issuance of the Decision, the Department also received a "follow-on" report from Barclays ("Barclays Update").  The Decision sets forth the Department's analysis of these reports.  Of particular concern to the Department was the fact that, as detailed in the Barclay's Report, under the planned separation (and as effectuated on July 1, 2018) the costs to operate the separated GCU increase from $810 Million to $1.496 Billion for fiscal year 2019, solely as a result of the Service Fees paid to GCE.  Barclays Report at 33.[5]  As noted above, the revenue split set forth in the ARMSA is not appreciably different than the revenue split set forth in the MSA, providing for the lesser of 68.8% of Tuition and Fee Revenue, or 59% of Adjusted Gross Revenue (which includes Tuition and Fee Revenue).[6]

On May 6, 2020, GCU provided an updated transfer pricing report in support of its request for reconsideration, dated April 29, 2020 and entitled "Transfer Pricing Planning Report" ("Deloitte

---

[4] The Initial Term of the MSA is 15 years, with automatic renewals thereafter for successive five years terms apparently in perpetuity.  MSA §6.1.  This remains the same in the ARMSA.  ARMSA §6.1.  The ARMSA has, however, eliminated the Non-Renewal fee.  ARMSA  §6.2.  Gazelle has the right to terminate the ARMSA during the Initial Term, but it cannot elect do so before the fifth anniversary of the Effective Date (which is appears to be referring to the Effective Date of the MSA).  ARMSA §6.3.  If Gazelle exercises that right, it must pay GCE an Early Termination Fee (50% of the aggregate Services Fees paid or payable for the trailing twelve- month period just ended).  ARMSA §6.3 and MSA Exhibit A at A-3.  Thus, Gazelle is locked into the agreement for at least five years.   The ARMSA eliminates the requirement that the Senior Secured note be paid in full as a condition precedent for early termination.

[5] Although the Barclays Report (dated April 26, 2018) assumed a 65%/35% revenue split on most items, and a different split on housing (20%/80%), meals (5%/95%) and Canyon Connect (5%/95%), the executed MSA provides for a straight 60%/40% split and included sources of revenue that are not included in the Barclays Report, including revenue from Gazelle Arena.  As noted in the Decision, these differences would seem to only exacerbate Barclays' assessment that the separation of the servicing functions from GCI will (and has) resulted in a significant increased cost for the operation of the Institution, with those increased funds flowing to the benefit of its prior owner, GCE.

[6] The Services Fee under the MSA is 60% of Adjusted Gross Revenue.  Adjusted Gross Revenue includes the same items in the ARMSA as are included in the MSA.  As described above, the Monthly Fee under the ARMSA is 68.8% of Tuition and Fee Revenue.  GCU's "largest primary component" of revenue is tuition, with online tuition accounting for "74% to 98% of total revenue."  *See* "Valuation of the Invested Capital of Grand Canyon University," as of January 7, 2020, prepared by BKD CPAs and Advisors, at 7.  "The second main revenue component is other revenue, which consists of fee income, room and board and other less meaningful sources."  *Id.*

Grand Canyon University
OPE ID: 00107400
Page 5 of 19

2020 TPPR").[7]  The Deloitte 2020 TPPR includes another pricing transfer study as Appendix B, described as "FY 2017 EPS Analysis Grand Canyon University - TP Report August-19-2019 – Original Analysis" (hereinafter "Deloitte 2019 TPR").[8]  the Deloitte 2020 TPPR refers to the Deloitte 2019 TPR as the "Original Analysis."  The Department does not adopt the term "Original Analysis" because use of that term is confusing given the existence of the Deloitte 2018 TPR,[9] which is the report discussed in the Decision.  The Deloitte 2018 TPR, the Deloitte 2019 TPR and the Deloitte 2020 TPPR are hereinafter collectively referred to as "the Deloitte Reports."

In its May 2020 submissions, GCU also provided three reports prepared by BKD CPAs & Advisors ("BKD"):  a "Valuation of the Invested Capital of Grand Canyon University," as of July 1, 2018 ("BKD 2018 Valuation"); a "Valuation of the Invested Capital of Grand Canyon University," as of January 7, 2020 ("BKD 2020 Valuation")[10]; and a "Review of a Pricing Transfer Analysis Prepared By a Third Party with Respect to Provision of Education Services by Grand Canyon Education, Inc. on Behalf of Grand Canyon University as of December 31, 2018 and December 31, 2019" ("BKD Review").  The BKD Review is a review of the Deloitte 2020 TPPR, which is referred to in the BKD Review as the "Transfer Pricing Study."

The methodology used in the Deloitte Reports and reviewed by BKD is an "Economic Profit Split" ("EPS") analysis.  *See* Decision at 6-9 for a discussion of the EPS analysis performed by Deloitte.  As described in the Deloitte Reports, there are various steps required to perform an EPS analysis (*i.e.,* identifying the "assets and activities" of the enterprise that generate revenue, identifying risks associated with the revenue-generating activities and assets; calculating a consolidated contribution margin; estimating the share of total fixed costs for each entity; splitting the contribution margin based on the fixed cost share of each entity; recreating an accounting income statement and determining the revenue split between GCU and GCE).  *See* Deloitte 2018 TPR at 32 and Deloitte 2020 TPPR at 39.

Although much of the verbiage in the three different Deloitte Reports is the same, the Deloitte 2020 TPPR contains a new discussion about the different methodologies for conducting transfer pricing studies.  *See* Deloitte 2020 TPPR at 32-38.  The EPS used by Deloitte is only one of several identified methods, as discussed more fully below.

---

[7] Not surprisingly, GCU has not provided any further analysis from Barclays in support of its request for reconsideration.

[8] The Deloitte 2019 TPR (Appendix B to the Deloitte 2020 TPPR) was not provided by GCU when it submitted the Deloitte 2020 TPPR in May 2020.  The Department requested and received the Deloitte 2019 TPR in November 2020.

[9] Although the Deloitte 2018 TPR and the Deloitte 2019 TPR are similar, they are not identical.

[10] Given the Decision's conclusion that the MSA prevented the Department from approving the requested conversion to nonprofit status, the Decision did not examine whether the purchase price was at fair value and was not based on a finding that the purchase price for the assets was not at fair value.  *See* Decision at 6 n.11.

Grand Canyon University
OPE ID: 00107400
Page 6 of 19

## III. THE DEPARTMENT'S REVIEW OF THE DELOITTE TPPR AND THE BKD REVIEW

The Department has extensively reviewed both the Deloitte 2020 TPPR and the BKD Review.[11] Neither document changes the Department's conclusion, expressed in its November 6, 2019 letter to GCU, that "the primary purpose of the MSA, and by extension, the Transaction, was to drive shareholder value for GCE with GCU as its captive client – potentially in perpetuity." Decision at 12. Neither the Deloitte 2020 TPPR nor the BKD Review demonstrates that the Monthly Fee under the ARMSA (based on the lesser of 68.8% of Tuition and Fee Revenue or 59% of GCU's Adjusted Gross Revenue), potentially in perpetuity, constitutes anything other than a continuing revenue stream to its former owner GCE, the primary purpose of which is to drive shareholder value for GCE. [12]

Transfer Pricing in General

Transfer pricing assumes that a transaction is between related parties (referred to in the applicable regulations as "controlled taxpayers," as discussed below). GCU and GCE have repeatedly insisted that GCU/Gazelle and GCE are independent of each other. Neither the Deloitte 2020 TPPR nor the BKD Review acknowledge that GCU/Gazelle and GCE are *not* controlled parties and that this is *not* a controlled transaction. Furthermore, the EPS method selected by Deloitte assumes that both entities have profits. Gazelle, however, does not. It has 501(c)(3) status under federal regulations and was incorporated as a nonprofit corporation under state law. Neither Deloitte nor BKD even mention this fact. The analysis used by both assumes that GCU/Gazelle has profits to contribute to a joint enterprise, but that assumption is erroneous – there is no joint enterprise – or at least there should not be if GCU is truly independent.

Transfer pricing is an accounting and tax practice that is used to determine whether prices charged between controlled taxpayers or entities (*e.g.*, two divisions of one corporation or two subsidiaries of a parent) are fair and at arms-length for tax purposes. Indeed, the Deloitte 2020

---

[11] This letter includes an extensive discussion of the transfer pricing methodologies used by Deloitte. The Department also notes the following qualifying language used by Deloitte – these are by way of example only:

- "Information and data provided by the Client, the completeness and accuracy of which we did not independently verify." Deloitte 2020 TPPR at 2.
- "[w]e have assumed all related party transactions involving the University and its subsidiaries are priced at arm's length." *Id.* (not clear to what "subsidiaries" Deloitte is referring).
- "For the fixed costs that generate OBSAs, based on the management confirmation, we rely on the estimates performed in the Original Analysis, for the lead time and useful lives of these costs to quantify the value of OBSAs and their amortization schedule." Deloitte 2020 TPPR at 4.

[12] The Department also notes the inconsistencies in the terminology used by Deloitte and the terminology used in the ARMSA. For example, the Deloitte 2020 TPPR bases the EPS on a percentage of GCU's net revenues. *See e.g.*, Deloitte 2020 TPPR at p. 4 (§1.3(3)(e); p. 10 (§4); p. 43 (§6.2.1.3, Table 7); p.45-46 (§6.3). BKD similarly states that "[b]ased on its analysis, Deloitte determined an arm's-length range for the share of revenue as a percentage of total net revenue . . .." BKD Review at 14 (emphasis added). In other places, the Deloitte 2020 TPPR refers to just "revenue." The ARMSA and Exhibit D thereto refer to "adjusted gross revenue," not "net revenue" or "consolidated net revenue." The ARMSA fee is based on a percentage of "Tuition and Fee Revenue" or "Adjusted Gross Revenue." ARMSA at Exhibit D, §3.

Grand Canyon University
OPE ID: 00107400
Page 7 of 19

TPPR states at the beginning that the "analysis contained in this report *is solely for tax purposes . . ..*" Deloitte 2020 TPPR at 1 (§ 1.1) (emphasis added).  "Transfer pricing is an accounting practice that represents the price that one division in a company charges another division for goods and services provided. Transfer pricing allows for the establishment of prices for the goods and services exchanged between a subsidiary, an affiliate, or commonly controlled companies that are part of the same larger enterprise. Transfer pricing can lead to tax savings for corporations, though tax authorities may contest their claims."  Shobhit Seth, Transfer Pricing, Corporate Finance & Accounting (Sept. 9, 2019) (available at https://www.investopedia.com/terms/t/transfer-pricing.asp). Transfer pricing is an "accounting and taxation practice that allows for pricing transactions internally within businesses and between subsidiaries that operate under common control or ownership. The transfer pricing practice extends to cross-border transactions as well as domestic ones." *Id.*  Transfer pricing provides methods by which controlled taxpayers justify to the Internal Revenue Service (or other taxing authorities) how income and costs are being allocated amongst those taxpayers.  Section 482 of the Treasury Regulations (26 C.F.R. § 482 *et seq.*) "places a controlled taxpayer on a tax parity with an uncontrolled taxpayer *by determining the true taxable income of the controlled taxpayer*."  Treas. Regs. § 1.482-1(a)(1) (emphasis added).

Here, the issue is not whether two controlled parties have properly allocated income and costs between themselves for tax and accounting purposes.  Rather, the issue is whether requiring GCU to actually pay out to GCE, an independent entity, a substantial share of its revenues (*i.e.,* actual money out the door, not just a paper exercise of putting dollars in one column or another for accounting and tax purposes) for services under the MSA/ARMSA is the type of benefit that disqualifies GCU from being recognized by the Department as a nonprofit institution.

Treasury Regulations

The Internal Revenue Service has promulgated a complex set of regulations to determine for tax purposes whether the allocation of income, profit and expenses among related taxpayers is arms-length.  The underlying premise of transfer pricing is that the entities involved are "controlled" entities.  "The purpose of section 482 [Treasury's transfer pricing regulations] is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes with respect to such transactions. Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer."  Treas. Reg. 1.482-1.  The following pertinent definitions apply:

- "Controlled" is defined by Treas. Reg. 1.482-1(i)(4) as "any kind of control, direct or indirect, whether legally enforceable or not, and however exercisable or exercised, including control resulting from the actions of two or more taxpayers acting in concert or with a common goal or purpose. It is the reality of the control that is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted."
- "Controlled group" is defined by Treas. Reg. 1.482-1(i)(6) means "the taxpayers owned or controlled directly or indirectly by the same interests."
- "Controlled taxpayer" is defined by Treas. Reg. 1.482-1(i)(5) as "any one of two or more taxpayers owned or controlled directly or indirectly by the same interests, and includes

- the taxpayer that owns or controls the other taxpayers. Uncontrolled taxpayer means any one of two or more taxpayers not owned or controlled directly or indirectly by the same interests."
- "Controlled transaction or controlled transfer" is defined by Treas. Reg. 1.482-1(i)(8) defines as "any transaction or transfer between two or more members of the same group of controlled taxpayers. The term uncontrolled transaction means any transaction between two or more taxpayers that are not members of the same group of controlled taxpayers."

According to GCE's 2020 10-K, "GCU is a separate non-profit entity *under the control of an independent board of trustees, none of whose members have ever served in a management or corporate board role at the Company. Accordingly, the Company's relationship with GCU, both pursuant to the Master Services Agreement and operationally, is no longer as owner and operator, but as a third-party service provider to an independent customer.*" Feb. 20, 2020 10-K at 23 (emphasis added). Taking this public pronouncement, as well as the parties' various representations to the Department as true, GCU/Gazelle does not control GCE and GCE does not control GCU/Gazelle.

Neither the Deloitte 2020 TPPR nor the BKD Review address these terms and definitions, much less explain why transfer pricing is an appropriate tool to evaluate a price being charged between two supposedly independent entities.

In addition to ignoring that these are not parties subject to common control, the BKD Review does not establish that the revenue-based pricing scheme is in fact arm's length nor does it establish that GCU could not purchase the same or better or more innovative service from other vendors at a better price. Nor does it address in any meaningful way the fact that given GCU's size and the revenue it generates, it would also seem that some of the services could be managed by GCU itself with the appropriate staff. This is exactly what it did before the two entities were separated in July 2018.

Nor does the BKD Review in any way address or challenge the conclusion set forth in the Decision that the revenue sharing arrangement between GCU and GCE precludes GCU from being recognized as a nonprofit institution for purposes of Title IV programs. While the Department considers the application of a transfer pricing analysis here to be questionable, it nevertheless wants to address the conclusions reached by Deloitte and BKD.

Transfer Pricing Methods

The main authorities for methods of transfer pricing used by U.S. companies are the Treasury Regulations 1.482-1 *et seq.* and the guidelines issued by the Organization for Economic Co-Operation and Development ("OECD"). OECD is an international organization that promulgates guidelines for evaluating transfer pricing in international transactions. The United States is a party to the OECD Convention and agrees to follow OECD policies/standards for *international* transactions. The Transaction at issue is *not* an international transaction. However, the transfer pricing method that Deloitte used in this case (the EPS) is a method that comes from OECD and is not recognized by the Treasury regulations for domestic transactions (and therefore

Grand Canyon University
OPE ID: 00107400
Page 9 of 19

presumably would constitute an "unspecified method" under the Treasury regulations, as discussed below). [13]

Section 1.482-9 of the Treasury Regulations sets forth the following transfer pricing methods for determining taxable income in connection with a controlled services transaction: (1) services cost method; (2) the comparable uncontrolled services price method; (3) the gross services margin method; (4) the cost of services plus method; (5) the comparable profits method; (6) the profit split method; and (7) unspecified methods.  *See* Treas. Reg. §1.482-9(a) (listing methods).  By cross-reference to § 1.482-1(c), §1.482-9(a) of the regulations requires that the best method be used: "Best method rule—(1) In general. The arm's length result of a controlled transaction must be determined under the method that, under the facts and circumstances, ***provides the most reliable measure of an arm's length result***."  Treas. Regs. 1.482-1(c) (emphasis added).  Thus, the methods identified in §1.482-9(a) must be applied "in accordance with the provisions of §1.482-1, including the best method rule of §1.482-1(c), the comparability analysis of §1.482-1(d), and the arm's length range of §1.482-1(e), except as those provisions are modified in this section [§1.482-9]."

The BKD Review acknowledges that the taxpayer must demonstrate why the selected method was chosen and why the alternatives methods were rejected.  Neither the Deloitte 2020 TPPR nor the BKD Review analytically demonstrate that the unspecified method chosen (EPS) is the most reliable methodology here, nor do they explain in anything more than a perfunctory way why the other methods were rejected.  Notably, the Deloitte 2018 TPR fails to even mention any of the other methodologies, instead simply adopting the EPS method.

As noted above, the factual predicate for all the transfer pricing methods is that the entities and taxpayers are "controlled," a factor that does not exist here.  Additionally, the Department notes that both the Deloitte 2020 TPPR and the BKD Review are, for the most part, superficial.  Neither analyzes the applicable regulations (or the various examples contained therein), in any depth.  Notwithstanding that these are not "controlled" parties and the Department therefore questions the appropriateness of using a transfer pricing study (especially an "unspecified" one under the Treasury regulations) to support a request to convert to nonprofit status, the following provides a summary of the Department's concerns about the conclusions reached by Deloitte and BKD as to the specific methodologies:

1. Services Cost Method ("SCM") - Treas. Reg. § 1.482-9(a)(1), (b)):
The SCM evaluates "whether the amount charged for certain services is arm's length by reference to the total services costs (as defined in paragraph (j) of this section [1.482-9(b)]) with no markup."  Treas. Reg. § 1.482-9(b)(1).  Deloitte's "analysis" and rejection of the SCM method consists of one sentence: "The Education Support Services provided by the GCE to GCU contribute significantly to the key competitive advantages of the *Company*. Under Treas. Reg. Section 1.482-9(b)(4)(vi) (research, development or experimentation type of service transactions) and Treas. Reg. Section 1.482-9(b)(4)(vii) (engineering or scientific type of service

---

[13] In fact, the Deloitte 2020 TPPR includes references to an "MNE" without any explanation.  *See* Deloitte 2020 TPPR at 15-17.  "MNE" means a "multinational enterprise … A group of associated companies with business establishments in two or more countries."  OECD Guidelines (2017) at 28.

Grand Canyon University
OPE ID: 00107400
Page 10 of 19

transactions) are ineligible for the SCM method and therefore, the SCM cannot be used as the best method/most reliable method." Deloitte 2020 TPPR at p.33, §6.1.1.2 (emphasis added). The BKD Review discusses this conclusion at pages 5 (§II.A.3(a)) and 9 (§II.B.1).  Although the Deloitte 2020 TPPR does not define "Company," BKD substitutes "GCU" in place of "Company" in its Review.  BKD Review at 9.  However, the regulation discusses contributions to key competitive advantages of the "controlled group" (§1.482-9(b)(5)) which would have to include both GCU and GCE.  As explained at the outset of this discussion, however, GCU and GCE are not controlled entities and therefore there is no "controlled group," which begs the question of whether the services do or do not "contribute significantly to the key advantages" of a controlled group.  Moreover, the BKD Review states "[w]hile the Back Office Support component of the Education Support Services could potentially be eligible for SCM treatment, it is not a requirement that the taxpayer elect the SCM method (*i.e.*, it is a voluntary election)." While it may not be a *requirement* that a taxpayer elect the SCM method, the taxpayer is required to explain why SCM is rejected as an alternative method to evaluate services (like back office support) that are routine and do not contribute significantly to the success or failure of GCU.  Neither Deloitte nor BKD have adequately done so here.

2. Comparable Uncontrolled Services Price Method ("CUSP") - Treas. Reg. § 1.482-9(a)(2),(c):
The CUSP method evaluates "whether the amount charged in a controlled services transaction is arm's length by reference to the amount charged in a comparable uncontrolled services transaction." Treas. Regs. § 1.482(c)(1).  Deloitte rejected the CUSP method in part because "due to the specificity of the transaction and the industry, no external CUSP/CUP[14] method analyzing the transactions between two unrelated parties, is available." Deloitte 2020 TPPR at p. 33 (§6.1.2.2) (footnote added).  BKD agreed. BKD Review at 9-10.  However, neither the Deloitte 2020 TPPR nor the BKD Review identified which transactions they reviewed and on what basis those transactions were not similar.  Although "similarity of services rendered, and of the intangible property (if any) used in performing the services, generally will have the greatest effects on comparability under this method," neither BKD nor Deloitte discussed whether or not "adjustments [could be made] to account for any differences." Treas. Regs. § 1.482-9(c)(2)(ii)(A).

3. Gross Services Margin Method ("GSMM")- Treas. Reg. § 1.482-9(a)(3), (d):
The GSMM "evaluates whether the amount charged in a controlled services transaction is arm's length by reference to the gross profit margin realized in comparable uncontrolled transactions." Treas. Regs. §1.482-9(d)(1).  Similar to the brevity of its analysis and rejection of the SCM, Deloitte rejects the GSMM in two sentences: "Neither GCU [n]or GCE provide comparable services with third parties, and we are unaware of instances where two third parties jointly provide comparable services in a comparable market. Therefore, we reasonably concluded that the GSMM/RPM[15] method is not the best method/most reliable method to determine the arm's length nature of the Covered Transaction." Deloitte 2020 TPPR at 34 (§6.1.3.2) (footnote added).  Both Deloitte and BKD fail to acknowledge that the claimed lack of comparability is a creature of the unique structure of this transaction: taking a fully integrated proprietary

---

[14] "CUP" refers to "comparable uncontrolled price" method which is a method used by OECD but not the Treasury Department for domestic transactions.  The OECD methods are discussed further below.

[15] "RPM" refers to "resale price method" which is a method used by OECD but not the Treasury Department for domestic transactions.

Grand Canyon University
OPE ID: 00107400
Page 11 of 19

institution and separating its academic and campus structure into a nonprofit entity, retaining the "servicing" functions in the publicly-traded for-profit former owner for which the institution is the primary, if not only client, and providing services for a fee that is 59.9% of Tuition and Fee Revenue.

4.  Cost of Services Plus Method ("CSPM") - Treas. Reg. § 1.482-9(a)(4), (e):
The CSPM "evaluates whether the amount charged in a controlled services transaction is arm's length by reference to the gross services profit markup realized in comparable uncontrolled transactions." Treas. Regs. § 1.482-9(e)(1).[16] This method "is ordinarily used in cases where the controlled service renderer provides the same or similar services to both controlled and uncontrolled parties." Treas. Regs. § 1.482-9(e)(1). CSPM "measures an arm's length price by adding the appropriate gross services profit to the controlled taxpayer's comparable transactional costs." Treas. Regs. § 1.482-9(e)(2).

In determining that the CSPM was not applicable, Deloitte states, in part: "No internal CSP/Cost Plus transactions were identified for Covered Transaction. As stated above, GCE does not provide similar services to any other third-party entities. An external CSP/Cost Plus approach is also not available due to lack of sufficient information on similar service transactions involving third parties in the given industry." Deloitte 2020 TPPR at p. 34 (§6.1.4.2). Using those statements as support, BKD agreed with Deloitte. BKD Review at pp. 11-12. However, the regulations provide: "***If possible***, the appropriate gross services profit markup should be derived from comparable uncontrolled transactions of the same taxpayer participating in the controlled services transaction because similar characteristics are more likely to be found among services provided by the same service provider than among services provided by other service providers. ***In the absence of such services transactions, an appropriate gross services profit markup may be derived from comparable uncontrolled services transactions of other service providers.***" Treas. Regs. § 1.482-9(e)(3)(ii)(A) (emphasis added). Neither the Deloitte 2020 TPPR nor the BKD Review address this alternative approach. Nor, as described below, did Deloitte or BKD seem to make any attempt to identify any companies that provide individual components of the services provided under the ARMSA.

5.  Comparable Profits Method ("CPM") – Treas. Regs. §1.482-9(a)(5), (f):
The CPM "evaluates whether the amount charged in a controlled transaction is arm's length, based on objective measures of profitability (profit level indicators) derived from uncontrolled taxpayers that engage in similar business activities under similar circumstances." Treas. Regs. § 1.482-9(f)(1). Deloitte concluded, and BKD agreed, that CPM is not the best transfer pricing method. Deloitte 2020 TPPR at 35-36 (§6.1.5.2);[17] BKD Review at 11.

---

[16] Deloitte combines its discussion of the CSPM with a discussion of the Cost Plus Method which is an OECD method used in "circumstances where semi-finished goods are sold between related parties, where related parties have concluded joint facility agreements or long-term buy-and-supply arrangements." Deloitte 2020 TPPR at p. 34 (§6.1.4.1). It is unclear why Deloitte included the discussion of the Cost Plus Method. Not only is the Cost Plus Method not included in the Treasury Regulations, the ARMSA does not involve the sale of goods.

[17] Deloitte also analyzed the OECD's transactional net margin method ("TNMM"). TNMM is not a method recognized by the Treasury Department for domestic transactions.

Grand Canyon University
OPE ID: 00107400
Page 12 of 19

In agreeing with Deloitte's conclusion, BKD points to the "highly integrated nature of GCE and GCU and the non-routine nature of the services being provided by GCE." BKD Review at 11. "Routine" and "non-routine" are not terms that are used in the regulatory discussion of the CPM. BKD defines "routine" service providers as entities that do not hold valuable intangible assets. BKD Review at p. 11.  Although § 1.482-9(f) does not itself refer to valuable intangible assets, §1.482-5, which it cross-references does: "Consequently, *in most cases* the tested party will be the least complex of the controlled taxpayers and will not own valuable intangible property or unique assets that distinguish it from potential uncontrolled comparables." Treas. Regs. § 1.482-5(b)(2)(i)(emphasis added).  Thus, contrary to what BKD suggests, holding valuable intangible property is not disqualifying, it just may not occur "in most cases."  Moreover, as to vertical integration, the Deloitte 2020 TPPR explains that vertical integration is something that happens "within the same organization." Deloitte 2020 TPPR at 13 (§4.1.3) (quoting Joskow, Paul. Vertical integration, Handbook of New Institutional Economics, Kluwer, 2003).  Clearly, GCE and GCU are not within the same organization.  Yet, neither the Deloitte 2020 TPPR nor BKD Review acknowledges this fact and do not explain why they are discussing a vertically integrated organization when that is not the pattern here.  Moreover, neither Deloitte nor BKD apparently made any effort to analyze the component parts of the ARMSA (or the MSA) to determine whether other companies (for which data is available) provide services that can be compared to the various components of the ARMSA.  By way of example only -- companies that provide institutions with financial aid servicing, or companies that provide marketing or student support services.

6. Profit Split Method ("PSM") – Treas. Regs. §1.482-9(a)(6), (g):
The PSM "evaluates whether the allocation of the combined operating profit or loss attributable to one or more controlled transactions is arm's length by reference to the relative value of each controlled taxpayer's contribution to that combined operating profit or loss." Treas. Regs. §1.482-9(g)(1).  There are two types of profit splits – comparable and residual.  Treas. Regs. §1.482-9(g)(1); *see also* §1.482-6(c).  Deloitte rejected the comparable split method because "it did not identify publicly available information on uncontrolled companies, the transactions and activities of which are sufficiently comparable to the Covered Transaction. Further, it is highly unlikely that an arrangement sufficiently comparable to the Covered Transaction can be found." the Deloitte 2020 TPPR at p. 36 (§ 6.1.6.3).  Again, as noted above, this "lack of comparables" results from the way this Transaction was structured (separating the academic and servicing functions) to maintain the continued revenue stream to GCE from GCU's operations.

BKD's review of Deloitte's rejection of PSM consists of block quotes from the Deloitte 2020 TPPR and then just one sentence of "analysis": "The Preparer rejected both forms of the PSM, the comparable PSM and the RPSM. Given the lack of comparable profit split transaction information, Deloitte's rejection of the comparable PSM is appropriate." BKD Review at 12.  This is hardly an analysis, and demonstrates the lack of any consideration of whether the component parts of the services could be examined.

7. Unspecified Method – Treas. Regs. § 1.482-9(a)(7), (h):
Treasury Regulations § 1.482-9(h) provides that "[m]ethods not specified in paragraphs (b) through (g) of this section [§ 1.482-9] may be used to evaluate whether the amount charged in a controlled services transaction is arm's length. Any method used under this paragraph (h) must

Grand Canyon University
OPE ID: 00107400
Page 13 of 19

be applied in accordance with the provisions of §1.482-1." The regulation cautions however that "an unspecified method will not be applied unless it provides the most reliable measure of an arm's length result under the principles of the best method rule." Treas. Regs. § 1.482-9(h) (citing § 1.482-1(c)).

Deloitte determined that the economic profit split ("EPS"), an unspecified method, was the most reliable transfer pricing method. Deloitte's analysis of the EPS is based on the OECD's guidance because OECD has identified EPS as a transfer pricing method; the Treasury Regulations have not. Indeed, the Treasury Regulations specifically provide that "the allocation of profit or loss under the profit split method must be made in accordance with one of the following allocation methods – (i) the comparable profit split … ; or (ii) the residual profit split … ." As described immediately above, Deloitte rejected both of these methods for another "profit split" method – the EPS.

The EPS method (also referred to as the Transactional Profit Split Method):

> . . . first identifies the profits to be split from the controlled transactions—the relevant profits—and then splits them between the associated enterprises on an economically valid basis that approximates the division of profits that would have been agreed at arm's length. As is the case with all transfer pricing methods, the aim is to ensure that profits of the associated enterprises are aligned with the value of their contributions and the compensation which would have been agreed in comparable transactions between independent enterprises for those contributions. The transactional profit split method is particularly useful when the compensation to the associated enterprises can be more reliably valued by reference to the relative *shares* of their contributions to the profits arising in relation to the transaction(s) than by a more direct estimation of the value of those contributions.

C.1. ¶2.114, OECD Guidelines (2018) (emphasis in original).[18] The OECD explains further:

> The main strength of the transactional profit split method is that it can offer a solution for cases where both parties to a transaction make unique and valuable contributions (e.g. contribute unique and valuable intangibles) to the transaction. *In such a case, independent parties might effectively price the transaction in proportion to their respective contributions, making a two-sided method more appropriate*.

---

[18] OECD issued comprehensive guidelines in 2017 (referred to herein as "OECD Guidelines (2017)"). In June 2018 OECD issued "Revised Guidance on the Application of the Transactional Profit Split Method" (referred to herein as ("OECD (2018)").

13

Grand Canyon University
OPE ID: 00107400
Page 14 of 19

C.2.1. ¶2.119, OECD Guidelines (2018) (emphasis added). Yet Deloitte and BKD have failed to establish that any of the services provided by GCE are truly unique or valuable[19] or to examine what price independent parties would have put on the services provided here.

Further, Deloitte and BKD fail to explain why EPS is the most reliable method for evaluating the revenue sharing fee structure in the ARMSA when (1) there is no controlled transaction because GCU and GCE are not controlled taxpayers; (2) there are no profits to split because under Internal Revenue Service ("IRS") and state authority Gazelle is a nonprofit entity; and (3) GCU/Gazelle and GCE are not "associated enterprises." The MSA is a revenue sharing agreement between two uncontrolled (*i.e.*, supposedly independent) parties; it is not a profit splitting allocation between two related entities. The proposed revised terms for the arrangement, as set forth in the ARMSA, do not change the fact that most of the revenue being generated by Gazelle/GCU is going out the door to another entity – GCE – for the benefit of its shareholders. The Department located no authority, nor have either Deloitte or BKD cited any sources, that support a profit-splitting transfer pricing method as the correct methodology to evaluate a transaction in which one of the parties is organized as a nonprofit entity under state law.

EPS is, according to Deloitte, appropriate when, among other factors, the "business operations are highly integrated such that the contributions of the parties cannot be reliably evaluated in isolation from each other[.]" Deloitte 2020 TPPR at 16 (§4.1.7). Similarly, Deloitte describes GCU and GCE as entities "in a corporate group." Deloitte 2020 TPPR at 38 (§ 6.2). As noted *supra*, however, GCU and GCE are represented to the Department as separate, independent entities – they do not constitute, and are not part of, a "highly integrated" taxpayer and they are not entities in a "corporate group."[20] Even more significant is the fact that the EPS is a method that allocates profits from a controlled transaction to each entity based on their relative contribution. Deloitte 2020 TPPR at 17-18 (§ 4.1.8). According to Deloitte, GCU and GCE "should share the profits in a manner proportional to each entity's relative value contribution." Deloitte 2020 TPPR at 38 (§6.1.7). Deloitte "selected the EPS method to recommend an

---

[19] Functions performed or assets used are "'unique and valuable' in cases where (i) they are not comparable to contributions made by uncontrolled parties in comparable circumstances, and (ii) they represent a key source of actual or potential economic benefits in the business operations." OECD (2018) at 15 ("The Glossary of the Transfer Pricing Guidelines will be amended to add a definition of 'Unique and valuable contributions'"). The Department views the services provided by GCE as garden variety services in higher education. Either typically performed in-house, or by one or more services providers. Indeed, Deloitte explains that GCE relies on four third parties to provide the IT platforms, although those platforms are apparently enhanced by GCE ("GCE subscribes or pays for third-party platforms because it is more efficient for the third-party providers to maintain the systems"). *See* Deloitte 2020 TPPR at 23. Deloitte notes that GCE employs "roughly 14" people to support one of the platforms. There is absolutely no examination of why these functions cannot be performed by GCU employees, as they certainly were before the July 1, 2018 CIO which resulted in two entities – Gazelle and GCU.

[20] Although both Deloitte and BKD use the term "corporate group" in their respective documents, neither document defines the term. The term does not appear in either the relevant Treasury regulations or OECD's guidelines. The Department assumes that Deloitte means a group of entities that are either within a parent/subsidiary or brother/sister corporate chain. GCU and GCE do not share such an organizational relationship and the Department does not consider them part of a "corporate group."

Grand Canyon University
OPE ID: 00107400
Page 15 of 19

appropriate range with respect to the allocation of overall profits between GCU and GCE," and explains that the steps in the EPS method are intended "to arrive at an eventual allocation of profits to each entity in the corporate group based on their relative contribution." Deloitte 2020 TPPR at 38 (§§6.1.8, 6.2).[21] The Deloitte 2020 TPPR does not explain why it is appropriate to "allocate profits" between two independent, unrelated, uncontrolled taxpayers, one of which is for-profit and the other of which is organized as a nonprofit.

Indeed, Deloitte notes that "at arm's length, each party to a transaction optimize their own value." Deloitte 2020 TPPR at 14. That is what should govern the relationship between GCU and GCE. Contrary to how parties work at arm's length, Deloitte explains that "companies by definition optimize value of the group as a whole." *Id.* There is no singular "company here" nor is there a "corporate group." GCE and GCU are not controlled taxpayers; there is no controlled transaction; and there are no profits to split – GCU is a tax-exempt entity and is organized as a nonprofit entity under state law. Neither the Deloitte 2020 TPPR nor the BKD Review address these factors. In fact, in agreeing with Deloitte's selection of the EPS method, BKD simply block-quoted from the Deloitte 2020 TPPR and then concluded, "[g]iven that both GCU and GCE make significant contributions to the creation of intangible assets and the lack of comparable transactions/comparable companies, a profit split-based method appears to be reasonable in this instance." BKD Review at 13.[22] With respect to the profit factor, if GCU wants to stand by Deloitte's and BKD's characterization of it as earning profits that can be "split," then it seems to be acknowledging that it operates as a for-profit.

The common thread running through both the Deloitte 2020 TPPR and the BKD Review transfer pricing analysis is that "no comparables" exist. Yet the OECD defines47 transactions as "comparable if none of the differences between the transactions could materially affect the factor being examined in the methodology (e.g., price or margin), or if reasonably accurate adjustments can be made to eliminate the material effects of any such differences." OECD Guidelines (2017) at 24. OECD's revised guidance on the transactional profit split method further explains:

---

[21] The "steps" identified by Deloitte principally focus on the risk of fixed costs, defined as costs that do not vary with the quantity of services provided. Deloitte 2018 TPR at 1, 33-35; Deloitte 2020 TPPR at 1, 39-44. Deloitte claims that the party assuming fixed costs assumes greater risk justifying a greater share of profits. Deloitte 2018 TPR at 5; Deloitte 2020 TPPR at 10-11. Deloitte apparently determined which costs associated with the seven revenue-generating activities were fixed costs and what share of fixed costs Gazelle and GCE were contractually obligated to pay. Deloitte 2018 TPR at 33; Deloitte 2020 TPPR at 44 (and Appendix C at 11 and Appendix D at 11). The Deloitte 2020 TPPR (as did the Deloitte 2018 TPR) also appears to give significant weight in its determination of fixed costs to its consideration of off-balance sheet assets ("OBSA"). Deloitte states that it considered historic trial balance sheet financial data to "capture any fixed costs incurred in the past accounting period that are tied to the revenue generated in FY 2018 and FY 2019. These are the costs that contribute to the generation of OBSAs." Deloitte 2020 TPPS at 39; *see also* Deloitte 2018 TPR at 32. As noted previously in the Decision, because all of those earlier costs were incurred during the years prior to the separation, Deloitte's calculation of fixed costs gives GCE – and not GCU – the benefit of those historical costs that were incurred before the services function was separated on July 1, 2018. Indeed, Deloitte divides the OBSAs into three categories: marketing; technology development; and executive strategy and explains: "further refinement of these OBSAs is not as reliable due to the interrelated nature of GCE's business model." Deloitte 2020 TPPR at 39-40.

[22] Although BKD more thoroughly recounted *how* Deloitte applied each step of the method (*e.g.,* how it identified economic risks), it failed to analyze the appropriateness of selecting the EPS method in the first place.

15

> In general, it will tend to be the case that the presence of factors indicating that a transactional profit split is the most appropriate method will correspond to an absence of factors indicating that an alternative transfer pricing method—one which relies entirely on comparables—is the most appropriate method, determined in accordance with paragraph 2.2 of these Guidelines. ***Put another way, if information on reliable comparable uncontrolled transactions is available to price the transaction in its entirety, it is less likely that the transactional profit split method will be the most appropriate method. However, a lack of comparables alone is insufficient to warrant the use of a transactional profit split.*** See paragraph 2.128.

C.2.3 ¶2.143, OECD Guidelines (2018) (emphasis added). Paragraph 2.128 states:

> A lack of closely comparable, uncontrolled transactions which would otherwise be used to benchmark an arm's length return for the party performing the less complex functions should not *per se* lead to a conclusion that the transactional profit split is the most appropriate method. Depending on the facts of the case, ***an appropriate method using uncontrolled transactions that are sufficiently comparable, but not identical to the controlled transaction is likely to be more reliable than an inappropriate use of the transactional profit split method***. …

C.2.2. ¶2.128, OECD Guidelines (2018) (emphasis added). Paragraph 2.129 cautions: "if independent parties engaged in comparable transactions are found to make use of other pricing methods, this should also be taken into account in determining the most appropriate transfer pricing method." C.2.2. ¶2.129, OECD Guidelines (2018). None of these additional provisions of the OECD Guidelines were discussed by either Deloitte or BKD.

BKD states that it reviewed 24 agreements between service providers and higher educational institutions and that of those, ten agreements used a revenue-sharing fee structure. According to BKD, the percentage of revenues used in those agreements ranged from 12.5% to 80%, with an interquartile range of 45.9% to 62.4%, with a median of 50.0%. BKD Review at16. BKD then states:

> We note that the Preparer's concluded TY 2018 range of revenue split in the Transfer Pricing Study of 60.22% to 60.71% falls within the interquartile range of the ten agreements. Further, we note that the Preparer's concluded TY 2019 range of revenue split to the renderer of the services in the Transfer Pricing Study of 59.32% to 59.72% also falls within the interquartile range of the agreements. Accordingly, the Preparer's concluded results for TY 2018 and TY 2019 in the Transfer Pricing Study do not appear unreasonable.

BKD Review at 16. BKD's analysis is striking for what it does *not* address. For example, what is the relationship between the institution and the service provider – were they formerly one and the same? Why is it reasonable to charge GCU a fee equal to 59.9% - 68.8% of revenues (as described in ARMSA Exhibit D §3) when the range of the

ten agreements BKD cites included a low of 12%?[23] Why is it reasonable to charge GCU that fee when the median of the ten agreements reviewed is 50%? Does the increase over the low of 12% or the median of 50% indicate the purpose of the ARMSA is to benefit GCE stockholders?

And what are the fee structures in the remaining 14 agreements? Why were those fee structures not analyzed as alternatives to the revenue sharing fee used in the ARMSA? The failure to do so is especially concerning, given that GCE has very recently advised its shareholders and the public that "[i]n recent years, an alternative unbundled fee-for-service model has emerged, in which the companies offer the same services, or some subset of services, *for the market price of those services*." 8/28/20 GCE 8-K at 9 (emphasis added). Neither the Deloitte 2020 TPPR nor the BKD Review reflect any examination of such alternative models – nor did they appear to analyze unbundled services to compare them to the components of the services provided under the ARMSA.

## IV. THE DEPARTMENT'S RECONSIDERATION DETERMINATION

In both its initial request for nonprofit status and in its request for reconsideration of the Decision, GCU has pointed to the fact that Gazelle is an Arizona nonprofit corporation, the IRS granted Gazelle tax-exempt status and GCU's accreditor (the Higher Learning Commission ("HLC")) has approved nonprofit status. However, unlike the IRS's initial grant of tax-exempt status and state organization as a nonprofit, the Department's determination of nonprofit status considers the structure and planned operations of the institution when its owner(s) apply for that change of status, and seeks to ensure that a nonprofit institution's revenues – a good portion of which are generated from Title IV funds – are primarily devoted to the mission of the school and not to other parties, including (as here) the prior owner and its shareholders. The Department makes its own determination regarding nonprofit status, and the fact that HLC may have reached a different conclusion is neither binding nor persuasive.

Although the revenue sharing percentages have changed somewhat under the ARMSA, the basic structure whereby a substantial portion of GCU's revenues benefits GCE remains unchanged. Based on the tax authority cited in the Decision, the Department has determined that, under the ARMSA, GCU will still not meet the requirement that both the primary activities of the organization and its stream of revenue benefit the nonprofit itself. The Deloitte 2020 TPPR and the BKD Review have not convinced the Department otherwise.

GCU has repeatedly tried to convince the Department that it should be granted nonprofit status because of GCU's positive accomplishments on campus and in the community. Although those

---

[23] Deloitte recognizes that curriculum is "the heart of any learning institution." (Deloitte 2018 TPR at 26, Deloitte 2020 TPPR at 27). However, as noted above, Curriculum Services and Faculty Operations services have been eliminated from the ARMSA, and therefore, the risks related to curriculum and faculty are primarily borne by GCU. Deloitte 2020 TPPR at 27. Presumably, both a strong curriculum and talented faculty – the risks and costs of which are borne by GCU -- are primary drivers of enrollment, and thereby, GCU's revenue. Yet, the Monthly Fee payable to GCE under the ARMSA is 68.8% of Tuition and Fee Revenue (or 59% of Adjusted Gross Revenue). Deloitte and BKD do not discuss why the revenue sharing percentages were not significantly reduced given this change in risk and responsibility.

Grand Canyon University
OPE ID: 00107400
Page 18 of 19

activities are worthwhile and commendable, they are not remarkable for an institution of higher education – whether proprietary, nonprofit, or public.  And they do not change the Department's conclusion that the arrangement between GCU and GCE under the ARMSA precludes approval of GCU's request to convert to nonprofit status.

Beyond the continuing revenue stream to GCE, the Decision also noted your (Brian Mueller's) dual roles as a concerning factor.  You remain the President of GCU and the Chief Executive Officer of GCE.  You are also Chairman of GCE's board.  In a Memorandum to the Board of Directors of GCE from the Board of Directors of GCU (updated as of January 7, 2020), GCU's Board stated, "[g]iven President Mueller's critical importance to the ongoing operations of the University, we are not willing to concede this point and we intend to reiterate our insistence to the Department that President Mueller retain his position as President of the University."  Although the Department is not directing GCU to remove you as President of the University, your multiple roles continue to be of concern to the Department.  Of course, nothing would prevent you from severing ties with GCE if you (and the GCU Board) thought it was more important for you to stay with GCU instead of serving in two potentially conflicting positions.  As the Decision explained regarding your dual role of running both GCU and GCE (and as one of GCE's shareholders):

> [A]s the CEO of GCE, [Mr. Mueller] is the key executive responsible for providing the services under the MSA, with duties of loyalty to shareholders of GCE.  Yet, as the Institution's President he will have responsibility to manage matters large and small with its primary service provider, notwithstanding the appointment of a Designee and the independent trustees who comprise the MSA Committee.  Given those obviously conflicting loyalties, and the breadth of the services provided under the MSA, the Department is not satisfied that these structures are sufficient to ensure that Mr. Mueller's undivided loyalty is to the Institution.

Decision at 15.  The Decision also noted the Department's skepticism that any nonprofit could outsource the number and type of institutional functions that Gazelle has and still be deemed to operate the Institution.  Curriculum Services and Faculty Operations have now been transferred to GCU.  Given the Department's conclusion in this reconsideration determination that the continued revenue stream under the ARMSA (if executed) would prevent the Department from approving GCU's requested conversion to nonprofit status, there is no need for the Department to re-examine this issue.[24]

---

[24] Given the Department's conclusion that the continuing revenue stream to GCE (whether under the MSA or the ARMSA) prevents the Department from approving the requested conversion to nonprofit status, this reconsideration determination is not based on an examination of the purchase price valuation.  The BKD 2018 Valuation and the BKD 2020 Valuation conclude that the range of value for the purchased assets was between $1,100,000,000 to $1,400,000,000 which exceeded the purchase price of $877,459,000.  However, as noted in the Decision, at a GCE board meeting immediately prior to the closing of the Transaction, Mr. Bachus (GCE Chief Financial Officer) explained that "[w]hile the purchase price for the assets will be at book value, which approximates fair value based on the appraisals received … it was expected that Gazelle would seek a new appraisal post-closing on certain assets including the land being sold.  To the extent the new appraisal showed a higher fair value for those assets, [GCE] would not get the benefit from that."  GCE June 28, 2018 Board Minutes at 1.  However, Mr. Bachus further explained that "a higher fair value, and a resulting margin between fair value and book value, benefitted Gazelle in

## V. CONCLUSION

For the reasons discussed above, GCU does not satisfy the Department's definition of a nonprofit. Accordingly, the Department rejects GCU's request to reconsider the Department's decision denying GCU's request to convert to nonprofit status.

As explained in the Decision, GCU's status as a proprietary institution is for purposes of its participation in the Title IV, HEA programs. The Department does not take a position with respect to Gazelle's non-profit 501(c)(3) status with the Internal Revenue Service. However, GCU/Gazelle must not engage in any advertising or other communications that refer to GCU as a "nonprofit." Such statements are confusing to students and the public, who may interpret such statements to mean that the Department has approved GCU as a nonprofit under its regulations. The Department does not take a position regarding statements that GCU or Gazelle may make about Gazelle's status as a 501(c)(3) tax exempt organization.

The PPPA under which the Institution has been operating since November 14, 2019 continued the prior approval for GCU to participate under a proprietary status. The proprietary status for GCU's continued participation is therefore unchanged. GCU is reminded that it must meet the Title IV, HEA programs reporting and program eligibility requirements applicable to for-profit institutions, including the 90/10 eligibility requirements described in 34 C.F.R. §668.28.

Sincerely,

Martina Fernandez-Rosario, Director
School Eligibility and Oversight Service Group

cc: The Higher Learning Commission (*email: Barbara Gellman-Danley, President - president@hlcommission.org, Anthea Sweeney, VP for Legal and Governmental Affairs - asweeney@hlcommission.org*)
AZ State Board for Private Postsecondary Education (*email:* Kevin.LaMountain@azppse.gov)
New Mexico Higher Education Department (*email:* exec.admin@state.nm.us)
IRS
   Attn: EO Classification
   MC 4910 DAL
   1100 Commerce Street
   Dallas, TX  75242
   eoclass@IRS.gov

---

connection with its composite score." *Id.* Although no details are provided, Mr. Bachus apparently further explained "why a good composite score for Gazelle ultimately benefited the Company [*i.e.,* GCE]." *Id.* at 1-2.