

Steven M. Gombos

703-934-9831 Direct
sgombos@glpclaw.com

## GOMBOS | LEYTON PC
ATTORNEYS

11350 Random Hills Road | Suite 400 | Fairfax, Virginia 22030
703.934.2660 Main | 703.934.9840 Fax | www.glpclaw.com

August 14, 2020

**By email only**

Michael J. Frola, Director
Multi-Regional and Foreign School
Participation Division
U.S. Department of Education
Union Center Plaza, 73C3
830 First Street, NE
Washington, DC 20202

Re:   Grand Canyon University's Nonprofit Status

Mr. Frola:

Grand Canyon University ("GCU") has hired our firm regarding its request to be recognized as a nonprofit institution.

As you know, GCU proposed several amendments earlier this year to its transaction with Grand Canyon Education ("GCE"), all in response to concerns your office raised for the first time some 16 months after the deal closed. The University also provided the Department, nearly three months ago, with independent studies your office requested, which show the transaction's enormous benefit to GCU and its students.

My client's general counsel, Brian Roberts, wrote to you on July 1, 2020, asking for an update on the status of the Department's review, but, to date, the Department has not responded. Because GCU addressed all of your concerns and also because the Department has no basis to deny GCU's status as a nonprofit, we request that the Department issue a final agency decision confirming GCU's nonprofit status.

The Department's ongoing delay in recognizing GCU's nonprofit status is inexplicable as a legal matter. GCU is a nonprofit institution operating under all of the restrictions that status imposes, notwithstanding this agency's contrary decision. Moreover, that decision is indefensible. Under even the broadest conception of the Department's purported authority to determine nonprofit status under 34 CFR 600.2, the Department's analysis is arbitrary and capricious.

Michael J. Frola, Branch Chief
August 14, 2020
Page 2

The crux of the Department's decision is an analysis of the reasons why GCE considered the deal to be beneficial—not GCU. It has been previously pointed out that GCU did not rely on the Barclays Report cited so frequently in the Department's decision. GCU's motivation and basis for executing the transaction lay elsewhere. A commitment to its students and its Christian mission lay at the heart of its decision to seek nonprofit status.

Moreover, the Department questioned the terms of the Master Service Agreement between GCE and GCU. But the Department has approved transactions involving similar revenue-sharing arrangements and comparable terms, including the recent Kaplan-Purdue transaction, which is very close to the structure GCU followed. Added to that is the fact the Department has no regulations prohibiting such arrangements, which are common among many institutions of higher education. In any event, both GCE and GCU agreed to significant proposed amendments to the MSA in response to the Department's concerns. So whatever can be said of the merits of the Department's decision denying GCU nonprofit status, in an effort to avoid litigation, GCU has proposed modifications to resolve those concerns.

Finally, broader than any specific factual conclusion in the initial decision, the Department's starting premise, that 600.2's definition of nonprofit institution authorizes it to independently assess nonprofit status, fails. *See* Letter from U.S. Dept. of Educ. to Brian Mueller at 14 (Nov. 6, 2019).

1. **It is incompatible with the Department's regulatory framework**. 600.2 simply defines what nonprofit means when used in 34 CFR Part 600. It is not a substantive regulation. Indeed, it is a guide to understanding the substantive regulations in Part 600 that use the term nonprofit—like 600.20(b)(2)(iii) or 600.31(d)(7).

   The definition cannot authorize what you claim it does without rewriting those provisions. 600.31(d)(7) tells us that the change from proprietary to nonprofit status—read nonprofit here as 600.2 defines it—is a change in control that causes an institution to lose eligibility when the change occurs. The institution must then reestablish its eligibility by showing the Secretary it remains eligible **after** the change in control—in this case, **after** it changes from proprietary to nonprofit status. See 600.31(a)(3); 34 CFR 600.20(b)(2) (an institution must reapply to the Secretary to establish its eligibility "**after** the institution changes its status as a proprietary, nonprofit, or public institution") (emphasis added).

   By way of example: GCU lost eligibility on July 1, 2018, the day the transaction closed. That change from proprietary to nonprofit status occurred by operation of law and without the Department's approval. It also meant GCU had to reapply to participate in Title IV programs **after** it changed from proprietary to nonprofit status.



Michael J. Frola, Branch Chief
August 14, 2020
Page 3

If 600.2 embodies what your team says it does—i.e., that the Department must approve an institution's change from proprietary to nonprofit status—then both 600.31(d)(7) and 600.20(b)(2) fall apart. A key sign the position the Department has taken is wrong. The Department's position creates an internal inconsistency: If it is the Department that decides, during the reapplication phase, whether the institution has changed from proprietary to nonprofit status, how can an institution's change from proprietary to nonprofit status be the triggering event that causes it to lose eligibility and requires it to reapply in the first instance? The answer is obvious: It cannot be.

And the contrary notion that the Department seems to have in mind—that state authorization and IRS approval trigger the change from proprietary to nonprofit status for 600.31(d)(7), but the Department decides nonprofit status for Title IV purposes under 600.2—does not work. There's only the one definition of nonprofit after all—600.2. So every reference in Part 600 to an institution's nonprofit status must be given the same meaning. And that cannot happen under the Department's approach which equivocates on the meaning of nonprofit.

Simply put, a court will not accept the Department's interpretation of 600.2, because it is contrary to the broader regulatory framework.

2.  **It contradicts the Department's past statements on nonprofit conversion**. The very reason the Secretary designated the change from proprietary to nonprofit status as a change in control was in recognition of the fact that an institution could change to nonprofit status with "little formality," without Department approval, without reconstituting itself as a new corporation, and while "keep[ing] the very same faculty, management, programs and facilities." 59 Fed. Reg. 22324, 22333. As one commenter noted, and the Secretary agreed, the change-in-control provision was necessary to give the Department some role in scrutinizing institutions that convert from proprietary to nonprofit. *See Id*.

    But that role is limited. As the Department explained to Congress, in 1995, because "institutions can easily switch from profit status to non-profit status," the Department would "subject schools that do change from profit to non-profit . . . to the same requirements of their previous designation for a certain period of time."[1] *Abuses in Federal Student Grant Programs Proprietary School Abuses: Hearing before the S. Perm. Subcomm. on Investigations*, S. Hrg. 104-

---

[1] The Department later put that thought into practice, as shown in the 2014-15 FSA Handbook, Vol. 2, ch. 4 at 2-60, which notes that an institution that converts to nonprofit status must comply with 90/10 for the first year of its nonprofit status. Or look to the Department's internal change-in-ownership guidance, Ex. A at 3-51 or 3-120, which, again, makes clear that the Department's oversight of nonprofit conversion is exclusively after-the-fact by way of limited provisional conditions.



477 at 222 (written answers of David A. Longanecker, Assist. Sec. for Postsecondary Education). But implicit in that statement and inherent in the change-in-control provisions is the recognition that an institution changes from for-profit to nonprofit status, even for Title IV purposes, without the Department's approval.

The Department reiterated that point more recently. In 2010, the Department added a new paragraph about foreign institutions to the nonprofit definition in 600.2. The new paragraph, the Department explained, was meant to be "as comparable as possible to those applicable to domestic institutions." 75 Fed. Reg. 42192.

> [T]o make the proposed regulations as comparable as possible to those applicable to domestic institutions, the Department proposed, and the Committee agreed, that a determination that an institution is nonprofit by an entity in the institution's foreign country would qualify an institution as nonprofit only if the determination is made by a recognized tax authority of the country, and the Secretary has recognized that tax authority as one that can make a determination using criteria that are similar to those used by the U.S. IRS.

*Id.*

In other words, if the Secretary determined that a foreign tax authority used similar criteria to the IRS, then the Secretary "would **automatically accept**" that tax authority's judgment "for purposes of making determinations of an institution's nonprofit status for Title IV, HEA purposes." *Id.* (emphasis added).

All this makes the following clear: An institution's change from proprietary to nonprofit status, even for purposes of the Title IV programs, takes place without the Department's approval.

The Department's newly adopted contrary view counters its own regulations, contradicts its own prior statements, and gives greater credence to foreign tax authorities than it does the IRS.

3. **It departs from the Department's longstanding practice**. Consistent with the change-in-control provisions and the Department's past statements, 501(c)(3) status has historically been conclusive of an institution's nonprofit status for purposes of Title IV programs.

   The Department's decision to depart from that longstanding practice creates several independent problems. Apart from the fact the Department's interpretation of 600.2 is untenable as explained above, the Department has yet to formally acknowledge its change in practice. And it has not offered a reasonable explanation why the change was necessary. Both failures are strong indicators of arbitrary and capricious agency action.



All of this started when the Department denied nonprofit status to Center for Excellence in Higher Education in 2016. Given your involvement in that case, this letter will exclude some detail that you are familiar with. The important point is that case highlights the Department's change in practice. Consistent with its regulations and past practice, the Department acknowledged, in 2012, that CEHE's planned acquisition of four existing for-profit colleges would mark "a change in structure for the institutions from proprietary to not-for-profit." That was because the IRS recognized CEHE as a 501(c)(3). And the Department informed CEHE during preacquisition review that it would have to report 90/10 numbers for the four colleges during the first fiscal year after the conversion. That comes directly from the FSA Handbook guidance available to colleges at the time.

Four years later, however, the Department denied CEHE's nonprofit status—to our knowledge, the first time the Department ever denied nonprofit status to any recognized 501(c)(3). In doing so, the Department ignored its prior contrary statements in the preacquisition review. It did not acknowledge that it had departed from its longstanding practice. And it offered no reasoned explanation why the change in policy was necessary.

Instead former Secretary John King and former Under Secretary Ted Mitchell made public comments threatening for-profit institutions that were thinking about taking the perfectly legal step of changing their business form: "Don't waste your time." Ex. B. So far as warnings go that is the 21st century equivalent of heads on pikes.

Needless to say, that is not in step with the Administrative Procedure Act. It was only after the fact and after our firm challenged the Department's denial, that the Department attempted to create a basis for its policy change. For the first time, after it denied CEHE's nonprofit status, the Department admitted that in the past it had approved nonprofit status for Title IV purposes based on state approval and IRS designation. The Department also conceded that it mitigated the risk that institutions might convert to nonprofit status to avoid oversight by imposing "a transition requirement for the institution to continue to meet the 90/10 revenue requirement for one additional year." Ex. C at 3. Finally, the Department asserted that the new gainful employment regulations created more incentive for for-profits to convert and explained that warranted a more detailed examination before approving nonprofit status.

That is where things sit now. As you know, CEHE's legal challenge ended in a settlement agreement that saw the Department approve the colleges as nonprofits. So the Department's after-the-fact explanation has yet to be tested in court. But our firm remains confident the Department's policy change violates the Administrative Procedure Act. Initially the gainful employment regulations were not in effect when CEHE acquired its colleges. So the purported explanation was a non sequitur. Nor were the gainful employment regulations in effect when the Department denied GCU nonprofit status. So there is reason to



      question the only explanation the Department has offered for the claimed policy change. On top of that the Department has never explained why its prior provisional certification approach was inadequate to check nonprofit conversions designed to evade for-profit regulations. Recall that is why the Department adopted the current change-in-control provisions. That failure alone makes the policy change arbitrary and capricious under the APA.

4. **It has led to inconsistent treatment**. Because the Department has no substantive regulations on nonprofit conversion and also because the purported reason for the detailed examination no longer exists, the Department's approach to nonprofit conversion has been ad hoc and inconsistent. Even though GCU closely modeled its transaction on the Purdue-Kaplan model the Department approved, for example, the Department still denied GCU nonprofit status. And if GCU cannot determine what it must do to convert to nonprofit status, with the significant resources it has available to it, then no college can. Of course, if that is the Department's main goal, it is improper. The Department's actions reveal an agency whose aim is not to check that institution's convert to nonprofit status for the right reasons, but simply to afford the agency the freedom to arbitrarily choose which will be recognized as a nonprofit educational institution and which will not.

My client has sought to avoid litigation by attempting to work with the Department to resolve its nonprofit status. It is much more effective than litigation and GCU values its relationship with the Department. But you know our law firm has already gone down that path with the Department on this very issue, and we feel confident doing so again. We believe the likelihood a court will grant discovery, particularly in the absence of any controlling regulations or agency guidance and given approvals of similarly structured deals, are strong reasons why the Department should resolve this issue without litigation. Indeed, we believe those reasons played a primary role in why the Department of Justice approached CEHE about settling its lawsuit with the Department of Education.

A quick note on that last point about the administrative record. We know from other litigation and subsequent FOIAs that the administrative record filed in the CEHE lawsuit was incomplete. The administrative record did not disclose, for example, the fact the Department referred CEHE to the IRS for a determination of its continued 501(c)(3) status. It did not include correspondence summaries and other change-in-ownership memos we now know were circulated internally within the Department. Nor did it include any contemporaneous internal guidance, memoranda, or analysis supporting the Department's decision to change its longstanding practice of accepting IRS's nonprofit designation. Finally, it failed to include information about or analysis of other transactions, even though CEHE's complaint alleged inconsistent treatment of similarly situated parties. If we cannot resolve this dispute, the Department is on notice now that the administrative record should include those materials as they relate to this case.



Michael J. Frola, Branch Chief
August 14, 2020
Page 7

Finally, we are confused as to why the Department under this administration wants to continue the Obama Administration's political attack on for-profit colleges.

At the core it is animus against for-profit institutions that has motivated the Department's current treatment of nonprofit conversions. Absolutely no one at the Department read 600.2 to give it authority to decide nonprofit status before former Deputy Under Secretary Robert Shireman raised the issue in his September 2015 article The Covert For-Profit. Indeed, that same month Under Secretary Mitchell, Mr. Shireman's former boss, explained to several Congressmen that questions about nonprofit conversions were for the IRS to determine under that agency's standards. Ex. D. So what accounts for the quick policy change?

More than any other reason, the Department changed how it approached nonprofit conversion because the prior administration successfully stigmatized the for-profit college label and wanted to force colleges, including GCU, to bear it. The ability to convert to nonprofit status under clear standards defeated that objective. So the prior administration put nonprofit conversion in a black box so it could arbitrarily pick and choose at whim when it would recognize nonprofit status.

Sadly, it seems the Department is now repeating the same process with respect to revenue-sharing arrangements—again following the path laid out by Mr. Shireman. The list of colleges that share tuition with service providers is long. Perhaps the Department should consider adopting guidance about tuition sharing arrangements, including parameters on how colleges set the percentage share service providers receive. But the Department does not have regulations addressing that issue. And the Department does not provide any guidance that institutions can follow to order their affairs. Again, another black box that allows the Department to subjectively approve or disapprove arrangements based solely on whim. Indeed, GCU negotiated its revenue split with GCE after analyzing publicly available data about other revenue-sharing contracts, including the Kaplan-Purdue deal the Department approved, only for the Department to cite the revenue split as the basis to deny GCU nonprofit status.

We are open to meeting with the Department to discuss GCU's nonprofit status if the Department is open to working through this issue with the University. As you know, however, my client has already proposed several concessions that address the Department's concerns about its nonprofit status.

Accordingly, we request a response to the information provided by GCU to resolve the matter no later than August 28, 2020, informing us of the Department's decision about GCU's nonprofit status. GCU has consistently tried to work with the Department, even though the decision denying nonprofit status is wrong as a legal matter. My client voluntarily proposed amendments to the service agreement to answer your concerns, which it had no obligation to do. And my client incurred the expense of additional valuation reports to confirm the value of the transaction, again in an effort to work with the Department to resolve this issue. But my



Michael J. Frola, Branch Chief
August 14, 2020
Page 8

client cannot continue to wait when the Department has given no indication (not even updating Mr. Roberts about the status of its review) that it intends to meaningfully engage. The Department's decision denying GCU's nonprofit status violates the law, and it is causing ongoing harm to my client. If we do not have a response by August 28, 2020, the University believes that the Department will have left it with no other option than to file suit to challenge the Department's decision letter and, astoundingly, force the Department to at a minimum communicate with the University.

Respectfully,

Steven M. Gombos

c: Secretary Betsy DeVos
Reed Rubinstein
Diane Auer Jones
Donna Mangold