

UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF POSTSECONDARY EDUCATION

THE ASSISTANT SECRETARY

**MAR 1 7 2011**

GEN-11-05

Subject:  Implementation of Program Integrity Regulations

Summary:  This letter provides guidance on three areas of the final regulations published on October 29, 2010, addressing program integrity issues:  State authorization, incentive compensation, and misrepresentation.

Dear Colleague:

On October 29, 2010, the Department published in the Federal Register final regulations on program integrity issues (75 FR 66832).  The final regulations are available at http://www.ifap.ed.gov/eannouncements/110110PubFinalRulesforTitlveIVStudentAidPrgms.html. These final regulations make a number of changes to the regulations governing the programs authorized by the Higher Education Act of 1965, as amended (HEA).  The regulations are generally effective July 1, 2011, except for revisions to Subpart E of part 668 of the Student Assistance General Provision regulations, Verification and Updating of Student Aid Application Information, which are effective July 1, 2012.

The enclosure to this letter provides additional guidance on three areas of these final regulations:  State authorization, incentive compensation, and misrepresentation.  This guidance is provided to assist institutions with understanding the changes to the regulations in these areas, and does not make any changes to the regulations.  Affected parties are responsible for taking the steps necessary to comply by the effective dates established by the final regulations.

We encourage you to review the preambles to the notice of proposed rulemaking (75 FR 34806-34890, June 18, 2010) and the final regulations (75 FR 66833-66932, Oct. 29, 2010), as well as the final regulations themselves (75 FR 66946-66975, Oct. 29, 2010).

We thank you for your continued cooperation as we work to implement these regulations.

Sincerely,

Eduardo M. Ochoa

Enclosure

1990 K ST. N.W., WASHINGTON, DC 20006
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

AR-K-0001

| State Authorization |
| --- |

**Question 1:  Does section 600.9(a)(1)(i)(A) permit an institution to be authorized by name by a State as a postsecondary educational institution in one of several ways – by statute, by constitution, or by other actions issued by an appropriate State agency or entity?**

Answer 1:  Pursuant to section 600.9(a)(1)(i)(A), the legal basis for the institution's existence as an eligible institution under the HEA is its authorization, by name, to offer postsecondary education.  States may use a variety of means to establish a postsecondary institution, including a State agency that charters an institution, a statute that establishes a postsecondary institution, or a provision of a State's constitution that establishes a postsecondary institution.  This provision does not preclude a State from having a further approval or licensure process with which the institution must comply.

**Question 2:  Does "established by name" literally mean that a statute, constitution, or other action of a State must specifically establish and name an institution?**

Answer 2:  Yes.

**Question 3:  Regarding the requirement in section 600.9(a)(1)(i)(A) that an institution be "established by name as an educational institution by a State through a charter, statute, constitutional provision, or other action issued by an appropriate State agency or State entity and is authorized to operate educational programs beyond secondary education," in the absence of State law, or a State-authorized charter, could the "other action issued by an appropriate State agency or State entity" that recognizes an institution by name as a postsecondary institution be the articles of incorporation filed with the State's Secretary of State?**

Answer 3:  Yes, if the articles of incorporation are for the establishment of a postsecondary institution and the institution is incorporated by name.  No, if the articles of incorporation are the same as articles of incorporation for a business or nonprofit entity in the State.  As noted in the preamble to the final regulations, a State is expected to take an active role in authorizing an institution to offer postsecondary education, and this is a substantive requirement.  (See 75 FR 66861 (Oct. 29, 2010).)  If the institution is not incorporated by the State as a postsecondary institution, a further State approval or licensure by name is required.  These regulations are premised on the notion that an institution must obtain some type of authorization as a postsecondary institution to be considered legally authorized by the State.

**Question 4:  A State's community colleges are authorized by State law, but not by name. Would the State's Department of Education need to provide some documentation of their individual authority -- by name -- to grant postsecondary credentials in the State?**

Answer 4:  As discussed in the preamble to the final regulations (see generally 75 FR 66867 (Oct. 29, 2010)), to the extent a public community college is a State institution, it is an instrumentality of a State government and is by definition compliant with section 600.9(a)(1)(i).

**Question 5:  If, for example, in order to offer a diploma in nursing, State law requires a nursing school to be licensed by a State education agency as well as by the State's board of nursing, must the school document both licenses to be eligible for the title IV, HEA student financial assistance programs?**

Answer 5:  Yes.  To be eligible to participate in the title IV and other HEA programs, an institution must be in compliance with all applicable State laws, which include that all requisite licenses are current and in good standing.

**Question 6:  If an institution meets the qualifications for a religious exemption under section 600.9(b) of the regulations, but the institution is subject to State licensing or approval requirements independent of its status as a religious institution, is the institution considered exempt from demonstrating State legal authorization for HEA purposes?**

Answer 6:  No.  The Department recognizes a specific religious exemption in its regulations, but when an institution is subject to State laws independent of its status as a religious institution, the Department requires that it have State legal authorization.  For example, a religious institution that also operates a nursing school must comply with any State requirements imposed on nursing schools, even though the institution otherwise qualifies for a religious exemption under section 600.9(b).

**Question 7:  If a religious institution does not satisfy a particular State's religious exemption from State licensure, but it does satisfy the religious exemption under 600.9(b) of the regulations, must the institution comply with State licensure requirements to be an eligible institution?**

Answer 7:  Yes, the institution must comply with State law.

**Question 8:  If a tribal college offers postsecondary education in a location that is not on tribal lands, must the college be able to demonstrate legal authorization from the State to offer postsecondary education at that location?**

Answer 8:  Yes.  If the State requires approval for tribal college programs located on non-tribal land, such approval must be obtained to be an eligible institution.

**Question 9:  Can a State establish a for-profit or private nonprofit institution under the provisions of section 600.9(a)(1)(i)(A) and have a further State approval or licensure process applicable to the institution?**

Answer 9:  Yes.  A further State approval or licensure process is not required given the legal basis for the institution's existence.  A State, however, may have such a process.  An institution must have such approval in order to be considered an institution of higher education for the purposes of the HEA.  A State approval or licensure process does not require the creation of or reliance on a State agency; e.g., an act of the State legislature may provide such approval.

Additionally, a for-profit or private nonprofit school that is not compliant with section 600.9(a)(1)(i)(A), i.e., is only established as a business or nonprofit charitable organization without authorization to offer postsecondary education, must have State approval or licensure by name.  Pursuant to section 600.9(a)(1)(ii)(B), approval based on accreditation, years in operation, or other comparable exemption is not sufficient.

**Question 10:  Would a letter issued by the State naming an institution satisfy the Department's requirement of "other action" under section 600.9(a)(1)(i)(A)?  Would that "other action" need to be issued by the cognizant postsecondary education regulatory agency or entity, or would any State agency or entity be adequate under the rule, e.g., the governor, legislature, or head of an executive branch agency?**

Answer 10:  A letter would not satisfy this requirement.  For purposes of section 600.9(a)(1)(i)(A), the legal instrumentality that is the basis for the institution's existence must authorize it by name to offer postsecondary education.  The appropriate State entity to take the "other action" would depend on State law.  As stated in the response to Question 3, in general, the "other action" will usually involve the incorporation documents of the institution.

**Question 11:  Even if certain institutions are exempt from a State's approval or licensure requirements, is there still a requirement for the State to have a process to resolve complaints involving those institutions?  In addition, could the State statutorily delegate this function to a non-State entity, such as an institution's governing board or a trade association?**

Answer 11:  The State must have a process to handle complaints for all institutions in the State, except Federally run institutions (including the service academies) and tribal institutions such as tribally controlled community colleges.  For purposes of HEA eligibility under these regulations, the State remains responsible for responding to complaints about institutions in the State regardless of what body or entity actually manages complaints.  The Department will only recognize a delegation that maintains the final authority with the State.  This responsibility can be met by the offices of a State's Attorney General, or by a more specialized State entity.  A State, upon considering a complaint, may refer it to other appropriate entities, such as an institution's accrediting agency, for final resolution.

**Question 12:  The Department appears to acknowledge that a State may have a combination of agencies or officials to handle complaints.  If multiple agencies are used to handle complaints, do they need to have any affiliation or expertise with postsecondary education?  For example, could the State's generic consumer protection agency act on complaints?**

Answer 12:  Pursuant to section 600.9(a)(1), the Department did not specify that a single State agency must handle complaints, nor did it specify any particular expertise on the part of the State agency.  If multiple agencies are applicable to an institution, the institution, under section 668.43(b), must provide its students or prospective students with contact information for filing complaints with the institution's State approval or licensing entity and any other relevant State official or agency that would appropriately handle a student's complaint.

**Question 13:  For purposes of acting on complaints, would a governing board that has oversight of multiple institutions as part of a State university system satisfy the requirement that a complainant have access to a process that is independent of any institution?**

Answer 13:  As stated in the preamble to the final regulations (75 FR 66866 (Oct. 29, 2010)), "The State is not permitted to rely on institutional complaint and sanctioning processes in resolving complaints it receives as these do not provide the necessary independent process for reviewing a complaint.  A State may, however, monitor an institution's complaint resolution process to determine whether it is addressing the concerns that are raised within it."  A State may rely on a governing board or central office of a State-wide system of public institutions if the State has made the determination the governing board or central office is sufficiently independent to provide successful oversight of complaints for the institutions in that system.  It would not be acceptable for such a board or central office to handle complaints for other institutions in the State.

**Question 14:  What if a State changes its laws in the future and an institution is not in compliance for a period of time?  Will the institution immediately lose its eligibility for title IV funds?**

Answer 14:  Questions like this that address unique circumstances will be resolved on a case-by-case basis given the particular facts and circumstances of the case.  The Department recognizes that institutions need time to adjust to changes in State law, and the reasonableness of the steps taken by an institution to respond to those changes will be considered by the Department in evaluating an institution's eligibility to participate in programs authorized by the HEA.

**Distance Education**

**Question 15:  Will the Department be publishing a list of State authorizing methods or agencies for distance education?**

Answer 15:  No.  However, the Department is aware that States and others have indicated a need for such information, and the Department will encourage the voluntary development of common Web sites and tools for the sharing of information about State authorizing methods and agencies.

**Question 16:  Some institutions have not sought approvals in other States to provide distance education or correspondence study to their students residing in those States.  To meet the July 1, 2011, effective date of the regulations, these institutions are now seeking the necessary approvals.  What does the Department expect of an institution that is making a good-faith effort to comply with the regulations, but may still be in the process of obtaining these State approvals as of July 1, 2011?**

Answer 16:  An out-of-State institution offering distance education, including online education or correspondence study to students in a State that regulates these offerings, was always required to have determined whether State approval was necessary and to have sought approval from the

State where required prior to awarding title IV funds to students who reside in that State.  Section 600.9(c) merely reinforces that such approval is required in a State that regulates out-of-State institutions offering distance education in the State.

However, for purposes of the 2011-2012 award year alone, the Department will consider an institution to be making a good-faith effort to prospectively comply with the distance education regulations for State authorization, if--

- The institution has applied for approval of its offerings in such a State, either in response to the publication of the regulations, or earlier if the State notified the institution that such approval was required;
- The institution is able to document its application for approval and the application's receipt by the State; and
- The institution notifies the Department when the State issues its decision on the pending applications for approval.

If a State does not regulate such activities by out-of-State institutions, the institution is considered to be legally operating in that State.

**Question 17:  If an institution provides distance education to military personnel stationed in a State that requires State approval for distance education programs originating in another State, must the institution have the approval of the State where the personnel are stationed?**

Answer 17:  This question is a matter of State law and is decided by whether the State applies its law to military personnel in its State.

**Question 18:  If an out-of-State institution is offering distance education to a State's residents, is the institution required to provide its students or prospective students with contact information for filing complaints with its accreditor and with any relevant State official or agency that would appropriately handle a student's complaint?**

Answer 18:  Yes.  The information must be provided under the provisions of section 668.43(b), regardless of whether the State otherwise regulates the out-of-State institution's provision of distance education.

**Question 19:  If an out-of-State institution does not obtain a required State approval for a distance education program in the future, could the Department declare the residents of that State enrolled in the institution's distance education program to have been ineligible for any title IV, HEA funds received and hold the institution liable for those funds?  Could the Department also take other actions if it determines the school acted in disregard of the rule?**

Answer 19:  Institutions have always been responsible for knowing when such approvals are needed, and are expected to have obtained them when required to do so as an integral aspect of obtaining State authorization.  As a result, as it has done in the past, the Department expects to

continue to hold institutions responsible for the return of title IV funds that were obtained without the requisite State authorization to receive them, and it likewise retains the ability to take other actions against noncompliant institutions.

**Question 20:  Does an institution have to identify where a student is located and seek approval from the State before enrolling the student in an online program if such approval is required by that State?  What happens if the student moves to another State?**

Answer 20:  Yes.  If a State requires such approval for the provision of distance or online education to students located in the State, a student is eligible for title IV, HEA funds only if the required State approval has been obtained.  While the location of the student is initially determined at the time of enrollment in a program, consistent with other determinations of student eligibility, it must also be reevaluated each time an institution makes a new award to a student.

**Question 21:  Is there a minimum number of enrollments that would trigger the need for an institution to have a State's approval to offer distance education in the State (a *de minimus* test)?**

Answer 21:  There is no Federal minimum number of enrollments that triggers compliance.  It is up to a State to establish the conditions for when State approval is required.  States may decide to adopt their own *de minimus* tests.

**Question 22:  If an institution offering distance education programs to students in a State has no other physical presence in the State, and the State does not require the institution to obtain State approval under those circumstances to offer distance education to its residents, would the institution be required for the purposes of section 600.9(c) to have a document from the State stating that no approval by that State is required?**

Answer 22:  No.  However, an institution would be expected to demonstrate upon request from the Department that no State approval was required.

**Question 23:  Will an institution lose its HEA eligibility on July 1, 2011, if its pending application for authorization for approval of distance or online programs in another State has not been acted on by that State?**

Answer 23:  No.  The Department recognizes that some States may not be able to process requests for authorization for institutions to offer distance or online programs to students resident in those States before the effective date of the regulations.  As previously explained in the answer to question 16, to retain eligibility, institutions will be expected to demonstrate that they have determined the States where such approvals are needed, to have applied for such approvals, and to notify the Department upon receipt of the approvals.

| Incentive Compensation |
|:---:|

**Incentive Compensation Q & A**

**Question 1:  What activities are subject to the ban on incentive compensation?**

Answer 1:  Only two types of activities are subject to the incentive compensation ban:  securing enrollment (recruitment) and securing financial aid.  No other activities are subject to the ban.  When other activities are coupled with recruitment or securing financial aid, institutions must consider how they compensate persons or entities to avoid payments that are prohibited.  Table 1 and the subsequent examples illustrate how these principles would be applied to activities that institutions carry out in support of recruitment and financial aid.  Consistent with the clear statutory language, the Department considers payments to persons or entities that undertake or have responsibility for recruitment and decisions related to securing financial aid as subject to the incentive compensation ban even if their work also includes other activities.

TABLE 1

| **Covered Activities**<br><br>**Activities that are ALWAYS subject to the ban on incentive compensation** | **Exempt Activities**<br><br>**Activities not subject to the ban on incentive compensation include the following, unless the activities of the employee or entity also involve a covered activity.** |
|---|---|
| **Recruitment activities, including:**<br><br>Targeted information dissemination to individuals;<br>Solicitations to individuals;<br>Contacting potential enrollment applicants; aiding students in filling out enrollment application information | **Marketing activities, including:**<br><br>Broad information dissemination;<br>Advertising programs that disseminate information to groups of potential students;<br>Collecting contact information;<br>Screening pre-enrollment information to determine whether a prospective student meets the requirements that an institution has established for enrollment in an academic program;<br>Determining whether an enrollment application is materially complete, as long as the enrollment decision remains with the institution |
| **Services related to securing financial aid, including:**<br><br>Completing financial aid applications on behalf of prospective applicants (including activities | **Student support services offered after the point at which financial aid is allowed to be disbursed for a payment period, including:**<br>General student counseling; |

Page 9 of 15—Program Integrity

| | |
|---|---|
| which are authorized by the Department, such as the FAA Access tool, which can be used to enter, correct, verify, or analyze financial aid application data) | Career counseling;<br>Financial aid counseling, including loan management;<br>Online course support  - both professional services and computer hardware and software;<br>Academic support services, including tutoring, aimed at student retention, whether that support is provided prior to attendance in classes or after attendance has begun |
| | **Policy decisions made by senior executives and managers related to the manner in which recruitment, enrollment, or financial aid will be pursued or provided, such as, e.g., decisions to admit only high school graduates** |

Example 1-A:

Employee A at XYZ.com posts information about available programs and enrollment application procedures on a Web site for a local business school.  Employee A also answers general questions about completing an enrollment application and forwards completed enrollment applications to the school.  Employee A has no additional direct contact with these applicants.  Payments to Employee A for these activities are not subject to the ban on incentive compensation because the employee is only engaged in exempt activities.

Example 1-B—Financial Aid Servicer:

A third-party servicer provides services related to securing financial aid.  In addition to collecting financial aid information, the servicer uses that information to contact the financial aid applicant and helps him or her locate other publicly available information about programs and resources in completing the submission of information that could lead to the award of financial aid.  Once the applicant has submitted the information, no further contact is made by the servicer.  This level of activity is not subject to the ban on incentive compensation. (See 75 FR 66878 (Oct. 29, 2010).)  However, if the servicer helps the student identify missing information on a financial aid application and then continues to counsel the applicant on receiving financial aid, the conduct of the servicer is now subject to the ban on incentive compensation as the conduct now encompasses covered activities.

Example 1-C:

Employee B tutors students after they have been admitted and become eligible to receive a disbursement of financial aid, but before they have actually received financial aid or started

Page 10 of 15—Program Integrity

classes.  None of the academic support services provided by Employee B is subject to the ban on incentive compensation.

Example 1-D:

Employee C encourages students to consider enrollment in an educational program before a purported enrollment deadline.  Employee C's compensation is subject to the ban on incentive compensation as it involves covered recruitment activities.

Example 1-E:

Employee D is involved in recruitment activities and is therefore subject to the ban on incentive compensation.  Nonetheless, Employee A is eligible for a merit increase to his or her annual salary based on standard evaluative factors, as discussed in Question 4, that are independent of the number of students recruited, retained, or graduated.

**Question 2:  What types of payment are considered direct or indirect payments of incentive compensation?**

Answer 2:  The following table and subsequent examples provide examples of different types of payments relative to their characterization as incentive compensation.

**TABLE 2**

| Types of payment that are direct or indirect payment of incentive compensation | Types of payment that are not direct or indirect payment of incentive compensation |
|---|---|
| "Tuition sharing" as a measure of compensation when based on a formula that relates the amount payable to the entity to the number of students enrolled as a result of the activity of the entity | Tuition as a source of revenue from which compensation is paid to an unrelated third party for a variety of bundled services (Example 2-B) |
| Profit sharing plans from which distributions are made to individuals based on the number of students enrolled by virtue of covered activities by the recipient  (section 668.14(b)(22)(ii)(B)) | Profit sharing plans, including 401(k) type plans, from which distributions are made to individuals on a basis that is neutral with respect to the role the recipient plays in student recruitment or the securing of financial aid |
| Salary adjustments that take the form of incentive payments based directly or indirectly on success in securing enrollments or financial aid | Employee benefits plans offered to all employees on a basis that is neutral with respect to the role the recipient plays in student recruitment or the securing of financial aid |
| Payments based on the application of an admissions policy | Cost of living adjustments (COLAs) |
| Bonus or other payments based on success in securing enrollments or financial aid | Compensation adjustments based upon seniority |
|  | Payments to faculty based upon student class |

Page 11 of 15—Program Integrity

|  | size or academic achievement |
|---|---|
|  | Payments to senior executives with responsibility for the development of policies that affect recruitment, enrollment, or financial aid |
|  | Payments based upon securing student housing or other student services, including career counseling |
|  | Volume driven arrangements based on services that are not recruitment or securing of financial aid |

Neither persons nor entities may receive direct or indirect payments of incentive compensation. The Department received numerous questions about the use of "persons" rather than "persons or entities" in some parts of the preamble to the final rule. The Department will issue a technical correction to the regulations, consistent with this letter, which will clarify that in all places in the preamble related to incentive compensation, the Department was referencing the statutory prohibition that applies to both persons and entities.

 **"Tuition sharing:"**  The Department has been informed that some third parties charge institutions a percentage of tuition as a way of assuming the business risk associated with student recruitment. Further, such third parties have typically combined student recruitment services with other services not covered by the incentive compensation prohibition, such as advertising, marketing, counseling, and support services to admitted students, and verification of student aid application information.

Section 487(a)(20) of the HEA mandates that the "institution will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any **persons or entities** engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." The Department generally views the payment based on the amount of tuition generated as an indirect payment of compensation based on success in recruitment and therefore a prohibited basis upon which to measure the value of the services provided. This is true regardless of the manner in which the entity compensates its employees.

However, as illustrated in the examples below, the Department does not consider payment based on the amount of tuition generated by an institution to violate the incentive compensation ban if that payment compensates an unaffiliated third party that provides a set of services that may include recruitment services. The independence of the third party (both as a corporate matter and as a decision maker) from the institution that provides the actual teaching and educational services is a significant safeguard against the abuses the Department has seen heretofore. When the institution determines the number of enrollments and hires an unaffiliated third party to provide bundled services that include recruitment, payment based on the amount of tuition generated does not incentivize the recruiting as it does when the recruiter is determining the enrollment numbers and there is essentially no limitation on enrollment.

With the statutory mandate in mind, the Department offers the following guidance with respect to certain possible business models:

Example 2-A:

A third-party servicer provides services that do not include student recruitment or the awarding of student financial aid, such as student counseling, verification of student aid application information, advertising, and collection of contact information about enrollment applicants.   The ban on incentive compensation does not apply to the entity and does not apply to the employees of the entity because no services are offered that are subject to the ban.

Example 2-B:

A third party that is not affiliated with the institution it serves and is not affiliated with any other institution that provides educational services, provides bundled services to the institution including marketing, enrollment application assistance, recruitment services, course support for online delivery of courses, the provision of technology, placement services for internships, and student career counseling.  The institution may pay the entity an amount based on tuition generated for the institution by the entity's activities for all bundled services that are offered and provided collectively, as long as the entity does not make prohibited compensation payments to its employees, and the institution does not pay the entity separately for student recruitment services provided by the entity.

Example 2-C:

The employees at Business A ensure that enrollment applications are complete and then forward the enrollment applications to the institution for admissions decisions.  In addition, Business A employees receive financial aid files along with required verification documentation, complete the verification process, then return the files to the institution.  In each instance, payments by Business A to compensate its own employees based on the number of files processed by those employees would be permitted because the employees do not undertake recruiting or admitting of students, or make decisions about and award title IV, HEA program funds.

In all of these examples, the institution receiving title IV funds remains responsible for the actions of any entity that performs functions and tasks on the institution's behalf.  These responsibilities include ensuring that employees are not paid for services that would convert these payments into prohibited incentive compensation because of the activity the employees engage in.

**Question 3:  Does the incentive compensation prohibition apply to all employees regardless of title or position?**

Answer 3:  Yes, the incentive compensation prohibition applies to all employees "with responsibility for recruitment or admission of students, or making decisions about awarding title IV, HEA program funds."  (75 FR 66874 (Oct. 29, 2010).)  As shown in Table 1, the Department

makes a distinction between recruitment activities that involve working with individual students and policy-level determinations that affect recruitment, admission, or the awarding of title IV funds.  The Department expects that employees who have titles such as enrollment counselors, recruitment specialists, recruiters, and enrollment managers have sufficiently direct involvement in recruitment that the incentive compensation ban applies to them.  Senior managers and executive level employees who are <u>only</u> involved in the development of policy and do not engage in individual student contact or the other covered activities listed in Table 1 will not generally be subject to the incentive compensation ban.

Likewise, a college president or dean who speaks with prospective students about the value of a college education or the virtues of attending a particular institution would not violate the incentive compensation prohibition.  (75 FR 66874 (Oct. 29, 2010).)

**Question 4:  What "standard evaluative factors" other than seniority may an institution take into account in determining compensation of employees?**

Answer 4:  Institutions may use factors such as seniority or length of employment as a basis for compensating employees covered by the incentive compensation prohibition.  Many other qualitative factors may also be used so long as they are not related to the employee's success in securing student enrollments or the award of financial aid.  These factors may include such things as job knowledge and professionalism, skills such as analytic ability, initiative in work improvement, clarity in communications, and use and understanding of technology, and traits such as accuracy, thoroughness, dependability, punctuality, adaptability, peer rankings, student evaluations, and interpersonal relations.  (See also 75 FR 66877 (Oct. 29, 2010).)

**Question 5:  Can institutions make payments to persons or entities engaged in any student recruitment or admission activity or in making decisions regarding the award of financial aid based upon the institution's students' academic performance while enrolled?**

Answer 5:  No.  The compensation of recruiters based on the academic performance of the students recruited violates the incentive compensation ban.  (See 75 FR 34817-34818 (June 18, 2010).)  However, many activities are not considered recruitment activities subject to the ban on incentive compensation as shown in Table 1.  To the extent that employees are engaged in these other activities their compensation may be based on successful student performance.

The preamble noted that bonuses for athletic personnel to reward performance other than securing enrollment or awarding financial aid, such as a successful athletic season, team academic performance, or other measures of a successful team, are permitted.  (See 75 FR 66874-66875 (Oct. 29, 2010).)  This statement merely reflects the fact that the payment of bonuses to athletic personnel is a common practice and is not typically viewed as incentive compensation based on recruitment of individuals as students, but at most may indirectly reward success in recruiting that small subset of individuals whose enrollment would benefit the institution's athletic program.  This discussion was not intended to suggest that incentive payments in other areas of the institution are allowed.

**Question 6:  The preamble discusses the making of profit sharing payments and suggests that in certain circumstances they may be permitted.  (See 75 FR 66878 Oct. 29, 2010.) Can you provide further clarity regarding when profit sharing is allowed?**

Answer 6: The final rule on profit sharing arrangements is at 34 C.F.R. § 668.14(b)(22)(ii)(B). In using the term "profit sharing," the Department intended to address plans that for-profit corporations use to compensate employees and officers of the corporation. The term "profits" here was not intended to address revenue generated at nonprofit corporations. This section was also intended to make clear that the Department does not view eligible retirement plans pursuant to section 402(c)(8)(B)(iii-vi) of the IRS Code as prohibited incentive compensation.

As stated in the response to Question 2, the sharing of profits with employees is permitted when they are shared in a way that is neutral relative to the type of work that an employee does. The rule prohibits using profit sharing as a bonus or commission for employees involved in recruitment or financial aid activities as described in the response to Question 1.

The Department has received requests for clarification regarding whether the profit sharing rule applies to payments to entities in addition to payments to individuals. The incentive compensation ban applies to payments to entities. However, section 668.14(b)(22)(ii)(B) was not intended to address payments to third parties as specifically addressed in Question 2. As illustrated in Table 2, nothing in the Department's regulations is intended to limit an institution's ability to reward its employees with traditional profit sharing payments as long as such payments are not designed to benefit recruitment and financial aid personnel distinct from all other institutional employees. In that regard, section 668.14(b)(22)(ii)(B) was offered to provide assurance that profit sharing within the confines of traditional pensions plans is allowed as long as the payments are not a substitute for otherwise impermissible compensation to individuals engaged in recruitment or the provision of financial aid.

---

**Misrepresentation**

---

**Question 1: In 34 C.F.R. § 668.71(a), the Department identifies actions it may consider taking in response to a finding that an institution has engaged in substantial misrepresentation. What process will the institution be provided to contest the action that the Department initiates?**

Answer: The institution will be entitled to receive the full benefit of the process that applicable law requires the Department to follow with respect to the type of action that it initiates. There is nothing in revised section 668.71(a) that reduces the procedural protection given by the HEA and applicable regulations to an institution to contest the specific action the Department may take to address substantial misrepresentation by the institution.

For example, section 487(c)(3) of the HEA requires the Department to provide an institution "reasonable notice and opportunity for a hearing" before the Department suspends, terminates, or fines an institution that has engaged in substantial misrepresentation. (20 U.S.C. § 1094(c).)

Revised section 668.71(a) provides that if the Department is going to take any of these actions, it will proceed under 34 C.F.R. Part 668, Subpart G—the same notice and opportunity for a hearing that has always existed for institutions that face an action the HEA addresses in section 487(c)(3). In addition, section 498c(h) of the HEA authorizes the Department to provisionally certify an institution, and to terminate such a certification for cause. (20 U.S.C. § 1099c(h).)

Page 15 of 15—Program Integrity

If the Department revokes the participation of an institution that is provisionally certified, the procedures described in 34 C.F.R. § 668.13(d), not those in Subpart G, govern the process afforded the institution.  (34 C.F.R. § 668.81(c)(4).)  An institution's program participation agreement requires it to provide prospective and enrolled students with accurate information about its programs, charges, and the employability of its graduates.  (20 U.S.C. §§ 1092(a)(1), 1094(a)(7).)

If the Department determines that substantial misrepresentation by a provisionally-certified institution demonstrates that it is unable to meet these obligations, 34 C.F.R. § 668.71(a)(1) provides that the Department may revoke that institution's title IV participation.  If it does so, the Department will offer the institution the opportunity provided in 34 C.F.R. § 668.13(d) to contest that action.

**Question 2:  Do the misrepresentation regulations create a private right of action?**

Answer 2:  No.  As stated in the preamble to the final regulations (75 FR 66916, Oct. 29, 2010), nothing in the regulations alters a student's ability to pursue claims of substantial misrepresentation pursuant to State law, and nothing in the regulations creates a new Federal private right of action.  The regulations are intended to make sure that institutions are on notice that the Department believes that substantial misrepresentations constitute a serious violation of an institution's fiduciary duty, and that the Department will carefully and fairly evaluate claims of substantial misrepresentation before determining an appropriate course of action.

**Question 3:  Do the misrepresentation regulations extend beyond substantial misrepresentations made about the nature of an eligible institution's educational programs, its financial charges, or the employability of its graduates?**

Answer 3:  No.  The Department recognizes that section 487(c)(3)(A) of the HEA provides the Department with the authority to act in response to substantial misrepresentations that may be made in three broad areas.  The Department will not evaluate, nor potentially sanction, institutions for their substantial misrepresentations that do not fall within one of these three categories.  Thus the revised regulations in 34 C.F.R. Part 668, Subpart F continue to offer a "scope and special definitions" section, and then provide specific discussion of the three regulated areas of potential substantial misrepresentation.