

**United States Government Accountability Office**

## Report to Congressional Requesters

**April 2022**

# HIGHER EDUCATION

# Education Needs to Strengthen Its Approach to Monitoring Colleges' Arrangements with Online Program Managers

Exhbit B



# GAO Highlights

April 2022

Highlights of GAO-22-104463, a report to congressional requesters

## HIGHER EDUCATION

## Education Needs to Strengthen Its Approach to Monitoring Colleges' Arrangements with Online Program Managers

## Why GAO Did This Study

Almost three-quarters of the nation's college students were enrolled in an education program offered at least partially online in 2020. Some colleges have contracted with third parties, known as OPMs, to help them deliver programs online and recruit students for these programs.

GAO was asked to review Education's role in overseeing colleges' use of OPMs. This report examines (1) colleges' use of OPMs and (2) the extent to which Education's monitoring instructions ensure that it obtains the information needed to assess whether OPM arrangements comply with the incentive compensation ban. GAO analyzed data and information from a market research firm, a higher education research firm, and seven OPM companies with the largest number of arrangements with colleges. GAO reviewed relevant regulations and agency guidance on Education's monitoring policies and procedures. GAO interviewed Education officials as well as officials from selected colleges, three audit firms, and a state audit office that were identified through research and referrals.

## What GAO Recommends

GAO is making two recommendations to Education to improve instructions for auditors and colleges to help Education obtain the information needed to assess OPM arrangements for incentive compensation violations. Education agreed with GAO's recommendations and described plans to address them.

View GAO-22-104463. For more information, contact Melissa Emrey-Arras at (617) 788-0534 or emreyarrasm@gao.gov.

## What GAO Found

At least 550 colleges worked with an online program manager (OPM) to support at least 2,900 education programs (e.g., certificate and degree programs) as of July 2021, according to the most recently available market research data. However, the exact number of OPM arrangements is unknown, due to a lack of comprehensive data, and there could be more of these OPM arrangements. Available market research data show that the number of new arrangements between colleges and OPMs is growing. There were at least 20 new arrangements between colleges and OPMs in 2010, and by 2020 the number had grown to at least 165. About 90 percent of the colleges with OPM arrangements are public or nonprofit colleges. GAO found that OPMs commonly recruit students for colleges, making these arrangements subject to the Department of Education's oversight and the Higher Education Act's ban on incentive compensation—which was designed to prevent abusive recruiting practices.

How Colleges Work with Online Program Managers



**Services** can include marketing, recruiting, course development, and tech support

**Payment** for OPM services can be a share of the tuition revenue from the college's online program, set fee(s), or both

Online Program Manager (OPM)

College

Source: GAO. | GAO-22-104463

Education's monitoring instructions for annual audits and agency reviews do not ensure it obtains information about colleges' OPM arrangements to fully assess compliance with the ban on incentive compensation.

- Education relies on independent auditors to collect information on OPM arrangements to identify potential violations of the incentive compensation ban; however, auditor instructions lack some key details. For example, the instructions do not specifically reference OPMs or a key piece of guidance that Education released in 2011. As a result, compliance audits may not assess relevant OPM arrangements.

- Education depends on colleges to provide information about their OPM arrangements during audits and agency reviews. However, Education's instructions to colleges also lack key details about identifying OPM arrangements subject to agency oversight and consequently colleges do not always report such arrangements, according to agency officials.

Without clearer instructions to auditors and colleges about the information on OPM arrangements that must be assessed during compliance audits and agency reviews, there is a risk that Education will not have the information it needs to detect incentive compensation violations.

**Exhbit B**

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 5 |
| | Arrangements between Colleges and OPMs Are Growing and Often Include Services Subject to the Incentive Compensation Ban | 11 |
| | Education Does Not Ensure that It Obtains the Information Needed to Fully Assess OPM Arrangements for Compliance with Incentive Compensation Ban | 16 |
| | Conclusions | 23 |
| | Recommendations for Executive Action | 24 |
| | Agency Comments | 24 |
| Appendix I | Comments from the U.S. Department of Education | 26 |
| Appendix II | GAO Contact and Staff Acknowledgments | 28 |

Figures

| | Figure 1: Details of the 2011 Dear Colleague Letter Related to Colleges' Tuition Revenue-Sharing Arrangements with Online Program Managers (OPM) | 8 |
|---|---|---|
| | Figure 2: Department of Education's Primary Methods for Monitoring Colleges' Arrangements with Online Program Managers for Compliance with the Ban on Incentive Compensation | 9 |

**Exhbit B**

**Abbreviations**

| | |
|---|---|
| Education | Department of Education |
| IPEDS | Integrated Postsecondary Education Data System |
| OIG | Office of the Inspector General |
| OMB | Office of Management and Budget |
| OPM | online program manager |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

**Exhbit B**



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

April 5, 2022

The Honorable Patty Murray
Chair
Committee on Health, Education, Labor, and Pensions
United States Senate

The Honorable Robert "Bobby" Scott
Chairman
Committee on Education and Labor
House of Representatives

The Honorable Sherrod Brown
United States Senate

The Honorable Tina Smith
United States Senate

The Honorable Elizabeth Warren
United States Senate

While overall enrollment in college has declined in recent years, enrollment in online education has increased, and the number of college students enrolling in online education has grown considerably during the COVID-19 pandemic.[1] According to Department of Education (Education) data, the percent of college students enrolled in education programs offered entirely or partially online increased from about 26 percent of total enrollment in 2013 to 73 percent in 2020.[2] The number of students enrolled in exclusively online programs increased 150 percent from 2019

---

[1]For purposes of this report, "college" includes 2- and 4-year degree-granting U.S. institutions, as well as those that provide technical postsecondary training in certificate programs of shorter duration in the U.S.

[2]Online student enrollment increased from about 5.5 million out of 20.8 million total students in 2013 to about 14 million out of 19.4 million in 2020. Education uses the Integrated Postsecondary Education Data System (IPEDS) to collect information on student enrollment in "distance education," which the agency defines as education that uses one or more technologies to deliver instruction to students who are separated from the instructor. In this report, we use "online education" and "distance education" interchangeably. U.S. Department of Education, National Center for Education Statistics, Integrated Postsecondary Education Data System, 2013, 2020.

**Exhbit B**

to 2020.[3] According to a survey recently published by a higher education organization, 85 percent of responding colleges reported moving courses online to provide emergency remote learning in the fall of 2020 because of the pandemic. Almost 60 percent of responding colleges said they plan to continue some or all of their remote learning online after the pandemic.[4]

Colleges can contract with third parties, commonly known as online program managers (OPM), for services that enable colleges to offer their programs online.[5] In addition to providing services such as instructional design and technology support, OPMs can provide colleges with marketing and student recruitment. The Higher Education Act of 1965, as amended, prohibits colleges from providing incentive payments to either individuals or contracted third parties engaged in student recruiting based on their success in enrolling students.[6] This incentive compensation ban was created to eliminate financial incentives that could lead to abusive recruiting practices. Education is responsible for enforcing the ban on incentive compensation. You asked us to review colleges' use of OPMs and Education's role in ensuring colleges' compliance with the ban on incentive compensation.

---

[3]IPEDS 2019, 2020.

[4]The National Council for State Authorization Reciprocity Agreements, *NC-SARA Institution Survey: Perspectives of the Pandemic* (October 20, 2021). The National Council for State Authorization Reciprocity Agreements is a membership organization that sets shared standards for postsecondary distance education courses and programs that are offered across state lines. It collects data on students from its membership of about 2,300 colleges that are located in all states except California.

[5]We use the term third party in this report to represent outside entities with which colleges may enter into arrangements. We use this term to include both for-profit companies and nonprofit organizations. We are not referring exclusively to "third party servicers" as the term is defined in the Higher Education Act, which describes entities that perform specific financial aid administration services for colleges.

[6]The Higher Education Act prohibits colleges from providing any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance, with the exception of recruiting foreign students residing in foreign countries who are not eligible to receive federal student assistance. 20 U.S.C. § 1094(a)(20). According to Education's regulations, certain adjustments to recruitment staff's salary (such as longevity bonuses) may be acceptable as long as these adjustments are consistent with this prohibition on the payment of incentive compensation. In this report, we refer to this prohibition as the incentive compensation ban.

**Exhbit B**

This report examines (1) colleges' use of OPMs and how commonly OPM arrangements include services that are subject to the ban on incentive compensation and (2) the extent to which Education's monitoring instructions ensure that it obtains the information it needs to assess whether OPM arrangements comply with the incentive compensation ban.

To describe what is known about colleges' use of OPMs, we obtained data from the market research firm LISTedTECH.[7] This included summary information on the number of colleges working with OPMs and characteristics of these colleges and education programs, as of July 2021. We assessed the reliability of these data by reviewing information about the company's data collection and quality assurance methods, and conducted manual checks for errors. Because there are no public data sources relating to colleges' arrangements with OPMs, we cannot confirm that LISTedTECH's data capture every OPM arrangement. However, we found the data to be reliable for the purpose of estimating the prevalence of OPM arrangements and OPM-supported education programs, as well as providing general descriptive characteristics of colleges that work with OPMs.

To describe what is known about how commonly OPMs provide services subject to the ban on incentive compensation, we conducted interviews or requested written responses from eight of the largest OPM companies and received responses from seven.[8] We also obtained summarized results from a 2019 survey of 145 college leaders conducted by Eduventures Research.[9] We assessed the reliability of these data by reviewing information about the survey design and quality assurance methods. We determined the data were reliable for describing the characteristics of the OPM arrangements at the survey respondents'

---

[7]LISTedTECH is a market research firm that tracks systems used in education. According to the company's website, its goal is to help colleges and universities, consultants, higher education companies, and investment firms leverage data to better understand the higher education information technology market. Based on our research, LISTedTECH is one of a few companies that collects information on the use of OPMs, and its data are used by other researchers who study OPMs.

[8]We contacted the eight largest OPM companies, according to LISTedTECH's data. At the time of our data request, one of the largest OPM companies was working to acquire another of the largest companies. These eight OPMs represent approximately one-half of all OPM arrangements identified by LISTedTECH.

[9]Eduventures Research is an Eduventures and advisory firm focused on higher education issues. It is part of the Encoura family (formerly ACT | National Research Center for College and University Admissions).

colleges. The Eduventures Research survey results and information collected from the seven OPMs included details on the services that OPMs provide to colleges, how colleges pay OPMs, and the types of programs OPMs support. We also interviewed selected individuals knowledgeable about this industry that we identified through research and referrals, as well as officials from three colleges that have OPM arrangements.[10]

To examine Education's instructions for monitoring compliance with the incentive compensation ban, we reviewed relevant federal laws and regulations, including the Higher Education Act, and documentation on Education's monitoring policies and procedures. Specifically, we reviewed monitoring documentation related to compliance audits and the agency's program reviews. We identified any explicit instructions directed to auditors or college officials regarding how they are to assess compliance with the incentive compensation ban for colleges that contract with OPMs for student recruiting. We also analyzed Education's final audit determination and final program review determination reports that Education identified as containing incentive compensation violations from fiscal years 2012 through 2020.[11] Education identified reports with incentive compensation violations using its Postsecondary Education Participants System, and we assessed the reliability of these data by reviewing the underlying reports associated with each finding and interviewing knowledgeable Education officials about data input and quality assurance methods.[12] We found the data to be reliable to report the number of identified incentive compensation violations.

Further, in coordination with representatives from the American Institute of Certified Public Accountants, a national association representing accountants, we selected and interviewed three audit firms and one state auditing office (which we refer to as audit organizations) that audited at

---

[10]We selected colleges from among those whose OPM contracts were publicly available. We did not assess the OPM arrangements of any college for compliance with the incentive compensation ban. While the perspectives of those we interviewed are not necessarily representative of this field, they provided important context.

[11]We selected this time period because Education issued key guidance that went into effect in July 2011 that was relevant for assessing the compliance of colleges' arrangements with OPMs, and 2020 reports were the most recent available at the time of our review.

[12]Education uses the Postsecondary Education Participants System data system to track its monitoring and enforcement activities.

**Exhbit B**

least one college that contracted with an OPM.[13] In addition, we interviewed Education officials about compliance audit and program review practices and any challenges auditors and agency officials encounter obtaining information to assess whether colleges' OPM arrangements comply with the incentive compensation ban. We assessed Education's communications with auditors and colleges about its monitoring policies and procedures against requirements in the Higher Education Act, federal regulations for updating compliance requirements for auditors, and federal internal control standards for designing control activities to achieve objectives and sharing quality information with external parties to help the agency achieve its objectives.[14]

We conducted this performance audit from August 2020 to April 2022 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

### Online Program Management

Though their expertise can vary, OPMs generally provide services that fall within a few broad areas: market research, marketing and student recruiting, enrollment management, student retention services, and technology-related support. OPMs can also provide instructional design and curriculum development services to help faculty develop new online courses or transition existing courses to an online format.[15] For the purpose of our report, we consider an OPM to be a third party that works with a college to manage services necessary to develop and deliver an

---

[13]We considered audit organizations' size, geographical location, and private/public status to identify a variety of organizations. The perspectives of those we interviewed are not generalizable to all audit organizations, but provide useful insights into audit procedures.

[14]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: Sept. 2014).

[15]P3EDU: Innovation and Public-Private Partnership in Higher Education, *P3EDU 100: A Directory of Leading Companies Partnering with Colleges and Universities for Strategic and Financial Impact* (2020).

**Exhbit B**

online education program.[16] We consider an education program to be one that includes at least two courses. Therefore, our OPM definition excludes single courses, such as massive open online courses, but includes short-term programs, such as microcredentials and bootcamps. Our definition also includes traditional degree programs, such as associates, bachelors, and graduate degrees. Colleges may work with OPMs to support programs that are eligible for federal student aid, as well as short-term programs that are not eligible.[17]

## Statutory Ban on Incentive Compensation

The Higher Education Act requires a college to enter into an agreement with Education in order to participate in federal student aid programs and award federal aid to its students.[18] Under this agreement, colleges commit to comply with all relevant statutory and regulatory requirements in exchange for access to student aid. Among other things, the Higher Education Act prohibits colleges that participate in federal student aid programs from paying incentive payments, such as commissions or bonuses, to individuals or third parties engaged in student recruiting based on their success in enrolling students.[19] This ban on incentive compensation applies to:

[16]We based our definition of OPMs on the one used by LISTedTECH and Eduventures Research, which are the primary sources of information on OPM arrangements for this report. This definition excludes single service providers or vendors, such as those companies that only provide colleges with the software application for the administration and delivery of online education courses—commonly referred to as learning management systems. Education does not define online program managers, as colleges are not required to report the existence of all OPM arrangements.

[17]To be eligible for federal student aid, a program must meet a specified number of weeks of instruction, be offered by an institution accredited by a recognized accreditor, be authorized by a state, and admit only students who have earned at least a high school diploma. Students enrolled in certain preparatory or teacher certification courses may be eligible to receive limited forms of student aid. 34 C.F.R. § 668.8(h).

[18]For this report, we define federal student aid programs as financial aid programs authorized under Title IV of the Higher Education Act of 1965, as amended. See Pub. L. No. 89-329, tit. IV, 79 Stat. 1219, 1232-54 (codified as amended at 20 U.S.C. §§ 1070-1099d). These include the William D. Ford Federal Direct Loan, the Federal Pell Grant, and the Federal Work-Study Program.

[19]The ban on incentive payments was added to the Higher Education Act of 1965 by the Higher Education Amendments of 1992. See Pub. L. No. 102-325, § 490, 109 Stat. 448, 625-27. The Higher Education Act prohibits colleges that receive federal student aid from providing any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance. 20 U.S.C. § 1094(a)(20).

- **Third parties:** Entities that contract with a college to conduct student recruiting (or other services subject to the incentive compensation ban) for the college.[20]

- **Individuals:** Any employee of the college or contracted third party who conducts student recruiting (or other services subject to the incentive compensation ban) and any higher level employee with responsibility for student recruiting or other covered service.

In 2011, Education published a Dear Colleague Letter that provided additional guidance related to the ban on incentive compensation.[21] Among other things, Education clarified its view that payment to a third party for student recruiting based on the amount of tuition generated, often referred to as tuition revenue sharing, is considered incentive compensation and is therefore generally prohibited.[22] However, the Dear Colleague Letter explained that Education does not consider some tuition revenue-sharing arrangements to violate the incentive compensation ban if the payment is for a bundle of services that includes recruiting, and if other conditions are met to safeguard against abusive recruiting practices (see fig. 1).[23] This letter also states that OPM staff involved in student recruiting cannot receive prohibited incentive payments, even when the college pays the OPM with a share of tuition revenue for a bundle of services and these safeguards are in place.

---

[20]We use the term "third party" to mean "entity" as defined in 34 C.F.R. § 688.14, as any institution or organization that provides a service subject to the incentive compensation ban—the recruiting or admitting of students or that makes decisions about and awards federal student aid funds. Although "entity" may include third party servicers as they are defined in the Higher Education Act, we are not exclusively referring to third party servicers. For example, an OPM that provides recruiting services, but does not administer federal student aid funds, would not be considered a third party servicer.

[21]Education uses Dear Colleague Letters to convey guidance to colleges about the administration of federal student aid programs.

[22]Specifically, in the 2011 Dear Colleague Letter, Education clarified its view that tuition revenue sharing is generally considered indirect incentive compensation based on success in enrolling students, which is prohibited. The statutory ban on incentive compensation prohibits both direct and indirect incentive payments.

[23]According to the Department of Education's 2011 Dear Colleague Letter, such safeguards were designed to help ensure that the contracted entity is independent from the college and provides services in addition to recruiting, making it less likely for the contracted entity to financially benefit from increasing enrollment through abusive recruiting. Department of Education, *Implementation of Program Integrity Regulations,* GEN-11-05 (Washington, D.C.: March 17, 2011).

**Exhbit B**

**Figure 1: Details of the 2011 Dear Colleague Letter Related to Colleges' Tuition Revenue-Sharing Arrangements with Online Program Managers (OPM)**

> According to the Dear Colleague Letter, Education allows colleges to pay OPMs with a share of tuition revenue for contracted services that include student recruiting if the following safeguards are in place:

 **The OPM Provides a Bundle of Services.** The OPM must provide services in addition to recruiting—often referred to as a set of "bundled services" to the college. "Bundled services" may include marketing, enrollment application assistance, recruiting services, course support for online delivery of courses, the provision of technology, placement services for internships, and student career counseling.

 **The College Pays the OPM for the Full Set of Bundled Services.** The college may not pay the OPM separately for student recruiting services.

 **The College and the OPM Are Unaffiliated and Independent.** The OPM must not be affiliated with the college it contracts with, or with any other college. The college must also maintain its independence from the OPM, both as a corporate matter and as a decision maker.

 **The College Makes Enrollment Decisions.** The college must determine the number of total students to be enrolled.

 **Recruitment Staff Do Not Receive Incentive Payments Based On Enrollment.** OPM staff involved in student recruiting cannot receive bonuses or other incentive payments based on their success in enrolling students.

Source: GAO analysis of the Department of Education Dear Colleague Letter, GEN-11-05.  |  GAO-22-104463

Note: In the 2011 Dear Colleague Letter, Education clarified its view that payment based on the amount of tuition generated (often referred to as tuition revenue sharing) is considered indirect compensation based on success in enrolling students and is therefore generally prohibited incentive compensation. However, the Dear Colleague Letter explained that Education does not consider some tuition revenue-sharing arrangements between a college and a third party that provides student recruiting—such as an OPM—to violate the incentive compensation ban if the conditions outlined in this table are followed to safeguard against abusive recruiting practices.

The incentive compensation ban applies at the college level, and it does not rely on the federal student aid eligibility of individual education programs. Therefore, payments to individuals or third parties that violate the ban on incentive compensation are considered a violation, even if those payments are strictly related to student recruiting for programs that are not eligible for federal student aid, such as short-term programs.

## Education's Oversight of the Ban on Incentive Compensation

Education is responsible for ensuring that colleges comply with the requirements associated with federal student aid programs. While Education does not have direct oversight authority over the OPM company itself, the agency has oversight of colleges' arrangements with OPMs, if the OPM provides recruiting (or another service subject to the ban on incentive compensation). In this capacity, Education is responsible for enforcing the ban on incentive compensation, and as a penalty for any violation, it has authority to recover from the college federal student aid

funds associated with the violation. Education uses independent compliance audits, program reviews, and other processes to monitor college compliance with federal laws and regulations (see fig. 2).

**Figure 2: Department of Education's Primary Methods for Monitoring Colleges' Arrangements with Online Program Managers for Compliance with the Ban on Incentive Compensation**

 **Independent Compliance Audits**

**Conducted by Independent Auditors**

- Required each year for all colleges receiving federal student aid.[a]

- Evaluate colleges' compliance with requirements for federal student aid programs (including the incentive compensation ban) and review any violations from prior years.

 **Program Reviews**

**Conducted by Department of Education Staff**

- Required for a relatively small number of colleges selected by Education each year, generally colleges considered at high risk for not complying with program requirements.

- Evaluate colleges' compliance with federal student aid program requirements that can include the ban on incentive compensation.

Source: GAO analysis of regulations and Education documentation. | GAO-22-104463

Note: Education may also identify potential incentive compensation violations from investigations conducted by its Office of Inspector General or from qui tam lawsuits filed by college employees or other private citizens under the False Claims Act.

[a]Colleges that disburse less than $200,000 in federal student aid funds for 2 consecutive years and meet other conditions may have their audit submission waived for 3 years. The college must then submit a compliance audit covering each year in the period and a financial statement audit for the last year of the waiver period. See 20 U.S.C. § 1094(c)(1)(A)(iii) and 34 C.F.R. § 668.27.

Because compliance audits occur annually and are required of all colleges participating in federal student aid programs, this is Education's primary method for identifying potential violations of the incentive compensation ban.[24] Colleges submit compliance audit reports conducted by independent auditors to Education staff for their review. If Education identifies any program violations, the agency will generally issue a final

---

[24]Colleges that disburse less than $200,000 in federal student aid funds for 2 consecutive years and meet other conditions may have their audit submission waived for 3 years. The college must then submit a compliance audit covering each year in the period and a financial statement audit for the last year of the waiver period. See 20 U.S.C. § 1094(c)(1)(A)(iii) and 34 C.F.R. § 668.27. In addition to compliance audits and program reviews, Education's OIG also periodically conducts examinations of colleges, targeting colleges based on complaints and other information. Another way Education can identify violations of the incentive compensation ban is when private citizens sue colleges on behalf of the government for incentive compensation violations.

determination to the college, indicating the violations and any corrective actions.

Auditors follow two sets of instructions to assist them in planning and conducting compliance audits for U.S. colleges, depending on the type of college being audited. Auditors use:

- Education's Office of the Inspector General's (OIG) audit guide (OIG audit guide) when auditing for-profit colleges and
- The Office of Management and Budget's (OMB) Compliance Supplement when auditing public and nonprofit colleges.[25]

While OMB issues the Compliance Supplement, federal agencies are responsible for identifying key program areas considered important for auditors to evaluate for compliance. The agencies provide annual updates to OMB with references to relevant laws, regulations, and other compliance requirements, which can include references to guidance including Dear Colleague Letters.[26] Auditors rely on the supplement to understand a federal program's objectives, procedures, and compliance requirements; without the supplement, auditors would have to research many laws and regulations for each program. The supplement also provides suggested audit procedures to further assist auditors with their compliance evaluations. Education is responsible for updating the compliance requirements and suggested audit procedures for federal student aid programs.

Education also monitors colleges' compliance with the incentive compensation ban through program reviews. Education staff conduct program reviews of a relatively small number of colleges each year, focusing on selected high-risk colleges using the agency's program review procedures. During program reviews, Education staff examine

---

[25]Department of Education, Office of Inspector General, *Guide for Audits of Proprietary Schools and for Compliance Attestation Engagements of Third-Party Servicers Administering Title IV Programs* (Washington, D.C.: Sept. 2016). Office of Management and Budget, *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 CFR Part 200, Appendix XI, Compliance Supplement*. Public and nonprofit colleges that disburse $750,000 or more in federal awards in a fiscal year are required to comply with the audit requirements in the Compliance Supplement. 31 U.S.C. § 7502; 2 C.F.R. § 200.501.

[26]The Compliance Supplement is not designed to be exhaustive, and states that auditors should use their professional judgment, as appropriate.

**Exhbit B**

college records, interview college staff and students, and review relevant student information, among other things.

## Arrangements between Colleges and OPMs Are Growing and Often Include Services Subject to the Incentive Compensation Ban

### More than 500 Colleges Worked with an OPM as of July 2021, and the Number of New OPM Arrangements Has Increased since 2010

At least 550 colleges worked with an OPM as of July 2021, and the number of new arrangements between colleges and OPMs has increased since 2010, according to data we obtained from the market research firm LISTedTECH. However, the exact number of OPM arrangements is not known, due to a lack of comprehensive data, and the number of existing arrangements is likely somewhat higher.[27] According to this market research data, at least 20 colleges established a new arrangement with an OPM in 2010, and the annual number of new arrangements generally

[27]LISTedTECH identifies active partnerships—that is, arrangements between OPMs and U.S. colleges whose online program website landing pages were active. This count represents unique arrangements between a college and an OPM. For example, if a college has a contract with two different OPMs, this would be counted as two arrangements in LISTedTECH's data. LISTedTECH uses multiple methods to collect information on colleges' OPM arrangements; however, we cannot be certain that it has identified all OPM arrangements. According to a LISTedTECH official, the company estimates that its data account for approximately 80 percent of the market, in part because of the lack of publicly available information on colleges' arrangements with OPMs.

**Exhbit B**

increased over the next 10 years. In 2020 there was a considerable increase, with at least 165 new arrangements that year.[28]

OPMs provided services to colleges to support at least 2,900 online education programs as of July 2021, according to the market research data we obtained. The estimated number of new OPM-supported programs offered by colleges each year increased substantially from 2010 through 2020. In 2010, at least 25 new online programs were offered by colleges with support from an OPM, and in 2020 the number of new programs grew to at least 385.[29]

Colleges that contract with OPMs are predominantly public or nonprofit colleges, and they work with OPMs to support a variety of education programs. Approximately 90 percent of the colleges that LISTedTECH has identified as working with an OPM are public or nonprofit colleges, and a vast majority of these colleges are 4-year or above (about 90 percent). Relatively few colleges (about 10 percent) that work with OPMs are for-profit colleges.[30] Colleges of different sizes, based on student enrollment, work with OPMs in about equal numbers. According to officials from five of the largest OPM companies that provided us with information, these OPMs commonly work with colleges to support graduate degree programs.[31] However, some of these OPMs support more short-term programs, such as bootcamps, than graduate degree

---

[28]Holon IQ, another market research firm that collects and analyzes data on the OPM market, has published similar information on the growth in OPM arrangements from 2010 through 2020. According to Holon IQ reports, there were an estimated 13 new arrangements in 2010 to support online programs (including bootcamps) at U.S. colleges. These reports state that the number of new OPM arrangements initiated each year increased over the next 10 years, with 180 new arrangements in 2020. Holon IQ, "1,377 University Partnerships. OPM & Bootcamp PPPs," (February 9, 2021) accessed January 19, 2022, https://www.holoniq.com/notes/1377-university-partnerships.-opms-bootcamps-and-the-academic-ppp-acceleration./.

[29]According to a LISTedTECH official, these data may undercount the total number of new online programs implemented each year, as the company was unable to identify implementation dates for approximately 30 percent of online programs.

[30]LISTedTECH's data show that similar numbers of public and nonprofit colleges work with an OPM. Information about colleges that work with OPM providers are based on data provided by LISTedTECH as of February 2021.

[31]Of the seven OPMs that responded to our request for information, five OPMs provided information about the types of programs they support. Two of the seven OPMs did not respond to this question.

**Exhbit B**

programs. Several colleges work with OPM providers to launch coding and other bootcamps, often in their continuing education departments.[32]

Colleges can have arrangements with more than one OPM to support different online education programs.[33] For example, we spoke with officials from a 4-year public university that works with three different OPM providers. One OPM supports related health information management degree and certificate programs. Another OPM works with the college to offer cyber security, coding, and data analytics bootcamps. This college also recently entered into a new contract with a third OPM to help the school expand the degree and certificate programs offered by the college's continuing education department. According to LISTedTECH's market research data, a small number of OPM companies account for a large share of all OPM arrangements. LISTedTECH has identified approximately 60 companies that provided colleges with OPM services in July 2021, and eight of these companies accounted for approximately one-half of all OPM arrangements.[34]

---

[32]Liz Eggleston, "Best University Coding Bootcamps: Ultimate Guide and Market Research," Course Report (June 2021), accessed Jan. 21, 2022, https://www.coursereport.com/blog/best-university-coding-bootcamps-ultimate-guide-market-research#Trend.

[33]LISTedTECH's market research data indicate that, as of July 2021, the approximately 60 companies that provided OPM services had a total of at least 885 arrangements with colleges to support online education programs, indicating that some of the estimated 550 colleges identified as working with at least one OPM have arrangements with more than one OPM company.

[34]Individuals we spoke with that are knowledgeable about the OPM industry estimate there are between approximately 35 and 60 companies that offer OPM services, as different organizations use somewhat different definitions of online program management. Other research has similarly estimated the number of OPM providers to be between 26 and 61, while noting that estimates can vary due to variation in the definition of an OPM and the year during which the list was made. John J. Cheslock, Kevin Kinser, Sarah T. Zipf, and Eunjong Ra, *Examining the OPM: Form, Function, and Policy Implications* (Penn State College of Education, Dec. 2021).

## OPM Contracts Often Include Recruiting Services and Tuition Revenue Sharing, Making Them Subject to Education's Oversight of the Incentive Compensation Ban

Information we obtained from OPM companies and survey results suggest that a significant share of OPMs provide student recruiting services—a service subject to Education's oversight of the ban on incentive compensation.[35] According to information we collected from seven of the largest OPMs, five of them offered colleges a set of services that almost always included student recruiting. Another OPM offered colleges the option to use its student recruiting services, but did not indicate how frequently colleges actually use this service.[36]

Survey data that we obtained from the higher education research firm Eduventures Research also suggest that student recruiting is among the most commonly provided OPM services. According to the 49 survey respondents whose colleges contracted with an OPM, the most commonly provided OPM services included student recruiting (33), program marketing (31), and marketing analytics (27). Other commonly provided OPM services, according to survey respondents, included: developing the online course, student and faculty support, management of the online teaching and learning environment, and student retention services. Published findings from a survey of college chief online officers conducted in 2019 also found that the services most frequently provided by OPMs included marketing online programs (73 percent), market research (71 percent), and recruiting students (65 percent).[37] OPMs can provide student recruiting and marketing expertise that a college may not have (see text box for an example from one college official we spoke with).

[35]According to officials from Eduventures Research and the seven OPM companies we contacted, OPMs typically do not provide colleges with financial aid administration services. Education recently conducted a review of one of the largest OPM companies and determined it is not a third party servicer, as the term is defined in the Higher Education Act, which describes entities that perform specific financial aid administration services for colleges.

[36]One of the seven OPMs that we contacted said that student recruiting is not among the services it provides.

[37]This survey was conducted by Quality Matters, a U.S. quality assurance organization focused on online learning, and Eduventures Research, a higher education research and advisory company. The survey sample for this study included chief online officers from 367 colleges. Richard Garrett, Ron Legon, and Eric Fredericksen, *CHLOE 4: Navigating the Mainstream, The Changing Landscape of Online Education*, Quality Matters and Eduventures Survey of Chief Online Officers (2020), accessed Aug. 6, 2020, https://www.qualitymatters.org/qa-resources/resource-center/articles-resources/CHLOE-project.

**Exhbit B**

---

> **Example of a college working with an online program manager (OPM) for marketing and student recruiting services**
>
> An official from a medium-sized 4-year public college explained why the college decided to contract with an OPM to support its business and education online graduate degree programs. This official told us that the college relies on its OPM for marketing and student recruiting services, explaining that it is hard for the college to compete with the larger public colleges in the state and with large, nationally-known colleges that offer online programs. This official said that most online programs will enroll students within a radius of about 90 miles from the college, and believes a college cannot expect to be competitive outside its home state without the advertising reach and resources of an OPM. The college official said that the primary indicator the college uses to measure the OPM's success is its completed application and enrollment rates.

Source: GAO interview. | GAO-22-104463

Many OPM contracts include tuition revenue sharing provisions, which Education addresses in its Dear Colleague Letter. According to the letter, third parties can provide colleges with recruiting services in exchange for a share of the program's tuition revenue—but only if payment is made for a bundle of services and certain other conditions are met to safeguard against abusive recruiting practices. Officials from five of the largest OPM companies that provide recruiting services informed us that colleges always pay them with a share of tuition revenue.[38] An official from a sixth large OPM informed us that it is usually paid with a share of tuition revenue, although in a few instances it receives a set fee for services.[39]

Data from the Eduventures survey also found that the majority of survey respondents whose colleges contract with an OPM for student recruiting pay the OPM with a share of tuition revenue (25 of 32). Among these respondents, most (16 of 25) pay between 41 and 60 percent of tuition to the OPM, and four respondents said their college pays the OPM 61

---

[38]This includes one company that charges colleges a fee per total enrollment hours, in addition to other fees. According to Education's Dear Colleague Letter, this payment structure meets the definition of tuition sharing.

[39]Data provided by these OPM companies refer specifically to academic programs that are eligible for federal student aid.

percent or more.[40] Researchers who conducted this survey told us they have found that clauses stipulating that a college will pay an OPM a greater share of tuition revenue as student enrollment in a program increases are becoming more common in OPM contracts.

Education has faced questions about how to interpret and apply its safeguards, as they are currently described in its Dear Colleague Letter. Some of these questions have included how to determine whether a college is sufficiently independent and unaffiliated with the OPM provider and what constitutes a sufficient bundle of OPM services. Education officials told us the agency is currently reviewing its guidance on the incentive compensation ban and how it applies to OPM arrangements for possible revisions to address some of these issues. Education officials also told us that lessons learned from its ongoing program reviews assessing colleges' tuition revenue-sharing arrangements with OPMs will inform their plans for revising this guidance.

# Education Does Not Ensure that It Obtains the Information Needed to Fully Assess OPM Arrangements for Compliance with Incentive Compensation Ban

---

[40]The Century Foundation reported similar findings in a 2019 review of selected contracts between public colleges and OPM providers. The review found that over half of the contracts indicated the college would pay the OPM with a share of tuition revenue, typically between 40 and 65 percent of tuition revenue. The Century Foundation reviewed 79 contracts from public colleges, and of these, 41 were directly relevant to the management of online programs and did not include contracts that only addressed access to software like learning management systems. Stephanie Hall and Taela Dudley, *Dear Colleges: Take Control of Your Online Courses* (The Century Foundation, Sept. 2019).

## Limited Instructions to Auditors Make It Difficult to Fully Assess OPM Arrangements for Incentive Compensation Violations

Education relies primarily on information collected during annual compliance audits conducted by independent auditors to ensure that OPMs and recruiting staff are not paid in ways that violate the incentive compensation ban; however, instructions provided to auditors are missing references to key details and guidance to help auditors fully assess colleges' arrangements with OPMs. To assess these arrangements for potential violations and ensure compliance, Education officials told us they expect auditors to review how an OPM and its recruiters are paid. Specifically, when a college contracts with an OPM for student recruiting, Education's Dear Colleague Letter states that the college can pay the OPM with a share of tuition revenue only if the payment is for a bundle of services and other safeguards are in place. Additionally, the statutory ban on incentive compensation prohibits recruiters employed by the OPM from receiving incentive payments based on their success in enrolling students.

**Instructions to auditors lack key details to ensure they identify all relevant OPM arrangements.** Auditors use instructions in the Compliance Supplement to evaluate public or nonprofit colleges that receive federal funds from Education. These suggested audit procedures direct auditors to determine whether the college conducts student recruiting internally or contracts with a third party, which includes OPMs according to Education officials.[41] However, these instructions do not specifically state that auditors should inquire about any applicable arrangements colleges have with OPMs. Moreover, these instructions do not specifically state that auditors should review OPM arrangements that include recruiting students for education programs that are not eligible for federal student aid, such as short-term bootcamps, which are also subject to the incentive compensation ban.

Because auditors are not instructed to ask college officials about OPM arrangements that include recruiting, college officials may not identify all relevant OPM arrangements. As a result, auditors may miss an opportunity to assess these arrangements for potential violation of the incentive compensation ban. Audit organization officials we interviewed said it would be helpful to include language that prompts auditors to specifically ask about any contracts a college may have with an OPM for recruiting to ensure that auditors are aware of all relevant OPM

---

[41]Colleges may also contract with third parties for general student recruiting that is unrelated to online programs. The incentive compensation ban applies to third parties engaged in student recruiting for both online and campus-based education programs.

arrangements that should be assessed for compliance with the incentive compensation ban.

**Instructions to auditors lack key details to ensure they fully assess how OPM recruiters are paid.** The Compliance Supplement generally directs auditors to review information about how colleges recruit students and pay third parties involved in recruiting; however, the suggested audit procedures do not direct auditors to review compensation information for recruiters employed by OPMs. Specifically, if an auditor determines that a college contracts with a third party for student recruiting, the Compliance Supplement instructs auditors to obtain a copy of the contract and identify any provisions in the contract that might violate the incentive compensation ban regulations. These instructions also direct auditors— only under limited circumstances—to determine whether the third party made prohibited incentive payments.[42]

However, these instructions do not direct auditors to review compensation information for recruiters employed by the third party. Officials we spoke with from one audit organization that has audited colleges with OPM arrangements told us that their auditors do not collect compensation information for contracted recruitment staff. In contrast to the Compliance Supplement, the OIG audit guide, which is applicable only to for-profit colleges, directs auditors to review compensation information for contracted recruiters. However, colleges that contract with OPMs are predominantly public or nonprofit colleges, which are subject to audit instructions in the Compliance Supplement, rather than the OIG audit guide.

**Instructions to auditors do not reference key guidance needed to fully assess how OPMs are paid.** The suggested audit procedures in the Compliance Supplement lack key guidance needed to ensure auditors fully assess colleges' arrangements with OPMs for potential violations of the incentive compensation ban. While the Compliance Supplement refers auditors to the Higher Education Act and regulations relevant to the ban on incentive compensation, it does not refer to the 2011 Dear Colleague Letter, which contains important information for evaluating OPM arrangements. Even though it is not cited in the Compliance Supplement, Education officials told us that they expect auditors to

---

[42]Specifically, the Compliance Supplement instructs auditors to determine if the college made payments to the third party in excess of the contract. If a college has made excess payments, the auditor is instructed to determine whether the third party used them for incentive payments.

consider the Dear Colleague Letter when evaluating a college's arrangement with an OPM.

Officials we interviewed from four audit organizations told us they expect auditors to follow instructions in the Compliance Supplement. Audit officials said that if guidance relevant to determining compliance is not specifically cited in the instructions, auditors generally do not consider it. Officials from three audit organizations told us that if guidance in the 2011 Dear Colleague Letter is important for evaluating compliance, then it would be helpful to have the letter specifically cited in the Compliance Supplement. Officials added that if the letter is not cited, auditors would not know to consider it.

If relevant guidance is not included in the Compliance Supplement, it is up to individual auditors' discretion to conduct additional research to determine if Education has issued any relevant guidance and decide whether they should consider it in their evaluation.[43] Education has issued other Dear Colleague Letters with guidance on other aspects of federal student aid programs and cited those in the Compliance Supplement to clarify compliance requirements. The Education OIG has further indicated that this particular 2011 Dear Colleague Letter provides important guidance for assessing compliance with the ban on incentive compensation, as it refers auditors to this letter in the OIG audit guide for for-profit colleges.

Federal regulations require Education to work with OMB to ensure that the Compliance Supplement contains the key details and guidance the agency considers critical to assess compliance with program requirements.[44] Moreover, standards for internal control in the federal government state that agency management should design control activities to achieve its objectives and share quality information with external parties to help the agency achieve its objectives.[45] Because the Compliance Supplement does not specifically mention OPMs, direct auditors to review compensation information for contracted recruiters, or reference the Dear Colleague Letter, auditors may miss key information when assessing OPM arrangements. More detailed instructions to

---

[43]The purpose of the Compliance Supplement is to compile the important compliance requirements federal agencies expect auditors to consider as part of an audit so that auditors do not have to research the many laws and regulations for each program.

[44]See 2 C.F.R. § 200.513(c)(4).

[45]GAO-14-704G.

**Exhbit B**

auditors for assessing how OPMs and recruiters are paid would help ensure that audit findings provide Education with the information it needs to fully assess colleges' OPM recruiting arrangements for compliance with the incentive compensation ban.

## Education's Instructions to Colleges Lack Key Details on Information Needed to Assess OPM Arrangements

Education's instructions to colleges about their responsibilities during compliance audits and program reviews lack details specifying the information colleges must provide to auditors and Education staff with respect to OPM arrangements that include student recruiting. Education provides instructions about program review procedures in its Program Review Guide for Institutions and directs colleges to the Compliance Supplement for more information on audits, but these instructions lack key information relating to OPMs:

- **Program Review Guide for Institutions:** In its Program Review Guide for Institutions, Education instructs colleges to inform Education staff of any arrangements with third parties for recruiting services. This guide also instructs colleges to provide Education with the contract and information about contracted recruiter compensation. However, these instructions do not specifically state that these requirements apply to all OPM arrangements that involve recruiting, including arrangements that support short-term programs.

- **Compliance Supplement:** For instructions on audits, Education directs colleges to the Compliance Supplement for information on compliance audit procedures. However, as we have described, the Compliance Supplement does not specifically direct auditors to ask college officials to identify all OPM arrangements for recruiting services, nor does it state that auditors must obtain information about how OPM recruiters are paid.

Education also provides information about the ban on incentive compensation and an overview of compliance audits and program reviews in the Federal Student Aid Handbook—a comprehensive annual guide for colleges on the regulatory and administrative requirements for federal student aid programs. While the handbook's section on the incentive compensation ban refers to Education's Dear Colleague Letter, it does not specify that arrangements between colleges and OPMs that conduct student recruiting are subject to the ban. It also does not inform colleges that such OPM arrangements are subject to Education's oversight and that these OPM contracts should be shared with Education staff and independent auditors for review.

Auditing officials told us that they rely on colleges to inform them of any arrangements that include student recruiting, but colleges may not always report OPM arrangements. Officials from two audit organizations told us that none of the colleges they audited informed them of any contracts with OPMs for recruiting services and an official from another audit organization provided the perspective that colleges run their online programs internally and do not contract with OPMs for student recruiting. However, publicly available information on OPM arrangements indicated that each of these organizations had audited colleges that in fact do have contracts with OPMs that often provide recruiting services. Auditing officials told us that college officials may not inform auditors of all OPM arrangements because college staff do not consider them relevant to a compliance audit. According to these officials, this may occur because college officials generally think about recruiting services provided more broadly at the college level and may not think to inform auditors of OPMs that provide recruiting services for individual programs. However, college officials are required to inform auditors of all OPM arrangements for recruiting services, including those for individual programs.

Similarly, during program reviews, Education also relies on colleges to inform the agency of any arrangements that include student recruiting. However, Education officials told us that it is common for college officials not to inform them of relevant OPM arrangements. For example, a college official responding to a request for information for a program review may not be aware of all OPM arrangements at the college that include student recruiting. Education officials provided details about a specific instance where college officials did not disclose an OPM arrangement during a program review, but Education later learned about the arrangement when the agency conducted a review of the OPM provider to learn more about its potential financial aid administration services. Through its review of the OPM, Education learned that the OPM conducted student recruiting for the college, yet few college staff knew details about the services the OPM provided.

Further, colleges may not report all relevant OPM arrangements subject to the incentive compensation ban, such as those that support short-term programs. Education officials told us that the agency has not yet conducted a program review where the college identified an OPM arrangement that supported such programs. Education officials said they are likely not notified of relevant OPM arrangements because their instructions to colleges do not clearly state that college officials are responsible for identifying all OPM arrangements that include recruiting services.

Education officials also told us that even when college officials inform them of relevant OPM arrangements, the agency has challenges obtaining complete information about the arrangements. Specifically, they said that some colleges have withheld or redacted relevant sections of OPM contracts during program reviews and have not provided information about OPM recruiter compensation. According to Education officials, this is because college officials incorrectly believed that the Dear Colleague Letter exempts OPM arrangements for student recruiting from Education's review if recruiting services are provided as part of a bundle of services.

Although Education does not consider tuition revenue-sharing payments to violate the incentive compensation ban if the conditions in the Dear Colleague Letter are met, Education is responsible for reviewing colleges' OPM arrangements to see if those conditions are met. Education officials described one instance where the agency had to notify a college that it would not be able to contract with an OPM for recruiting services if it did not provide the contract for agency review. In instances where colleges initially refused to provide their OPM contracts, Education officials told us they ultimately obtained them. Education officials said they believe their difficulties in obtaining information about colleges' OPM arrangements is likely because their instructions to colleges do not clearly state that these types of arrangements are subject to Education's review. Education officials told us that they need to improve their instructions to colleges to make it clear that colleges must provide any OPM contracts for recruiting, as well as information about how OPM recruiters are paid.

Education has assessed relatively few college arrangements with OPMs for compliance with the incentive compensation ban. According to Education's data, 16 completed compliance audits and five completed program reviews have reported incentive compensation findings since 2012, but none of these violations involved a college's arrangement with an OPM.[46] However, as colleges' use of OPMs has grown, Education has started to review more OPM arrangements. Education officials told us the agency is currently conducting five program reviews involving OPM arrangements, but these reviews are ongoing with no final decisions yet. Education officials said that they have learned a lot about the OPM

---

[46]Education's OIG reported that it conducted eight investigations of colleges that involved incentive compensation from fiscal year 2012 through 2020. One investigation was closed due to insufficient information and seven resulted in a civil settlement agreement. Out of those seven, only one involved a college's arrangement with an OPM for recruiting services.

industry in recent years and believe that additional instructions are needed for college officials.

The Higher Education Act requires Education to establish procedures for conducting program reviews and provide this information to colleges. Further, standards for internal control in the federal government state that managers should share quality information with external parties to help the agency achieve its objectives.[47] However, Education's instructions do not clearly communicate to colleges their responsibilities for sharing information about their OPM arrangements during compliance audits and program reviews. Without clear instructions to colleges that specifically state that colleges are required to inform auditors and Education staff about OPM arrangements that include recruiting and provide these contracts, there is a risk that Education may not identify potential violations of the incentive compensation ban.

## Conclusions

As enrollment in online education continues to grow, colleges are increasingly looking to OPM providers to help them develop and deliver their online programs. Available information suggests that a significant share of OPMs recruit students for enrollment in the online education programs they support, and that many OPMs are paid with a share of tuition revenue generated by these online programs. Education's 2011 Dear Colleague Letter contains important agency guidance for evaluating such arrangements to prevent prohibited incentive compensation payments and to safeguard against abusive recruiting practices. Determining whether colleges' arrangements with OPMs comply with the ban on incentive compensation requires independent auditors and Education's program review staff to ensure that these safeguards are in place and that OPM-employed recruiting staff are not receiving incentive payments. To protect students from predatory recruiting practices, it is important for Education to ensure that OPMs that provide recruiting services for colleges, as well as OPM recruiting staff, do not receive incentives based on their success enrolling students. Without clearer instructions to auditors and colleges about the information on OPM arrangements that must be assessed during compliance audits and program reviews, there is a risk that Education will not have the information it needs to detect incentive compensation violations.

---

[47]GAO-14-704G.

## Recommendations for Executive Action

We are making the following two recommendations to Education:

The Secretary of Education should provide additional instructions for inclusion in the Compliance Supplement to help auditors better identify and assess potential incentive compensation ban violations when a college contracts with an OPM. Additional instructions should prompt auditors to ask specifically about OPMs, direct auditors to obtain and assess compensation information for OPM staff who provide recruiting services, and reference relevant guidance including the 2011 Dear Colleague Letter. (Recommendation 1)

The Secretary of Education should provide additional instructions to colleges regarding the information they must provide about their OPM arrangements during compliance audits and program reviews. Additional instructions should explain that colleges are responsible for both identifying all OPM contracts that include recruiting, and then providing auditors and Education's program review staff with copies of those contracts and information on how covered OPM staff are compensated. (Recommendation 2)

## Agency Comments

We provided a draft of this report to the Department of Education for review and comment. In its comments, reproduced in appendix I, Education agreed with both recommendations. We also provided relevant sections of the report to LISTedTECH for review and comment, and LISTedTECH agreed that GAO accurately presented its information and had no technical comments.

In its formal comments, Education agreed that colleges are increasingly seeking out OPMs to help administer their online education programs and that this development presents challenges for the agency's oversight of the ban on incentive compensation. Education noted that colleges that contract with OPMs and auditors of those contracts should be aware of their responsibilities regarding the ban on incentive compensation.

In response to the first recommendation, Education agreed that the Compliance Supplement's treatment of the ban on incentive compensation can be strengthened and stated that it plans to propose revisions to the Compliance Supplement to OMB. Education noted that its proposed revisions will provide relevant guidance, including the 2011 Dear Colleague Letter. According to Education, proposed revisions will also suggest procedures for auditors to obtain and assess information about college or third party staff performing any functions covered under the ban, including student recruitment.

**Exhbit B**

In response to the second recommendation, Education stated that it will revise its instructions to colleges about program reviews and audits to improve the agency's enforcement of the ban on incentive compensation. According to Education, the agency's revised instructions will identify the types of information that colleges must provide about contracts with third parties—including contracts with OPMs for student recruiting services. Education also stated that it would reinforce for colleges that the ban on incentive compensation applies to all educational programs they offer.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies of this report to the Secretary of Education, appropriate congressional committees, and other interested parties. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (617) 788-0534 or emreyarrasm@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix II.

*Melissa Emrey-Arras*

Melissa Emrey-Arras
Director,
Education, Workforce, and Income Security

# Appendix I: Comments from the U.S. Department of Education



March 15, 2022

Ms. Melissa Emrey-Arras
Director, Education, Workforce, and Income Security Issues
Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Ms. Emrey-Arras:

On behalf of the U.S. Department of Education (Department), I write in response to the statements and recommendations made in the draft Government Accountability Office (GAO) report, *Higher Education: Education Needs to Strengthen Its Approach to Monitoring Colleges' Arrangements with Online Program Managers (GAO-22-104463)*.

We appreciate the opportunity to respond to this draft GAO report. In general, the Department agrees that colleges are increasingly seeking out third-party online program manager (OPM) providers to help them administer their online programs and that this development presents unique challenges and potential concerns. The Department takes the legal ban on incentive compensation seriously because of the potential harm to students that can result from the misuse of incentive compensation by institutions and their contractors.

The draft GAO report provides important information for the Department as it reviews its guidance on incentive compensation. While the work of GAO was limited to the incentive compensation ban as it applies to OPMs, the issues identified may have broader applicability to the other parties to the OPM contracts as well. The Department believes that institutions of higher education that contract with OPMs and auditors of those contracts should be aware of their responsibilities regarding the ban on incentive compensation for all third-party contracts.

The following are GAO's two recommendations from the report and the Department's response for each recommendation:

**Recommendation 1:** The Secretary of Education should provide additional instructions for inclusion in the Compliance Supplement to help auditors better identify and assess potential incentive compensation ban violations when a college contracts with an OPM. Additional instructions should prompt auditors to ask specifically about OPMs, direct auditors to obtain and assess compensation information for OPM staff who provide recruiting services, and reference relevant guidance including the 2011 Dear Colleague Letter.

**Exhbit B**

**Response 1:** The Department concurs with this recommendation. We agree that the Compliance Supplement's treatment of the ban on incentive compensation can be strengthened with respect to all third parties, including OPMs. The Department will propose revisions to the Compliance Supplement to the Office of Management and Budget (OMB). These proposed revisions will provide relevant guidance, including Dear Colleague Letter GEN-11-05. They will also suggest strengthened audit procedures for auditors to obtain and assess information for staff at the institution or a third party performing any functions covered under the ban on incentive compensation, including student recruitment. The Department notes that OMB makes the final determination on revisions that are made to the Compliance Supplement on an annual basis.

**Recommendation 2:** The Secretary of Education should provide additional instructions to colleges regarding the information they must provide about their OPM arrangements during compliance audits and program reviews. Additional instructions should explain that colleges are responsible for both identifying all OPM contracts that include recruiting, and then providing auditors and Education's program review staff with copies of those contracts and information on how covered OPM staff are compensated.

**Response 2:** The Department concurs with this recommendation. We agree to reinforce for institutions of higher education that the ban on incentive compensation applies to all educational programs that an institution offers and all contracts that an institution enters. This will help the institutions better understand what documentation must be maintained and provided to auditors and program reviewers. The Department will amend its procedures for program reviews and propose changes to the Compliance Supplement. These modifications will identify the types of information that institutions must provide about contracts with third parties during audits and program reviews to improve enforcement of the ban on incentive compensation. The information identified will address any third-party contracts that involve recruiting activities, such as OPMs.

Thank you for the chance to respond to the recommendations outlined in this draft GAO report.

Sincerely,

Richard Cordray
Chief Operating Officer
Federal Student Aid

**Exhbit B**

# Appendix II: GAO Contact and Staff Acknowledgments

| GAO Contact | Melissa Emrey-Arras, (617) 788-0534 or emreyarrasm@gao.gov |
|---|---|
| Staff Acknowledgments | In addition to the individual named above, Michelle St. Pierre (Assistant Director), Karissa Robie (Analyst in Charge), Jessica Ard, and Myra Francisco made key contributions to this report. Also contributing to this report were Andrew Bellis, James Bennett, Marcia Carlsen, Sarah Cornetto, Antonia Gordon, Gina Hoover, Kristy Kennedy, Vivian Ly, Kim McGatlin, Jean McSween, Mimi Nguyen, Michelle Philpott, Joy Solmonson, Rachel Stoiko, Anjali Tekchandani, Adam Wendel, Diana Vu, and Tatiana Winger. |

**Exhbit B**

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube.<br>Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts.<br>Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet:<br><br>Website: https://www.gao.gov/about/what-gao-does/fraudnet<br><br>Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, DC 20548 |
| **Strategic Planning and External Liaison** | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707<br>U.S. Government Accountability Office, 441 G Street NW, Room 7814,<br>Washington, DC 20548 |

