BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

EMILY NESTLER
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street NW
Washington, D.C. 20005
Telephone: (202) 305-0167
E-mail: emily.b.nestler@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Grand Canyon University, | No. 2:21-cv-177-SRB |
| Plaintiffs, | |
| v. | **Defendants' Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment and Memorandum in Support** |
| Miguel Cardona, in his official capacity as Secretary of Education, *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 1

II.  BACKGROUND ........................................................................................................ 2

     A.   Title IV Eligibility and Participation ......................................................... 2

     B.   Statutory and Regulatory Requirements Upon a School's Change in
          Ownership.................................................................................................... 5

     C.   Grand Canyon University ........................................................................... 6

III. STANDARD OF REVIEW ....................................................................................... 8

IV.  ARGUMENT .............................................................................................................. 9

     A.   The Department Acted Consistent with its Statutory Authority and
          Regulations to Make an Independent Determination as to Plaintiff's
          Nonprofit Status. ........................................................................................ 9

          1.   The HEA Authorizes the Secretary to Determine Whether a
               School is a "Nonprofit Institution" for Purposes of the Higher
               Education Act. ................................................................................. 9

          2.   The Decisions are Consistent with the Unambiguous Language
               of the Department's Regulations............................................... 10

          3.   Even if the Regulations were Ambiguous, the Department's
               Interpretation is Reasonable. ..................................................... 13

     B.   The Department's Determination that GCU is not a Nonprofit for
          Purposes of Title IV Participation was not Arbitrary and Capricious............. 14

               a. Analysis of Transaction Documents.................................... 15

               b. Analysis of Transaction Documents .................................... 17

               c. Consideration of IRS Grant of Tax-Exempt Status ........... 19

               d. Consideration of Assessment by Accrediting
               Agency ..................................................................................... 21

               e. Review was Consistent with the Department's Existing
               Practices................................................................................... 22

i

C.   The Decisions did not Impose Legislative Rules that Require Notice and Comment Rulemaking ......................................................................... 26

D.   The Department's Enforcement of the HEA does not violate Plaintiff's First Amendment Rights. ...................................................... 26

    1.   The Challenged Restriction is a Permissible Condition on the Receipt of Federal Funds ............................................................. 26

    2.   The Condition Would Survive First Amendment Analysis ................... 29

VI.   CONCLUSION ................................................................................................ 31

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Agency for Int'l Dev. V. All. For Open Soc. Int'l, Inc.*,
  570 U.S. 205 (2013) ............................................................................................. 28

*Airmark Corp. v. FAA*,
  758 F.2d 685 (D.C. Cir. 1985) ............................................................................ 26

*Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle*,
  829 F.2d 933 (9th Cir. 1987) ........................................................................ 11, 13

*Am. Acad. of Pain Mgmt. v. Joseph*,
  353 F.3d 1099 (9th Cir. 2004) ............................................................................ 29

*Am. Fed. of Teachers v. DeVos*,
  484 F. Supp. 3d 731 (N.D. Cal. 2020) ................................................................. 3

*Ass'n of Private Sector Colleges & Univs. v. Duncan*,
  681 F.3d 427 (D.C. Cir. 2012) ..................................................................... 3, 9, 19

*Becerra v. Azar*,
  950 F.3d 1067 (9th Cir. 2020) ............................................................................ 19

*Bolger v. Youngs Drug Prods. Corp.*,
  463 U.S. 60 (1983) ......................................................................................... 29, 30

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) ............................................................................................ 22

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'm of New York*,
  448 U.S. 557 (1980) ...................................................................................... 29, 31

*Colls. & Univs. v. Duncan*,
  870 F. Supp. 2d 133 (D.D.C. 2012) ...................................................................... 3

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) ...................................................................................... 11, 12

*Dep't of Comm. v. New York*,
  139 S. Ct. 2551 (2019) ........................................................................... 14, 15, 19

iii

*Dillmon v. Nat'l Tranp. Safety Bd.,*
   588 F.3d 1085 (D.C. Cir. 2009) ................................................................ 22

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 ....................................................................................14, 19

*F.C.C. v. Fox Telev. Stations., Inc.,*
   556 U.S. 502, 513 (2009)................................................................. 14, 23, 24

*F.E.R.C. v. Elec. Power Supply Ass'n,*
   136 S. Ct. 760 (2016) ...................................................................... 14, 15, 19

*Grand Canyon Univ. v. Cardona,*
   Case No. CV-21-00566, 2021 WL 5396090 (D. Ariz. Nov. 18, 2021);
   appeal filed, *Grand Canyon Univ. v. Cardona,* No. 21-17113. ....................................... 3

*Hemp Indus. Ass'n v. DEA,*
   333 F.3d 1082 (9th Cir. 2003) ................................................................ 26

*Hoffman Cap. Cities/ABC, Inc.,*
   255 F.3d 1180 (9th Cir. 2001) ................................................................ 29

*In re Duncan,*
   Case No. 2:11-BK-16577, 2012 WL 5462917 (Bankr. D. Ariz. Nov. 6, 2012).................. 11

*In re First Magnus Fin. Corp.,*
   403 B.R. 659 (D. Ariz. 2009)................................................................. 11

*In re R.M.J.,*
   455 U.S. 191 (1982) ............................................................................ 29

*Kisor v. Wilkie,*
   139 S. Ct. 2400 (2019) ......................................................................... 13

*M.M. v. School Dist. of Greenville,*
   303 F.3d 523 (4th Cir. 2002) ................................................................. 21

*Mountain Comms. for Fire Safety v. Elliot,*
   25 F.4th 667 (9th Cir. 2022)................................................................. 11

*Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs,*
   842 F. Supp. 2d 127 (D.D.C. 2012) ...................................................... 9

iv

*NLRB v. Bell Aeorspace Co.*,
　416 U.S. 267 (1974) ........................................................................ 23

*Occidental Eng'g Co. v. INS*,
　753 F.2d 766 (9th Cir. 1985) ............................................................ 9

*Perez v. Mort. Bankers Ass'n*,
　575 U.S. 92 (2015) .......................................................................... 12

*Reed v. Town of Gilbert*,
　135 S. Ct. 2218 (2015) .................................................................... 30

*Rust v. Sullivan*,
　500 U.S. 173 (1991) ................................................................... 28, 29

*Sector Coll. & Univs.*,
　110 F. Supp. 3d 176 (D.D.C. 2015) .............................................. 9, 19

*Sierra Club v. Mainella*,
　459 F. Supp. 2d 76 (D.D.C. 2006) ................................................... 9

*United States v. Martinez*,
　905 F.2d 251 (9th Cir. 1990) .......................................................... 11

*Zauderer v. Off. of Disciplinary Couns. of Supreme Court of Ohio*,
　471 U.S. 626 (1985) ........................................................................ 29

## **Statutes**

5 U.S.C. § 706 ............................................................................. 8, 14

20 U.S.C. § 1001 ...................................................................... 1, 3, 4

20 U.S.C. § 1002 ...................................................................... 3, 4, 9

20 U.S.C. § 1003 .................................................................... 2, 4, 10

20 U.S.C. § 1058 ............................................................................ 22

20 U.S.C. § 1094 ...................................................................... 4, 5, 9

20 U.S.C. § 1099 ...................................................................... 4, 22

20 U.S.C. § 1221 ............................................................................. 3

20 U.S.C. § 10001 ........................................................................................................................ 4

26 U.S.C. § 501 .......................................................................................................................... 21

Consolidated Appropriations Act 2021,
    Pub. L. No. 116-260, 134 Stat. 1182 (Dec. 27, 2020) ......................................................... 3

Higher Education Opportunity Act,
    Pub. L. No. 110-315, 122 Stat. 3078 (Aug. 14, 2008) ......................................................... 3

Title IV of the Higher Education Act of 1965,
    Pub. L. No. 89-329, 79 Stat. 1219 ....................................................................................... 1

**Rules**

Fed. R. Civ. P. 56 ....................................................................................................................... 8

**Regulations**

34 C.F.R. § 600.2 ................................................................................................................. *passim*

34 C.F.R. § 600.20 ........................................................................................................ 5, 6, 9, 13

34 C.F.R. § 600.31 ..................................................................................................... 5, 10, 12, 13

34 C.F.R. § 602.22 ..................................................................................................................... 22

34 C.F.R. § 668.14 ................................................................................................................4, 5, 6, 7

34 C.F.R. § 668.14 ................................................................................................................5, 6, 7

34 C.F.R. § 668.16 ..................................................................................................................... 14

34 C.F.R. § 668.71 ..................................................................................................................... 27

59 Fed. Reg. 22333 (Apr. 29, 1994) .......................................................................................... 12

75 Fed. Reg. 66832-01 (Oct. 29, 2010) ...................................................................................... 17

75 Fed. Reg. 42,190 (July 20, 2010) .......................................................................................... 13

76 Fed. Reg. 34448 (June 13, 2011) ............................................................................................ 4

84 Fed. Reg. 31392 (July 1, 2019) ............................................................................................... 4

85 Fed. Reg. 18,649 (Apr. 2, 2020) ..................................................................................... 13

**Other Authorities**

Dept. of Ed., Issue Paper 3: Gainful Employment (Session 1: Jan. 18-21, 2022),
    *available at* https://www2.ed.gov/policy/highered/reg/hearulemaking/
    2021/3gainfulemployment.pdf. ...................................................................................... 4

Grand Canyon Education Inc. (LOPE CEO Brian Mueller on Q4 2018
Results Earnings Call Transcript,
    *available at* https://seekingalpha.com/article/4242733-grand-canyon-education-inc-lope-
    ceo-brian-mueller-on-q4-2018-results-earnings-call-transcript. ............................................. 31

Written Testimony of Brian Galle to U.S. Dep't of Ed. (May 7, 2018),
*available at* https://edlabor.house.gov/imo/media/doc/GalleBrianTestimony042021.pdf... 27

Internal Rev. Proc. 2202-5 § 3.05,
    *available at* https://www.irs.gov/irb/2022-01_IRB#REV-PROC-2022-5 .......................... 20

IRS Databook, Table 12 (Oct. 1, 2020-Sept. 30, 2021,
    *available at https://www.irs.gov/pub/irs-pdf/p55b.pdf.* .................................................. 20

*Gov't Accountability Off., GAO-21-89, Higher Ed.: IRS and Education Could Better Address Risks
    Associated with Some For-Profit College Conversions,* at 41 (December 2020),
    *available at* https://www.gao.gov/assets/gao-21-8989.pdf ..................................................23

*The Future of Education – Trends, Costs & Technology,* the Motley Fool (Dec. 20, 2018),
    *available at* https://www.fool.com/investing/2018/12/20/the-future-of-education-trends-
    cost-technology.aspx ...................................................................................................... 30

U.S. Department of Education, 2017-2018 Federal Student Aid Handbook,
    (June 15, 2017). ............................................................................................................. 5

## I.     INTRODUCTION

This case challenges the Department of Education's (the "Department") authority to set the terms when a school receives federal funds under Title IV of the Higher Education Act of 1965 (the "HEA"), Pub. L. No. 89-329, 79 Stat. 1219 (codified as amended at 20 U.S.C. § 1001 *et seq*.). Under Title IV, the Department distributes billions of dollars through loan and grant payments for postsecondary education. To protect the integrity of Title IV, Congress sensibly requires the Department to ensure that all schools meet certain requirements to participate. In addition, because Congress recognized that different incentives come into play when a school operates for profit (as opposed to a nonprofit institution or a public institution), Congress imposed additional rules for proprietary institutions of higher education. Through the HEA, Congress tasked the Department with ensuring that a school meets Title IV's requirements and determining whether an institution is designated as a non-profit or proprietary institution of higher education for purposes of the program.

Plaintiff Grand Canyon University ("GCU") is a private university that had been owned by a for-profit entity, Grand Canyon Education, Inc. ("GCE") for nearly two decades, and operated as a proprietary institution during that time. In 2018, GCU changed its ownership structure—with an eye toward being reclassified as a nonprofit school. To that end, GCE created a new Arizona nonprofit entity, called Gazelle, and then GCE sold its assets (namely, the core assets of private University GCU) to that new entity of its own creation. Under the terms of the sale, the for-profit seller retained a strong foothold in the university. GCE remained the exclusive provider of certain services to the school, in exchange for approximately 60% of the school's revenue on an ongoing and captive basis. In addition, other aspects of the transaction (*e.g.*, a credit agreement whereby Gazelle remained indebted to GCE for the entire $800 million-plus sales price) and shared management (*e.g.*, GCE's CEO would also be Gazelle's President) left the seller and buyer deeply intertwined.

Upon its change in ownership, GCU sought to renew its eligibility for Title IV participation, and asked the Department to newly classify the school as a "nonprofit institution" for purposes of receiving student aid under Title IV. Based on a thorough review

of the transaction documents and other supporting information, the Department approved GCU's ongoing Title IV participation as a proprietary institution, but denied its application to convert to nonprofit status. In sum, the Department reasonably determined that GCU does not qualify as a nonprofit institution under the HEA, because the school's revenues were still flowing to its prior owner (a for-profit corporation) and ultimately to the benefit of GCE's shareholders. Importantly, to qualify under Title IV as a "nonprofit institution," a school must demonstrate, among other things, that "no part of [its] net earnings [] benefits any private shareholder or individual." 34 C.F.R. § 600.2(i); 20 U.S.C. § 1003(13).

Plaintiff's claims challenging the Department's decisions fail as a matter of fact and law: (1) the Department has authority to determine whether GCU is a nonprofit for purposes of Title IV, even if the IRS has separately granted it 501(c)(3) tax-exempt status—indeed, both the HEA and the Department's implementing regulations expressly contemplate the Department's independent analysis; (2) the Department's analysis was not arbitrary and capricious; (3) the Department's approach was not a policy change—rather, it was consistent with the process employed by the Department for years, as Plaintiff itself repeatedly acknowledged throughout the application period; (4) the Department's decisions did not "impose legislative rules that require notice and comment rulemaking"; and (5) Plaintiff does not have a First Amendment right to make misleading statements relating to its nonprofit status under Title IV.

Accordingly, the Court should grant summary judgment for Defendants.

## II.     BACKGROUND

### A.     Title IV Eligibility and Participation

The Higher Education Act was intended "to strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education," by (among other things) increasing federal money given to institutions of higher education and giving low-interest loans to students. 79 Stat. 1219 (1965).[1] Under

---

[1] The Higher Education Act has been reauthorized a number of times, including most recently

Title IV of the HEA, "Congress provides billions of dollars through loan and grant programs to help students pay tuition for their postsecondary education." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 433 (D.C. Cir. 2012). The Secretary has "broad authority" to regulate programs administered by the Department, including Title IV. *Am. Fed. of Teachers v. DeVos*, 484 F. Supp. 4d 731, 736 (N.D. Cal. 2020) (citing 20 U.S.C. § 1221e-3).

"To participate in Title IV programs—*i.e.*, to be able to accept federal funds—a postsecondary institution . . . must satisfy several . . . requirements." *Ass'n of Private Sector Colleges & Univs.*, 681 F.3d at 433-34. To begin with, each school must be an "institution of higher education" under the HEA. 20 U.S.C. § 10001. Section 101 of the Act provides the principal definition of that term, which it limits to "public or other nonprofit institutions." 20 U.S.C. § 1001(a)(4). "Proprietary institutions" and "postsecondary vocational institution[s]," *id.* § 1002(b) & (c), may also participate in Title IV programs, under different terms, but are not eligible for most other programs authorized by the HEA. *See Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 133, 138-41 (D.D.C. 2012) (discussing evolution of these definitions through amendments to the HEA).[2]

The HEA defines "[t]he term 'nonprofit' as applied to a school, agency, organization, or institution" as one that is "owned and operated by one or more nonprofit corporations or

---

by the Higher Education Opportunity Act, Pub. L. No. 110-315, 122 Stat. 3078 (Aug. 14, 2008), which authorized most of the relevant programs through 2015. Congress continues to provide appropriations for Higher Education Act programs under a variety of appropriations legislation and continuing resolutions—including, for example, the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 1598-1612 (Dec. 27, 2020).

[2] Classification as a proprietary institution may impact an institution's eligibility for other types of funding. For example, Congress made clear that some coronavirus pandemic relief funds are only available to public, nonprofit, or postsecondary vocational institutions of higher education, and directed smaller tranches of funding for proprietary institutions. *See* Coronavirus Supplemental Appropriations, § 314(a)(1), (4), 134 Stat. 1932-33; American Rescue Plan, § 2003, 135 Stat. 23. In separate litigation, Plaintiff is challenging the Department's determination that it is only eligible to receive pandemic relief funds as a proprietery institution. The District Court dismissed Plaintiff's claims. *See Grand Canyon Univ. v. Cardona*, No. CV-21-00566, 2021 WL 5396090 (D. Ariz. Nov. 18, 2021). Plaintiff filed an appeal that is pending at the Ninth Circuit. *See Grand Canyon Univ. v. Cardona*, No. 21-17113.

associations, no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual." 20 U.S.C. § 1003(13). The Department's regulations implement this provision of the HEA by further clarifying that:

> [F]or purposes of [institutional eligibility under the Higher Education Act], a "nonprofit institution" is an institution that:
>
> (i) Is owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private shareholder or individual;
>
> (ii) Is legally authorized to operate as a nonprofit organization by each State in which it is physically located; and
>
> (iii) Is determined by the U.S. Internal Revenue Service to be an organization to which contributions are tax-deductible in accordance with section 501(c)(3) of the Internal Revenue Code.

34 C.F.R. § 600.2.

Some requirements for Title IV participation apply to all schools, regardless of whether they are nonprofits or proprietary. For example, all institutions must be accredited by a nationally-recognized accrediting agency. 20 U.S.C. §§ 1001(a)(5), 1002(b)(1), 1002(c)(1)(A). And all institutions must demonstrate their "financial responsibility." *Id.* § 1099c(a). In addition, some Title IV eligibility requirements apply only to proprietary schools. They must not derive more than 90% of their revenue from Title IV funds, *id.* § 1094(a)(24). And the Department is engaged in the rulemaking process to reinstate gainful employment requirements for proprietary institutions—which, if implemented, could require them to demonstrate certain debt-to-earnings ratios for their students upon graduation. *See* Dept. of Ed., Issue Paper 3: Gainful Employment (Session 1: Jan. 18-21, 2022), *available at* https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/3gainfulemployment.pdf. Similar gainful employment regulations were issued in 2011, 76 Fed. Reg. 34448 (June 13, 2011), and were rescinded in 2019, 84 Fed. Reg. 31392 (July 1, 2019).

A school may "participate in . . . Title IV, HEA program[s] . . . only if the institution enters into a written program participation agreement with the Secretary." 34 C.F.R. §

4

668.14(a)(1); 20 U.S.C. § 1094. The program participation agreement "conditions the [school's] initial and continued participation" in Title IV programs upon compliance with the applicable regulations "and any additional conditions specified in the program participation agreement that the Secretary requires the institution to meet." 34 C.F.R. § 668.14(a)(1). Because some conditions only apply to for-profit colleges, the Secretary must make a determination about whether the school should be classified as nonprofit or proprietary institution at the outset, in order to establish the terms of a school's program participation agreement.

## B.   Statutory and Regulatory Requirements Upon a School's Change in Ownership

When a school that has been participating in Title IV programs undergoes "a change in ownership that results in a change in control," its program participation automatically terminates and it ceases to qualify as an eligible institution. 34 C.F.R. § 668.14(g)(1). A "change in ownership resulting in a change in control" may include, among other things: "[t]he sale of the institution"; "[a] transfer of assets that comprise a substantial portion of the educational business of the institution . . ."; and/or "a change in status as a for-profit, nonprofit, or public institution." *Id.* § 600.31(d); *see also id.* § 600.20(b)(2)(i). Upon such a change in ownership, the school must submit a new application to the Secretary if it wishes to renew its participation. *Id.* § 600.31(a)(1); *Id.* § 600.20(b)(2)(B) (requiring reapplication to "[r]establish [Title IV] eligibility and certification as a private nonprofit, private for-profit, or public institution following a change in ownership that results in a change in control as described in § 600.31").[3]

Through this reapplication process, the school can "[re]establish [its] Title IV eligibility and certification" by demonstrating "to the Secretary . . . that the institution continues to meet the [relevant] requirements" *Id.* § 600.20(b)(2)(i). In addition, if the school applies to participate

---

[3] Potential buyers often wish to know if the Department sees any impediment to their continued eligibility for Title IV after the anticipated change in ownership and what conditions may be imposed for continued participation. As a courtesy, and at the institution's request, the Department may conduct a "preacquisition review." This is a voluntary process that does not result in a final agency decision. *See* U.S. Department of Education, 2017-2018 Federal Student Aid Handbook, vl. 2, ch. 5, at 2-121 (June 15, 2017). Only after the transaction occurs does the Department make a final decision on a Title IV application. *Id.*

in the Title IV program as a nonprofit institution, it must demonstrate that its new ownership structure satisfies the definition of a "nonprofit institution" under the HEA and its implementing regulations. *Id.* Depending on the circumstances, the Secretary may approve a proprietary institution's eligibility to continue participation in Title IV, while denying the college's request to participate as a nonprofit institution for purposes of the program.

If a school "under [] new ownership submits a 'materially complete application' . . . no later than 10 business days after the day the change [in ownership] occurs," then "the Secretary may continue the institution's participation in [Title IV] programs on a provisional basis" while evaluating the application. *Id.* § 600.20(g)(1); *see id.* §600.20(h). Unless and until the Secretary approves a school's application for nonprofit status, the Department continues to treat the school as a proprietary institution for Title IV purposes. If the Secretary approves the school's request to be treated as a nonprofit institution, the Secretary then considers the school a nonprofit for purposes of its participation in Title IV.

## C.      Grand Canyon University

GCU was founded in 1949, and sold to GCE in 2004. *See* Compl. ¶ 1. Since 2004, it has participated in Title IV funding programs as a proprietary institution, as defined in Section 102(b) of the Higher Education Act.

In 2014, GCU's Board of Trustees formed a new Arizona nonprofit entity, Gazelle University ("Gazelle"),[4] for the purposes of facilitating GCU's conversion to nonprofit status. AR-F-0066-0077. Gazelle would ultimately purchase all GCU-related "real property . . . as well as tangible and intangible academic-related assets . . . from GCE" for approximately $853 million. AR-A-0002. As part of that sale, Gazelle agreed to pay approximately 60% of the school's adjusted gross revenue to the for-profit seller (GCE) on an ongoing basis, for the provision of various services. AR-A-0003. On November 9, 2015, the IRS approved Gazelle's 501(c)(3) tax-exempt status. AR-F-0607-0608.

After preliminarily agreeing upon the terms of purchase, GCU submitted a request for

---

[4] Gazelle later changed its name to GCU. Consistent with the Court's prior treatment, ECF 55 at 2, this memorandum only refers to Gazelle when describing the sale of GCU in 2018.

preacquisition review to the Department on January 18, 2018. AR-A-0001. On July 1, 2018, notwithstanding the fact that GCU had not yet received a substantive response to that request, the buyer and seller completed the sale. *Id.* Within ten business days, GCU submitted a materially complete application to continue its participation in Title IV programs, and it sought a change in status to be deemed a nonprofit institution under Section 101 of the HEA. *Id.* In accordance with the regulatory authority, the Department continued GCU's Title IV participation while the agency evaluated that application. AR-A-0002.

On November 16, 2019, the Department approved GCU's ongoing Title IV participation as a proprietary institution, but denied its application to convert its status to a nonprofit institution of higher education. AR-A-0016-0017. The Department offered two primary reasons for the denial. First, the Department examined the transaction documents for the change-in-ownership (including, but not limited to, the revenue-sharing servicing agreement), and concluded that their terms would cause a substantial portion of the school's net earnings to benefit the for-profit seller on an ongoing basis. AR-A-0015. Second, the Department concluded that overlap between management of the for-profit seller and the non-profit buyer—notably, including the fact that the seller's CEO would serve as the institution's President—indicated that GCU would still be effectively operated for the benefit of the for-profit corporation. AR-A-0015-0016. The agency acknowledged that the IRS had granted GCU tax-exempt status, but explained that determinations by the IRS and others "are not the sole determining factors" in the Department of Education's analysis, "nor does the Department need to defer to those determinations." AR-A-0014-0015. The agency further noted that "the IRS approval was issued three years prior to the" transaction the Department of Education reviewed. *Id.* Moreover, the agency found that the IRS had not "conducted a comprehensive review" of the 2018 transaction, and "[u]nlike the IRS's initial grant of tax-exempt status, the Department's determination of nonprofit status considers the structure and planned operations of the institution when its owner(s) apply for that change of status." *Id.* Finally, the Department stated that GCU "must cease any advertising or notices that refer to its 'nonprofit status'" because "[s]uch statements are confusing to students and the public,

who may interpret such statements to mean that the Department considers GCU a nonprofit under its regulations," and made clear that it "does not take a position regarding statements that GCU may make about its IRS status as a 501(c)(3) tax exempt organization." AR-A-0017.

GCU then proposed amending the servicing agreement with GCE, which would have slightly modified its terms, AR-A-0020-0022, and sought reconsideration, which the Department denied on January 12, 2021. AR-A-0019. The amended terms changed the revenue-sharing structure somewhat, but not materially, and overall the revised terms did not change "the basic structure whereby a substantial portion of GCU's revenues benefits GCE." AR-A-0035. Thus, in denying reconsideration, the agency reiterated the reasoning in its November 2019 letter, and explained that GCU's 2018 change in ownership still resulted in "taking a fully integrated proprietary institution and separating its academic and campus structure into a nonprofit entity," while "retaining" various "'servicing' functions in the publicly-traded for-profit former owner." AR-A-0028-29. The agency again explained that its review differed from "the IRS's initial grant of tax-exempt status" because "the Department's determination of nonprofit status considers the structure and planned operations of the institution when its owner(s) apply for that change of status" and the agency "seeks to ensure that a nonprofit institution's revenues . . . are primarily devoted to the mission of the school and not to other parties, including . . . the prior owner and its shareholders." AR-A-0035. Accordingly, the Department would continue to classify GCU "as a proprietary institution" for purposes of its Title IV participation. AR-A-0037.

On February 2, 2021, Plaintiff filed the instant case, challenging the Department's November 6, 2019 and January 12, 2021 decisions (collectively, the "Decisions") under the Administrative Procedure Act ("APA") and the First Amendment.

## III.   STANDARD OF REVIEW

The APA provides that courts "shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When reviewing agency action under the APA, courts do not apply the Fed. R. Civ. P. 56 analysis for determining whether a genuine issue of material fact

exists "because of the limited role of a court in reviewing the administrative record." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006); *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985). Rather, "[u]nder the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Sierra Club*, 459 F. Supp. 2d at 90 (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). "[T]he district court acts like an appellate court, and the 'entire case' is 'a question of law.'" *Nat'l Law Ctr. on Homelessness v. U.S. Dep't of Veterans Affs.*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012).

## IV.   ARGUMENT

### A.   The Department Acted Consistent with its Statutory Authority and Regulations to Make an Independent Determination as to Plaintiff's Nonprofit Status.

#### 1.   The HEA Authorizes the Secretary to Determine Whether a School is a "Nonprofit Institution" for Purposes of the Higher Education Act.

The Secretary has broad authority to issue and implement regulations that "advance[] the purposes of both the Higher Education Act and Title IV (i.e., a statute and program that is administered and managed by the Department)." *Ass'n of Priv. Sector Coll. & Univs.*, 110 F. Supp. 3d 176, 199 (D.D.C. 2015) (citing 20 U.S.C. §§ 1221e-3 & 3474). Congress expressly authorized the Secretary to make determinations about schools' eligibility to participate in Title IV programs, and to set the terms of each school's participation. 20 U.S.C. § 1094. Congress also made clear that it is the Department's role to ensure that the terms of each school's Title IV participation comport with the HEA's eligibility requirements—including, when deemed applicable, HEA requirements that apply only to proprietary institutions. *See* 20 U.S.C. § 1002.

Consistent with this authority, the Department promulgated longstanding regulations that set forth the "notice and application procedures for establishing, maintaining, or expanding institutional eligibility and certification," 34 C.F.R. § 600.20, and a reapplication process that applies when a school undergoes a "change in ownership resulting in a change in control." *Id.* § 600.31(a). Because different statutorily-mandated terms apply depending on

whether the school is a nonprofit institution or proprietary institution, the Department necessarily determines which status best characterizes the school at the time of its application. In making that determination, the Secretary applies the definition of "nonprofit institution" set forth in the HEA and its implementing regulations. 20 U.S.C. § 1003(13); 34 C.F.R. § 600.2.

Based on this established statutory and regulatory framework, there can be no doubt that the Secretary has authority to make determinations about a school's appropriate classification to participate in Title IV. Yet, Plaintiff contends the Department acted contrary to law because "[t]he definition of nonprofit institution at 34 C.F.R. 600.2 cannot be read to give the Secretary authority to determine nonprofit status." Pl's Mot. at 10. Plaintiff fails to recognize that the Department's authority derives from its statutory mandate to set the terms for each school's participation in Title IV, which necessarily includes determining whether the school is subject to the requirements applicable to a nonprofit or to a proprietary institution.

2.    The Decisions are Consistent with the Unambiguous Language of the Department's Regulations.

Under the HEA, "[t]he term 'nonprofit' as applied to a school, agency, organization, or institution" means one that is "owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual." 20 U.S.C. § 1003(13). To implement this provision, the Department's regulations set forth three elements that must be met in order for a school to be a "nonprofit institution." The school must be:

> "(i) [] owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private shareholder or individual;
>
> (ii) [] legally authorized to operate as a nonprofit organization by each State in which it is physically located; *and*
>
> (iii) [] determined by the U.S. Internal Revenue Service to be an organization to which contributions are tax-deductible in accordance with section 501(c)(3) of the Internal Revenue Code.

34 C.F.R. § 600.2 (emphasis added).

10

Section 600.2 has three subparts that are connected by the word "and." This means that, for an institution to be a "nonprofit" for purposes of the HEA, the school must satisfy all three elements—*i.e.*, it must show that it has tax-exempt status under subpart (iii) *and* it must satisfy subparts (i) and (ii) in addition to that. Use of the word "and" to include all subparts "is one of the clearest and easiest statutory principles to apply." *In re Duncan*, No. 2:11-BK-16577, 2012 WL 5462917, at *3 (Bankr. D. Ariz. Nov. 6, 2012); *see also In re First Magnus Fin. Corp.*, 403 B.R. 659, 665 (D. Ariz. 2009) (holding that the connector "and" requires that both parts of a subsection must exist).[5]

Ignoring this plain language, Plaintiff argues that an IRS grant of 501(c)(3) tax-exempt status alone "controls nonprofit status for Title IV participation." Pl.'s Mot. at 12. To the contrary, the plain language of Section 600.2 clearly aligns with the Department's approach. Plaintiff's interpretation would render parts (ii) and (iii) of the definition in Section 600.2, as well as the word "and," meaningless—contrary to the well-established maxim of statutory interpretation that courts "should attempt to give meaning and effect to every word, clause and section of a regulation." *United States v. Martinez*, 905 F.2d 251, 255 (9th Cir. 1990) ("[A] court should not interpret a statute to render meaningless certain parts of that statute."); *Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 943 (9th Cir. 1987) ("[O]ne provision should not be interpreted in a way which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless."). Moreover, Plaintiff's myopic focus on part (iii) of the definition gets it backward, given that part (i) tracks the language of the statute. *See* 20 U.S.C. § 1003(13).

Because the language of Section 600.2 is clear, Plaintiff's argument fails from the start. When the "words of a [regulation] are unambiguous, then [the] first canon [of relying on the text of the statute or regulation] is also the last: judicial inquiry is complete." *Mountain Comms.*

---

[5] Plaintiff itself previously recognized that the Department considers all three factors. *See* AR-J-0079 ("To our knowledge, the Department has never published any [policy] on any *other* factors that [it] would consider in assessing whether an institution qualifies as a nonprofit entity for Title IV purposes *beyond the three factors above*." (emphasis added)).

*for Fire Safety v. Elliot*, 25 F.4th 667, 676-77 (9th Cir. 2022) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)). "That is so because '[o]nly the text of a regulation goes through the procedures established by Congress for agency rulemaking. And it is that text on which the public is entitled to rely.'" *Id.* (quoting *Perez v. Mort. Bankers Ass'n*, 575 U.S. 92, 131 (2015) (Thomas, J. concurring)). Since the regulation is unambiguous, the Court need look no further.

Still, Plaintiff is wrong to argue that the Department's interpretation of Section 600.2 "contravenes" its other change-in-control regulations.  Pl.'s Mot. at 11. Plaintiff misconstrues the fact that the regulations list "a change in status as a for-profit, nonprofit, or public institution" as one of the  events that triggers a school's requirement to reapply for Title IV eligibility. *Id.* (citing 34 C.F.R. § 600.31(d)(7)). Plaintiff incorrectly argues that this means a change in the institution's classification as a "nonprofit institution" for Title IV purposes has already occurred prior to the Department's review. *Id.* But the regulatory history makes clear that the triggering event listed in Section 600.31 refers to an institution's change in IRS tax-exempt status—not its classification as a "nonprofit institution" for Title IV purposes (which is a determination that can only be made by the Department after it reviews the school's application). As the Department explained during the rulemaking process, "[t]he Secretary considers it reasonable to treat changes in business form [to a 501(c)(3)] as a significant change in control *warranting the same scrutiny section 498(i) of the HEA dictates for other, perhaps far less consequential changes in governance by schools*." 59 Fed. Reg. 22333 (emphasis added).[6]  In other words, the Department included a change to 501(c)(3) status as triggering event for the very purpose of ensuring that the Department would conduct the same independent examination that it applies to other changes in control—*e.g.*, the analysis informed by the three-prong test set forth in Section 600.2—regardless of whether the other types of changes in ownership listed in 34 C.F.R. § 600.31(d) are even at play. The fact that a school in that situation would already have demonstrated it satisfies one prong of that test (tax-exempt status) does not

---

[6] The Department further noted that "although a corporation may affect the change in form from taxable to tax-exempt, nonprofit status with little formality . . . *these consequences of the change* make it a change cognizable under Section 498(i) of the HEA." *Id.* (emphasis added).

somehow eliminate its requirement to meet the other two prongs. Rather, it is possible—and indeed sensible—to interpret the Sections 600.2 and 600.31 "so that that they do not conflict and so that both provisions serve a purpose." *Alaska Fish & Wildlife Fed'n*, 829 F.2d at 943.[7]

### 3.   Even if the Regulations were Ambiguous, the Department's Interpretation is Reasonable.

Even assuming *arguendo* that the applicable regulations were ambiguous, the Department's interpretation was reasonable. For the reasons discussed above, the Department's interpretation of Section 600.2 is the product of its "fair and considered judgment" about when a school can be classified as a "nonprofit institution" under the HEA. And examination by the Department ensures the integrity of the HEA's requirements for proprietary institutions, thereby serving their statutory purpose of preventing program weaknesses and abuse among for-profit institutions. Thus, the Department's interpretation of its regulations is entitled to deference. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019).

In any event, the Department's interpretation of its regulations is the most reasonable interpretation of those provisions. It would make no sense for the HEA to require schools to submit applications to the Department upon a change in control, 34 § 600.31(a)(1); *id.* § 600.20(b)(2)(B), and to require the Department to set the terms of the school's Title IV program participation, *id.* § 600.20(b)(2)(i), while at the same time eliminating any discretion

---

[7]Plaintiff also points to the Department's 2010 amendment of Section 600.2, which added a distinct subsection to address nonprofit status for foreign institutions. Pl.'s Mot. at 13. Plaintiff is wrong to argue that the nonprofit test for foreign institutions somehow maps onto (and supersedes) the Regulation's separate test for domestic institutions. The Department set forth a different test to consider foreign institutions because they are not similarly situated, given the array of distinct concerns at stake when foreign regulatory bodies are also involved. *See* Fed. Reg. 42,190, 42,192 (July 20, 2010). Similarly, Plaintiff's reliance on the Department's recent removal of redundant language from Section 600.2, which merely corrected what was obviously a drafting error, *id.*, also is a red herring. *See* 85 Fed. Reg. 18, 649 (Apr. 2, 2020). That identical language had inadvertently been copied in the course of adding the foreign institution subsection, and was never intended to effect a substantive change, *compare* 34 C.F.R. § 600.2 (effective Sept. 8, 2006 to July 1, 2010), *with* 34 C.F.R. § 600.2 (effective July 1, 2011); *see also* 75 Fed. Reg. 42,190. 42,292, 42,230 (July 20, 2010) (discussing forthcoming amendments to Section 600.2 without proposing the redundant language would be included.).

for the Department to scrutinize which eligibility requirements apply for purposes of that program participation. Surely the Department should not—and cannot—be required to classify a school as a nonprofit, even if it is readily apparent to the Department that the school actually operates for the benefit of a private third-party. That outcome would contravene Congress's mandate that: "the term 'nonprofit' as applied to a school, agency, organization, or institution means a school, agency, organization, or institution owned and operated by one or more nonprofit corporations or associations, *no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual*." 20 U.S.C. § 1003(13) (emphasis added).

The purpose of the Title IV application (and reapplication) process is for the Department to ensure program integrity and that the terms of each school's program participation adequately protect students and the public. *See generally* 34 C.F.R. § 668.16. The Department's independent review as to whether a school qualifies as a non-profit for purposes of the HEA is a reasonable mechanism to serve that statutory purpose.

**B.** **The Department's Determination that GCU is not a Nonprofit for Purposes of Title IV Participation was not Arbitrary and Capricious.**

In the alternative, Plaintiff argues that if the Department had authority to make a determination as to GCU's nonprofit status for purposes of Title IV participation, the Decisions were "arbitrary and capricious." On the contrary, the Decisions were reasonable and consistent with APA standards.

The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). Courts' review under this directive is narrow and deferential. *See Dep't of Comm. v. New York*, 139 S. Ct. 2551 (2019). The Court "must uphold a [decision] if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *F.E.R.C. v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). "Th[is] requirement is satisfied when the agency's explanation is clear enough that its path may reasonably be discerned," *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125, even where an agency's decision is "of less than ideal

14

clarity," *F.C.C. v. Fox Telev. Stations., Inc.*, 556 U.S. 502, 513 (2009). The Court cannot "ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *Elec. Power Supply Ass'n*, 136 S. Ct. at 782. Nor may the Court "substitute [its] judgment for that of the [agency]." *Dep't of Commerce*, 139 S. Ct. at 2569. The Court is also prohibited from "second-guessing the [agency]'s weighing of risks and benefits and penalizing [it] for departing from the . . . inferences and assumptions" of others. *Id.* at 2571. The challenged Decisions meet this deferential standard.

The Department examined the relevant considerations and articulated a satisfactory explanation for the decision. Because Plaintiff readily met the second and third prongs of the Department's definition of a "nonprofit institution," discussed above, the Department explained that its analysis focused on the remaining issue (whether GCU is operated by a nonprofit and whether its net earnings benefit any private shareholder or individual)"—*i.e.*, the first prong. AR-A-0002-0010. To make that determination, the Department conducted an in-depth analysis of the relevant considerations, including: the transaction documents that govern Plaintiff's corporate structure; valuation reports from consulting firms that were prepared for Plaintiff to purportedly support the legitimacy of that structure; the applicable Title IV regulations that govern nonprofit status for purposes of Title IV; and relevant authority interpreting a similar standard from the Internal Revenue Code. *See* AR-A-0010. The Department also considered the fact that the IRS had granted Plaintiff 501(c)(3) tax exempt status, but determined that its own review standards for nonprofit status were distinguishable and warranted a different result for purposes of Title IV participation.

*a.*     *Analysis of Transaction Documents.* The Department provided a detailed description and analysis of: (1) the Asset Purchase Agreement, which set the terms for Gazelle/GCU to acquire the school's assets from GCE, AR-B-0007-0059; (2) the Credit Agreement, which structured the purchase through a Senior Secured Note with GCE as the lender, AR-B-1355-1441; and (3) the Master Services Agreement (the "MSA"), which set up a revenue-sharing agreement through which GCE is guaranteed to continue to providing certain services to Gazelle/GCU in exchange for approximately 60% of the school's adjusted gross

revenue, AR-B-1279-1354, including under the amended terms that were presented upon reconsideration. AR-A-0021. The MSA also sets an initial 15-year term for this revenue-sharing arrangement, with automatic renewals every five years into perpetuity, and imposes punishing fees for termination. AR-A-0002-0004, 0012-0016; AR-A-0021.

Based on its careful analysis of these materials, the Department reasonably "concluded that the primary purpose of the MSA, and by extension the Transaction, was to drive shareholder value for GCE with GCU as its captive client—potentially in perpetuity." AR-A-0012; AR-A-0024. In particular, the Department expressed concern that "[d]espite GCE only taking on the responsibilities of 28% of the operating costs, 60% of the gross adjusted revenue from the Institution will be paid to GCE under the MSA" and "[w]hen payments on the Senior Secured Note are included in the analysis, GCE will be receiving approximately 95% of Gazelle's revenue." AR-A-0014. Under these circumstances, it was reasonable to conclude that "if revenue increases at a rate faster than operating costs, GCE has the potential to be paid even significantly higher amounts over the costs of the services it provides. Therefore, instead of the increased revenue being used for GCU's exempt purpose of providing education, the additional revenues would benefit the shareholders of GCE." *Id.*; AR-A-0021.[8]

In addition, the Department concluded that overlap between the management of GCE and GCU indicated that GCU would still effectively be operating under control of the for-profit seller—most notably the fact that the same person (Brian Mueller) would continue to serve as both GCE's CEO and GCU's President, in addition to his being a GCE shareholder. AR-A-0015-16. In light of "the breadth of the services provided under the MSA" and the "obviously conflicting loyalties at stake," the Department reasonably concluded that Mr. Mueller was not insulated from conflicts, despite some limited protections put into place. *Id.*; *see also* AR-A-0036. In sum, against the backdrop of the overwhelming benefits flowing to

---

[8] While Plaintiff proposed some minor adjustments to the revenue-sharing agreement when seeking reconsideration, the Department found that "[t]he proposed revised terms for the arrangement . . . do not change the fact that most of the revenue being generated by Gazelle/GCU is going out the door to another entity—GCE—for the benefit of its shareholders." AR-A-0032.

GCE under the MSA and the credit agreement, Mr. Mueller's conflict of interest was yet another factor that confirmed the Department's determination that GCU should not be classified as a nonprofit institution for Title IV purposes. AR-A-0015; AR-A-0036.

Notably, the Department did not "condition GCU's nonprofit status on removing its chosen President," as Plaintiff suggests. Pl.'s Mot. at 22. Indeed, the Department made clear that it was not directing GCU to remove Mr. Mueller as President of the school. Since the Department's only concern was Mr. Mueller's dual roles, it explained that "nothing would prevent [him] from severing ties with GCE if [he] and (and the GCU Board) thought it was more important for [him] to stay with GCU instead of serving in two potentially conflicting positions." AR-A-0036; *see* 75 Fed. Reg. 66832-01 (explaining intent of "nonprofit institution" definition in Section 600.2 "is not to interfere with the academic decision-making process" but rather to "ensure the integrity of the Federal Programs, including the title IV, HEA programs"). Notwithstanding these concerns, Mr. Mueller chose to continue in both positions.

   *b.   Analysis of Plaintiff's Expert Reports.* The Department also carefully considered the valuation reports that Plaintiff submitted from Barclays Capital Inc. ("Barclays") and Deloitte Tax LLP ("Deloitte"), which were commissioned to support the transaction. AR-A-004-008 (discussing AR-C-0001-0042 and AR-C-0057-00140). The Department identified multiple flaws in those reports, and also noted that the credibility of those reports was questionable in light of the fact that "opinions in key areas appear to have been based on information supplied by GCE management." AR-A-0009. Based on those considerations and its thorough review, the Department reasonably concluded that nothing in those reports undermined its view that GCU was structured for the benefit of GCE's shareholders.[9]

   The Department also extensively reviewed supplemental economic studies that

---

[9] Contrary to Plaintiff's assertion, the Department's analysis was not based on "mathematical errors." Pl.'s Mot. at 23. The Department did not find that GCU's "operating expenses" increased as a result of the transaction. Rather, the Department noted, based on the Barclays report, that the costs to operate GCU "increased from $810 Million to $1.496 Billion . . . *solely as a result of the Service Fees paid to GCE.*" AR-A-0005. In other words, the costs to the University rose dramatically, even if the underlying expenses remained the same.

Plaintiff provided in support of its application for reconsideration, which were from Deloitte and BKD CPAs & Advisors ("BKD"). AR-A-0024 (discussing AR-C-0224-0306 and AR-C-0316-0459). The Department provided detailed explanation as to why nothing in those reports demonstrated that the revenue-sharing arrangement between GCE and GCU "potentially into perpetuity, constitutes anything other than a continuing revenue stream to its former owner GCE, the primary purpose of which is to drive shareholder value for GCE." AR-A-0024.

In particular, the Department explained that both Deloitte's and BKD's studies were based on transfer pricing methods—which, as described in the reconsideration decision, are methods that "allow[] for the establishment for the goods and services exchanged between a subsidiary, an affiliate, or commonly controlled *companies that are part of the same larger enterprise* [which] can lead to tax savings for corporations." AR-A-0025 (emphasis added). The Department reasonably concluded that the transfer pricing approach was inapt here, where the entire question at hand is whether the service agreement is consistent with the behavior of what should be two financially *independent* entities. *Id.* As the Department explained: "Here, the issue is not whether two controlled parties have properly allocated income and costs between themselves for tax and accounting purposes." *Id.* Instead, "the issue is whether requiring GCU to actually pay out to GCE, an independent entity, a substantial share of its revenues (*i.e.,* actual money out the door, not just a paper exercise of putting dollars in one column or another for accounting and tax purposes) . . . is the type of benefit that disqualifies GCU from being recognized by the Department as a nonprofit institution." *Id.*; *see also* AR-A-0032 ("The Department located no authority, nor have either Deloitte or BKD cited any sources, that support a profit-splitting transfer pricing method as the correct methodology to evaluate a transaction in which one of the parties is organized as a nonprofit entity under state law."). It was reasonable for the Department to consider this important distinction. Indeed, if anything the fact that Plaintiff proffers the transfer pricing studies at all, demonstrates that Plaintiff conceives of GCU and GCE as a common enterprise.

Plaintiff largely ignores this aspect of the Department's decision and fails to explain why Plaintiff relied only upon a methodology typically reserved for controlled entities, instead

of one for independent contractual parties. Instead, Plaintiff argues that the Department "misapplied tax law" by disagreeing with "hyper-technical" aspects of its experts' transfer pricing analysis. Pl.'s Mot.. at 27-29. This misses the point. The Department's decision was not ultimately based on its disagreement with the technical aspects of Plaintiff's transfer pricing analysis, but rather on its view that transfer pricing is not the appropriate framework for analyzing a transaction between two purportedly-*independent* entities in the first place. AR-A-0026. While the Department also correctly discussed why particulars of the transfer analyses in Plaintiff's studies were problematic, that was merely icing on the cake, not the determining factor. *See id.* ("While the Department considers the application of a transfer pricing analysis here to be questionable, it nevertheless wants to address the conclusions reached by Deloitte and BKD."). In any event, while Plaintiff may disagree with the Department's reasons for rejecting its experts' methodology (both as to the overall approach and as to the particulars of the analysis itself), Pl.'s Mot. at 27-29, that alone cannot render the Decisions arbitrary and capricious. Expert theories and assumptions are "'simply evidence for the [agency] to consider,' and are not entitled to controlling weight." *Becerra v. Azar*, 950 F.3d 1067, 1100 (9th Cir. 2020) (quoting *Dep't of Commerce*, 139 S. Ct. at 2571); *Ass'n of Priv. Sector Coll. & Univs.*, 110 F. Supp. 3d at 195 ("[A] battle of experts" is "off limits to APA judicial review"). Thus, the only question is "whether the agency examined the relevant considerations" from Plaintiff's expert studies and laid out a reasonably discernable path for its alternative view. *F.E.R.C.*, 136 S. Ct. at 782; *Encino Motorcars, LLC,* 136 S. Ct. at 2125. The Department clearly did so here.

   *c.* <u>Consideration of IRS Grant of Tax-Exempt Status</u>. Contrary to Plaintiff's assertions, the Department did not "ignore[e] the IRS's decision approving GCU's tax-exempt status." Pl.'s Mot. at 23. The Department expressly considered the IRS's designation of tax-exempt status, and for several reasons concluded that this designation was not determinative in the context of GCU's eligibility for Title IV participation. The Department found that "[t]here is no evidence that the IRS conducted a comprehensive review of the MSA or any of the studies that were later performed to support the MSA." AR-A-0015. Rather, the IRS granted tax-exempt status three years prior to the Transaction. And the IRS made its decision just twenty-

19

two business days after Gazelle's application, merely based upon the representations made by Plaintiff at that time. *Id.* Unlike the Department's in-depth analysis of transaction documents and expert reports, the IRS's review of initial 50(c)(3) applications is a purely representational process—meaning that the IRS makes its determination "based solely upon the facts, attestations, and representations" made by the taxpayer in its request. *See* Internal Rev. Proc. 2202-5 § 3.05, *available at* https://www.irs.gov/irb/2022-01_IRB#REV-PROC-2022-5.[10]

Thus, the Department concluded, based on its expertise in administering the Title IV program, that its review was materially distinguishable from the IRS's determination. First, "[u]nlike the IRS's initial grant of tax-exempt status, the Department's determination of nonprofit status considers the structure and planned operations of the institution when its owner(s) apply for that change in status." AR-0015. Indeed, as Plaintiff itself recognized, "[t]he financial terms of the transaction [] changed since the 2015 application [to the IRS]" and "the third party valuation and transfer pricing studies that New GCU has initiated for purpose of informing the price of the acquisition of GCU and the terms of the MSA had not yet been completed" at the time of the IRS's review. AR-J-0077 n.3.

Second, the Department "seeks to ensure that a nonprofit institution's revenues—a good portion of which are generated from Title IV funds—*are primarily devoted to the mission of the school* and not to other parties, including (as here) the shareholders of the prior owner." *Id.* (emphasis added). In light of the Department's important task of identifying the appropriate conditions for releasing millions of dollars in taxpayer funds to Plaintiff, it was reasonable, and consistent with the statute and regulations as demonstrated above, for the Department to conclude that a more in-depth review of Plaintiff's organizational structure was warranted.[11]

---

[10] The IRS's approach is necessitated by the demands of its caseload. In FY 2021 alone, the IRS closed 94,466 applications for tax-exempt status, and approved 86.4% of those applications. *See* IRS Databook, Table 12 (Oct. 1, 2020-Sept. 30, 2021), *available at https://www.irs.gov/pub/irs-pdf/p55b.pdf.* Only a very small fraction of the applications for tax-exempt status received by the IRS are submitted on behalf of educational institutions. *Id.*

[11] Plaintiff cites IRS regulations for the proposition that GCU is entitled to "rely upon" the IRS's determination of its tax-exempt status. Pl.'s Mot. at 24. But, those regulations are simply

The fact that the Department recognized similarities between its own definition of "non-profit institution" and the language of 26 U.S.C. § 501(c)(3), and thus considered relevant tax authority when making its determination, AR-A-0010-0012, does not somehow render its decision arbitrary. Rather, the Department took account of that tax law, but then applied it in a different context—that of administering a financial assistance program in a manner that accounted for the important interests of the students and the public at stake.

At its core, Plaintiff's argument is not that the Department was wrong to consider persuasive tax authority in its analysis, but rather that the Department should not have conducted any analysis at all. *See* Pl.'s Mot. at 12-13, 24-25. Plaintiff posits that the Department should have blindly deferred to the IRS's grant of tax-exempt status—which is conveniently based on Plaintiff's own representations about its corporate structure. As discussed *supra* in Part IV.A, the Department has clear authority to make independent determinations with respect to a school's "nonprofit status" when setting the terms for participation in its program, and the Department reasonably did so here.

    *d.*    <u>*Consideration of Assessment by Accrediting Agency*</u>. The Department considered the fact that Plaintiff's accrediting agency, the Higher Learning Commission ("HLC"), had approved its conversion for accreditation purposes, but disagreed with HLC's conclusions that Plaintiff's executive leadership remained sufficiently independent from GCE. The Department explained that it "makes its own determination regarding nonprofit status, and the fact that HLC may have reached a different conclusion is neither binding nor persuasive." AR-A-0035. Plaintiff does not cite any authority for the proposition that the Department is required to defer to an accrediting agency's findings when deciding how to administer a federal program, nor is the Department aware of any such authority.[12] Given that the Department is

---

for IRS tax purposes—they have nothing to do with the Department of Education or the Higher Education Act. The Department has made clear that it takes no position on and does not purport to interfere with Plaintiff's IRS tax-exempt status. *See* AR-A-0017.

[12] Plaintiff only cites *M.M. v. School Dist. of Greenville*, 303 F.3d 523 (4th Cir. 2002) on this issue, Pl.'s Mot. at 25, which is inapposite. *M.M.* addressed whether the district court erred in failing to defer to educators' assessment of a student's disability accommodation, in a claim under

the source of the Title IV funds administered by an institution, it is easy to understand why it is responsible for ensuring that institutions participating in Title IV programs comply with the program's requirements—not accrediting agencies. Indeed, that is why approval from an accrediting agency is merely one of many threshold requirements that schools must meet to establish Title IV eligibility, not the sole or deciding factor. *See* 20 U.S.C. § 1058(b)(1)(D).[13] As HLC itself recognized, the accrediting agency must accept the Department's determination about Title IV eligibility and nonprofit status—not the other way around. *See* AR-G-0048.

The Department considered HLC's finding and explained why it reached contrary conclusions; the APA requires nothing more. *See Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) ("[U]nder [the arbitrary and capricious] standard, we 'defer to the wisdom of the agency, provided its decision is reasoned and rational, and even 'uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned.'" (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

e.     _Review was Consistent with the Department's Existing Practices_. Plaintiff is also wrong to argue that the Decisions are arbitrary and capricious because "the Department deviated from its long-established policy" of "always deferr[ing] to IRS tax-exempt approval for determining nonprofit status" when reviewing non-profit conversions. Pls.' Mot. at 18. The challenged Decisions were not a departure from the Department's existing practices. As the record reflects, Plaintiff is well-aware that the Department has been scrutinizing nonprofit conversions closely for years, to more reliably ensure that its requirements for nonprofit status

---

the Individuals with Disabilities Act; that case has no bearing on the Department's administration of the Higher Education Act, accreditors, or anything else relating to this case.

[13] Contrary to Plaintiff's assertions, this is wholly consistent with the fact that accrediting agencies are required to maintain standards for reviewing a variety of substantive changes, including changes in ownership or control. Pl.'s Mot. at 25 (citing 20 U.S.C. § 1099b(c) & 34 C.F.R. § 602.22). In accordance with HEA, accrediting agencies focus on educational quality, not corporate structure, and apply different review standards from the Department. 20 U.S.C. § 1099b. There is no HEA or regulatory provision that requires accrediting agencies to consider—let alone determine—whether an institution meets the Department's requirements for nonprofit status. Accreditation is always just one step in achieving Title IV eligibility—otherwise the Department's other eligibility requirements would be meaningless.

are met. *See, e.g.*, AR-J-0333. It is well-settled that agencies are free to develop their own rules in an adjudicatory setting. *See NLRB v. Bell Aeorspace Co.*, 416 U.S. 267 (1974). And, while that general rule is subject to the constraint that an agency must "display awareness [when] it is changing position," *Fox Telev. St.*, 556 U.S. at 515, that requirement does not apply when, as here, the agency action was actually consistent with its existing practices.

Since at least 2016—*three years before the challenged decision in this case and two years before the Gazelle/GCE transaction closed*—the Department has employed a process of detailed scrutiny to assess change-in-control applications seeking nonprofit conversion. *See Gov't Accountability Off., GAO-21-89, Higher Ed.: IRS and Education Could Better Address Risks Associated with Some For-Profit College Conversions*, at 41 (December 2020), *available at* https://www.gao.gov/assets/gao-21-89.pdf.[14] That process includes evaluating the types of information considered in the challenged Decisions, such as: "a list of the new tax exempt college's board of directors, purchase and sale agreements, and independent appraiser reports, to assess whether the sale price was fair and did not improperly benefit insiders." *Id.* As a result, this is not the first time the Department has rejected an application for nonprofit status by a 501(c)(3) tax-exempt institution. Indeed, Plaintiff concedes that the Department rejected the nonprofit status of at least one other tax-exempt school in 2016. Pls.' Mot. at 6.[15] Thus, the Decisions applied the Department's existing practice to GCU's application; it did not create a new policy. *See Select Specialty Hosp.-Bloomington, Inc. v. Sebelius* (denying APA claims where plaintiffs "d[id] not show that the [agency] actually changed [its] interpretation of the regulation.").

Plaintiff cannot credibly suggest it lacked notice of the Department's current standards, or that the Department "fail[ed] to take GCU's reliance into account." Pl.'s Mot. at 19 (citing *Fox Television*, 556 U.S. at 515-16). In fact, Plaintiff was well-aware of the Department's policy

---

[14] As Defendants explained in prior briefing, the Court can take judicial notice of the statements made in GAO reports, so long as it does not automatically adopt inferences or conclusions of law stated therein. ECF No. 68 at 6-7.

[15] Notably, the lawyers who challenged that 2016 decision are the same lawyers representing Plaintiff in this case. *See* AR-J-0320. The parties settled the case, and thus the Department's analysis of the applicable statutes and regulations was not considered by any court. AR-J0320.

of reviewing change-in-control applications for more than just 501(c)(3) status in accordance with the HEA and its implementing regulations, which Plaintiff repeatedly acknowledged throughout the application process. *See, e.g.*, AR-J-0333; AR-J-0074 ("We understand that the Department makes an independent decision regarding an institution's status as a nonprofit institution for Title IV purposes."); *see also* AR-J-0078. Plaintiff explicitly recognized that the Department had rejected nonprofit classification of 501(c)(3) schools in the past, and tried to differentiate itself from that scenario. *See* AR-J-0081 ("We are aware that, in other cases, the Department has determined that, notwithstanding an institution's nonprofit status, the terms of the institution's relationship with its former for-profit owner suggest the former owner still benefits from the net earnings of the institution."); AR-J-0077 (contending that "the new GCU and GCE relationship differs from other 'nonprofit conversions' that have come under Department scrutiny in the past."). Plaintiff knew about the Department's practice of independently scrutinizing nonprofit conversions, but thought that it would be able to push its application through *in spite of that policy. See* AR-E-0007 ("It appears the current political landscape is much more favorable to this type of transaction."); AR-E-0098 (same).

Finally, Plaintiff is wrong to argue that the Decisions were a "policy change" based on the fact that other schools with distinct revenue-sharing agreements have been classified as nonprofit institutions. Pl.'s Mot. at 20. The fact that some *existing* nonprofits have service agreements with third-party online program managers, *id.*, has nothing to do with the standards that the Department applies when evaluating a conversion following a change-in-ownership application. Rather, the Department's decision to deny a conversion to nonprofit status "*depends on the structure and impact of the Transaction* in the context of the regulatory requirements for a nonprofit institution." *See* AR-J-0329 (emphasis added). The Department considered the voluminous documents Plaintiff provided with its reapplication and determined that nonprofit status was not warranted because of various factors in combination, including but not limited to the service agreement. This larger context in conjunction with Plaintiff's service agreement—*i.e.*, the myriad ways in which the buyer (GCU) and the seller (GCE) remained intertwined—was a key aspect of the Department's analysis here.

Nor can complex service agreements be distilled down to mere percentages of revenue divorced from their context, as Plaintiff suggests. Pl.'s Mot. at 21. For that reason, the Department concluded that Plaintiff's conversion was "unlike any prior nonprofit conversion" it had seen before. AR-J-0129. Still, the Department considered the chart of other service-provider agreements that Plaintiff provided during the application process (even though they were distinguishable because they did not involve changes in ownership), AR-C-1775-1781, and asked Plaintiff for additional information to better understand Plaintiff's view. Specifically, the Department requested that "to the extent GCU relies on the service provider survey chart . . . and to the extent the information is available to you or your clients, please identify any service providers that are affiliates, owners, or former owners of the institution (including related persons and entities), and indicate whether any of the servicing agreements were entered into in conjunction with a change in ownership transaction." AR-J-0156. Plaintiff could not point to any comparable agreements in response, stating instead that "*GCU believes that comparisons to the Kaplan transaction or any other example are not relevant* . . . Rather, it believes that the Transaction stands on its own." AR-J-0086 (emphasis added). While Plaintiff now attempts to invoke the Purdue-Kaplan sale (which resulted in a grant of *public* status by virtue of Purdue's receipt of that status from the state of Indiana) as an example of a "materially similar" conversion with disparate results, Pl.'s Mot. at 20, that cannot be squared with Plaintiff's own statements in the record. In any event, the Purdue-Kaplan transaction had materially distinguishable characteristics that reasonably led to a different result—for example, unlike Plaintiff, Purdue is *public* institution of higher education, which means that its Title IV student loans are backed by the state of Indiana. *See* AR-J-0006 (describing Purdue Kaplan as "a newly created online university within a high profile *state university system* (emphasis added)).[16]

---

[16] Contrary to Plaintiff's assertion that the Purdue-Kaplan transaction was "nearly identical" to GCU's transaction, Pl.'s Mot. at 20, it also differed from GCU's conversion in other significant ways. For example, the Purdue-Kaplan transaction was structured so that the for-profit service company would only be paid for services it actually provided to the public university and then only after the non-profit broke even on its expenses. And those payments were capped at approximately 12% of Purdue's tuition and fees. *See* Second Am. Compl. ¶ 8, *In re Grand Canyon Ed., Inc. Sec. Lit.*, 20-cv-639-MN-CJB (D. Del. Filed Jan. 21, 2022).

### C.     The Decisions did not Impose Legislative Rules that Require Notice and Comment Rulemaking

For the same reasons discussed above, the Court should also grant summary judgment for Defendant on Count III of Plaintiff's Complaint, which claims that the "Decisions imposed legislative rules because they required GCU to comply with new obligations in order to establish nonprofit status for purposes of Title IV [and] changed the Department's long-standing practice for acknowledging nonprofit status for purpose of Title IV." Compl. ¶¶ 342-46. In Plaintiff's summary judgment motion, it now argues that the Department's Decisions "re[wrote] its change-in-control regulations in the guise of interpreting 600.2." Pl.'s Mot. at 14-15. As discussed above, these arguments are meritless. The Decisions did not impose new rules, but rather reasonably applied the Department's longstanding regulations. *See supra* Part IV.A & B. And the Department did not "change [its] longstanding practice," but rather applied its existing practice for reviewing change in control applications—which practice also is consistent with the applicable regulations. *See supra* Part IV.B.e.

The Department did not impose any new rule here, much less a "legislative rule" that warrants negotiated rulemaking. *See Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003) ("[I]nterpretive rules merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule. Legislative rules . . . create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress."). In any event, it is well-settled that an agency "is free to alter its past rulings and practices even in an adjudicatory setting." *Airmark Corp. v. FAA*, 758 F.2d 685, 691-92 (D.C. Cir. 1985).

### D.     The Department's Enforcement of the HEA does not violate Plaintiff's First Amendment Rights.

Plaintiff is wrong to claim that the Department violated its First Amendment rights by prohibiting GCU from describing itself as a nonprofit in a manner that would mislead the public. Pl.'s Mot. at 30. The challenged restriction is a permissible condition on Plaintiff's receipt of federal funds under Title IV. Moreover, it prohibits only misleading commercial speech, which is not protected under the First Amendment. And, even if the First Amendment applied, the condition prohibiting misleading speech would survive any level of scrutiny.

1.   <u>The Challenged Restriction is a Permissible Condition on the Receipt of Federal Funds.</u>

The challenged restriction is not a First Amendment violation. Rather, it properly conditions Plaintiff's ongoing participation in Title IV—and thus its receipt of federal funds—on the school's accurate representation of its participation in the program.

A Title IV program participant that engages in "substantial misrepresentations about the nature of its educational program, its financial charges, or the employability of its graduates" faces the prospect of losing its Title IV funding. 34 C.F.R. § 668.71(b). The term "misrepresentation is defined as "[a]ny false, erroneous or misleading statement . . . A misleading statement includes any statement that has the likelihood or tendency to mislead under the circumstances." *Id.* § 668.71(c). The term "substantial misrepresentation is further defined as a "misrepresentation on which the person to whom it was made could easily be expected to rely, or has reasonably relied, to that person's detriment." *Id.*

Because GCU is not classified as a nonprofit institution for purposes of the Higher Education Act, the Department reasonably determined that statements touting the school's "nonprofit status" would mislead students and the public about its educational program. Students and their families are not in a position to carefully assess the ownership structure and contracts of a school in order to consider whether the school has incentives contrary to their interests (*i.e.*, to use their tuition in a manner that does not prioritize their high-quality educational experience); instead, they must rely on whether the Department has classified the school as a nonprofit. *See* Written Testimony of Brian Galle to U.S. Dep't of Ed. (May 7, 2018) (explaining that there is strong "evidence that consumers believe nonprofits act differently than for-profits . . . [Consumers] believe that nonprofits are not looking out for their bottom line—that they're not going to cut quality to make money").[17]

Accordingly, at the end of its Decision, the Department, after stating that "[t]he for-profit status of the Institution is for purposes of its participation in the Title IV, HEA programs" and that the Department "does not take a position with respect to Gazelle's non-

---

[17] *available at* https://edlabor.house.gov/imo/media/doc/GalleBrianTestimony042021.pdf

profit 501(c)(3) status with the Internal Revenue Service," instructed GCU that, in order to receive Title IV funds, it "must cease any advertising or notices that refer to its 'nonprofit status'" because "[s]uch statements are confusing to students and the public, who may interpret such statements to mean that the Department considers GCU a nonprofit under its regulations. The Department does not take a position regarding statements that GCU may make about its IRS status as a 501(c)(3) tax exempt organization." AR-A-0017 (initial decision); *see also* AR-A-0037 (reconsideration decision).

Generally, "if a party objects to a condition on the receipt of federal funds, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. V. All. For Open Soc. Int'l, Inc.* 570 U.S. 205, 214 (2013). In some cases, however, "a funding condition can result in an unconstitutional burden on First Amendment rights," but only if the condition falls "outside the contours of the program itself." *Id.*

Here, the Department's condition falls squarely within the contours of the program; it requires that GCU accurately represent its classification as a proprietary institution for purposes of its Title IV participation. The purpose of Title IV is to provide loans and grants that help students pay tuition for their postsecondary education, and the Department has broad authority to implement that purpose. *See supra* Part II.A. Thus, the Department imposed a condition to ensure that students and the public would not be confused about where that money actually goes. *See Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("Congress' power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use."). At the same time, Plaintiff remains free to engage openly in speech that falls outside its participation in Title IV. For example, the Department does not "demand that [GCU] adopt—as [its] own—the Government's view." *Id.* at 218. Rather, Plaintiff can publicly express disagreement with the Department's decision and its view that GCU *should have been* recognized as a nonprofit institution for purposes of its participation in Title IV programs. And Plaintiff also is free to make statements about classifications it receives outside the Title IV program, including its IRS status as a 501(c)(3) tax-exempt organization.

AR-A-0017. Because the condition does not "prohibit [] the recipient from engaging in protected conduct outside the scope of the federally funded program," it does not violate the First Amendment. *Rust*, 500 U.S. at 193.

### 2.  The Condition Would Survive First Amendment Analysis

Similarly, there is no First Amendment protection for commercial speech that is inherently misleading. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'm of New York*, 447 U.S. 557, 563 (1980); *in re R.M.J.*, 455 U.S. 191, 203 (1982); *Hoffman Cap. Cities/ABC, Inc.*, 255 F.3d 1180, 1185 (9th Cir. 2001). It is permissible "to ban forms of communication more likely to deceive the public than to inform it." *Cent. Hudson*, 447 U.S. at 563; *see also Zauderer v. Off. of Disciplinary Couns. of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985). ("[T]he Federal Government [is] free to prevent the dissemination of commercial speech that is false, deceptive, or misleading."). Plaintiff does not dispute that its advertising and marketing materials constitute commercial speech, but claims that calling itself a nonprofit in those materials is "factually accurate" (*i.e.*, not misleading). Pl.'s Mot. at 30-31. While that is true in the context of its IRS 501(c)(3) status (which the Department did not restrict), Plaintiff marketing itself as a nonprofit *school* suggests to students and the public that the Department considers GCU a nonprofit under its regulations. AR-A-0017.

Plaintiff also argues that the restricted representations are not "purely commercial speech" because they include more than "just advertisements." Pl.'s Mot. at 30.[18] But advertising is not the only form of commercial speech. Rather, when determining whether speech is "commercial," courts consider multiple factors, including not just whether the speech is a form of "advertising," but also whether "the speech references a specific product" and/or whether "the speaker has an economic motive for engaging in the speech." *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983)). None of these factors alone is dispositive. While the combination of all

---

[18] Even if the Court were to find that some speech covered by the Decisions receives First Amendment protection, the Court should limit any such holding and uphold the Decisions as applied to Plaintiff's advertising and marketing materials.

three may provide support for a finding of commercial speech, "it is not necessary that each of the characteristics "be present in order for speech to be commercial." *Bolger*, 463 U.S. at 67 n.14. Here, regardless of whether labeled as "advertising" or some other format, Plaintiff's representations about its "nonprofit status" are designed to market the school—*i.e.*, to promote its product (the school) in a manner that ultimately serves GCE's economic interests. Shortly after the transaction closed, Brian Mueller, who is both GCU's President and GCE's CEO, made this explicit, stating: "[T]he University being not-for-profit is a tremendous advantage. That stigma is now gone. We can recruit in high schools that would not let us in the past . . . We're just 90 days into this, but we're experiencing, we believe, a tailwind already just because of how many students didn't pick up the phone [before] because we were for-profit." *The Future of Ed. – Trends, Costs & Tech.*, the Motley Fool (Dec. 20, 2018), https://www.fool.com/investing/2018/12/20/the-future-of-education-trends-cost-technology.aspx.

Even assuming *arguendo* that the Department's condition covers some noncommercial speech, the Decisions would survive any level of scrutiny under the First Amendment. Indeed, it survives the highest level, strict scrutiny, which requires that the condition serve a compelling government interest and is narrowly tailored to serve that interest. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). As discussed above, the Department restricted GCU from making statements referring to its nonprofit status (but not as to its 501(c)(3) status) because those statements are likely to mislead students and the public about the school's status for purposes of Title IV funding, its operations, and its competing financial incentives. Plaintiff does not dispute that this interest is compelling, but rather only insists that it is not implicated—*i.e.,* that there is no evidence "that students place any importance on the Department's elusive nonprofit/for-profit distinction." Pl.'s Mot. at 30-31. Plaintiff's position defies not only the Department's extensive experience and common sense, but also Plaintiff's own public statements and data. On February 20, 2019, Mr. Mueller stated during GCE's Q4 2018 earnings call: "[N]ew student online growth [following GCU's conversion] was more than we expected and I think it's evidence that being out there now a million times a day saying we're

non-profit has had an impact."[19] In other words, not only did Mr. Mueller recognize that the school's representations about its nonprofit status were directly driving student enrollment, but he also considered that information significant and relevant on a call about GCE's financial earnings. Moreover, GCE's stock price soared by 50% following the transaction, based on its statements about GCU's nonprofit status, and then dropped dramatically when those misrepresentations were curbed by the Department's Decisions. *See* Second Am. Compl. ¶ 2, *In re Grand Canyon Ed., Inc, Sec. Lit.*, No. 20-639-MN-CJB (D. Del. filed on Jan. 21, 2022) (securities class action filed by GCE shareholders, based on university's misrepresentations about nonprofit status).

Finally, the Department's prohibition against misleading representations is narrowly tailored to address the compelling interest at stake. The Decisions only restrict GCU's statements insofar as they are likely to mislead students and the public about its classification by the Department for purposes of Title IV. GCU remains free to make accurate statements about the nature of its organizational structure (that it is owned by a corporation organized under Arizona law as a nonprofit corporation) and about its tax status (that the IRS has granted it 501(c)(3) tax-exempt status), so long as it makes clear that the Department has not granted it nonprofit status under the HEA. AR-A-0017.[20]

## V.    CONCLUSION

Accordingly, for the foregoing reasons, the Court should grant summary judgment in favor of Defendants on all counts of Plaintiff's complaint.

---

[19] Grand Canyon Education Inc. (LOPE CEO Brian Mueller on Q4 2018 Results Earnings Call Transcript, *available at* https://seekingalpha.com/article/4242733-grand-canyon-education-inc-lope-ceo-brian-mueller-on-q4-2018-results-earnings-call-transcript.

[20] For these same reasons, the condition would meet the lesser level of intermediate scrutiny because it directly advances a substantial governmental interest and is not more extensive than necessary to serve that interest. *See Cent. Hudson*, 447 U.S. at 566.

Dated: June 30, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director
Federal Programs Branch

*/s/ Emily Nestler*
EMILY NESTLER
Trial Attorney (DC Bar No. 973886)
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street NW
Washington, D.C. 20005
Telephone: (202) 305-0167
E-mail: emily.b.nestler@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2022, I electronically transmitted the foregoing to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants for this matter.

/s/ *Emily Nestler*

EMILY NESTLER