BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

EMILY NESTLER
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street NW
Washington, D.C. 20005
Telephone: (202) 305-0167
E-mail: emily.b.nestler@usdoj.gov

*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Grand Canyon University, | No. 2:21-cv-177-SRB |
| Plaintiffs, | |
| v. | **Defendants' Response to Plaintiff's Statement of Material Facts; Defendants' Statement of Material Facts in Support of Cross-Motion for Summary Judgment.** |
| Miguel Cardona, in his official capacity as Secretary of Education, *et al.*, | |
| Defendants. | |

Defendants file this response to Plaintiff's Statement of Material Facts and Statement of Material facts in in support of their Cross-Motion for Summary judgment pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1.

## I.   DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

1.    Undisputed.

2.    Undisputed.

3.    Undisputed.

4.    Defendants lack sufficient information to dispute or not to dispute the other information in this paragraph, particularly because Plaintiff's Statement cites only to its own representations in the record, without any further support. However, Defendants do not dispute that Plaintiff has made those representations.

5.    Defendants do not dispute that Plaintiff began the process of trying to convert to nonprofit status in 2014.  Defendants lack sufficient information to dispute or not to dispute this information in this paragraph, particularly because Plaintiff's Statement cites only to its own representations in the record, without any further support. However, Defendants do not dispute that Plaintiff has made those representations.

6.    Undisputed.

7.    Undisputed.

8.    Disputed. The Department issued a decision letter on November 6, 2019, which approved Plaintiff's change in ownership application and approved GCU as a proprietary institution for purposes of its continued participation in Title IV programs. The Department also denied Plaintiff's request for recognition as a nonprofit institution. AR-A-0001-0018.

9.    Defendants do not dispute that Plaintiff proposed changes to the transaction and that their request for reconsideration was denied, nor that it filed this lawsuit on February 2, 2021. Defendants dispute that their concerns were merely "purported." AR-A-0001-0018; AR-A-0019-0037.

10.   Defendants dispute this paragraph to the extent it suggests the transaction "accomplish[ed] the University's nonprofit conversion." AR-A-0001-0018; AR-A-0019-0037. The remainder of this paragraph is undisputed.

11.   Undisputed.

12.     Defendants do not dispute that revenue-sharing service agreements are sometimes used in higher education. However, this paragraph is disputed to the extent Plaintiff implies that such service agreements are comparable to the arrangement between GCU and GCE at the time of the transaction at issue or that those other agreements are relevant to GCU's request for nonprofit status. AR-A-0001-0018; AR-A-0019-0037; AR-J-0156; AR-J-0086.

13.     Defendants do not dispute that the persons and firms listed in this paragraph were involved with the transaction. However, to the extent Plaintiff characterizes the independence of these parties and/or the correctness of their conclusions, this paragraph is disputed. AR-A-0001-0018; AR-A-0019-0037.

14.     Defendants do not dispute that firms were hired to provide a valuation of the transaction. However, to the extent Plaintiff characterizes the independence of those firms and/or the correctness of their conclusions, including but not limited to their valuation of the transaction, this paragraph is disputed. AR-A-0001-0018; AR-A-0019-0037.

15.     Defendants lack sufficient information to dispute or not to dispute the statements in this paragraph regarding what documents any member of the Board of Trustees actually reviewed or for what purposes they were reviewed, but do not dispute that Plaintiff initially pointed to service agreements of other educational institutions in the process of seeking approval to participate as a nonprofit institution for purposes of the Title IV program. However, this paragraph is disputed to the extent Plaintiff implies that such service agreements are comparable to the arrangement between GCU and GCE at the time of the transaction at issue. AR-A-0001-0018; AR-A-0019-0037; AR-J-0156; AR-J-0086. Moreover, during the time that Plaintiff's request was under review, Plaintiff asserted that its transaction was not comparable to other service agreement transactions. AR-J-0086.

16.     Undisputed.

17.     Defendants dispute this paragraph to the extent it takes the quoted language out of context. AR-F-0001-0606.

18.     Defendants dispute Plaintiff's characterizations of this letter, and moreover any

3

implication that it presented an accurate picture of the transaction to the IRS. AR-F-0001-0606; AR-A-0001-0018; AR-A-0019-0037.

19.     Defendants dispute Plaintiff's characterization of what it provided to the IRS, and moreover any implication that it presented an accurate picture of the transaction to the IRS. AR-F-0001-0606; AR-A-0001-0018; AR-A-0019-0037.

20.     Defendants dispute Plaintiff's characterization of what it provided to the IRS, and moreover any implication that it presented a complete and accurate picture of the transaction to the IRS. AR-F-0001-0606; AR-A-0001-0018; AR-A-0019-0037. The actual terms of the MSA are set forth in that agreement. AR-B-1279-1354.

21.     Defendants dispute Plaintiff's characterization of what it provided to the IRS, and moreover any implication that it presented an accurate picture of the transaction to the IRS. AR-F-0001-0606; AR-A-0001-0018; AR-A-0019-0037.

22.     Defendants do not dispute that Plaintiff disclosed Brian Mueller's dual roles to the IRS, but dispute that Plaintiff provided the full context of Mr. Mueller's dual roles to the IRS. AR-F-0001-0606; AR-A-0001-0018; AR-A-0019-0037.

23.     Defendants do not dispute that the IRS granted Plaintiff 501(c)(3) tax-exempt status on November 20, 2015 and do not dispute that the decision was based on Plaintiff's representations to the IRS. However, Defendant's dispute Plaintiff's characterization of what it provided to the IRS, and moreover any implication that it presented a complete and accurate picture of the transaction to the IRS. AR-F-0001-0606; AR-A-0001-0018; AR-A-0019-0037.

24.     Undisputed.

25.     Disputed. AR-A-0001-0018; AR-A-0019-0037.

26.     Undisputed.

27.     Defendants lack sufficient information to dispute or not to dispute information about the reasons provided in this paragraph as to why Plaintiff's application to HLC was denied, particularly because Plaintiff's Statement relies on its own representations in the record. However, Defendants do not dispute that Plaintiff has made those representations. Defendants do not dispute that HLC adopted new guidelines in 2017, but Defendants lack

sufficient information to dispute or not to dispute whether HLC "invited" the University to reapply for approval of the transaction.

28.     Defendants do not dispute that Plaintiff submitted an application to HLC in August 2017. However, Defendants dispute that the characterization of that application in this paragraph provides an accurate and complete description of that application, and moreover any implication that it presented an accurate picture of the transaction to HLC. AR-G-0013-0053; AR-A-0001-0018; AR-A-0019-0037.

29.     Undisputed.

30.     Defendants do not dispute HLC's summary report discussed Brian Mueller's dual roles, but dispute that the discussion addressed or accounted for the context of Mr. Mueller's dual roles. AR-G-0025-0026;. AR-A-0001-0018; AR-A-0019-0037.

31.     Defendants do not dispute that HLC's summary report reached this conclusion, but dispute that the discussion addressed or accounted for the context of Mr. Mueller's dual roles, or his role as a shareholder in GCE. AR-G-0025-0026; AR-A-0001-0018; AR-A-0019-0037.

32.     Defendants do not dispute HLC's summary report discussed this committee, but dispute that the discussion addressed or accounted for the context of that committee, or that the committee could effectively supervise every decision Mr. Mueller made or every action he took in his dual roles. AR-G-0025-0026; AR-A-0001-0018; AR-A-0019-0037.

33.     Defendants dispute this paragraph to the extent it takes quoted language from HLC's staff out of context, and to the extent it suggests HLC's conclusions were supported by the larger context of the transaction at issue. AR-G-0013-0053; AR-A-0001-0018; AR-A-0019-0037.

34.     Defendants do not dispute that HLC voted to extend Plaintiff's accreditation under HLC's policy on Change of Control. However, Defendants dispute that HLC's decision applies to or is determinative for any other purpose. AR-G-0052.

35.     Undisputed.

36.     Undisputed.

5

37.     Undisputed.

38.     Undisputed.

39.     Defendants lack sufficient knowledge to dispute or not dispute what any party would or would not do based on information received during the preacquisition process. Plaintiff's citation does not address or support this fact.

40.     Defendants do not dispute that institutions must submit a Title IV application based on a change in ownership upon completion of the transaction. But, Defendants lack sufficient information to determine whether the preacquisition process, which is a voluntary process, may be important or not important to any party generally.

41.     Defendants do not dispute that this paragraph paraphrases 34 C.F.R. § 600.31(d)(7), but dispute this paragraph to the extent that it fails to account for the relevant regulatory context.

42.     Defendants do not dispute that this paragraph paraphrases 34 C.F.R. § 600.20(b)(2)(B), but dispute this paragraph to the extent that it fails to account for the relevant regulatory context.

43.     Undisputed.

44.     Defendants do not dispute that Plaintiff discussed GCU's desire to be recognized as a nonprofit institution with some Department officials in 2014. Defendants dispute Plaintiff's characterizations of those conversations, which are not supported by Plaintiff's record citations or any other parts of the record. AR-M-0001-0003.

45.     Defendants do not dispute that Plaintiff's preacquisition review request included a proposed MSA, asset purchase agreement and credit agreement. However, Defendants dispute Plaintiff's characterization that the information provided to the Department was "substantially the same" information that was provided to IRS and HLC. AR-J-0002-0017.

46.     Defendants do not dispute that the preacquisition review request contained the listed information, but dispute this paragraph to the extent that it divorces the listed information from the larger context of both the preacquisition review request and the

transaction. AR-J-0002-0017; AR-A-0001-0018; AR-A-0019-0037.

47.    The Department disputes any implication that preacquisition reviews are a mandatory part of the process, or that a preacquisition review constitutes a substantive review of the entire transaction, or that a preacquisition review results in a decision about whether an application would be approved. *See* U.S. Department of Education, 2017-2018 Federal Student Aid Handbook, vl. 2, ch. 5, at 2-121 (June 15, 2017), https://fsapartners.ed.gov/sites/default/files/2021-02/Chapter%205%20-%20Updating%20Application%20Information.pdf.  However, Defendants do not dispute that, if an institution elects to request preacquisition review, it must do so at least 45 days before the planned transaction.  *Id.* The Department also does not dispute that GCU filed its preacquisition review request almost 6 months before the transaction closed.

48.    Defendants do not dispute that GCU and the Department were in communication during the preacquisition review process. Defendants dispute Plaintiff's characterization of those communications, which are not supported by Plaintiff's cited reference.

49.    Defendants do not dispute that GCU reached out to the Department for guidance during the preacquisition review process. However, Defendants dispute Plaintiff's statement that "the Department never substantively engaged with GCU about the transaction." AR-J-0009-0017; AR-J-0097-0106; AR-J-00127-00131; AR-M-0003.

50.    Defendants dispute that the statements in this paragraph provide an "example" of the disputed claims in paragraph 49, and therefore incorporate its response to paragraph 49 paragraph here. The remainder of this paragraph is undisputed.

51.    Defendants do not dispute that Plaintiff provided updates. Defendants dispute the remainder of this paragraph. AR-J-0009-0017; AR-J-0097-0106; AR-J-00127-00131; AR-M-0003.

52.    Undisputed.

53.    Undisputed.

54.    Defendants do not dispute that Plaintiff decided to close the Transaction on July 1, 2018. Defendants dispute that Plaintiff made this decision "with no further contact

form the Department, and no indication as to when its review would be completed, or that the review team and Office of General Counsel had completed their review." AR-L-0054. Defendants lack sufficient information to dispute or not dispute the remainder of this paragraph, particularly because Plaintiff's Statement cites only to its own representations in the record, without any further support. Defendants do not dispute that Plaintiff has made those representations. However, Defendants dispute the characterization of the information that Plaintiff purportedly relied upon, as set forth in its cited representations. AR-A-0001-0018; AR-A-0019-0037; AR-J-0086.

55.    Defendants lack sufficient information to dispute or not dispute this paragraph, particularly because Plaintiff's Statement cites only to its own representations in the record, without any further support. Defendants do not dispute that Plaintiff has made those representations.

56.    Defendants lack sufficient information to dispute or not dispute whether Plaintiff took the items listed in this paragraph into account when closing the transaction, particularly because Plaintiff's Statement cites only to its own representations in the record, without any further support. Defendants do not dispute that Plaintiff has made those representations. Defendants do not dispute that Plaintiff took the steps listed in this paragraph.

57.    Defendants lack sufficient information to dispute or not dispute this paragraph, particularly because Plaintiff's Statement cites only to its own representations in the record, without any further support. Defendants do not dispute that Plaintiff has made those representations.

58.    Defendants dispute this paragraph because it does not provide the full context of the listed transaction documents, but rather isolated terms that cannot be divorced from other material aspects of those documents and the transaction. AR-A-0001-0018; AR-A-0019-0037.

59.    Defendants lack sufficient knowledge to know Plaintiff's objectives. However, Defendants do not dispute that Plaintiff has made representations that its objectives included those listed in this paragraph.

60.     Undisputed.

61.     Undisputed.

62.     Undisputed.

63.     Defendants do not dispute that Plaintiff applied to participate in the Title IV programs under its new ownership structure, but dispute any implication that its new ownership structure rendered Plaintiff a Nonprofit Institution under the HEA and for purposes of Title IV programs.  AR-A-0001-0018; AR-A-0019-0037

64.     Defendants do not dispute that Plaintiff was required to identify its tax status as part of the reapplication process under the applicable regulations. Defendants do not understand what is meant by the phrase "recognizing that tax status is controlled by state law and the IRS" and therefore cannot respond to that part of this paragraph.

65.     Defendants do not dispute the first sentence of this paragraph. The remainder of this paragraph is disputed. AR-A-0001-0018; AR-A-0019-0037.

66.     Undisputed. For clarity, however, 34 C.F.R. § 600.4 does not define what is required to establish eligibility to be recognized as a nonprofit institution under Title IV. The definition of "nonprofit institution" is in 34 C.F.R. § 600.2.

67.     Undisputed. For clarity, however, 34 C.F.R.  § 600.4 provides the eligibility requirements for an "institution of higher education," which is "a public or private nonprofit educational institution." 34 C.F.R. § 600.4 does not define what is required to establish eligibility to be recognized as a nonprofit institution under Title IV.  The definition of "nonprofit institution" is in 34 C.F.R. § 600.2.

68.     Undisputed.

69.     Undisputed.

70.     Defendants dispute Plaintiff's characterization of the valuation reports it provided as "independent." AR-A-0001-0018; AR-A-0019-0037. The remainder of this paragraph is undisputed.

71.     Disputed. AR-A-0001-0018; AR-A-0019-0037.

72.     Disputed. AR-A-0001-0018; AR-A-0019-0037.

73. To the extent the word "[n]onetheless" assumes the accuracy of the statements in paragraph 72, any incorporation or reference to those statements is denied here for the same reasons. The remainder of this paragraph is undisputed.

74. Defendants do not dispute that Plaintiff sent a letter to the Department on October 1, 2018, which made these representations. Defendants dispute characterizations and statements in that letter, but does not dispute that GCU was granted 501(c)(3) status by the IRS. AR-A-0001-0018; AR-A-0019-0037.

75. Defendants do not dispute that Plaintiff made this representation, but disputes the substance of that representation. AR-A-0001-0018; AR-A-0019-0037.

76. Defendants do not dispute that Plaintiff made these representations, but disputes the substance of the representations. AR-A-0001-0018; AR-A-0019-0037.

77. Defendants do not dispute that they never reached a final decision on Plaintiff's preacquisition review request. However, Defendants dispute this paragraph to the extent it suggests Defendants did not correspond with Plaintiff during the preacquisition review process, including by responding to questions and correspondence from Plaintiff during that time. AR-J-0009-0017; AR-J-0097-0106; AR-J-00127-00131; AR-M-0003; AR-L-0054. Defendants also dispute this request to the extent it suggests the Department does not have substantive regulations regarding non-profit conversions, *see, e.g.*, 34 C.F.R. §§ 600.2, or that Plaintiff lacked guidance on the Department's standards for nonprofit conversions. AR-J-0333; AR-J-0074; AR-J-0077-0079. Defendants lack sufficient information to dispute or not dispute the remainder of this paragraph because it discusses what Plaintiff relied upon when structuring its transaction and why, but Defendants do not dispute that Plaintiff made representations about what it relied on.

78. Defendants lack sufficient information to dispute or not dispute this paragraph, particularly because Plaintiff's Statement cites only to its own representations in the record, without any further support. Defendants do not dispute that Plaintiff has made those representations. However, Defendant has also made contrary representations. AR-J-0086.

79. Undisputed.

80.     Disputed. The statement in this paragraph is not supported by the cited references. Moreover, this paragraph relies on information that is not part of the administrative record. The email that Plaintiff partially quoted in its Complaint was redacted in the Administrative Record because it concerned an entirely different school and deals with an issue unrelated to GCU's nonprofit status. AR-J-0180-0182.  GCU did not object to the redactions when the administrative record was served, or when it filed its motion to complete the administrative record. *See* ECF 38.

81.     Disputed. AR-J-0333, AR-J-0074-0081; AR-J-0333; AR-J-0077-0079.

82.      Disputed. AR-J-0009-0017; AR-J-0097-0106; AR-J-00127-00131; AR-M-0003. Moreover, the phrase "controlling tax authority" does not appear in the cited document, let alone the cited page.

83.     To the extent the word "instead" assumes the accuracy of the statements in paragraph 82, any incorporation or reference to those statements is denied here for the same reasons. The remainder of this paragraph is undisputed.

84.     Disputed. AR-A-0001-0018; AR-A-0019-0037.

85.     Disputed. AR-A-0001-0018; AR-A-0019-0037.

86.     Disputed. AR-A-0001-0018; AR-A-0019-0037.

87.     Disputed. AR-A-0001-0018; AR-A-0019-0037.

88.     Disputed. AR-A-0001-0018; AR-A-0019-0037.

89.     Defendants do not dispute that the IRS interprets and applies the Internal Revenue Code when making decisions about tax-related issues. Defendants do not dispute that the IRS issued an affirmation letter on August 31, 2018, but clarify that the affirmation letter merely confirmed Plaintiff's tax-exempt based on the IRS's prior determination from 2015. To the extent Plaintiff implies that the IRS conducted any substantive analysis of its tax-exempt status in 2018, this paragraph is disputed. AR-F-0607-0608. The remainder of this paragraph is also disputed. AR-A-0001-0018; AR-A-0019-0037.

90.     Defendants do not dispute that the IRS granted Plaintiff tax-exempt status, but dispute any implication that the IRS's determination was comparable to the information

considered by Defendants in time, substance, or level of review. AR-A-0001-0018; AR-A-0019-0037.

91.    Disputed. AR-A-0001-0018.

92.    Disputed. AR-A-0001-0018.

93.    Disputed. AR-A-0001-0018.

94.    Defendants dispute this paragraph to the extent it is inconsistent with the statement made in the Department's decision. AR-A-0016.

95.    Disputed. AR-A-0001-0018; AR-J-0129; AR-C-1775-1781; AR-J-0156; AR-J-0086.

96.    Disputed. AR-A-0001-0018.

97.    Defendants dispute the characterizations in this paragraph, including the quoted language that is taken out of context. AR-A-0001-0018.

98.    Undisputed. However, GCU did later seek reconsideration. AR-A-0019-0037.

99.    Defendants do not dispute that GCU met with representatives of the Department on December 16, 2019 and made such representations.

100.    Defendants do not dispute that the Department sent Plaintiff a letter on August 28, 2020, which stated "The Department agreed with the GCU representatives that those activities are worthwhile and commendable, however explained that they do not change the factors identified in the November 6, 2019 Letter which the Department determined precluded its approval of nonprofit status for GCU." AR-J-0349. Defendants dispute that this information was "surprising." AR-A-0001-0018.

101.    Defendants do not dispute that Plaintiff held a Board meeting on December 23, 2019 and approved proposed changes to the MSA. Defendants dispute Plaintiff's characterization of those changes. AR-A-0019-0037.

102.    Defendants do not dispute that the Board appears to have accepted the Amended MSA at a January 7, 2020 meeting. However, Defendants lack sufficient information to dispute or not dispute statements about the nature of the negotiations leading up to that meeting or what actually occurred at that meeting.

103.    Disputed. Plaintiff's statement is not consistent with its cited reference.

104.    Defendants dispute that the statements in this paragraph provide the full and accurate context of this change in the transaction structure. AR-A-0021.

105.    Defendants do not dispute that the draft amended MSA included changes made to termination rights under the Amended MSA, but disagree that they were "significant" under the circumstances and for purposes of the Department's analysis, or that they adequately addressed the Department's concerns. AR-A-0021-0022.

106.    Defendants do not dispute that other changes were made in the MSA. The remainder of this paragraph is disputed. AR-A-0021-0022.

107.    Undisputed.

108.    Undisputed.

109.    Undisputed.

110.    Defendants do not dispute that Plaintiff hired BKD to provide a valuation report, but disputes the remaining statements in this paragraph, which are not supported by Plaintiff's cited references.

111.    Undisputed.

112.    Defendants do not dispute that BKD provided the listed reports, but disputes that they are "independent." AR-A-0022-0035.

113.    Disputed. AR-A-0022-0034.

114.    Defendants do not dispute that Deloitte opined on the fairness of the Amended MSA. The remainder of this paragraph is disputed. AR-A-0022-0034.

115.    Undisputed.

116.    Undisputed.

117.    Defendants do not dispute that BKD reached the conclusion that GCU paid below fair-market value. However, Defendants dispute that "all prior valuation experts" reached that same conclusion. Plaintiff has not identified what "all prior valuation experts" refers to, and that statement is not supported by the cited references. However, Defendants do not dispute that the experts Plaintiff commissioned to support the transaction reached this

13

1    conclusion.

2        118.    Defendants do not dispute that the experts Plaintiff commissioned to support

3    the transaction reached this conclusion. However, one of the experts retained by GCE

4    determined that the costs to operate GCU following the change in ownership (with GCE

5    providing services) would increase from $810 Million to $1.496 Billion for fiscal year 2019,

6    solely as a result of the fees paid to GCE. AR-C-0041.

7        119.    Disputed. The cited letter from Plaintiff is dated August 14, 2020. AR-J-0316.

8    And the Department responded to that letter on August 28, 2020. AR-J-0348. The

9    Department continued to correspond with Plaintiff thereafter. AR-J-0352-0356.

10       120.    Undisputed.

11       121.    Undisputed.

12       122.    Disputed. AR-A-0019-0037.

13       123.    Disputed. AR-A-0019-0037.

14       124.    Disputed. AR-A-0019-0037.

15       125.    Defendants dispute the first sentence of this paragraph because it

16   mischaracterizes the nature of Defendants' analysis and takes the quoted statement out of

17   context. The second sentence of this paragraph is also disputed. AR-A-0019-0037.

18       126.    This paragraph contains Plaintiff's legal argument and thus is not appropriately

19   included as a statement of fact. Accordingly, no response is required.

20       127.    This paragraph contains Plaintiff's legal argument and thus is not appropriately

21   included as a statement of fact. Accordingly, no response is required.

22       128.    This paragraph contains Plaintiff's legal argument and thus is not appropriately

23   included as a statement of fact. Accordingly, no response is required.

24       129.    This paragraph contains Plaintiff's legal argument and thus is not appropriately

25   included as a statement of fact. Accordingly, no response is required.

26       130.    Disputed. AR-A-0019-0037.

27       131.    Disputed. AR-A-0019-0037.

28       132.    Disputed. AR-A-0001-0018; AR-A-0019-0037; AR-J-0074-0081; AR-J-0333.

14

133.    Disputed to the extent this paragraph mischaracterizes Defendants' decision. AR-A-0034-0035.

134.    Defendants do not dispute that BKD's analysis addressed 24 such agreements. However, Defendants dispute that BKD's analysis adequately considered the nuance and context of those agreements, which are distinguishable from the transaction at issue. Defendants further dispute the statement that the Department did not consider supporting evidence in reaching its determination. AR-A-0001-0018; AR-A-0019-0037; AR-J-0156; AR-J-0086. And further, on October 1, 2018, Plaintiff's counsel told Defendant that those agreements were irrelevant.  AR-J-0077; AR-J-0086.

135.    Defendants do not dispute that its decision contains the quoted language.

136.    Disputed. AR-A-0001-0018; AR-A-0019-0037.

137.    Disputed. AR-A-0001-0018; AR-A-0019-0037.

138.    Defendants do not dispute that the Department reaches a decision about each transaction on a case-by-case basis based on the facts and particular circumstances at hand. However, Defendants dispute this paragraph to the extent it takes other language from the cited hearing out of context and implies that the Department lacks applicable law and standards for making those determinations. AR-A-0001-0018; AR-A-0019-0037.

139.    With respect to the first sentence of this paragraph, Defendants do not dispute that not all decision on change-in-ownership applications are published, but Defendants dispute the remainder of this sentence because decisions are routinely requested and made available through the Freedom of Information Act ("FOIA"). Defendants do not dispute that decisions about GCU's and CEHE's nonprofit status were published. The remainder of this paragraph is disputed. AR-J-0074-0081; AR-J-0333.

140.    Disputed. AR-J-0156; AR-J-0086.

141.    Undisputed.

142.    Defendants do not dispute the statement that it did not retain an external expert for purposes of assessing the transaction at issue. However, Defendants dispute this paragraph to the extent it implies that the Department lacked the requisite internal expertise to assess the

1    transaction at issue. Defendants further dispute the statement that the Department did not
2    engage in any analysis of the MSA other than what is in the two decision letters. The
3    Administrative Record contains thousands of pages of materials that the Department
4    considered to reach its decisions.

5    **II.    DEFENDANTS' STATEMENT OF MATERIAL FACTS**

6    **A. Title IV Eligibility and Participation**

7        1.      Congress enacted the Higher Education Act "to strengthen the educational
8    resources of our colleges and universities and to provide financial assistance for students in
9    postsecondary and higher education," by (among other things) increasing federal money given
10   to institutions of higher education and giving low-interest loans to students of those
11   institutions. Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219, 1219 (1965).

12       2.      The Higher Education Act has been reauthorized a number of times, including
13   most recently by the Higher Education Opportunity Act, Pub. L. No. 110-315, 122 Stat. 3078
14   (Aug. 14, 2008), which authorized most of the relevant programs through 2015. Congress
15   continues to provide additional appropriations for Higher Education Act programs under a
16   variety of appropriations legislation and continuing resolutions—including, for example, the
17   Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 1598-1612 (Dec.
18   27, 2020).

19       3.      Under Title IV of the HEA, "Congress provides billions of dollars through loan
20   and grant programs to help students pay tuition for their postsecondary education." *Ass'n of*
21   *Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 433 (D.C. Cir. 2012).

22       4.      The Secretary has "broad authority" to regulate programs administered by the
23   Department, including Title IV. *Am. Fed. of Teachers v. DeVos*, 484 F. Supp. 3d 731, 736 (N.D.
24   Cal. 2020) (citing 20 U.S.C. § 1221e-3).

25       5.      "To participate in Title IV programs—*i.e.*, to be able to accept federal funds—
26   a postsecondary institution . . . must satisfy several . . . requirements." *Ass'n of Private Sector*
27   *Colleges & Univs.*, 681 F.3d at 433-34. To begin with, each school must be an "institution of
28   higher education" under the HEA. 20 U.S.C. § 10001.

6.      Section 101 of the Act provides the principal definition of the term "institution of higher education," which it limits to "public or other nonprofit institutions." 20 U.S.C. § 1001(a)(4). Proprietary institutions" and "postsecondary vocational institution[s]," *id.* § 1002(b) & (c), may also participate in Title IV programs, under different terms, but are not eligible for most other programs authorized by the HEA. *See Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 133, 138-41 (D.D.C. 2012).

7.      The HEA defines "[t]he term 'nonprofit' as applied to a school, agency, organization, or institution" as one that is "owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual." 20 U.S.C. § 1003(13).

8.      The Department's regulations implement this provision of the HEA by further clarifying that:

> F]or purposes of [institutional eligibility under the Higher Education Act], a "nonprofit institution" is an institution that:
>
> (i) Is owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private shareholder or individual;
>
> (ii) Is legally authorized to operate as a nonprofit organization by each State in which it is physically located; and
>
> (iii) Is determined by the U.S. Internal Revenue Service to be an organization to which contributions are tax-deductible in accordance with section 501(c)(3) of the Internal Revenue Code.

34 C.F.R. § 600.2.

9.      Some requirements for Title IV participation apply to all schools, regardless of whether they are nonprofits or proprietary. For example, all institutions must be accredited by a nationally-recognized accrediting agency. 20 U.S.C. §§ 1001(a)(5), 1002(b)(1), 1002(c)(1)(A). And all institutions must demonstrate their "financial responsibility." *Id.* § 1099c(a).

10.     Some Title IV eligibility requirements apply only to proprietary schools. Proprietary institutions must not derive more than 90% of their revenue from Title IV funds,

*id.* § 1094(a)(24). And the Department is engaged in the rulemaking process to reinstate gainful employment requirements for proprietary institutions—which, if implemented, could require them to demonstrate certain debt-to-earnings ratios for their students upon graduation. *See* Dept. of Ed., Issue Paper 3: Gainful Employment (Session 1: Jan. 18-21, 2022), *available at* https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/3gainfulemployment.pdf. Similar gainful employment regulations were issued in 2011, 76 Fed. Reg. 34448 (June 13, 2011), and were rescinded in 2019, 84 Fed. Reg. 31392 (July 1, 2019).

11.    Classification as a proprietary institution may impact an institution's eligibility for other types of funding. For example, Congress made clear that some coronavirus pandemic relief funds are only available to public, nonprofit, or postsecondary vocational institutions of higher education, and directed smaller tranches of funding for proprietary institutions. *See* Coronavirus Supplemental Appropriations, § 314(a)(1), (4), 134 Stat. 1932-33; American Rescue Plan, § 2003, 135 Stat. 23. In separate litigation, Plaintiff is challenging the Department's determination that it is only eligible to receive pandemic relief funds as a proprietery institution. The District Court dismissed Plaintiff's claims. *See Grand Canyon Univ. v. Cardona*, No. CV-21-00566, 2021 WL 5396090 (D. Ariz. Nov. 18, 2021). Plaintiff filed an appeal that is pending at the Ninth Circuit. *See Grand Canyon Univ. v. Cardona*, No. 21-17113.

## B. Reapplication Upon a School's Change in Ownership

12.    A school may "participate in . . . Title IV, HEA program[s] . . . only if the institution enters into a written program participation agreement with the Secretary." 34 C.F.R. § 668.14(a)(1); 20 U.S.C. § 1094. The program participation agreement "conditions the [school's] initial and continued participation" in Title IV upon compliance with the applicable regulations "and any additional conditions specified in the program participation agreement that the Secretary requires the institution to meet." 34 C.F.R. § 668.14(a)(1). Because some conditions only apply to for-profit colleges, the Secretary must make a determination about whether the school should be classified as nonprofit or proprietary institution at the outset, in order to establish the terms of a school's program participation agreement.

13.    When a school that has been participating in Title IV programs undergoes "a

18

change in ownership that results in a change in control," its program participation automatically terminates and it ceases to qualify as an eligible institution. 34 C.F.R. § 668.14(g)(1).

14. A "change in ownership resulting in a change in control" may include, among other things: "[t]he sale of the institution"; "[a] transfer of assets that comprise a substantial portion of the educational business of the institution . . ."; and/or "a change in status as a for-profit, nonprofit, or public institution." *Id.* § 600.31(d); *see also id.* § 600.20(b)(2)(i).

15. Prior to a change in control, potential buyers often wish to know if the Department sees any impediment to their continued eligibility for Title IV after the anticipated change in ownership and what conditions may be imposed for continued participation. As a courtesy, and at the institution's request, the Department may conduct a "preacquisition review." This is a voluntary process that does not result in a final agency decision. *See* U.S. Department of Education, 2017-2018 Federal Student Aid Handbook, vl. 2, ch. 5, at 2-121 (June 15, 2017). Only after the transaction occurs does the Department make a final decision based on the institution's new Title IV application. *Id.*

16. Upon a change in ownership, the school must submit a new application to the Secretary if it wishes to renew its participation. *Id.* § 600.31(a)(1); *Id.* § 600.20(b)(2)(B) (requiring reapplication to "[r]establish [Title IV] eligibility and certification as a private nonprofit, private for-profit, or public institution following a change in ownership that results in a change in control as described in § 600.31").

17. Through the reapplication process, a school can "[re]establish [its] Title IV eligibility and certification" by demonstrating "to the Secretary . . . that the institution continues to meet the [relevant] requirements" *Id.* § 600.20(b)(2)(i). In addition, if the school applies to participate in the Title IV program as a nonprofit institution, it must demonstrate that its new ownership structure satisfies the definition of a "nonprofit institution" under the HEA and its implementing regulations. *Id.* Depending on the circumstances, the Secretary may approve a proprietary institution's eligibility to continue participation in Title IV, while denying the college's request to participate as a nonprofit institution for purposes of the program.

18.    If a school "under [] new ownership submits a 'materially complete application' . . . no later than 10 business days after the day the change [in ownership] occurs," then "the Secretary may continue the institution's participation in [Title IV] programs on a provisional basis" while evaluating the application. *Id.* § 600.20(g)(1); *see id.* §600.20(h). Unless and until the Secretary approves a school's application for nonprofit status, the Department continues to treat the school as a proprietary institution for Title IV purposes. If the Secretary approves the school's request to be treated as a nonprofit institution, the Secretary then considers the school a nonprofit for purposes of its participation in Title IV.

19.    Since at least 2016, the Department has employed a process of detailed scrutiny to assess change-in-control applications seeking nonprofit conversions. *Gov't Accountability Office, GAO-21-89, Higher Education: IRS and Education Could Better Address Risks Associated with Some For-Profit College Conversions*, at 41 (December 2020), *available at* https://www.gao.gov/assets/gao-21-89.pdf.[1] That process includes evaluating the types of information that were considered by the Department with respect to Plaintiff's application following its change in control, such as: "a list of the new tax exempt college's board of directors, purchase and sale agreements, and independent appraiser reports, to assess whether the sale price was fair and did not improperly benefit insiders." *Id.*

20.    As a result of the Department's practice of making independent determinations regarding an institution's nonprofit status for Title IV purposes upon a change in ownership, and closely scrutinizing change-in-control applications, the Department has rejected at least one other ;application for nonprofit status prior to the transaction at issue. AR-J-0331-0342; AR-J-0074; AR-J-0078; AR-J-0077. In 2016, the Department denied the Center for Excellence in Higher Education's ("CEHE") request to convert its colleges to nonprofit status following a change in ownership even though CEHE had been issued 501(c)(3) tax exempt status. AR-J-0331-0342.

---

[1] As Defendants explained in prior briefing, the Court can take judicial notice of the statements made in GAO reports, so long as it does not automatically adopt inferences or conclusions of law stated therein. ECF No. 68 at 6-7.

21.     Notably, in communications with the Department throughout its application process, Plaintiff repeatedly acknowledged the Department's practice of independently scrutinizing nonprofit conversions and referred to the Department's denial of CEHE's prior request. AR-J-0333; AR-J-0074; AR-J-0078; AR-J-0077.

22.     For example, Plaintiff stated: "We understand that the Department makes an independent decision regarding an institution's status as a nonprofit institution for Title IV purposes." AR-J-0074.

23.     Plaintiff also stated: "We are aware that, in other cases, the Department has determined that, notwithstanding an institution's nonprofit status, the terms of the institution's relationship with its former for-profit owner suggest the former owner still benefits from the net earnings of the institution." AR-J-0081; *see also* AR-J-0077 (contending that "the new GCU and GCE relationship differs from other 'nonprofit conversions' that have come under Department scrutiny in the past.").

24.     Separately, however, Plaintiff indicated to its Board that it believed it would be able to push its application through *in spite of the Department's policy. See* AR-E-0007 ("It appears the current political landscape is much more favorable to this type of transaction."); AR-E-0098.

### C. Grand Canyon University

25.     GCU was founded in 1949 and sold to GCE in 2004. *See* Compl. ¶ 1. Since 2004, it has participated in Title IV funding programs as a proprietary institution, as defined in Section 102(b) of the Higher Education Act.

26.     In 2014, GCU's Board of Trustees formed a new Arizona nonprofit entity, Gazelle University ("Gazelle"),[2] for the purposes of facilitating GCU's conversion to nonprofit status. AR-F-0066-0077. Gazelle would ultimately purchase all GCU-related "real property . . . as well as tangible and intangible academic-related assets . . . from GCE" for approximately $853 million. AR-A-0002.

---

[2] Gazelle later changed its name to GCU. Consistent with the Court's prior treatment, ECF 55 at 2, this statement only refers to Gazelle when describing the sale of GCU in 2018.

27.     As part of that sale, Gazelle agreed to pay approximately 60% of the school's adjusted gross revenue to the for-profit seller (GCE) on an ongoing basis, for the provision of various services. AR-A-0003.

28.     On November 9, 2015, the IRS approved Gazelle's 501(c)(3) tax-exempt status. AR-F-0607-0608.

29.     After preliminarily agreeing upon the terms of purchase, GCU submitted a request for preacquisition review to the Department on January 18, 2018. AR-A-0001.

30.     On July 1, 2018, notwithstanding the fact that GCU had not yet received a substantive response to its request for preacquisition review, the buyer and seller completed the sale. AR-A-0001.

31.     Within ten business days, GCU submitted a materially complete application to continue its participation in Title IV programs, and it sought a change in status to be deemed a nonprofit institution under Section 101 of the HEA. AR-A-0001. In accordance with the regulatory authority, the Department continued GCU's Title IV participation while the agency evaluated that application. AR-A-0002.

32.     Meanwhile, on December 20, 2018 (after the transaction closed, but before the Department had issued its decision on Plaintiff's application), Brian Mueller, who is both GCU's President and GCE's CEO, stated in an inverview: "[T]he University being not-for-profit is a tremendous advantage. That stigma is now gone. We can recruit in high schools that would not let us in the past . . . We're just 90 days into this, but we're experiencing, we believe, a tailwind already just because of how many students didn't pick up the phone [before] because we were for-profit." *The Future of Education – Trends, Costs & Technology*, the Motley Fool (Dec. 20, 2018), *available at* https://www.fool.com/investing/2018/12/20/the-future-of-education-trends-cost-technology.aspx.

33.     On February 20, 2019, Mr. Mueller further stated during GCE's Q4 2018 earnings call: "[N]ew student online growth [following GCU's conversion] was more than we expected and I think it's evidence that being out there now a million times a day saying we're non-profit has had an impact."

**a) The Department's November 16, 2019 Decision regarding GCU's Application**

34.     To review Plaintiff's application, the Department conducted an in-depth analysis of the relevant considerations, including: the transaction documents that govern Plaintiff's corporate structure; valuation reports from consulting firms that were prepared for Plaintiff to purportedly support the legitimacy of that structure; the applicable Title IV regulations that govern nonprofit status for purposes of Title IV; and relevant authority interpreting a similar standard from the Internal Revenue Code. *See* AR-A-0010. The Department also considered the fact that the IRS had granted Plaintiff 501(c)(3) tax-exempt status, but determined that its own review standards for nonprofit status were distinguishable and warranted a different result for purposes of Title IV participation. AR-A-0014-0015.

35.     In addition, the Department considered a chart of other service-provider agreements that Plaintiff provided during the application process. AR-C-1775-1781. Even though the service-provider agreements on that chart were distinguishable for various reasons, including but not limited to the fac that they did not involve changes in ownership, the Department asked Plaintiff for additional information to better understand Plaintiff's view as to why those agreements might be relevant. Specifically, the Department requested that "to the extent GCU relies on the service provider survey chart . . . and to the extent the information is available to you or your clients, please identify any service providers that are affiliates, owners, or former owners of the institution (including related persons and entities), and indicate whether any of the servicing agreements were entered into in conjunction with a change in ownership transaction." AR-J-0156. Plaintiff could not point to any comparable agreements in response, stating instead that "GCU believes that comparisons to the Kaplan transaction or any other example are not relevant . . . Rather, it believes that the Transaction stands on its own." AR-J-0086 (emphasis added).

36.     In addition, while Plaintiff at other times referenced the Purdue-Kaplan sale in an attempt to draw comparisons, the Purdue Kaplan transaction was materially different for a number of reasons, including but not limited to the fact that Purdue is *public* institution of

higher education, which means that its Title IV student loans are backed by the state of Indiana. *See* AR-J-0006. Indeed, Plaintiff's comparisons to Purdue-Kaplan were directly contradicted by their own statement that "GCU believes that comparisons to the Kaplan transaction or any other example are not relevant." AR-J-0086.

37.     On November 16, 2019, the Department approved GCU's ongoing Title IV participation as a proprietary institution, but denied its application to convert its status to a nonprofit institution of higher education. AR-A-0016-0017 (the "November 16 Decision").

38.     The Department's November 16 Decision provided a detailed description and analysis of: (1) the Asset Purchase Agreement, which set the terms for Gazelle/GCU to acquire the school's assets from GCE, AR-B-0007-0377; (2) the Credit Agreement, which structured the purchase through a Senior Secured Note with GCE as the lender, AR-B-1355-1441; and (3) the Master Services Agreement (the "MSA"), which set up a revenue-sharing agreement through which GCE is guaranteed to continue to providing certain services to Gazelle/GCU in exchange for approximately 60% of the school's adjusted gross revenue, AR-B-1279-1354, including under the amended terms that were presented upon reconsideration. AR-A-0021. The November 16 Decision also discussed that the MSA also sets an initial 15-year term for this revenue-sharing arrangement, with automatic renewals every five years into perpetuity, and imposes punishing fees for termination. AR-A-0002-0004, 0012-0016; AR-A-0021.

39.     The Department also carefully considered the valuation reports that Plaintiff submitted from Barclays Capital Inc. ("Barclays") and Deloitte Tax LLP ("Deloitte"), which were commissioned to support the transaction. AR-A-004-008 (discussing AR-C-0001-0042 and AR-C-0057-00140). The Department identified multiple flaws in those reports, and further noted that the credibility of those reports was questionable in light of the fact that "opinions in key areas appear to have been based on information supplied by GCE management." AR-A-0009.

40.     Based on its careful analysis of the materials submitted, the Department concluded that the transaction terms (including, but not limited to, the revenue-sharing

servicing agreement) would cause a substantial portion of the GCU's net earnings to benefit the for-profit seller on an ongoing basis. AR-A-0015

41.     The Department expressed concern that "[d]espite GCE only taking on the responsibilities of 28% of the operating costs, 60% of the gross adjusted revenue from the Institution will be paid to GCE under the MSA" and "[w]hen payments on the Senior Secured Note are included in the analysis, GCE will be receiving approximately 95% of Gazelle's revenue." AR-A-0014. Thus, "if revenue increases at a rate faster than operating costs, GCE has the potential to be paid even significantly higher amounts over the costs of the services it provides. Therefore, instead of the increased revenue being used for GCU's exempt purpose of providing education, the additional revenues would benefit the shareholders of GCE." *Id.*; AR-A-0021.

42.     The November 16 Decision also explained that overlap between the management of GCE and GCU indicated that Grand Canyon would still effectively be operating under control of the for-profit seller—most notably the fact that the same person (Brian Mueller) would continue to serve as both GCE's CEO and GCU's President, in addition to his being a GCE shareholder. AR-A-0015-16. In light of "the breadth of the services provided under the MSA" and the "obviously conflicting loyalties at stake," the Department concluded that Mr. Mueller was not insulated from conflicts, despite some limited protections put into place. *Id.*; *see also* AR-A-0036

43.     The Department's November 16 Decision acknowledged that the IRS had granted GCU tax-exempt status, but explained that determinations by the IRS and others "are not the sole determining factors" in the Department's analysis, "nor does the Department need to defer to those determinations." AR-A-0014-0015.

44.     The agency further noted that "the IRS approval was issued three years prior to the" transaction the Department of Education reviewed. *Id.* The financial terms of the transaction had changed since the 2015 application to the IRS, and Plaintiff's pricing valuation studies were not presented to the IRS because they had not been completed at that time. AR-J-0077 n.3.

45.     In addition, the Department found that the IRS had not "conducted a comprehensive review" of the 2018 transaction, and "[u]nlike the IRS's initial grant of tax-exempt status, the Department's determination of nonprofit status considers the structure and planned operations of the institution when its owner(s) apply for that change of status." *Id.*

46.     The Department also considered the fact that Plaintiff's accrediting agency, the Higher Learning Commission (HLC), had approved its conversion for accreditation purposes, but disagreed with HLC's conclusions that Plaintiff's executive leadership remained sufficiently independent from GCE. The Department explained that it "makes its own determination regarding nonprofit status, and the fact that HLC may have reached a different conclusion is neither binding nor persuasive." AR-A-0035.

47.     The Department's November 16 Decision also stated that GCU "must cease any advertising or notices that refer to its 'nonprofit status'" because "[s]uch statements are confusing to students and the public, who may interpret such statements to mean that the Department considers GCU a nonprofit under its regulations," and made clear that it "does not take a position regarding statements that GCU may make about its IRS status as a 501(c)(3) tax exempt organization." AR-A-0017.

**b) The Department's Reconsideration Decision**

48.     Following the November 16 Decision, GCU proposed amending the servicing agreement with GCE, which would have slightly modified its terms, AR-A-0020-0022, and sought reconsideration.

49.     The Department conducted a reconsideration review and, on January 12, 2021, the Department denied GCU's request to reconsider its decision denying GCU's request to convert to nonprofit status. AR-A-0019 (the "Reconsideration Decision"). Accordingly, the Department would continue to classify GCU "as a proprietary institution" for purposes of its Title IV participation. AR-A-0037.

50.     The Reconsideration Decision explained that GCU's proposed amended terms changed the revenue-sharing structure somewhat, but not materially, and overall the revised terms did not change "the basic structure whereby a substantial portion of GCU's revenues

benefits GCE." AR-A-0035.  Thus, the Reconsideration Decision reiterated the reasoning in its November 2019 Decision, and explained that GCU's 2018 change in ownership still resulted in "taking a fully integrated proprietary institution and separating its academic and campus structure into a nonprofit entity," while "retaining" various "'servicing' functions in the publicly-traded for-profit former owner." AR-A-0028-29.

51.     The Reconsideration Decision also explained that the Department had extensively reviewed supplemental economic studies that Plaintiff provided in support of its application for reconsideration, which were from Deloitte and BKD CPAs & Advisors ("BKD"). AR-A-0024 (discussing AR-C-0224-0306 and AR-C-0316-459). The Department provided detailed explanation as to why nothing in those reports demonstrated that the revenue-sharing arrangement between GCE and GCU "potentially into perpetuity, constitutes anything other than a continuing revenue stream to its former owner GCE, the primary purpose of which is to drive shareholder value for GCE." AR-A-0024.

52.     For example, the Department explained that both Deloitte's and BKD's studies were based on transfer pricing methods—which, as described in the reconsideration decision, are methods that "allow[] for the establishment for the goods and services exchanged between a subsidiary, an affiliate, or commonly controlled companies that are part of the same larger enterprise [which] can lead to tax savings for corporations." AR-A-0025. The Department concluded that the transfer pricing approach was inapt for the transaction at issue, where the question at hand is whether the service agreement is consistent with the behavior of what should be two financially independent entities. *Id.* And the Department also discussed the reasons why other particulars of the Deloitte and BKD studies were problematic. AR-A-0026-0035.

53.     The Reconsideration Decision also again explained that Department's review differed from "the IRS's initial grant of tax-exempt status" because "the Department's determination of nonprofit status considers the structure and planned operations of the institution when its owner(s) apply for that change of status" and the agency "seeks to ensure that a nonprofit institution's revenues . . . are primarily devoted to the mission of the school

27

and not to other parties, including . . . the prior owner and its shareholders." AR-A-0035.

54.      In addition, the Reconsideration Decision reiterated its concerns about Mr. Mueller's dual roles as President of GCU and CEO of GCE. But, the Department also made clear that it was not directing GCU to remove Mr. Mueller as President of the school. Rather, the Department explained that, because its concern was Mr. Mueller's dual roles, "nothing would prevent [him] from severing ties with GCE if [he] and (and the GCU Board) thought it was more important for [him] to stay with GCU instead of serving in two potentially conflicting positions." AR-A-0036. Mr. Mueller ultimately chose to continue in both positions.

55.      Accordingly, the Department again determined that GCU does not satisfy the Department's definition of a nonprofit and rejected GCU's request to reconsider the Department's decision denying GCU's request to convert to nonprofit status. AR-A-0037.

Dated: June 30, 2022                    Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

                                        MARCIA BERMAN
                                        Assistant Branch Director
                                        Federal Programs Branch

                                        */s/ Emily Nestler*
                                        EMILY NESTLER
                                        Trial Attorney (DC Bar No. 973886)
                                        Civil Division, Federal Programs Branch
                                        U.S. Department of Justice
                                        1100 L Street NW
                                        Washington, D.C. 20005
                                        Telephone: (202) 305-0167
                                        E-mail: emily.b.nestler@usdoj.gov

                                        *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2022, I electronically transmitted the foregoing to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants for this matter.

/s/ *Emily Nestler*

EMILY NESTLER