Kevin E. O'Malley (006420)
Hannah H. Porter (029842)
Gallagher & Kennedy
2575 E. Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone: 602.530.8000
Facsimile: 602.530.8500
Email: kevin.omalley@gknet.com
Email: hannah.porter@gknet.com

Steven M. Gombos (*pro hac vice*)
Virginia State Bar No. 30788
David A. Obuchowicz (*pro hac vice*)
Virginia State Bar No. 82483
Gombos Leyton, PC
11350 Random Hills Road, Suite 400
Fairfax, Virginia 22030
Telephone: 703.934.2660
Facsimile: 703.934.9840
Email: sgombos@glpclaw.com
Email: dobuchowicz@glpclaw.com
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Grand Canyon University,<br>                    Plaintiff,<br>v.<br><br>Miguel Cardona, *et al*,<br><br><br>                    Defendants. | No. 2:21-cv-00177-SRB<br><br>**Plaintiff's Reply in Support of its Motion for Summary Judgment and Opposition to Defendants' Cross-Motion for Summary Judgment** |

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

# Table of Contents

Argument.................................................................................................................. 2

1.   The relevant text, history, and structure confirm nonprofit status for Title IV
purposes is a result of state authorization and IRS recognition. ...................................... 2

2.   The Department has failed to provide fair notice to regulated parties about its
standards governing nonprofit status. ................................................................... 9

3.   The Department never identifies a legitimate basis to second-guess GCU's
nonprofit status................................................................................................... 11

3.1.   The Department has already conceded it does not have unique nonprofit
standards.......................................................................................................... 12

3.2.   Nothing unique about Title IV warrants a new application of IRS principles... 12

3.3.   Far from undertaking a Title IV-specific analysis, the Department ignored its
own statutes, regulations, guidance, and treatment of other institutions. ................ 14

3.4.   The Department dissembles about its analysis of the IRS's determination.......15

4.   The Department cannot establish that GCU's net revenue inures to the benefit of
any private shareholder or individual. ............................................................... 16

4.1.   GCU's revenues are solely devoted to its educational mission. ....................... 17

4.2.   GCE is not an insider of GCU......................................................................... 19

5.   The Department failed to rebut consensus expert evidence of GCU's nonprofit
status.................................................................................................................... 20

6.   The Department's pejorative attacks do not justify the restriction of GCU's First
Amendment Rights............................................................................................. 23

Conclusion.............................................................................................................. 24

i

1

2

**Table of Authorities**

3

**Cases**

4

*Allentown Mack Sales & Serv., Inc. v. N.L.R.B.,*
522 U.S. 359 (1998) ............................................................................ 16

5

6
*Am. Radio Relay League, Inc. v. FCC,*
524 F.3d 227 (D.C. Cir. 2008) .......................................................... 22

7
*Azure v. Morton,*
514 F.2d 897 (9th Cir. 1975) ............................................................... 3

8

9
*Broadway Theatre League v. United States,*
293 F. Supp. 346 (W.D. Va. 1968) ............................................... 17, 19

10
*Caldwell v. Dretke,*
429 F.3d 521 (5th Cir. 2005) ............................................................... 7

11

12
*Christopher v. SmithKline Beecham Corp.,*
567 U.S. 142 (2012) ........................................................................... 13

13
*FCC v. Fox,*
556 U.S. 502 (2009) ............................................................................. 9

14

15
*Founding Church of Scientology v. United States,*
412 F.2d 1197 (Ct. Cl. 1969) ......................................................... 17, 18

16
*Friedler v. GSA,*
271 F. Supp. 3d 40 (D.D.C. 2017) ..................................................... 11

17

18
*Goffney v. Becerra,*
995 F.3d 737 (9th Cir. 2021) .............................................................. 13

19
*Gonzales v. Oregon,*
546 U.S. 243 (2006) ........................................................................... 20

20

21
*Gov't of Guam v. Guerrero,*
11 F.4th 1052 (9th Cir. 2021) ............................................................ 16

22
*Kisor v. Wilkie,*
139 S.Ct. 2400 (2019) .............................................................. 2, 12, 20

23

24
*Morisette v. United States,*
342 U.S. 246 (1952) ........................................................................... 17

25
*Nat. Res. Def. Council v. EPA,*
777 F.3d 456 (D.C. Cir. 2014) ........................................................... 16

26

*PSEG Energy Res. & Trade LLC v. FERC*,
665 F.3d 203 (D.C. Cir. 2011) .................................................................................. 23

*Ringsby Truck Lines, Inc. v. United States*,
263 F. Supp. 552 (D. Col. 1967). ............................................................................. 22

*Select Specialty Hosp. - Bloomington, Inc. v. Burwell*,
757 F.3d 308 (D.C. Cir. 2014) .................................................................................. 11

*U.S. ex rel. Bookwalter v. UPMC*,
946 F.3d 162 (3rd Cir. 2019) ...................................................................................... 4

*United Cancer Council v. Commissioner*,
165 F.3d 1173 (7th Cir. 1999) .............................................................................. 19, 20

*United States v. Chem. Found.*,
272 U.S. 1 (1926) ....................................................................................................... 16

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) ...................................................................................... 4, 6, 9, 14

*Wilderness Society v. U.S. Fish Wildlife*,
353 F.3d 1051 (9th Cir. 2003) ................................................................................... 17

*Yselta del sur Pueblo v. Texas*,
142 S.Ct. 1929 (2022) .................................................................................................. 3

**Statutes**

20 USC 1003(13) ........................................................................................................... 3

20 USC 1232a ...................................................................................................... 3, 14, 20

26 USC 501(c)(3) ................................................................................................... passim

Higher Education Act of 1965, Pub. L. 89–329 § 801(a)(4), (c) (Nov. 8, 1965) ................... 4

Higher Education Amendments of 1992, Pub. L. 102-32 (July 23, 1992). ........................... 5

Higher Education Opportunity Act, Pub. L. No. 110-315, 122 Stat. 3078 (Aug. 14, 2008).. 6

**Other Authorities**

59 Fed. Reg. 22,324 (Apr. 29, 1994)......................................................................... 7, 9

75 Fed. Reg. 42,190 (July 20, 2010). ............................................................................. 6

ABUSES IN FEDERAL STUDENT GRANT PROGRAMS PROPRIETARY SCHOOL ABUSES, S.
Hr'g 104-477 at 222 (July 12, 1995)............................................................................ 6

ADMINISTRATIVE LAW TREATISE, § 6.9 (4th ed. 2002) ................................................ 10

Private Letter Ruling 201609006, 2015 PLR LEXIS 1192, *155 (I.R.S. April 9, 2015) .......17

**Regulations**

26 CFR 1.482-1(b)..............................................................................................................22

34 CFR 600.2 ............................................................................................................. 1, 2, 4

34 CFR 600.31 ....................................................................................................................6

34 CFR 668.13(b)..............................................................................................................15

34 CFR 668.25 ...................................................................................................................1

34 CFR 668.25(a)............................................................................................................ 14

As expected, the Department attempts to cloak its nonprofit decision in agency deference and sell the Court on the notion that it "seeks to ensure that a nonprofit institution's revenues . . . are primarily devoted to the school's mission." AR-A-0015. But if that were the case, GCU would already be a nonprofit for Title IV purposes. And what's more, the Department's brief does not support that claim and goes a good way towards demolishing it. For all its elevated rhetoric, the Department concedes it does not review nonprofit status of the approximately 1,800 existing nonprofits. ECF #74 (Opp.) at 24. In other words, the Department's stated interest in ensuring that Title IV funds are used for a nonprofit's educational mission is limited to a handful of converting institutions and excludes hundreds of existing nonprofits with similar revenue sharing arrangements. That alone is arbitrary and capricious.

Nor does the Department's brief shed any light on what its purported independent review process entails. There is simply no guidance from the Department explaining how private inurement changes in the Title IV context, which is especially egregious given that the Department does not have expertise in private inurement matters. Similarly, the Department fails to deal directly and forthrightly with its own past statements recognizing nonprofit status occurs outside its control.

Moreover, nowhere in its brief does the Department address 34 CFR 668.25, which permits GCU to contract out any services it chooses to a third party, like GCE. Nor does the Department confront its published guidance expressly permitting bundled services agreements, like the MSA, which pay third parties for services using revenues.

The Department's Decisions fail as a matter of law and fact. (1) The Department concedes that its interpretation of 34 CFR 600.2 requires the Court to read nonprofit institution to mean more than one thing in part 600, contrary to long settled rules of statutory and regulatory construction. The text, history, and structure of the HEA and part 600 all confirm nonprofit status is the outcome of state law and IRS approval. (2) Despite

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

1

basing its written decisions on IRS authority, the Department retreats from the IRS's private inurement test in reliance on an unarticulated Title IV standard. But the Department fails to identify any interests touching its substantive expertise—asking instead that this Court sanction a determination untethered to discernable standards.

**Argument**

**1.  The relevant text, history, and structure confirm nonprofit status for Title IV purposes is a result of state authorization and IRS recognition.**

Under the plain language of the HEA and 34 CFR 600.2, GCU is a nonprofit institution. No other conclusion is reasonable considering the relevant regulatory **text, history, and structure**. *See Kisor v. Wilkie*, 139 S.Ct. 2400, 2412-14 (2019) (explaining that courts defer to agency interpretations "only if a regulation is genuinely ambiguous" and then to determine the "original meaning"). Moreover, even if the Court were to find 600.2 genuinely ambiguous after exhausting all traditional tools of construction, GCU's argument still prevails because the Department's position is unreasonable. *See Id.* at 2415. The Department's interpretation conflicts with its change-in-control regulations, deviates from its own prior interpretation, and takes the agency far outside its substantive expertise. *Id.* at 2417-18.

**Text.** On an initial glance, the Department's superfluity argument raises questions, but it is superficial and misapprehends GCU's argument and the plain language of 34 CFR 600.2. Far from cutting 600.2 short, GCU's argument gives it full effect. And, on closer review, it is actually the Department whose argument renders language mere surplusage.

Take the last point first. On mere *ipse dixit*, the Department asserts that the HEA's nonprofit definition is a congressional "mandate" authorizing the Secretary to decide nonprofit status. ED at 14. But the Department ignores the text and history of the HEA, both of which undermine its claim. Congress borrowed the operative language in the HEA's nonprofit definition verbatim from the IRS's private inurement test in § 501(c)(3)—but

2

specifically added the **bolded** text below to the IRS's language.[1] A nonprofit institution, as defined in the HEA, is an institution "owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which inures, **or may lawfully inure**, to the benefit of any private shareholder or individual." 20 USC 1003(13) (emphasis added).

Congress made it clear, by specifically including the phrase "**or may lawfully inure**" in the HEA's nonprofit definition, that those institutions prohibited by law from engaging in private inurement qualify as nonprofit institutions for the Title IV programs. *See Yselta del sur Pueblo v. Texas*, 142 S.Ct. 1929, 1939 (2022) (differences in language convey differences in meaning). The regulatory history, addressed below, confirms this reading. Under the HEA's plain language, then, GCU is a nonprofit institution because, as an IRS-approved 501(c)(3), "no part of [GCU's] net earnings . . . may lawfully inure[] to the benefit of any private shareholder or individual." 20 USC 1003(13).

The Department's congressional mandate argument—which runs something along these lines: (1) Congress defined nonprofit by reference to private inurement; (2) private inurement must be addressed by someone; so, therefore (3) the Department enforces private inurement—ignores the distinct clause Congress set off with the disjunctive "or" in the HEA's nonprofit definition. *See Azure v. Morton*, 514 F.2d 897, 900 (9th Cir. 1975) ("the use of a disjunctive in a statute indicates alternatives and requires that they be treated separately"). It also ignores other statutes, which confirm Congress's intent to keep the Department out of the operational matters of institutions of higher education—operational matters inherent in making nonprofit determinations. *See, e.g.,* 20 USC 1232a (barring the Department from interfering in college personnel or management).

---

[1] *Compare* 26 USC 501(c)(3) ("no part of the net earnings of which inures to the benefit of any private shareholder of individual") *with* 20 USC 1003(13) ("no part of the net earnings of which inures, **or may lawfully inure**, to the benefit of any private shareholder or individual") (emphasis added).

1    In contrast, GCU's interpretation gives full effect to the HEA and the Department's

2    nonprofit definition at 34 CFR 600.2. The Department misstates or misapprehends GCU's

3    argument in asserting that GCU's reading of 600.2 renders subparts (i) and (ii) surplusage.

4    Opp. at 11. First, the Department's claim that GCU ignores state authorization (subpart ii)

5    is dispelled by the same page from GCU's motion the Department cites for support. GCU

6    Mot. at 12 ("Nonprofit status for Title IV purposes is a function of state law and IRS

7    approval). Moreover, GCU maintains that state authorization as a nonprofit (subpart ii) and

8    IRS recognition as a 501(c)(3) (subpart iii) conclusively establish that a school is owned and

9    operated by one or more nonprofit corporations or associations, no part of the net earnings

10   of which inures to the private benefit of any individual or shareholder (subpart i). That

11   subparts (ii) and (iii) evidence subpart (i) does not render subpart (i) meaningless.[2] *See U.S.*

12   *ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 171 (3rd Cir. 2019) ("[J]ust because a statute has

13   two elements does not mean that one can never be evidence of the other.").

14   **HISTORY.** The Department's "congressional mandate" argument also takes a major

15   hit if you pause to review how the "statutory and regulatory framework" developed. Opp.

16   at 12. Notably, for all its bluster as to its mandate, the Department provides no supporting

17   evidence or analysis. As demonstrated in GCU's opening brief and expounded below, the

18   historical evidence is uniform and backs GCU's interpretation of 600.2. In contrast, no

19   sources speak of the Department's authority to decide nonprofit status, a conspicuous

20   omission. *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022) ("[T]he want of assertion of

21   power by those who presumably would be alert to exercise it, is equally significant in

22   determining whether such power was actually conferred.") (quotation omitted).

23

---

24   [2] In any event, the surplusage canon merely raises a presumption. *See* Scalia & Garner,
     Reading Law: The Interpretation of Legal Text at 176-77 (2012) (noting that the surplusage
25   canon, "like all other canons, [] must be applied with judgment and discretion and with
     careful regard to context . . . . Sometimes drafters *do* repeat themselves and *do* add words
26   that add nothing of substance[.]").

When Congress enacted the definition of nonprofit, the HEA limited Title IV participation exclusively to public and nonprofit schools. HEA of 1965, Pub. L. 89–329 § 801(a)(4), (c) (Nov. 8, 1965). The Department thus cannot credibly claim the HEA's nonprofit definition authorized the Secretary to scrutinize whether an institution is "best characterize[d]" as a proprietary or nonprofit institution for participation purposes. Opp. at 10.

Nor can the Department find support in later HEA reauthorizations. Take, for example, the two most relevant reauthorizations.

**(1)** Congress enacted major amendments to the HEA in 1992 on the heels of committee hearings about program abuses by institutions of all types, but certainly focused on proprietary schools. Higher Education Amendments of 1992, Pub. L. 102-32 (July 23, 1992). The reauthorization introduced the 90/10 rule (*id.* at § 481(b)(3))—the only "statutorily mandated term[]" exclusive to proprietary schools.[3] Opp. at 9; AR-J-0350. And the Department also informed Congress, at that time, that it intended to treat proprietary and nonprofit institutions differently. If ever Congress or the Department contemplated the Secretary deciding whether an institution is "best characterized" as nonprofit or proprietary, the 1992 reauthorization would have been it. Yet there is not only a conspicuous absence of such talk, but near contemporaneous recognition that nonprofit status occurs outside the Department's review.

A written exchange between Congress and the Department highlights this point:

> Question: You have stated that your new approach will differentiate between for-profit and nonprofit institutions. The Subcommittee's hearings in 1993 showed, and recent information indicates, however, nonprofit institutions can also be abusive. Moreover, it would also seem very simple for a school to change its status from for-profit to non-profit and to simply plough through all of its profits into salary and expenses. How will your new approach deal with these possibilities?

---

[3] Originally, the 85/15 Rule, because it required for-profits to generate at least 15 % of revenues from non-Title IV sources, it is referred to herein as the 90/10 Rule for consistency.

Answer: The Department recognizes that in some states, institutions can easily switch from profit status to non-profit status, or from a non-degree granting institution to a degree-granting institution. We want to ensure that schools do not evade certain regulatory requirements simply by changing their designation. For this reason, we will subject schools that do change from profit to non-profit or from a non-degree granting institution to a degree-granting institution to the same requirements of their previous designation for a certain period of time, perhaps as long as five years. We believe that this would be an effective way to dissuade institutions from changing their designation to avoid regulatory requirements . . ..

ABUSES IN FEDERAL STUDENT GRANT PROGRAMS PROPRIETARY SCHOOL ABUSES, S. Hr'g 104-477 at 222 (July 12, 1995). That exchange makes little sense if Congress mandated that the Department decide "whether an institution is designated as a non-profit or proprietary institution . . . for purposes of the [Title IV] program." Opp. at 1. Put simply, Congress never gave the Department the power to make such decisions and "[a]gencies have only those powers given to them by Congress…" *West Virginia*, 142 S. Ct. at 2609.

**(2)** Or consider the foreign nonprofit definition the Department added just after the most recent reauthorization in 2008. *See* Opp. at 3, n. 1 (citing the Higher Education Opportunity Act, Pub. L. No. 110-315, 122 Stat. 3078 (Aug. 14, 2008)). The Department expressly stated that an institution designated as a nonprofit by its relevant tax authority would be "automatically accepted" as a nonprofit for Title IV purposes—so long as the tax authority applied the same criteria as does the IRS. The Department's only response, buried in a footnote on page 13, is to say that this "different test" does not "supersede[]" the preexisting test for domestic schools. Opp. at 13, n. 7. But that misses the obvious logical inference. The Department wanted the foreign nonprofit definition to be "as comparable as possible to those [already] applicable to domestic institutions." 75 Fed. Reg. 42,190, 42,192 (July 20, 2010). For how could it be that the Department would rely on the tax designation of a foreign government but not its own? Simply put, "across the board," whether foreign or domestic, the Department believed the "only entities it should recognize . . . for making

determinations of nonprofit status are those that are responsible for administering the country's tax laws." *Id.*

**STRUCTURE.** If text and history compel GCU's reading of 600.2, then the broader regulatory structure rejects the Department's approach. To sustain its argument, the Department agrees it must read *nonprofit institution* in 34 CFR 600.31 to mean 501(c)(3) recognition (Opp. at 12), but then argues that everywhere else in Part 600, it means the entity's status for Title IV purposes as determined by the Department. This inconsistent approach is convenient for the Department, but it defies the most basic principle of statutory interpretation. *See Caldwell v. Dretke*, 429 F.3d 521, 527 (5th Cir. 2005) ("It is an elementary canon of statutory construction that we must give a term consistent meaning throughout an act.").

In response to this argument, the Department makes the same mistake with the Federal Register it cites. *See* Opp. at 12 (citing 59 Fed. Reg. 22,324, 22,333 (Apr. 29, 1994)). The regulatory history, in pertinent part, says the following:

1. When an institution changes its structure from for-profit to "tax-exempt, nonprofit status" it constitutes a change in control "under section 498(i) of the HEA."

2. Section 498(i) of the HEA permits the Department to provisionally certify institutions "that undergo a change [in] control."

3. Provisional certification means "certification subject to conditions, and the change from for-profit to nonprofit status *[i.e., the triggering event]* warrants adopting as those conditions of the required provisional certification *[i.e., ongoing participation]* those restrictions that would have applied to the institution had it remained a for-profit entity *[i.e., an acknowledgment the institution became a nonprofit for Title IV purposes before the Department recertified it].*"

59 Fed. Reg. at 22,334 (emphasis added). The relevant Federal Register is clear that IRS tax-exempt status is a triggering event for a change in control. This much the Department

acknowledges. But it also makes clear that IRS tax-exempt status makes the institution a nonprofit for Title IV purposes, too. *See id.* ("Although changes in the form of incorporation from for-profit to nonprofit are governed by a variety of State laws, only those nonprofit organizations that meet the further restrictions of section 501(c)(3) of the Internal Revenue Code qualify to participate in the title IV, HEA programs as nonprofit institutions."). Notably, the only further requirement to participate in Title IV is meeting the "restrictions of section 501(c)(3)" not also passing some arbitrary Departmental evaluation. *Id.*

**WHICH LEAVES?** The remainder of the Department's response essentially rests on a series of rhetorical questions that simply assume the truth of the Department's argument, instead of supporting it. And the questions are not difficult to answer, keeping in mind that the Department previously acknowledged nonprofit status turned on state approval and IRS recognition. Indeed, the Department's failure to deal directly with its past practice and statements is a major shortcoming in its Opposition.

- If it is "readily apparent" that a school's operations primarily benefit a third party, then "surely," the Department asks, it should not be required to classify it as a nonprofit. Opp. at 14. But that is a red herring. To the contrary, in a letter from then Under Secretary Ted Mitchell to Congresswoman DeLauro, Mitchell acknowledged that it is the IRS that should "determine whether those [operations] are permissible under the nonprofit rules," AR-J-0344. But that does not make the Department inert to concerns it has "during [its] review." Indeed, the Department routinely brought such concerns "to the attention of the IRS for review under that agency's standards." *Id.*

- The Department also asks what sense it makes to require schools to reapply after a change in control if it lacks discretion to "scrutinize" nonprofit status. Opp. at 13-14. But that is merely an opportunistic power grab that simply ignores why the Department made nonprofit conversion a change in control in the first place. It was not to determine whether an institution *is* a nonprofit for Title IV purposes; but, instead, to ensure the institution had

not converted to evade for-profit rules. Making nonprofit conversion a change in control permitted the Department to impose provisional requirements, *i.e.*, making the nonprofit temporarily comply with "those restriction that would have applied . . . had it remained a for-profit entity," which checked the incentive to convert to evade for-profit rules. *See* 59 Fed. Reg. at 22,334.

### 2. The Department has failed to provide fair notice to regulated parties about its standards governing nonprofit status.

Regulated parties are entitled to fair warning of the law the agency applies. *FCC v. Fox*, 556 U.S. 502, 515 (2009) recognizes this and requires agencies to acknowledge and explain policy changes. Although the Department's brief nowhere admits that it deferred to the IRS on nonprofit status for decades (*see* AR-J-0333), the Department argues that it satisfied *Fox* by announcing it would make an independent determination of nonprofit status. Opp. at 23.

But that fails to provide regulated parties fair warning about the law applied. Either the Department *is* or it *is not* basing its decision on tax authority. AR-A-00105; to be honest, we still do not know. The Department's decision, seemingly, takes both positions. *Compare* AR-A-0015 (rejecting GCU's nonprofit status "[b]ased on [IRS] tax authority cited above") *with* Opp. at 20 (stating that "its review was materially distinguishable from the IRS's determination").

Indeed, the reason the Department proffered in 2016 for making an independent determination of nonprofit status does not explain its analysis here. Then, the Department explained that newly established rules (*i.e.*, the gainful employment rules) exclusive to "proprietary institutions" created "greater incentives to convert" to evade proprietary rules.[4] AR-J-0333. But the gainful employment rules were rescinded before the

---

[4] The Department's legal authority and factual predicate have not been tested in court. Although the affected institution filed a lawsuit, the case settled with the Department recognizing the school's nonprofit status. *See CEHE v. Dept. of Educ.*, No. 2:16-cv-00911 (D. Utah); *see also West Virginia*, 142 S. Ct. at 2610 (discrediting the agency's position

1   Department's November 6, 2019 Decision, so the Department cannot rely on the gainful

2   employment regulations, thereby nullifying need for any unauthorized independent

3   determination. 84 Fed. Reg. 31,392, 31,394 (July 1, 2019). And for sake of argument, even if

4   the Department had authority to review GCU's motivation for becoming a nonprofit, it did

5   not, thereby making its review even more illicit. *See* AR-L-0058 – 0072 (explaining reasons

6   for becoming nonprofit).

7       It is not even clear *now* what the Department is actually independently determining.

8   Whereas the Department previously suggested it decides *nonprofit status* for Title IV

9   purposes, it clarifies on brief it is assessing only *nonprofit conversion*—not nonprofit status.

10  Opp. at 24 ("[T]hat some *existing* nonprofits have service agreements with [for-profits] . . .

11  has nothing to do with the standards . . . when evaluating a conversion following a change-

12  in-ownership application.").

13      This inconsistent position substantially undermines the Department's purported reason

14  for disregarding GCU's 501(c)(3) status in this case. If the Department truly "seeks to

15  ensure that a nonprofit institution's revenues . . . are primarily devoted to the mission of the

16  school and not to other parties," AR-A-0015, it would be arbitrary and capricious to review

17  only the handful of institutions converting to nonprofit status, while ignoring the hundreds

18  of nonprofit institutions employing similar revenue sharing agreements. Yet the

19  Department says that is exactly what it is doing. *See* Opp. at 24.

20      This persistent and intentional ambiguity neuters the Department's pot shots at GCU's

21  transaction counsel. Opp. at 22-24. The Department cites emails in which counsel took at

22  face value "the Department's position" that it made an independent determination of

23  nonprofit status in order to ask what that determination entailed, which the Department

24  _____

25  because "[t]he legality of that choice was controversial at the time and was never addressed
    by a court."); Richard J. Pierce, Jr., ADMINISTRATIVE LAW TREATISE, § 6.9 (4th ed. 2002)

26  ("[A]n agency cannot apply to future cases a 'rule' announced in a prior adjudicatory case
    if that 'rule' is predicated on facts that are contested in a subsequent case.")

simply ignored. *See, e.g.*, AR-J-0128 (asking "[w]hat role does [the MSA] play in the Department's analysis? Are there thresholds we should be aware of [?]"). Emails asking the Department to explain its standards are not evidence that GCU knew those standards.

### 3. The Department never identifies a legitimate basis to second-guess GCU's nonprofit status.

The Department asks this Court to sanction a nonprofit review process that is untethered by law, standards, or guidance. It is not enough that the Department says it has an independent review process without concretely disclosing what the process entails. There is simply no way to discern from the record what standards the Department applied, and thus, no way to discern whether the decision follows from them. "Such an amorphous [process] is, by definition, arbitrary and capricious." *Select Specialty Hosp. - Bloomington, Inc. v. Burwell*, 757 F.3d 308, 314 (D.C. Cir. 2014)

To the extent the Decisions identified discernable legal principles explaining its asserted independent nonprofit determination, they arose exclusively from IRS tax law. AR-A-0015 ("Based on the **tax authority** cited above . . .") (emphasis added). Indeed, the Department premised its analysis on the fact that the HEA's nonprofit definition "mirrors" the IRS's private inurement test. AR-A-0010. But now, in the face of obvious deficiencies, the Department retreats from 501(c)(3) nonprofit principles, and instead asserts that it has "distinguishable" Title IV standards. Opp. 15, 20-21.

That presents multiple problems. First, it contradicts the Department's written decision and representations to this Court. Second, the Department cannot identify how its substantive review deviates from that of the IRS based on any Title IV-specific factors. Finally, the Department cannot square its illusory standards with its actual statutes, regulations, and guidance, or its treatment of other nonprofit institutions. *Friedler v. GSA* 271 F. Supp. 3d 40, 61 (D.D.C. 2017) (finding an agency has "acted arbitrarily and

capriciously, no matter how well-reasoned and seemingly well-supported its ultimate conclusion might be" when it violates applicable requirements).

### 3.1. The Department has already conceded it does not have unique nonprofit standards.

In its Opposition, the Department claims that the uniform consensus of the IRS, Higher Learning Commission ("HLC"), and evaluation experts is insufficient under its own "materially distinguishable" nonprofit standards and review process. Opp. at 15, 20-21. But the Department never identifies those standards.

Recall however, the Department unambiguously represented to this Court that it does not have any independent Title IV nonprofit standards. When GCU sought to complete the record with documents evidencing the Department's new standards and processes, the Department told this Court there was "no mystery" that the only standard it applied was the HEA's definition of nonprofit, which it agrees simply restates the IRS's private inurement test. Jan. 13, 2022 Hr'g Tr. 21:24 – 22:5. The Department was adamant it applied no other written policies, standards, or guidance. *Id.* at 22:5 – 23:2. Accordingly, there is nothing in the record resembling a "distinguishable" nonprofit standard.

It strains credulity to believe the Department developed unique Title IV requirements yet has no communications or guidance documenting that process. Rather, it is apparent that the Department is simply providing "ad hoc," after-the-fact rationalizations to justify its Decision. *Kisor*, 139 S. Ct. at 2416, 2420-21 ("a court may defer to only an agency's authoritative and considered judgments"). And if the Department has authoritative standards that are "materially distinguishable" from IRS requirements, as it claims, it has never explained them.

### 3.2. Nothing unique about Title IV warrants a new application of IRS principles.

To be sure, there is nothing distinguishable between the Department's talismanic references to the "structure and planned operations of the institution" and the IRS's

analysis of whether GCU is "organized and operated" exclusively for its nonprofit purpose. 26 USC 501(c)(3); Opp. 20. Nothing in the record explains how GCU could be properly "organized" for nonprofit purposes under IRS requirements but somehow fail to be "structured" for nonprofit purposes under Title IV.

GCU's receipt of Title IV funds does not change the relevant analysis. The IRS prohibits improper uses of **all** revenue, no matter the source. 26 USC 501(c)(3). The Department never explains how private inurement involving Title IV funds is any different than private inurement involving all funds. And the Department acknowledges its nonprofit determination has no effect on GCU's receipt of Title IV funds. AR-J-0350.

Moreover, the Department never explains what, specifically, about the "structure and planned operations of the institution" warrants or precludes nonprofit recognition for Title IV purposes. In the Department's view, GCU was supposed to "divine the agency's interpretation[]" before undertaking its change in ownership. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-59 (2012); *see also Goffney v. Becerra*, 995 F.3d 737, 745-46 (9th Cir. 2021).

The Department's actions also dispel any Title IV-specific inquiry. GCU went to great lengths to demonstrate to the Department how nonprofit conversion advanced its educational mission. Converting to nonprofit status allowed GCU full voting membership in Division I of the NCAA, access to scholarly grants for faculty, staff, and students, and secured its financial strength so that it could continue to freeze on-ground tuition while devoting an estimated $500 Million for the expansion of campus facilities. AR-L-0104 - 0117. From a purely Title IV perspective, GCU also demonstrated that its Title IV reliance continued to decline with a 90/10 calculation of 70.05 percent. *Id.* at 0114.

The Department was clear that those "factors" were unimportant to its decision. AR-J-0092. The only thing that mattered to the Department was whether the MSA "provide[d] an excess benefit to GCE." *Id.* In other words, it applied nothing more than a straight private

inurement analysis for which it has no comparative expertise vis-à-vis the IRS. *West Virginia*, 142 S. Ct. at 2612-13 ("When an agency has no comparative expertise in making certain policy judgments, we have said Congress presumably would not task it with doing so.") (quotations omitted).

### 3.3. Far from undertaking a Title IV-specific analysis, the Department ignored its own statutes, regulations, guidance, and treatment of other institutions.

The Department insists that its review of GCU's application was dictated by the "context" of administering Title IV programs. Opp. at 21. However, the Department's analysis simply does not work, **specifically**, in the Title IV "context." The Department ignored and contradicted its own statutes, regulations, and written guidance. Nor can it justify its analysis given the widespread use of similar service agreements by "existing" nonprofit universities whose nonprofit status the Department concedes it does not scrutinize. Opp. at 24.

First, the Department concedes the HEA prohibits it from interfering in GCU's personnel and administrative decisions, yet it continues to insist that it can condition GCU's nonprofit status on its choice of president and administrative services provider. Opp. at 17; 20 USC 1232a. The Department's response, that it only conditioned GCU's nonprofit status on President Mueller's resignation (from GCE or GCU), is a distinction without a difference. *See* Opp. at 17. No matter how one frames it, the Department is exercising "direction, supervision, [and] control" over GCU's employment and administrative decisions in direct violation of the HEA. *See* 20 USC 1232a.

Second, the Department fails to address how its consideration of the MSA is consistent with Title IV regulations and current guidance that expressly allow revenue-share agreements. *See* 34 CFR 668.25(a); AR-K-0011 – 0012. Indeed, 668.25(a) says GCU can contract any aspect of its Title IV services, without limitation. And the Department's published guidance says GCU can share revenue with GCE as compensation for those

services. AR-K-0011 – 0012. Unlike vague, undefined phrases, these authorities are central to the "context" of Title IV administration, yet the Department addressed neither in its Decisions or Opposition.

Finally, the Department's justification for treating GCU differently than the hundreds of nonprofit institutions using revenue sharing agreements creates more questions than answers.[5] According to the Department, bundled services agreements at "existing" nonprofit institutions "have nothing to do with the standards that the Department applie[d] to [GCU]." Opp. at 24. But the Department has been clear that the only standard it applied is the HEA's nonprofit definition, which makes no distinction between existing and applying institutions.

Moreover, the Department's proposed distinction between existing nonprofits and converted institutions is nonsense. Every institution must reapply to participate in Title IV programs on a periodic basis. 34 CFR 668.13(b). And the Department's application to participate in Title IV programs is the very same, whether an institution is undergoing a change-in-ownership or simply reapplying as an existing institution. So the Department's statement that it does not consider existing nonprofits for compliance with its purported standard is a startling concession, undermining its claims here.

### 3.4. The Department dissembles about its analysis of the IRS's determination.

In its Opposition, the Department falsely claims that it "found that the IRS had not conducted a comprehensive review of the 2018 transaction." Opp. at 7. Not so. Rather, the Department merely said that "there is no evidence that the IRS conducted a comprehensive

---

[5] A few notes on the Purdue-Kaplan transaction: First, the Department misstates the payment structure under their services agreement. Purdue does not cap its payments at 12 percent revenue share. As the Department knows, Purdue pays Kaplan the "costs of services **plus** 12.5 percent of consolidated revenues." Ans. ¶ 205 (emphasis added). Second, the Department seeks to distinguish the relationship because, as a public university, Purdue's students Title IV loans are backed by Indiana. But the Department does not explain why that has any relevance to the issue at hand.

review of the MSA[.]" But how would there be? Asked another way, how would GCU obtain the IRS's working file given the deliberative process privilege? And the Department itself never asked the IRS about its review of GCU's 1023 application.

The Department cannot just assume the IRS abdicated its duty to faithfully apply the tax code. The IRS is entitled to a heavy presumption that it properly discharged its duties, absent clear evidence to the contrary. *Gov't of Guam v. Guerrero*, 11 F.4th 1052, 1055 (9th Cir. 2021) (citing *United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926)). That is especially true where the application for tax exemption involves a university that reports well over $1 Billion in revenue per year.

Moreover, the Department continues to assign significance to the fact that the IRS approved GCU's 501(c)(3) application based on the "facts, attestations, and representations" provided by GCU. Opp. 20. That argument has no merit because GCU's actual operations are consistent with what was disclosed to the IRS. In fact, President Mueller's resignation from GCU's Board of Trustees and the independent reviews of multiple appraisers, valuation experts, and tax professionals, all of whom concluded that the sale and MSA arrangement were at or below fair market value, bolster, rather than detract from, the IRS's determination. The Department is acting in bad faith by (1) falsely claiming that it found that the IRS had not conducted a comprehensive review of the 2018 transaction and (2) holding a lack of evidence against GCU when, in fact, there could be none.

**4. The Department cannot establish that GCU's net revenue inures to the benefit of any private shareholder or individual.**

The Department's analysis is arbitrary and capricious as a matter of law because it dodges the only statutory question it arguably has any authority to consider—whether GCU's net earnings inure to the benefit of any private shareholder or individual. *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 ("an agency's decreed result [must] be within the scope of its lawful authority"); *see also Nat. Res. Def. Council v. EPA*, 777 F.3d

456, 469 (D.C. Cir. 2014) (finding that an agency's action "untethered to Congress's approach" must be vacated).

The HEA's nonprofit definition is unambiguous. It restates the well-established private inurement test. *See Morisette v. United States*, 342 U.S. 246, 263 (1952) ("where Congress borrows terms of art . . . it presumably knows and adopts the cluster of ideas that were attached to each borrowed word[.]") That test asks whether there has been a transfer of charitable assets to the organization's insiders for which the organization does not receive adequate consideration. P.L.R. 201609006, 2015 PLR LEXIS 1192, *155 (I.R.S. April 9, 2015).

Here, "clearly and without question," there is no private inurement because GCU pays fair-market value to an independent third party, GCE, for services directly related to its nonprofit mission. *Broadway Theatre League v. United States*, 293 F. Supp. 346, 355 (W.D. Va. 1968). Indeed, the Department never meaningfully disputes that the revenue share represents fair-market value for the valuable and substantial services GCE provides, nor does it dispute that the MSA was negotiated at arm's-length between two wholly independent boards.[6] More fundamentally, the Department never claims that GCE is an insider of GCU. Whatever concerns the Department may have about GCU's relationship with GCE, they have nothing to do with private inurement. *See Wilderness Society v. U.S. Fish Wildlife*, 353 F.3d 1051, 1069 (9th Cir. 2003) ("the [Department's] opinion cannot be considered persuasive on interpretation of a statutory term that it does not discuss with specificity").

**4.1. GCU's revenues are solely devoted to its educational mission.**

It is beyond question that GCU can incur ordinary and necessary expenditures in the course of its operations without jeopardizing its nonprofit status. *Founding Church of*

---

[6] President Mueller resigned from GCU's (then Gazelle's) Board of Trustees before the vote to approve the transaction and the MSA. AR-J-0076.

1    *Scientology v. United States*, 412 F.2d 1197, 1200 (Ct. Cl. 1969). The Department cannot

2    show improper private inurement because GCU does not spend a **single dollar** of revenue

3    on any expense or service that is not directly related to its nonprofit mission.

4       Nor does the Department meaningfully dispute that GCU pays at or below fair market

5    value for those services. There can be no excess benefit to an insider, and therefore no

6    private inurement, unless the value of the benefit provided (the revenue share) exceeds the

7    consideration received (the MSA services). *Founding Church*, 412 F.2d at 1200; 26 CFR

8    53.4958-4. That is because reasonable payments for ordinary and necessary expenditures

9    are not "net earnings." *Founding Church*, 412 F.2d at 1200.

10      The independent experts who analyzed the MSA all agreed that the revenue share is fair

11    market value for the services GCU receives. The Department, on the other hand, made no

12    findings regarding the market value of those services and conceded that it did not retain an

13    expert to evaluate the transaction. (Jan. 13, 2022 Hr'g Tr. 15:24 – 25). There is, thus, no

14    basis in the record to conclude that GCU pays an excess benefit to GCE, so the Department

15    cannot reasonably conclude that GCU's net earnings inure to GCE's benefit.

16      To be sure, the Department's reliance on the Barclay's forecast provides no such basis.

17    Unlike Deloitte and BKD, Barclays did not opine on the fair market value of the MSA's

18    revenue share. Nor did Barclays analyze the fairness of the transaction to GCU. Rather, the

19    report was only a forecasted estimate prepared for GCE's shareholders to ensure them that

20    it would continue to be a viable business after the transaction.

21      Beyond that, the Department misconstrues the Barclays report. The Department

22    continues to insist that GCU's operating expenses increased to $1.496B following the

23    transaction. But that figure is a forecasted "consolidated" expense that combined both

24    GCE's and GCU's projected operating expenses. Nevertheless, the Department attributes

25    all $1.496B to GCU, which makes no sense and demonstrates just how little the Department

26    understands about GCU's transaction.

1

2        **4.2. GCE is not an insider of GCU.**

3        The MSA is consistent with any other independent contractor arrangement between a

4   nonprofit university and a third-party services provider. It was negotiated at arms-length by

5   separate and independent boards, it requires GCE to follow GCU's policies (subject to

6   GCU's oversight), and it prohibits GCE from exercising any control over GCU. GCE is an

7   unaffiliated third-party, not an insider. *See United Cancer Council v. Commissioner*, 165 F.3d

8   1173, 1176 (7th Cir. 1999).

9        In the private inurement context, an "insider" means someone with control over the

10  management and use of the organization's funds.  *Id.* An independent third-party with no

11  power to control the organization—like GCE—is not an insider under the private

12  inurement test. *Id.*; *Broadway Theatre League*, 293 F. Supp. at 354-55. The private inurement

13  test—and the HEA's nonprofit definition—asks whether those in control of a nonprofit's

14  revenues siphon them for personal gain. *United Cancer Council*, 165 F.3d at 1176.  It does not

15  "empower the [Department] to monitor the terms of arm's length contracts made by

16  charitable organizations with [third-party service providers]." *Id.*

17       The Department does not—and cannot—reasonably argue that GCE has any control

18  allowing it to direct GCU's revenue or its payment decisions. It receives the revenue to

19  which it is entitled through the MSA—no more, no less. If GCE's costs go up, or GCU's

20  revenues go down, GCE has no ability to change the terms of payment to make up the

21  difference, even though it remains bound to perform all services. *See Id.* at 1177 (noting that,

22  for an exclusive contract, the law reads into it an obligation to use one's best efforts to

23  promote the contract's objectives).

24       Moreover, GCU's Bylaws expressly prohibit anyone affiliated with, or having financial

25  ties to, GCE from serving on its Board of Trustees. And, as an added layer of protection

26  against improper influence, any issues or decisions related to the MSA are handled

1  exclusively by an MSA Committee, whose members similarly can hold no affiliation with,

2  or financial interest in, GCE. Nothing in the record suggests GCU operated inconsistently

3  with these substantial conflict-of-interest policies, which were approved by the IRS and

4  HLC. Again, the Department seeks to regulate through innuendo rather that legitimate fact

5  finding.

6       Put simply, GCE has no more power to direct how GCU spends its revenue than any

7  other bundled services provider has over the hundreds of other nonprofit and public

8  universities who avail themselves of such arrangements. The Department has never taken

9  the position that such contracts create insider relationships. And if the Department takes

10  that position now, hundreds of other nonprofit universities who have relied on such

11  arrangements to develop online programs are "in trouble." *See United Cancer Council*, 165

12  F.3d at 1176.

13  **5. The Department failed to rebut consensus expert evidence of GCU's nonprofit**
14      **status.**

15       The Decisions bear none of the hallmarks of reasoned decision making entitling them to

16  deference over the consensus opinions of the IRS, HLC, and multiple independent experts.

17  First, the Department receives no deference where it interprets a rule that parrots the

18  statutory text, because merely paraphrasing statutory language does not involve agency

19  experience or expertise. *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006). Second, the

20  Department cannot claim deference because the private inurement test is not part of the

21  Department's traditional duties and clearly falls within the scope of the IRS's authority.

22  *Kisor*, 139 S. Ct. at 2417; *see also* 20 USC 1232a. Third, a court may not defer to a new

23  interpretation creating unfair surprise to regulated parties, such as when the agency

24  retroactively prohibits longstanding conduct that the agency never before addressed. *Kisor*,

25  139 S. Ct. at 2418. Here, the Department deferred to the IRS for decades and permits other

26

1   nonprofits to use revenue share bundled services agreements without consideration of
2   nonprofit requirements. Opp. at 24.

3       With that in mind, the Department cannot reasonably challenge the findings of the IRS,
4   Deloitte, and BKD without offering positive evidence of its own regarding the fair market
5   value of the MSA services. The Department seeks to posture this case as a "battle of the
6   experts" (Opp. at 19), but that cannot be the case when the Department offers no expert
7   analysis.

8       As discussed above, the Department's reasons for discounting the IRS's determination
9   are without merit. And its reasons for disposing of Deloitte's transfer pricing studies and
10  BKD's independent confirmation of the methods and results of the transfer pricing studies
11  similarly fail to persuade. To be clear, the Department never said Deloitte and BKD were
12  wrong. It just identified specious reasons to ignore them.

13      For example, the Department dismissed the studies because they did not demonstrate
14  that the revenue share "constitutes anything other than a continuing revenue stream to its
15  former owner, GCE[.]" AR-A-0024. That is a patently unreasonable interpretation. The
16  Department completely ignored the entire point of the studies, which was to determine
17  whether the "continuing revenue stream" was supported by adequate consideration, *i.e.,*
18  the services GCE provided in return. The Department cannot conceivably contend that a
19  fair market value exchange of money for services is "nothing other than a continuing
20  revenue stream to its former owner" but that seems to be exactly what the Department is
21  doing.

22      The Department also deemed the studies irrelevant because it did not believe "transfer
23  pricing studies were the appropriate framework" for analyzing the fair market value of an
24  arm's length contract between two independent entities. Opp. at 19. But the Department
25  apparently fails to comprehend that, at the time of Deloitte's original analysis, GCU and
26  GCE were a single entity. So, while the University's independent board and GCE's

independent board negotiated the MSA at arm's length, the transfer pricing study was appropriate to ensure that the division was fair and equitable to all parties. Transfer pricing is specifically aimed at arriving at an arm's length result for a transaction involving a singular entity. 26 CFR 1.482-1(b). Because GCU was a single controlled entity prior to the transaction, a transfer pricing study was uniquely tailored for that purpose.

Moreover, the Department's position follows a disturbing and continuing theme in this case where the Department was informed of GCU's plans, refused to respond to requests for guidance about those plans, and then penalized GCU for carrying out those very plans. In this instance, GCU told the Department from the beginning that it intended to obtain transfer pricing studies to confirm the fair market value of the MSA, and the Department never once told GCU that transfer pricing was not sufficient to meet its unwritten and undisclosed "standards." AR-J-0002, AR-J-0128, AR-J-0352 – 0356. And the Department specifically required GCU to submit those studies as part of its review and required GCU to retain yet another independent expert to review and opine on those studies to further confirm the fairness of the transaction to GCU. AR-J-0092. And =GCU did just that.

The Department cannot now reasonably refuse to consider those studies and claim they are "not the appropriate framework" for demonstrating fairness. Opp. at 19; *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 241 (D.C. Cir. 2008) (finding that it was arbitrary and capricious to summarily dismiss empirical data that was submitted at the agency's invitation). The Department had every opportunity before the transaction to inform GCU that something more would be required. If not transfer pricing studies, then what? Comparing the agreements with those used by other nonprofit universities? BKD did that, and the Department similarly found that analysis to be inappropriate because BKD did not evaluate the other agreements based on factors the Department has never articulated. AR-A-0033 – 0034. If the Department wanted different data than what GCU had provided, "it

should [have] explain[ed] what type of data [it wanted]." *Ringsby Truck Lines, Inc. v. United States*, 263 F. Supp. 552, 558 (D. Col. 1967).

Similarly, the Department failed to meaningfully address the IRS's and HLC's review of GCU's corporate structure and conflicts of interest policies. Instead, the Department summarily dismissed their opinions merely because it was "not satisfied." Such conclusory findings in the face of multiple expert analyses are highly inappropriate, insufficient, arbitrary, and capricious. *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011) ("An agency's failure to respond meaningfully to objections raised by a party renders its decision arbitrary and capricious.") (internal quotations omitted).

**6.  The Department's pejorative attacks do not justify the restriction of GCU's First Amendment Rights.**

The arguments offered by the Department for restricting GCU from referencing its nonprofit status are irrational and confirm its stated compelling interest is mere pretext. Is the Court really to accept that a student considering GCU considers the MSA's terms and relies on the Department's assessment, but the same student considering University of Southern California could not care less about the terms of its similar agreement with bundled services provider, 2U, Inc.? *See* AR-M-0004. Given the Department's concession that service agreements at existing nonprofits have "nothing to do with" its nonprofit standards, Opp. at 24, that is the conclusion one would have to reach. Beyond that, the Department never establishes the existence of a compelling interest with evidence in the record. It only cites extra-record evidence, some of which even postdate its decision. The Department's actual practices reveal the purpose behind restricting GCU from referencing its nonprofit status: the Department knows the for-profit label is damaging and simply wants GCU to wear the label even if it does not fit.

1

**Conclusion**

2     For the reasons above and those in GCU's initial motion, the Court should grant

3  summary judgment in GCU's favor and find the Department's refusal to recognize GCU's

4  nonprofit status is arbitrary, capricious, and contrary to law.

5

6     Dated this August 1, 2022.

7

8

9                                    Respectfully submitted,

10

11                                   /s/Steven M. Gombos
                                     Steven M. Gombos
12                                   David A. Obuchowicz
                                     GOMBOS LEYTON, P.C.
13                                   11350 Random Hills Road, Suite 400
                                     Fairfax, VA 22030
14

15                                   Kevin E. O'Malley
                                     Hannah H. Porter
16                                   GALLAGHER & KENNEDY
                                     2575 E. Camelback Road, Suite 1100
17                                   Phoenix, Arizona 85016

18                                   *Counsel for Plaintiff*

19

20

21

22

23

24

25

26

1

**Certificate of Service**

2

3       I certify that on August 1, 2022, I electronically filed this document using the Court's
CM/ECF system.

4

5                                                        */s/ Steven M. Gombos*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26