**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GRAND CANYON UNIVERSITY, | No. 23-15124 |
| *Plaintiff-Appellant*, | D.C. No. 2:21-cv-00177-SRB |
| v. | |
| MIGUEL A. CARDONA, in his official capacity as Secretary of the United States Department of Education; U.S. DEPARTMENT OF EDUCATION, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted January 24, 2024
Pasadena, California

Filed November 8, 2024

Before: Daniel P. Collins, Danielle J. Forrest, and Jennifer
Sung, Circuit Judges.

Opinion by Judge Collins

# SUMMARY[*]

## Higher Education Act of 1965 / Administrative Procedure Act

The panel reversed the district court's summary judgment in favor of the Department of Education in an action brought by Grand Canyon University ("GCU") challenging the Department's denial of GCU's application to be recognized as a nonprofit institution under the Higher Education Act of 1965 ("HEA").

In considering GCU's application, the Department concluded that even though GCU had satisfied the regulatory requirement to obtain 26 U.S.C. § 501(c)(3) recognition from the Internal Revenue Service as a tax-exempt organization, the Department would need to independently review whether GCU qualified as a § 501(c)(3) organization. The Department held that GCU's organizing documents satisfied the relevant requirements of the organizational test, but GCU did not meet the operational test's requirement that both the primary activities of the organization and its stream of revenue benefit the nonprofit itself.

The panel held that the Department applied the wrong legal standards in evaluating GCU's application, and that the Department's legal error required that its decision be set aside. The Department invoked the wrong legal standards by relying on IRS regulations that impose requirements that go well beyond the HEA's requirements and instead

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

implement a portion of § 501(c)(3) that has no counterpart in the definition of the term "nonprofit" set forth in HEA § 103(13). The correct HEA standards required the Department to determine (1) whether GCU was owned and operated by a nonprofit corporation, and (2) whether GCU satisfied the no-inurement requirement. Because the Department failed to apply the correct legal standards, the panel reversed the judgment of the district court, and remanded with instructions to set aside the Department's denials and to remand to the Department for further proceedings.

## COUNSEL

Steven Gombos (argued), David A. Obuchowicz, and Jacob Shorter, Gombos Leyton PC, Fairfax, Virginia; Kevin E. O'Malley and Hannah H. Porter, Gallagher & Kennedy PA, Phoenix, Arizona; for Plaintiff-Appellant.

Casen B. Ross (argued) and Daniel Tenny, Attorneys, Appellate Staff, Civil Division; Gary M. Restaino, United States Attorney; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice, Washington, D.C.; Toby Merrill, Deputy General Counsel; Lisa Brown, General Counsel; United States Department of Education, Washington, D.C.; for Defendants-Appellees.

**OPINION**

COLLINS, Circuit Judge:

Grand Canyon University ("GCU"), a private university in Arizona, applied to the Department of Education (the "Department") to be recognized as a nonprofit institution under the Higher Education Act of 1965 ("HEA"). The Department denied GCU's application and adhered to that denial on GCU's request for reconsideration. GCU then filed this action, alleging that the Department's decisions were arbitrary and capricious under the Administrative Procedure Act ("APA") and should be set aside. The district court granted summary judgment to the Department, and GCU has appealed. We reverse and remand.

**I**

**A**

Through a variety of "loan and grant programs" administered by the Department under Title IV of the HEA, "Congress provides billions of dollars" each year "to help students pay tuition for their postsecondary education." *Association of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 433 (D.C. Cir. 2012). To be eligible to "participate in Title IV programs," a postsecondary school "must satisfy several statutory requirements." *Id*. at 433–34. In particular, the school must meet HEA § 102(a)'s statutory definition of an "institution of higher education'" for purposes of Title IV. *See* 20 U.S.C. § 1002(a).[1]  That definition includes both a

---

[1] The HEA has generally been classified to Chapter 28 of the unenacted Title 20 of the United States Code. Its current text is available at <https://www.govinfo.gov/content/pkg/COMPS-765/pdf/COMPS-765.pdf>.

qualifying for-profit "proprietary institution of higher education," *id*. § 1002(a)(1)(A), and a qualifying "public or other nonprofit institution," *id*. § 1001(a)(4). Each school must also "enter into a program participation agreement" with the Department. *Id*. § 1094(a). The requirements for such an agreement are generally comparable for nonprofit and for-profit institutions, but there are some differences. *See*, *e.g.*, *id*. § 1094(a)(24) (specifying that for-profit schools must "derive not less than ten percent of such institution's revenues from sources other than" funds provided under Title IV).

GCU has been a nonprofit school for most of its history. However, when GCU experienced significant financial trouble in the early 2000s, GCU sought to avoid bankruptcy by selling the school to private investors who would then operate GCU as a for-profit entity. Following the completion of that sale, the school "was owned and operated by Grand Canyon Education, Inc. ('GCE'), a Delaware publicly traded corporation." After GCU operated successfully as a for-profit institution for several years, GCU's Board of Trustees decided that, for a variety of reasons, the school would seek to return to a nonprofit status. These reasons included the perceived academic and athletic competitive disadvantages of a for-profit school, as well as the desire to ensure that GCU would be able to keep its tuition rates low.

Under the HEA and the Department's implementing regulations, GCU's reorganization as a nonprofit institution would require it to enter into a new program participation agreement and to establish that, after the transaction accomplishing the change, GCU met the HEA's requirements to qualify as a nonprofit institution. 20 U.S.C. § 1099c(i)(1); 34 C.F.R. §§ 600.20(b)(2)(iii), 600.31(a)(3),

668.14(g)(1).[2]  Section 103(13) of the HEA contains the following definition of a "nonprofit" institution:

> The term "nonprofit" as applied to a school, agency, organization, or institution means a school, agency, organization, or institution owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual.

20 U.S.C. § 1003(13).  The Department's regulations track this statutory definition, but also add the further requirements that the school must be "authorized to operate as a nonprofit organization" under applicable state law and must qualify as a tax-exempt organization under § 501(c)(3) of the Internal Revenue Code ("IRC").  *See* 34 C.F.R. § 600.2.

In an effort to comply with these requirements, GCU's Board of Trustees established an Arizona nonprofit entity known as "Gazelle University" ("Gazelle") and arranged for Gazelle to buy GCU back from GCE.  The Gazelle-GCE transaction, which closed on July 1, 2018, was accomplished through three main documents: (1) an Asset Purchase Agreement, (2) a Credit Agreement, and (3) a Master Services Agreement ("MSA").  Under the Asset Purchase Agreement, GCE agreed to sell GCU to Gazelle for approximately $853 million.  Under the Credit Agreement, GCE loaned Gazelle the purchase price, and the loan was

---

[2] All citations to the Department's regulations are to the version in effect in January 2021, when the Department denied GCU's application on reconsideration.

secured by a first-priority lien on essentially all of Gazelle's property and equitable interests. Under the MSA, Gazelle agreed to "outsource certain services to GCE," and "in exchange," GCE would receive, as service fees, "60% of the university's adjusted gross revenues." The MSA was to last for an initial term of 15 years, and unless terminated, the MSA would "automatically renew for successive five (5) year terms." Gazelle could terminate the agreement after seven years of the initial term by providing GCE with written notice 18 months in advance, and it could likewise prevent a renewal by providing notice at least 18 months before the end of the then-current term. If Gazelle invoked its right not to renew the MSA, it had to pay GCE, by the end of the then-current term, a non-renewal fee that was equal to 50% of the service fees payable to GCE over approximately the last 12 months of that current term.

**B**

After Gazelle was established as a nonprofit corporation but before the transaction with GCE was closed, Gazelle detailed the proposed transaction to the IRS in its application for tax-exempt status under § 501(c)(3). The IRS formally recognized Gazelle as a § 501(c)(3) tax-exempt organization on November 9, 2015. In the spring of 2018, state regulators in Arizona approved GCU's bid to operate as a nonprofit university, effective upon the close of the Gazelle-GCE transaction. The relevant accrediting authorities also approved Gazelle's proposed operation of GCU as a nonprofit university in March 2018.

Meanwhile, on January 18, 2018, GCU submitted a request to the Department for a "pre-acquisition review" of the proposed transaction and for a determination that the Department would agree to reclassify GCU as a nonprofit

institution for purposes of Title IV.  After the Department
failed to provide any pre-acquisition guidance, Gazelle and
GCE nonetheless proceeded to close the transaction on July
1, 2018.  After the transaction closed, and Gazelle acquired
the rights to GCU's trademarked name, Gazelle changed its
name to "Grand Canyon University."  While GCU's request
for reclassification remained pending, the Department
provisionally allowed GCU to continue to participate in Title
IV programs under the same conditions as before.

By letter dated November 6, 2019, the Department
denied GCU's application to be recognized as a nonprofit
under Title IV.  The Department conceded in its letter that
GCU met the regulatory requirements that it be an
authorized nonprofit organization under Arizona law and
that it have received recognition from the IRS as a tax-
exempt § 501(c)(3) organization.  *See* 34 C.F.R. § 600.2.
But the Department concluded that GCU failed to meet the
remaining requirement that it be "owned and operated by
one or more nonprofit corporations or associations, no part
of the net earnings of which benefits any private shareholder
or individual."  *Id*.; *see also* 20 U.S.C. § 1003(13).

In examining this issue, the Department concluded that
it "requires a review of relevant authority under the Internal
Revenue Code."    That was true, according to the
Department, because its regulatory "definition of a nonprofit
institution mirrors the statutory language for tax exempt
organizations found in 26 U.S.C. § 501(c)(3)."[3]    The
Department therefore concluded that, even though GCU had
satisfied the regulatory requirement to obtain § 501(c)(3)
recognition from "the U.S. Internal Revenue Service," 34

---

[3] As we discuss below, there are in fact significant differences in the
relevant statutory language. *See infra* Section III(A).

C.F.R. § 600.2, the Department would need to independently review whether GCU qualified as a § 501(c)(3) organization under the applicable IRS regulations.  Citing 26 C.F.R. § 1.501(c)(3)-1(a)(1), the Department stated that those regulations required GCU "to meet both an organizational test and an operational test."  The Department agreed that GCU's organizing documents satisfied the relevant requirements of the "organizational test," and it therefore turned to consider whether GCU satisfied the "operational test."

Under § 1.501(c)(3)-1(c)(1)'s operational test, "[a]n organization will be regarded as *operated exclusively* for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3)."     26 C.F.R. § 1.501(c)(3)-1(c)(1).  According to the Department's first denial letter, the "focus of the operational test is on the prohibition against private benefit and private inurement," with the "private benefit" inquiry focusing on "the primary activities of the organization" and the "private inurement" inquiry focusing on the "distribution of earnings."  The Department stated that, "[a]lthough there is significant overlap in the analysis of prohibited substantial private benefit under the primary activities test and private inurement under the distribution of earnings test, the prohibition on private benefit encompasses a greater range of activities" (footnote omitted).    "Unlike private inurement," the Department explained, "private benefit does not necessarily involve the flow of funds from an exempt organization to a related private party[;] it can also include other benefits from the activities of the exempt organization to an unrelated party" (emphasis omitted).

Turning to GCU's case, the Department concluded that the "primary purpose" of the GCE-Gazelle transaction "was to drive shareholder value for GCE." The Department based this conclusion on the purportedly disproportionate 60% share of GCU's revenues to which GCE was entitled under the transaction, which included revenue from operations to which GCE was not obligated to "provide[]" any "services" under the MSA. The Department also found that, when taking into account payments on the loan under the Credit Agreement, GCE would be "receiving approximately 95%" of the university's revenues. "[E]qually concerning" to the Department was its view that GCU was a "captive client" under the transaction, given the initial seven-year term of the MSA and the substantial financial payment that the university would have to make in order to terminate the agreement. The Department concluded that "GCU d[id] not meet the operational test's requirement that both the primary activities of the organization and its stream of revenue benefit the nonprofit itself." According to the Department, "[t]his violates the most basic tenet of nonprofit status—that the nonprofit be primarily operated for a tax-exempt purpose and not substantially for the benefit of any other person or entity."

The Department also stated, as "additional support" for its conclusion that GCU was not entitled to nonprofit status, that Gazelle was "not the entity *actually operating*" the university under the Department's regulations. *See* 34 C.F.R. § 600.2 (stating that a HEA nonprofit must be "operated by one or more nonprofit corporations or associations"); 20 U.S.C. § 1003(13) (same). The Department reasoned that the board "responsible for managing and overseeing the University" consisted predominantly of GCE employees. The Department also

found that Gazelle was not operating the university because, under the MSA, GCE was responsible for "marketing, enrollment services and budget consultations," "curriculum services, accounting services," "procurement services, audit services, human resources," "faculty operations," and other areas.

As further "additional support" for its conclusion, the Department expressed concern that Brian Mueller, the CEO of GCE, also served as the President of GCU.  While it acknowledged that the MSA "limit[s] Mr. Mueller's direct involvement in the day[-]to[-]day oversight of [GCU's] relationship with GCE," the Department was "not satisfied that these structures are sufficient to ensure that Mr. Mueller's undivided loyalty is to the Institution."

GCU requested reconsideration of the denial of its application and proposed an Amended and Restated Master Services Agreement ("ARMSA") in an attempt to assuage some of the Department's specific concerns about the transaction.  Thus, for example, the ARMSA eliminated GCE's control over curriculum services and faculty operations.  It also eliminated GCE's entitlement to share in GCU's revenue from operations to which GCE did not provide any services.  Instead GCE would be paid 66.8% of the tuition paid on behalf of students and fees received from students.

By letter dated January 12, 2021, the Department reaffirmed its denial of nonprofit status to GCU.  The Department reasoned that, "[a]lthough the revenue sharing percentages ha[d] changed somewhat under the ARMSA," the transaction still retained "the basic structure whereby a substantial portion of GCU's revenues benefits GCE." "Based on the tax authority cited" in its earlier decision, the

Department concluded that GCU still had not met "the requirement that both the primary activities of the organization and its stream of revenue benefit the nonprofit itself."

The Department acknowledged GCU's argument that, in light of the elimination of GCE's control over curriculum and faculty, the Department should revisit its earlier conclusion that Gazelle was not actually "operating" GCU. But the Department expressly declined to decide that issue: "Given the Department's conclusion in this reconsideration determination that the continued revenue stream under the ARMSA (if executed) would prevent the Department from approving GCU's requested conversion to nonprofit status, there is no need for the Department to re-examine this issue." The Department also stated that it continued to believe that Mueller's "dual roles" as GCE's CEO and GCU's President were a "concerning factor."

## C

GCU then filed suit against the Department and its Secretary, Miguel Cardona, under the APA, which provides that a "reviewing court" shall "hold unlawful and set aside agency action[] . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The district court granted summary judgment to the Defendants (whom we will refer to collectively as "the Department"), holding that the Department's decisions were not arbitrary and capricious or

contrary to law.[4]    GCU timely appealed, and we have
jurisdiction under 28 U.S.C. § 1291.

## II

We review the district court's grant of summary
judgment to the Department de novo. *Donell v. Kowell*, 533
F.3d 762, 769 (9th Cir. 2008). "De novo review of a district
court judgment concerning a decision of an administrative
agency means th[is] court views the case from the same
position as the district court." *Corrigan v. Haaland*, 12 F.4th
901, 906 (9th Cir. 2021) (citation omitted).

We review de novo whether the Department correctly
construed the HEA. *Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244, 2261, 2273 (2024).    If the Department
construed the law correctly, we then review its application
of the law to the facts of the case under the APA's deferential
standards.    Under the "arbitrary and capricious" standard,
"[o]ur only task is to determine whether the [Department]
has considered the relevant factors and articulated a rational
connection between the facts found and the choice made."
*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,
Inc.*, 462 U.S. 87, 105 (1983).    We review the factual
findings underlying the agency's decision for substantial
evidence. *See Center for Cmty. Action & Env't Just. v. FAA*,
18 F.4th 592, 598 (9th Cir. 2021).    That means that we must
uphold such findings if "a reasonable mind might accept
[this] particular evidentiary record as adequate to support
[the agency's] conclusion." *Dickinson v. Zurko*, 527 U.S.
150, 162 (1999) (simplified).

---

[4] The district court also rejected GCU's separate claim that the
Department violated the First Amendment when it prohibited GCU
"from holding itself out to the public as a nonprofit."    GCU does not
challenge that conclusion on appeal.

## III

We conclude that the Department applied the wrong legal standards in evaluating GCU's application.

### A

As noted earlier, § 103 of the HEA defines "[t]he term 'nonprofit[,]' as applied to a school, agency, organization, or institution," to "mean[] a school, agency, organization, or institution owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual." 20 U.S.C. § 1003(13). We also noted above that the Department's corresponding regulatory definition of "[n]onprofit institution" incorporates, in slightly paraphrased form, that statutory definition, and it adds two further requirements: (1) the institution must be "authorized to operate as a nonprofit organization" in the relevant States; and (2) the institution must be "determined by the U.S. Internal Revenue Service" to be a § 501(c)(3) organization. 34 C.F.R. § 600.2. The Department specifically determined that those two additional requirements were met here,[5] and so the only remaining issue is whether the HEA's statutory definition of a "nonprofit" institution was satisfied.

In addressing that "remaining" issue of whether the HEA's statutory definition was met, the Department started from the assumption that this definition "mirrors the statutory language for tax exempt organizations found in 26

---

[5] Accordingly, we have no occasion to address whether the Department's addition of these two further requirements is inconsistent with the HEA. We express no view on that question.

U.S.C. § 501(c)(3)." That assumption was incorrect, as a comparison of the relevant statutory texts confirms.

As relevant here, the IRC describes the "educational" institutions that are eligible for § 501(c)(3) status as follows:

> Corporations . . . [1] organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or *educational* purposes, . . . [2] no part of the net earnings of which inures to the benefit of any private shareholder or individual, [3] no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and [4] which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

26 U.S.C. § 501(c)(3) (bracketed numbers added) (emphasis added). Once again, the HEA defines a "nonprofit" educational institution to mean the following:

> a school, agency, organization, or institution [1] owned and operated by one or more nonprofit corporations or associations, [2] no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual.

20 U.S.C. § 1003(13) (bracketed numbers added).

The clauses we have marked as "[2]" in both statutes are very similar and impose, under both statutes, a requirement that "no part of the net earnings" of the organization may "inure[] to the benefit of any private shareholder or individual." The third and fourth clauses of the § 501(c)(3) definition, however, have no counterpart in HEA § 103(13)'s definition. As to the first clauses, the wording is very different. Section 501(c)(3) requires that the institution be "organized and operated exclusively" for "educational" and other specified "purposes," 26 U.S.C. § 501(c)(3), whereas HEA § 103(13) requires only that the institution be "owned and operated by one or more nonprofit corporations or associations," 20 U.S.C. § 1003(13). We note, however, that satisfying this latter definition of "nonprofit" does not suffice to render the institution eligible to participate in Title IV, because § 101(a) of the HEA imposes several additional requirements to ensure that the institution in fact operates as an "institution of higher education." *Id*. § 1001(a).[6]

---

[6] Specifically, for a nonprofit institution to participate in Title IV, it must show that it:

> (1) admits as regular students only persons having a certificate of graduation from a school providing secondary education, or the recognized equivalent of such a certificate, or persons who meet the requirements of section 1091(d) of this title;

> (2) is legally authorized within such State to provide a program of education beyond secondary education;

> (3) provides an educational program for which the institution awards a bachelor's degree or provides not less than a 2-year program that is acceptable for full credit toward such a degree, or awards a degree that is

The HEA thus does not replicate § 501(c)(3)'s requirement that the institution be "organized and operated exclusively" for "educational purposes"; instead, it ensures the nonprofit educational status of the institution by stating that the institution must meet the educational operation requirements in § 101(a) and that it must be "owned and operated by one or more nonprofit corporations or associations," 20 U.S.C. § 1003(13). Particularly in light of the near-verbatim copying of clause [2] of IRC § 501(c)(3) into clause [2] of HEA § 103(13), the obvious differences in the remainder of the respective definitions must be deemed to be deliberate and to signify that, in those remaining respects, the statutes do not apply identical standards. *See United States v. Olmos-Esparza*, 484 F.3d 1111, 1114 (9th Cir. 2007) ("[W]hen some statutory provisions expressly mention a requirement, the omission of that requirement from other statutory provisions implies that the drafter

> acceptable for admission to a graduate or professional degree program, subject to review and approval by the Secretary;
>
> (4) is a public or other nonprofit institution; and
>
> (5) is accredited by a nationally recognized accrediting agency or association, or if not so accredited, is an institution that has been granted preaccreditation status by such an agency or association that has been recognized by the Secretary for the granting of preaccreditation status, and the Secretary has determined that there is satisfactory assurance that the institution will meet the accreditation standards of such an agency or association within a reasonable time.

20 U.S.C. § 1001(a).   There is no dispute that GCU satisfies requirements (1), (2), (3), and (5) of this definition.  The only question is whether it meets requirement (4), which turns on the definition of "nonprofit" in HEA § 103(13).

intended the inclusion of the requirement in some instances but not others."); *see also Prewett v. Weems*, 749 F.3d 454, 461 (6th Cir. 2014) ("Omitting a phrase from one statute that Congress has used in another statute with a similar purpose 'virtually commands the . . . inference' that the two have different meanings." (quoting *United States v. Ressam*, 553 U.S. 272, 277 (2008))).

The resulting differences in the statutory requirements are significant here, because the portions of the IRS regulations on which the Department relied in determining that GCU was not a "nonprofit" construe the language of § 501(c)(3) that is *missing* from HEA § 103(13). The Department applied the "organizational test" and the "operational test" of 26 C.F.R. § 1.501(c)(3)-1, and that regulation makes clear that those two tests implement what the regulation describes as § 501(c)(3)'s requirement that the "organization must be both organized and operated *exclusively* for one or more of the purposes specified in such section." 26 C.F.R. § 1.501(c)(3)-1(a)(1) (emphasis added). Those tests thus implement the requirement of what we identified as clause [1] of § 501(c)(3)—which is language that is *omitted* from HEA § 103(13).

The IRS regulation discussing the organizational and operational tests mentions, as an aspect of the operational test, that an organization does not qualify for § 501(c)(3) status "if its net earnings inure in whole or in part to the benefit of private shareholders or individuals." 26 C.F.R. § 1.501(c)(3)-1(c)(2). That corresponds to the statutory requirement in what we have identified as clause [2] of § 501(c)(3) and that *is* replicated in HEA § 103(13). *See* 26 U.S.C. § 501(c)(3); *see also* 20 U.S.C. § 1003(13). In that sense, the IRS regulations fold the no-inurement requirement of clause [2] of § 501(c)(3) into the requirement

of clause [1] of § 501(c)(3) that the organization must be
"organized and operated exclusively" for "educational
purposes." 26 U.S.C. § 501(c)(3). But as the Department
itself recognized in its ruling in this matter, the converse is
not true—*i.e.*, the no-inurement test does *not* subsume the
organized-and-operated-exclusively test. The Department's
letter quoted the following statement from the Tax Court:

> [W]hile the private inurement prohibition
> may arguably be subsumed within the private
> benefit analysis of the operational test, the
> reverse is not true. Accordingly, when the
> Court concludes that no prohibited inurement
> of earnings exists, it cannot stop there but
> must inquire further and determine whether a
> prohibited private benefit is conferred.

*American Campaign Acad. v. Comm'r*, 92 T.C. 1053, 1068–
69 (1989); *see also id*. at 1068 ("The absence of private
inurement of earnings to the benefit of a private shareholder
or individual does not, however, establish that an
organization is operated exclusively for exempt purposes.").

The Department thus invoked the wrong legal standards
by relying on IRS regulations that impose requirements that
go well beyond the HEA's requirements and that instead
implement a portion of § 501(c)(3) that has no counterpart
in HEA § 103(13).

**B**

The Department's legal error requires that its decisions
be set aside. As we have explained, the correct HEA
standards required the Department to determine (1) whether
GCU was "owned and operated" by a nonprofit corporation;

and (2) whether GCU satisfied the no-inurement requirement.  The Department failed to apply these standards in denying GCU's requests.

In its first decision denying GCU's request, the Department conceded that GCU was "owned" by a "nonprofit corporation," as required by HEA § 103(13). However, in then turning to the question of "whether GCU is operated by a nonprofit," the Department applied the IRS's operational test, which implements § 501(c)(3)'s requirement that the entity be "operated *exclusively*" for "educational purposes" or other listed purposes.  26 U.S.C. § 501(c)(3) (emphasis added).  But, as we have explained, the HEA does not require that the institution be "operated exclusively" for "educational purposes."  It ensures the educational nature of the institution through a series of distinct operational requirements (none of which are at issue here), *see* 20 U.S.C. § 1001(a), and beyond that it only requires that the institution be "operated by one or more nonprofit corporations or associations," *id*. § 1003(13).

Although the Department's first letter concluded that Gazelle (the relevant nonprofit corporation) "is not the entity *actually operating*" GCU, it is not clear to what extent that determination was completely independent of the Department's erroneous application of the IRS's "operational test."  *See National Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (stating that, where an agency's multiple rationales are not clearly alternative and independent and "at least one of the rationales is deficient, [the court] will ordinarily vacate the order unless" the court is "certain that [the agency] would have adopted it even absent the flawed rationale"). Moreover, in its subsequent letter denying reconsideration, the Department clearly abandoned any reliance on this

earlier determination, because it expressly declined to consider whether, in light of the changes made by the ARMSA, GCU now *did* meet the requirement that it be operated by a nonprofit, *i.e.*, Gazelle.[7]

The Department also failed to apply HEA § 103(13)'s private inurement requirement.  Instead, the Department applied the IRS's "operational test," under which it examined, not whether "net earnings" inured to private benefit, but whether "the primary activities of the organization and its stream of revenue" primarily benefit private parties.

Because the Department failed to apply the correct legal standards, its decisions must be set aside.[8]

## IV

For the reasons stated above, the judgment of the district court is reversed, and the matter is remanded to the district court with instructions to set aside the Department's denials and to remand to the Department for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

---

[7] The Department's decisions also fail to make clear what significance Mueller's "dual roles" as the CEO of GCE and the President of GCU would have under the proper legal standards.

[8] In light of our conclusion that this matter must be remanded to the Department for reconsideration, any questions as to the adequacy of the administrative record are moot.  GCU's arguments that supplementation of the record remains warranted even under this court's decision in *Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 444–45 (9th Cir. 2024), may be re-raised in the event of any future judicial review proceedings.